UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 SEP 12 P 2:25

DISTRICT COURT

MM GLOBAL SERVICES, INC.,
MM GLOBAL SERVICES PTE., LTD,
MEGA VISTA SOLUTIONS (S)
PTE., LTD., and MEGA VISA
MARKETING SOLUTIONS LTD.,
  Plaintiffs,

VS.                                           Civil No. 3:02cv 1107 (AVC)

THE DOW CHEMICAL COMPANY,
UNION CARBIDE CORPORATION,
UNION CARBIDE ASIA PACIFIC,
INC., UNION CARBIDE CUSTOMER
SERVICES PTE., LTD, and DOW
CHEMICAL PACIFIC (SINGAPORE)
PTE., LTD.,
  Defendants.

### RULING ON THE DEFENDANTS' MOTIONS TO DISMISS

This is an action for damages arising out of a business arrangement pursuant to which the plaintiffs purchased chemicals, polymers, and other products from the defendants and resold them to customers located in India. The amended complaint alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 1, the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 28(a), the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, and common law tenets concerning breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation and non-disclosure, negligent misrepresentation, tortious interference with business expectancies, tortious interference with contractual relationships, and unfair competition.

The defendants, Dow Chemical Company and Union Carbide Corporation, now move pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss the federal antitrust claim for want of

subject matter jurisdiction. The defendants also move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint in its entirety for failure to state a claim upon which relief can be granted.

The issues presented are: 1) whether the court has subject matter jurisdiction to adjudicate the claimed violation of the Sherman Antitrust Act, 15 U.S.C. § 1; 2) the choice of law to be applied to the claim of breach of contract and the claim of breach of the implied covenant of good faith and fair dealing; 3) whether the amended complaint states a cause of action for breach of contract; 4) the choice of law to be applied to the claim of tortious interference with business expectancies, tortious interference with contractual relationships, unfair competition, fraudulent misrepresentation, negligent misrepresentation, violations of the Connecticut Unfair Trade Practices Act, and violations of the Connecticut Antitrust Act; and 5) whether the amended complaint states a cause of action for fraudulent misrepresentation and negligent misrepresentation.

For the reasons hereinafter set forth, the court concludes: 1) the court has subject matter jurisdiction to adjudicate the claimed violation of the Sherman Antitrust Act, 15 U.S.C. § 1; 2) the law of Singapore governs the breach of contract claims and, because Singapore does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing, that claim is dismissed; 3) the amended complaint alleges with adequate particularity a cause of action for breach of contract;

4) the law of India governs the tort claims and, because that country does not recognize a cause of action for tortious interference with business expectancies, tortious interference with contractual relationships or unfair competition, those claims are also dismissed. Further, because the claimed violations of the Connecticut Unfair Trade Practices Act and the Connecticut Antitrust Act are also governed by the law of India, and India does not have a similar basis for relief, those claims are dismissed as well. Finally, the court concludes that: 5) the amended complaint fails to state a claim for fraudulent misrepresentation, but sets forth with adequate particularity a claim for negligent misrepresentation. The motion to dismiss the antitrust claim for want of subject matter jurisdiction is therefore DEMIED. The motion to dismiss the amended complaint for failure to state a claim is GRANTED in part and DENIED in part.

## FACTS

Examination of the amended complaint and supplemental documents, including affidavits and exhibits submitted in connection with the instant motion, set forth the following material facts. The defendant, Union Carbide Corporation ("Union Carbide") is engaged in the manufacture and sale of chemicals, polymers, and other specialty products to customers located in the United States and throughout the world. It is incorporated in New York with its corporate headquarters and principal place of business located in Danbury, Connecticut.

3

In December 1984, lethal gas escaped from Union Carbide's plant in Bhopal, India. The leak caused the death of 3,800 persons and injuries to an additional 200,000. In February 1989, Union Carbide and its Indian affiliate were ordered to pay a total of $470 million for all civil claims arising from the tragedy.

In the aftermath of this tragedy, Union Carbide ceased selling products directly to customers in India and, in 1987, Union Carbide, through its subsidiary, Union Carbide Eastern, Inc. ("UCE"), appointed the plaintiff, Mega Vista Marketing Solutions Ltd. ("MVMS") as a non-exclusive distributor to maintain Union Carbide's access to the Indian marketplace. MVMS[1] is an Indian corporation, having its principal place of business in Mumbai, India.

The relationship between Union Carbide and MVMS was memorialized in a letter agreement dated November 16, 1987 ("the 1987 letter agreement"). As stated therein, Union Carbide appointed MVMS as a "non-exclusive distributor/indentor in India" for Union Carbide products. MVMS agreed to "canvas and promote" the products, and to establish contact with potential customers in India on behalf of Union Carbide. UCE did not grant MVMS authority to accept any order from any prospective customer or to undertake any act that would bind Union Carbide under a contract of sale or otherwise. Further, under the 1987 letter agreement, Union Carbide agreed to pay MVMS a commission on all sales

---

[1] MVMS was then known as Visa Petrochemcials Pvt. Ltd.

arranged by MVMS in India. Union Carbide had the right to terminate the 1987 letter agreement in its sole discretion on ninety days written notice.

In 1993, Union Carbide requested that MVMS form separate corporate affiliates and open offices outside India that would buy Union Carbide products in the United States and resell them to end-users in India. MVMS complied with the request, and formed the plaintiff, Mega Global Services, Inc. ("MMGS") a Texas corporation with a principal place of business in Houston. MVMS also formed the plaintiff, Mega Global Services, Inc. - Singapore ("MMGS-S"), a business entity organized under the laws of Singapore with a principal places of business in that country. In addition, Union Carbide formed the defendant, Union Carbide Asia Pacific, Inc. ("UCAP") and the defendant, Union Carbide Customer Services Pte Ltd ("UCCS") to assist product sales in India. UCAP is a corporation organized under the laws of Delaware with a principal place of business in Singapore. UCCS is a corporation organized under the laws of Singapore with a principal place of business in that country.

Thereafter, on April 5, 1993, Union Carbide, acting through UCAP, terminated the 1987 letter agreement with MVMS and, on the same day, UCAP confirmed its agreement to sell products to MMGS by way of another letter agreement ("the 1993 letter agreement"). Under the 1993 letter agreement, MMGS succeeded MVMS as the non-exclusive distributor of Union Carbide products in India. As with MVMS, MMGS purchased products from UCAP, with title and risk

of loss passing to MMGS in the United States, and MMGS then resold the products from the United States to end-users in India. Terms relating to volume, specifications, price, payment and delivery were set forth in transactional documents relating to specific orders, including purchase orders, invoices, order acknowledgments and shipping receipts.

During the period of 1993 through 2000, MMGS-S intermittently purchased products from Union Carbide in the United States under the same terms and conditions as established between UCAP and MMGS. The orders were processed in the United States and MMGS-S made payments for and took title to the products in the United States through banking channels set up with Union Carbide.[2]

On September 8, 1995, UCAP and MMGS reaffirmed their relationship by way of a new letter agreement ("the 1995 letter agreement") with UCAP sending the letter from Singapore to MMGS's offices in Texas. The letter stated:

> This is to confirm Union Carbide's interest in selling to MM Global Services Inc. (MMGS) from time to time effective as of 8th September, 1995, certain of Union Carbide's products for resale by MMGS to customers located in India.
>
> Each such sale, of course, would be contingent upon the continuing interest of MMGS and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following:

---

[2] The defendants maintain that, to the contrary, MMGS-S paid for the products in Singapore.

- Unless otherwise specified by the parties, all shipments under this contract shall be made on MMGS's behalf and in MMGS's name as shipper. MMGS shall have title to product and shall bear all risks associated with product from the time when product has effectively passed the ship's rail at the point of shipment.

- Unless otherwise requested by MMGS, Union Carbide will arrange ocean transportation with its usual carriers. The issue as to which party bears the cost of such transportation shall be negotiated on a case by case basis.

- MMGS purchase price will customarily include a mutually acceptable reseller's discount that will be established based on the product, volumes, etc.

- MMGS will consign and sell all the products, as supplied by Union Carbide Corporation, only to the customers in India and not to customers in any other country in the world. If MMGS sells any of these products in any countries outside India, the Distributorship arrangement with MMGS will forthright be terminated without any notice.

We recognize that there may be instances when it is more economical or otherwise efficient for MMGS to purchase products from the stock of the appropriate Union Carbide affiliate in the Asia/Pacific region such as Union Carbide Asia Limited in Hong Kong. In such cases, Union Carbide will recommend to its affiliate that it follow the same protocol set forth in this letter.

There also may be instances where Union Carbide will elect not to sell MMGS a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vase majority of such instances.

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

In 1998, at Union Carbide's direction, MMGS assigned all of its rights and duties under the 1995 letter agreement to MMGS-S.

7

MMGS-S thereafter assumed all purchasing of the products for en-users in India. The purchases continued to be made by Union Carbide in the United States, and MMGS-S made payments in Singapore. Delivery of the products occurred in the Gulf states area of the United States with resale to end-users in India. MMGS-S made contract payments in the United States through banking channels and a standby letter of credit.

In 2000, the plaintiff, Mega Vista Solutions (S) Pte Ltd ("MVS") succeeded MMGS-S with respect to all of MMGS-S's business activities. MVS is a business entity organized under the laws of Singapore with a principal places of business in that country. MVS and UCAP memorialized their relationship in a letter agreement, dated June 27, 2000, restating the parties' relationship ("the 2000 letter agreement"), with UCAP in Singapore sending the letter to MVS's offices in Singapore. The terms of the 2000 agreement, for all relevant purposes, were the same as reflected in the 1993 and 1995 agreements, including the following paragraphs:

> This is to confirm Union Carbide's interest in selling to M/s Megavisa Solutions (S) Pte Ltd. (Megavisa) from time to time effective as of 1st July 2000, certain of Union Carbide's products for resale by Megavisa to customers located in India.
>
> Each such sale, of course, would be contingent upon the continuing interest of Megavisa and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. . .
>
> . . . .
>
> We sincerely look forward to developing a mutually

8

beneficial relationship in the days ahead.

The 2000 letter agreement had a one year duration and authorized UCAP to terminate it on 90 days notice. During the period covered by the 1995 and 2000 letter agreements, the resale of Union Carbide products accounted for at least 85% of the plaintiffs' business.

In or around August 1999, Union Carbide announced a plan of merger with the co-defendant herein, Dow Chemical Company ("Dow"). Dow is a corporation organized under the laws of Delaware, with a principal place of business in Midland, Michigan. The amended complaint alleges that with the plan of merger, the need dropped for the re-sale services in India previously performed by MVMS, MVS, MMGS and MMGS-S. Consequently, the amended complaint alleges that Union Carbide and its affiliates ceased acting consistently with their alleged contractual and legal obligations and, in particular, undertook efforts to establish Dow, untainted by the Bhopal tragedy, in place of the plaintiffs as a direct seller of products to end-users in India.

On February 6, 2001, Union Carbide merged with a subsidiary of Dow and became a wholly owned subsidiary of Dow. At around this time, Dow also created the defendant, Dow Chemical Pacific (Singapore) Private Ltd. ("Dow Singapore"). Dow Singapore is a wholly owned subsidiary of Dow and is incorporated in Singapore with a principal place of business in that country. Dow created Dow Singapore to effectuate sales of Union Carbide products to

9

the plaintiffs and to further Union Carbide and Dow's relationship with the plaintiffs. Dow Singapore succeeded to UCAP's relationship with MVS. On January 16, 2002, Dow Singapore advised MVS that, effective March 31, 2002, MVS would no longer be a distributor for Union Carbide products other than wire and cable compounds. MVS refused to continue the relationship with Dow Singapore on those terms.

On June 25, 2003, the plaintiffs MVMS (India), MVS (Singapore), MMGS (Texas) and MMGS-S (Singapore) commenced this lawsuit against the defendants, Union Carbide Corporation (Connecticut), Dow Chemical Company (Michigan), Union Carbide Asia Pacific, Inc. ("UCAP") (Singapore), Union Carbide Customer Service Pte Ltd ("UCCS") (Singapore), and Dow Chemical Pacific Private Ltd. (Singapore). The amended complaint alleges that, from 1993 through March 2002, Union Carbide and Dow, directly and through the above named affiliates, compelled the plaintiffs to agree to engage in a price maintenance conspiracy with respect to the resale of Union Carbide products in India, and refused to accept orders or cancelled accepted orders if the prospective resale prices to end-users in India were below certain levels. According to the amended complaint, Dow and Union Carbide sought to "ensure that prices charged by [the] [p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users. . . in the United States as well as in other jurisdictions. . ," and that,

> [a]s a direct and proximate result of [the]
> [d]efendants fixing of minimum resale prices
> and other terms of sale, competition in the
> sale and resale of [Union Carbide] products
> in and from the United States was improperly
> diminished and restrained. . .

Further, the amended complaint alleges that, starting in mid-1999 and continuing until 2002, Union Carbide, acting through the defendants, UCAP and UCCS, refused to authorize orders placed by the plaintiffs for Union Carbide products and arbitrarily declined to fill orders that had been placed and accepted, knowing that such actions would "severely damage[] [the] plaintiffs' relationships with long term strategic customers." The amended complaint further alleges that after the merger, Dow, acting through the other defendant-affiliates herein, purposefully implemented a series of unjustified contract modifications, such as reducing the credit limit available to the plaintiffs and changing their billing practices, all to make it impossible for the plaintiffs to make timely payments on invoices. When, as a consequence, the plaintiffs were late in making payments, the amended complaint alleges that the defendants imposed a credit hold on shipments to the plaintiffs, and deliberately refused to release pending orders.

Further, the amended complaint alleges that: (1) Dow, acting through Dow India, contacted the plaintiffs' customers and told them that the plaintiffs were experiencing financial difficulties and, in this way, undermined the plaintiffs' relationships with their customers at a time when the plaintiff were unable to obtain shipments due to the changes in billing and credit terms,

11

causing the plaintiffs' customers to establish relationships with other vendors; and (2) the defendants, in order to induce the plaintiffs to disclose confidential customer information, characterized the parties' future relationship as long term, and then used the confidential information to establish direct sales to the plaintiffs' customers.

## STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) must be granted if a plaintiff has failed to establish subject matter jurisdiction. Golden Hill Paugussett Tribe of Indians v. Weicker, 839 F. Supp. 130, 136 (D. Conn. 1993). In analyzing a motion to dismiss under Rule 12(b)(1), the court must accept all well pleaded factual allegations as true and must draw reasonable inferences in favor of the plaintiff. Capital Leasing Co. v. F.D.I.C., 999 F.2d 188, 191 (7th Cir. 1993). Where a defendant challenges the district court's subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits. Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991).

The defendants have also moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When ruling on a 12(b)(6) motion, the court must presume that all well-pleaded facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). The court may

consider only those facts "stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). A court may dismiss a complaint at this stage only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim." Scheurer v. Rhodes, 416 U.S. 232, 236 (1974).

## DISCUSSION

### I

### Federal Antitrust Claim

The defendants first move to dismiss count one of the amended complaint which alleges that the defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The defendants assert that, because the amended complaint alleges price fixing occurring in India that is not alleged to have a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States, the court is deprived of subject matter jurisdiction over the claim by the Foreign Trade and Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a. In response, the plaintiffs assert that, because price fixing is per se illegal under the Sherman Act, there is a presumption of anticompetitive effect constituting a direct, substantial and reasonably foreseeable effect on United States commerce and, hence the court has jurisdiction to hear the claim.

Section 1 of the Sherman Act provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. An agreement between a manufacturer and a distributor to fix prices is per se illegal under the Sherman Act. Monsanto Company v. Spray-Rite Service Corp., 465 U.S. 752, 759, 104 S.Ct. 1464 (1984); see also Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376 (1911) (vertical price fixing is per se illegal). "Per se violations do not require a showing of deleterious impact on competition. . . [and] create a presumption of anticompetitive effect." Gianna Enterprises v. Miss World Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982); see also United States v. National Assoc. of Real Estate Bds., 339 U.S. 485, 489, 70 S.Ct. 711 (1950). This is so because of their "pernicious effect on competition and lack of any redeeming virtue." Northern Pacific Railroad Co. v. United States, 365 U.S. 1, 5, 78 S.Ct. 514, 518 (1958).

The reach of the Sherman Act, however, is limited. Metallgesellschaft AG v. Sumitomo Corp., 325 F.3d 836, 838 (7th Cir. 2003). Under an amendment to the Sherman Act, known as the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), the court does not have jurisdiction to adjudicate antitrust conduct that:

> involv[es] trade or commerce (other than import trade or import commerce) with foreign nations unless:

14

>      (1) such conduct has a direct, substantial, and reasonably foreseeable effect:
>
>           (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
>           (B) on export trade or export commerce With foreign nations, of a person engaged In such trade or commerce in the United States; and
>
>      (2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.
>
>      If [the Sherman Act applies] to such conduct because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

Id. Consequently, antitrust conduct directed at foreign markets that has no effect on the domestic market is beyond the reach of this court. Kruman v. Christie's Int'l PLC, 284 F.3d 384, 395 (2d Cir. 2001); Metallgesellschaft AG v. Sumitomo Corp., 325 F.3d at 838. Where there is a domestic effect, the court has jurisdiction to hear the claim only where the conduct "reduces the competitiveness of the domestic market. . .[or] mak[es] possible anticompetitive conduct directed at domestic commerce." Id. at 399-401 (citing National Bank of Canada v. Interbrook Card Assoc., 666 F.2d 6, 8 (2d Cir. 1981)). To establish jurisdiction, a plaintiff need only demonstrate conduct directed "at both domestic and foreign markets [that] actually reduced the competitiveness of a domestic market. . . [or] [otherwise] mak[es] possible anticompetitive conduct that `give[] rise to a claim' under the Sherman Act." Kruman, 284 F.3d at 401.