UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN ALAN SAKON, EXPRESSWAY :
ASSOCIATES I, EXPRESSWAY :
ASSOCIATES II, EXPRESSWAY :
ASSOCIATES III, EXPRESSWAY :
ASSOCIATES IV, :
  Plaintiffs. :
                              :
v. : Civil No. 3:95CV1869 (AVC)
                              :
LOREN ANDREO, FRANK :
TORNAQUINDICI, A/K/A FRANK :
TORNA, ANDY'S FOODTOWN, INC., :
FRANK'S SUPERMARKET, TORNA, :
INC., PETER GERSTEN, GERSTEN & :
GERSTEN, MARY ANDREO RANDAZZO, :
NEIL A. McPHAIL, :
  Defendants. :

### RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This is an action for injunctive relief and damages brought pursuant to Sections 4, 4c, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c and 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[1] The defendants, Loren Andreo ("Andreo"), Andy's Foodtown, Inc. ("Andy's"), Mary Randazzo ("Randazzo"), Frank Tornaquindici ("Tornaquindici"), Torna, Inc. ("Torna") and Frank's Supermarket ("Frank's") now move for summary judgment on the claims against them.[2]

The issues presented are: 1) whether the plaintiff has

---

[1] The amended complaint also alleges violations of: 1) the Connecticut Antitrust Act, Ch. 25 of Conn. Gen. Stat.; 2) the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. §§ 43-110g et seq.; and 3) the common law of Connecticut for tortious interference with contractual relations and tortious interference with business expectancies.

[2] The court will make reference to defendants Tornaquindici, Torna and Frank's as the "Tornaquindici defendants," and to Andreo, Andy's and Randazzo as the "Andreo defendants."

standing to bring the within antitrust action; and 2) whether the defendants' acts are immunized under the Noerr-Pennington doctrine. For the reasons hereinafter set forth, the court concludes that: 1) the plaintiff does not have standing to bring the within antitrust claims; and 2) the Noerr-Pennington doctrine immunizes the defendants conduct with respect to the Manager lawsuit, the Hargraves lawsuit and the alleged zoning opposition.

Accordingly, the defendants' motions for summary judgment are granted.

**FACTS**

Examination of the complaint, affidavits, pleadings, exhibits, supplemental materials and the Rule 9 statements of material fact accompanying the motion for summary judgment, and the responses thereto, discloses the following undisputed material facts.

The plaintiff, John Alan Sakon ("Sakon"), is an individual businessman residing in Connecticut. The remaining plaintiffs, Expressway Associates I, II, III, and IV ("expressway partnerships"), are each Connecticut general partnerships. Sakon is the general partner of each of the expressway partnerships. The expressway partnerships owned adjacent parcels of land in Glastonbury, Connecticut. These parcels were to be combined in order to develop a site and build a shopping center which would accommodate a supermarket-superstore.

The defendant, Andreo, is the president of Andy's Foodtown, a supermarket-superstore near the Glastonbury town-line, and

allegedly owns or has interests in real estate capable of being developed as a shopping center in the greater Glastonbury area. At the time of the filing of the amended complaint, the defendant, Torna, operated a supermarket-superstore known as Frank's Supermarket in Glastonbury, Connecticut. The defendant, Tornaquindici, is the president of Torna and allegedly owns or has interests in real estate capable of being developed as a shopping center in the greater Glastonbury area. Andreo and Torna are associated with A & F Foods, a business located in the greater Glastonbury area.

The defendant, Randazzo, is Andreo's daughter and is a trustee for Andreo and Torna. Randazzo held, inter alia, an option to purchase a certain parcel of real property located adjacent to the expressway partnerships' property in Glastonbury.

The amended complaint alleges that there has been extremely limited competition in the greater Glastonbury area for supermarket-superstores. The complaint further alleges that Andy's Foodtown and Frank's Supermarket were, at the time of the filing of the complaint, the only supermarket-superstores operating in the greater Glastonbury area.[3] Generally, new supermarket-superstores require a shopping center and a large parking area. The amended complaint alleges that potential competition to challenge the shared dominance of Andy's Foodtown

---

[3] It is undisputed that, subsequent to the filing of the amended complaint, a national grocery store chain known as Edwards Superstore, was opened in the Somerset Square Shopping Center, in Glastonbury and, in September 1994, Frank's ceased operations.

3

and Frank's Supermarket could only come from the construction of new supermarket-superstores in the greater Glastonbury area. This construction was dependent upon a potential competitor acquiring a site approved for supermarket-superstore construction.

> The amended complaint alleges that the defendants
>
> conspired to restrain trade and commerce in real estate sites for the development of shopping centers/supermarket superstores in the greater Glastonbury, Connecticut area in order to protect and enlarge the shared monopoly power . . . in supermarket-superstore sales and in the ownership of real estate capable of supporting shopping center/supermarket-superstore development in the greater Glastonbury area.

The amended complaint further alleges that the defendants agreed to: 1) "prevent all actual or potential competitors from competing with them;" 2) "prevent any potential competitor from acquiring a real estate site capable of supporting a supermarket;" 3) "oppose any zoning approval or variance which would allow a potential competitor to develop a site for a supermarket;" and 4) "cause the institution of baseless sham litigations and engage in a patterns of baseless and sham zoning opposition."

The complaint alleges that through this conspiracy, the defendants acquired, between 1981 and 1992, legal or equitable interests in real estate sites in the greater Glastonbury area. The defendants allegedly purchased these sites for the collateral purpose of preventing and restraining competition. With respect to this conspiracy to obtain property, the plaintiff argues that the defendants obtained 11 of 14 sites in the Glastonbury area

4

capable of accommodating supermarket-superstores.

The plaintiff's antitrust claims are also based upon the defendants' alleged institution of sham litigation and baseless zoning opposition. With respect to these allegations, the plaintiff relies upon the following conduct:

1) the defendants' opposition to development of a Finast grocery store on Hebron Avenue, in Glastonbury;

2) the defendants' opposition to development of an Edwards supermarket-superstore at Somerset Square, in Glastonbury;

3) the defendants' opposition to development of a Stop & Shop on the New London Turnpike, in Glastonbury;

4) the defendants' lawsuit regarding the "Manager" parcel.[4] and

5) the defendants' involvement in the "Dee Dee Hargraves"

---

[4] Specifically, the complaint alleges that the defendants filed a lawsuit with respect to a certain parcel adjacent to the plaintiff's property. That parcel was owned by one Thomas Manager. In an effort to acquire property in Glastonbury, sufficient to accommodate a supermarket-superstore, the plaintiff inquired about the Manager parcel, which was adjacent to the plaintiff's properties and would complete the plaintiff's supermarket-superstore site.
By September 3, 1987, the defendants had acquired an option to purchase the property and allegedly approached the plaintiff concerning the plaintiff's interest in the parcel. During negotiations, all of the defendants proposals were allegedly accompanied by a "no supermarkets" clause.
In August 1991, the plaintiff communicated with the Manager family and in December 1991, allegedly reached agreement with the Manager family for the plaintiff's purchase of the parcel.
On December 16, 1991, the defendants brought suit against the Manager family for specific performance for sale of the parcel to the defendants. That case settled and the Manager family sold the parcel to the defendants. The plaintiff claims that the defendant's lawsuit was a sham and an effort to surreptitiously obtain a monopoly in the supermarket-superstore market.

litigation.[5]

**STANDARD**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248). After discovery, if the non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to

---

[5] This refers to a lawsuit concerning a parcel of real property fronting partially on Main Street, in Glastonbury, that was allegedly capable of supporting a supermarket-superstore. The owner of the property at the time, one Ray Fortier, brought suit against his real estate broker, Dee Dee Hargraves, for alleged misrepresentations concerning leasehold issues. After the lawsuit was filed, the defendants allegedly purchased the property through Randazzo, succeeded to Fortier's interest in the lawsuit and obtained a judgment against Hargraves.

determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).

## DISCUSSION

The defendants argue that the plaintiff's antitrust clams must fail for several reasons. The defendants argue that there is no evidence that they monopolized the supermarket-superstore market. Further, the defendants state that even if there was a monopoly, the plaintiffs do not have standing to bring the claims alleged and that the defendants' alleged anticompetitive conduct is protected under the Noerr-Pennington doctrine. The plaintiffs respond that material issues of fact preclude the entry of summary judgement in favor of the defendants.

## I. Standing[6]

The defendants argue that even if the plaintiff can prove the existence of a monopoly, the plaintiff does not have standing to bring the within antitrust claims. Specifically, the defendants argue that the plaintiff has suffered an individual competitive injury, but has not suffered a sufficient antitrust injury, that is, an injury to consumers in the market generally. In opposition, the plaintiff states that until the trier of fact determines the relevant markets, no determination can be made as to the plaintiff's standing to bring an antitrust claim as to those markets. Further, the plaintiff states that in either the

---

[6] Because the standing issue is dispositive of the antitrust claims, the court does not address the defendants' argument that their conduct does not amount to a monopoly or a restraint of trade.

"site development" or "retail" supermarket-superstore markets, he has standing to bring the within antitrust claims.

"It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury." Balaklaw v. Lovell, 14 F.3d 739 (2d Cir. 1994). Rather, a plaintiff "'must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

The second circuit has recognized that "[o]ver time, courts have developed a two-pronged analysis to determine whether a plaintiff suffered an antitrust injury." Balaklaw v. Lovell, 14 F.3d 739, 797 n.9 (2d Cir. 1994). First, "courts must determine whether the plaintiff suffered an antitrust injury." Id. If the court answers that question in the affirmative, "they must determine whether any other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." Id. With respect to this second inquiry, the court considers:

> (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress with the

antitrust laws; (4) the directness of the connection between the injury and the alleged restraint in the relevant market; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages.

The complaint alleges that the defendants' conduct of obtaining interests in real property in the greater Glastonbury area precluded others from developing supermarket-superstores in that area. Specifically, the plaintiff states that the defendants' obtained 11 of 14 real estate sites in the Glastonbury area, capable of accommodating supermarket-superstores. Further, the complaint alleges that the defendants baseless objections to zoning proposals and institution of sham lawsuits, also prevented competition in the market for the development of supermarket-superstores.

The defendants argue that the plaintiff's injury is insufficient because it is solely individual to the plaintiff and is not an antitrust injury. Specifically, the plaintiff's injury relates solely to the Manager property and not to any of the defendants' remaining alleged anticompetitive behavior. Further, the defendants cite the fact that the plaintiff is not a resident of Glastonbury or the Glastonbury area and, therefore, is not a consumer of groceries in that area.

In Goldberg v. Wakenfern Food Corp., 3:93CV1359(AWT) (D. Conn Sept. 30, 1997) and Rosenberg v. Cleaty, Gottlieb, Steen and Hamilton, 598 F. Supp. 642 (S.D.N.Y. 1984) the courts were faced with cases factually similar to the case at bar. In Goldberg, the plaintiffs contracted to sell a parcel of land to a national

supermarket chain, Stop & Shop. The plaintiffs claimed that the defendants, competing national supermarkets, "engaged in a conspiracy to use the Neighbors'[7] standing to oppose and appeal various permits, variances and plan applications in order to prevent the construction of a new Stop & Shop . . . ." The defendants argued that "the plaintiffs lack[ed] standing to assert an antitrust claim because they [did] not participate in the relevant market." The court concluded that the landowner/developer plaintiffs lacked standing to bring their antitrust claims. The court cited cases in which the courts refused to confer antitrust standing upon a mall owner and a landlord who sought to lease property in their respective shopping areas to supermarkets. In light of such cases, the court recognized that the plaintiffs in its case were one step further removed from the relevant market as the plaintiffs held an option contract for sale of their property and a contingent lease agreement with Stop & Shop. Goldberg v. Wakenfern Food Corp., 3:93CV1359(AWT) slip op. at 9-10 (D. Conn Sept. 30, 1997).

In Rosenberg v. Cleary, Gottlieb, Steen and Hamilton, 598 F. Supp. 642 (S.D.N.Y. 1984), the plaintiff owned a parcel of land on which he sought to construct a supermarket. Although the plaintiff did complete construction, he filed suit against several competing supermarkets because, during construction, they filed unsuccessful lawsuits seeking to enjoin construction and

---

[7] The court's reference to the "Neighbors" was to a group of individuals who owned land adjacent to the plaintiff's subject property.

10

objected to the project at local government meetings. The court held that the plaintiff lacked antitrust standing and dismissed the plaintiff's claims. Further, the court noted that while "[t]he antitrust laws are intended to 'protect[] the economic freedom of participants in the relevant market,'" the plaintiffs "[did] not claim to be a participant in the grocery market." Instead, the plaintiff alleged "that it was injured as a participant in the construction and real estate market."[8] Because the plaintiff was "not a direct participant in the retail grocery market, it [was] not entitled to the protections of section 4 of the Clayton Act." Id.

The Supreme Court has recognized that, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages from the injury to his business or property." Blue Shield of Virginia v. McCready, 457 U.S. 465, 477 (1982). Further, the courts have recognized "the fundamental tenet that 'the antitrust laws . . . were enacted for the protection of

---

[8] The court held that,

> the relevant market which was restrained was the retail grocery business. The facts alleged in the complaint do not support the conclusion that the defendants, repeatedly described as 'competing supermarkets,' were operating to restrain trade in the construction market. Instead, the amended complaint, fairly read, alleges the existence of a conspiracy, if any, among various members of the retail grocery industry to prevent the creation of additional and powerful competition in the supermarket business.

Rosenberg v. Cleaty, Gottlieb, Steen and Hamilton, 598 F. Supp. 642, 645 (S.D.N.Y. 1984).

competition, not competitors.'" Balaklaw v. Lovell, 14 F.3d 739, 797 (2d Cir. 1994) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (internal quotation and emphasis omitted). The plaintiff owns real property in Glastonbury and because of the defendants' allegedly anticompetitive conduct, was unable to develop that property with a supermarket-superstore. The plaintiff is not a Glastonbury citizen, he does not allege that he is a consumer of groceries in Glastonbury, he does not claim that he has ever been in the supermarket business and does not claim to have ever leased a supermarket. The court concludes that the plaintiff has suffered an individual competitive injury and not a sufficient antitrust injury, that is, an injury to consumers in the market generally. Accordingly, the defendants' motions for summary judgment with respect to the antitrust claims are granted. The plaintiff does not have standing to bring the antitrust claims in counts one, two and three of the amended complaint.[9]

III. **Noerr-Pennington**

The plaintiff's brings his remaining claims pursuant to common law tenets concerning tortious interference with contract and tortious interference with business expectations and

---

[9] The relevant provisions of the Connecticut Antitrust Act, Ch. 25 of Conn. Gen. Stat. §§ 35-27, 35-28 and 35-29, incorporate the Sherman Act, and in construing the Connecticut act, courts look to federal court interpretations of federal antitrust laws. C.G.S. § 35-44b; Elida, Inc. v. Harmor Realty Corp., 177 Conn. 218, 226-27 (1979). Therefore, based upon the within analysis, the plaintiff does not have standing to bring his claim for a violation of the Connecticut Antitrust Act, in count three of the amended complaint.

12

violation of the Connecticut Unfair Trade Practices Act, C.G.S. §§ 43-110g, et seq. The defendants argue that their conduct in filing lawsuits and opposing certain zoning applications is immune pursuant to the so-called "Noerr-Pennington" doctrine. The plaintiff responds that there are genuine issues of material fact with respect to whether the lawsuits and zoning opposition fall within the so-called "sham" exception to the Noerr-Pennington doctrine.

The First Amendment to the United States Constitution provides, in relevant part, as follows: "Congress shall make no law . . . abridging . . . the right of people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The United States Supreme Court has recognized that the right to petition the government for redress is protected from liability in the context of antitrust litigation. Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United States Mine Workers v. Pennington, 381 U.S. 657 (1965). The so-called Noerr-Pennington doctrine allows individuals or businesses to petition the government,[10] free of the threat of antitrust liability, even when the individual acted with the intention of restraining competition. Pennington, 381 U.S. at 670. Although it evolved in the context of antitrust litigation, courts have applied the Noerr-Pennington doctrine to

---

[10] The Supreme Court has recognized that the First Amendment right to petition extends to all departments of the government. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).

13

protect the exercise of the First Amendment right to petition the government for redress of grievances against claims of tortious interference with business expectancy and the Connecticut Unfair Trade Practices Act. Suburban Restoration Co., Inc. v. Acmat Corp., 700 F.2d 98, 101-02 (2d Cir. 1983).

The Noerr-Pennington doctrine does have limitations, however. The Noerr Court noted that immunity does not apply "where the alleged conspiracy 'is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" California Transport, 404 U.S. at 514 (quoting Noerr, 365 U.S. at 144).[11] The "sham" exception applies where the defendants have conspired to "deter their competitors from having 'free and unlimited access' to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities." California Transport, 404 U.S. at 515 (emphasis in original). The Court in California Transport also noted that the "sham" exception would apply where defendants engaged in a "pattern of baseless, repetitive claims." Id. at 513.[12]

---

[11] Courts have recognized the applicability of the sham exception in the context of civil liability for tortious interference with business relations. See Havoco of America, Ltd. v. Hollobow, 702 F.2d 643, 649 (7th Cir. 1983).

[12] In Landmarks Holding Corp. v. Bermant, 664 F.2d 891 (2d Cir. 1981), the second circuit applied the sham exception because: (1) the defendant developers appealed zoning decisions for the purpose of delaying plaintiffs' planned developments without standing and without any chance of succeeding; (2) the defendant developers "deliberately protracted the proceedings by misrepresenting to the Chief Justice of the Connecticut Supreme Court that they needed extra time to have the record printed,"

14