## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MM GLOBAL SERVICES INC., MM GLOBAL SERVICES PTE. LTD., and MEGAVISA SOLUTIONS (S) PTE. LTD., | : : : : | |
| Plaintiffs, | : | Civil No. 302 CV 1107 (AVC) |
| -v- | : : | |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD., and DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD., | : : : : : | February 6, 2004 |
| Defendants. | : | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO RECONSIDER ORDER DENYING MOTIONS TO DISMISS FEDERAL ANTITRUST CLAIM FOR LACK OF SUBJECT MATTER JURISDICTION

THELEN REID & PRIEST LLP
   Richard S. Taffet (ct 10201)
   875 Third Avenue
   New York, New York 10022-6225
   (212) 603-2000

WIGGIN & DANA LLP
   Robert M. Langer (ct 06305)
   Suzanne E. Wachsstock (ct 17627)
   One CityPlace
   185 Asylum Street
   Hartford, Connecticut 06103-3402
   (860) 297-3724

   Attorneys for Plaintiffs MM Global Services
   Inc., MM Global Services Pte. Ltd., and
   Megavisa Solutions (S) Pte. Ltd.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ……………………………………………………………ii

PRELIMINARY STATEMENT …………………………………………………………1

FACTUAL BACKGROUND ……………………………………………………………3

ARGUMENT ……………………………………………………………………………..7

I.    THE COURT'S DECISION APPLIED THE
      PROPER LEGAL STANDARD ……………………………………………………7

II.   THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES
      THAT DEFENDANTS' RESALE PRICE FIXING CONSPIRACY
      HAD A DIRECT, SUBSTANTIAL, AND REASONABLY
      FORESEEABLE EFFECT ON DOMESTIC COMMERCE …………………………..10

III.  THE EVIDENCE DEMONSTRATES THAT DEFENDANTS'
      CONDUCT HAD A DIRECT, SUBSTANTIAL AND REASONABLY
      FORESEEABLE EFFECT ON DOMESTIC COMMERCE ………………………...…19

CONCLUSION …………………………………………………………………….....27

## TABLE OF AUTHORITIES

### CASES

Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless Plc,
    148 F.3d 1080 (D.C. Cir. 1998) …………………………………………………..……..12

Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc.,
    227 F.3d 62 (3d Cir. 2000) …………………………………………………………19

Catalano, Inc. v. Target Sales, Inc.,
    446 U.S. 643 (1980) …………………………………………………………………..21

Coors Brewing Co. v. Miller Brewing Co.,
    889 F. Supp. 1394 (D. Colo. 1995) ………………………………………..…………13

Den Norske Stats Oljeselskap AS v. Heeremac VOF,
    241 F.3d 420 (5th Cir. 2001) …………………………………………….……….11, 12

Empagran S.A. v. F. Hoffman-LaRoche, Ltd.,
    315 F.3d 338 (D.C. Cir.), cert. granted, No. 03-724,
    2003 WL 22734815 (Dec. 15 2003) …………..……………………………..………1, 11

Eurim-Pharm GmbH v. Pfizer, Inc.,
    593 F. Supp. 1102 (S.D.N.Y. 1984) …………………………………...………..16

Ferromin Int'l Trade Corp. v. UCAR Int'l, Inc.,
    153 F. Supp. 2d 700 (E.D. Pa. 2001) …………………………………….…………13

Gross v. New Balance Athletic Shoe, Inc.,
    955 F. Supp. 242 (S.D.N.Y. 1997) …………………………………...…………………16

'In' Porters, S.A. v. Hanes Printables, Inc.,
    663 F. Supp. 494 (M.D.N.C. 1987) …………………………………………………..15

Kruman v. Christie's Int'l Plc,
    284 F.3d 384 (2d Cir. 2002) …………………………………………..……*passim*

Liamuiga Tours v. Travel Impressions, Ltd.,
    617 F. Supp. 920 (E.D.N.Y. 1985) ……………………………...…………….9, 16

McElderry v. Cathay Pac. Airways, Ltd.,
    678 F. Supp. 1071 (S.D.N.Y. 1988) ……………………………………………16

McGlinchy v. Shell Chem. Co.,
    845 F.2d 802 (9th Cir. 1988) …………………………………...……………………16

National Bank of Canada v. Interbank Card Assoc.,
666 F.2d 6 (2d Cir. 1981) ........................................................................8, 9

Republic of Argentina v. Weltover, Inc.,
504 U.S. 607 (1992) ...................................................................................17

S. Megga Telecomms. Ltd. v. Lucent Tech., Inc.,
No. 96-357-SLR, 1997 WL 86413 *1 (D. Del. Feb. 14, 1997) ...............................15

Sniado v. Bank Austria AG,
352 F.3d 73 (2d Cir.) ...........................................................2, 10-12, 15

Toyota Motor Manuf., Kentucky, Inc. v. Williams,
534 U.S. 184 (2002) ...................................................................................17

Turicentro, S.A. v. Am. Airlines, Inc.,
303 F.3d 293 (3d Cir. 2002) ........................................................................16

United States v. Dillard,
214 F.3d 88 (2d Cir. 2000) ..........................................................................17

Virtual Countries, Inc. v. Republic of South Africa,
300 F.3d 230 (2d Cir. 2002) ........................................................................17

## STATUTES

15 U.S.C. § 6a ...........................................................................*passim*

## OTHER AUTHORITIES

H.R. Rep. No. 97-686 (1982) ........................................................................14

IA Areeda & Hovenkamp § 272e (2000 ed.) ..........................................................14

U.S. Dept. of Justice and Federal Trade Comm'n, Antitrust Enforcement
Guidelines for International Operations, 4 Trade Reg. Rep. (CCH)
¶ 13,107 (1995) ......................................................................................18

## PRELIMINARY STATEMENT

Plaintiffs MM Global Services, Inc. ("MMGS"), MM Global Services Pte. Ltd. ("MMGS-S") and MegaVisa Solutions (S) Pte. Ltd. ("MVS") (collectively, "Plaintiffs") submit this memorandum of law in opposition to the motion of defendants The Dow Chemical Company ("Dow"), Union Carbide Corporation ("UCC"), and Union Carbide Asia Pacific, Inc. ("UCAP") to reconsider the Court's Decision denying defendants' motions to dismiss the federal antitrust claim for lack of subject matter jurisdiction.[1]

In their motion papers, defendants continue to raise the same misguided arguments they have repeatedly asserted since filing their initial motions to dismiss plaintiffs' antitrust claim for lack of subject matter jurisdiction – arguments that were properly considered and properly rejected by this Court in its Decision denying defendants' motions. Indeed, in the instant motion, defendants again misconstrue controlling Second Circuit precedent and ignore the well-pleaded allegations in the First Amended Complaint. They also fail to take into account, in any way, the supporting documentary evidence submitted by plaintiffs to date that establishes subject matter jurisdiction over the antitrust claims.

Defendants' primary argument is that the Court applied an improper standard by failing to consider whether plaintiffs' allegations and proof meet the requirements of § 6a(1) of the Foreign Trade and Antitrust Improvements Act ("FTAIA") – i.e., that defendants' conduct had a "direct, substantial, and reasonably foreseeable" effect on domestic commerce. This is not correct.[2]   Indeed, the Court's Decision specifically assessed plaintiffs' allegations and the

---

[1] See Ruling On The Defendants' Motions To Dismiss, dated September 12, 2003 ("Decision").

[2] Defendants also note their position that the decision by the United States Supreme Court in Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 315 F.3d 338 (D.C. Cir. 2003), cert. granted, No. 03-724, 2003 WL 22734815 (Dec. 15, 2003), may also be dispositive of this case based upon issues under § 6a(2) of the FTAIA. See Defs.' Brief, at 2 n.1. As will be discussed in plaintiffs' opposition to defendants' motion for a stay, this is not correct either.

evidence submitted consistent with this standard, and concluded that "the plaintiffs have established that their claim involves a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States."[3]  The Court's conclusion in this regard is entirely consistent with applicable authority, and is supported yet further by the Second Circuit's most recent discussion of the requirements of § 6a(1) in <u>Sniado v. Bank Austria AG</u>, 352 F.3d 73 (2d Cir. 2003).

Thus, despite defendants' now familiar arguments to the contrary, plaintiffs have more than met their burden at this stage of the litigation under the FTAIA, and the Court properly assessed these issues.  Adopting a broad view of "conduct," as mandated by the Second Circuit in <u>Sniado</u>, 352 F.3d at 399, the relevant conduct here for FTAIA purposes is defendants' resale price fixing conspiracy, formed within the United States by, among others, United States companies, to fix plaintiffs' resale prices in India for the purpose of maintaining supracompetitive prices in the United States.  Allegations of such conduct that directly targets domestic markets for the anticompetitive purpose of maintaining artificially high prices plainly satisfies the first prong of the FTAIA test.  In addition, based on the discovery available to date, plaintiffs have submitted documentary evidence confirming that defendants' anticompetitive conduct was designed to protect domestic prices from erosion, and that enforcing the resale price fixing conspiracy for products ultimately re-sold in India was essential to maintaining artificially high domestic prices.  Despite now having several bites at this apple, defendants still do not cite a single case that controverts plaintiffs' allegations and evidence.

Accordingly, the Court's Decision should not be reconsidered.  The Decision correctly acknowledges the relevant FTAIA standard and also employs the appropriate Second Circuit test

---

[3] Decision, at 16-17.

for analyzing whether plaintiffs' allegations and evidence show that defendants' conduct had a "direct, substantial, and reasonably foreseeable" effect on United States commerce. Moreover, the facts and applicable law, which defendants continue to disregard, plainly support plaintiffs' position.

## FACTUAL BACKGROUND

Plaintiffs filed their original complaint in this case in June 2002 against Dow and UCC. In response, specifically to plaintiffs' claim of resale price fixing under § 1 of the Sherman Act, Dow and UCC filed their initial motions to dismiss for lack of subject matter jurisdiction in the summer of 2002. While this motion was sub judice, plaintiffs filed and served a First Amended Complaint, dated March 24, 2003, naming three additional defendants, UCAP, Union Carbide Customer Services Pte. Ltd. ("UCCS") and Dow Chemical Pacific (Singapore ) Pte. Ltd. ("Dow Singapore").[4]

In response to the First Amended Complaint, defendants Dow and UCC filed another motion, dated April 23, 2003, to dismiss plaintiffs' Sherman Act claim for lack of subject matter jurisdiction. The additional defendants, UCAP, UCCS and Dow Singapore, then filed their own motion to dismiss plaintiffs' federal antitrust claim for lack of subject matter jurisdiction on May 30, 2003.[5] Dow and UCC's second round of subject matter jurisdiction motions made the exact same arguments as were presented on their first motions,[6] and the companion motions by UCAP,

---

[4] The First Amended Complaint, however, "did not alter the material facts as alleged in the original Complaint, nor did it modify Plaintiffs' causes of action set forth therein." April 17, 2003 Ruling on the Defendants' Motion to Dismiss For Forum Non Conveniens, at 2.

[5] Each of UCAP, UCCS and Dow Singapore also filed motions to dismiss the First Amended Complaint for lack of personal jurisdiction. By decision dated November 17, 2003, this Court denied the motion as respects UCAP, but granted the dismissal of UCCS and Dow Singapore on personal jurisdiction issues. On December 4, 2003, plaintiffs filed a motion for reconsideration of the Court's decision dismissing UCCS and Dow Singapore, and such motion has been fully briefed by the parties and is currently sub judice.

[6] By Order dated August 11, 2003, the Court denied Dow and UCC's original subject matter jurisdiction motion as moot.

UCCS and Dow Singapore expressly adopted the arguments of Dow and UCC's second subject matter jurisdiction motions.

In each of these motions, defendants have consistently sought to characterize this case as an Asian dispute, arguing that United States courts do not have jurisdiction to hear Sherman Act claims "involving primarily foreign conduct unless the alleged anticompetitive conduct has had the requisite anticompetitive effect on United States commerce."[7]  More specifically, defendants have asserted that a resale price fixing conspiracy targeting sales to end-user customers in India cannot have the requisite "direct, substantial and reasonably foreseeable" effect on United States commerce, as mandated by the FTAIA.[8]  Indeed, defendants have argued that the conduct alleged in the First Amended Complaint in support of plaintiffs' Sherman Act claim does not have any effect at all on commerce or competition in the United States.[9]

In opposition, plaintiffs have repeatedly shown that the allegations of their pleadings and the evidence currently available demonstrate that defendants engaged in a per se unlawful vertical resale price fixing conspiracy in violation of § 1 of the Sherman Act, in which the price fixing conduct occurred in the United States and had an adverse effect upon United States commerce.  Thus, for example, defendants have been alleged and shown to have set the resale prices for products sold to plaintiffs in the United States and made sales of products subject to the price fixing arrangement to plaintiffs in the United States.  Moreover, it has been alleged and

---

[7] See Mem. of Law in Support of Defs.' Mot. to Dismiss the Antitrust Claims for Lack of Subj. Matter Juris., dated Sept. 9, 2002, at 10 ("9/9/02 Defs.' Mem. of Law").  See also Mem. of Law in Support of Defs.' Dow and UCC Mot. to Dismiss the Antitrust Claims for Lack of Subj. Matter Juris, dated April 23, 2003, at 1, 7-8 ("4/23/03 Defs.' Mem. of Law"); and Mem. of Law in Support of Defs.' Mot. for Cert. for Inter. Appeal of Court's Orders Denying Mots. to Dismiss the Fed. Antitrust Claim for Lack of Subj. Matter Juris., dated Oct. 10, 2003, at 13 ("10/10/03 Defs.' Mem. of Law").

[8] See 9/9/02 Defs.' Mem. of Law, at 11, 14.  See also 4/23/03 Defs.' Mem. of Law, at 2-3, 9; 10/10/03 Defs.' Mem. of Law, at 2, 10-13.

[9] See 9/9/02 Defs.' Mem. of Law, at 11, 14-16.  See also 4/23/03 Defs.' Mem. of Law at 13; and 10/10/03 Defs.' Mem. of Law, at 5, 13.

4

shown that such conduct was intended to and did in fact cause a significant anticompetitive effect on commerce in the United States by limiting plaintiffs' ability to compete freely here and by raising prices for products sold to others, including in the United States.[10] In this regard, plaintiffs specifically allege and have submitted evidence showing that the per se unlawful price fixing scheme had a direct, substantial and reasonably foreseeable effect on United States commerce, and that such an effect gave rise to a claim under the Sherman Act.

Based on these showings, in the Decision, this Court denied Dow and UCC's motion to dismiss plaintiffs' antitrust claims. On September 16, 2003, the Court also denied the motions of UCAP, UCCS and Dow Singapore on the same grounds. In so doing, the Court expressly recognized that the "reach of the Sherman Act . . . is limited," and that each part of the FTAIA needs to be met.[11] Nonetheless, the Court rejected defendants' argument, which is the same as is made here, viz.: "[b]ecause the amended complaint alleges price fixing occurring in India that is not alleged to have a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States, the court is deprived of subject matter jurisdiction over the claim by the [FTAIA]."[12]

The Court further rejected defendants' arguments by holding that the per se unlawful nature of defendants' conduct creates a presumption that such conduct has an anticompetitive effect, and "[b]ecause the amended complaint and evidentiary record support the conclusion that [defendants'] conduct was directed at both the foreign and domestic market, the court . . . has jurisdiction."[13] The Court specifically pointed to the First Amended Complaint's allegation that

---

[10] See, e.g., First Am. Compl. ¶¶ 29, 53-55, 112.

[11] Id. at 14-15.

[12] Decision, at 13.

[13] Id. at 16.

5

the price fixing conspiracy was directed to "'ensur[ing] that prices charged by [the] [p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users . . . <u>in the United States</u> as well as in other jurisdictions.'"[14]  The Court further quoted from the First Amended Complaint that "[a]s a direct and proximate result of [the] [d]efendants fixing of minimum resale prices and other terms of sale, competition in the sale and resale of [Union Carbide] products <u>in and from the United States</u> was improperly diminished and restrained. . . ."[15]

The Court's Decision also referenced specific evidentiary proof that was held to establish defendants' conduct as having a direct, substantial and reasonably foreseeable effect on domestic commerce of the United States.  Such evidence includes e-mails and correspondence showing that defendants refused orders placed by the plaintiffs because of domestic market pricing concerns, defendants examined the interrelationship between foreign and domestic pricing during world strategy meetings, and defendants considered the firmness of domestic prices before deciding whether to meet competitive pricing in the India market.[16]  Accordingly, as commented above, the Court held that "the plaintiffs have established that their claim involves a direct, substantial and reasonably foreseeable effect on the domestic commerce of the United States . . . ."[17]

Despite the Court's application of the standards of the FTAIA and adherence to applicable Second Circuit precedent, defendants next moved to have the denial of their motion to dismiss for lack of subject matter jurisdiction certified for interlocutory appeal.[18]  Plaintiffs

---

[14] <u>Id.</u> (emphasis in original).

[15] <u>Id.</u> (emphasis in original).

[16] <u>Id.</u> at 16-17 & n.3.

[17] <u>Id.</u> at 17.

[18] <u>See</u> 10/10/03 Defs.' Mem. of Law.

opposed an immediate appeal of this issue, because defendants did not meet their burden of demonstrating that an interlocutory appeal was appropriate under the prescribed legal criteria.[19] Moreover, plaintiffs demonstrated that the Decision was well-founded on appropriate Second Circuit precedent and on the allegations pleaded and evidence submitted. Nonetheless, on December 9, 2003, the Court issued an order denying defendants' motion without prejudice to its refiling "after defendants have filed and served, and the court has ruled, on a motion for reconsideration."[20] The Court, thus, invited defendants to file the instant motion making the same arguments set forth in their motion seeking certification for interlocutory appeal, and further requested that plaintiffs, in their response, identify all "substantial, and reasonably foreseeable" effects within the meaning of the FTAIA.[21]

## ARGUMENT

### I.

### THE COURT'S DECISION APPLIED THE PROPER LEGAL STANDARD

Defendants correctly state that the FTAIA provides that:

Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –

    (1)    such conduct has a direct, substantial, and reasonably foreseeable effect –

        (A)    on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

---

[19] See Pltffs.' Mem. Of Law In Opp. To Defs.' Mot. For Cert. For Interlocutory Appeal, dated Oct. 31, 2003 ("10/31/03 Pltffs.' Mem. of Law").

[20] See Order, dated December 9, 2003.

[21] Id.

        (B)     on export trade or export commerce with foreign
                    nations, of a person engaged in such trade or
                    commerce in the United States; and

     (2)     such effect gives rise to a claim under the provisions of
               sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation
Of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct
only for injury to export business in the United States.

15 U.S.C. § 6a.[22]

Defendants focus here on the first subsection of the statute, and argue that the Decision

"relies upon an improper legal standard to deny defendants' motion to dismiss plaintiffs' federal

antitrust claim for lack of subject matter jurisdiction."[23] Specifically, defendants assert that the

Decision "fails to measure plaintiffs' antitrust claim against the requirements of subsection

(1) [of the FTAIA]," which requires that the challenged conduct "has a direct substantial and

reasonably foreseeable effect" on United States trade or commerce.[24] Defendants, however,

continue to ignore the relevant Second Circuit standard for analyzing whether foreign conduct

violates U.S. antitrust laws, and further ignore the Court's clear consideration of the "direct,

substantial, and reasonably foreseeable" prong of the FTAIA.[25]

Prior to the passage of the FTAIA, the law in the Second Circuit for purposes of

establishing subject matter jurisdiction over a Sherman Act violation was set forth in National

Bank of Canada v. Interbank Card Assoc., 666 F.2d 6 (2d Cir. 1981). There, the Second Circuit

held that for conduct directed at foreign markets to be actionable under the federal antitrust laws,

---

[22] Brief In Support Of Defendants' Motion To Reconsider Order Denying Motions To Dismiss Federal Antitrust Claim For Lack Of Subject Matter Jurisdiction ("Defs.' Brief"), dated December 23, 2003, at 1.

[23] Defs.' Brief, at 1.

[24] Defs.' Brief, at 5.

[25] See Decision, at 14-17.

such conduct must have the "effect" of "injuries to United States commerce which reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation . . ." Id. at 8. See also Kruman v. Christie's Int'l Plc, 284 F.3d 384, 389 (2d Cir. 2002).[26] While the Second Circuit has not addressed directly whether the FTAIA amends or codifies previously existing law in connection with § 6a(1), at least one case in this Circuit has held that the statute did adopt the National Bank of Canada rule in its entirety. See, e.g., Liamuiga Tours v. Travel Impressions, Ltd., 617 F. Supp. 920, 924 (E.D.N.Y. 1985). We are aware of no authority in this Circuit to the contrary.

Indeed, defendants themselves concede that National Bank of Canada remains good law in the Second Circuit. They have argued in the course of their numerous subject matter jurisdiction motions that "[i]n Kruman, the Second Circuit held that the FTAIA was enacted by Congress to codify the common law rule established in National Bank of Canada, and did not impose on plaintiffs any additional substantive burdens."[27] Further, defendants have stated in their motions that in "[c]onstruing National Bank of Canada, the court in Kruman held that ["]the antitrust laws only applied to anticompetitive conduct directed at foreign markets if it caused injury to domestic commerce either by (1) reducing the competitiveness of the domestic market; or (2) making possible anticompetitive conduct aimed at domestic commerce."[28]

---

[26] In Kruman the Second Circuit did not address issues relating to subsection 1 of the FTAIA, in that the parties did not dispute that the conduct involved satisfied that subsection. The Second Circuit did comment, however, in connection with subsection 2 of the FTAIA that the statute did not "alter the National Bank of Canada rule, under which anticompetitive conduct directed at foreign markets is only regulated by the Sherman Act if it has the 'effect' of causing injury to domestic commerce by (1) reducing the competitiveness of a domestic market; or (2) making possible anticompetitive conduct directed at domestic commerce." Kruman, 284 F.3d at 389-390.

[27] 9/9/02 Defs.' Mem. of Law, at 20; 4/23/03 Defs.' Mem. of Law, at 14. See also Mot. of Defs. UCAP, UCCS, and Dow Singapore To Dismiss The Antitrust Claims For Lack Of Subject Matter Jurisdiction, dated 5/30/03 (adopting the arguments made by Dow and UCC in the 4/23/03 Defs.' Mem. of Law). They may now argue that this position is limited to subsection 2 of the FTAIA, but they have never before done so, and there is no authority for such a limitation.

[28] 9/9/02 Defs.' Mem. of Law, at 20; 4/23/03 Defs.' Mem. of Law, at 14.

This is exactly the standard the Court applied in the Decision in evaluating whether defendants' conduct had a direct, substantial and reasonably foreseeable effect on United States commerce:

> Where there is a domestic effect, the court has jurisdiction to hear the claim only where the conduct "reduces the competitiveness of the domestic market . . . [or] mak[es] possible anticompetitive conduct directed at domestic commerce." To establish jurisdiction, a plaintiff need only demonstrate conduct directed "at both domestic and foreign markets [that] actually reduced the competitiveness of a domestic market . . . [or] [otherwise] mak[es] possible anticompetitive conduct that 'gives rise to a claim' under the Sherman Act. [29]

## II.

## THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS' RESALE PRICE FIXING CONSPIRACY HAD A DIRECT, SUBSTANTIAL, AND REASONABLY FORESEEABLE EFFECT ON DOMESTIC COMMERCE

In considering the requirements of both subsections of the FTAIA, as set forth above, see supra at 5-6, the Court reviewed plaintiffs' allegations and the proof submitted by plaintiffs. In so doing, the Court properly assessed such alleged and proven conduct consistent with cases that speak directly to the issue of a "direct, substantial and reasonably foreseeable" effect on United States commerce.

As an initial matter, the Decision properly considered the correct conduct for FTAIA purposes. The Second Circuit has firmly held that the relevant conduct is that which violates the Sherman Act, which in this case is defendants' formation of a price fixing conspiracy. See Sniado v. Bank Austria AG, 352 F.3d 73, 78 (2d Cir. 2003); Kruman, 284 F.3d at 398. In Kruman, the Second Circuit was quite precise in this regard, holding that:

---

[29] Decision, at 15 (internal citations omitted).

> The defendants' agreement to fix prices would be "conduct" that
> violates the Sherman Act regardless of whether they charged the
> plaintiffs high prices or whether the plaintiffs suffered injury. In
> sum, the "conduct" in this case was not the imposition of high
> prices pursuant to an illicit agreement, but the alleged agreement
> by the defendants to fix prices in foreign auction markets.

Id. at 399.

Other Circuits are in accord. See Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 315 F.3d

338, 344 (D.C. Cir. 2003), cert. granted, 2003 WL 22734815 (2003) (rejecting a narrow

definition of conduct as "solely the market transactions between [defendants] and foreign

plaintiffs overseas" and concluding that the relevant conduct is the "massive international cartel,

exercising global market power"); and Den Norske Stats Oljeselskap AS v. Heeremac VOF, 241

F.3d 420, 426 (5th Cir. 2001) (defining the relevant conduct as "the agreement among heavy-lift

service providers to divide territory, rig bids, and fix prices").[30]

Most recently, in Sniado, which directly addresses the FTAIA's "direct, substantial, and

reasonably foreseeable" effects standard, the Second Circuit again explained that "conduct refers

to acts that are illegal under the Sherman Act, not to the specific acts that caused the plaintiff

injury." 352 F.3d at 78 (internal quotations and citations omitted). The Second Circuit further

commented, specifically in connection with § 6a(1), that the district court in the case, pre-

Kruman, had speculated on two alternative interpretations of "conduct" under the FTAIA: a

"narrow" approach and a "broad" approach. Id. It explained that the "narrow" definition would

be "the charging of supra-competitive fees in Europe," that is, the acts that harmed Sniado. The

"broad" interpretation would be "'the entire alleged conspiracy to fix fees for exchanges of

---

[30] In Den Norske, the Fifth Circuit held contrary to the Second Circuit in Kruman, as well as contrary to the Seventh
Circuit in Metallgesellschaft AG v. Sumitomo Corp. of America, 325 F.3d 836 (7th Cir. 2003), and the D.C. Circuit
in Empagran, 315 F.3d 338, in connection with the applicable standard under subsection 2 of the FTAIA. 241 F.3d
at 428. This issue is not relevant to the instant motion, and will be addressed by plaintiffs in their opposition to
defendants' motion for a stay.

European currencies in Europe and the United States.'" Id. The Second Circuit remanded with direction to the district court to apply the "broad" interpretation of "conduct" for purposes of § 6a(1). Id. Here, therefore, the relevant conduct for FTAIA purposes is the entire alleged per se unlawful conspiracy, formed within the United States by, among others, United States companies, to fix resale prices in order to maintain artificially high prices in domestic and other markets.

Even though the Decision predates Sniado, it is entirely consistent with it. It is also entirely consistent with cases from other jurisdictions that specifically address the "direct, substantial and reasonably foreseeable" standard of § 6a(1).

For example, in Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless Plc, 148 F.3d 1080 (D.C. Cir. 1998), the District of Columbia Circuit considered whether a complaint alleging attempted and actual monopolization involving foreign conduct pleaded the requisite "direct, substantial, and reasonably foreseeable" effect on domestic commerce. Id. at 1085-87. The Court concluded that § 6a(1)'s requirements were satisfied, relying on allegations that U.S. consumers paid excessive prices for advertising as a result of the anticompetitive actions of the defendant, even though the plaintiff sold the services in a foreign market. See id. at 1086-87 ("[p]aying higher prices is certainly a direct harm to customers"). The allegation of excessive prices for U.S. consumers alone, the Court held, was dispositive on the issue of whether plaintiffs had alleged a "direct, substantial, and reasonably foreseeable" effect on domestic commerce.

Similarly, in Den Norske, the Fifth Circuit held that plaintiffs had properly alleged that "the defendants' conduct – that is, the agreement among heavy-lift service providers to divide territory, rig bids, and fix prices – had a direct, substantial, and reasonably foreseeable effect on

12

the United States market." 241 F.3d at 426. The Fifth Circuit found conclusive plaintiffs'

allegations that defendants' conspiracy "not only forced purchasers of heavy-lift services in the

Gulf of Mexico to pay inflated prices, but also that the agreement compelled Americans to pay

supra-competitive prices for oil." Id.

Lower courts have followed suit. For example, in Ferromin Int'l Trade Corp. v. UCAR

Int'l, Inc., 153 F. Supp. 2d 700, 705 (E.D. Pa. 2001),[31] the district court determined that

allegations that U.S. prices for graphite electrodes and the price of imported steel in the U.S.

were artificially inflated, together with allegations of U.S. output restrictions, "are sufficient to

satisfy the first requirement of the FTAIA." Id. As in Caribbean Broadcasting and Den Norske,

therefore, the FTAIA requirement of "direct, substantial, and reasonably foreseeable" effect on

domestic commerce was satisfied simply by allegations that domestic consumers paid higher

prices as a result of defendants' anticompetitive conduct.[32]

Under this authority, even if this Court limited its consideration solely to the allegations

of plaintiffs' First Amended Complaint, the requirements of § 6a(1) have been met. As the

Decision recognizes:

> [T]he amended complaint alleges that the defendants coerced the
> plaintiffs into agreeing to fix the resale price of Union Carbide
> products in India, and that they did so in order to ensure that prices
> charged by [the] [p]laintiffs to end-users in India for [p]roducts
> would not cause erosion to prices for the [p]roducts charged by
> [Union Carbide] and Dow to end-users . . . in the United States as
> well as in other jurisdictions . . ., and that, [a]s a direct and
> proximate result of [the] [d]efendants fixing of minimum resale
> prices and other terms of sale, competition in the sale and resale of

---

[31] This case is currently on appeal to the Third Circuit, and has been stayed pending the Supreme Court's decision in Empagran. See Exh. 1 to the Declaration of Richard S. Taffet, dated February 5, 2004 ("Taffet Decl."). For reasons that will be set forth in plaintiffs' opposition to defendants' stay motion, the same step should not be taken here.

[32] See also Coors Brewing Co. v. Miller Brewing Co., 889 F. Supp. 1394, 1398 (D. Colo. 1995) (finding FTAIA's "direct, substantial, and reasonably foreseeable" effect standard met where plaintiffs' allegations, taken as true, demonstrate the requisite effect on Canadian markets, "but also, albeit less directly, on the United States beer market and the consumers in that market") (emphasis added).

[Union Carbide] products in and from the United States was improperly diminished and restrained.[33]

Defendants ignore this authority and the straightforward allegations of the First Amended Complaint relied upon by the Court. They continue to argue that this action only involves effects in India, notwithstanding the allegations directly to the contrary. Defendants also try to characterize the alleged effects on U.S. commerce as only "spillover" effects.[34] They do so, however, by ignoring the direct effects alleged. Moreover, even if the effects were considered to be merely "spillover" effects from price fixing in India, which they are not, authority exists supporting the position that Congress intended such effects to satisfy the FTAIA. See H.R. Rep. No. 97-686, at 13 (1982) (stating that if conduct has "a 'spillover' effect on commerce within [the United States] – by creating a world-wide shortage or artificially inflated world-wide price that had the effect of raising domestic prices – [such] conduct would fall within the reach of our antitrust laws," because "[s]uch an impact would, at least over time, meet the test of a direct, substantial and reasonably foreseeable effect on domestic commerce"); Kruman, 284 F.3d at 403 n.10 (quoting the FTAIA legislative history, "[a] course of conduct in the United States – e.g., price fixing not limited to the export market – would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic"); IA Areeda & Hovenkamp § 272e, at 354 (2000 ed.) (opining that the Sherman Act could reach even conduct with "only remote[ ] and insignificant[ ]" effects on United States commerce and no intent to affect United States commerce if "American firms participate in the restraint" because "[s]uch participation might also imply some planning or other conduct within the United States").

---

[33] Decision, at 16 (internal quotations omitted, emphasis in original).

[34] See Defs.' Brief, at 8.

14

Nor do the cases relied upon by defendants compel a different conclusion. As with their prior arguments, defendants continue to assert that federal courts "consistently have rejected the jurisdictional applicability of the Sherman Act to complaints raising allegations similar to those raised by plaintiffs here."[35] As plaintiffs have demonstrated time and again, however, the cases defendants rely upon either employ analysis that has been expressly rejected by controlling Second Circuit precedent or are not factually analogous to the circumstances at hand. Indeed, some of defendants' cited cases do not even involve the FTAIA at all.

For example, in 'In' Porters, S.A. v. Hanes Printables, Inc., 663 F. Supp. 494 (M.D.N.C. 1987),[36] the basis for the district court's rejection of jurisdiction under the FTAIA was that "[a] foreign company that . . . fails to establish that it is within the class of injured United States exporters[] lacks a jurisdictional basis to sue under the Sherman Act." Id. at 500. The district court's finding of no FTAIA jurisdiction in S. Megga Telecomms. Ltd. v. Lucent Tech., Inc., No. 96-357-SLR, 1997 WL 86413 (D. Del. Feb. 14, 1997),[37] likewise hinged entirely on the fact that "[p]laintiffs' alleged injuries – lost sales to Lucent – are not injuries within the United States." Id. at *9.

But the Second Circuit in Kruman expressly rejected precisely this reading of the FTAIA. In fact, the Second Circuit held that jurisdiction is based upon the conduct's effect on United States commerce and whether a claim could be raised in the United States, not upon whether the plaintiff's injury is suffered here. 284 F.3d at 399-401.[38] See also Sniado, 352 F.3d at 78. It is thus defendants, and certainly not plaintiffs or this Court, that continue to misconstrue

---

[35] Defs.' Brief, at 12.

[36] See Defs.' Brief, at 13.

[37] See Defs.' Brief, at 13.

Kruman by conflating the two prongs of the FTAIA and relying on decisions that relate to the second prong – which defendants concede is not at issue here[39] – and worse, reflect the directly contrary law of other jurisdictions. Defendants' cited cases are therefore of no precedential effect in the case at hand.

Defendants' reliance on Eurim-Pharm GmbH v. Pfizer, Inc., 593 F. Supp. 1102 (S.D.N.Y. 1984), is also misplaced.[40] In fact, the plaintiffs in Eurim-Pharm expressly conceded that "defendants' conduct lacks a direct, substantial and reasonably foreseeable effect" on U.S. import or export commerce. Id. at 1106. The district court also determined that defendants' conduct did not meet § 6a(1)'s requirements because "plaintiff has failed to allege any facts demonstrating a causal connection between defendants' conduct in Europe and the price increase in the United States," and a "spillover" theory could not even be sustained. Id. at 1106-07. Plaintiffs here, however, allege that defendants' anticompetitive conduct, which took place in large part in the United States, was intended to and in fact did have the effect of raising prices in the United States.[41]

Defendants' other citations are equally inapposite. They involve factual scenarios vastly different from those at issue here.[42] Defendant's continued reliance on Gross v. New Balance

_____

[38] Even if this aspect of the Second Circuit's decision in Kruman is overturned by the Supreme Court's decision in Empagran, however, plaintiffs have suffered injury in the U.S., as will be discussed in detail in plaintiffs' opposition to defendants' motion for a stay.

[39] See Defs.' Brief, at 1.

[40] See Defs.' Brief, at 9, 11-13.

[41] See First Amend. Compl., at ¶¶ 29, 54, 112.

[42] See, e.g., Liamuiga Tours, 617 F. Supp. 920 (plaintiffs only alleged harm to themselves and not to competition in general); McElderry v. Cathay Pac. Airways, Ltd., 678 F. Supp. 1071 (S.D.N.Y. 1988) (same); McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir. 1988) (same); Turicentro, S.A. v. Am. Airlines, Inc., 303 F.3d 293 (3d Cir. 2002) (plaintiffs failed to allege any domestic market effect whatsoever and raised the claim for the first time on appeal). Moreover, defendants quote Turicentro out of context. The language quoted, see Defs.' Mem. of Law, at 9, in fact relates only to the question of whether defendants' activities constituted "import commerce" and thus fell outside the scope of the FTAIA. 303 F.3d at 302-03. Plaintiffs here raise no argument concerning import commerce.

Athletic Shoe, Inc., 955 F. Supp. 242 (S.D.N.Y. 1997), is particularly telling. Defendants cite

Gross for the proposition that injury caused by a vertical price fixing scheme is "indirect" rather

than "direct," as required by the FTAIA.[43]  However, Gross did not even involve the FTAIA, and

certainly does not speak to the meaning of the "direct, substantial, and reasonably foreseeable"

prong of that statute.  Moreover, at issue in Gross was whether indirect purchasers had standing

under § 4 of the Clayton Act, which requires a plaintiff to show injury to its business or property,

to challenge a resale price maintenance scheme.  955 F. Supp. at 245-47.  Once again, the Court

in Kruman makes clear that this injury inquiry is precisely not the relevant one under the FTAIA

in this Circuit.[44]  The relevant question under Second Circuit FTAIA precedent is whether the

alleged conduct had a direct, substantial and foreseeable effect in United States commerce that

gives rise to a claim under the Sherman Act, Kruman, 284 F.3d at 399-402, not whether that

effect is sufficient to confer standing as a direct purchaser under the Clayton Act.

      Likewise, other non-FTAIA cases are of no significance here.  See Republic of

Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992)[45] (involving breach of contract claim and

addressing meaning of "direct" as used in the Foreign Sovereign Immunities Act); Virtual

Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 236 (2d Cir. 2002)[46] (involving

declaratory judgment action and addressing meaning of "direct" as used in the Foreign Sovereign

Immunities Act); and Toyota Motor Manuf., Kentucky, Inc. v. Williams, 534 U.S. 184, 196

(2002)[47] (involving claimed violations of the Americans with Disabilities Act and addressing

---

[43] See Defs.' Brief, at 9.

[44] Again, even if this aspect of the Second Circuit's decision in Kruman is overturned by the Supreme Court's decision in Empagran, however, plaintiffs have suffered injury in the U.S., as will be discussed in detail in plaintiffs' opposition to defendants' motion for a stay.

[45] See Defs.' Brief, at 8.

[46] See Defs.' Brief, at 8.

[47] See Defs.' Brief, at 11.

meaning of "substantial" as used in that statute). Such cases may not properly be substituted for cases that address the "direct, substantial, and reasonably foreseeable" effects standard in the precise context of the FTAIA. See United States v. Dillard, 214 F.3d 88, 103 (2d Cir. 2000) ("[s]tatutes and rules created in different contexts and for different purposes may have different meanings, notwithstanding the use of similar words").

Moreover, defendants' attempt to contest that the domestic effects alleged by plaintiffs are not "reasonably foreseeable" disregards the very standard defendants seek to exploit, i.e., that the effect must be evident to a reasonable person making practical business judgments.[48] Taking plaintiffs' allegations as true, with all reasonable inferences drawn in plaintiffs' favor, the First Amended Complaint alleges that defendants imposed a per se unlawful resale price fixing scheme with the express purpose of maintaining prices in the United States at artificially high levels.[49] Moreover, as the documentary evidence presented by plaintiffs reveals, defendants in fact manipulated the prices for the sale of products to end-users in India specifically to protect domestic pricing from erosion. A reasonable person making a practical business judgment would not undertake such a course of conduct if it did not believe it would be successful.

Lastly, defendants' attempt to rely on the DOJ/FTC International Guidelines[50] is equally unavailing. Illustrative Example C, Variant (1) of the Guidelines is factually distinguishable, as it involves a cartel agreement formed outside of the United States to fix prices outside of the United States and considered whether subsequent excess sales into the United States at below-market prices, leading ultimately to lower production output in the United States, could constitute a direct, substantial, and reasonably foreseeable effect on domestic commerce. This

---

[48] See Defs.' Brief, at 11-12.

[49] See, e.g., First Amend. Compl., ¶¶ 29, 54.

[50] See Defs.' Brief, at 13-14.

plainly indirect effect is clearly not the situation alleged by plaintiffs here and shown by defendants' documents – i.e., the manipulation of pricing in the Indian market for the explicit purpose of protecting supracompetitive domestic prices.  As stated above, the allegations and evidence submitted by plaintiffs in this action demonstrate that it is only through their per se unlawful resale price fixing conspiracy that defendants are able to maintain artificially high domestic prices, resulting in higher prices paid by U.S. consumers.

## III.

### THE EVIDENCE DEMONSTRATES THAT DEFENDANTS' CONDUCT HAD A DIRECT, SUBSTANTIAL, AND REASONABLY FORESEEABLE EFFECT ON DOMESTIC COMMERCE

In prior briefing on subject matter jurisdiction issues, plaintiffs provided significant documentary evidence from the limited discovery available to date showing the direct, substantial and reasonably foreseeable effects of defendants' price fixing conduct on domestic commerce.[51]  Such evidence clearly shows that it was defendants' employees in the United States who were determining – i.e., fixing – the prices that plaintiffs could charge to end-users in India pursuant to a per se illegal resale price maintenance program, and that the purpose and effect of such conduct was specifically to maintain worldwide and U.S. prices at supracompetitive levels and protect such prices from erosion.[52]

The Court's Decision properly took account of this evidence, stating that "documentary evidence submitted in connection with the instant motion suggest that the defendants made

---

[51] See 11/12/02 Pltffs' Mem. of Law, at 9-14, and accompanying Exhibits referenced therein; and 5/23/03 Pltffs' Mem. of Law, at 16-18, and accompanying Exhibits referenced therein.

[52] See Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc., 227 F.3d 62, 72 (3d Cir. 2000) ("because, in the Sherman Act context, jurisdictional facts are often closely intertwined with the merits of the claim, it is incumbent upon the trial judge to demand less in the way of jurisdictional proof than would be appropriate at a trial stage") (internal quotations and citations omitted).

pricing decisions for the Indian market based on anticipated domestic market consequences."[53]
Specifically, the Court stated as follows:

> By way of illustration, the record reflects various e-mails and
> correspondence in which:  (1) the defendants refused orders placed
> by the plaintiffs because of domestic market pricing concerns;
> (2) that the defendants examined competitive pricing during world
> strategy meetings; and (3) that the defendants considered the
> firmness of domestic prices before deciding whether to meet
> pricing in the India market.[54]

Thus, for example, plaintiffs submitted evidence showing that defendants sought to and

did in fact control end-user prices in India for the purpose of protecting supracompetitive prices

in the United States.[55]  These documents leave little doubt that defendants' anticompetitive

conduct was intended to and did in fact achieve a direct, substantial, and reasonably foreseeable

effect on U.S. commerce.  For example:

- Email from UCAP employee to UCC employees throughout the world, requesting "current competitive pricing" and "sales potential" in preparation for the "coming world strategy meeting." See Taffet Decl., Exh. 2.

- Email from UCC employee in North America to plaintiffs and others forwarding detailed "business update" guidance regarding U.S. and Canadian sales and pricing activity to be used "as information for other world regions." See Taffet Decl., Exh. 3.

- Report of global pricing and sales activity, including India, forwarded to various UCC personnel located in Danbury. See Taffet Decl., Exh. 4.

- Email from Ken Bromfield, UCC/Danbury, setting forth key objectives for 2000, including "INCREASE PRICES WORLDWIDE!!!!" See Taffet Decl., Exh. 5.

- Email from UCAP to plaintiffs refusing order because pricing "does not provide sufficient netback to UC USA.  We are . . . looking for pricing . . . to match our current netback in the North American market." See Taffet Decl., Exh. 6.

---

[53] Decision, at 16.

[54] Decision, at 16 n.3.

[55] See 5/23/03 Pltffs' Mem. of Law, at 16-18, and accompanying Exhibits referenced therein.

- Email from UCAP to plaintiffs evaluating competitive pricing in India, and deciding whether to meet competitive pricing based on fact that "prices in the U.S. are firming." See Taffet Decl., Exh. 7.

- Internal UCCS email evaluating price proposed by Plaintiffs for sales in India and stating that the "order is priced at a much higher price than the other countries." See Taffet Decl., Exh. 8.

- Email from UCCS to plaintiffs evaluating prices charged in Bangladesh in determining price to be charged to Indian end-user. See Taffet Decl., Exh. 9.

Two documents in particular make clear that Defendants' per se illegal resale price fixing scheme had the requisite anticompetitive effect on United States commerce to confer jurisdiction in United States courts. First, in 1998, David Tornow, a UCC Danbury employee, emailed various UCC sales personnel throughout the world, including MegaVisa, encouraging such personnel to help preserve a recent UCC price increase by not "soft-peddl[ing] the increase." The email also states that "[a]ll U.S. producers followed" UCC's price increase. See Taffet Decl., Exh. 10. A clearer connection between end-user prices in India and U.S. directed and implemented prices would be hard to imagine.

Similarly, an email dated August 30, 1999 from a UCC employee in Singapore requests that various UCC sales personnel, including MegaVisa, increase prices for a certain product, stating that "all US producers are hurting like mad." See Taffet Decl., Exh. 11. This communication reflects the direct correlation between the dynamics of the United States marketplace and prices sought to be controlled by UCC and elsewhere in the world, including India.

Notably, each of the two just mentioned documents further suggests that defendants' conduct involved potential per se unlawful horizontal price fixing by U.S. producers of the particular products. See, e.g., Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647 (1980) ("[a] horizontal agreement to fix prices is the archetypal example of" a per se unlawful

21

anticompetitive practice).  This, too, clearly shows a "direct, substantial and reasonably foreseeable" effect on U.S. commerce.  See Taffet Decl., Exh. 11 (defendants announcing price increase and advising employees to "watch for competitors' responses since this round, we are taking the lead"); Taffet Decl., Exh. 12 ("[a]gree . . . we not meet Akzo's latest prices . . . let Akzo have some business"); Taffet Decl., Exh. 10 (defendants directing North American employees to maintain price increase for product because all producers followed UCC's lead).

Because the Court has directed that plaintiffs identify all "substantial, and reasonably foreseeable" effects on domestic commerce resulting from defendants' per se unlawful resale price fixing conspiracy,[56] plaintiffs now submit additional documentary evidence plainly showing that defendants considered United States and other countries' prices when unlawfully fixing the prices to be charged to Indian end-users.  Such new documentation includes:

- Memorandum prepared by plaintiffs reflecting discussions with Dicky Leung, a UCAP product director, wherein defendants rejected lower pricing concessions requested by plaintiffs because lower prices for sales to end-users in India would "lead[] to overall reduction of world prices of bulk commodity chemicals."  See Taffet Decl., Exh. 13.

- Email from defendants directing plaintiffs, and others, to "keep moving prices UP." Defendants specifically sought a $100m/t price increase in order to be on par with U.S. and Canadian prices, which had already been increased by $100m/t.  See Taffet Decl., Exh. 14.

- Emails from defendants rejecting plaintiffs' proposed orders on the basis that prices were too low, and informing plaintiffs that Indian prices cannot be lowered because defendants are attempting to implement a worldwide price increase.  The emails further direct plaintiffs to help maintain the price increase, i.e., by not selling below the prices dictated by defendants.  See Taffet Decl., Exhs. 15, 16.

These documents, together with the evidence submitted by plaintiffs previously, clearly reflect the direct correlation between the dynamics of the United States marketplace and prices sought to be controlled by defendants elsewhere in the world, including in India.  In fact, for

---

[56] See 12/9/03 Order ("[i]n their response, the plaintiffs must identify all known [substantial and reasonably foreseeable effects within the meaning of 15 U.S.C. § 6(a)(1)]").

defendants to implement and maintain price increases in the United States and worldwide, it was necessary for defendants to enforce their minimum resale price fixing scheme by rejecting plaintiffs' lower-priced orders and directing plaintiffs not to seek approval for pricing below the minimum resale prices set by defendants.

As further evidence that the primary focus of defendants' per se unlawful price fixing conspiracy was on U.S. markets, plaintiffs submitted documents unequivocally showing that defendants' employees in the United States were intimately involved in formulating, implementing, and enforcing the resale price fixing conspiracy alleged in the First Amended Complaint, including setting the minimum resale prices and rejecting plaintiffs' proposed orders that were below such minimum resale prices.[57] Thus, for example:

- Email from MMGS to UCAP stating "Tom White [UCC/Danbury Global Business Manager] has suggested us to get some orders for BUTYL CELLOSOLVE at a price of USD 675 CIF Mumbai . . . . Please confirm on this with the quantities available so that we can approach customer accordingly. See Taffet Decl., Exh. 17.

- Email from Arjun Samtani to Kevin Dillan, UCC/Danbury, describing pricing breakup, including final CIF price sold to customer. See Taffet Decl., Exh. 18.

- Email from UCAP to UCC/Danbury stating "[p]lease verify again the pricing of DEK ex-Taiwan. We need to make sure the pricing quote is at USD 2.10/kg CIF Mumbai level." See Taffet Decl., Exh. 19.

- Email from UCAP to MMGS stating "[a]s promised, we had a conference call with Danbury last week on CZ which included price increase in one of the topics we discussed. We will proceed with our announced price increase and move the minimum floor price up to USD 5.45/kg CIF." See Taffet Decl., Exh. 20.

- Email from UCAP to MMGS requesting information because "[w]e are being requested by Danbury to seriously consider a major price increase on 2,4PDO effective Nov 1 . . . I need this data to strategically determine what to recommend to Danbury on 2,4PDO business/price increase." See Taffet Decl., Exh. 21.

---

[57] See id. at 14-18.

- Email from Gene Fischer, UCC/Danbury Global Business Manager, setting minimum pricing for all telecom jacketing and insulation at USD 800/ton. See Taffet Decl., Exh. 22.

- Email from Kevin Dillan, UCC/Danbury, to Arjun Samtani approving price for plaintiffs' sale of product to India and asking to be "informed as to the success of [the] negotiations." See Taffet Decl., Exh. 23

- Letter from Dow/Midland announcing price increase for Carbowax. See Taffet Decl., Exh. 24.

- Emails from Dow India to plaintiffs confirming order processing procedures following the Dow/UCC merger, and explaining that Dow India sales team would get clearance from Dow's U.S. marketing managers before accepting and entering plaintiffs' orders. See Taffet Decl., Exhs. 25, 26.

A string of related emails during February 1998 involving Kevin Dillan of

UCC/Danbury, Arjun Samtani of UCAP and Sharad Mirji of MMGS is particularly illustrative of

UCC/Danbury's involvement in setting the minimum resale prices that could be charged by

Plaintiffs. See Taffet Decl., Exh. 27. These emails provide as follows:

> Mirji (MMGS) to Samtani (UCAP):
>
> [A]s per your advice, we are quoting them [the customer] USD 1900/MT CIF Madras D/A 180 days in Isotanks.
>
> Samtani (UCAP) to Dillan (UCC/Danbury):
>
> Kevin, if I recall correctly, we did discuss this in our last conference call. Kevin are you still OK with this or are there any fresh thoughts?
>
>       *            *            *
>
> Dillan (UCC/Danbury) to Samtani (UCAP):
>
> What is our current price on PM-6079? I assume it is $1900/mt CIF and that we are simply trying to roll-over the price. We should be increasing the price from today's level by at least $100/mt . . . .
>
> Samtani (UCAP) to Dillan (UCC/Danbury):

24

Kevin, thanks. Our current price is $1900/mt. We will quote
$2000/mt and of course will not get the business.

Samtani (UCAP) to Mirji (MMGS):

Please see attached email from Kevin and my reply. Let us quote
$2000/mt.

Plaintiffs also submitted documents evidencing the integral involvement of defendants'

employees in the United States in all aspects concerning the sale of defendants' products to

plaintiffs, including the development of plaintiffs' annual business plans,[58] allocation and

availability of product, review of plaintiffs' monthly and quarterly sales reports,[59] gathering and

analyzing competitive information, providing marketing and other promotional material to assist

plaintiffs' sales, and resolving plaintiffs' end-user customer disputes.[60] The following

documents illustrate these U.S. ties to plaintiffs' transactions with defendants, and the direct

connection of plaintiffs' resale of products in India to the U.S. market:

- Email from Jennifer Casazza, marketing manager UCC/Danbury requesting year end
  sales reports for UCC to update its long range plan, stating "it's important that you
  communicate any forecast or significant changes to volume on specific product, to insure
  our production and inventory matches up with customer needs." See Taffet Decl., Exh.
  28.

- Email from UCC/Australia to MMGS requesting market information to incorporate into
  plan to be submitted to Joe Soviero, V.P. and General Manager UCC/Danbury. See
  Taffet Decl., Exh. 29.

- Email requesting sales projections from plaintiffs to be submitted to Kevin Dillan,
  UCC/Danbury. See Taffet Decl., Exh. 30.

---

[58] Decisions concerning the allocation and availability of products each year, including to plaintiffs, were made by
defendants through a process involving the development of Annual Business Plans, or ABPs. ABPs were developed
in the first instance by UCC's local representatives, together with plaintiffs, with information provided by UCC's
Danbury personnel. The information compiled for the ABPs was submitted to UCC/Danbury to be considered by
UCC in the development of global strategy. Sample ABPs relating to plaintiffs are submitted herewith as Exh. 44 to
the Taffet Decl.

[59] Samples of plaintiffs' quarterly and monthly sales reports are submitted herewith as Exh. 45 to the Taffet Decl.

[60] See 11/12/02 Pltffs.' Mem. of Law, at 9-13.

- Requests to plaintiffs to use specific format provided by UCC for sales reports to allow input into UCC/Danbury systems. <u>See</u> Taffet Decl., Exh. 31.

- Emails to UCC/Danbury requesting 1999 rolling shipping forecasts. <u>See</u> Taffet Decl., Exh. 32.

- UCC Chairman and CEO, William Joyce, directing UCC affiliates in 1998 to "minimize" the ABP planning process. <u>See</u> Taffet Decl., Exh. 33.

- UCAP email to MMGS stating, "I had a conference call with Danbury last night. We definitely need the 1000MT business with Indofil. I am willing to be more flexible on price/terms if need be." <u>See</u> Taffet Decl., Exh. 34.

- UCC/Malaysia advising MMGS that "[t]he Danbury managers would like to be more aware of what is happening at our key customers and would like to have more information on a regular basis rather than the occasional emails." <u>See</u> Taffet Decl., Exh. 35.

- Email from David Tornow, UCC/Danbury, to UCAP stating "[p]lease keep pressing hard at distributors for more . . . business – that's where the most busines [sic] is uncommitted." <u>See</u> Taffet Decl., Exh. 36.

- Email from Patricia Holahan, UCC/Danbury, forwarded to MMGS providing information on various competitors, attaching letter from Holahan announcing price adjustments for certain products. <u>See</u> Taffet Decl., Exh. 37.

- Plaintiffs were provided and requires to use UCC marketing materials and participate in UCC's quality assurance programs, including at UCC headquarters in Danbury, Connecticut. <u>See</u> Taffet Decl., Exhs. 38, 39.

- UCC provided product information to use in conjunction with their marketing efforts. <u>See</u> Taffet Decl., Exh. 40.

- UCC directed training for plaintiffs, including at UCC headquarters in Danbury, Connecticut. <u>See</u> Taffet Decl., Exh. 41.

- UCC employees were involved in several significant customer disputes involving plaintiffs' end-user customers in India. <u>See</u> Taffet Decl., Exh. 42.

Plaintiffs also have shown that defendants' domestic employees directed and controlled the logistical aspects of defendants' sale and plaintiffs' purchase of products, including accepting, processing and filling orders in the United States.[61]  For example:

---

[61] <u>See</u> <u>id.</u> at 13-14.

- Plaintiffs submitted orders for products directly to UCC in the United States. Orders submitted to defendants' local representatives were entered into the UCC global order entry system, CEBA, and accessed in the United States by UCC.[62]

- Plaintiffs were advised that a particular order was accepted and the terms approved by UCC by "understood and agreed," or "U/A," emails. See Taffet Decl., Exh. 43.

- Once plaintiffs' orders were entered into the CEBA system, decisions regarding whether products would be allocated to fill plaintiffs' orders were made by UCC's Global Business Managers with responsibility for each of the groups responsible for the sale of the particular type of product.[63]

In combination with the allegations in the First Amended Complaint, the foregoing documentary evidence clearly supports that defendants' per se illegal price fixing conspiracy had the requisite "direct, substantial, and reasonably foreseeable" effect on United States commerce.

## CONCLUSION

For the foregoing reasons, we respectfully submit that the Court correctly denied defendants' motions to dismiss for lack of subject matter jurisdiction pursuant to proper Second Circuit and FTAIA legal authority and a correct reading of plaintiffs' pleading and documentary

---

[62] See id.

[63] See id.

27

evidence.  Subject matter jurisdiction is therefore proper, and defendants' motion to reconsider

should be denied.

THELEN REID & PRIEST LLP

By: _Richard Taffet_

Richard S. Taffet (ct 10201)
875 Third Avenue
New York, New York  10022-6225
(212) 603-2000 (tel)
(212) 603-2001 (fax)

WIGGIN & DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One CityPlace
185 Asylum Street
Hartford, Connecticut  06103-3402
(860) 297-3724 (tel)
(860) 525-9380 (fax)

Attorneys for Plaintiffs MM Global Services Inc.,
MM Global Services Pte. Ltd. and MegaVisa
Solutions (s) Pte. Ltd.