UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., <br><br>Plaintiffs, <br><br>v. <br><br>THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD., and DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD., <br><br>Defendants. | : <br> : <br> : <br> : <br> : <br> : Civil No. 3:02 CV 1107 (AVC) <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : February 20, 2004 |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO RECONSIDER ORDER DENYING MOTIONS TO DISMISS FEDERAL ANTITRUST CLAIM FOR LACK OF SUBJECT MATTER JURISDICTION

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
(860) 275-8304

Andrew S. Marovitz (ct 25409)
MAYER, BROWN, ROWE & MAW LLP
190 S. LaSalle Street
Chicago, IL 60603-3441
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street
Washington, DC 20006-1157
(202) 263-3000

*Attorneys for Defendants The Dow Chemical Company, Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    A.   Plaintiffs Cannot Avoid The FTAIA's Jurisdictional Requirement Of Direct, Substantial, And Foreseeable Effects on U.S. Commerce ........................................................................................................ 2

    B.   Plaintiffs Have Not Identified Direct, Substantial, And Reasonably Foreseeable Effects on the U.S. ................................................................... 6

    C.   Plaintiffs' Position Would Transform U.S. Courts Into World Courts ......................................................................................................... 9

CONCLUSION ....................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Caribbean Broadcasting Sys. v. Cable & Wireless*,
  148 F.3d 1080 (D.C. Cir. 1998) ................................................................. 4

*Den Norske Stats Oljeselskap v. Heeremac*, 241 F.3d 420 (5th Cir. 2001) ................. 4

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 342 (D.C. Cir.), *cert. granted*, 124 S. Ct. 966 (2003) ............................................................ 4

*F. Hoffman-La Roche Ltd. v. Empagran, S.A.*, No. 03-724 (U.S.) ...................... 1, 10

*Ferromin Int'l Trade Corp. v. UCAR Int'l, Inc.*,
  153 F. Supp. 2d 700 (E.D. Pa. 2001) ........................................................ 4

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) ............................. 3

*'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494 (M.D.N.C. 1987) ........ 6

*Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002) ....................... 2, 3, 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................. 9

*National Bank v. Interbank Card Ass'n*,
  666 F.2d 6 (2d Cir. 1981) ............................................................... 4, 9

*S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.*,
  1997 WL 86413 (D. Del. 1997) ............................................................ 6

*Sniado v. Bank Austria AG*, 352 F.3d 73 (2d Cir. 2003), petition for cert. filed, 72
  U.S.L.W. 3488 (U.S. Jan. 12, 2004) (No. 03-1015) .................................... 3, 6

*United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945) .................................... 5

**Statutes, Rules & Regulations**

15 U.S.C. § 6a ...................................................................... *passim*

**Other Authorities**

1A Areeda & Hovenkamp, ANTITRUST LAW (2d ed. 2000) ................................... 5, 9

BLACK'S LAW DICTIONARY (6th ed. 1990) .................................................... 7

H.R. Rep. 97-686 (1982) ............................................................ 2, 3, 7

## INTRODUCTION

This Court's December 9 Order was straightforward: Plaintiffs were to "identify all known effects" on U.S. commerce arising from defendants' alleged resale price maintenance scheme. Plaintiffs' answer should have been equally straightforward. But because they cannot allege or show any *actual effects* in the U.S. from the alleged resale prices in India, plaintiffs submitted a 28-page Opposition and a 45-exhibit Appendix to divert attention from the "direct, substantial, and reasonably foreseeable effect" on domestic commerce actually required by the FTAIA.

Because plaintiffs cannot meet the FTAIA's standard, the Opposition attempts to shift the focus from the location of the *effects* to the location of the *conduct*, from the *actual* effects to ascribed *intentions*, and from *direct* effects to a *speculative association* between prices in India and a lack of price "erosion" in the U.S. None of the exhibits appended to plaintiffs' Opposition (discussed *infra* at 8-9) even begins to address the threshold question of how alleged price restraints in India *actually* caused anticompetitive effects in the United States; they confirm, to the contrary, that the purported effects of any such restraints occurred in India.

This term, the Supreme Court will address the meaning of subsection (2) of the FTAIA. *F. Hoffman-LaRoche, Ltd. v. Empagran S.A.*, No. 03-724. Its ruling will have no impact here if this Court grants defendants' motion, which is based solely on subsection (1) of the FTAIA. But if the Supreme Court rejects the Second Circuit's interpretation of subsection (2) – as the Solicitor General has urged[1] – that provision will provide an additional ground for dismissing this case because no effect on U.S. commerce gave rise to plaintiffs' claim.

---

[1]     The Solicitor General's amicus brief supporting petitioners in *Empagran* is available at http://www.usdoj.gov/osg/briefs/2003/3mer/1ami/2003-0724.mer.ami.pdf.

## ARGUMENT

### A.  Plaintiffs Cannot Avoid The FTAIA's Jurisdictional Requirement Of Direct, Substantial, And Foreseeable Effects On U.S. Commerce.

The FTAIA states that the Sherman Act "shall not apply" unless the challenged conduct "has a direct, substantial, and reasonably foreseeable effect" on U.S. commerce. 15 U.S.C. § 6a(1). This "single, clear standard" governs the extraterritorial scope of the Sherman Act. H.R. Rep. 97-686, at 6 (1982). Plaintiffs cannot prevail under this statutory standard because they cannot identify any direct, substantial, and reasonably foreseeable effect in the U.S. from the alleged price restraints in India. For that reason, they offer up a new standard all their own.[2]

*First*, plaintiffs improperly focus on the locus of the alleged *conduct* rather than the locus of the *effects*. They contend (at 4, 23-27) that the alleged price restraints in India were developed and discussed in the United States. But "it is the situs of the effects, as opposed to the conduct, that determines whether United States antitrust law applies." H.R. Rep. 97-686, at 5; *accord Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002). Thus, notwithstanding any alleged conduct in the U.S., injurious prices in India do not support a U.S. antitrust claim.

*Second*, plaintiffs substitute subjective *intentions* for the *actual effects* on U.S. commerce required by the FTAIA. Plaintiffs claim (at 2) that the alleged plan "to fix plaintiffs' resale prices in India" had an ultimate "purpose of maintaining supracompetitive prices in the United States" and "was designed" to achieve that purpose. Missing from this scenario are any *actual* effects in the U.S., let alone the "direct, substantial, and reasonably foreseeable" effects required by the FTAIA. Conduct challenged under the Sherman Act not only must have been intended to produce the requisite effects but "*did in fact produce* some substantial effect in the United

---

[2]  Notably, plaintiffs' Opposition no longer presses the Court to find (as it did in its Sept. 12 Order at 16) that the FTAIA is satisfied because of the purported *per se* nature of resale price maintenance.

States." *Kruman*, 284 F.3d at 394, *quoting Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993). Plaintiffs speak of "purpose" and "design" because they cannot identify or properly allege any actual U.S. effects from the purported India resale pricing scheme.

*Third*, plaintiffs claim (at 14) that it is sufficient to identify "spillover" effects, relying on use of that term in the House Report. But the House Report makes clear that any "spillover" effects must themselves be direct, substantial, and reasonably foreseeable to serve as the basis for Sherman Act jurisdiction. Congress used the example of a global cartel "raising domestic prices." H.R. Rep. 97-686, at 13. Congress recognized that fixing prices everywhere presumptively results in fixed prices in the U.S. In contrast, there is no reason to think that resale price restraints in India would restrain prices in the U.S. Plaintiffs' posited lack of price erosion in the U.S. is precisely the type of ancillary effect that does not authorize Sherman Act jurisdiction. *See Kruman*, 284 F.3d at 402 (Congress sought to "prevent conduct that merely has an ancillary effect on our markets from being actionable under our antitrust laws").

*Fourth*, plaintiffs try to employ Second Circuit decisions to weaken the statutory requirements, but their reliance on *Kruman* and *Sniado v. Bank Austria AG*, 352 F.3d 73 (2d Cir. 2003) is completely misplaced. *Kruman* and *Sniado* involved purported effects in the U.S. that, unlike the Indian prices alleged here, plainly satisfied the FTAIA test. In *Kruman*, 284 F.3d at 401, the same conduct "actually reduced competitiveness in the domestic auction market" and produced "explicit domestic price-fixing agreements" in the U.S. In *Sniado*, 352 F.3d at 76, defendants were alleged to have charged supracompetitive currency exchange fees "in the United States." Furthermore, satisfaction of the subsection (1) effects test was not at issue in either case. In *Kruman*, 284 F.3d at 402, the court of appeals "did not address" whether the plaintiff satisfied the subsection (1) effects test. In *Sniado*, 352 F.3d at 77-78, the court of appeals vacated the

3

district court's subsection (2) ruling and remanded for a determination on whether the plaintiff's claim satisfied subsection (1).

Plaintiffs also suggest (at 8-9) that a pre-FTAIA case, *National Bank v. Interbank Card Ass'n*, 666 F.2d 6 (2d Cir. 1981), adopted a less stringent effects test. But in *National Bank* the Second Circuit expressly required an "anticompetitive effect upon American commerce" to meet "the threshold requirement of jurisdiction." *Id.* at 8. Moreover, the court stressed, Sherman Act jurisdiction cannot rest on a "*conceivable repercussion* of the action objected to on United States commerce." *Id.* (emphasis added). The court therefore affirmed dismissal for lack of jurisdiction because the plaintiff "failed to make clear the linkage, if any," between the challenged licensing in Canada and "anticompetitive consequences to United States commerce." *Id.* at 9. Here, too, plaintiffs rely entirely on "conceivable repercussions" in the U.S. from the allegedly restrained resale prices halfway around the world in India and fail to make clear any linkage between the two.

*Fifth*, the contrast between plaintiffs' deficient allegations (that the purported price restraints in India somehow stemmed "price erosion" here) and the facts in the cases they cite at 11-13 (that anticompetitive conduct actually affected prices here) is striking. *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 342 (D.C. Cir.), *cert. granted*, 124 S. Ct. 966 (2003) (vitamins "sold [within] the United States"); *Den Norske Stats Oljeselskap v. Heeremac*, 241 F.3d 420, 422 (5th Cir. 2001) ("higher prices" charged for crude oil "exported to the United States"); *Caribbean Broadcasting Sys. v. Cable & Wireless*, 148 F.3d 1080, 1086 (D.C. Cir. 1998) ("advertisers in the United States" paid higher prices); *Ferromin Int'l Trade Corp. v. UCAR Int'l, Inc.*, 153 F. Supp. 2d 700, 704 (E.D. Pa. 2001) ("effects [on] the United States market" included higher electrode and steel prices). In contrast to these cases, the Complaint

(quoted in Opposition at 13) states that defendants agreed "to fix the resale price of Union Carbide products in India." It does not allege any agreement to fix prices in the U.S. or indicate that the pricing in India actually affected prices in the U.S. An intended lack of price erosion in the U.S. – on which plaintiffs now rely – is a far cry from the allegedly supracompetitive prices actually charged in each of the above cases and from the effects required by the FTAIA.

The support claimed by plaintiffs (at 14) from the Areeda & Hovenkamp treatise rests on a misrepresentation. Plaintiffs fail to disclose that the quoted selection does not address the FTAIA's effects test at all. Instead, it comes from a discussion of Judge Hand's suggestion in *United States v. Alcoa*, 148 F.2d 416 (2d Cir. 1945), that proof of "intended" effects serve as an alternative to "substantial" and "direct" effects. *See* 1A Areeda & Hovenkamp, ANTITRUST LAW ¶¶ 272d-e, at 352-54 (2d ed. 2000). When the treatise authors addressed the effects actually required by FTAIA subsection (1), they explained that "[p]rice fixing confined to exports with no significant domestic spillover [would] fall outside the Sherman Act, as would price fixing abroad that did not significantly affect imports into the United States." *Id.* ¶ 272h, at 360. Based on the treatise, then, the "price fixing abroad" alleged by plaintiffs falls "outside the Sherman Act."

*Finally*, plaintiffs try to evade the authorities cited by defendants. They brazenly assert (at 2) that defendants "do not cite a single case" supporting lack of jurisdiction here, ignoring the *many* cases cited in defendants' opening brief (at 12-13) that rejected jurisdiction on analogous facts. Plaintiffs (at 16) find some of those cases not germane because here defendants' conduct "in fact did have the effect of raising prices in the United States." Plaintiffs somehow have transformed the Complaint's allegation of an *intent to prevent price erosion* in the U.S. into prices raised "in fact." Even if it were permissible to amend their complaint in such fashion,

5

plaintiffs do not show how any price restraints in India "in fact" resulted in higher prices or in any way affected relevant product sales in the U.S. Plaintiffs' further contention (at 15) that two cases cited by defendants, *'In' Porters* and *S. Megga*, are inconsistent with *Kruman* and *Sniado* is nonsense. The courts rejected Sherman Act jurisdiction in those cases because of a failure to satisfy the effects test in FTAIA subsection (1), the very question at issue on this motion. In contrast, as explained above, the subsection (1) effects test was *not* at issue in *Kruman* or *Sniado*.

Plaintiffs are equally unsuccessful (at 18-19) in their attempt to brush aside the DOJ/FTC Guidelines. As discussed in defendants' opening brief (at 13-14), the U.S. antitrust enforcers concluded that "[t]he mere fact that the existence of U.S. sales or the level of U.S. prices may *ultimately be affected*" by restraints abroad "is not enough" for Sherman Act jurisdiction. Plaintiffs' purported distinction (at 18-19) between restraints that lower and raise prices in the U.S. is irrelevant to the issue here: whether the alleged price restraints in India caused "*direct, substantial, and reasonably foreseeable*" effects in the U.S. The facts in the federal agencies' example, involving overseas price restraints with possible indirect effects here, are in all relevant aspects identical to the facts alleged by plaintiffs. The federal agencies' conclusion that there is no subject matter jurisdiction under the Sherman Act is compelled here as well.

### B. Plaintiffs Have Not Identified Direct, Substantial, And Reasonably Foreseeable Effects On The U.S.

As demonstrated in defendants' opening brief (at 8-12), the supposed effects on U.S. commerce alleged by plaintiffs are not direct, not substantial, and not reasonably foreseeable. Plaintiffs' Opposition simply confirms that conclusion.

Plaintiffs (at 17) reject the relevance of cases construing the meaning of "direct" and "substantial" in other federal statutes. But they offer no competing standard. The dictionary definition of "direct" is "[i]mmediate; proximate; by the shortest course; without circuity;

operating by an immediate connection or relation, instead of operating through a medium." BLACK'S LAW DICTIONARY 459 (6th ed. 1990). The only effects alleged by plaintiffs that fit within this definition are resale prices in India. Otherwise, plaintiffs propose only an undefined and unspecified but plainly remote and circuitous association between the Indian price restraints and a lack of price erosion in the U.S. And they make no attempt to quantify any such lack of price erosion, precluding them from satisfying the FTAIA's substantiality requirement through which Congress sought to ensure a "substantial nexus to this country" before antitrust claims may proceed in U.S. courts. H.R. Rep. 97-686, at 10.

Nor do plaintiffs suggest why it is "reasonably foreseeable" that price restraints in India would have the required effect on prices in the U.S. Foreseeable does not mean hypothetically possible. The test for reasonable foreseeability is "whether the effects would have been evident to a reasonable person making practical business judgments." H.R. Rep. 97-686, at 9. Plaintiffs offer no reason why a reasonable person would find it evident that price restraints in Calcutta would have a direct and substantial impact on prices in Connecticut.

In lieu of "identify[ing] all known effects," as this Court ordered, plaintiffs offer naked and plainly inaccurate assertions. For example, they claim (at 5) that defendants' conduct had an anticompetitive effect "on commerce in the United States by limiting plaintiffs' ability to compete freely here." But plaintiffs previously stipulated that they compete only in India. *See* Def. Open. Br. 2. Plaintiffs also assert (at 5) that they have "shown" that defendants' alleged conduct "did in fact cause a significant anticompetitive effect on commerce in the United States." But, as demonstrated above, they cite nothing to support any such "showing." Plaintiffs must at least *specify* some direct, substantial, and reasonably foreseeable effects on U.S. commerce. What do plaintiffs mean by a lack of "erosion" in U.S. prices? Did defendants

7

actually sell product in the U.S. at supracompetitive prices as a result of price restraints in India? If so, how did the Indian events actually affect prices here? Plaintiffs never answer these questions because they cannot identify *any* transactions at supracompetitive prices in the U.S.

Plaintiffs contend (at 20-21) that documents appended to their brief "leave little doubt" that defendants' conduct "did in fact achieve a direct, substantial, and reasonably foreseeable effect on U.S. commerce." None of those documents, however, supports plaintiffs' assertion that price restraints in India "in fact achieve[d]" the requisite effects on U.S. commerce.

- Exhibit 2 is a request to the sales force for price and sales information to prepare for an upcoming strategy meeting. Manufacturing companies typically gather this type of information for planning purposes.
- Exhibit 3 summarizes recent performance, forecasts future performance, and urges UCC's sales force to "hold our price gains," "keep the growth trends rising," and "regain share" – hardly evidence of anticompetitive conduct or effect.
- Exhibit 4 summarizes UCAP sales *in Asia*, not the U.S.
- Exhibit 5 urges UCC's sales force to "[l]ook for opportunities to improve profitability [and] increase prices worldwide" and to provide "accurate forecasts [to] make sure that we can satisfy our worldwide demand." It does *not* link price changes in India to any price effect in the U.S.
- Exhibit 6 informs Indian distributors that their proposed prices would not allow UCC to earn a sufficient "netback," particularly given supply shortages. The e-mail refers to the U.S. price to indicate an appropriate netback in India. It says nothing about the effect of an increase in price on the U.S. market.
- Exhibit 7 tells Indian distributors that a competitor's price offer is "suspicious," in part because of "firming" U.S. prices. This communication addresses only the price to be charged in India; there is no link to any U.S. effect.
- Exhibit 8 compares prices proposed by plaintiffs in India to prices in unspecified "other countries." It references no prices in the U.S.
- Exhibit 9 compares prices in Bangladesh to prices proposed by plaintiffs in India, all using a common currency. There is no reference to sales in the U.S.
- Exhibit 10 summarizes recent performance successes and shortfalls and urges the UCAP sales force to seek "every pound of business." Plaintiffs say (at 21) that it "would be hard to imagine" a "clearer connection" between Indian and U.S. prices. But the only references to the U.S. note that competitors followed a recent price increase and that sales volume is up in the U.S. and down in Asia. If anything, this document indicates *lack* of a connection between Indian and U.S. prices.

- Exhibit 11 announces a price hike and urges sales personnel to observe competitors' reactions to avoid loss of market share. The author expected the price hike to succeed because U.S. competitors were "hurting like mad." This sole reference to the U.S. does not indicate any impact on U.S. prices from restraints in India. Contrary to plaintiffs' contention (at 21), evaluating strengths and weaknesses of competitors does not indicate "potential per se unlawful horizontal price fixing" but rather is a routine and prudent business function.

- Exhibit 12 addresses pricing in India, with no reference to the U.S.

- Exhibit 13 relates UCAP's rejection of plaintiffs' proposal to sell *to distributors* at discounted prices rather than to end users at market prices. MegaVisa was advised to sell "products directly to endusers" instead of pushing for "bulk consignments" with insufficient volume. The document does not discuss the setting of prices in the U.S.

- Exhibit 14 evaluates whether to raise prices in Asia. The only reference to the U.S. notes that U.S. and Canadian prices had been rising.

- Exhibits 15 and 16 address proposed prices in India, not U.S. effects of such prices.

- Exhibits 17-43 focus upon pricing in India. Plaintiffs state (at 23-24) that these documents show that "defendants' employees in the United States" were involved in developing resale prices in India and illustrate "UCC/Danbury's involvement" in setting those prices. Plaintiffs thereby admit that these documents reflect only conduct – not any effects of such conduct – in the U.S.

- Exhibit 44 contains annual business plans ("ABPs") for India. Plaintiffs state (at 25 n.58) that UCC reviewed such ABPs in developing its "global strategy." But Exhibit 44 does not refer to U.S. sales or prices.

- Exhibit 45 contains UCAP sales reports. Plaintiffs state (at 25) that defendants' employees reviewed these reports. Again, these provide no evidence of U.S. effects.

At most, these documents show that defendants sought higher profits throughout the world and evaluated what the market would bear. A desire to raise prices and profits – common to all rational businesses – is not the jurisdictional test for an antitrust claim. As in *National Bank*, 666 F.2d at 9, plaintiffs' claim must be dismissed because "appreciable anticompetitive effects on United States commerce * * * do not appear from the record."

### C. Plaintiffs' Position Would Transform U.S. Courts Into World Courts.

"American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986); *see* Areeda & Hovenkamp, *supra*, ¶ 273a, at 368 ("Congress did not intend American antitrust law to

9

rule the entire commercial world"). Plaintiffs' attempt to have this Court evaluate price restraints in India cannot be reconciled with these principles or with the plain text of the FTAIA, which was enacted to "codify *limits* on the extraterritorial reach of the antitrust laws." Solicitor General Empagran Br., *supra* n.1, at 13. Plaintiffs flout those limits by arguing that everything is connected in the global economy and thus any restraint anywhere is governed by U.S. antitrust law. That position not only conflicts with the FTAIA but also with established principles of international law. As explained by the numerous government-amici in *Empagran*, affirmance of the D.C. Circuit's ruling would impede their ability to remedy anticompetitive conduct in their own countries. Plaintiffs' attempt to have this Court regulate the propriety of resale prices in India should be rejected as a matter of law and of sound public policy.

## CONCLUSION

Defendants' motion for reconsideration should be granted and plaintiffs' federal antitrust claim dismissed for lack of jurisdiction.

Respectfully submitted,

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
(860) 275-8304

Andrew S. Marovitz (ct 25409)
MAYER, BROWN, ROWE & MAW LLP
190 S. LaSalle Street
Chicago, IL 60603-3441
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street
Washington, DC 20006-1157
(202) 263-3000

*Attorneys for Defendants The Dow Chemical Company,
Union Carbide Corporation, and Union Carbide Asia Pacific, Inc.*