## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., ) ) ) ) | |
| Plaintiffs, ) | Civil No. 3:02 CV 1107 (AVC) |
| v. ) | |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. ) ) ) | April 21, 2004 |
| Defendants. ) ) | |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 05103-3497
(860) 275-8304

Andrew S. Marovitz (ct 25409)
Britt M. Miller (ct 25411)
MAYER, BROWN, ROWE & MAW LLP
190 South La Salle Street
Chicago, Illinois 60603
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006-1157
(202) 263-3000

*Counsel for Defendants The Dow Chemical Company,*
*Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 1

ARGUMENT ....................................................................................................... 6

I.     PLAINTIFFS' REQUESTS IMPERMISSIBLY SEEK COMPLETELY
      IRRELEVANT MATERIALS ...................................................................... 8

      A.     Discovery Requests Related To Geographic Regions Other Than India Are
           Inappropriate And Irrelevant ...................................................................... 8

           1.     Plaintiffs Lack Standing To Assert Their Antitrust Claim And
                Thus Are Not Entitled To Discovery Relating Thereto ........................... 9

           2.     This Court's Denial Of Defendants' Motion To Dismiss On
                Grounds Of Lack Of Subject Matter Jurisdiction Renders
                Plaintiffs' Claims For Further "Jurisdictional" Discovery
                Inappropriate At This Time ................................................................... 11

      B.     Bhopal Has Nothing To Do With The Present Litigation ..................................... 12

      C.     Plaintiffs' Own Inaction Prevents Their Discovery Of The Requested
           "End-User" Communications ...................................................................... 13

      D.     Documents Concerning Dow's Pre-Merger Sales Are Irrelevant ........................ 15

II.     THE BURDEN THAT WOULD BE IMPOSED UPON DEFENDANTS WERE
      THEY REQUIRED TO PRODUCE THE REQUESTED DOCUMENTS IS
      PROHIBITIVE ......................................................................................... 16

CONCLUSION .................................................................................................. 17

# TABLE OF AUTHORITIES

**Page**

## CASES

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990).............................. 10

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir.),
    *cert. granted*, 124 S.Ct. 966 (2003) ..................................................... 9

*Herbert v. Lando*, 441 U.S. 153 (1979) ............................................................... 7

*IBM Peripheral EDP Devices Antitrust Litig., In re*, 77 F.R.D. 39 (N.D. Cal. 1977)................. 18

*Johnson Matthey, Inc. v. Research Corp.*, No. 01 Civ. 8115, 2002 WL 31235717
    (S.D.N.Y. Oct. 3, 2002) ................................................................. 6

*Kruman v. Christie's International PLC*, 284 F.3d 384 (2d Cir. 2002),
    *cert. dismissed*, 124 S. Ct. 27 (2003) ................................................... 9

*MM Global Svcs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689 (D. Conn. 2003)................. 12, 13

*Nasdaq Market-Makers Antitrust Litig., In re*, 164 F.R.D. 346 (S.D.N.Y. 1996)....................... 17

*Rus, Inc. v. Bay Indus., Inc.*, No. 01 Civ. 6133, 2003 WL 1740745 (S.D.N.Y. Apr. 1, 2003)....... 6

*Security Ins. Co. v. Trustmark Ins. Co.*, 218 F.R.D. 24 (D. Conn. 2003) ................................. 7

*Tottenham v. Trans World Gaming Corp.*, No. 00 Civ. 7697, 2002 WL 1967023
    (S.D.N.Y. June 21, 2002)................................................................. 6

*Turicentro, S.A. v. American Airlines, Inc.*, 303 F.3d 293 (3d Cir. 2002) ................................ 10

*United States v. Consolidated Edison Co.*, No. CV-88-0049, 1988 WL 138275
    (E.D.N.Y. Dec. 15, 1988) ............................................................... 11

## OTHER AUTHORITIES

Fed. R. Civ. P. 26(b)(1) advisory committee's notes (2000)......................................... 7

http://www.ftc.gov/os/2001/02/dowunionana.pdf .................................................... 15

Jay E. Grenig, et al., HANDBOOK OF FEDERAL CIVIL DISCOVERY AND DISCLOSURE
    § 1.130 (2004)......................................................................... 7

Thomas B. Scheffey, *Foreign Distributors' Antitrust Suit OKed*," THE CONN. LAW TRIBUNE,
    Nov. 3, 2003........................................................................... 13

## RULES

Fed. R. Civ. P. 26(b)(1)................................................................... 1, 6, 13

Fed. R. Civ. P. 26(c)(1)....................................................................... 8

Fed. R. Civ. P. 26(c)(4)....................................................................... 8

## INTRODUCTION

Throughout the course of discovery in this litigation, Plaintiffs have sought information completely irrelevant to any claim or defense of any party. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is *relevant to the claim or defense of any party* ....") (emphasis added). Despite numerous meet-and-confer sessions and repeated written attempts to resolve the parties' differences, *see infra* at 4-5, Plaintiffs persist in seeking four categories of documents from Defendants that have no bearing in this case: (1) documents relating to the sale of Products made either outside of India or to non-Plaintiffs; (2) documents concerning sabotage at a manufacturing facility in Bhopal, India owned by Union Carbide India Limited, a joint venture between Union Carbide Corporation ("UCC") and the Indian government; (3) communications between any Defendant and any end-user of Products from Plaintiffs; and (4) documents in The Dow Chemical Company's ("Dow") possession relating to sales it transacted before its merger with UCC in 2001.[1] Plaintiffs' repeated demands for these materials amount to nothing more than an unfounded and impermissible fishing expedition. Their requests are contrary to established Second Circuit law and any requirement that Defendants produce such documents would, at a minimum, be unduly burdensome. Defendants' Motion should be granted.

## FACTUAL BACKGROUND

From approximately 1993 until 2001, Plaintiffs distributed certain products purchased from Asian subsidiaries and affiliates of UCC to customers *in India*. *See, e.g.*, Compl. ¶ 7 (Plaintiffs were "established for the specific purpose of promoting and selling the Products in India."); June 27, 2000 Letter from Ron Neri to Manjiv Sanghvi (attached hereto as Exhibit 1), at

---

[1]      Plaintiffs admit that the merger between Dow and UCC did not occur until 2001 (*see* Plaintiffs' First Amended Complaint ("Complaint" or "Compl.") ¶ 26), and that prior to that time, their relationship was solely with

M 0009 (confirming Union Carbide Asia Pacific, Inc.'s desire to engage Plaintiffs as their distributor of "certain of Union Carbide's products for resale by Megavisa to customers located in India."). Following the Dow/UCC merger in 2001, non-party Dow India and former Defendant Dow Singapore became Plaintiffs' primary contacts for obtaining UCC/Dow products for resale. When Plaintiffs' distributor role was reduced by Dow India, Plaintiffs abruptly terminated their relationship with both Asian Dow subsidiaries and began soliciting distribution business from Dow's competitors in India. Still dissatisfied, Plaintiffs brought their Indian claims to the United States seeking treble damages for damages they alleged to have incurred overseas.

On March 21, 2003, Plaintiffs filed their First Amended Complaint asserting twelve separate claims. On September 12, 2003, the Court denied Defendants' Motion to Dismiss Plaintiffs' claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, pursuant to Federal Rule of Civil Procedure 12(b)(1), but granted in part and denied in part Defendants' Motion to Dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) ("September 12 Order"). As a result of that ruling, only three claims remain, alleging: (i) violations of the Sherman Act (Count I), (ii) breach of contract (Count II), and (iii) negligent misrepresentation (Count V). On October 15, 2003, Plaintiffs served Defendants with their Second Request to Defendants for Production of Documents ("Second Request") (attached hereto as Ex. 2) and their Second Set of Interrogatories ("Second Set") (attached hereto as Exhibit 3), containing a series requests that seek information relating to:

- **Defendants' sales of Products[2] outside of India or to non-Plaintiffs.** *See* Second Request (Ex. 2) ¶ 4 (identification of certain Defendant personnel worldwide), ¶ 5

---

UCC-related entities (*id.* ¶¶ 16-26).

[2]    Although Plaintiffs did not specifically define the term in their various discovery requests, "Products" appears as a purportedly "defined term" throughout Plaintiffs' discovery. For purposes of construing Plaintiffs' requests, Defendants therefore have read the term as broadly defined in Plaintiffs' Complaint — all "chemical and

(location of Defendant offices worldwide), ¶ 6 (board of directors minutes relating to sales of Products worldwide), ¶ 7 (pricing of Products worldwide), ¶ 8 (profit margins or losses relating to Products sold worldwide), ¶ 9 (market share for sale of Products worldwide), ¶ 10 (competition in the sale of Products worldwide), ¶ 11 (training seminars, programs, manuals or guidelines relating to the Sale of Products worldwide), and ¶ 12 (procedures and methods for order entry and processing in connection with the sale of Products worldwide); Second Set (Ex. 3) ¶ 4 (processes used in connection with processing and filling orders for Products worldwide), ¶ 5 (Defendant employees who processed or filled orders for Products worldwide), ¶ 6 (Defendant employees responsible for analyzing competition for sales of Products worldwide), and ¶ 7 (Defendant employees responsible for determining or evaluating the prices of the Products worldwide).

- **Bhopal.** *See* Second Request (Ex. 2) ¶ 29;

- **All communications between any Defendant and any of Plaintiffs' customers.** *See* Second Set (Ex. 3) ¶ 3; and

- **Dow's Pre-Merger Documents.** Plaintiffs have defined the "Relevant Period" of time applicable to all of their Requests as January 1, 1984 to the Present. *See* Plaintiffs' First Request to Defendants for Production of Documents ("First Request") (attached hereto as Exhibit 4). Thus, all of the requests that are addressed to Dow seek documents predating the 2001 merger. *See* Second Request (Ex. 2) ¶ 1 (incorporating Plaintiffs' First Request which, in turn, seeks a variety of sales and other internal documents from the pre-merger period), ¶ 3 (sales reporting relationships within each Defendant, including Dow, for the Relevant Period), ¶ 4 (Defendants' officers and directors during the Relevant Period), ¶ 5 (location of offices and employees during the Relevant Period), ¶ 6 (board of directors minutes re: competition in sales, pricing of products, contemplated effects of the Merger on sales of Products during the Relevant Period), ¶ 7 (prices or pricing of Products sold to end users), ¶ 8 (profit margins or losses relating to the Products during the Relevant Time Period), ¶ 9 (market share information during the Relevant Period), ¶ 10 ("all documents not otherwise requested" re: competition during the Relevant Period), ¶ 11 (training seminars, programs, manuals, or guidelines relating to sales during the Relevant Period), ¶ 12 (order entry processes during the Relevant Period), ¶ 13 (order entry processes for sales to Plaintiffs during the Relevant Period), ¶ 14 (delivery of Products to Plaintiffs during the Relevant Period), ¶ 17 (sales by Dow Singapore to Plaintiffs during the Relevant Period), ¶ 18 (communications between Defendants re: sales to Plaintiffs during the Relevant Period), ¶ 19 (liability owed by certain Defendants in connection with sales to Plaintiffs during the Relevant Period), ¶ 20 (liability owed by certain non-defendants in connection with sales to Plaintiffs during the Relevant Period), ¶ 24 (documents concerning Plaintiffs' purchases on credit during the Relevant Period), ¶ 25 (meetings between Plaintiffs and Defendants during the Relevant Period), ¶ 26 (statements by Defendants to Plaintiffs regarding sales within the Relevant Period), ¶ 27 (contractual

---

polymer products" sold by Defendants (*see* Compl. ¶ 1), including all "Water Soluble Polymers ... Performance Polymers ... Specialty Industrial Products ... and UCAR Emulsion Systems," (*id.* ¶ 14(a)), "Wire and Cable" products including "Polyolefin-Based Compounds ... and Specialty Polyolefin products," (*id.* ¶ 14(b)), "Industrial Performance Chemicals" including "Ethylene Oxide Derivatives ... and Formulated Glycol," (*id.* ¶ 14(c)), and "Solvents, Intermediates & Monomers," (*id.* ¶ 14(d)).

arrangements between Plaintiffs and any Defendants during the Relevant Period), ¶ 28
(payments by any Plaintiff to any Defendant during the Relevant Period), ¶ 30 ("all
documents not otherwise requested" concerning any end user to which any Plaintiffs sold
Products during the Relevant Period), and ¶ 32 ("all documents not otherwise requested"
concerning all persons connected with the sale or distribution of Products to Plaintiffs
during the Relevant Period).

On November 17, 2003, Defendants served Plaintiffs with Responses and Objections to
the Second Request and the Second Set, lodging objections to each of these identified Requests.
Also on November 17, 2003, the Court granted in part and denied in part a Motion to Dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(2) brought by Defendants Union Carbide Asia
Pacific, Inc., Union Carbide Customer Services Pte Ltd., and Dow Chemical Pacific (Singapore)
Private Ltd., dismissing the latter two parties from this action for lack of personal jurisdiction.

In a November 26, 2003 letter sent in anticipation of an upcoming informal discovery
conference between counsel in this case, Plaintiffs' counsel urged that the disputed requests
sought relevant documents insofar as Plaintiffs believed that every document, relating to every
Product that Defendants sold, to every customer, in every location around the world related to
"Defendants' resale price maintenance scheme, and its anticompetitive effect in the United
States." *See* November 26, 2003 letter from Paul Winick to William Webber (attached hereto as
Exhibit 5) at 3; *see also* December 19, 2003 letter from Paul Winick to Andrew Marovitz
(attached hereto as Exhibit 6) at 1 (while "Defendants have objected to providing Plaintiffs with
discovery that relates to pricing, competition and sales to end-users in markets outside of India,"
"[d]ocuments concerning such issues ... are relevant to Defendants' resale price maintenance
scheme, and its anticompetitive effect in the United States). By letters dated December 1, 2003,
January 5, 2004, and February 4, 2004, Defendants' counsel reiterated that because the subject
requests "cast so broad a net so as to border on the absurd" (*see* December 1, 2003 Letter from
Britt Miller to Paul Winick (attached hereto as Exhibit 7), at 4), and "Plaintiffs' definition of

4

'end-user' which includes *any and all end-users throughout the world*, including but not limited to those in the United States with whom Plaintiffs never had any relationship," was overly broad and irrelevant (*see* January 5, 2004 Letter from Dana Douglas to Paul Winick (attached hereto as Exhibit 8), at 3), Defendants would stand on their refusal to produce any documents in response to those requests.[3]

On April 2, 2004, Plaintiffs served their Third Request to Defendants for Production of Documents ("Third Request") (attached hereto as Exhibit 11) containing broad requests similar in scope to their previous requests,[4] including:

- All documents concerning the manufacture, sale, offer for sale or distribution *in any geographic market or territory* by any person other than You of any products that are competitive with the Products.  Third Request (Ex. 11) ¶ 1 (emphasis added).

- All documents concerning the manufacture, sale, offer for sale or distribution *in any geographic market or territory* of Products or products that are competitive with the Products by *any person or entity of which you are, directly or indirectly, less than the 100% owner. Id.* ¶ 3 (emphasis added).

- All documents concerning the effect or contemplated effect of the Merger on competition for the sale of Products *in any geographic market or territory other than India. Id.* ¶ 5 (emphasis added).

- All documents concerning competition between Dow and UCC *prior to the Merger* in connection with the sale of Products or products that are competitive with the Products *in any geographic market or territory other than India. Id.* ¶ 6 (emphasis added).[5]

This Motion followed.

---

[3]    Plaintiffs' counsel confirmed that the parties would be unable to resolve this issue without Court intervention. *See* January 23, 2004 Letter from Paul Winick to Dana Douglas (attached hereto as Exhibit 10), at 2 ("We agree that we are at impasse concerning Defendants' objection to Plaintiffs' definition of 'end-user,' as used throughout Plaintiffs' discovery requests.").

[4]    As Defendants have just received the Third Request, the time for Defendants to serve their objections and responses, and the opportunity for the parties to meet and confer regarding any disputes, has not passed. Accordingly, this Motion does not seek protection from the Third Request, as such a Motion would not yet be ripe. But the demands in the Third Request evidence a trend of Plaintiffs' continued quest for broad and irrelevant categories of information — a trend that will continue if unchecked.

[5]    Although not set forth in full in the text of this Memorandum, the other Interrogatories contained in Plaintiffs' Third Request are similarly limitless in scope. *See id.* (Ex. 11).

## ARGUMENT

It used to be that discovery was quite broad and that parties were able to discover any non-privileged materials so long as their requests were somehow arguably relevant to the general "subject matter" of the action and "reasonably calculated" to lead to the discovery of admissible evidence. *Johnson Matthey, Inc. v. Research Corp.*, No. 01 Civ. 8115, 2002 WL 31235717, at *2 (S.D.N.Y. Oct. 3, 2002) (noting that Rule 26(b)(1) used to allow discovery where there was "'any possibility' that the sought-after information may be relevant to the *subject matter* of the action") (emphasis in original). In response to abuse of this standard, the federal rules were revised to require that requests for production seek non-privileged materials that are "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1); *see also Rus, Inc. v. Bay Indus., Inc.*, No. 01 Civ. 6133, 2003 WL 1740745, at *13 (S.D.N.Y. Apr. 1, 2003) (holding that under the revised rule "it is not sufficient that the material sought be relevant to the general subject matter of the action, if it does not relate to the specific claims or defenses of either party"); *Johnson Matthey*, 2002 WL 31235717, at *2 (explaining that Rule 26(b)(1) was amended to "narrow the scope of relevancy from 'subject matter' of the action to 'claim or defense of any party'"). This narrowing of Rule 26(b) was intended to curtail the very type of "fishing expedition" Plaintiffs are attempting here. *See, e.g., Tottenham v. Trans World Gaming Corp.*, No. 00 Civ. 7697, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) (holding that the offending "document requests constitute no more than a fishing expedition to discover additional instances of wrongdoing beyond those already alleged in the Answer. We will not condone such a fishing expedition on the mere speculation that the [opposing party may have committed other wrongs] where the [propounding party] has not offered any objective support for that contention."). The

Advisory Committee on the Federal Rules of Civil Procedure aptly summarized the proper

standard (as effected by the Rule change), and the basis therefore:

> The Committee has heard that in some instances ... parties seek to justify
> discovery requests that sweep far beyond the claims and defenses of the parties on
> the ground that they nevertheless have a bearing on the "subject matter" involved
> in the action. ... The Committee intends that the parties and the court focus on
> the actual claims and defenses involved in the action. ... *The rule change signals*
> *to the court that it has the authority to confine discovery to the claims and*
> *defenses asserted in the pleadings, and signals to the parties that they have no*
> *entitlement to discovery to develop new claims or defenses that are not already*
> *identified in the pleadings.*

Fed. R. Civ. P. 26(b)(1) advisory committee's notes (2000) (emphasis added). Indeed, the

Supreme Court has long emphasized the importance of preventing abuse of the discovery

process:

> [T]he discovery provisions, like all of the Federal Rules of Civil Procedure, are
> subject to the injunction of Rule 1 that they "be construed to secure the just,
> *speedy*, and *inexpensive* determination of every action." To this end, the
> requirement of Rule 26(b)(1) that the material sought in discovery be "relevant"
> should be firmly applied, and the district courts should not neglect their power to
> restrict discovery where "justice requires [protection for] a party or person from
> annoyance, embarrassment, oppression, or undue burden or expense...." Rule
> 26(c). With this authority at hand, judges should not hesitate to exercise
> appropriate control over the discovery process.

*Herbert v. Lando*, 441 U.S. 153, 177 (1979) (emphasis in original).

If faced with offending discovery requests, then, the appropriate recourse is for the non-

offending party to seek protection from the Court. *See Security Ins. Co. v. Trustmark Ins. Co.*,

218 F.R.D. 24, 27 (D. Conn. 2003) ("An overly broad request may justify issuance of a

protective order precluding irrelevant discovery."); Jay E. Grenig, et al., HANDBOOK OF FEDERAL

CIVIL DISCOVERY AND DISCLOSURE § 1.130 (2004) ("Protective orders are a necessary corollary

to the scope of discovery permitted by Rule 26(b)(1)."). Although parties are afforded

significant latitude in carrying out discovery under the federal rules, "[t]he scope of discovery ...

is not without bounds...." *Security Ins.*, 218 F.R.D. at 27. Courts are empowered, upon good

cause shown, to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... (1) that the disclosure or discovery not be had ... [or] (4) that certain matters not be inquired into...." Fed. R. Civ. P. 26(c)(1), (4).

As demonstrated below, the issuance of such an order is warranted here.

## I.    PLAINTIFFS' REQUESTS IMPERMISSIBLY SEEK COMPLETELY IRRELEVANT MATERIALS.

### A.    Discovery Requests Related To Geographic Regions Other Than India Are Inappropriate And Irrelevant.

Perhaps the most blatantly inappropriate and irrelevant of Plaintiffs' Requests are those seeking documents relating to regions other than India. *See supra* at 2-3. In nearly half of their discovery requests, Plaintiffs ask for highly confidential sales and pricing information for a 20-year time period from hundreds of Defendants' subsidiaries and affiliates located around the world. *Id.* Yet the very basis of Plaintiffs' antitrust claim is that they have been "deprived of the ability effectively to compete ... in the resale of the Products from the United States to end-users *in India*, free of Defendants' price maintenance requirements," and have been injured "by being required to resell the Products [*in India*] at artificially inflated prices directly caused by Defendants' unlawful and anticompetitive conduct." Compl. ¶ 55 (emphasis added).

It is undisputed that Plaintiffs were barred by their distribution agreement from selling Defendants' Products in any country other than India. *See, e.g.,* Ex. 1 at M 0009 ("Megavisa will consign and sell all the products, as supplied by Union Carbide Corporation and its affiliates only to the customers in India and not to customers in any other country in the world."). Accordingly, documents relating to pricing or sales made *outside* India are wholly irrelevant to Plaintiffs' claim that they were injured *in* India because of resale price maintenance there.

Faced with these facts, Plaintiffs nonetheless attempt to justify their fishing expedition by claiming that these documents might establish subject matter jurisdiction over Defendants under the federal antitrust laws. But even under Plaintiffs' theory of subject matter jurisdiction — that the jurisdiction of this Court might be triggered as a result of an injury to *someone else* in a completely different transaction[6] — the fact is that Plaintiffs lack standing to raise this issue and demand information about places in which they could not even sell.

### 1. Plaintiffs Lack Standing To Assert Their Antitrust Claim And Thus Are Not Entitled To Discovery Relating Thereto.

As set forth in detail in the parties' briefing on Defendants' pending Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), Plaintiffs lack standing to bring Count I of their Complaint, and they have not demonstrated any entitlement to demand documents that relate to injuries allegedly suffered by *others* instead of by themselves.[7]

Plaintiffs' own opposition brief admits that "[h]ere, plaintiffs have alleged, and the evidence supports, that the actual sales of products by defendants to them took place in the United States *for resale from the United States to India.*" Plaintiffs' Opposition to Defendants' Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), dated February 13, 2004 ("Opp") at 13 (emphasis in original). And, as Defendants explained in their Reply:

---

[6]     Plaintiffs' theory of subject matter jurisdiction rests entirely upon the Second Circuit's decision in *Kruman v. Christie's International PLC*, 284 F.3d 384 (2d Cir. 2002), *cert. dismissed*, 124 S. Ct. 27 (2003), and the D.C. Circuit's decision in *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338 (D.C. Cir.), *cert. granted*, 124 S.Ct. 966 (2003). *See generally* Plaintiffs' Opposition to Defendants' Motion to Reconsider Order Denying Motions to Dismiss Federal Antitrust Claim for Lack of Subject Matter Jurisdiction, dated February 6, 2004 (and materials cited therein). As this Court is aware, the Supreme Court will hear oral argument in *Empagran* on April 26 and squarely address the continued viability of those two decisions. And, as Defendants have repeatedly noted in their briefing to this Court, a Supreme Court reversal of *Empagran* would confirm that this Court lacks subject matter jurisdiction to consider this case. *See, e.g.*, Brief in Support of Defendants' Motion to Stay Proceedings Pending the United States Supreme Court's Decision in *F. Hoffmann-La Roche, Ltd v. Empagran, S.A.*, dated December 31, 2003, at 3; Reply Memorandum of Law in Support of Defendants Motion to Stay Proceedings Pending the United States Supreme Court's Decision in *F. Hoffmann-La Roche, Ltd v. Empagran, S.A.*, dated March 1, 2004, at 6.

[7]     Plaintiffs have not — and cannot — offer any plausible reason why documents relating to Defendants' sales and competitive activities outside of India bear, in any way, on Plaintiffs' two remaining claims (for breach of contract and negligent misrepresentation) either.

> Whether the sales took place in the United States or elsewhere does not matter; what does is that, by the plaintiffs' own words, the sales subject to the purported resale price maintenance were for resale to India. Plaintiffs do not allege that they had any right to sell defendants' products in the United States or *anywhere* but in India. By definition, any resale terms on which plaintiffs and defendants agreed therefore could only affect Indian buyers. To the extent any such terms were not agreeable to Indian buyers, the result would be lost Indian sales. Similarly, the only sales defendants could disrupt by refusing or canceling an order from plaintiffs would be Indian. Plaintiffs have confirmed, then, that any injury they suffered was in India and only in India.

Reply Memorandum of Law in Support of Defendants' Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), dated March 1, 2004 ("Reply"), at 3; *see also* Brief in Support of Defendants' Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) ("Brief"), dated December 31, 2003, at 2, 6-9. *Turicentro, S.A. v. American Airlines, Inc.*, 303 F.3d 293, 307 (3d Cir. 2002), is dispositive on this point: damages that "occurred exclusively in foreign markets ... are not of the type Congress intended to prevent through the Foreign Trade Antitrust Improvements Act or the Sherman Act." *See* Brief at 7-8; Reply at 4.[8]

With no legitimate allegation of any antitrust injury within the United States — to themselves or others — Plaintiffs' attempts to root around in Defendants' non-Indian international sales and pricing records must be rebuffed. No amount of such discovery could transform Plaintiffs' claim into one redressable by U.S. law, thus every such request can serve only to annoy, oppress, or unduly burden Defendants. These sort of harassing tactics undermine Defendants' ability to conduct discovery in an appropriate and efficient manner and-moreover — are expressly condemned by the federal rules.

---

[8] Plaintiffs have also failed to (1) prove that their alleged antitrust loss "stems from a competition-*reducing* aspect or effect of the defendant's behavior," *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original); *see also* Brief at 9-10; Reply at 5-8; or (2) rebut Defendants' showing that their alleged damages are speculative, *see* Brief at 10-12; Reply at 8-10.

**2.**    **This Court's Denial Of Defendants' Motion To Dismiss On Grounds
Of Lack Of Subject Matter Jurisdiction Renders Plaintiffs' Claims
For Further "Jurisdictional" Discovery Inappropriate At This Time.**

Even if Plaintiffs did have standing to bring a claim under the U.S. antitrust laws (which

they do not), Plaintiffs' requests for documents relating to regions outside of India would

nonetheless be inappropriate and unnecessary (and Defendants would be entitled to a Protective

Order) because Plaintiffs' stated purpose in seeking these kinds of documents has been to

establish subject matter jurisdiction over Defendants. *See, e.g.,* December 19, 2003 Letter from

Paul Winick to Andrew Marovitz (Ex. 6) at 1 (arguing that documents concerning pricing, sales,

and competition outside of India are relevant to the "anticompetitive effect" of Defendants'

actions on the United States and are "necessary to establish that subject matter jurisdiction is

proper as respects Plaintiffs' antitrust claim"). Since this Court has denied Defendants' Motion

to Dismiss for lack of subject matter jurisdiction, Plaintiffs' Requests should not properly be

based upon subject matter jurisdiction at this time. *See* Order, dated March 18, 2004.

Plaintiffs choose to ignore these facts and instead persist in demanding large volumes of

irrelevant, non-Indian documents. There is no apparent reason for Plaintiffs to press these

requests. Plaintiffs have not explained what the perceived link is between foreign, non-Indian

sales by Defendants and any purported antitrust injury within the United States. Plaintiffs' hope

or conjecture that they may find additional, interesting documents — even had the Court not

already ruled in their favor on the motion to dismiss — is a wholly unacceptable basis on which

to conduct discovery. Defendants should therefore be protected from the burden of having to

search for and produce such material. *See, e.g., United States v. Consolidated Edison Co.*, No.

CV-88-0049, 1988 WL 138275, at *1-2 (E.D.N.Y. Dec. 15, 1988) (denying motion to compel

where the requested discovery "constitute[d] no more than a 'fishing expedition' by plaintiff to

discover additional violations beyond those alleged in the complaint").

**B.    Bhopal Has Nothing To Do With The Present Litigation.**

Plaintiffs' proffered justifications for engaging in discovery related to Bhopal are utterly

meritless. *See, e.g.,* November 26, 2003 Letter from Paul A. Winick to William L. Webber (Ex.

5), at 5 (urging that Item 29 sought relevant documents insofar as (i) "they are reasonably

calculated to lead to evidence showing the motivation of Defendants in breaching contracts with

Plaintiffs and making negligent misrepresentations to and concerning Plaintiffs" and (ii)

"Defendants have placed sabotage in issue in their Answers").   Information related to a chemical

leak that occurred nearly *twenty years ago* at a *former plant of a former joint venture* between

UCC and the Indian government in India can have no conceivable bearing whatever on whether

Defendants did, or did not, breach the contracts at issue in this case, or whether Defendants did,

or did not, engage in negligent misrepresentation.

Plaintiffs pretend that such discovery is somehow warranted as "reasonably calculated to

lead to evidence showing the *motivation* of Defendants in breaching contracts with Plaintiffs and

making negligent misrepresentations to and concerning Plaintiffs."   November 26, 2003 Letter

from Paul A. Winick to William L. Webber (Ex. 5), at 5 (emphasis added).   The problem with

this argument is that Defendants' "motivation" is totally irrelevant to the present claims —

"motivation" is neither part of, nor does it relate in any meaningful way to, the elements of a

claim for breach of contract or negligent misrepresentation.   As the Court held in its September

12 Order, the former requires a plaintiff to establish "(a) the existence of a contract or agreement;

(b) the defendant's breach of the contract or agreement; and (c) damages resulting from the

breach." *MM Global Svcs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689, 702 (D. Conn. 2003).

The latter requires a plaintiff to "prove that, in the course of business, profession, or

employment, (a) the defendant[] supplied false information for the plaintiff['s] guidance; (b) that

the defendant[] failed to exercise reasonable care or competence in obtaining or communicating

the information; and (c) that the plaintiff[] justifiably relied upon the information to [its]

detriment." *Id.* at 706. Judged by these standards, it is clear that nothing sought by Request No.

29 comes even close to being "reasonably calculated to lead to the discovery of admissible

evidence." Fed. R. Civ. P. 26(b)(1).

   Plaintiffs try a different, but equally baseless tactic — labeling Request No. 29 a

permissible discovery request because "Defendants have placed sabotage in issue in their

Answers." Presumably, plaintiffs mean that because Defendants have characterized the Bhopal

Incident as "a tragic act of sabotage" (Answer ¶ 16), whereas Plaintiffs have simply referred to

the incident as "the Bhopal tragedy," without more (Compl. ¶ 16), that there is some sort of

disagreement between the parties sufficient to justify discovery. This is pure nonsense. Because

Bhopal is itself irrelevant to the pending claims, the question of how the incident should properly

be characterized cannot possibly have any significance either. Absent any connection at all to

the elements required to prove Plaintiffs' claims, discovery on Bhopal cannot proceed, and

Plaintiffs' sideshow on the point should be stopped. [9]

**C.     Plaintiffs' Own Inaction Prevents Their Discovery Of The Requested "End-User" Communications.**

   In Interrogatory No. 3 of Plaintiffs' Second Set of Interrogatories, Plaintiffs ask that

Defendants "[i]dentify each meeting or communication between any person employed by,

representing or otherwise acting on behalf of a Defendant, and an end user of Products purchased

from any Plaintiff or MVMS, and for each such meeting or communication state with

---

[9]     The importance of reaching final resolution of this issue cannot be minimized. Notwithstanding the irrelevance of the Bhopal tragedy to the issues in this lawsuit, Plaintiffs continue to pepper their filings with references to Bhopal in an apparent effort to prejudice the Defendants. These references, which have previously been incorporated in Orders of this Court, have, in turn, been published by the media in a way that casts UCC in a particularly unfavorable, and indeed, affirmatively negative light. *See, e.g.,* Thomas B. Scheffey, *Foreign Distributors' Antitrust Suit OKed,*" THE CONN. LAW TRIBUNE, Nov. 3, 2003, at 1 (highlighting the fact that in the period following the Bhopal tragedy the Indian authorities "attempted to criminally prosecute Union Carbide's CEO

particularity its date, the person attending, sending or receiving the communication, and the subject matter discussed." Ex. 3 ¶ 3. While this request might, at first blush, be read to seek responsive materials that might relate to Plaintiffs' claim for negligent misrepresentation, there is one glaring flaw — the request fails to identify who the "end user[s] of Products purchased from any Plaintiff or MVMS" are, let alone identify those "end users" that are relevant to Plaintiffs' misrepresentation claims. As Defendants have repeatedly explained, "Interrogatory [#3] is . . . premature insofar as it purports to require Defendants to identify any meetings or communications that their employees may have had with any 'end user.' Defendants do not know the identity of each and every one of Plaintiffs' customers, much less those that Plaintiffs claim are relevant to their negligent misrepresentation claim, because Plaintiffs have not seen fit to provide such information to Defendants. Until Plaintiffs have identified who their relevant 'end users' are, Defendants cannot begin to determine whether any of their employees or representatives met with any of those end users." December 1, 2003 Letter from Britt Miller to Paul Winick (Ex. 7) at 8. Throughout the parties' meet-and-confer discussions, Plaintiffs have nonetheless balked when pressed to identify those customers who are relevant to their negligent misrepresentation claims, effectively depriving Defendants of all ability to answer this Interrogatory.

Moreover, Defendants should not be required to expend significant sums of time and money to investigate and identify meetings any of their personnel may have had with end-users in India that have no bearing on the issues in this lawsuit. Thus, if Plaintiffs cannot (or will not) identify which customers they lost as a result of Defendants' alleged negligent misrepresentations or which customers even support the fact that a representative of a Defendant

---

for murder"). Defendants' Motion should be granted and the flood of improper references to the tragedy stemmed so that any additional prejudice to Defendants may be avoided.

contacted an end user of Plaintiffs, they should not be allowed to conduct a fishing expedition in hopes of snaring a fact they should have had in hand before they filed this claim against Defendants in the first place.

Defendants cannot be expected — and, indeed, the discovery rules do not require them — to engage in a guessing game to determine who Plaintiffs' relevant customers are. It is literally impossible for Defendants to meaningfully answer Interrogatory No. 3 without Plaintiffs' cooperation. Unless and until Plaintiffs properly identify the "end-user[s]" about which they are seeking discovery, Defendants should be absolved from any duty to respond to the Interrogatory.

### D. **Documents Concerning Dow's Pre-Merger Sales Are Irrelevant.**

Plaintiffs admit in their Complaint that their "agreements" during the relevant period were with UCC-related entities (*see* Compl. ¶¶ 16-25), and that it was not until 2001, when Dow merged with UCC, that Dow allegedly "assumed operational control of the relationship reflected in the 2000 Agreement between UCC and MVS" (*id.* at 26). Plaintiffs nonetheless seek numerous categories of documents from *Dow* which are related, in various ways, to *Dow's pre-merger* sales to non-Plaintiff customers. *See supra* at 3-4. Because, on their face, these requests are totally unsupported by the Complaint, they should be disallowed. There is no possible justification behind this discovery other than an illegitimate one.

Prior to the merger between Dow and UCC, the two companies were competitors in various markets worldwide — including in India. *See generally* http://www.ftc.gov/os/2001/02/ dowunionana.pdf (describing the competition between the two companies and how it might be affected post-merger). As a result, Dow was (and continues to be) a competitor of Plaintiffs (insofar as Plaintiffs were a pre-merger distributor of UCC products in India). Besides seeking information from Dow during an irrelevant time period when it had no connection to the contracts in dispute at all, Plaintiffs have failed to explain, as a general matter, why they should

be able to gain free access to the highly confidential, historical competitive information of one of

their competitors.  There is no imaginable scenario under which these documents — which

contain extremely sensitive internal information that would be quite enlightening to a competitor

seeking to obtain an unfair advantage — could be remotely relevant to any of the three remaining

claims in this litigation.

For example, Plaintiffs have not (and cannot) show a legitimate reason why documents

relating to Dow's pricing and sales of Products in 1985 when it was a competitor of UCC (and

thus of Plaintiffs), see Second Request (Ex. 2) ¶ 7, have any bearing on any alleged effort by

UCC-related entities to impose a retail price maintenance scheme (Count I) upon Plaintiffs

during the course of those parties' dealings from 1987 to 2001.  Similarly irrelevant are

Plaintiffs' requests for documents relating to Dow sales personnel (Second Request (Ex. 2) ¶¶ 3-

5), Dow's direct sales to Plaintiffs or Plaintiffs' customers (Second Request (Ex. 2) ¶¶ 7, 17 ), or

Dow's Board of Directors Meetings (Second Request (Ex. 2) ¶ 6) in, for example, 1994.  Such

documents have no bearing on whether Defendants breached a contract in 2001 (Count II) or

negligently misrepresented anything to Plaintiffs post-merger (Count V).  In short, Plaintiffs'

Requests seeking Dow pre-merger documents are plain overreaching because the claims before

this Court could only concern Dow's post-merger activities.  Such blatant misuse of the

discovery process should not be sanctioned by this Court.

## II.   THE BURDEN THAT WOULD BE IMPOSED UPON DEFENDANTS WERE THEY REQUIRED TO PRODUCE THE REQUESTED DOCUMENTS IS PROHIBITIVE.

Even if this Court finds the requested information "relevant" for purposes of Rule

26(b)(1), Second Circuit precedent still supports the issuance of the requested Protective Order.

It is not only the case that Plaintiffs' subject discovery requests are irrelevant to the three

remaining claims in this litigation, but it is also the case that the search for and production of the

requested documents would impose too onerous a burden on Defendants — one that would far outweigh any remote claim of relevance Plaintiffs may belatedly advance. *See, e.g., In re Nasdaq Market-Makers Antitrust Litig.*, 164 F.R.D. 346, 357 (S.D.N.Y. 1996) (affirming issuance of protective order prohibiting discovery on grounds that requested documents contained highly confidential trade secret/commercially sensitive information and that the cost of producing such materials was unduly burdensome).

Plaintiffs' thirteen discovery requests seeking information related to the pricing and sales of the myriad "Products" Defendants sell worldwide to any of their customers (*see supra* at 2-3) illustrate this problem most vividly. Enforcing those requests would require Defendants to comb through millions of pages of documents, located at hundreds of subsidiaries and affiliates, in countries scattered across the globe — and all to produce hundreds of thousands of documents that contain no mention of Plaintiffs or of Product sales in India and in no way relate to whether Defendants breached any "agreement" with Plaintiffs or made negligent misrepresentations to them. Add to that the twenty-year "relevant" time period for which Plaintiffs are seeking documents, and the enormity of Defendants' task grows exponentially.

The thousands of man-hours necessary to complete such an endeavor within a reasonable period of time — not to mention the millions of dollars that would be spent attempting to accomplish it — would be grossly prohibitive. If discovery is to proceed as contemplated by the federal rules at all, it cannot be by saddling Defendants with such unduly, and unnecessarily, burdensome requests. A protective order is warranted to prevent that.

## CONCLUSION

Defendants have already produced over 70,000 thousand pages of documents to Plaintiffs in this litigation, including all of the records in Defendants' files relating, in any reasonably

relevant way, to Plaintiffs' Product purchases from Defendants. Notwithstanding this substantial production, Plaintiffs persist in their quest to obtain discovery *not* "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). Plaintiffs have effectively declared "open season" on Defendants and "instead of using rod and reel, or even a reasonably sized net," would seemingly prefer to "drain the pond and collect the fish from the bottom." *In re IBM Peripheral EDP Devices Antitrust Litig.*, 77 F.R.D. 39, 41-42 (N.D. Cal. 1977) (denying motion to compel certain discovery on overbreadth grounds). Past attempts to abuse the latitude afforded by the discovery rules have been consistently rejected by the federal courts. Plaintiffs' efforts should fare no better here, and Defendants' Motion for a Protective Order should be granted.

Dated: April 21, 2004

Respectfully submitted,

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 05103-3497
(860) 275-8304

Andrew S. Marovitz (ct 25409)
Britt M. Miller (ct 25411)
MAYER, BROWN, ROWE & MAW LLP
190 South La Salle Street
Chicago, Illinois 60603
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006-1157
(202) 263-3000

*Counsel for Defendants The Dow Chemical Company,
Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served on the 21st of April, 2004 to the following:

Robert M. Langer, Esquire
Wiggin & Dana LLP
One City Place
185 Asylum Street
Hartford, CT  06103-3402
(via hand delivery)

Richard S. Taffet, Esquire
Thelen Reid & Priest LLP
875 Third Avenue
New York, New York  10022-6225
(via overnight courier)

Suzanne Wachstock, Esquire
Wiggin & Dana LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT  06911-0325
(via overnight courier)

Craig A. Raabe