UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., AND MEGAVISA SOLUTIONS (S) PTE. LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | CIVIL ACTION NO. 3:02 CV 1107 (AVC) |
| v. | ) ) | May 7, 2004 |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, AND UNION CARBIDE ASIA PACIFIC, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR PROTECTIVE ORDER AND
MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
TO COMPEL PRODUCTION OF DOCUMENTS
AND ANSWERS TO INTERROGATORIES**

BINGHAM McCUTCHEN LLP
Richard S. Taffet (ct 10201)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

THELEN REID & PRIEST LLP
Paul A. Winick (ct 21813)
Alyson L. Redman (ct 25494)
875 Third Avenue
New York, NY 10022
(212) 603-2000 (tel)
(212) 603-2001 (fax)

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

*Attorneys for Plaintiffs MM Global Services Inc., MM Global Pte. Ltd. and Megavisa
Solutions (S) Pte. Ltd.*

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   BACKGROUND ................................................................................... 2

      A.    The Pleadings................................................................................ 2

      B.    Merits Discovery............................................................................ 4

III.  ARGUMENT ....................................................................................... 6

      A.    The Scope of Permissible Discovery Under Rule 26 Remains Broad.................. 6

      B.    Discovery Regarding Sales and Pricing of Products in Markets Other Than
            India Is Directly Relevant to Plaintiffs' Antitrust Claim and to Defendants'
            Defense of Lack of Subject Matter Jurisdiction ..................................... 8

            1.    Plaintiffs Have Standing to Bring Their Sherman Act Claim and,
                  Therefore, Discovery Related to Defendants' Global Sales and
                  Pricing Practices Is Relevant .................................................... 8

            2.    Because Lack of Subject Matter Jurisdiction May Be Raised at
                  Any Time in These Proceedings, It Is Critical That Plaintiffs Be
                  Permitted to Develop Their Proof on This Issue ...................... 11

            3.    The Court Should Reject Defendants' Preemptive Challenge To
                  Plaintiffs' Pending Discovery Requests................................... 12

      C.    Defendants Have Made "Sabotage" at Union Carbide's Bhopal, India
            Plant Relevant ............................................................................ 13

      D.    Defendants Are Able and Should Be Compelled to Identify All
            Communications Between Them and Plaintiffs' Customers ........................ 15

      E.    Evidence of Pre-merger "Gun-Jumping" Communications Between UCC
            and Dow Are Highly Relevant........................................................... 17

      F.    Defendants Overstate the Burden Imposed By Compliance........................ 19

            1.    The Time Period Is Reasonable. ............................................... 19

            2.    Defendants' Complaints About the Purported Burden of
                  Compliance Are Unsupported by Any Facts ........................... 20

      G.    Defendants Should Promptly Produce All Documents and Answer All
            Interrogatories For Which There Exists No Outstanding Dispute................ 21

IV.   CONCLUSION.................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

AMW Material Testing, Inc. v. Town of Babylon,
  215 F.R.D. 67 (E.D.N.Y. 2003) .......................................................................................7

City of Rome, N.Y. v. Verizon Communications, Inc.,
  362 F.3d 168 (2d Cir. 2004)..........................................................................................12

In re PE Corporation Securities Litigation,
  3:00 Civ. 705, 2003 WL 23329188 (D. Conn. Nov. 3, 2003) ...........................................7

Ahern v. Trans Union LLC,
  3:01 Civ. 02313, 2002 WL 32114492 (D. Conn. Oct. 23, 2002) .....................................20

Omega Engineering, Inc. v. Omega, S.A.,
  3:98 Civ. 2464 (AVC), 2001 WL 173765 (D. Conn. Feb. 6, 2001) .................................20

Lugosch v. Congel,
  218 F.R.D. 41 (N.D.N.Y. 2003)........................................................................................7

In re Nasdaq Market-Makers Antitrust Litigation,
  164 F.R.D. 346 (S.D.N.Y. 1996) ....................................................................................20

Northern Pacific Railway Co. v. United States,
  356 U.S. 1 (1958).............................................................................................................9

Pace Electronics, Inc. v. Canon Computer System, Inc.,
  213 F.3d 118 (3d Cir. 2000).............................................................................................9

Reading Industrial, Inc. v. Kennecott Copper Corporation,
  477 F. Supp. 1150 (S.D.N.Y. 1979)...............................................................................10

Ross v. UKI Ltd.,
  02 Civ. 9297, 2004 WL 67221 (S.D.N.Y. Jan. 15, 2004)..................................................7

State of New York v. Kraft General Foods, Inc.,
  926 F. Supp. 321 (S.D.N.Y. 1995) .................................................................................10

## STATUTES

Fed. R. Civ. P. 26(b) .................................................................................................... 6, 7

## I.     PRELIMINARY STATEMENT

Plaintiffs MM Global Services, Inc., MM Global Services Pte. Ltd., and Megavisa Solutions (S) Pte. Ltd. (collectively, "plaintiffs"), submit this memorandum of law in opposition to defendants'[1] motion for a protective order, and in support of plaintiffs' cross- motion to compel production of documents and answers to interrogatories.

Defendants' instant motion is just their latest attempt to preclude plaintiffs from proceeding with discovery on issues that go to the heart of the claims alleged in the Amended Complaint. Their previous attempts to stay or limit discovery were not successful, and their current attempt is likewise unavailing. Defendants' shopworn arguments remain factually and legally baseless, and as this case approaches its second anniversary the Court should refuse to condone the continuing attempts to manipulate the discovery process. Plaintiffs, therefore, request that the Court deny defendants' motion, and compel defendants to produce the requested documents and interrogatory answers in full, by a date certain, and in no event later than June 30, 2004.

More particularly, defendants now seek a protective order against legitimate discovery requests for documents and information directly relevant to plaintiffs' antitrust, breach of contract, and negligent misrepresentation claims, as well as to defendants' defenses as to, among other things, subject matter jurisdiction. Defendants do so by continuing to mischaracterize plaintiffs' allegations and by raising the same tired arguments they have repeatedly made and this Court has rejected in support of their Rule 12 motions to dismiss. Thus, contrary to defendants' argument that the discovery sought is "irrelevant"—i.e., beyond the scope of Rule 26, as amended—it arises directly from the allegations of the Amended Complaint and from defendants' own answers and alleged affirmative defenses.

---

[1] Plaintiffs' motion for reconsideration of the Court's dismissal of two of defendants' subsidiaries, Union Carbide Customer Services Pte. Ltd. and Dow Chemical Pacific (Singapore) Private Ltd., is still pending.

Further, defendants' cries of undue burden ring hollow. On the one hand, they argue that no additional discovery should be produced because documents have been provided from each of the defendants and their worldwide affiliates; on the other hand, they assert that it would be too difficult to produce documents from these same sources.

Likewise, their protest against what they repeatedly label a "fishing expedition" should be given no heed. For months the parties have been negotiating the scope of discovery. Even with respect to those document requests and interrogatories that defendants have agreed are not problematic, and for which they have promised to produce additional documents and information, they have continued in their refusal to make any meaningful production by now stating either that all documents and information have been produced or that documents will be produced "shortly." Such responses, however, are a far cry from the production of all relevant discovery required by the Federal Rules of Civil Procedure and this Court's prior rulings.

Accordingly, the Court should deny defendants' motion and issue an Order compelling defendants to produce, on or before June 30, 2004—on pain of sanctions—(a) all discovery for which they now purport to seek a protective order, and (b) all discovery to which defendants affirmatively have agreed that they have no objection, but which they have failed to provide to date. A proposed form of Order is submitted herewith.

## II.     BACKGROUND

### A.     The Pleadings

As the Court is well aware, this case involves claims of resale price fixing in violation of federal antitrust law, breach of contract, and negligent misrepresentation. The price fixing claim arises from the distribution arrangement that arose between plaintiffs and Union Carbide Corporation ("UCC"), and later The Dow Chemical Company ("Dow"), following the Bhopal tragedy in India. *See* Am. Compl. at ¶¶ 16-26.[2] Based upon this relationship, plaintiffs

---

[2] Defendants allege that the Bhopal tragedy occurred as the result of "sabotage" and deny plaintiffs' characterizations of the Bhopal events. *See* Answer and Affirmative Defenses of Defendant The Dow

(Footnote Continued on Next Page.)

purchased products from UCC, ands later Dow, in the United States, where risk of loss and title passed.  Plaintiffs then caused the products to be shipped from the United States to end-user customers in India.  *Id.*

As also alleged, "[t]hroughout the period of 1993 through March 2002, pursuant to the parties' contractual relationship, UCC and Dow, directly and acting through their affiliates, compelled plaintiffs to agree to engage in a resale price maintenance conspiracy for the Products purchased from Defendants in the United States and resold by Plaintiffs."  Am. Compl. at ¶ 27.  Further, "[a]t all times Defendants imposed the price requirements, *inter alia*, to ensure that prices charged by Plaintiffs to end-users in India for Products would not cause erosion to prices for the Products charged by UCC and Dow to end-users of Products in the United States as well as in other jurisdictions to which UCC and Dow sold Products from the United States."  *Id.* at ¶ 29.  Moreover, at least since August 1999, prior to the consummation of the UCC/Dow merger, the resale price maintenance conspiracy was imposed at the urging and direction of Dow.  *Id.*  In addition, "[a]s a direct and proximate result of Defendants' price fixing of minimum resale prices and other terms of sale, competition in the sale and resale of Products in and from the United States was improperly diminished and restrained, and as the result of such effect on competition Plaintiffs were injured by being precluded from effectively and fully competing and maximizing their sales of Products."  *Id.* at ¶ 30.

The Amended Complaint further alleges that once defendants announced their plan of merger in August 1999, but before the merger was completed, "in addition to their resale price fixing, Defendants ceased acting consistently with their contractual and legal obligations toward Plaintiffs.  In particular, . . . Defendants undertook efforts to establish Dow, untainted by the

---

(Footnote Continued from Previous Page.)

Chemical Company to the First Amended Complaint ("Dow Ans.") at ¶ 16; Answer and Affirmative Defenses of Defendant Union Carbide Corporation to the First Amended Complaint ("UCC Ans.") at ¶ 16; Defendant Union Carbide Asia Pacific, Inc.'s Answer and Additional Defenses to Plaintiffs' First Amended Complaint ("UCAP Ans.") at ¶ 16; *see* discussion *infra* at III.C.

Bhopal tragedy, in place of Plaintiffs as a direct seller of Products to end-users in India." *Id.* at ¶ 32. In so doing, defendants engaged in conduct, as alleged in the Amended Complaint, that was in breach of their contractual relationship with plaintiffs and that constitutes the tort of negligent misrepresentation. *Id.* at ¶¶ 33-51, 59-63, and 77-80.

Defendants deny these claims and each asserts various affirmative defenses, including that the Court lacks subject matter jurisdiction over plaintiffs' antitrust claims, that plaintiffs lack antitrust standing, and that the Amended Complaint fails to state a claim for breach of contract or negligent misrepresentation.

### B.     Merits Discovery

Plaintiffs' served their First Request for Production of Documents and First Set of Interrogatories on September 18, 2002. By order dated November 20, 2002, the Court granted defendants' first motion for a protective order limiting discovery to issues relating to the then pending motion to dismiss on *forum non conveniens* grounds. The November 20, 2002 Order further stated, however, that "[f]ull merits discovery will begin after the court rules on the defendants' motions to dismiss." Subsequently, the Court ruled in favor of plaintiffs on the bulk of the various motions to dismiss, and the parties commenced full merits discovery on plaintiffs' federal antitrust claim and its breach of contract and negligent misrepresentation claims.

On October 15, 2003, plaintiffs served their Second Request to Defendants for the Production of Documents and Second Set of Interrogatories.[3] Defendants responded on November 17, 2003, asserting objections to plaintiffs' discovery on the merits, including on the same grounds as put forth in the instant protective order motion.[4] Thus, defendants refused to produce documents or information concerning: competitive issues relating to any markets other than India; the Bhopal tragedy; communications between defendants and plaintiffs' end-user

---

[3] *See* Memorandum of Law in Support of Defendants' Motion for a Protective Order, dated April 21, 2004 ("Defs. Mem."), at Exs. 1 and 2.

[4] *See* Exs. A and B hereto.

4

customers, both before and after the Dow/UCC merger; and communications between Dow and UCC prior to the consummation of their merger. Defendants asserted additional objections as well, in connection with specific requests and interrogatories.

By correspondence, dated November 26, 2003, plaintiffs advised defendants of their disagreement with the objections asserted.[5] Through the end of 2003 the parties attempted to negotiate a resolution of defendants' objections. At that time, however, defendants took it upon themselves to cause a *de facto* stay of discovery simply because they filed a motion on December 31, 2003 to stay this proceeding pending the United States Supreme Court's decision in *F. Hoffman La-Roche, Ltd. v. Empagran.* While that motion was pending, the parties attended a conference with the Court on February 9, 2004. The issues that are now the subject of defendants' instant protective order motion and plaintiffs' motion to compel were presented in a letter, dated February 5, 2004, submitted in anticipation of the conference.[6] As reflected there, the parties had been able to agree on certain discovery issues, but had reached an impasse in connection with the issues raised by defendants' present motion.

The stay motion was denied by the Court by Order dated March 18, 2004, the same day as the Court's ruling granting defendants' motion for reconsideration of the Court's original subject matter jurisdiction ruling but denying the relief sought by defendants. Accordingly, counsel for the parties participated in a conference call on March 30, 2004, during which the parties confirmed that by the end of April 2004 they would supplement their discovery production in connection with document requests and interrogatories for which resolution had been reached.[7] The parties further agreed to reconsider the issues relating to those requests and interrogatories for which impasse had previously been reached. The status of the parties'

---

[5] *See* Defs. Mem., Ex. 5.

[6] *See* Ex. C hereto.

[7] On April 30, 2004, plaintiffs served supplemental answers to defendants' First Set of Interrogatories on the Merits and produced approximately 3,000 pages of additional documents.

discussions was reported to the Court in a letter from plaintiffs' counsel dated April 13, 2004.[8]

By letter, dated April 19, 2004, defendants identified the document requests and interrogatories for which there were no dispute, but stated as to certain requests that no further production would be made, and as to others only that supplemental responses would be made "shortly."[9] By letter, dated April 29, 2004, defendants again represented that supplemental interrogatory responses and document production would be made.[10] During a telephone conference on May 4, 2004, however, defendants' counsel advised that only one additional "type of document" relating to the corporate structure of defendants would be produced, and that the defendants' interrogatory responses would be supplemented only to reflect additional names.

Defendants' motion for a protective order, in the meantime, was filed on April 21, 2004, broadly seeking to preclude plaintiff from obtaining discovery concerning (i) the anticompetitive effects of the resale price maintenance conspiracy in markets outside of India, including in the United States; (ii) the basis for defendants' allegation that sabotage caused the Bhopal tragedy; (iii) defendants' communications with end-user customers of plaintiffs; and (iv) pre-merger communications between Dow and UCC.

### III.    ARGUMENT

#### A.    The Scope of Permissible Discovery Under Rule 26 Remains Broad.

What is "relevant" discovery in this case is not nearly as complicated a determination as defendants would like the Court to believe. Federal Rule of Civil Procedure 26(b)(1) states, in pertinent part, that:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.

---

[8] *See* Ex. D hereto.

[9] *See* Ex. E hereto.

[10] *See* Ex. F hereto.

Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Thus, contrary to defendants' attempt to argue that permissible discovery is now limited in scope,[11] Rule 26(b) "make[s] clear the broad scope of examination and that it may cover not only evidence for use at trial but also inquiry into matters in themselves inadmissible as evidence but which will lead to the discovery of such evidence." Fed. R. Civ. P. 26(b) advisory committee's note. Indeed, it remains that "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case." *Id.*

Cases post-dating the amendment of Rule 26 are in accord. *See, e.g., In re PE Corp. Securities Litig.,* 3:00 Civ. 705, 2003 WL 23329188, at *3 (D. Conn. Nov. 3, 2003) ("relevance, in discovery matters, is broadly and liberally construed"); *Ross v. UKI Ltd.,* 02 Civ. 9297, 2004 WL 67221, at *7 (S.D.N.Y. Jan. 15, 2004) ("relevance for purposes of discovery is an extremely broad concept"); *Lugosch v. Congel,* 218 F.R.D. 41, 45-46 (N.D.N.Y. 2003) ("[t]he scope of discovery in federal lawsuits is significant and broad" and "the requirement of relevancy with regard to discovery matters should be construed liberally and with common sense"); *AMW Material Testing, Inc. v. Town of Babylon,* 215 F.R.D. 67, 72 (E.D.N.Y. 2003) ("[t]he term 'reasonably calculated' means 'any possibility that the information sought may be relevant to the subject matter of the action'").

Under this authority and in accordance with the plain language of Rule 26, the discovery that is the subject of defendants' protective order motion should clearly be produced and the Court should compel defendants to do so. Similarly, there is no excuse for further delay with respect to the discovery that defendants have agreed would be produced and supplemented, and the Court should compel defendants to meet their discovery obligations in that regard promptly.

---

[11] Defs. Mem. at 6-8.

**B.    Discovery Regarding Sales and Pricing of Products in Markets Other Than India Is Directly Relevant to Plaintiffs' Antitrust Claim and to Defendants' Defense of Lack of Subject Matter Jurisdiction.**

**1.    Plaintiffs Have Standing to Bring Their Sherman Act Claim and, Therefore, Discovery Related to Defendants' Global Sales and Pricing Practices Is Relevant.**

As their first line of attack, defendants argue that documents and information concerning their sales and pricing activities outside India are not discoverable because plaintiffs lack antitrust standing. Their argument relies entirely on the false premise, oft repeated without basis by defendants, that plaintiffs' claims are limited by allegations that they were injured in India exclusively and that defendants' alleged global price fixing conspiracy had no effect outside India. Of course, the Amended Complaint alleges precisely the opposite. Plaintiffs (one of whom defendants acknowledge to be a U.S.-based entity) specifically allege that defendants' price fixing as to sales of products for resale to Indian end-users was designed to and did diminish and restrain "competition in the sale and resale of Products *in and from the United States*." Am. Compl. ¶ 30 (emphasis added).

Likewise, it is plainly alleged that the injury suffered by plaintiffs arose directly from the anticompetitive effects of defendants' price fixing conspiracy in the United States, including the diminishment and restraint on competition "in the sale and resale of Products *in and from the United States*," and that plaintiffs were injured thereby by being precluded from effectively and fully competing and maximizing their sales of the Products which they purchased *in the United States*. *Id.* (emphasis added). In the presence of such allegations, discovery to establish the degree and nature of "competition in the sale and resale of Products in and from the United States" falls squarely within the scope of the pleadings and is relevant for purposes of the Federal Rules of Civil Procedure. Selectively quoting snippets from plaintiffs' various papers opposing the volume of motions that defendants have unsuccessfully asserted, as defendants do, does not alter this conclusion.

The standing issue also has been thoroughly briefed and is already before the Court, embodied in defendants' motion for partial judgment on the pleadings under Rule 12(c). For the multitude of reasons set forth in plaintiffs' opposition to that motion, the Court should swiftly reject this argument. In the interest of efficiency and to avoid duplication, plaintiffs will not repeat all their arguments again. Like all of defendants' other motions, however, the Rule 12(c) motion asks the Court to ignore the nature of plaintiffs' price fixing claim and the allegations in the Amended Complaint. As defendants are well aware, a *per se* violation of the Sherman Act like price fixing does not require particularized allegations of market power in a relevant antitrust market or an adverse effect on competition. Such effects are presumed. *See* Plaintiffs' Opposition to Defendants' Motion for Partial Judgment on the Pleadings, dated February 13, 2004, at 7–10. Thus, contrary to defendants argument, market power and the precise adverse effects on competition resulting from defendants' actions need not be pleaded, much less proved, to establish a substantive violation of § 1 of the Sherman Act. *See id.* (citing, e.g., *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *Pace Elec., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 120 n.2 (3d Cir. 2000)).

Moreover, even if such allegations were required to establish a *per se* violation of the Sherman Act, there would be no grounds on which to rule that plaintiffs lack standing, or deny them the requested discovery which relates directly to the allegations of antitrust standing and injury. In fact, the Amended Complaint specifically describes plaintiffs' antitrust injury (*see, e.g.*, Am. Compl. at ¶¶ 30, 55), as well as injury suffered in the United States of the type against which the antitrust laws are directed (*see, e.g., id.* at ¶¶ 22, 24, 25, and 55).

Plaintiffs' standing is also supported by more than just the pleadings alone. Substantial documentary evidence has already been submitted to and addressed by the Court, most recently in the Court's March 18, 2004 ruling concerning subject matter jurisdiction, showing the anticompetitive effects of defendants' price fixing activities in the United States and elsewhere outside of India. Indeed, the very Federal Trade Commission ("FTC") document cited by defendants, analyzing the effects of the Dow/UCC merger and explaining why certain Dow businesses were required to be divested,[12] lends further support to the showing already made by plaintiffs of an anticompetitive effect in the United States as a result of defendants resale price fixing conspiracy. The FTC analysis explains the highly concentrated nature of the markets for the specific products that were sold by UCC/Dow to plaintiffs. For at least certain of these products, Dow and UCC's combined market share equaled at least 50% of capacity in the United States and Canada, and from 60% to 90% of worldwide capacity.[13] Highly concentrated markets such as these are naturally more likely to be subject to anticompetitive collusion among competitors—as Dow and UCC were—and as a result suffer from the anticompetitive effects of such collusion.[14] As a result, in the highly concentrated markets in which Dow and UCC competed, both pre- and post- merger, the effects of even a single firm's resale price fixing conspiracy directed to one distributor will be substantial and could, as here, be used to maintain prices throughout the market.

---

[12] *See* Defs. Mem. at 15. A copy of the analysis is annexed as Ex. G hereto. The divestitures were pursuant to the Consent Order settling the FTC's complaint that alleged anticompetitive harm from the merger.

[13] *E.g., id.* at 4-5.

[14] *See, e.g., State of N.Y. v. Kraft General Foods, Inc.*, 926 F. Supp. 321, 364 (S.D.N.Y. 1995) (economists' conventional wisdom is "that the more highly concentrated a market is, the greater the likelihood sellers will avoid direct and open everyday low price competition"); *Reading Indus., Inc. v. Kennecott Copper Corp.*, 477 F. Supp. 1150, 1157 (S.D.N.Y. 1979) ("[i]n a highly concentrated, vertically integrated, interdependent industry . . . opportunities for collusion are extensive and the potential benefits to be realized great").

Thus, at the same time that defendants attempt to turn their discovery motion into an ill-disguised supplemental brief in support of their pending Rule 12(c) motion, they fail, as they have previously, to address the fact that the Amended Complaint fully satisfies their own, legally unsupported pleading standards. Discovery concerning defendants' pricing and sales of the products at issue—in all markets—goes directly to the heart of plaintiffs' allegations of an anticompetitive effect resulting from the resale price fixing conspiracy directed specifically to plaintiffs. In particular, such discovery goes to the heart of plaintiffs' claim that the resale price fixing conspiracy was for the purpose of preventing "erosion to prices for the Products charged by UCC and Dow to end-users of Products in the United States" (Am. Compl. at ¶ 29), and to the proof that plaintiffs will put forward to address the issues of antitrust standing and injury. Proof has already been presented on this issue, and defendants now cannot credibly argue that additional discovery would not be equally pertinent to the issues alleged in this case.

**2.  Because Lack of Subject Matter Jurisdiction May Be Raised at Any Time in These Proceedings, It Is Critical That Plaintiffs Be Permitted to Develop Their Proof on This Issue.**

Defendants further argue that discovery pertaining to competition outside India is not needed because the Court has denied defendants' motion to dismiss plaintiffs' federal antitrust claim for lack of subject matter jurisdiction. Plaintiffs agree with the Court's holding that at this juncture they have "at the very least, presented a compelling case . . . of direct, substantial, and foreseeable effects on domestic commerce" to establish subject matter jurisdiction over their federal antitrust claim consistent with the Foreign Trade Antitrust and Improvements Act ("FTAIA"). *See* March 18, 2004 Order. Defendants have hardly conceded this point, however. Even now they are seeking certification for interlocutory appeal of the Court's most recent ruling on this issue.

Moreover, contrary to the assumption underlying defendants' argument, subject matter jurisdiction remains a dispositive issue throughout the pendency of any litigation, including the appellate process. "[I]t is well settled that lack of federal jurisdiction may be raised for the first time on appeal, even by a party who originally asserted that jurisdiction existed, or by the Court

11

*sua sponte.*" *City of Rome, N.Y. v. Verizon Communications, Inc.*, 362 F.3d 168, 174 (2d Cir. 2004) (vacating summary judgment after party asserted, for the first time on appeal, that court lacked subject matter jurisdiction under federal Telecommunications Act, 47 U.S.C. § 253) (citation omitted). Thus, defendants could raise this defense at any time in this case, which, given their practices to date would seem a likely step, and plaintiffs would have the burden of showing that jurisdiction existed based upon the evidentiary record. Accordingly, even if there were not, as explained above, such a clear link between the discovery at issue and the merits of plaintiffs' Sherman Act claim, there is no basis for defendants' argument that plaintiffs should be precluded from obtaining further proof of the "direct, substantial and reasonably foreseeable" effects of the defendants resale price fixing conspiracy on U.S. domestic commerce.

### 3. The Court Should Reject Defendants' Preemptive Challenge To Plaintiffs' Pending Discovery Requests.

For the same reasons as set forth above, the Court should reject any attempt by defendants now to be excused from responding to Plaintiffs' Third Request for Production of Documents, served April 2, 2004.[15] These discovery requests specifically seek discovery directly probative of the same essential elements of plaintiffs' antitrust claims as discussed above. As part of their case in chief, plaintiffs need to prove not only the mere existence of defendants' price fixing activities—which they could arguably do with many of the documents already produced to date—but also the full scope of the impact and competitive injury caused by those activities. Likewise, as previously remarked, plaintiffs are entitled to explore the nature and scope of the competition adversely affected by defendants' price fixing, not only concerning the competition between Dow and UCC, but also competition with other companies in the various markets within and beyond India, for the products purchased and resold by plaintiffs. The pending document requests and interrogatories, like the disputed requests now before the Court, go only as far as plaintiffs need to go in order to present their case in chief and to show

---

[15] *See* Defs. Mem., Ex. 11.

12

defendants' affirmative defenses to be without merit. Defendants have made no showing to the contrary, and simply wish to continue to avoid their discovery obligations.[16]

### C. Defendants Have Made "Sabotage" at Union Carbide's Bhopal, India Plant Relevant.

The 1984 leakage of toxic chemicals from Union Carbide's Bhopal, India plant (the "Bhopal Incident") plays a central role in the relationship of the parties in this case and the circumstances surrounding their contractual dealings. *See, e.g.,* Am. Compl. at ¶ 16 ("UCC's ability to sell directly to . . . customers was dramatically impacted . . . when a leak from its plant in Bhopal, India, caused the death of approximately 3,800 persons and injuries to an additional 200,000"); ¶ 17 ("[a]s a result of the Bhopal tragedy, UCC decided that it would not sell Products directly to end-users in India. To maintain access to the Indian market and to end-user customers in India, UCC established MVMS"); ¶ 19 ("to further insulate UCC from liabilities in India resulting from the Bhopal tragedy, in 1993 UCC's corporate law department, located in Danbury, Connecticut, reinforced its directions that no UCC employee would be allowed to travel to India and that UCC could not ship Products directly to India"); ¶ 20 ("[t]o implement the 1993 UCC corporate legal directive, and to allow UCC to continue to realize the benefits of selling to the Indian market . . . UCC requested that MVMS form separate corporate affiliates and open offices outside India that would buy the Products in the United States and resell them to end-users in India"); ¶ 32 ("both before and after the effective date of the Dow/UCC merger transaction, Defendants undertook efforts to establish Dow, untainted by the Bhopal tragedy, in place of Plaintiffs as a direct seller of Products to end-users in India").

In their answers, defendants dispute these facts, and make the remarkable factual allegation, unsupported by any known reports of the incident and contrary to the findings in India

---

[16] Indeed, defendants' argument anticipated their responses, dated May 5, 2004, to Plaintiffs' Third Request for Production of Documents. Each of the defendants objected to the production of any documents in response to any Request. The parties have not yet met and conferred regarding these objections, but plaintiffs anticipate the need to supplement their motion to compel.

that criminal negligence by UCC employees was involved, that the Bhopal tragedy resulted from acts of "sabotage."[17] Yet, even though they have "opened the door" concerning this factual contention, they refuse to produce any discovery "concerning sabotage in connection with the Bhopal Incident."[18] If for no other reason, therefore, discovery concerning defendants' allegations of sabotage would go to issues of credibility and bias, in that it would show that testimony or other attempts at making evidentiary showings by defendants are suspect and should be accorded little, if any, weight.

But that is not all. Documents already produced by defendants preview the prevalent role the Bhopal Incident played in *all* business decisions made thereafter,[19] including, most significantly, the undisclosed intentions of UCC and Dow to eliminate plaintiffs and have Dow sell directly to end-users in India. For example, in a document summarizing a meeting that took place on February 13, 2001, a week after the merger was consummated, between the country manager of India for Dow and Megavisa, the Dow employee noted, "[f]or two years after Bhopal[,] Union Carbide was still continuing to trade in India. In 1987-1988 the Government advised them to exit totally out of India. The group that was in international trading of UCC formed MegaVisa . . . ."[20]

Other documents produced by defendants also recognize the significance of Bhopal in connection with Dow's undisclosed plan to eliminate plaintiffs. For example, an April 26, 2001 email from a Dow employee regarding direct shipments of product to India comments that, "[t]here was a big law suit with UCC in India in the past. UCC considered the case is closed, but India's official and companies didn't think so. Presuming the product ships directly from USA

---

[17] *See* Dow Ans. at ¶ 16; UCC Ans. at ¶ 16; UCAP Ans. at ¶ 16.

[18] *See* Ex. A hereto, Response to Request 29.

[19] *See* Ex. H hereto at DE400005a.

[20] *See* Ex. I hereto at DI4000903.

to India, my suggestion is to selling the product under Dow legal entity with Dow label and document will be a good way to proceed [*sic*]."[21]  Another email of the same date from a Dow employee recognizes that the entire Megavisa contract was based upon the Bhopal incident: "Megavisa India based in Mumbai is of course the main operating entity, whereas the Megavisa Singapore entity was setup to take care of the post Bhopal situation and is essentially a shell company."[22]

It should not be surprising, therefore, that defendants seek to expunge from this litigation any reference to Bhopal.  It was a tragic event that is no doubt a sensitive issue for them.  But Bhopal is omnipresent in this case, influencing the parties' entire relationship throughout their course of dealing, and defendants' attempt in public documents to make factual allegations concerning sabotage needs to be investigated.  Discovery of this unexplained characterization of the Bhopal incident is relevant to the defendants' motives for and circumstances surrounding defendants' alleged negligent misrepresentations, and the role the incident played in the relationship between the parties, their contracts, and the defendants' conduct simply cannot be ignored.  Nor should discovery regarding defendants' investigation and conclusions about the tragedy's cause be swept under the rug.

### D.  Defendants Are Able and Should Be Compelled to Identify All Communications Between Them and Plaintiffs' Customers.

Plaintiffs have also requested documents regarding communications between representatives of defendants and end-users of products purchased from plaintiffs.  On its face such information is relevant to plaintiffs' negligent misrepresentation claim, which defendants concede.  *See* Defs. Memo. at 14.  Each and every one of these communications is "relevant" within the meaning of Rule 26(b), and defendants should not be allowed to cherry-pick which they will produce and which they will withhold.  Defendants told plaintiffs one thing, and

---

[21] *See* Ex. J hereto at DS250233a.

[22] *See* Ex. K at DS250234.

plaintiffs' customers another. The requested communications will be probative of this fact, which in turn establishes the falsity of the representations made to plaintiffs and defendants' knowledge of same. Accordingly, all contacts between defendants and plaintiffs' customers, especially between August 1999, when the UCC/Dow merger was announced, and March 31, 2002, when plaintiffs were terminated by Dow, are relevant and should be produced.

Defendants' objections center around their assertion that they cannot possibly know what to produce, because they do not know who plaintiffs' customers are or which communications are relevant. This professed ignorance is non-responsive and plainly false. Defendants' own documents admit that in connection with every order placed by plaintiffs with defendants the identity of the end-user was revealed.[23] Furthermore, the Amended Complaint specifically states that certain representatives of defendants contacted plaintiffs' customers and made false statements to them with intent to damage plaintiffs. *See, e.g.,* Am. Compl. at ¶ 44 ("Dow, acting through Dow India, and specifically through its marketing director in India, Ashish Mitra, contacted Plaintiffs' customers directly and informed them that Plaintiffs were experiencing financial difficulties"); ¶ 48 ("Defendants also repeatedly induced Plaintiffs to disclose confidential customer information . . . regarding end-users in India"). At a minimum, before asserting the instant argument, one would think that Dow would have inquired of its employees identified by the Amended Complaint as having had communications with plaintiffs' customers and arranging for meetings between Dow representatives and plaintiffs' customers.

Further, defendants are well aware of the situation alleged in ¶ 37 of the Amended Complaint, concerning the proceeding in which UCC was named by plaintiffs' customers Finolex and Sterlite to recover their losses in connection with unfilled orders. Numerous documents have been produced concerning this proceeding and the disputes underlying it, and it is simply untenable for defendants to assert that they do not know the identity of the specific

---

[23] *See, e.g.,* Ex. I hereto at DI4000905.

customers that were involved.

Nor does defendants' argument of undue burden hold water. Again, this position is belied by defendants' own documents. In 2001, a Dow employee created a presentation that provided an overview of Megavisa. Indicating both Dow's knowledge of the customer base of Megavisa and the reasonableness of Megavisa's request, one slide states, "80% of sales to this customer are *from some top 10-12 accounts*. Most of these MV customers are on secured terms. Sales needs to track and advise us the payment terms offered to key customers and % of sales they account for."[24] Not only does this document establish that defendants knew the identify of plaintiffs' customers and the terms of sale applicable to each, it further shows that only a dozen or fewer end-users accounted for almost all of the sales of defendants' products by plaintiffs.

Defendants' position that they also should not be required to produce discovery concerning their communications with plaintiffs' customers because plaintiffs have not identified specific customers who plaintiffs claim were contacted falls by its own weight. Information concerning who defendants contacted and what they said is in *defendants'* possession, and that is exactly what plaintiffs are seeking to find out.

### E. Evidence of Pre-merger "Gun-Jumping" Communications Between UCC and Dow Are Highly Relevant.

Defendants argue that allegations that Dow "assumed operational control" over the parties' contractual relationship after the 2001 merger with UCC bar the door against discovery about Dow's pre-merger role in the global price maintenance conspiracy to which UCC was a party. What defendants omit to mention is that the Amended Complaint specifically alleges that Dow and UCC, *well before they merged in 2001*, conspired with each other to maintain the unlawful retail price fixing conspiracy on which plaintiffs' Sherman Act claim is based:

> The minimum resale price maintenance agreement was established and imposed upon Plaintiffs *with the full knowledge and at the direction of UCC's and Dow's corporate management*, including those located at UCC's corporate headquarters

---

[24] *See* Ex. L hereto at DI4002424.

in Connecticut. Enforcement of the resale price fixing agreement was undertaken *by UCC and Dow* directly and through Defendants' operational personnel in UCAP, UCCS and Dow Singapore, acting as representatives of UCC and Dow. *At least since August, 1999 the resale price maintenance conspiracy was imposed at the urging and direction of Dow*. At all times Defendants imposed the price requirements, *inter alia*, to ensure that prices charged by Plaintiffs to end-users in India for Products would not cause erosion to prices for the Products charged by *UCC and Dow* to end-users of Products in the United States as well as in other jurisdictions to which *UCC and Dow* sold Products from the United States.[25]

Paragraph 32 of the Amended Complaint is to similar effect in connection with the

breach of contract and tort claims:

Once Defendants announced their plan of merger *in August 1999*, in addition to their resale price fixing, Defendants ceased acting consistently with their contractual and legal obligations. In particular, both *before* and after the effective date of the Dow/UCC merger transactions, *Defendants undertook efforts to establish Dow, untainted by the Bhopal tragedy, in place of Plaintiffs as a direct seller of Products to end-users in India.*

(emphasis added).

Accordingly, discovery regarding Dow's pre-merger communications with UCC and

Dow's pre-merger sales activity flows directly from the allegations of the Amended Complaint,

and goes to each of the claims asserted by plaintiffs against defendants. Moreover, the requested

documents and information are independently relevant.

There can be no question that documents relating to the competition, or the lack of it,

between Dow and UCC pre-merger would shed significant light on the competitive effects of the

price fixing conspiracy involving plaintiffs. As the Court has already observed based upon

evidence submitted in connection with the subject matter jurisdiction motions, the conduct

alleged involves "quite possibly the largest industrial chemical manufacturers in the world."

March 18, 2004 Order. Furthermore, as shown by the FTC analysis cited by defendants, and

annexed hereto as Ex. G, in at least certain of the markets for the products sold by defendants to

---

[25] Am. Compl. ¶ 29 (emphasis added).

plaintiffs, Dow and UCC were the primary if not the only competitors. Thus, any pre-merger communications between them concerning competitive issues would go far in substantiating the showing already made that the resale price fixing conspiracy was for the purpose of furthering a horizontal conspiracy aimed at maintaining prices for the relevant products in the United States and in markets throughout the globe.

Documents and information about pre-merger communications between Dow and UCC are equally relevant to plaintiffs' tort claim. Such discovery would go directly to issues relating to the plans, hatched before the merger was consummated, to drop plaintiffs once the merger was complete. This is not mere speculation. A letter from William Joyce, UCC's CEO, in 2000 gives a clear indication that such discussions with Dow were already underway at that time.[26] Similarly, an internal Dow email dated February 2, 2002, immediately prior to the closing of the merger, shows that communications concerning plaintiffs' future were well underway prior to the closing.[27]

There is no doubt, therefore, that discovery concerning pre-merger communications between Dow and UCC would not only be relevant to the anticompetitive intent and effects of the resale price maintenance conspiracy—i. e., the parties were "jumping the gun" in an effort to coordinate pricing or allocate customers—but also to show the negligently false representations that were being made to plaintiffs about the post-merger entity's intent to continue to do business. In either event, defendants should be compelled to produce the discovery.

### F.    Defendants Overstate the Burden Imposed By Compliance.

#### 1.    The Time Period Is Reasonable.

Defendants go on at great length to paint a picture purportedly showing their good faith attempts to compromise on various issues. Their biggest complaint regarding burden,

---

[26] *See* Ex. M hereto.

[27] *See* Ex. I at DI4000901.

however—that the relevant period of time extends as long as 20 years—was never raised during

the any of the discovery conferences between the parties. As a threshold matter, therefore, this

issue is not ripe for judicial intervention. Nonetheless, plaintiffs are quite prepared to agree to

narrower time limitations so long as they are not prejudicial to the prosecution of their claims.

### 2. Defendants' Complaints About the Purported Burden of Compliance Are Unsupported by Any Facts.

Where, as here, no offer of proof is made regarding the likely cost or time involved in

compliance, compliance with relevant discovery requests may not be excused. *See Ahern v.*

*Trans Union LLC*, 3:01 Civ. 02313, 2002 WL 32114492, at *1 (D. Conn. Oct. 23, 2002) ("the

objecting party must show specifically how . . . each request is not relevant or how each question

is overly broad, burdensome or oppressive by submitting affidavits or offering evidence

revealing the nature of the burden") (internal citations and quotation marks omitted); *Omega*

*Engineering, Inc. v. Omega, S.A.*, 3:98 Civ. 2464 (AVC), 2001 WL 173765, at *2 (D. Conn. Feb.

6, 2001) (same).

Nor is the single case cited by defendants in relation to their "burden" claims, *In re*

*Nasdaq Market-Makers Antitrust Litig.*, 164 F.R.D. 346 (S.D.N.Y. 1996), to the contrary. The

issue there concerned the propriety of ordering disclosure to an intervenor newspaper of certain

discovery materials containing both confidential and non-confidential content. Because the

producing party had relied on an existing, stipulated protective order in producing the materials

to plaintiffs and filing them under seal, the court exercised its discretion and denied access to the

intervenor.

Defendants' argument that they will have to review and gather documents "located at

hundreds of subsidiaries and affiliates" around the world,[28] provides no basis for allowing them

to escape their discovery obligations. Likewise, their cry that they will have to "comb through

---

[28] *See* Defs. Memo. at 17.

millions of pages of documents,"[29] is hollow.  This is a complex lawsuit involving international companies that transacted business through affiliates, and commercial relationships extending for over a decade.  The price fixing alleged, as previously recognized by the Court, may involve the largest chemical producers in the world.  Having to thoroughly review highly pertinent documents is a consequence of the wide-ranging unlawful conduct that is involved.

Defendants should also not now be heard to complain regarding any burden that may exist because of the need to review documents of non-U.S. affiliates because, when it served their interests to do so in connection with *forum non conveniens* discovery, they had no difficulty producing what they themselves characterize as "substantial" documents from the foreign subsidiaries.[30]  Yet, they have never provided the representation repeatedly sought by plaintiffs as to whether or not the production from the foreign affiliates was complete, not merely "substantial."  Defendants just cannot have it both ways, and blanket assertions that litigating this case will be "too onerous" and "grossly prohibitive" are of no moment.

**G.    Defendants Should Promptly Produce All Documents and Answer All Interrogatories For Which There Exists No Outstanding Dispute.**

Despite defendants' commitment to supplement their document productions and interrogatory answers in connection with certain requests by the end of April, defendants have failed to do so.  Further delay is unacceptable.  This case is now approaching its second anniversary, and even when defendants provide an assurance that they will produce discovery on the merits, they still fail to do so.

Specifically, with respect to Document Requests 1-4, 7-21, 24-28, and 30-31, the parties have agreed that there are no outstanding disputes, and defendants have said they have either produced documents (without specifying that all responsive documents from all foreign

---

[29] *Id.*

[30] *See* Letter from Dana S. Douglas, Esq. to Paul A. Winick, Esq., dated February 4, 2004, attached as Ex. C hereto at Tab 2.

subsidiaries and affiliates have been produced) or that they will be supplementing their production.[31] Yet, as recently as May 4, 2004, defendants' counsel advised that only "one type of document" would be produced and otherwise that the document production for the agreed upon Requests is complete.

The parties also purportedly reached an agreement with respect to defendants supplementing their answers to Interrogatories No. 2, 5 and 7. As of May 4, however, defendants advised only that additional names will be provided.

Accordingly, plaintiffs respectfully submit that defendants should be compelled to fully respond to the foregoing document responses and interrogatories, including by producing documents and information from and relating to each and all of their foreign subsidiaries and affiliates, on or before June 30, 2004.[32]

## IV.    CONCLUSION

Defendants are not entitled to a protective order that will prejudice plaintiffs in their ability to prove essential elements of their claims, notwithstanding defendants' arguments, *ad nauseum*, that plaintiffs' claims have no merit. There is no reason at this early stage of the case to block legitimate discovery. In fact, the discovery sought by plaintiffs, including in their Third Request for Production of Documents, falls well within the scope of permissible discovery under Rule 26.

---

[31] *See* Ex. C.

[32] The Court should also require defendants to specify whether they have completed a thorough search of *all* locations at which they or entities under their control possess responsive documents. At first, defendants stated that *some* documents from at least *some* of the foreign defendants had been produced. *See* Ex. N hereto. Now, in contrast, defendants offer no more than a conclusory representation that "an appropriate search" was conducted. *See* Ex. E hereto. Despite plaintiffs' repeated inquiries, it is still unclear whether defendants gathered and produced documents from all foreign subsidiaries and affiliates in possession of responsive documents.

Contrary to defendants' lament, the federal rules will hardly be desecrated by recognizing that the pleadings and documents already discovered to date provide more than ample basis for denying defendants' motion and granting plaintiffs' cross-motion to compel. Plaintiffs respectfully request, therefore, that the Court enter the attached form of Order at its earliest convenience, so that full merits discovery may proceed without further delay.

Respectfully submitted,

**BINGHAM McCUTCHEN LLP**

Richard S. Taffet (ct 10201)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

THELEN REID & PRIEST LLP
Paul A. Winick (ct 21813)
Alyson L. Redman (ct 25494)
875 Third Avenue
New York, NY 10022
(212) 603-2000 (tel)
(212) 603-2001 (fax)

Contrary to defendants' lament, the federal rules will hardly be desecrated by recognizing that the pleadings and documents already discovered to date provide more than ample basis for denying defendants' motion and granting plaintiffs' cross-motion to compel.  Plaintiffs respectfully request, therefore, that the Court enter the attached form of Order at its earliest convenience, so that full merits discovery may proceed without further delay.

Respectfully submitted,

BINGHAM McCUTCHEN LLP

Richard S. Taffet (ct 10201)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

THELEN REID & PRIEST LLP
Paul A. Winick (ct 21813)
Alyson L. Redman (ct 25494)
875 Third Avenue
New York, NY 10022
(212) 603-2000 (tel)
(212) 603-2001 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on this 7th day of May, 2004, a copy of the foregoing has been

hand-delivered to the following:

Craig A. Raabe, Esq.
Edward J. Heath, Esq.
Elizabeth A. Fowler, Esq.
Robinson & Cole LLP
280 Trumbull Street, 28th Floor
Hartford, CT  06103

and sent via FedEx to the following:

Andrew S. Marovitz
Britt M. Miller
Dana S. Douglas
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street
Chicago, IL  60603

Christopher J. Kelly
Mayer, Brown, Rowe & Maw LLP
1909 K Street
Washington, DC  20006-1157



_____
Robert M. Langer

\15726\1\44335.5