**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

FILED

2004 JUN -3 P 1: 58

U.S. DISTRICT COURT

|  |  |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., )<br>)<br>)<br>)<br>) | |
| Plaintiffs, )<br>) | Civil No. 3:02 CV 1107 (AVC) |
| v. )<br>) | |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. )<br>)<br>)<br>) | June 2, 2004 |
| Defendants. )<br>) | |

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER & OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES**

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 05103-3497
(860) 275-8304

Andrew S. Marovitz (ct 25409)
Britt M. Miller (ct 25411)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
190 South La Salle Street
Chicago, Illinois 60603
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006-1157
(202) 263-3000

FILED
2004 JUN -7 A 9: 14
U.S. DISTRICT COURT
HARTFORD CT

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. THE SCOPE OF PERMISSIBLE DISCOVERY .......... 4

III. PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO SHOW THAT DOCUMENTS AND INFORMATION RELATED TO GEOGRAPHIC REGIONS OTHER THAN INDIA ARE RELEVANT .......... 7

A. Plaintiffs Have Failed to Allege Facts Supporting Antitrust Standing. .......... 7

B. Plaintiffs Have Failed to Allege an Anticompetitive Effect in the U.S.. .......... 9

C. Plaintiffs Have Failed to Demonstrate that Their Interrogatories and Document Requests – Including Those Discussed in Their "Supplemental Statement – Seek Relevant Information .......... 11

IV. THE CAUSE OF THE LEAK AT BHOPAL IS TOTALLY IRRELEVANT TO PLAINTIFFS' CLAIMS .......... 16

V. PLAINTIFFS PROVIDE NO JUSTIFICATION FOR THEIR FAILURE TO IDENTIFY THE CUSTOMERS REGARDING WHOM THEY SEEK DISCOVERY FROM DEFENDANTS .......... 17

VI. PLAINTIFFS' PRE-MERGER "GUN JUMPING" REQUESTS ARE IRRELEVANT TO THEIR CAUSES OF ACTION .......... 20

VII. AS WRITTEN, PLAINTIFFS' REQUESTS WOULD IMPOSE AN INORDINATELY HEAVY BURDEN ON DEFENDANTS .......... 23

VIII. AN APPROPRIATE SEARCH WAS CONDUCTED IN RESPONSE TO THE AGREED-UPON DISCOVERY REQUESTS. .......... 29

IX. CONCLUSION. .......... 32

## TABLE OF AUTHORITIES

**Cases:**

*AMW Materials Testing, Inc. v. Town of Babylon*, 215 F.R.D. 67 (E.D.N.Y. 2003) .................... 6

*Chemical Bank v. Affiliated FM Ins. Co.*, 1994 WL 89273
    (S.D.N.Y. Mar. 16, 1994) ........................................................................................... 25

*Dana Commercial Credit Corp. v. National Fin. Servs. Corp.*, 1992 WL
    63184 (S.D.N.Y. June 24, 1992)................................................................................ 24

*In re PE Corp. Sec. Litig.*, 221 F.R.D. 20 (D. Conn. 2003)...................................................... 5, 10

*In re Surety Ass'n*, 388 F.2d 412 (2d Cir. 1967)...................................................................... 10, 15

*Johnson Matthey, Inc. v. Research Corp.*, 2002 WL 31235717
    (S.D.N.Y. Oct. 3, 2002) .............................................................................................. 22

*Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002)......................................................... 1

*Lugosch v. Congel*, 218 F.R.D. 41 (N.D.N.Y. 2003).......................................................... 6, 7, 10

*Morse/Diesel, Inc. v. Fid. & Deposit Co.*, 122 F.R.D. 447 (S.D.N.Y. 1988)................................ 5

*Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 2003 WL
    1956214 (N.D.N.Y. Apr. 24, 2003) ........................................................................... 18

*Omega Eng'g, Inc. v. Omega, S.A.*, 2001 WL 173765
    (D. Conn. Feb. 6, 2001) ...............................................................................................7

*Pierson v. Columbus McKinnon Corp.*, 2004 WL 966177
    (W.D.N.Y. Apr. 28, 2004) ........................................................................................ 25

*Rapkin v. Rocque*, 228 F. Supp. 2d 142 (D. Conn. 2002)........................................................... 21

*Ross v. UKI Ltd.*, 2004 WL 67221 (S.D.N.Y. 2004) .................................................................. 7

*Rus, Inc. v. Bay Industries, Inc.*, 2003 WL 1740745
    (S.D.N.Y. Apr. 1, 2003)............................................................................................. 22

*Segan v. Dreyfus Corp.*, 513 F.2d 695 (2d Cir. 1975) ............................................................... 29

*Turicentro, S.A. v. American Airlines, Inc.*, 303 F.3d 293 (3d Cir. 2002)................................... 10

*Union Carbide Corporation v. Montell N.V.*, 28 F.Supp.2d 833 (S.D.N.Y. 1998) ..................... 17

**Statutes:**

15 U.S.C. § 6a ....................................................................................................................... 11, 12

**Rules:**

Fed. R. Civ. P. 26 ..................................................................................................... passim

**Other Authorities:**

Fed. R. Civ. P. 26(b)(1) advisory committee note (2000) ..................................................... passim

## I.    INTRODUCTION

Plaintiffs' own documents repeatedly concede that Plaintiffs could not distribute

Union Carbide products *anywhere in the world but in India*:

> [MM Global Services] WILL SELL UCC&P PRODUCTS ONLY
> TO INDIA THROUGH VISA.  THEY WILL NOT SELL UCC&P
> PRODUCTS IN THE USA DOMESTIC MARKET OR TO ANY
> COUNTRY OTHER THAN INDIA.

Slide presentation, "The Major Changes" (relevant pages attached hereto as Ex. 12), at M 5908.

> Megavisa will consign and sell all the products, as supplied by
> Union Carbide Corporation and its affiliates only to the customers
> in India and not to customers in any other country in the world.  If
> Megavisa sells any of these products in any countries outside of
> India, the Distributorship arrangement with Megavisa will
> forthwith be terminated without any notice.

Letter from R. Neri, UCAP, to S. Sanghvi, Megavisa Solutions (June 27, 2000) (Ex. 1a), at M

0009.[1]  A series of letters between the parties confirming their interest in transacting business

with each other confirms the same point.[2]  These uncontroverted documents make clear that

Plaintiffs never could have lost a single sale anywhere in the world but in India due to the

purported resale price agreements they claim to have entered into with Defendants.

No wonder, then, that Plaintiffs previously relied so heavily on the holding of *Kruman v.*

*Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002), to assert that this Court has subject matter

---

[1] Exhibits 1-11 are attached to our opening brief.  Exhibits 12-17 are attached to this brief, with one exception:
Exhibit 1a is the Plaintiff-produced copy of the document previously attached as Exhibit 1.

[2] Letter from R. Natarajan, UCAP, to M. Mehta, Mega Global Services (Apr. 5, 1993) (attached as Ex. 13) ("This is
to confirm Union Carbide's interest in selling to Mega Global Services Inc. from time to time effective as of 6 July
1993, certain of Union Carbide's products for resale by Mega Global Services Inc. *to customers located in India*.")
(emphasis added); Letter from R. Neri, UCAP, to R. Bowry, MM Global Services (Sept. 8, 1995) (attached as Ex.
14) ("This is to confirm Union Carbide's interest in selling to MM Global Services Inc. (MMGS) from time to time
effective as of 8th September, 1995, certain of Union Carbide's products for resale by MMGS *to customers located
in India*.") (emphasis added).

jurisdiction over their claim regardless of where they were injured, so long as some alleged

antitrust violation injured *someone* in the United States. But with an expected ruling date for the

Supreme Court's decision in *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.* only weeks away

(and, significantly, now that reports of the April 26 oral argument have been made public),[3]

Plaintiffs are edging away from their long-argued legal theories. Nowhere in their most recent

papers do they invoke the familiar, and now endangered, cases upon which they repeatedly relied

throughout this matter – *Kruman, Sniado* and others – to prop up their claims. *See, e.g.,* Pls.

Mem. in Opp. to Mot. to Dismiss at 1 (Nov. 12, 2002) ("under established law, including the

Second Circuit's recent decision in *Kruman v. Christie's Int'l plc,* 284 F.3d 384 (2d Cir. 2002),

this Court has subject matter jurisdiction"); Pls. Mem. in Opp. to Mot. for Certification at 17

(Oct. 31, 2003) (the Second Circuit held in *Kruman* "that jurisdiction is based upon the conduct's

effect on United States commerce and whether a claim could be raised in the United States, not

upon whether the plaintiff's injury is suffered here."); Pls. Opp. to Mot. to Reconsider at 2 (Feb.

6, 2004) ("Adopting a broad view of 'conduct,' as mandated by the Second Circuit in

*Sniado....*"). Plaintiffs relied upon those cases to provide the legal underpinning for their

demands for far-reaching discovery about matters that could not have injured them.

Now, fearful that soon they will no longer be able to rely on someone else's hypothetical

cause of action to create subject matter jurisdiction over their own, Plaintiffs have changed their

tactics. They seed their most recent brief with intimations of worldwide horizontal collusion

between Dow and UCC – a "global price fixing conspiracy" (Pls. Opp. to Mot. for Protective

Order and Mem. in Supp. of Pls. Cross-Mot. to Compel Prod. of Docs. and Answers to Interrogs.

at 8 ("Pls. Opp.")), "defendants' price fixing conspiracy in the United States" (*id.*), "highly

---

[3] *See* http://www.supremecourtus.gov/oral_arguments/argument_transcripts/03-724.pdf (transcript).

concentrated market" (*id.* at 10), "anticompetitive collusion" (*id.*), and again "defendants' price fixing activities" (*id.* at 12) -- intimations so groundless that they did not even warrant inclusion as an independent cause of action in their 12-claim Complaint. They step up their rhetoric in critiquing Defendants' arguments and motivations.[4]  Finally, they contend that -- even though (1) the conspiracy they allege would have fixed the prices at which they sold UCC products in India (not the prices at which they bought them in the United States), (2) their injury was in the form of lost sales, and (3) those lost sales could have been only in India -- somehow they can assert that they were injured in the United States.

But none of these approaches redeems Plaintiffs' attempt to get global discovery after having alleged an Indian resale price maintenance agreement.  Plaintiffs' requests for documents and information relating to the Defendants' commercial activity "in all markets" (Pls. Opp. at 11) "around the world" (Pls. Supplemental Statement in Further Supp. of Their Mot. to Compel Prod. of Docs and Answers to Interrogs. at 3 ("Pls. Supp.")) have nothing to do with "the claim or defense of any party" in this case, Fed. R. Civ. P. 26(b)(1).  Nor have Plaintiffs shown anything like the "good cause" required to empower the Court to extend discovery to matters "relevant to the subject matter involved in the action."  *Id.*

Plaintiffs' opposition brief and cross-motion to compel fails equally to show why they are entitled to discovery of the other three categories of information they demand.  For example, in a campaign of harassment over what they concede is a "sensitive issue" for Defendants (Pls. Opp. at 15), Plaintiffs demand the production of documents related to the sabotage that occurred at Bhopal, but never explain how the presence or absence of sabotage tends to prove or disprove

---

[4] *See* Pls. Opp. at 1 ("shopworn arguments"); *id.* ("manipulate the discovery process"); *id.* ("same tired arguments"); *id.* at 2 ("cries of undue burden"); Pls. Supp. at 6 ("defendants are playing an old and tiresome game").

any of their claims for resale price maintenance, breach of contract or negligent misrepresentation. Similarly, Plaintiffs have not demonstrated why they are entitled to discovery on Dow's communications with an as-yet unidentified class of "end user[s] of Products purchased from any Plaintiff or MVMS." Pls. Second Set of Interrogs. No. 3. And Plaintiffs' allusions to a horizontal price-fixing conspiracy, undignified by even a good-faith cause of action in the Complaint, hardly make Dow's documents relating to pre-merger sales dating back as far as 1984 relevant to "the claim or defense of any party" in this action.

Defendants in this case long ago produced their relevant documents related to Plaintiffs and to India, and told Plaintiffs that. *See infra* at 29-31. Apparently, those documents are insufficient to support the claims that Plaintiffs have pursued here. Now that their legal theory may soon be rejected by the Supreme Court, Plaintiffs are looking for other ways to advance their case. But they cannot do it by seeking discovery for claims that they did not and could not bring. Defendants' Motion for Protective Order should be granted, and Plaintiffs' Cross-Motion to Compel should be denied.

## II.    THE SCOPE OF PERMISSIBLE DISCOVERY

Plaintiffs quote Rule 26(b)(1) accurately, then mangle it. Remarkably, they quote Advisory Committee notes from the *1946* amendments to demonstrate that the *2000* amendments did not narrow the rule. Pls. Opp. at 7. In doing so, they confuse the proviso that evidence, *if relevant*, need not be admissible at trial to be discoverable with the threshold requirement of relevance set forth in the first two sentences. And they overlook the 2000 amendment to this sentence, which "clarif[ied] that information must be relevant to be discoverable, even though inadmissible." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000); *see* Proposed Amendments to the Federal Rules of Civil Procedure at 67 (May 11, 1999) (relevant pages

4

attached as Ex. 15), *available at* http://www.uscourts.gov/rules/archive/1999/cvruless.pdf. This clarification addressed the Committee's "concern[] that the 'reasonably calculated to lead to the discovery of admissible evidence' standard set forth in this sentence might swallow any other limitation on the scope of discovery" (Ex. 15 at 71) -- *exactly* what happens in Plaintiffs' interpretation of the Rule.

Having misinterpreted the rule, Plaintiffs then cite four cases (at 7) that are consistent with Defendants' cases.[5] *In re PE Corp. Sec. Litig.*, 221 F.R.D. 20 (D. Conn. 2003), which Plaintiffs cite for its statement that "relevance, in discovery matters, is broadly and liberally construed" (*id.* at 23 (citing *Herbert v. Lando*, 441 U.S. 153, 177 (1979))), acknowledges that by virtue of the 2000 amendments, a fact now "'must be germane to a claim or defense alleged in the pleading for information concerning it to be a proper subject of discovery.'" *Id.* at 24 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 26.41[6][c] (3d ed. 2002)). Applying the rule, the court held that information relating to one of the stock offerings plaintiffs claimed to be fraudulent was sufficiently relevant to the claims in the case to be discoverable. *Id* at 24. The court found that the facts in question "are essential to a fair presentation of the case," and that "the plaintiffs would be hard-pressed to prepare their case if discovery were limited as the defendants suggest." *Id.*[6] The same could hardly be said of documents and information relating to the manufacture and sale of UCC Products "in any market," the Bhopal tragedy,

---

[5] Plaintiffs' Supplemental Statement charges (at 4) that Defendants' arguments that the evidence in question is not relevant to a claim or defense rests "entirely on false assumptions and misleading citations of authority." We address the "false assumptions" issue, which we take to be related to the impossibility of any harm to Plaintiffs outside of India, here. The "misleading citations of authority" are harder to pinpoint, as neither Plaintiffs' Opposition nor their Supplemental Statement mentions, let alone confronts, even one of the cases cited in our opening brief.

[6] Further, citing two pre-2000 cases, the court mistakenly ignored the 2000 amendments when it stated that "information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery." *Id.* at 23 (citing *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir. 1991); *Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 122 F.R.D. 447, 449 (S.D.N.Y. 1988)).

communications with an unidentified group of end-users of Products bought from Plaintiffs, and Dow's sales prior to its merger with UCC.

The other three cases offer little to support Plaintiffs' argument that the 2000 amendments to Rule 26(b)(1) did not narrow the scope of discoverability. Although it recites the rule's language, *AMW Materials Testing, Inc. v. Town of Babylon*, 215 F.R.D. 67, 72 (E.D.N.Y. 2003) does not address Plaintiffs' point.[7] Viewed in context, the court's observation in *Ross v. UKI Ltd.*, 2004 WL 67221, at *7 (S.D.N.Y. Jan. 15, 2004), that "relevance for purposes of discovery is an extremely broad concept" is unremarkable. What the court was addressing was the defendant's contention that discovery was limited "to information directly supporting or contradicting the ultimate question in a case, narrowly formulated." *Id.* Moreover, the statement follows immediately the court's recitation of the rule's "claim or defense" language, and the subsequent provision that relevant evidence need not be admissible at trial to be discoverable. *Id.* (quoting Fed. R. Civ. P. 26(b)(1)).

Plaintiffs' quotations from *Lugosch v. Congel*, 218 F.R.D. 41 (N.D.N.Y. 2003) similarly omit the court's thorough discussion of the Rule in the wake of the 2000 amendments. Describing a "two tier analysis of what is to be disclosed," the court observed that, without the court's intervention, "relevancy is guided by whether it relates to the claims and defenses plead." *Id.* at 45. "[W]hen the court's authority is invoked," however, "relevancy revolves around good cause being shown and that the requested matter is relevant to the subject matter involved in the case." *Id.* Importantly, "[t]he burden of establishing relevancy is on the party seeking the

---

[7] However, the passage Plaintiffs quote to the effect that, for the purposes of the proviso that inadmissibility at trial is not a bar to discovery of relevant evidence, "[t]he term 'reasonably calculated' means 'any possibility that the information sought may be relevant to the subject matter of the action ' (*id.* at 72) (quoting *Omega Eng'g, Inc. v. Omega, S.A.*, 2001 WL 173765, at *2 (D. Conn. Feb. 6, 2001) (Covello, C.J.)) is clearly incorrect in the wake of the 2000 amendments. Plaintiffs fail to note that *Omega Engineering* decided a discovery motion filed *before* the 2000 amendments became effective, and the test for discoverability then was relevance to the subject matter of the action. *Omega Engineering* did not purport to address Rule 26(b)(1) in its current form.

6

disclosure." *Id.* (citing *A.I.A. Holdings S.A. v. Lehman Bros.*, 2000 WL 763848, at *3 (S.D.N.Y. June 12, 2000)).

Plaintiffs' cases, therefore, do nothing to contradict the point that their discovery requests must be tested first for relevance to the claims and defenses in this case, and then, upon a showing of good cause, for relevance to the subject matter of this case. Viewed in this light, it is clear that Plaintiffs have failed to meet their burden of showing that either (a) the documents and information in dispute are relevant to their resale price maintenance, breach of contract or negligent misrepresentation claims or Defendants' defenses to any of those claims, or (b) the documents and information in dispute are relevant to the subject matter of this action *and* good cause exists for allowing their discovery in a case about the sale of Products in India.

## III.   PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN TO SHOW THAT DOCUMENTS AND INFORMATION RELATED TO GEOGRAPHIC REGIONS OTHER THAN INDIA ARE RELEVANT.

### A.   Plaintiffs Have Failed to Allege Facts Supporting Antitrust Standing.

As outlined above and in Defendants' earlier papers, Plaintiffs must demonstrate that the discovery they demand is relevant to one of their claims or one of the defenses in the litigation. According to Plaintiffs, "[d]iscovery concerning defendants' pricing and sales of the products at issue — *in all markets* — goes directly to the heart of plaintiffs' allegations of an anticompetitive effect resulting from the resale price fixing conspiracy directed specifically to plaintiffs." Pls. Opp. at 11 (emphasis added). Those "allegations of an anticompetitive effect" are that "competition in the sale and resale of Products in and from the United States was improperly diminished and restrained." Compl. ¶ 30; Pls. Opp. at 8. Plaintiffs explain further that this global discovery also "goes to the heart of plaintiffs' claim that the resale price fixing conspiracy was for the purpose of preventing 'erosion to prices for the Products charged by UCC and Dow

7

to end-users of Products in the United States.'"  Pls. Opp. at 11; Compl. ¶ 29.

  None of this, even if true, has anything to do with Plaintiffs.  Even if this purported

purpose was achieved -- and the Complaint's only allegation to that effect is the conclusory

language of ¶ 30 -- it would have no bearing on Plaintiffs, as they were not end-users, let alone

"end-users of Products in the United States."  Indeed, the Complaint alleges that Plaintiffs were

injured not as buyers of the Products, but as resellers:  they were "injured by being precluded

from effectively and fully competing and maximizing their sales of Products."  Compl. ¶ 29.

The fact that Plaintiffs claim to have purchased the Products "in the United States" (Pls. Opp. at

8) (emphasis omitted) is nothing more than a red herring, in light of the fact that Plaintiffs did

not and could not assert a cause of action with respect to *sales* made to Plaintiffs.  The only

antitrust cause of action alleged by Plaintiffs relates to the terms on which Plaintiffs would *resell*

the UCC products.

  But those resales could have taken place only in *India. See supra* at 1.  Plaintiffs'

putative injury followed not from any purportedly "diminished and restrained" "competition in

the sale and resale of Products in . . . the United States" (Compl. ¶ 30), but rather from restraints

Plaintiffs allegedly agreed to with UCC and later Dow concerning Plaintiffs' resales in India.

U.S. antitrust laws are indifferent to such restraints on (in Plaintiffs' words) the "*resale* of

Products . . . *from* the United States" where the effect is felt in other countries.  *Compare* Br. in

Supp. of Defs. Mot. for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) at 7

and n.7 *with* Compl. ¶ 30 (quoted above) (emphasis added).

  In sum, Plaintiffs' sole alleged injury:  (a) occurred *outside* the United States; (b)

involved decreased activity in *Indian* commerce; and (c) was not the result of any diminution of

competition among sellers in or into the United States.  Plaintiffs' assertion that "it is plainly

alleged that the injury suffered by plaintiffs arose directly from the anticompetitive effects of defendants' price fixing conspiracy in the United States" (Pls. Opp. at 8) bears no resemblance to their actual cause of action for resale price maintenance. In reality, Plaintiffs have failed to allege any injury to themselves in U.S. commerce. They therefore have failed to allege facts supporting antitrust injury, and thus they have failed to allege facts that would support a finding of antitrust standing. Bereft of such facts, their demand for the production of documents should be rejected.

**B.     Plaintiffs Have Failed to Allege an Anticompetitive Effect in the U.S.**

Plaintiffs' opposition brief also reflects how thin the allegations of an effect on U.S. commerce are (and how tenuous, therefore, their requests for documents and information that bear upon it). Plaintiffs go so far as to revive their earlier theory, already rejected by the Court, that the *per se* rule relieves them of the need to show anticompetitive effects in the United States stemming from resale price maintenance in India. *See* Pls. Opp. at 9. They also attempt to invoke the Federal Trade Commission's public explanation of its partial challenge to the Dow-UCC merger as evidence of the "anticompetitive effects . . . in the United States and elsewhere outside of India" from the alleged resale price maintenance. *Id.* at 10. Plaintiffs hypothesize that because, according to the FTC, several relevant markets were highly concentrated at the time of the Dow-UCC merger, resale price maintenance in India could somehow rebound to produce anticompetitive effects in the United States. Even putting aside Plaintiffs' inaccurate characterization of market shares, their armchair expert economic analysis (*e.g.*, "the effects of even a single firm's resale price fixing conspiracy directed to one distributor will be substantial" (*id.*)) does not support a conclusion that they have adequately alleged any actual effect on United States commerce.

9

Furthermore, even the existence of a hypothetical effect on U.S. commerce does not give *Plaintiffs* antitrust standing where their own injuries are suffered entirely outside the United States. The U.S. antitrust laws do not serve to protect foreign plaintiffs, even ones who buy products in the United States, against lost sales *outside* the United States. *Turicentro, S.A. v. American Airlines Inc.*, 303 F.3d 293, 307 (3d Cir. 2002) (damages that "occurred exclusively in foreign markets . . . are not of the type Congress intended to prevent through the Foreign Trade Antitrust Improvements Act or the Sherman Act").

Much of the language in their recent briefs, as well as the recent document requests and interrogatories, demonstrate that Plaintiffs are now attempting to shift the focus of this suit to the merger of Dow and UCC, and to their conduct over many years before the merger. However, with the exception of their baseless allegations that Dow involved itself in UCC's relationship with Plaintiffs just prior to the closing of the merger, the case Plaintiffs actually pled includes no such actionable agreement between Dow and UCC. Plaintiffs may not "'roam in shadow zones of relevancy and . . . explore matter which does not presently appear germane on the theory that it might conceivably become so.'" *In re Surety Ass'n of America*, 388 F.2d 412, 414 (2d Cir. 1967); *Lugosch*, 218 F.R.D. at 45 (quoting *Surety Ass'n); In re PE Corp.*, 221 F.R.D. at 23 ("discovery may not be used as a 'fishing expedition to discover additional instances of wrongdoing beyond those already alleged'" (quoting *Tottenham v. Trans World Gaming Corp.*, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002))).

**C.    Plaintiffs Have Failed to Demonstrate that Their Interrogatories and Document Requests – Including Those Discussed in Their Supplemental Statement – Seek Relevant Information.**

Even accepting for the moment the contention that Plaintiffs alleged facts sufficient to support findings of antitrust standing and subject matter jurisdiction, it is clear that they have

failed to show how their global discovery requests are directed towards documents or information "relevant to the claim or defense of any party" in this case. If the D.C. Circuit's decision in *Empagran* is not reversed – thereby permitting Plaintiffs' *Kruman*-based theory of subject matter jurisdiction to be considered – the test for jurisdiction will be whether the alleged Indian resale price maintenance conduct caused a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce (15 U.S.C. § 6a(1)),[8] an effect that "gives rise to a claim" under federal antitrust law (15 U.S.C. § 6a(2)). Even then, the lack of antitrust injury should bar Plaintiffs from conducting discovery at all, or otherwise pursuing this action. But putting antitrust injury aside, Plaintiffs cannot credibly claim that information and documents related to Defendants' activities "in all markets" the world over have any conceivable bearing on any claim or defense in this case.

Plaintiffs have not suggested, for example, how UCC's sales and prices in Italy could have any bearing on either the injury they claim to have suffered in India or the anticompetitive effect in the United States that they claim was intended. But even if, in fact, such data do bear on the existence and extent of competitive harm in the United States, then that harm could not be the *direct* product of the alleged resale price maintenance in India. Instead, any U.S. harm would depend also on market conditions in these other countries for which Plaintiffs seek discovery. Hence, if Plaintiffs' requests truly "go only as far as plaintiffs need to go in order to present their case in chief" (Pls. Opp. at 12), then this Court lacks subject matter jurisdiction by virtue of 15 U.S.C. § 6a(1).

---

[8] *See also* Pls. Supp. at 3 ("Plaintiffs need these documents to . . . prove 'direct, substantial, and foreseeable' effects on U.S. commerce, so as to ensure that this Court retains subject matter jurisdiction over this case."). Of course, if *Empagran* is reversed, Plaintiffs' entire theory is undermined and none of their demanded discovery is relevant to any actionable claim.

11

This problem is exacerbated by Plaintiffs' most recent discovery request. In our opening brief (at 5), we briefly described Plaintiffs' Third Request to Defendants for Production of Documents ("Third Request"), and attached it as Ex. 11. We pointed to four specific requests that most vividly showed the requests' limitless breadth, and we indicated that we were not yet seeking protection from them. As we had not yet had an opportunity to meet and confer with Plaintiffs, the matter was not ripe for the Court's consideration. *Id.* at 5 n.4. On May 5, 2004, Defendants submitted their responses to the requests, which Plaintiffs clearly read before filing their Opposition to Defendants' motion for a protective order. *See* Pls. Opp. at 13 n.16 (referring to Defendants' "responses, dated May 5, 2004"; "Each of the defendants objected to the production of any documents in response to any Request."). They admitted that the parties had not yet met and conferred about the Request, but added that they anticipated needing "to supplement their motion to compel" in any event. *Id.*

A week later, we received Plaintiffs' "Supplemental Statement in Further Support of Their Motion to Compel Production of Documents and Answers to Interrogatories." Although the document repeats some of what Plaintiffs already said in their Opposition, it also appears to be a motion to compel production in response to their Third Request to Defendants for Production of Documents, and to consolidate that motion with Plaintiffs' original cross-motion to compel production in response to its other discovery requests. Plaintiffs indicated that, in their view, the disagreement between the parties over the Third Request was the same as that concerning earlier discovery requests, and that the issues "are fully ripe for consideration by the Court." Pls. Supp. at 7. While a meet-and-confer may have allowed us to narrow the scope of

12

our disagreement,[9] the vastly excessive scope of each and every one of the requests in the Third
Request indicates a fundamental divide between the parties over the proper breadth of discovery
under Rule 26(b)(1).  We therefore ask the Court to include the Third Request within the scope
of the requested protective order.

Addressed to each Defendant, the Third Request called for all documents concerning:

- the manufacture, sale, offer for sale or distribution *in any geographic market or territory*
  by any person other than You of any products that are competitive with the Products (¶
  1);

- any communications between or among You and any person that is Your competitor in
  the manufacture, sale, offer for sale or distribution *in any geographic market or territory*
  of Products or any products that are competitive with the Products (¶ 2);

- the manufacture, sale, offer for sale or distribution *in any geographic market or territory*
  of Products or products that are competitive with the Products by any person or entity of
  which you are, directly or indirectly, less than the 100% owner (¶ 3);

- *any* trade association meeting or activity relating to the manufacture, sale, offer for sale
  or distribution of Products or products that are competitive with the Products (¶ 4);

- the effect or contemplated effect of the Merger on competition for the sale of Products *in
  any geographic market or territory other than India* (¶ 5);

- *competition between Dow and UCC prior to the Merger* in connection with the sale of
  Products or products competitive with the Products *in any geographic market or territory
  other than India* (¶ 6); and

- competition relating to the Products or products that are competitive with the Products
  [that were] provided to *any antitrust enforcement agency*, whether in the United States or
  elsewhere, *in connection with the Merger* (¶ 7).

Third Request (Ex. 11), ¶¶ 1-7 (emphasis added).

---

[9] In this regard, we were encouraged by the acknowledgement by Mr. Taffet, counsel for Plaintiffs, at last week's
Status Conference, that market information concerning some foreign countries were not relevant and that Plaintiffs
would not press for it through their discovery requests.

13

The common element of five of these seven requests is "any geographic market or territory." Ironically, requests five and six cut this global reach back to *exclude* India, the country at the center of this case. Otherwise, though, these five requests would *explicitly* call for a vast range of documents that would have no conceivable relevance to this case. Take some hypothetical examples:

- documents relating to the manufacture of vinyl acetate monomer in Tanzania (¶ 1);

- a hypothetical letter from a Dow office in Australia to an office of BASF in that country concerning a civic project in which both firms are participating (¶ 2);

- a document relating to the sale of butanol by a hypothetical manufacturer in Portugal over which Dow had no control but in which Dow had a nominal ownership share by virtue of a minority share in the manufacturer's parent (¶ 3);

- a report speculating on the effect of the Dow-UCC merger on competition for the sale of hexylene glycol in Chile (¶ 5); and

- a 1986 Dow sales report concerning Korean market activity in ethanolamines (¶ 6).

The two requests that are not explicitly global in their scope are implicitly so by definition. Request 4 would compel production of a notice of a meeting of a Kenyan propionaldehyde trade association; request 7 would require production of every document Dow or UCC provided concerning the Products to any antitrust agency in the world. This scope obviously goes far beyond what could ever be relevant to the subject matter of this case, let alone the claims and defenses at issue here.

Also striking is that the Third Request's substantive focus has shifted from resale price maintenance on the Products in India to issues relating to horizontal concerns, such as the Dow-UCC merger, having no bearing on this case. Plaintiffs never challenged the Dow-UCC merger.

Nor, despite their groundless smear in paragraph 29 of the Amended Complaint, did they claim that any competing makers of any of the Products colluded in violation of the antitrust laws. Yet they apparently ask this Court to reinvestigate the merger worldwide, calling for all documents relating to competition between Dow and UCC anywhere but India prior to the merger (¶ 6), all documents concerning the merger's possible effect anywhere in the world but India (¶ 5), and even for an audit of the antitrust agencies' investigations themselves (¶ 7). In addition, they would obtain documents relating to any maker or seller of any Product anywhere in the world (¶ 1), any communication, regardless of subject, between Dow or UCC and any other maker of any Product anywhere in the world (¶ 2), and any trade association conduct anywhere in the world relating to any of the Products (¶ 5). These requests pursue a case entirely different from the one Plaintiffs have alleged. Plaintiffs are now "roam[ing] in the shadow zones of relevancy," evidently hoping to "explore matter which does not presently appear germane on the theory that might conceivably become so." *In re Surety Ass'n*, 388 F.2d at 414. This is exactly the "fishing expedition to discover additional instances of wrongdoing beyond those already alleged" that the court curtailed in *Tottenham*, 2002 WL 1967023, at *2.

Thus, even under the broadest imaginable view of this case, the Third Request goes blatantly beyond what could possibly be relevant. Plaintiffs' Supplemental Statement shows clearly that this is not an accident. *See, e.g.*, Supp. St. at 3 ("The Third Requests seek documents concerning defendants' manufacture, sales, and distribution practices around the world"). Without the Court's intervention, Plaintiffs will continue to engage in blatant geographic and temporal overreaching, seeking more documents and information "in all markets" and "around the world," regardless of the material's relevance to the claims and defenses at issue in the case that they themselves have chosen to bring. The Court therefore should make the Protective

15

Order applicable to the Third Request as well as to Plaintiffs' other discovery requests.

## IV.    THE CAUSE OF THE LEAK AT BHOPAL IS TOTALLY IRRELEVANT TO PLAINTIFFS' CLAIMS.

Plaintiffs' demand for Bhopal-related discovery serves no purpose in this litigation other than to harass Defendants. In an effort to demonstrate that the 1984 leakage of toxic chemicals from a former Union Carbide plant somehow is relevant, Plaintiffs cite several paragraphs from their own Complaint and one paragraph from Defendants' Answers that refer to Bhopal. Pls. Opp. at 13-14. They say that the events at Bhopal "influenc[ed] the parties' entire relationship throughout their course of dealing." *Id.* at 15. But whether those events "influenced" the parties' relationship, what Plaintiffs never describe is why the *cause* of the leakage at Bhopal has anything to do with claims of resale price maintenance, breach of contract, or negligent misrepresentation, the actual claims they are asserting in this litigation. They do not describe that fact because the cause of the leakage has nothing to do with this lawsuit. Plaintiffs have not alleged a toxic tort case.

Yet that is exactly the kind of documentation Plaintiffs demand be produced. Plaintiffs' discovery request seeks "[a]ll documents concerning sabotage in connection with the Bhopal Incident." Pls. Second Doc. Req. ¶ 29 (Ex. 2). It pointedly does not seek the kinds of documents Plaintiffs actually cite in their Opposition: documents that relate to Plaintiffs themselves or to any relationship between Bhopal and the reasons for the formation of Megavisa (Pls. Opp. at 14-15), as those documents already have been produced to Plaintiffs, notwithstanding their irrelevance to the elements of Plaintiffs' remaining causes of action.

Even if the parties disagreed about the characterization of the cause of Bhopal, that disagreement would be wholly irrelevant to Plaintiffs' claims. Whether Bhopal occurred as the

16

result of sabotage or a tragic accident does not prove any element of Plaintiffs' breach of contract, negligent misrepresentation, or resale price maintenance claims, and thus discovery of this information is not "reasonably calculated to lead to the discovery of admissible evidence," regardless whether it provides "context" for Plaintiffs' claims. Fed. R. Civ. P. 26(b)(1). Indeed, Plaintiffs' Opposition never even attempts to explain how the characterization of the incident as sabotage would make Plaintiffs' claims more or less likely to be upheld.

Why, then, are Plaintiffs so interested in discovering this information? In their continuing effort to maintain the viability of their claims in the face of potentially dispositive Supreme Court guidance, Plaintiffs are pressing for whatever prejudicial information they can discover regardless of that information's relevance. Information related to Bhopal falls squarely within that category. As Plaintiffs admit, the Bhopal Incident is "no doubt a sensitive issue" (Pls. Opp. at 15) with extremely tragic facts that easily inflame. Allowing Plaintiffs to discover that highly prejudicial information only opens the door to an attempt by them to exploit that information as the case proceeds. Because Plaintiffs have provided no explanation of Bhopal's probative value to any element of any of their claims, the line on Plaintiffs' fishing pole should be cut. *See, e.g., Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 838 (S.D.N.Y. 1998) (excluding any evidence or reference to the disaster at Bhopal, India because "[t]he prejudice and confusion that would result from the admission of this evidence, which is only of the slightest relevance, outweighs its probative value").

## V.    PLAINTIFFS PROVIDE NO JUSTIFICATION FOR THEIR FAILURE TO IDENTIFY THE CUSTOMERS REGARDING WHOM THEY SEEK DISCOVERY FROM DEFENDANTS.

In their view, Plaintiffs can claim that Defendants interfered with their customers, demand discovery about Defendants' interactions with their customers, refuse to identify which

customers are the subject of their claims, and then complain to the Court that Defendants haven't been able to provide information about all of these unidentified customers. This age-old discovery tactic is improper. *See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 2003 WL 1956214, at *4 (N.D.N.Y. Apr. 24, 2003) ("At minimum, 'a defendant is entitled to know the bases for plaintiff's charges against it. The burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are.'") (quoting *Xerox Corp. v. Int'l. Bus. Mach. Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974)).

There is no deep philosophical dispute on this discovery request between the parties. All Defendants have asked Plaintiffs to do is to explain which "end users" Plaintiffs claim were the subject of Defendants' interference, so that Defendants can search their files for the relevant documents. Defs. Br. at 14. As Defendants explained, "Defendants do not know the identity of each and every one of Plaintiffs' customers, much less those that Plaintiffs claim are relevant to their negligent misrepresentation claim, because Plaintiffs have not seen fit to provide such information to Defendants. *Id.* Once Plaintiffs identify these customers, Defendants could take this list to search for responsive documents.

Plaintiffs remain unwilling to provide such a list. Notwithstanding Count IV of Plaintiffs' First Amended Complaint, which seeks in excess of $22.5 million of damages as a result of Defendants' alleged negligent misrepresentations, Plaintiffs steadfastly avoid disclosing the details of their negligent misrepresentation claim. Surely, Plaintiffs had some "former customers" in mind when they alleged that "but for [Defendants'] conduct, Plaintiffs would have been able to continue to maintain relationships with what are now former customers." Compl. ¶ 73 (incorporated by reference into Count IV). Similarly, one would expect that Plaintiffs had specific customers in mind when they alleged that

18

> Defendants' unjustified actions severely damaged
> Plaintiffs' relationships with long-term strategic customers.
> Further, [in 2001] Dow, acting through [non-party] Dow
> India, and specifically through its marketing director in
> India, Ashish Mitra, contacted Plaintiffs' customers directly
> and informed them that Plaintiffs were experiencing
> financial difficulties. Dow's willful misrepresentations
> seriously undermined Plaintiffs' relationships with these
> customers. * * * To date Plaintiffs have found it
> impossible to reestablish relationships with such customers.

Compl. ¶ 44.

Because Defendants adamantly deny the negligent misrepresentation allegations

advanced by Plaintiffs, they cannot simply "know" the names of customers generically

referenced by Plaintiffs in their First Amended Complaint. Plaintiffs presumably know which

customers underpin their damages claim of $22.5 million. Plaintiffs presumably know which

customers ceased doing business with them. Plaintiffs presumably know which customers were

affected by the alleged misrepresentations made by non-party Dow India to Plaintiffs' Indian

customers in India. Despite holding all these cards, Plaintiffs nonetheless argue that

Defendants somehow *must* know the identity of all of Plaintiffs' customers because Defendants'

documents identify several of them. But Plaintiffs' argument conveniently assumes that (1)

Plaintiffs have no customers other than those who purchased Defendants' Products and (2) all of

those customers are somewhere listed on the documents Plaintiffs cite. And Plaintiffs do not

limit their discovery demands to those assumptions: they want Defendants to

> [i]dentify each meeting or communication between any person
> employed by, representing or otherwise acting on behalf of a
> Defendant, and an end user of Products purchased from any
> Plaintiff or MVMS, and for each such meeting or communication
> [to] state with particularity its date, the person attending, sending
> or receiving the communication, and the subject matter discussed.

Ex. 3, ¶ 3. Plaintiffs' own documents reveal that Plaintiffs transacted products other than those

19

manufactured by Defendants. *See* Ex. I to Pls. Opp. (MegaVisa Pte Ltd "deals in Carbide products and also the products of a few other companies"; MegaVisa Lte Ltd started a commission agent relationship with Crompton and UOP, as well as an "Internet Solutions" company that actively trades in major chemical products). This request is hopelessly broad, and never could be answered fully.

Moreover, Plaintiffs' argument that answering this request should be simple because "only a dozen or fewer end-users accounted for almost all of the sales of defendants' products by plaintiffs" (Pls. Opp. at 17) actually proves Defendants' point. Defendants have no objection to producing properly responsive documents related to communications with 10-12 named customers of Plaintiffs, such as Finolex and Sterlite, regarding the sales of named Products. Indeed, Defendants' voluminous production in the case already includes such documents. What it may not include are the documents relating to the end-users that underlie Plaintiffs' negligent misrepresentation claim that Plaintiffs continue to refuse to identify.

Until Plaintiffs provide Defendants with a list of their customers or narrow their request in a manner that allows Defendants to determine the identities of Plaintiffs' customers, Defendants cannot meaningfully respond to them. Plaintiffs' failure – or inability – to specifically identify the customers that purport to substantiate the charges leveled at Defendants and their non-party affiliates should not result in an undue discovery burden being heaped upon Defendants; it should result in dismissal of the charges advanced by Plaintiffs.

## VI.    PLAINTIFFS' PRE-MERGER "GUN JUMPING" REQUESTS ARE IRRELEVANT TO THEIR CAUSES OF ACTION.

In Defendants' opening brief (at 15-16), we explained that the panoply of documents demanded by Plaintiffs concerning Dow's pre-merger sales were overly broad and not

reasonably calculated to lead to evidence regarding any factual dispute in this case:

> For example, Plaintiffs have not (and cannot) show a
> legitimate reason why documents relating to Dow's pricing and
> sales of Products in 1985 when it was a competitor of UCC (and
> thus of Plaintiffs), *see* Second Request (Ex. 2) ¶ 7, have any
> bearing on any alleged effort by UCC-related entities to impose a
> retail price maintenance scheme (Count I) upon Plaintiffs during
> the course of those parties' dealings from 1987 to 2001.  Similarly
> irrelevant are Plaintiffs' requests for documents relating to Dow
> sales personnel (Second Request (Ex. 2) ¶¶ 3-5), Dow's direct
> sales to Plaintiffs or Plaintiffs' customers (Second Request (Ex. 2)
> ¶¶ 7, 17), or Dow's Board of Directors Meetings (Second Request
> (Ex. 2) ¶ 6) in, for example, 1994.  Such documents have no
> bearing on whether Defendants breached a contract in 2001 (Count
> II) or negligently misrepresented anything to Plaintiffs post-merger
> (Count V).

Defs. Br. at 16.  These documents requested by Plaintiffs do not fall into one or two discrete

requests; instead, Plaintiffs requested that Dow produce, *beginning in 1984, all* pre-merger

documents responsive to all requests.  *See id.* at 3-4 (listing requested pre-merger documents).

Plaintiffs' Opposition does not even attempt to justify their blunderbuss approach for

documents, and offers no explanation of how documents created in the 1980s and early-mid

1990s could possibly be relevant to any of their claims.  Instead, citing their "gun-jumping"

theory" – the supposition that the parties "jumped the gun" by coordinating efforts before the

merger – Plaintiffs claim that documents created just before the merger may shed light on

Defendants' "anticompetitive intent . . . in an effort to coordinate pricing or allocate customers."

Pls. Opp. at 19.  There are two fundamental flaws in this analysis.

*First*, Plaintiffs' discovery requests are not aimed at discovering documents created just

before the merger, or at any specific category of documents at all.  Instead, Plaintiffs' requests

demand the production of *all* documents from Dow from *all* periods of time.  *See* Defs. Br. at 15-

16.  But that approach is improper.  It is well-established that a party may not seek the general

production of mountains of documents on the theory that a narrow subset of those documents may be relevant to their claims.  Plaintiffs – having drafted the requests – have an obligation to ensure that they are appropriately tailored to obtain relevant information.  *Rapkin v. Rocque*, 228 F. Supp. 2d 142, 156 (D. Conn. 2002) ("Plaintiff's counsel is cautioned that all discovery requests should be tailored as narrowly as possible to the specific issues of this case. . . . The Court will not tolerate discovery requests that are mere fishing expeditions.").  Their refusal to do so – and their continued refusal to narrow those requests in the meet-and-confer process between the parties – supports Defendants' motion for protection from these overly broad requests.

   *Second*, much of Plaintiffs' purported rationale for obtaining these documents, once again, has nothing to do with the allegations in their Complaint.  Plaintiffs postulate that documents evidencing pre-merger coordination between Dow and UCC could substantiate their theory that Defendants' actions were designed to further "a horizontal conspiracy aimed at maintaining prices for the relevant products in the United States and in markets throughout the globe" and that they might be relevant to a showing that Defendants were attempting to "coordinate pricing or allocate customers."  Pls. Opp. at 19.  But Plaintiffs' Complaint doesn't actually *allege* a cause of action based upon a horizontal conspiracy among competitors around the globe: it alleges a resale price maintenance scheme that injured them by costing them sales.  This is exactly the kind of request that is prohibited by the new version of the federal rules.  *See* Fed. R. Civ. P. 26(b)(1) (requests must seek materials that are "relevant to the *claim* or defense of any party") (emphasis added); *see also Rus, Inc. v. Bay Industries, Inc.*, 2003 WL 1740745, at *13 (S.D.N.Y. Apr. 1, 2003) (holding that under the revised rule "it is not sufficient that the material sought be relevant to the general subject matter of the action, if it does not relate to the

specific claims or defenses of either party"); *Johnson Matthey, Inc. v. Research Corp.*, 2002 WL 31235717, at *2 (S.D.N.Y. Oct. 3, 2002), (explaining that Rule 26(b)(1) was amended to "narrow the scope of relevancy from 'subject matter' of the action to 'claim or defense of any party'").

Indeed, the narrowing of Rule 26(b) was intended to curtail the very type of "fishing expedition" Plaintiffs are attempting here. *See, e.g., Tottenham*, 2002 WL 1967023, at *2 (holding that the offending "document requests constitute no more than a fishing expedition to discover additional instances of wrongdoing beyond those already alleged in the Answer. We will not condone such a fishing expedition on the mere speculation that the [opposing party may have committed other wrongs] where the [propounding party] has not offered any objective support for that contention."). As noted by the Advisory Committee on the Federal Rules of Civil Procedure:

> The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. . . . The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.

Fed. R. Civ. P. 26(b)(1) advisory committee's notes (2000). Plaintiffs have violated that settled rule here. This Court should grant Defendants' request for protection as a result.

## VII.    AS WRITTEN, PLAINTIFFS' REQUESTS WOULD IMPOSE AN INORDINATELY HEAVY BURDEN ON DEFENDANTS.

Plaintiffs' discovery requests contain few boundaries, limitations, or constraints. Despite a lengthy meet-and-confer process regarding the expansive breadth of Plaintiffs' Second Request, Plaintiffs made no attempt to tailor their Third Request. While discovery can be broad

23

in appropriate circumstances, it is not so broad that an eager plaintiff may require a defendant to undertake inordinately global searches for information that has no relevance to a plaintiff's claims. This is what Plaintiffs have done here. In Plaintiffs' mind, the fact that they filed a lawsuit entitles them to compel Defendants to search every file of every subsidiary or affiliated company around the world for information. The law, however, does not provide license for such a fishing expedition. *See Dana Commercial Credit Corp. v. National Fin. Servs. Corp.*, 1992 WL 163184, at *1 (S.D.N.Y. June 24, 1992) (motion to compel production of documents concerning structuring of entities related to defendant was denied "given the extensiveness and intrusiveness of the requested discovery and the irrelevance or dubious relevance of the documents sought").

Plaintiffs contend that there is no "offer of proof" for Defendants' claim that the requests are overly broad or would result in undue burden. Pls. Opp. at 19-20. But Plaintiffs miss the point: the identified requests are facially defective. This Court need not venture past the plain terms of Plaintiffs' requests to determine that they are hopelessly broad and improperly burdensome. Two particular deficiencies warrant particular attention.

*First*, Plaintiffs' discovery requests cover a ***twenty year*** time period. Plaintiffs attempt to ignore the fact that they bear the burden of serving an appropriately limited discovery request, and assert that Defendants never objected to the discovery of information over this twenty year time period during the meet-and-confer process. Pls. Opp. at 20. But Plaintiffs are simply mistaken. *See, e.g.*, Letter from Britt M. Miller to Paul Winick at 5 (Dec. 1, 2003) (Ex. 7) ("Request No. 10 thus seeks the production of every document relating to every Product Defendants ever sold, anywhere in the world, over the last decade. . . . Defendants stand ready to discuss this Request and work with Plaintiffs to narrow it, once Plaintiffs more reasonably ask

24

for documents that are relevant to this matter and that do not impose an undue burden on Defendants in producing them."); *id.* at 4 ("Perhaps one of the most flagrant examples of Plaintiffs' disregard for the limitations on discovery imposed by the Federal Rules is request no. 8, which seeks (again) *every* document relating to *every* profit or loss incurred by Defendants with respect to the myriad of Products Defendants have sold or distributed, to *any* third party, *anywhere* in the world, for the last several years."). This claim also does not address the facts that Plaintiffs' *Third Request* pertains to the same overly broad time frame, and Plaintiffs chose not to engage in any meet-and-confer with respect to Defendants' objections even though Defendants again pointed out this issue in their earlier Motion for a Protective Order.

 *Second*, Plaintiffs' unrestricted demand for the production of documents located at hundreds of Defendants' subsidiaries and affiliates across the globe is simple harassment. Couple the extraordinarily burdensome nature of Plaintiffs' demanded search with the fact that the requested documents are neither related to Plaintiffs nor the sale of Products in India, and it becomes plain that such a demand is not warranted. *See, e.g., Pierson v. Columbus McKinnon Corp.*, 2004 WL 966177, at *1 (W.D.N.Y. Apr. 28, 2004) (denying a motion to compel production of documents regarding defendant's 21 subsidiaries); *Chemical Bank v. Affiliated FM Ins. Co.*, 1994 WL 89273, at *2 (S.D.N.Y. Mar. 16, 1994) (denying a motion to compel on burdensome grounds where the documents were maintained in nine departments of plaintiff in various locations throughout New York City, New York, and Colombia, South America; the requested documents had been archived and put into storage; some of the documents were in Spanish).

 The terms of Plaintiffs' actual discovery requests make the best case against their demand for production. For example, Plaintiffs demand that Defendants produce

25

> [a]ll documents concerning Your profit margins or losses
> (including net profit or loss margins, gross profit or loss margins,
> pre-tax profit or loss margins, post-tax profit or loss margins, and
> other type of profit or loss margin) in connection with the sale or
> distribution, directly or indirectly, of Products.

Ex. 2 ¶ 8.  By its plain language, this request demands the production of every document relating

to every profit or loss incurred by Defendants with respect to a laundry list of Products

Defendants sold or distributed to any third party anywhere in the world for decades.  The request

has no geographical limitation and no reasonable time period limitation.  Defendants never could

comply with such a request, even if they undertook heroic efforts to do so.

Likewise, Plaintiffs also request

> [a]ll documents not otherwise requested concerning prices for or
> pricing of Products sold or distributed, directly or indirectly, to end
> users.

Ex. 2 ¶ 7.  Again, as written, this request requires the production of every document referencing

a price of Products sold or distributed anywhere in the world to any end-user.  Under this

request, Defendants would be required to produce all transaction documents for sales of Products

to customers located in South Africa, Brazil, or Canada.  It remains a mystery to Defendants how

all such documents could possibly be relevant in these proceedings.  The same is true for request

number 9 of the Second Request, which asks for

> [a]ll documents concerning Your market share or anticipated
> market share for the sale or distribution of Products or products
> competitive with Products, directly or indirectly, to end users.

Ex. 2 ¶ 9.  Again, this request demands the production of documents related to market share in

geographical areas in which Plaintiffs were not even permitted to sell the Products.

Plaintiffs try to avoid the hopelessly broad language of their own requests by arguing that

because Defendants produced some documents from a limited number of foreign subsidiaries

related to them, Defendants obviously can produce, without undue burden, documents regarding "Products" for each of its hundreds of subsidiaries and affiliated companies to all other end users around the globe. Pls. Opp. at 21. That argument is absurd. Undertaking the search requested by Plaintiffs would involve the review of the records of hundreds of entities related to Defendants. As drafted, Plaintiffs' Requests would require a search of the records of approximately 350 subsidiaries of Defendants. Defendants, their subsidiaries and affiliates operate approximately 180 manufacturing sites in 37 countries around the world to produce over 3500 different types of products sold to customers in 183 countries. Ex. 17. Compounding the burdensomeness of Plaintiffs' requests is the fact that Plaintiffs' definition of "Products" (Compl. ¶ 14) is nothing more than general product family groupings that are now obsolete in the Dow organization. Since Plaintiffs have not enumerated a list of specific product names or product codes that are relevant to this suit (i.e., the subset of "Products" that Plaintiffs actually sold), Defendants would need this information before they could conduct a product-specific search for the type of information requested by Plaintiffs.

    To illustrate the burden in more concrete terms, Defendants point out that 2003 sales in the Asia Pacific region alone reached $3.9 billion – over *350* times the volume of product that was distributed through Plaintiffs ($11mm/year). *See* Ex. 17; Ex. I to Pls. Opp. at DI 4000904. According to the 2002 Dow Pacific Public Report, Dow's subsidiaries in the Asia Pacific region employed 3400 people in over 13 countries: Singapore, Thailand, Taiwan, Vietnam, Australia, China, Hong Kong, Indonesia, Japan, Korea, Malaysia, New Zealand, and the Philippines. *Id.* Thus, while documents relating to Plaintiffs have already been produced from the relevant Asia Pacific, Indian and European subsidiaries in this matter, the business conducted by Mega Visa was a mere fraction (1/354) of the enterprise run by the Dow Asia Pacific companies. As

27

Plaintiffs know from the prior document productions in this case, documents generated and maintained by Dow's foreign subsidiaries are kept in the country or region of origin. That is why it took Defendants months to produce the substantial volume of *forum non conveniens* discovery from their Singapore and India subsidiaries.[10]  Since the majority of Dow's products are sold outside of the United States, any effort by Defendants to search for and retrieve the documents requested by Plaintiffs would involve mostly foreign document productions.

To conduct the search for discovery requested by Plaintiffs in the Asia Pacific region alone would entail a search for sales that dwarfs the search done for records pertaining to a specific vendor with only one "Ship To" country: India. Such a process conducted in Asia Pacific alone would likely entail months of attorney time and millions of dollars in expenditures and is unjustifiable given Defendants' prior production of material that relates directly to Plaintiffs' business relationship with any subsidiary of Dow or UCC and the significant financial expenditures already incurred by Defendants to produce such material to Plaintiffs. To extrapolate the foregoing process to an additional 170 countries is, frankly, nothing short of unfathomable.

Despite all of their rhetoric about the fact that this is a "complex lawsuit involving international companies" (Pls. Opp. at 21), Plaintiffs still have not explained why all documents requested from foreign subsidiaries or affiliates in places like Brazil, Egypt, Greece, South Africa, or the United Kingdom – locations that never dealt with Plaintiffs – are in any way relevant to this litigation. The reason for that failure is clear – they are *not* relevant. Plaintiffs provide no substantive explanation of the relevance of all these documents because such an explanation does not exist.

---

[10] Plaintiffs faced a similar international document production hurdle as the vast majority of their document production took several months to arrive from Bombay, India.

Plaintiffs recognize that this suit may involve "the largest chemical producers in the world" (*id.* at 21), but overlook the fact that these producers engage in more areas of business in locations other than those engaged in with Plaintiffs. To require Defendants to undertake the search simply by virtue of the fact that they have overseas operations, without any showing of relevance to Plaintiffs' claims, should not be tolerated by this Court. *See Segan v. Dreyfus Corp.*, 513 F.2d 695, 696 (2d Cir. 1975) (the trial court properly refused to compel discovery seeking discovery of "virtually the entire business history of defendants for a period of several years").

## VIII.   AN APPROPRIATE SEARCH WAS CONDUCTED IN RESPONSE TO THE AGREED-UPON DISCOVERY REQUESTS.

Defendants remain baffled by Plaintiffs' repeated accusations that Defendants have not advised them that an appropriate search was conducted of the Defendants' records. Defendants have produced all documents of which they are aware that are responsive to the agreed-upon requests. Additionally, Defendants have planned to present a witness or witnesses on June 17, 2004, for the deposition of a representative knowledgeable about the AMI document database.

With respect to Defendants' search for documents responsive to Plaintiffs' requests, Defendants have produced responsive documents (as limited by the parties' agreements reached during the meet-and-confer process) from the following searches:

- the Vermont document repository
- the AMI files
- Union Carbide Corporation Singapore files
- Dow Singapore files
- Dow Chemical International Private Ltd. files

- Dow Chemical Asia Pacific files

- Dow Europe files related to Plaintiffs

- The Dow Chemical Company's files related to Plaintiffs

- Union Carbide Corporation's files related to Plaintiffs

- E-mail from the United States, Singapore, India and Europe related to Plaintiffs

- Files of relevant employees as requested by Plaintiffs

What's more, Defendants repeatedly and recently have outlined the scope of their

production and search to Plaintiffs. As recently as February, Defendants provided a detailed

description of the documents that had been produced:

> Defendants' foreign subsidiaries' production in response to the
> earlier document requests has been substantial, not merely
> "selective." Specifically, I have been advised that UCCS and Dow
> Singapore produced transaction records and documents relating to
> Plaintiffs, as well as the relevant Canofiles; that Dow India
> produced documents concerning Plaintiffs' orders, the parties'
> dealings, products sold to Plaintiffs, credit and payment records
> and the impact of the Dow-UCC merger; and that Dow Chemical
> Asia Pacific's documents were produced along with Dow
> Singapore's documents. We are not aware of the existence of any
> documents in Defendants' possession, custody or control relating
> to Plaintiffs or their transactions with Defendants that have not
> been produced.

Letter from Dana S. Douglas to Paul A. Winick at 1-2 (Feb. 4, 2004) (Ex. 9).

Defendants have confirmed the scope of their search in numerous other instances. From

the very beginning, Defendants told Plaintiffs that they had produced documents responsive to

Plaintiffs' First Request, not merely documents responsive to the forum non conveniens issues.

*See* Letter from Britt M. Miller to Paul Winick at 2 (Dec. 1, 2003) (Ex. 7) ("Defendants are not,

as Plaintiffs seem to believe, withholding *other* documents that Defendants might have

discovered after responding to Plaintiffs' First Requests for Production. Rather, as plainly set

30

forth in Defendants' responses, Defendants object to *re-producing* any documents that have already been produced to Plaintiffs in response to Plaintiffs' First Requests."). And in response to Plaintiffs' repeated misconception that Defendants were unwilling to confirm whether an appropriate search was conducted in response to Plaintiffs' Second Requests, Defendants confirmed on a request-by-request basis that such a search had been performed. *See* Letter from Dana S. Douglas to Richard S. Taffet at 2-5 (Apr. 19, 2004) (attached as Ex. 16). Defendants have made every effort to assure Plaintiffs that an appropriate search was conducted in response to their document requests.

As all of this makes clear, Defendants have undertaken a considerable search for documents responsive to Plaintiffs' requests and have complied in good faith with their discovery obligations to date. Plaintiffs' suggestion that Defendants are "dragging their feet" has no basis in fact in the face of these substantial productions. Indeed, it was *Defendants*, not Plaintiffs, who presented the parties' discovery dispute for resolution to this Court. *See* Defs. Mot. for Protective Order (April 21, 2004). Plaintiffs did not file their Motion to Compel until the following month (May 7, 2004).

Defendants have taken every step to ensure a resolution of outstanding discovery disputes by bringing these issues to the Court's attention. Plaintiffs, on the other hand, have only guaranteed that these disputes will continue by serving a Third Set of Requests that are no more narrowly tailored than their earlier ones.

31

## IX.    CONCLUSION

Defendants respectfully request that this Court grant their Motion for Protective Order and deny Plaintiffs' Cross-Motion to Compel.


Dated:  June 2, 2004                                        Respectfully submitted,


Craig A. Raabe (ct 04116)                                  Andrew S. Marovitz (ct 25409)
Edward J. Heath (ct 20992)                                 Britt M. Miller (ct 25411)
ROBINSON & COLE LLP                                        Dana S. Douglas (ct 25412)
280 Trumbull Street                                        MAYER, BROWN, ROWE & MAW LLP
Hartford, CT  05103-3497                                   190 South La Salle Street
(860) 275-8304                                             Chicago, Illinois  60603
                                                           (312) 782-0600

                                                           Christopher J. Kelly (ct 25410)
                                                           MAYER, BROWN, ROWE & MAW LLP
                                                           1909 K Street, N.W.
                                                           Washington, D.C.  20006-1157
                                                           (202) 263-3000


*Counsel for Defendants The Dow Chemical Company,*
*Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

## **CERTIFICATE OF SERVICE**

I, Dana S. Douglas, do hereby certify that I caused a true and correct copy of Defendants'

Combined Reply In Support Of Their Motion For A Protective Order & Opposition To Motion

To Compel Production Of Documents And Answers To Interrogatories to be served this date via

Federal Express on the following:


Robert M. Langer                              Richard S. Taffet
WIGGIN & DANA LLP                             BINGHAM MCCUTCHEN LLP
One City Place                                399 Park Avenue
185 Asylum Street                             New York, N.Y. 10022
Hartford, CT 06103-3402


                                              Paul A. Winick, Esq.
                                              Thelen Reid & Priest LLP
                                              875 Third Avenue
                                              New York, NY  10022-6225


Dated:  June 2, 2004                          *Dana S. Douglas*
                                              Dana S. Douglas


33