Ex. 1a

12/07 2000 WED 15.19 FAX                                                    ☎001 002



ATTN: MR. AJAY MITTAL

Re: 4.
SPIJ~   1/2

**UNION CARBIDE ASIA PACIFIC, INC**
(INCORPORATED IN U.S.A WITH LIMITED LIABILITY)
ASIA PACIFIC HEADQUARTERS

*Ron Neri*
*President*

27 June 2000

Mr Sanjiv Sanghvi
Director
Megavisa Solutions (S) Pte Ltd
No. 3 Shenton Way
#07-04 Shenton House
SINGAPORE 068805

Dear Mr Sanghvi

This is to confirm Union Carbide's interest in selling to as its distributors to M/s. Megavisa Solutions (S) Pte Ltd. (Megavisa) effective as of 1ˢᵗ July 2000, certain of Union Carbide's products for resale by Megavisa to customers located in India.

Each such sale, of course, would be contingent upon the continuing interest of Megavisa and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following:

* Unless otherwise specified by the parties, all shipments under this contract shall be made on Megavisa's behalf and in Megavisa's name as shipper. Megavisa shall have title to product and shall bear all risks associated with product from the time when product has effectively passed the ship's rail at the point of shipment.

* Unless otherwise requested by Megavisa, Union Carbide will arrange ocean transportation with its usual carriers. The issue as to which party bears the cost of such transportation shall be negotiated on a case by case basis.

* Megavisa purchase price will customarily include a mutually acceptable reseller's discount that will be established based on the product, volumes, etc.

* Megavisa will consign and sell all the products, as supplied by Union Carbide Corporation and its affiliates only, to the customers in India and not to customers in any other country in the world. If Megavisa sells any of these products in any countries outside of India, the Distributorship arrangement with Megavisa will forthwith be terminated without any notice.

We recognize that there may be instances when it is more economical or otherwise efficient for Megavisa to purchase products from the stock of the appropriate Union Carbide affiliate in the Asia Pacific region such as Union Carbide Asia Limited in Hong Kong. In such cases, Union Carbide will recommend to its affiliate that it follows the same protocol set forth in this letter.

**M 0009**

Megavisa Solutions (S) Pte Ltd                                                    Page 2

There also may be instances where Union Carbide will elect not to sell Megavisa a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vast majority of such instances.

This agreement will commence with immediate effect and shall continue in effect for one year and thereafter unless terminated by Union Carbide in its sole discretion on ninety days prior written notice.

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

Very truly yours,
UNION CARBIDE ASIA PACIFIC INC

RON NERI

8 Shenton Way, #22-01 Temasek Building, Singapore 068811   Tel . (65) 322-9966  Fax  (65) 225-1845

M 0010

Ex. 12

# THE MAJOR CHANGES

**JULY 1984** : C&P TRADING DIVISION FORMED
IN UCIL (7 PEOPLE)

DECEMBER 1984 : BHOPAL TRAGEDY

**NOV 1987** :

- SPIN OFF FROM UCIL
- VISA FORMED
- TRADING BUSINESS CONTINUED AND GROWN
- NO UCIL ROLE IN TRADING

**JULY 1993** :

- UCC DISTANCING FROM VISA
- BUSINESS WITH INDIA TO BE ROUTED THRU MEGA
  GLOBAL SERVICES INC. (MGS), HOUSTON
- VISA ROLE CONTINUES
- UCC TRADING BIZ IN INDIA CONTINUES GROWING

M 5887

4. VISA IS EXCLUSIVE DISTRIBUTOR OF MGS IN INDIA FOR PETROCHEMICALS TRADING. MGS WILL SELL UCC&P PRODUCTS ONLY TO INDIA THROUGH VISA. THEY WILL NOT SELL UCC&P PRODUCTS IN THE USA DOMESTIC MARKET OR TO ANY COUNTRY OTHER THAN INDIA. THIS WILL BE MONITORED ON A MONTHLY BASIS UNDER ADVICE TO UCAP AND MGS AGENCY WILL STAND TO BE TERMINATED UPON ANY WILFUL DEVIATION FROM THIS CONDITION.

5. VISA VERY MUCH RETAINS THEIR SEPERATE ENTITY, IDENTITY AND CHARACTER.

M 5890



~ɪ/ɜ١

 **UNION CARBIDE ASIA PACIFIC, INC.**
INCORPORATED IN U.S.A. WITH LIMITED LIABILITY
ASIA PACIFIC, HEADQUARTERS

5 April 1993

R. Natarajan
PRESIDENT

Mega Global Services Inc.
1911 Westmead No. 2306
Houston, Texas 77077
U. S. A.

Attention: Mr. Minoo Mehta – Director

Dear Mr. Mehta

This is to confirm Union Carbide's interest in selling to Mega Global
Services Inc. from time to time effective as of 6 July 1993, certain of
Union Carbide's products for resale by Mega Global Services Inc. to
customers located in India.

Each such sale, of course, would be contingent upon the continuing
interest of Mega Global Services Inc. and Union Carbide and a mutual
agreement on specific terms including volume, specifications, price,
payment and delivery. However, certain aspects of our dealings should
be consistent such as the following:

–      Title and risk of loss or damage to the products should always pass
       to Mega Global Services Inc. at the ship rail or inlet flange, as the
       case may be, at the U.S. port of shipment (or other port of
       shipment in the case of affiliate sales).

–      Unless otherwise requested by Mega Global Services Inc. Union
       Carbide will arrange ocean transportation with its usual carriers.
       The issue as to which party bears the cost of such transportation
       shall be negotiated on a case by case basis.

–      Mega Global Services Inc. purchase price will customarily include
       a mutually acceptable reseller's discount that will be established
       based on the product, volumes, etc.

We recognize that there may be instances when it is more economical
or otherwise efficient for Mega Global Services Inc. to purchase
products from the stock of the appropriate Union Carbide affiliate in
the Asia/Pacific region such as Union Carbide Asia Limited in Hong
Kong. In such cases, Union Carbide will recommend to its affiliate that
it follows the same protocol set forth in this letter.

D00616

09/15/00   11:56   ☎203 794 4423   UC CT.LAW DEPT. ─   ☒008/031
15/09 '00 FRI 15:44 FAX 65 2   591   UNION CARBIDE AP F   ☒00

8/31

**UNION CARBIDE ASIA PACIFIC, INC.**

2

There also may be instances where Union Carbide will elect not to sell Mega Global Services Inc. a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vast majority of such instances.

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

Very truly yours

R. Natarajan

RN:vn

D00617

Ex. 14



**UNION CARBIDE ASIA PACIFIC, INC.**
[INCORPORATED IN U.S.A. WITH LIMITED LIABILITY]
ASIA PACIFIC HEADQUARTERS

*Ronald G. Neri*
*President*

8 September 1995

Mr. Riju Bowry
President
MM Global Services Inc.
810 Highway, 6 South, Ste 202,
Houston, Texas 77079
U. S. A.

Dear Mr. Bowry

This is to confirm Union Carbide's interest in selling to MM Global Services Inc. (MMGS) from time to time effective as of 8th September, 1995, certain of Union Carbide's products for resale by MMGS to customers located in India.

Each such sale, of course, would be contingent upon the continuing interest of MMGS and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following:

- Unless otherwise specified by the parties, all shipments under this contract shall be made on MMGS's behalf and in MMGS's name as shipper. MMGS shall have title to product and shall bear all risks associated with product from the time when product has effectively passed the ship's rail at the point of shipment.

- Unless otherwise requested by MMGS, Union Carbide will arrange ocean transportation with its usual carriers. The issue as to which party bears the cost of such transportation shall be negotiated on a case by case basis.

- MMGS purchase price will customarily include a mutually acceptable reseller's discount that will be established based on the product, volumes, etc.

8 SHENTON WAY, #35-01 TREASURY BUILDING, SINGAPORE 0106. TEL. 65-2232177 / 65-3229822 FAX. 65-2210581

M 33554

- MMGS will consign and sell all the products, as supplied by Union Carbide Corporation, only to the customers in India and not to customers in any other country in the world. If MMGS sells any of these products in any countries outside of India, the Distributorship arrangement with MMGS will forthwith be terminated without any notice.

We recognize that there may be instances when it is more economical or otherwise efficient for MMGS to purchase products from the stock of the appropriate Union Carbide affiliate in the Asia/Pacific region such as Union Carbide Asia Limited in Hong Kong. In such cases, Union Carbide will recommend to its affiliate that it follows the same protocol set forth in this letter.

There also may be instances where Union Carbide will elect not to sell MMGS a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vast majority of such instances.

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

Very truly yours

R. G. Neri

/vn

M 33555



# PROPOSED AMENDMENTS TO THE
## FEDERAL RULES OF CIVIL PROCEDURE[*]

### Rule 4. Summons

1                              * * * * *

2     (i) Serving~ce~ Upon the United States, ~and~ Its Agencies,

3   Corporations, ~or~ Officers, or Employees.

4                              * * * * *

5     (2)    (A) Servic━━━        an officer, agency, or

6          cor                 States, or an officer or

7          emp                 tates sued only in an

8          offic               ffected by serving the

9          Unite               ner prescribed by

10         paragr              on Rule 4(i)(1) and

11         by also             mmons and ~of the~

12         complai. ~y~ registered or certified mail to the

13         officer, employee, agency, or corporation.

14         (B)    Service on an officer or employee of

15   the United States sued in an individual capacity

16   for acts or omissions occurring in connection with

---

[*] New matter is underlined; matter to be omitted is lined through.

FEDERAL RULES OF CIVIL PROCEDURE          67

require that the disclosures it directs, and objections to them, be filed promptly. Subdivision (a)(4) continues to require that all disclosures under subdivisions (a)(1), (a)(2), and (a)(3) be in writing, signed, and served.

"Shall" is replaced by "must" under the program to conform amended rules to current style conventions when there is no ambiguity.

### GAP Report

The Advisory Committee recommends that the amendments to Rules 26(a)(1)(A) and (B) be changed so that initial disclosure applies to information the disclosing party "may use to support" its claims or defenses. It also recommends changes in the Committee Note to explain that disclosure requirement. In addition, it recommends inclusion in the Note of further explanatory matter regarding the exclusion from initial disclosure provided in new Rule 26(a)(1)(E) for actions for review on an administrative record and the impact of these exclusions on bankruptcy proceedings. Minor wording improvements in the Note are also proposed.

**Rule 26. General Provisions Governing Discovery; Duty of Disclosure**

1                        * * * * *

2          **(b) Discovery Scope and Limits.**  Unless otherwise

3     limited by order of the court in accordance with these rules,

4     the scope of discovery is as follows:

68         FEDERAL RULES OF CIVIL PROCEDURE

5          **(1) In General.**   Parties may obtain discovery

6          regarding any matter, not privileged, that ~~which~~ is

7          relevant to ~~the subject matter involved in the pending~~

8          ~~action, whether it relates to~~ the claim or defense of ~~the~~

9          ~~party seeking discovery or to the claim or defense of~~ any

10         ~~other~~ party, including the existence, description, nature,

11         custody, condition, and location of any books, documents,

12         or other tangible things and the identity and location of

13         persons having knowledge of any discoverable matter.

14         For good cause, the court may order discovery of any

15         matter relevant to the subject matter involved in the

16         action.   Relevant ~~The~~ information ~~sought~~ need not be

17         admissible at the trial if the discovery ~~information sought~~

18         appears reasonably calculated to lead to the discovery of

FEDERAL RULES OF CIVIL PROCEDURE          69

19          admissible evidence.   <u>All discovery is subject to the</u>

20          <u>limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).</u>

21                       * * * * *

**Committee Note**

   <u>Subdivision (b)(1).</u>  In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language. This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language. Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. <u>Discovery and Disclosure Practice,</u> *supra,* at 44-45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

   The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains

70        FEDERAL RULES OF CIVIL PROCEDURE

authority to order discovery of any matter relevant to the subject
matter involved in the action for good cause. The amendment is
designed to involve the court more actively in regulating the breadth
of sweeping or contentious discovery. The Committee has been
informed repeatedly by lawyers that involvement of the court in
managing discovery is an important method of controlling problems
of inappropriately broad discovery. Increasing the availability of
judicial officers to resolve discovery disputes and increasing court
management of discovery were both strongly endorsed by the
attorneys surveyed by the Federal Judicial Center. *See* Discovery and
Disclosure Practice, supra, at 44. Under the amended provisions, if
there is an objection that discovery goes beyond material relevant to
the parties' claims or defenses, the court would become involved to
determine whether the discovery is relevant to the claims or defenses
and, if not, whether good cause exists for authorizing it so long as it
is relevant to the subject matter of the action. The good-cause
standard warranting broader discovery is meant to be flexible.

The Committee intends that the parties and the court focus on the
actual claims and defenses involved in the action. The dividing line
between information relevant to the claims and defenses and that
relevant only to the subject matter of the action cannot be defined
with precision. A variety of types of information not directly
pertinent to the incident in suit could be relevant to the claims or
defenses raised in a given action. For example, other incidents of the
same type, or involving the same product, could be properly
discoverable under the revised standard. Information about
organizational arrangements or filing systems of a party could be
discoverable if likely to yield or lead to the discovery of admissible
information. Similarly, information that could be used to impeach a
likely witness, although not otherwise relevant to the claims or
defenses, might be properly discoverable. In each instance, the
determination whether such information is discoverable because it is

FEDERAL RULES OF CIVIL PROCEDURE        71

relevant to the claims or defenses depends on the circumstances of the pending action.

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

72        FEDERAL RULES OF CIVIL PROCEDURE

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. *See* 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. *Cf.* Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998) (quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

### GAP Report

The Advisory Committee recommends changing the rule to authorize the court to expand discovery to any "matter" — not "information" — relevant to the subject matter involved in the action. In addition, it recommends additional clarifying material in the Committee Note about the impact of the change on some commonly disputed discovery topics, the relationship between cost-bearing under Rule 26(b)(2) and expansion of the scope of discovery on a showing of good cause, and the meaning of "relevant" in the revision to the last sentence of current subdivision (b)(1). In addition, some minor clarifications of language changes have been proposed for the Committee Note.

**Rule 26.  General Provisions Governing Discovery; Duty of Disclosure**

1                                    * * * * *

2               **(b) Discovery and Limits.**

Ex. 16



Mayer, Brown, Rowe & Maw LLP
190 South La Salle Street
Chicago, Illinois 60603-3441

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

**Dana S. Douglas**
Direct Tel (312) 701-7093
dsdouglas@mayerbrownrowe.com

April 19, 2004

<u>VIA OVERNIGHT MAIL</u>

Richard S. Taffet, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022-4689

Re:   <u>MM Global Services, et. al. v. The Dow</u>
<u>Chemical Company, et. al.</u>, Civil No. 3:02 CV
(AVD)

Dear Richard:

     I write to follow up with you regarding outstanding discovery issues.  This letter supplements prior correspondence exchanged during the meet-and-confer process.  (We will be communicating separately with you to address the remaining issues in your April 13 letter.)  As I am sure you are aware, Defendants have continued to produce documents in accordance with the parties' resolution of certain discovery issues, and we have provided you with documents that were discovered as a result of our AMI document search.  We now anticipate that you also will begin the production of documents which you have agreed to produce.

**PLAINTIFFS' PRIOR PRODUCTION**

     To begin, on March 31, 2003 Charles Reitmeyer sent a letter to you listing nearly 125 orders for which you have not produced a transaction file or any transaction documents.  *See* Attachment A.  Each of these orders is referenced in Exhibits 1 and 3 of Plaintiffs' damage submission in your February 20, 2003 letter to William L. Webber as orders for which Plaintiffs claim contractual damages.  Mr. Reitmeyer reiterated this request on July 7, 2003.  It is my understanding that you did not respond to the July 7, 2003 letter and have not produced these documents.  Please locate and produce those files to us as soon as possible.  Please also advise us of their approximate volume.

**STATUS OF PLAINTIFFS' RESPONSES TO DEFENDANTS' REQUESTS FOR PRODUCTION AND INTERROGATORIES**

     With respect to the discovery issues that the parties resolved through the meet-and-confer process, Defendants await the following responses from Plaintiffs:

- Confirmation and any necessary update of the lists of documents provided in response to Defendants' Interrogatory Nos. 1-7 and 11.  Please provide copies of

Brussels  Charlotte  Chicago  Cologne  Frankfurt  Houston  London  Los Angeles  Manchester  New York  Palo Alto  Paris  Washington, D.C.
Independent Mexico City Correspondent:  Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

Mayer, Brown, Rowe & Maw LLP

Robert S. Taffet, Esq.
April 19, 2004
Page 2

documents M0707-M0711, M1206, M1541 and M4825, which are listed in
Plaintiffs' response to Defendants' Interrogatories. Please note that Defendants
continue to maintain that Plaintiffs' broad designations of documents in response
to Defendants' Interrogatories are inappropriate.

- Plaintiffs' identification of employees responsive to Defendants' Document
Request No. 3. Plaintiffs also agreed to provide those employees' job titles, and if
insufficiently descriptive, job descriptions.

- Board minutes that predate March 21, 2002 and concern sales of products in
India, Plaintiffs' relationship with customers, Plaintiffs' financial condition, and
information responsive to other document requests. Defendants continue to
maintain that postdate board minutes that postdate March 21, 2002 also are relevant to the
extent they concern these categories of information.

- Plaintiffs' identification of descriptive job titles, and if insufficiently descriptive,
job descriptions in response to Defendants' Interrogatory No. 8.

- Receipt of any non-privileged responsive documents to undisputed Document
Request Nos. 1, 2, 5, 7, 8, 10-41. Please confirm your anticipated timeframe for
production of these documents.

Finally, Defendants have noticed that certain documents within Plaintiffs' production
contain the notation "Page(s) Intentionally Omitted." Please provide the reason for these
notations and state whether any document pages have been omitted.

### STATUS OF DEFENDANTS' PRODUCTION IN RESPONSE TO PLAINTIFFS' REQUESTS FOR PRODUCTION

Defendants previously agreed during the meet-and-confer process to confirm the status of
their productions with respect to certain of Plaintiffs' Requests for Production. Defendants
provide this summary below. All statements are subject to the agreements reached by the parties
during the meet-and-confer process as well as the ongoing dispute regarding Plaintiffs' requests
to discover information and documents regarding end-users that had no relationship whatsoever
to them.

Document Request No. 1: Subject to their objections, Defendants confirm an appropriate
search for documents was made in response to Plaintiffs' First Requests. Defendants will
continue to produce responsive, non-privileged documents to the extent that any are found within
Defendants' possession, custody, or control.

Document Request No. 2: Subject to their objections, Defendants state they have already
produced documents sufficient to show the corporate relationships between and among each
Defendant at all times relevant to the claims at issue in this case to the extent such documents

**Mayer, Brown, Rowe & Maw LLP**

Robert S. Taffet, Esq.
April 19, 2004
Page 3

exist and are within Defendants' possession, custody, or control. Defendants intend to supplement shortly their production in response to this Request.

**Document Request No. 3:** Subject to their objections, Defendants state they have produced documents relevant to the reporting relationships among the Defendants and their employees in connection with the sale and distribution of Products to Plaintiffs to the extent such documents exist and are within Defendants' possession, custody, or control. Defendants further refer Plaintiffs to documents D00382-D00389. Pursuant to the parties' agreement, this production is limited to (a) decision makers, (b) persons with direct contact with Plaintiffs, and (c) persons with direct contact with end-user customers, with the exception of end-user customers having no relationship to Plaintiffs.

**Document Request No. 4:** Subject to their objections, Defendants state they have produced documents sufficient to identify their officers and senior level management personnel with involvement with the Products at issue as sold in India to the extent such documents exist and are within Defendants' possession, custody, or control. The identities of many such individuals are available in the individual transaction documents and will be provided in each Defendant's Supplemental Response to Interrogatory No. 2. Defendants intend to supplement shortly their production in response to this Request.

**Document Request No. 5:** The Products sold to Plaintiffs were manufactured in Louisiana, New Jersey, Texas and West Virginia, and pursuant to joint ventures with UCC and companies located in, among others, Malaysia, Kuwait and Japan.

**Document Request No. 6:** Subject to their objections, Defendants state they have produced non-privileged documents related to Plaintiffs and their purchases of Products that are responsive to this Request to the extent such documents exist and are within Defendants' possession, custody, or control.

**Document Request No. 7:** Subject to their objections, Defendants state UCC and UCAP have produced documents to the extent such documents exist and are within their possession, custody, or control that are responsive to this Request and relate to prices for or pricing of sales of Products sold to Plaintiffs for resale in India during the relevant time period. Dow has produced documents to the extent such documents exist and are within its possession, custody, or control that were created after its merger with UCC, are responsive to this Request, and relate to prices for or pricing of sales of Products sold to Plaintiffs for resale in India during the relevant time period.

**Document Request Nos. 8 & 9:** During the parties' December 3, 2003 discovery conference, Plaintiffs explained that they served these Requests as a tool to discover pricing information. Subject to their objections, Defendants state that pricing information for the Products sold to Plaintiffs at issue in the lawsuit was previously produced as part of the

Mayer, Brown, Rowe & Maw LLP

Robert S. Taffet, Esq.
April 19, 2004
Page 4

transaction documents at D01499 – D23587; DS200000 – DS221303; and DS222290 – DS236036.

Document Request No. 10:  Subject to their objections, Defendants state they have produced non-privileged documents to the extent such documents exist and are within their possession, custody, or control that are responsive to this Request and relate to the sales of Products in India.

Document Request No. 11:  Subject to their objections, Defendants state they have produced training seminar documents, programs, manuals, and guidelines that relate to (1) the sale of Products; (2) pricing of Products; (3) allocation of Products; and (4) certain payment/credit issues and apply specifically to Plaintiffs or generally to end-users outside of India to the extent such documents exists and are within Defendants' possession, custody, or control.

Document Request Nos. 12 & 13:  Subject to their objections, Defendants state that they have produced documents sufficient to show procedures and methods for order entry and processing in connection with the sale and distribution of Products in India.

Document Request Nos. 14 & 15:  Subject to their objections, Defendants state they have produced documents sufficient to show (a) where the goods originated and (b) who sold them. Defendants further refer Plaintiffs to the transaction documents at D01499 – D23587; DS200000 – DS221303; and DS222290 – DS236036.

Document Request Nos. 16-21:  Defendants state they have produced non-privileged documents that are responsive to this Request to the extent such documents exist and are are within Defendants' possession, custody, or control.

Document Request Nos. 22-23, 29:  Defendants stand on their objections to these Requests.

Document Request Nos. 24-25, 27-28:  Subject to their objections, Defendants state they have produced non-privileged documents that are responsive to this Request to the extent such documents exist and are within Defendants' possession, custody, or control.

Document Request No. 26:  Subject to their objections, Defendants state they have produced documents responsive to this Request to the extent they exist and are within Defendants' possession, custody, or control.  Defendants continue to object that Plaintiffs' request for *all* documents *concerning* any statement made by any Defendant to any Plaintiff is hopelessly overbroad.

Document Request No. 30:  Subject to their objections, Defendants state they will produce responsive, non-privileged documents to the extent such documents exist and are within

Mayer, Brown, Rowe & Maw LLP

Robert S. Taffet, Esq.
April 19, 2004
Page 5

their possession, custody, or control once Plaintiffs identify the end-users to which they sold Products.

Document Request No. 31:  Subject to their objections, Defendants state they are in the process of reviewing the relevant files possessed by the employees identified in this Request to the extent those files exist and are within Defendants' possession, custody, or control. Defendants will produce any non-privileged, responsive documents discovered pursuant to this review.

I look forward to your response.

Sincerely,

Dana S. Douglas

Dana S. Douglas

cc:      Paul A. Winick, Esq.