**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. )<br><br>Defendants. ) | Civil No. 3:02 CV 1107 (AVC)<br><br><br>July 1, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS BASED ON LACK OF SUBJECT**
**MATTER JURISDICTION FOLLOWING THE SUPREME COURT'S DECISION**
**IN *F. HOFFMANN-LA ROCHE LTD V. EMPAGRAN, S.A.***

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  05103-3497
(860) 275-8304

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
190 South La Salle Street
Chicago, Illinois  60603
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006-1157
(202) 263-3000

*Counsel for Defendants The Dow Chemical Company,*
*Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

I.    *Empagran* Establishes that the Court Lacks Subject Matter Jurisdiction
      Over Plaintiffs' Antitrust Claim.......................................................................... 2

      A.    The FTAIA Requires that Plaintiffs' Own Claim Arise from
            Effects on U.S. Commerce....................................................................... 3

            1.    The FTAIA..................................................................................... 3

            2.    Until Now, This Court Has Not Addressed the Second
                  Prong of the FTAIA Exception..................................................... 5

            3.    *Empagran* Makes Clear that a Plaintiff's Claim Must Arise
                  from the Effect on U.S. Commerce ............................................... 6

      B.    Plaintiffs Have Not Alleged that Their Claim Arises from an Effect
            on U.S. Commerce, as Required by *Empagran*. ....................................... 9

            1.    Plaintiffs' Summary of *Empagran* Is Mistaken ........................... 9

            2.    Plaintiffs Have Not and Cannot Allege that They Suffered
                  Injury as a Result of an Effect on United States Commerce........ 13

            3.    Plaintiffs Have Not and Cannot Allege that They Suffered
                  Injury in United States Commerce............................................... 19

II.   *Empagran* Is Consistent with Defendants' Pending Motion for Judgment
      on the Pleadings Based upon Plaintiffs' Lack of Standing................................. 21

III.  The Court Should Dismiss the Remaining Claims of Breach of Contract
      and Fraudulent Misrepresentation on *Forum Non Conveniens* Grounds............. 22

      A.    The Relevant Standard............................................................................ 23

      B.    With the Dismissal of the U.S. Antitrust Claim, Singapore is an
            Adequate Forum..................................................................................... 24

      C.    The *Gilbert* Factors Now Weigh in Favor of Singapore.......................... 25

CONCLUSION............................................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Dee-K Enters. v. Heveafil Sdn. Bhd.*, 299 F.2d 281 (4th Cir. 2002)..................................18

*Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196
    (2d Cir. 1992)...........................................................................................................21

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994).................................................................21

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) .........................................2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...............................21

*Capital Currency Exch. N.V. v. National Westminster Bank PLC*, 155
    F.3d 603 (2d Cir. 1998).....................................................................................23, 24

*DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996).........................................21

*Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420
    (5th Cir. 2001).........................................................................................................14

*DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir. 2002) ...........................................24

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338
    (D.C. Cir. 2003) .................................................................................................6, 10

*F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 124 S. Ct. 2359 (2004) ..................... *passim*

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)...................................................23, 24, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574
    (1986)........................................................................................................................15

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) ...........................................23

*Kontrick v. Ryan*, 124 S. Ct. 906 (2004) ............................................................................3

*Kruman v. Christie's International PLC*, 284 F.3d 384 (2d Cir. 2002),
    *cert. dismissed*, 124 S. Ct. 27 (2003) .......................................................... *passim*

*Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697
    (2d Cir. 2000)...........................................................................................................2

*MM Global Services, Inc. v. Dow Chemical Co.*, 283 F. Supp. 2d 689
    (D. Conn. 2003) ..................................................................................................6, 26

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*MM Global Servs., Inc. v. Dow Chem. Co.*, 2004 WL 556577
    (D. Conn. 2004) ...................................................................................6, 12, 16, 18

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ...............................................................17

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981) ......................................................23

*Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003) .................................2

*R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 169 (2d Cir. 1991) ......................26

*Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224
    (2d Cir. 1996) ..................................................................................................23

*Sever v. Glickman*, 298 F. Supp. 2d 207 (D. Conn. 2004) .................................................21

*United Phosphorus, Ltd. v. ANGUS Chem. Co.*, 131 F. Supp. 2d 1003
    (N.D. Ill. 2001), *aff'd*, 322 F.3d 942 (7th Cir.), *cert. denied*,
    124 S. Ct. 533 (2003) .......................................................................................10

*Young v. Bank of Boston Connecticut*, 1996 WL 756504 (D. Conn. 1996) ......................3

**Statutes:**

15 U.S.C. § 6a ....................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1).........................................................................................28

Fed. R. Civ. P. 12(c) ........................................................................................22, 23

**INTRODUCTION**

Since the inception of this case, Plaintiffs have not explained how they could have been injured *in U.S. commerce* as a result of resale price maintenance when they were permitted to sell the Products "only to customers in India and not to customers in any other country in the world." *See, e.g.,* Letter from R. Neri, Union Carbide Asia Pacific ("UCAP"), to S. Sanghvi, Megavisa Solutions (June 27, 2000) at M0009 (Ex. 1). To avoid this thorny issue, Plaintiffs have relied upon the Second Circuit's decision in *Kruman v. Christie's International PLC*, 284 F.3d 384 (2d Cir. 2002), *cert. dismissed*, 124 S. Ct. 27 (2003), which held that plaintiffs who had not suffered injury in U.S. commerce could bring Sherman Act proceedings so long as *someone else* had. Plaintiffs have pursued this analysis since 2002, declaring that "as *Kruman* makes clear, for purposes of the FTAIA analysis, Plaintiffs' injury is not the proper subject of inquiry." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims for Lack of Subject Matter Jurisdiction at 28 (Nov. 12, 2002).

On June 14, 2004, a unanimous United States Supreme Court undercut Plaintiffs' strategy. The Supreme Court flatly rejected *Kruman*, discrediting the notion that a plaintiff's injury is irrelevant and declaring that American antitrust principles should not be imposed on foreign disputes "in an act of legal imperialism, through legislative fiat." *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 124 S. Ct. 2359, 2368 (2004); *see id.* at 2364 (resolving the circuit split against *Kruman*). The Supreme Court went further, noting that it could find no justification for applying American antitrust law "to conduct that is significantly foreign *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim*." *Id.* at 2366 (emphasis in original).

*Kruman* is now a dead letter – and so is Plaintiffs' claim here.  Plaintiffs' resale price maintenance claim depends entirely upon "independent foreign harm" – lost sales in India due to Indian pricing that did not and could not depend upon competitive harm in the United States, because Plaintiffs could not sell Defendants' Products in the United States.  In addition, unlike *Empagran* – in which Plaintiffs allege a worldwide cartel (*see* 124 S. Ct. at 2366) – Plaintiffs' Complaint here does not allege or identify a single instance in which any end-user's purchase of any Product in the United States was set by resale price maintenance.  There simply is no worldwide resale price maintenance claim alleged in the Complaint in which American resale price maintenance somehow *led to* Indian resale price maintenance.

The Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA"), declares that U.S. antitrust law does not apply to "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations."  *Empagran*'s construction of the FTAIA makes clear that this Court lacks subject matter jurisdiction over Plaintiffs' antitrust claim and must dismiss it.  As a consequence, this Court should dismiss the only two remaining counts, both alleging causes of action under *foreign* law – breach of contract and negligent misrepresentation – pursuant to the doctrine of *forum non conveniens*, so that they can be adjudicated in a jurisdiction more familiar with the substantive law underlying the dispute.

## I.  *Empagran* Establishes that the Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Antitrust Claim.

"'If subject matter jurisdiction is lacking, the action must be dismissed.'"  *Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 193 (2d Cir. 2003) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700-01 (2d Cir. 2000), and citing *Bender*

2

*v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986)).  "A litigant generally may

raise a court's lack of subject-matter jurisdiction at any time in the same civil action."

*Kontrick v. Ryan,* 124 S. Ct. 906, 915 (2004); Ruling and Order on the Defendants'

Motion for a Protective Order, Slip Op. at 8 (D. Conn. June 29, 2004) ("*Protective Order*

*Ruling*") ("jurisdiction can be raised at any time"); *Young v. Bank of Boston Connecticut*,

1996 WL 756504, *2 (D. Conn. 1996) (Covello, J.) ("A party may move to dismiss

because of lack of subject matter jurisdiction at any time during the course of an action");

*see also* Pls. Opp. To Defs. Mot. For Protective Order and Memo. in Support of Pls.

Cross-Motion to Compel Production of Docs. and Answers to Interrogs. at 11 (May 7,

2004) ("subject matter jurisdiction remains a dispositive issue throughout the pendency

of any litigation").  A review of Plaintiffs' allegations in light of *Empagran* demonstrates

conclusively that this Court lacks jurisdiction over Plaintiffs' antitrust claim.

### A.    The FTAIA Requires that Plaintiffs' *Own* Claim Arise from Effects on U.S. Commerce.

#### 1.    The FTAIA

The FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets. . . .  It does so by removing from the Sherman Act's reach, (1) export activities and (2) other commercial activities taking place abroad, *unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States.

*Empagran*, 124 S. Ct. at 2364 (citation to legislative history omitted).  The statute itself

states in pertinent part:

> "Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

> "(1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>
> "(A) on trade or commerce which is not trade or commerce with foreign nations [*i.e.*, domestic trade or commerce], or on import trade or import commerce with foreign nations; or
>
> "(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States [i.e., on an American export competitor]; and
>
> "(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

*Id.* at 2364-65 (quoting 15 U.S.C. § 6a) (bracketed clarifications in original). As the

Supreme Court explained, the statute

> initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim." §§ 6a(1), (2).

*Id.* at 2365 (emphasis in original). That the Court italicized "both" reflects the

fundamental importance of the fact that neither prong of the FTAIA exception is

sufficient alone to trigger the exception. Instead, for conduct involving foreign

commerce to come within the reach of the U.S. antitrust laws, *not only* must it have a

"direct, substantial and reasonably foreseeable effect" on U.S. commerce (§ 6a(1)), *but*

*also* that effect on U.S. commerce must be what gives rise to the plaintiff's Sherman Act

claim. *See also Protective Order Ruling*, Slip Op. at 8 ("the court lacks subject matter

jurisdiction over antitrust conduct that involves trade or commerce with foreign nations

unless" both prongs of the FTAIA are satisfied).

4

**2.      Until Now, This Court Has Not Addressed the Second Prong of the FTAIA Exception.**

Until the Supreme Court addressed the FTAIA exception's second prong, the Second Circuit's interpretation enabled Plaintiffs to avoid it altogether. *See id.*, 124 S. Ct. at 2364 (citing *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 400 (2d Cir. 2002), as an example of the interpretation it was rejecting). *Kruman* made it irrelevant in the Second Circuit that the harm alleged in a complaint had nothing to do with plaintiffs. Under *Kruman*, the statute's requirement that the effect on U.S. commerce "giv[e] rise to a claim under the [Sherman Act]," 15 U.S.C. § 6a(2), demanded only that *someone* harmed in the course of U.S. commerce would have a claim; it did not matter that plaintiffs themselves would not. *See* Pls. Mem. in Opp. to Defs. Motion for Certification at 17 (Oct. 31, 2003) ("[T]he Second Circuit held [in *Kruman*] that jurisdiction is based upon the conduct's effect on United States commerce and *whether a claim could be raised in the United States, not upon whether the plaintiff's injury is suffered here*") (emphasis added).

Thus, until now, this Court's consideration of whether it has subject-matter jurisdiction over plaintiffs' antitrust claim was limited to the first prong of the exception to the FTAIA's general rule that U.S. antitrust law does not apply to foreign commerce, other than with respect to imports. This Court concluded that the First Amended Complaint met the first prong, sufficiently alleging a "direct, substantial and reasonably foreseeable" effect on U.S. commerce, inasmuch as:

> The amended complaint alleges that the defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, and that they did so in order to "ensure that prices charged by [the] [p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users ... in the United States as well as in other jurisdictions..."

*MM Global Servs., Inc. v. Dow Chem. Co.*, 2004 WL 556577, at *5 (D. Conn. 2004) (quoting First Amended Complaint, ¶ 29 (Ex. 4)) (adhering on reconsideration to *MM Global Services, Inc. v. Dow Chemical Co.*, 283 F. Supp. 2d 689, 697-98 (D. Conn. 2003)).  This language – in which this Court relied upon Plaintiffs' allegations to reject Defendants' earlier motion to dismiss based upon the first prong – will prove fatal to Plaintiffs' claim on the second, now that *Empagran* has corrected the Second Circuit's erroneous interpretation of the FTAIA.

### 3. *Empagran* Makes Clear that a *Plaintiff's* Claim Must Arise from the Effect on U.S. Commerce.

Unlike this case, *Empagran* involved allegations of a global horizontal conspiracy among admitted price-fixers.  The plaintiffs, originally a class of both "foreign and domestic purchasers of vitamins," sued a large group of "foreign and domestic vitamin manufacturers," alleging that the conspiracy "rais[ed] the price of vitamin products to customers in the United States and to customers in foreign countries."  *Empagran*, 124 S. Ct. at 2363.  The *Empagran* plaintiffs alleged that the defendant vitamin makers had met over a period of years in many locations, including the United States, to agree on vitamin prices.  The district court dismissed the claims of the foreign purchasers, but the appellate court reversed, holding that both prongs of the FTAIA exception had been satisfied by the pleadings in the Complaint.  The allegations satisfied the "direct, substantial and reasonably foreseeable effect" prong insofar as they stated that "the conspiracy brought about higher domestic vitamin prices."  124 S. Ct. at 2364; s*ee Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 341 (D.C. Cir. 2003).  And the second prong was satisfied because the complaint indicated that "'such effect' gave 'rise to a [Sherman Act]

claim,' *i.e.*, an injured *domestic* customer could have brought a Sherman Act suit." 124

S. Ct. at 2364 (quoting 15 U.S.C. § 6a(2)). Thus, the appellate court concluded, the

foreign plaintiffs' claim was within the FTAIA exception, and was therefore within the

U.S. courts' subject matter jurisdiction. *Id.*

      The Supreme Court vacated the appellate court's decision, concluding that the

second prong's requirement that "such effect gives rise to a claim" referred to the

*plaintiff's* claim, and thus that a claim based on independent foreign injury would not be

within the FTAIA exception. The first ground was "prescriptive comity" – the doctrine

that "this Court ordinarily construes ambiguous statutes to avoid unreasonable

interference with the sovereign authority of other nations." *Id.* at 2366. Looking to

Areeda and Hovenkamp, the Court pointed out that under the construction of the second

prong the D.C. and Second Circuits had adopted in *Empagran* and *Kruman*, respectively,

> "a Malaysian customer could . . . maintain an action under United States law in a
> United States court against its own Malaysian supplier, another cartel member,
> simply by noting that unnamed third parties injured [in the United States] by the
> American [cartel member's] conduct would also have a cause of action.
> Effectively, the United States courts would provide worldwide subject matter
> jurisdiction to any foreign suitor wishing to sue its own local supplier, but un-
> happy with its own sovereign's provisions for private antitrust enforcement,
> provided that a different plaintiff had a cause of action against a different firm for
> injuries that were within U. S. [other-than-import] commerce. It does not seem
> excessively rigid to infer that Congress would not have intended that result."

*Id.* at 2367 (quoting Philip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 273, pp. 51–

52 (Supp. 2003)). In addition, as noted above, it cannot be assumed that Congress

intended to impose American antitrust policies "in an act of legal imperialism, through

legislative fiat," into the international marketplace. *Id.* at 2369. And while the Court

acknowledged that Congress had "greater leeway" to "control through legislation the

actions of *American* companies," and noted that "some of the anticompetitive price-fixing

conduct alleged here [in *Empagran*] took place in *America*" (*id.* at 2367), *none* of these factors compelled the Court to adopt a reading of the statute that would apply American antitrust laws to overseas effects:

> the higher foreign prices of which the foreign plaintiffs here complain are not the consequence of any domestic anti-competitive conduct *that Congress sought to forbid*, for Congress did not seek to forbid any such conduct insofar as it is here relevant, *i.e.*, insofar as it is intertwined with foreign conduct that causes independent foreign harm. Rather Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm.

*Id.* (emphasis in original).

The FTAIA's language and legislative history also support this reading of the statute. As the Court observed, "the FTAIA's language and history suggest that Congress designed the FTAIA to clarify, perhaps to limit, but not to *expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." *Id.* at 2369. The Court reviewed the pre-FTAIA case law, finding little support for the proposition that the Sherman Act reached independent foreign injury. *See id.* at 2369-71. While it acknowledged that, as the respondents contended, the broader interpretation of "a claim" might be "the more natural reading of the statutory language," that "reading is not consistent with the FTAIA's basic intent." *Id.* at 2372. Accordingly, the Court concluded, "petitioners' reading of the statute" – that the second prong of the FTAIA exception requires that the *plaintiff's* claim arise from the alleged effect on United States commerce – "is correct." *Id.*

Finally, the Supreme Court remanded the matter to the court of appeals for consideration of respondents' claim that, contrary to that court's operating assumption, their harm was not independent of the effect on U.S. commerce – "that, because vitamins

8

are fungible and readily transportable, without an adverse domestic effect (i.e., higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury." *Id.* at 2372. Because the Court of Appeals did not address that argument, the Supreme Court declined to do so as well, remanding it for the appellate court's consideration. *Id.*

**B.      Plaintiffs Have Not Alleged that Their Claim Arises from an Effect on U.S. Commerce, as Required by *Empagran*.**

Mindful of the devastating effect that *Empagran* has on the viability of their antitrust claim, Plaintiffs sought to blunt its impact even before Defendants filed this motion. They represented to the Court last week, in a letter outlining their positions, that "EMPAGRAN IS NOT CONTROLLING" because "this case is very different than the situation addressed in *Empagran*." Letter from Richard S. Taffet to Hon. Alfred V. Covello (June 22, 2004) ("Taffet Letter"), Ex. 2 at 1-2. Plaintiffs offer two arguments in support of this position: as noted above, they assert that there are meaningful factual differences between the two cases (*see id.* at 2 (bullet points)), and they urge that the ruling has no bearing here because of the Supreme Court's decision to refrain (for the moment) from deciding whether conduct's domestic effects that might help "'bring about the foreign injury'" could state a claim. *Id.* at 3. Both of Plaintiffs' arguments seriously misstate the facts of *Empagran*.

**1.      Plaintiffs' Summary of *Empagran* Is Mistaken.**

Plaintiffs cannot properly distinguish *Empagran* by mischaracterizing it. As noted above, the Taffet Letter represents to this Court that *Empagran* "involved wholly foreign players, wholly foreign conduct and wholly foreign injury." *Id.* at 2. The first two representations are demonstrably incorrect; the third is highly misleading. *First*, just

like Plaintiffs before this Court named foreign and domestic defendants, so too did the *Empagran* plaintiffs. Empagran and its co-plaintiffs filed their action against more than 20 American companies, including Hoffman-LaRoche, Inc., Roche Vitamins Inc., BASF Corporation, Rhone-Poulenc Animal Nutrition, Inc., Rhone Poulenc, Inc., Akzo Nobel, Inc., Lonza, Inc., DCV, Inc., DuCoa, L.P., Eisai U.S.A., Inc., Eisai, Inc., Daiichi Fine Chemicals, Inc., Daiichi Pharmaceuticals Corporation, Takeda Vitamin & Food USA, Inc., Takeda U.S.A., Inc., Sumitomo Chemical America, Inc., Tanabe U.S.A. Inc., Nepara, Inc., Reilly Industries, Inc., UCB Chemicals Inc. and Mitsui & Co. U.S.A. Inc. *See* Amended Complaint in *Empagran* (Ex. 3) (*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*). Just as in this case, only one of the original plaintiffs in *Empagran* was an American company. *Id.* (caption names "The Procter & Gamble Company"). And just as in this case, several plaintiffs are foreign companies. *See* First Am. Cmplt., Ex. 4, at ¶¶ 5-6 (alleging that MM Global Services Pte. Ltd. and Megavisa Solutions (S) Pte. Ltd. are Singapore companies).[1] It is simply inexplicable that Plaintiffs would represent to this Court that *Empagran* can be distinguished on the ground that it "involved wholly foreign players," while Defendants here are both foreign and domestic. Taffet Letter at 2.

      *Second*, Plaintiffs' claim that *Empagran* is distinguishable from their case because it involved "wholly foreign conduct" (*id*.) is also demonstrably incorrect. In the very opinion Plaintiffs purport to summarize, the Supreme Court declared that "some of the

---

[1]    The foreign Plaintiffs, of course, cannot piggyback their claims on the one domestic Plaintiff. Each Plaintiff must show that the Court possesses subject matter jurisdiction to hear its claim. *See United Phosphorus, Ltd. v. ANGUS Chem. Co.*, 131 F. Supp. 2d 1003, 1019 (N.D. Ill. 2001) (holding that Indian plaintiffs could not maintain U.S. antitrust suit based on conduct allegedly preventing third-party U.S. firm from exporting to them), *aff'd*, 322 F.3d 942 (7th Cir.), *cert. denied*, 124 S. Ct. 533 (2003).

anticompetitive price-fixing conduct alleged here took place in *America*." 124 S. Ct. at

2367. The *Empagran* complaint is more specific:

> representatives of defendants participating in meetings and conversations in the
> United States and foreign nations, in which defendants and their co-conspirators
> discussed and agreed concerning the prices, volume of sales, and markets for
> vitamins and vitamin premixes

*Empagran* Cmplt., Ex. 3, at ¶ 4(a). Later in the Complaint, the *Empagran* plaintiffs

added even greater detail:

> The locations of the face-to-face meetings to initiate and monitor the conspiracies
> included . . . Wilmington, Delaware (USA); . . . Atlanta, Georgia (USA); . . . St.
> Louis, Missouri (USA); Detroit, Michigan (USA); [and] Chicago, Illinois (USA).

*Empagran* Complaint, Ex. 3 at ¶ 93; *compare with* Taffet Letter, Ex. 2 at 2 ("Substantial

conduct giving rise to plaintiffs' claims took place in the United States"). Plaintiffs'

emphasis on alleged domestic conduct only displays the similarity between their case and

*Empagran*. And it makes clear that Plaintiffs cannot rely upon domestic conduct to avoid

*Empagran*.

　　　　All of this is beside the point in any event. None of the specific allegations of

domestic conduct, which Plaintiffs claim are so important in distinguishing their case

from *Empagran*, stopped the Supreme Court from unanimously deciding that, based on

the record before it and the assumptions made by the court of appeals, there was no

subject matter jurisdiction. Indeed, none of these types of allegations is relevant at all to

the FTAIA, which asks instead whether (1) the alleged violation produced a "direct,

substantial, and reasonably foreseeable effect" on U.S. commerce, and (2) that effect

gave rise to plaintiff's claim. Neither prong asks where the defendants were domiciled or

where the alleged conspiracy was hatched or administered. In fact, in *Empagran*, as

noted above, the alleged conspiracy included U.S. firms, and the conspirators were

alleged to have met in several U.S. cities. If these factors had been significant to the FTAIA analysis, *Empagran* would have turned out differently. But instead, the factors did not even register in the Court's analysis, which simply followed the statute, focusing on the relationship between the alleged effect on U.S. commerce and the plaintiffs' alleged injury.

*Third*, it is highly misleading for Plaintiffs to suggest that, because this Court refused to dismiss their Complaint on the "direct, substantial, and reasonably foreseeable" standard, their case has been immunized from the Supreme Court's ruling in *Empagran*. *See* 2004 WL 556577, at *6 (previous ruling). That suggestion completely ignores the structure of the Foreign Trade Antitrust Improvements Act of 1982. As detailed above, the FTAIA contains two *separate* prongs: (1) the conduct must have a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, *and* (2) "such effect gives rise to a claim." 15 U.S.C. § 6a. Satisfying the first clause is necessary but insufficient. Plaintiffs must satisfy *both* clauses to proceed under the FTAIA, and *Empagran* is directed at the second. This Court has not yet considered whether what "gives rise to [Plaintiffs'] claim" is the alleged harm to U.S. commerce, as required to satisfy the second prong, or instead Plaintiffs' "foreign harm alone gives rise to [their] claim." *See Empagran*, 124 S. Ct. at 2367. As demonstrated *infra*, an examination of the First Amended Complaint shows conclusively that Plaintiffs' claim, which arises from allegedly lost sales in India, is entirely independent of any effect alleged as to U.S. commerce.

2.    **Plaintiffs Have Not and Cannot Allege that They
Suffered Injury as a Result of an Effect on
United States Commerce.**

Faced with a dispositive Supreme Court decision, Plaintiffs are left to hitch their

case to one strand of *Empagran*: they claim that the Supreme Court's remand leaves open

the question of "where the limits of jurisdiction under the FTAIA lie . . . when the alleged

foreign injury is not "independent" of the domestic harm."  Taffet Letter, Ex. 2 at 3.  It is

true that the Supreme Court declined to address that argument in *Empagran* because the

D.C. Circuit did not do so first.  124 S. Ct. at 2372 ("for that reason, neither shall we").

But the Supreme Court's remand[2] is totally irrelevant to the claim here, because Plaintiffs

have built their case around the proposition that Indian resale price maintenance led to

higher prices in the United States, *not the other way around*.  Plaintiffs' own allegations

in this regard are fatal under any reading of *Empagran*.  Here is why.

As noted above, the second prong of the FTAIA makes clear that the Sherman

Act "shall not apply to conduct involving trade or commerce . . . with foreign nations"

except where the "(1) conduct has a direct, substantial, and reasonably foreseeable effect

on [domestic] commerce***, and (2) such effect gives rise to a [Sherman Act] claim."

15 U.S.C. § 6a.  After reviewing the history and the reasons for the enactment of the

FTAIA, the Court determined that "the words 'a claim' [] refer to the 'plaintiff's claim'

---

[2]      The Supreme Court did *not*, as Plaintiffs' Letter here states, remand "for further
proceedings to determine whether the foreign injury in *Empagran* was independent of the
domestic anticompetitive effect."  Taffet Letter, Ex. 2 at 3.  That determination could be made *if*
the Court finds, as a matter of law, that such a claim would be cognizable under the Sherman Act.
But no court has made any such finding yet – and as noted above, the Fifth Circuit already found
that such a claim is *not* legally cognizable under the Sherman Act.  Like the Fifth Circuit,
Defendants here believe that the characterization of effects as "independent" or "dependent" is
legally irrelevant, as neither is cognizable under the Sherman Act.

13

or 'the claim at issue,'" not to just anyone's claim. 124 S. Ct. at 2372. Critically, the Court's language makes clear that a plaintiff injured in overseas commerce may not rely upon someone else's harm in the United States.

This holding – which Plaintiffs never mention in their letter – is crucial to the application of *Empagran* to this case. The only remaining way that a plaintiff claiming that its supplier unlawfully set the prices for the sale of its goods *in India* might arguably satisfy the second prong of the FTAIA – that the claim is *his* claim, not just anyone's – is if domestic effects "*bring about* [his] foreign injury." *Id.* at 2371 (emphasis added). In other words, to use the Supreme Court's terminology, the foreign injury is "not independent" – i.e., it is *dependent* -- on the U.S. injury. *Id.* at 2370. For this to happen, the effects must flow *from* U.S. *to* foreign commerce, not the other way around. That is the remand issue in *Empagran*, and for good reason: if the harm simply flowed from foreign commerce to United States commerce, then a plaintiff could never show that some anticompetitive effect in the United States "*gives rise to*" that plaintiff's claim, as required by the FTAIA. 15 U.S.C. § 6a(2) (emphasis added). While the plaintiff's injury could be said to lead to domestic effects, it could not be said to have been caused by them. And if his injury was not *caused* by the injury in the United States, then *his* claim would not have *arisen* from them, as required by the FTAIA.

The Fifth Circuit dealt with this point in *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420 (5th Cir. 2001) – the very opinion endorsed by the Supreme Court in resolving the circuit split with *Kruman* (*see* 124 S. Ct. at 2364). Appellant Statoil, a Norwegian oil company drilling exclusively in the North Sea, sued a group of providers of heavy-lift barge services that had pled guilty to a global territorial allocation.

14

On appeal from the dismissal of its complaint, plaintiff made an argument much like that of Plaintiffs here:  that "the defendants operating in the Gulf of Mexico were able to maintain their monopolistic pricing only because of their overall market allocation scheme (which included agreements regarding operations in the North Sea), Statoil's injury in the North Sea was a 'necessary prerequisite to' and was 'the quid pro quo for' the injury suffered in the United States domestic market."  241 F.3d at 425.  The Fifth Circuit rejected this argument, concluding that Statoil had "fail[ed] to show that this effect on United States commerce in any way 'gives rise' to its antitrust claim."  *Id.* at 427.  The court held that, while

> there may be a connection and an interrelatedness between the high prices paid for services in the Gulf of Mexico and the high prices paid in the North Sea, the FTAIA requires more than a 'close relationship' between the domestic injury and the plaintiff's claim; it demands that the domestic effect 'gives rise' to the claim.

*Id.*  Even Statoil's attempt to characterize defendants' conduct as a single global conspiracy did not relieve it of its burden under the second prong of the FTAIA exception.  *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*  475 U.S. 574, 584 n.7 (1986) (rejecting similar global conspiracy assertion; "However one decides to describe the contours of the asserted conspiracy – whether there is one conspiracy or several – respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief").

This backdrop is critical, because in tailoring their claim to satisfy the now-defunct *Kruman* standard, Plaintiffs have pled themselves out of court.  Contrary to the *Empagran* remand issues, Plaintiffs' Complaint in this case alleges that the harm they suffered in India flowed *from* there *to* the United States, and did not *arise* from resale

price maintenance effects in the United States.  The First Amended Complaint alleges

that Defendants sought

> to ensure that prices charged by Plaintiffs to end-users in India for Products would
> not cause erosion to prices for the Products charged by UCC and Dow to end-
> users of Products in the United States as well as in other jurisdictions to which
> UCC and Dow sold Products from the United States.

First Am. Cmplt., Ex. 4, at ¶ 29.

This is no mere passing allegation in the Complaint; it was so important that

Plaintiffs persuaded this Court to rely upon it, repeatedly, in rendering multiple decisions

in this case.  In denying Defendants' motion for reconsideration of its ruling denying

Defendants' motion to dismiss for lack of subject matter jurisdiction, the Court quoted

this same language from Paragraph 29 of the First Amended Complaint.  2004 WL

556577, at *5.  Based on that language, this Court summarized Plaintiffs' theory:

> The amended complaint alleges a price fixing conspiracy for product sales in
> India that was intended to prevent erosion to prices and, in this way, maintain
> artificially high prices for products that Union Carbide and Dow sold to end-users
> in the United States.

2004 WL 556577, at *6.  The Court went on to declare, again in reliance on Plaintiffs'

pleadings and representations, that it was

> quite foreseeable . . . to conclude that a conspiracy to fix prices in the
> Indian market *might reasonably cause direct and substantial effects on the
> prices charged for the same products in the United States*.

*Id.* at *7 (emphasis added).  The Court *twice* repeated this same language in its June

decision (entered three days before *Empagran* was decided) denying Defendants' Motion

for Leave to Certify for Appeal.  Order at 2, 3 (June 11, 2004) (quoting above language).

Just this week, the Court again quoted Plaintiffs' allegations that the Defendants "sought

to 'ensure that'" plaintiffs' prices in India "'would not cause erosion to prices . . . in the

United States.'"  *Protective Order Ruling*, Slip Op. at 4.

16

Plaintiffs have seized on the Court's adoption of their description of the case:

> In reaching the conclusion that plaintiffs have met their burden of establishing subject matter jurisdiction over their antitrust claims, as it did in the September 12, 2003 Ruling, the Court in the March 18 Order first considered plaintiffs' Amended Complaint, and specifically pointed to the allegation that "defendants coerced the defendants into agreeing to fix the resale price of Union Carbide products in India, and that they did so in order to 'ensure that prices charged by [the] [p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users . . . in the United States as well as in other jurisdictions.'"

Pls. Opp. To Defs. Motion for § 1292(B) Certification of Order Denying Motion to Dismiss for Lack of Subject Matter Jurisdiction, at 4 (relevant pages attached as Ex. 5).

Having induced this Court to repeatedly deny Defendants' Motions by relying upon Plaintiffs' representations of harm from India to the U.S., all for the sake of satisfying the now-defunct *Kruman* standard, Plaintiffs are barred by the doctrine of judicial estoppel from reversing their story. *See New Hampshire v. Maine*, 532 U.S. 742 (2001) (holding New Hampshire estopped from changing its argument about the extent of its boundary after it had persuaded court to accept its earlier position).

This is a straightforward matter of pleading, not a matter of facts requiring any additional discovery. On its face, Plaintiffs' First Amended Complaint alleges a cause of action barred by the Supreme Court's decision in *Empagran*, because the "claim" Plaintiffs seek to assert is not their own, as required by the FTAIA: they allege harm flowing *from* India to the United States, not the other way around. They could not therefore derive their injury from some effect in the United States.

Significantly, Plaintiffs' Complaint does not allege or identify a single instance in which Defendants fixed the price (through resale price maintenance) of a Product sold to a customer here in the United States, and their repeated suggestions (*see, e.g.*, Taffet

Letter, Ex. 2 at 2; Pls. Opp. To Defs. Motion to Stay Proceedings Pending the United

States Sup. Ct's Decision in *F.-Hoffman-La Roche, Ltd. v. Empagran, S.A.*, at 10-11

(Feb. 13, 2004) (relevant portions attached as Ex. 6) that some products were

manufactured here, that prices were set by Defendants here and that title passed here are

all completely irrelevant to the FTAIA: the *effects* of the anticompetitive conduct – the

purported resale price maintenance agreement – were allegedly imposed upon Plaintiffs'

customers in India (the only place Plaintiffs were permitted to sell) and then allegedly

flowed to affect U.S. commerce, *not the other way around*.

Recall that earlier in the litigation, to circumvent this problem, Plaintiffs claimed

that they were not required to demonstrate any actual effect on U.S. commerce because

minimum resale price maintenance agreements are treated as *per se* violations of Section

1 of the Sherman Act.  *See* Plaintiffs' Answers to Defendants' First Set of Interrogatories

Related to Jurisdictional and Venue Issues at 7 (Nov. 6, 2002) (relevant pages attached as

Ex. 7) ("Such illegally fixed resale prices were established in Connecticut and had a *per

se* anticompetitive effect on competition within that State and throughout the United

States").  On reconsideration, this Court recognized that, contrary to Plaintiffs' positions,

anticompetitive effects on U.S. commerce "may not be *presumed* when jurisdiction is

contested," 2004 WL 556577, at *5 (citing *Dee-K Enters. v. Heveafil Sdn. Bhd.,* 299 F.2d

281, 292 (4th Cir. 2002)).  Accordingly, Plaintiffs relied upon the Court's declaration that

> "it is not a stretch in logic, and quite foreseeable, to conclude that a conspiracy to
> fix prices in the India market might reasonably cause direct and substantial effects
> on the prices charged for the same product in the United States."

Opposition to Defendants' Motion for § 1292(B) Certification of Order Denying Motion

to Dismiss for Lack of Subject Matter Jurisdiction at 4 (April 21, 2004) (citing 2004 WL

556577, at *6). These statements were consistent with Plaintiffs' earlier representation that "that defendants considered United States and other countries' prices when unlawfully fixing the prices to be charged to Indian end-users." Pls. Opp. To Defs. Motion to Reconsider Order Denying Motions to Dismiss Fed. Antitrust Claim for Lack of Subj. Matter Jurisd. at 22 (Feb. 6, 2004) (relevant pages attached as Ex. 8).

No amount of discovery can change Plaintiffs' pleadings and their representations to this Court that the immediate effect of resale price maintenance was imposed on India with an eye toward keeping prices at inflated levels in the United States. The flow of alleged harm, clearly, was from India to the United States. That kind of claim is exactly what *Empagran* bars, because Plaintiffs' claim does not, even remotely, *arise from* an effect on domestic commerce. Unless Plaintiffs are permitted to violate well-established rules of judicial estoppel – in addition to ignoring their own letters confirming that they could sell the Products "only to customers in India and not to customers in any other country in the world"[3] – their antitrust action must be dismissed.

### 3.    Plaintiffs Have Not and Cannot Allege that They Suffered Injury in United States Commerce.

Bereft of any effect that could trigger the Sherman Act, Plaintiffs allege generally that they were "deprived of the ability effectively to compete independently in the purchase of products for resale in the United States,[4] and in the resale of the Products

---

[3]      Neri Letter, Ex. 1, at 1.

[4]      As we have noted previously, Plaintiffs presumably meant this to say "the purchase of products *in the United States* for resale *in India.*" The Complaint itself alleges that plaintiffs' very reason for existence was for resale of UCC's products into India. *E.g.*, Complaint, ¶ 17 (MegaVisa Marketing Solutions was created '[t]o maintain access to the Indian market and to end-user customers in India,' in order 'to replicate the marketing service previously performed by UCC directly in India'). Plaintiffs allege nothing to suggest that they had contractual authority to
(cont'd)

19

from the United States to end users in India free of Defendants' price maintenance requirement." First Am. Cmplt., Ex. 4, at ¶ 55. These allegations get Plaintiffs nowhere, at least in terms of the FTAIA: a purported resale price maintenance agreement that forced Plaintiffs to sell Products in India at prices higher than they would have chosen does not satisfy any exception to the FTAIA. According to Plaintiffs themselves, the purported resale price maintenance agreement simply prevented worldwide prices from eroding as a result of a decline in Indian prices.

The other alleged injury, being "deprived of the ability effectively to compete independently in the purchase of products for resale in the United States," is not only absurd, but it finds no pleading support in Plaintiffs' Complaint. Had Union Carbide or Dow imposed any exclusive-purchasing obligation on Plaintiffs, or some other terms that impaired Plaintiffs' ability to obtain products from other sources, Plaintiffs conceivably could have alleged – albeit baselessly – that they could not purchase products from Defendants' competitors in the U.S.

But Plaintiffs have made no such allegation. Nowhere, in the Complaint or elsewhere, have they alleged anything even *suggesting* that they were restrained in any way from purchasing products in the United States from others. Plaintiffs never have alleged, and cannot allege, any fact that indicates that at any time they were under any obligation to purchase products exclusively from Union Carbide or Dow, because such an allegation would be untrue. Indeed, the suggestion that they could not "compete

---

(… cont'd)

sell the Products in *any* country other than India, let alone in the United States." Brief in Support of Defs.' Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) at 3 n.4 (Dec. 31, 2003) (Ex. 9). And this Court need not blind itself to the undisputed letters confirming that Plaintiffs could sell the Products "only to customers in India and not to customers in any other country in the world." *See supra* at 1.

independently in the purchase of products" is irreconcilable with the documentary evidence *Plaintiffs* have produced, which confirms that they were never under any restraint as to the source of the Products.[5]  Plaintiffs' counterfactual and conclusory claim of injury falls short of the non-conclusory, material factual allegations necessary to survive a motion to dismiss for lack of subject-matter jurisdiction.  *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (on motion to dismiss for lack of subject-matter jurisdiction, "we accept as true all material factual allegations in the complaint," but "argumentative inferences favorable to the party asserting jurisdiction should not be drawn"); *see also Sever v. Glickman*, 298 F. Supp. 2d 207, 272 (D. Conn. 2004) ("This conclusory statement, wholly unsupported by factual allegations, is simply insufficient to withstand a motion to dismiss") (citing *DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996))**.**

## II.    *Empagran* Is Consistent with Defendants' Pending Motion for Judgment on the Pleadings Based upon Plaintiffs' Lack of Standing.

Not surprisingly, the principles recently articulated by the Supreme Court in *Empagran* are consistent with well-established standing doctrine.  The requirement that a plaintiff's claim arise from the type of harm that Congress contemplated – that the injury be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful" – completely comports with these principles. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see Balaklaw v.*

---

[5]    In his June 27, 2000 letter to Sanjiv Sanghvi of Megavisa Solutions (S) Pte., Ltd, for example, UCAP's President Ron Neri indicates that any sale from UCAP to Megavisa "would be contingent on the continuing interest of Megavisa and Union Carbide."  Ex. 1, at M 0009.  And in a March 26, 1999 e-mail, Sharad Mirji of Megavisa warned UCAP's Dicky Leung that "though we prefer to work with Vinyl Chemicals on exclusive basis, the slow response from them is forcing us to look at other opportunities."  M 4216 (March 26, 1999) (Ex. 10).

*Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) ("[i]t is now well settled" that antitrust standing

requires antitrust injury)).  These principles require entry of judgment on the pleadings

with respect to Plaintiffs' antitrust claim here.  The injuries Plaintiffs claim to have

suffered "are not the consequence of any domestic anti-competitive conduct *that*

*Congress sought to forbid*."  *Empagran,* 124 S. Ct. at 2366.  To the contrary, these

alleged injuries are the product of conduct that "Congress sought to *release . . .* from

Sherman Act constraints."  *Id.*  Defendants therefore moved, pursuant to Fed. R. Civ. P.

12(c), that this Court grant them judgment on the antitrust claim on the ground that the

pleadings demonstrate as a matter of law that Plaintiffs have not suffered antitrust injury,

and thus do not have antitrust standing.  *See* Defs. Motion for Partial Judgment on the

Pleadings Pursuant to Fed. R. Civ. P. 12(c) (filed Dec. 31, 2003).

### III.    The Court Should Dismiss the Remaining Claims of Breach of Contract and Fraudulent Misrepresentation on *Forum Non Conveniens* Grounds.

A key factor in this Court's earlier decision not to dismiss on *forum non*

*conveniens* grounds was the Court's belief that Singapore was not an adequate alternate

forum to hear a private antitrust cause of action.  *See* Ruling on the Defs. Motion to

Dismiss for Forum Non Conveniens at 17 (April 17, 2003) ("*FNC Ruling I*").[6]  Now that

the Supreme Court has made clear in *Empagran* that this Court lacks subject matter

jurisdiction to adjudicate Plaintiffs' Sherman Act count, this factor vanishes, leaving no

good reason for retaining jurisdiction over Plaintiffs' remaining foreign law claims for

breach of contract and negligent misrepresentation.  All that is left is a commercial

---

[6]    The Court's denial of the renewed Motion to Dismiss in March 2004 adopted "the same
reasons set forth in the April 17, 2003 decision."  Denial of Defs. Renewed Motion for Dismissal
on Grounds of Forum Non Conveniens (April 23, 2003) ("*FNC Ruling II*").

dispute between Plaintiffs and the Asian subsidiaries of Union Carbide and Dow with which Plaintiffs dealt. The overwhelming contacts that these claims and their resolution have to Singapore demonstrate that the Court should exercise its discretion to dismiss them so that they may be adjudicated there.

### A.    The Relevant Standard

"The common law has long permitted dismissal of suits where jurisdiction and venue are proper, but another forum is substantially more convenient." *Capital Currency Exch. N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 606 (2d Cir. 1998). Motions to dismiss on *forum non conveniens* grounds "'lie[] wholly within the broad discretion of the district court.'" *FNC Ruling I*, at 9 (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001), and *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)).

As with the FTAIA exception discussed above, a two-pronged analysis governs *forum non conveniens* motions. "First, a court must determine whether an adequate alternative forum exists." *FNC Ruling I*, at 10 (citing *Capital Currency Exch.* 155 F.3d at 609, and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). As this Court observed, "'An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'''" *FNC Ruling* I, at 10 (quoting *Capital Currency Exch.* 155 F.3d at 609, and *Piper Aircraft*, 454 U.S. at 254 n.22).

Next, "[i]f a court concludes that an adequate alternative forum exists, it must then weigh the private and public factors identified in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ('the *Gilbert* factors') to determine which forum 'will be the most convenient

and will best serve the ends of justice.'" *FNC Ruling* I, at 10 (quoting *Capital Currency Exch.* 155 F.3d at 609). "'The private interest factors enumerated in *Gilbert* include: (1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of [the] premises; and (5) all other factors that might make the trial quicker or less expensive.'" *FNC Ruling I*, at 10-11 (quoting *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29-30 (2d Cir. 2002) (citations omitted). The public-interest *Gilbert* factors are "'(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law.'" *FNC Ruling I*, at 11 (quoting *DiRienzo*, 294 F.3d at 31 (citations omitted)).

### B.    With the Dismissal of the U.S. Antitrust Claim, Singapore is an Adequate Forum.

In its original denial of Defendants' motion to dismiss on *forum non conveniens* grounds, the Court concluded that "the 'essential subject matter' of the contract, fraud and other common law tort causes of action can be addressed adequately by a Singapore court. *FNC Ruling I* at 15-16 (quoting *Capital Currency Exch.* 155 F.3d at 611). Still, the Court concluded that Singapore was not an adequate alternative forum because "Singapore purportedly does not recognize any causes of action for antitrust injury," and Plaintiffs therefore "would have 'no remedy at all' for the defendants' alleged resale price fixing." *FNC Ruling I*, at 17 (quoting *DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir. 2000)). In addition, the Court observed that neither Dow nor Union Carbide

had at that time "offered voluntarily to consent to the jurisdiction of the Singapore courts," although it noted that this was "not necessarily fatal" to the motion. *Id.* at 13.

However, once the Court has dismissed Plaintiffs' U.S. antitrust claim, these two inadequacies will have vanished. The unavailability of an antitrust claim in Singapore ceases to be relevant to Singapore's adequacy as a forum; Plaintiffs will not be able to pursue antitrust relief in either forum in any event. Determinative on that score is the Court's conclusion that a Singapore court could adequately address Plaintiffs' remaining claims for breach of contract and negligent misrepresentation. *FNC Ruling I*, at 15-16. Moreover, as Defendants have indicated to the Court, Dow and Union Carbide would consent to personal jurisdiction in Singapore as a condition for the dismissal of this case. *See* Defs. Mem. in Support of Motion to Modify the Court's Ruling of April 17, 2003 Denying Defs. Forum Non Conveniens Motion (May 1, 2003), at 6-7. As the Court has recognized, this is sufficient to make the alternative forum adequate with respect to service. *FNC Ruling I*, at 13-14.

     **C.**    **The *Gilbert* Factors Now Weigh in Favor of Singapore.**

When the Court first denied Defendants' Motion to Dismiss on *Forum Non Conveniens* Grounds in April 2003, it held that "[a] weighing of the *Gilbert* factors . . . supports [the] conclusion" that "defendants have failed to establish that litigation in a Singapore court would be significantly more convenient and in the best interests of justice." *Id.* at 17-18. Of the three private-interest *Gilbert* factors the Court considered, two – access to evidence and cost of witness attendance – appear to have been neutral as between Connecticut and Singapore, but the Court found that the witness-availability factor "points in favor of maintaining the suit" in Connecticut. *Id.* at 20. Examining the

public-interest factors, the Court concluded that "the local interest in this dispute is sufficient to warrant litigation in this forum," and that the prospect of having to apply foreign law to plaintiffs' contract and tort claims "'is not sufficient to dismiss under the doctrine of *forum non conveniens*.'" *Id.* at 23 (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 169 (2d Cir. 1991).

Now, however, once the Court dismisses Plaintiffs' U.S. antitrust claim, the matter's center of gravity will shift back to Asia. The breach of contract claim will focus on the transaction-by-transaction dealings between Plaintiffs and their counterparties at UCAP and, later, Dow Singapore, and Dow India. Similarly, the negligent misrepresentation claim will center on Plaintiffs' interactions with the personnel at Dow's Asian subsidiaries who were responsible for dealing with Plaintiffs and evaluating them as a business partner. Union Carbide and its Connecticut employees will have especially slight significance with respect to this latter claim.[7] In fact, Union Carbide itself is no longer located in Connecticut, having moved its corporate headquarters to Houston, Texas.[8] Consequently, once the antitrust claim is dismissed, only a small number of witnesses relevant to the remaining claims will be found in Connecticut, or even North America.

Since the Court first denied Defendants' *forum non conveniens* motion, it determined that Singapore law will govern the breach of contract claim (283 F. Supp. 2d at 699), and Indian law will govern the negligent misrepresentation claim. *Id.* at 705.

---

[7]     The significance of the foreign based subsidiaries is confirmed by the Taffet Letter, which emphasizes the importance of obtaining information known only by the U.S. Defendants' subsidiaries or affiliates, who in this case are located overseas. Ex. 2, at 4.

[8]     *See* http://www.dow.com/../ucc/locations/hstncorp.htm.

The dismissal of the one claim in this case governed by U.S. law will leave the Court in a position where it will be applying exclusively non-U.S. law to a record that will have to be developed through testimony from a range of Indian and Singaporean witnesses presently or formerly affiliated with UCAP and Dow Singapore, and from the employees of Plaintiffs, who, to Defendants' knowledge, have no further presence in the United States. The tremendous expense entailed in obtaining this testimony so that a Connecticut forum may apply Indian and Singaporean law, and *only* Indian and Singaporean law, to resolve an Asian business dispute, would place an unreasonable burden on Defendants. Especially with Union Carbide now being headquartered in Texas, this burden is not justified by any public interest that the State of Connecticut will have in the outcome of this dispute.

As the home of two of the three Plaintiffs – and of the real parties in interest in this matter – the site of much of the conduct surrounding both the contract and negligent misrepresentation claims, and the source of the law that would decide the contract claim even were it to remain in this Court, Singapore is the proper forum for the resolution of this dispute once the antitrust claim is dismissed. As this Court is aware, there has already been a related proceeding there, in which Dow Chemical Pacific (Singapore) Pte Ltd. sued Megavisa Solutions (Singapore) Pte Ltd. for payment of over $1 million in unpaid invoices for products sold and delivered between October 2001 and March 2002. The Singapore courts are well equipped to adjudicate Plaintiffs' claims. Therefore, if the Court dismisses the U.S. antitrust claim, it should dismiss the two remaining claims so that they may be adjudicated in a Singapore proceeding.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should dismiss the antitrust claim

pursuant to Federal Rule of Civil Procedure 12(b)(1), and then dismiss the remaining

claims for breach of contract and negligent misrepresentation on *forum non conveniens*

grounds.


Dated:  July 1, 2004                          Respectfully submitted,


_____

Craig A. Raabe (ct 04116)          Andrew S. Marovitz (ct 25409)
Edward J. Heath (ct 20992)         Dana S. Douglas (ct 25412)
ROBINSON & COLE LLP                MAYER, BROWN, ROWE & MAW LLP
280 Trumbull Street                190 South La Salle Street
Hartford, CT  05103-3497           Chicago, Illinois  60603
(860) 275-8304                     (312) 782-0600

                                   Christopher J. Kelly (ct 25410)
                                   MAYER, BROWN, ROWE & MAW LLP
                                   1909 K Street, N.W.
                                   Washington, D.C.  20006-1157
                                   (202) 263-3000


*Counsel for Defendants The Dow Chemical Company,*
*Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

1229589

28