**EXHIBIT 1**

12/07 2000 WED 13.19 FAX                                                    ⬚001/002

ATTN: MR. AJAY MITTAL

Rgd.

SANJIV   1/2



**UNION CARBIDE ASIA PACIFIC, INC**
(INCORPORATED IN U.S.A WITH LIMITED LIABILITY)
ASIA PACIFIC HEADQUARTERS

*Ron Neri*
*President*

27 June 2000

Mr Sanjiv Sanghvi
Director
Megavisa Solutions (S) Pte Ltd
No. 3 Shenton Way
#07-04 Shenton House
SINGAPORE 068805

Dear Mr Sanghvi

This is to confirm Union Carbide's interest in selling to as its distributors to M/s. Megavisa Solutions (S) Pte Ltd. (Megavisa) effective as of 1ˢᵗ July 2000, certain of Union Carbide's products for resale by Megavisa to customers located in India.

Each such sale, of course, would be contingent upon the continuing interest of Megavisa and Union Carbide and a mutual agreement on specific terms including volume, specifications, price, payment and delivery. However, certain aspects of our dealings should be consistent such as the following:

- Unless otherwise specified by the parties, all shipments under this contract shall be made on Megavisa's behalf and in Megavisa's name as shipper. Megavisa shall have title to product and shall bear all risks associated with product from the time when product has effectively passed the ship's rail at the point of shipment.

- Unless otherwise requested by Megavisa, Union Carbide will arrange ocean transportation with its usual carriers. The issue as to which party bears the cost of such transportation shall be negotiated on a case by case basis.

- Megavisa purchase price will customarily include a mutually acceptable reseller's discount that will be established based on the product, volumes, etc.

- Megavisa will consign and sell all the products, as supplied by Union Carbide Corporation and its affiliates only to the customers in India and not to customers in any other country in the world. If Megavisa sells any of these products in any countries outside of India, the Distributorship arrangement with Megavisa will forthwith be terminated without any notice.

We recognize that there may be instances when it is more economical or otherwise efficient for Megavisa to purchase products from the stock of the appropriate Union Carbide affiliate in the Asia Pacific region than is Union Carbide Asia Limited in Hong Kong. In such cases, Union Carbide will recommend to its affiliate that it follows the same protocol set forth in this letter.

**M 0009**

8 Shenton Way #22-01 Temasek Tower Singapore 068811  Tel (65) 322 9936  Fax (65) 225-1815

Megavisa Solutions (S) Pte Ltd                                    Page 2

2/2

There also may be instances where Union Carbide will elect not to sell Megavisa a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer. However, we trust that we will be in agreement on the vast majority of such instances.

This agreement will commence with immediate effect and shall continue in effect for one year and thereafter unless terminated by Union Carbide in its sole discretion on ninety days prior written notice.

We sincerely look forward to developing a mutually beneficial relationship in the days ahead.

Very truly yours,
UNION CARBIDE ASIA PACIFIC INC

RON NERI

**EXHIBIT 2**

BINGHAM McCUTCHEN

Richard S. Taffet
Direct Phone: (212) 705-7729
Direct Fax:    (212) 702-3603
richard.taffet@bingham.com
Our File No.:  307574

Bingham McCutchen LLP
399 Park Avenue
New York, NY
10022-4689

212.705.7000
212.752.5378 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

June 22, 2004

**Via Overnight Delivery**

Honorable Alfred V. Covello
Chief United States District Judge
District of Connecticut
450 Main Street
Hartford, CT  06103

**Re:  MM Global Services, et al. v. The Dow Chemical Co., et al.,
No. 3:02CV1107 (AVC)**

Dear Judge Covello:

We are writing to inform the Court of additional developments relating to discovery in this case since Mr. Marovitz's June 14, 2004 letter requesting the July 1, 2004 conference. These developments concern further unfounded objections by defendants to legitimate discovery in this case, in this instance pursuant to Rule 30(b)(6). (Plaintiffs' Rule 30(b)(6) Notices, dated May 18, 2004, are attached as Ex. A hereto.) We believe it is important to bring these matters to the Court's attention for purposes of the July 1 conference, particularly while the parties' discovery motions on many of the same issues are pending.

More particularly, by letter dated June 14, 2004 (attached as Ex. B), defendants assert numerous objections to plaintiffs' Rule 30(b)(6) Notices. Their overarching objection is that the Supreme Court's recent decision in *Empagran* renders plaintiffs' antitrust discovery irrelevant and causes there to be "no just reason" for this Court to hear the remaining case. Defendants have since further advised that they do not believe it would be appropriate to engage in substantive discovery, which can only be interpreted to mean they are refusing to produce *any* Rule 30(b)(6) witness.

Defendants' objections, and the arguments they make in support of them, are without merit, and reflect nothing more than the latest in what has become an unending series of obstructionist tactics intended despite repeated Court orders to the contrary to preclude plaintiffs from proceeding with discovery and allowing this case to get ready for trial.

**EMPAGRAN IS NOT CONTROLLING**

Defendants wrongly insist that this case cannot proceed based upon the Supreme Court's recent decision in the *Empagran* case. Defendants' position, however, cannot be

The Honorable Alfred V. Covello
June 22, 2004
Page 2

premised on what the Supreme Court wrote in that decision.  As we have previously explained to this Court (*see, e.g.,* my letter to the Court dated March 17, 2004), this case is very different than the situation addressed in *Empagran*.  That case involved wholly foreign players, wholly foreign conduct and wholly foreign injury.  In contrast:

- The defendants here are *all* U.S. companies and one of the plaintiffs (MM Global Services, Inc.) is a U.S. company.  Moreover, the other two entities that were named as defendants (Union Carbide Customer Services Pte. and Dow Chemical Pacific (Singapore) Pte., Ltd.)[1] are alleged in the Amended Complaint to have acted as agents for or at the direction and under the control of Union Carbide Corporation and Dow Chemical.

- Substantial conduct giving rise to plaintiffs' claims took place in the United States.  In particular, the products purchased by plaintiffs from Union Carbide and later Dow were manufactured in the United States; plaintiffs' orders for such products were processed in the United States; decisions to fill or not to fill plaintiffs' orders were made by defendants in the United States; the prices at which plaintiffs were permitted to resell the products were fixed in the United States by defendants; plaintiffs took possession of the products from Union Carbide and later Dow in the United States; title and risk of loss for such products passed to plaintiffs in the United States, and plaintiffs shipped the products to their customers from the United States.

- Plaintiffs have pleaded and presented evidence that at this juncture, at the very least, as the Court has twice stated, "present[s] a compelling case going far beyond speculation of direct, substantial and foreseeable effects" on prices in the United States from the price fixing conspiracy.  *See MM Global v. Dow*, 2004 WL 556577, at *6 (D. Conn. Mar. 18, 2004); *id.* Order Denying Motion for Leave to Certify for Appeal, June 11, 2004 (June 11 Order), at 2.

Defendants' continuing attempts to simply ignore the differences between this case and *Empagran* are inexplicable under any standard of good faith.  They simply cannot fit the round peg of this case into the square hole of *Empagran*.

The Supreme Court's decision confirms this conclusion.  At the outset the Supreme Court states that "[w]e here focus upon anticompetitive price-fixing activity that is *in significant part foreign*, that causes some domestic antitrust injury, and that *independently causes separate foreign injury*."  (Decision at 1, emphasis added.)  The Court then further explains – "To clarify: The issue before us concerns (1) *significant foreign anticompetitive conduct* with (2) an adverse domestic effect and (3) an *independent foreign effect giving rise to the claim*.  (Decision at 2, emphasis added.)

Bingham McCutchen LLP
bingham.com

---

[1]    These two parties were dismissed for lack of personal jurisdiction, but plaintiffs' motion for reconsideration of that order remains pending.

The Honorable Alfred V. Covello
June 22, 2004
Page 3

Bingham McCutchen LLP
bingham.com

Whether the substantially foreign conduct *independently* causes foreign injury that is *separate* from the adverse domestic effect, the Supreme Court says is determined by whether "the conduct's domestic effects *did not help* bring about the foreign injury." (Decision at 19, emphasis added.)

Thus, the Supreme Court expressly did not even address the type of significant domestic anticompetitive conduct as exists in this case, and certainly did not have before it the pleading and evidence that this Court has already held make it "quite foreseeable that a conspiracy to fix prices in the Indian market might reasonably cause direct and substantial effect on the prices charged for the same products in the United States." *MM Global v. Dow*, 2004 WL 556577, at *6; June 11 Order at 2. To the contrary, the Supreme Court expressly left undecided the critical issue in this case: where the limits of jurisdiction under the FTAIA lie (assuming the conduct in question here was foreign, which it is not) when the alleged foreign injury is not "independent" of the domestic harm. (Decision at 18-19.)

In these circumstances, even though defendants will no doubt advise the Court on July 1 that they are going to file yet more motions arguing the controlling nature of *Empagran* and that merits discovery here would be wasteful, such an argument will be as baseless as their prior arguments invoking *Empagran*. Indeed, if anything, the Supreme Court's decision, especially by remanding for further proceedings to determine whether the foreign injury in *Empagran* was independent of the domestic anticompetitive effect, compels the need for the discovery plaintiffs are seeking regarding competitive issues, not only in their document requests and interrogatories (which are subject to the pending motions before the Court), but also by their Rule 30(b)(6) Notices.[2]

**DEFENDANTS' OTHER OBJECTIONS EQUALLY LACK A GOOD FAITH BASIS**

Defendants' other objections equally reflect defendants' patent bad faith intention to do everything possible to preclude merits discovery in this case.

For example, defendants object to certain Rule 30(b)(6) subject areas on the ground of relevance even though the subject matters are directly pertinent to plaintiffs' contract and tort claims and address issues that have been previously raised by defendants and rejected by the Court in denying defendants' motions to dismiss those claims. Accordingly,

---

[2]    This is true, for example and without limitation, in connection with Subjects 2, 14, 17, 20, 21, 24, 25, 27, 29 and 30 of the Rule 30(b)(6) Notices. Each of these subject matters goes to issues of competition, and the relationship between plaintiffs' inability to sell products in India at prices other than as fixed by defendants and the anticompetitive effects in the United States resulting from the same domestic price fixing conduct that gave rise to plaintiffs' foreign and domestic injury. Consistent with the Court's statement in its March 18 and June 11, 2004 Orders: "In the absence of additional discovery, it would be inappropriate to reach any conclusion" other than that defendants' domestic conduct caused domestic anticompetitive effects that are directly related to and dependent upon the injury caused defendants, including in India.

The Honorable Alfred V. Covello
June 22, 2004
Page 4

Subjects 1 – 7, 9, 10, 13, 18, 26, 28 – 30, *inter alia*, inquire of the relationship between and among the individual defendants and the other entities within their corporate family; the control by defendants over the business transactions conducted by them and their corporate affiliates; the manufacture of the products at issue; defendants' order entry processes; the placement, entry, processing, acceptance and fulfillment of plaintiffs' orders; defendants' forms of contract, invoices and purchase orders relating to the distribution of products; lawsuits involving plaintiffs' customers and defendants; communications between or among defendants and plaintiffs; and changes in the distribution of products to plaintiffs as the result of the Dow/Union Carbide merger.

In other words, these subject areas seek testimony concerning matters relating to the issues raised by defendants in motions to dismiss regarding the actual party with which plaintiffs contracted and the extent to which UCAP and the other corporate affiliates and subsidiaries of Union Carbide and Dow acted as agents for Union Carbide and Dow or assumed their corporate obligations. In its September 16, 2003 Order denying the motion by UCAP, UCCS and Dow Singapore to dismiss under Rule 12(b)(6), the Court stated that the motion as respects plaintiffs' breach of contract claim was denied "because the amended complaint alleges with sufficient[ ] particularity facts supporting the conclusion that UCAP, UCCS, and Dow Singapore were agents of Union Carbide and/or assumed Union Carbide's obligations in connection with the undertakings at issue." The motion was further denied as respects the negligent misrepresentation claim because the amended complaint alleges that UCAP, as well as UCCS and Dow Singapore, negligently communicated false information to plaintiffs, *at the direction of Union Carbide and Dow*. As a result, the Court held that "[d]ismissal of this claim prior to the conclusion of fact discovery and without more thorough briefing on principles of agency liability would be inappropriate."

In this circumstance, defendants' position that the subject matters identified above have no relevance to the issues of this case cannot be justified.

Defendants also assert objections based upon their (versus their subsidiaries' or affiliates') lack of "direct" knowledge regarding certain subject matters (*e.g.*, Subjects 11 and 12), that they had no "direct" dealings in connection with sales of products to customers in India (*e.g.*, Subjects 31 and 32), or that they lack information concerning subject matters that they have already been shown to be fully familiar with (*e.g.*, Subjects 14 – prices charged by plaintiffs to end users for products; 18 – disputes, including lawsuits, by end users in India concerning the availability, sale or delivery of products, including two specifically named end users; and 28 – communications between defendants, including their subsidiaries and affiliates, and end user customers of plaintiffs). Where as here the defendants' subsidiaries and affiliates are expressly alleged to have acted as agents for or under the direction of defendants, it is simply not a valid objection for defendants to hide behind their corporate form – they are obligated to produce 30(b)(6) deponents even where the relevant knowledge is possessed by their subsidiaries or affiliates and not by them directly. *See, e.g., Twentieth Century Fox Film*

Bingham McCutchen LLP
bingham.com

The Honorable Alfred V. Covello
June 22, 2004
Page 5

*Corp. v. Marvel Enterprises, Inc.*, No. 01 Civ. 3016, 2002 WL 1835439, at *2 and *4
(S.D.N.Y. August 8, 2002).[3]

Finally, defendants object to producing Rule 30(b)(6) witnesses on certain subjects
because they say that documents have already been produced on the subject (*e.g.*,
subjects 2, 7 and 16), and because they assert plaintiffs must first identify specific
documents relevant to the subject matter (*e.g.*, subjects 15 and 16). Rule 30(b)(6),
however, does not impose such an obligation upon the party serving the 30(b)(6) Notice,
or allow the noticed party to limit the scope of the 30(b)(6) deposition in such a manner.

CONCLUSION

In short, defendants' June 14 letter concerning the Rule 30(b)(6) depositions reflects their
continuing disregard of their discovery obligations and the Court's orders. It also
confirms that there is no limit to the extent they will go to obstruct legitimate merits
discovery.

For these reasons, we request the opportunity during the July 1 teleconference to discuss
with the Court the most efficient means for addressing this most recent discovery abuse
so as not to delay the Court's consideration of the pending discovery motions.

Respectfully,

Richard S. Taffet

Bingham McCutchen LLP
bingham.com

Attachments

cc:    Andrew S. Marovitz, Esq. (by overnight mail)
       Craig A. Raabe, Esq. (by overnight mail)
       Robert M. Langer, Esq. (by overnight mail)

---

[3]    The same principle requires defendants to not limit their production of documents and
answers to interrogatories only to themselves. They are obligated to provide such discovery
from their subsidiaries and affiliates as well. *E.g.*, *Dietrich v. Bauer*, No. 95 Civ. 7051, 2000
WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000) ("[n]umerous courts have concluded that a
parent corporation has a sufficient degree of ownership and control over a wholly-owned-
subsidiary that it must be deemed to have control over documents located with that
subsidiary"). *Accord Alden v. Time Warner, Inc.*, No. 94 Civ. 6109, 1995 WL 679238, at *2
(S.D.N.Y. Nov. 14, 1995). Nor can defendants sustain their objection where the knowledge
or other discovery is possessed by an indirect subsidiary are affiliate. *See Lethbridge v.
British Aerospace PLC*, No. 89 Civ. 1407, 1990 WL 194915, at *1 (S.D.N.Y. Nov. 28, 1990).

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

MM GLOBAL SERVICES INC., MM GLOBAL     :
SERVICES PTE. LTD., and MEGAVISA          :
SOLUTIONS (S) PTE. LTD.,                    :

                               :
                  Plaintiffs,       :    3:02 CV 1107 (AVC)

           -v-                         :
                               :

THE DOW CHEMICAL COMPANY, and       :
UNION CARBIDE CORPORATION, UNION     :
CARBIDE ASIA PACIFIC, INC., UNION CARBIDE   :
CUSTOMER SERVICES PTE LTD. AND DOW     :
CHEMICAL PACIFIC (SINGAPORE) PRIVATE
LTD.

                  Defendants.

## FIRST AMENDED COMPLAINT

     Plaintiffs MM Global Services Inc. ("MMGS"), MM Global Services Pte. Ltd.

("MMGS-S") and MegaVisa Solutions (S) Pte. Ltd. ("MVS") (collectively "Plaintiffs"), by their

attorneys Wiggin & Dana LLP and Thelen Reid & Priest LLP, for their First Amended

Complaint against defendants The Dow Chemical Company ("Dow"), Union Carbide

Corporation ("UCC"), Union Carbide Asia Pacific, Inc. ("UCAP"), Union Carbide Customer

Services Pte Ltd. ("UCCS") and Dow Chemical Pacific (Singapore) Private Ltd. ("Dow

Singapore") (collectively "Defendants") allege, upon knowledge as to themselves and otherwise

upon information and belief, as follows:

## NATURE OF THE ACTION

     1.     Plaintiffs bring this action to recover for the significant injuries they have

sustained, and continue to sustain, as the direct and proximate result of Defendants' improper

and unlawful acts relating to the sale by Defendants of chemical and polymer products (the

3.      Venue is proper in this jurisdiction under 28 U.S.C. §§ 1391(b) and (c) based

upon Defendants residing, transacting business and/or being found in this State, and because a

substantial part of the events and omissions giving rise to the claims alleged occurred in this

jurisdiction.

## PARTIES

### The Plaintiffs

4.      Plaintiff MMGS is a corporation organized and existing under the laws of Texas,

maintaining, at all relevant times, a principal place of business at 810 Highway, 6 South, Suite

202, Houston, Texas 77079. Commencing in 1993, MMGS purchased Products from UCC in

the United States and resold such Products to end-user customers in India.

5.      Plaintiff MMGS-S was a corporation organized and existing under the laws of

Singapore, maintaining a principal place of business at 63 Robinson Road, #02-03 Afro Asia

Building, Singapore 068894. During the period of 1993 through 2000, MMGS-S purchased

Products from UCC in the United States and resold such Products to end-user customers in India.

6.      Plaintiff MVS is a corporation organized and existing under the laws of

Singapore, maintaining a principal place of business 07-04 Shenton House, No. 3 Shenton Way,

Singapore 068805. In 2000, MVS commenced purchasing Products from UCC, and thereafter

from Dow, in the United States and resold such Products to customers in India.

7.      MegaVisa Marketing Solutions Ltd. (f/k/a Visa Petrochemicals Pvt Ltd.)

("MVMS") is a corporation organized and existing under the laws of India, maintaining a

principal place of business at Twin Arcade, 5th floor, "C" Wing, Military Road, Marol Maroshi,

Andheri (East), Mumbai 400 059 India. MVMS was established for the specific purpose of

promoting and selling the Products in India. Throughout the relevant period, MVMS acted on

behalf of MMGS, MMGS-S and MVS as their representative in facilitating the resale of the

3

end-users, including as respects freight forwarding services, storage and movement of Products and credit and payment terms for end-users, also were imposed by Defendants, and Plaintiffs were required to agree thereto.

28.     Defendants enforced and compelled Plaintiff's agreement to the minimum resale price and other sales requirements by refusing to accept orders placed by Plaintiffs and by canceling accepted orders unless Plaintiffs agreed to maintain the minimum resale prices required by Defendants.

29.     The minimum resale price maintenance agreement was established and imposed upon Plaintiffs with the full knowledge and at the direction of UCC's and Dow's corporate management, including those located at UCC's corporate headquarters in Connecticut. Enforcement of the resale price fixing agreement was undertaken by UCC and Dow directly and through Defendants' operational personnel in UCAP, UCCS and Dow Singapore, acting as representatives of UCC and Dow. At least since August, 1999 the resale price maintenance conspiracy was imposed at the urging and direction of Dow. At all times Defendants imposed the price requirements, *inter alia*, to ensure that prices charged by Plaintiffs to end-users in India for Products would not cause erosion to prices for the Products charged by UCC and Dow to end-users of Products in the United States as well as in other jurisdictions to which UCC and Dow sold Products from the United States.

30.     As a direct and proximate result of Defendants' fixing of minimum resale prices and other terms of sale, competition in the sale and resale of Products in and from the United States was improperly diminished and restrained, and as the result of such effect on competition Plaintiffs were injured by being precluded from effectively and fully competing and maximizing their sales of Products.

NY #520628 v1

to be resold at end-user prices that were no longer acceptable, and by Defendants compelling and coercing Plaintiffs' agreement thereto.

54.    Defendants' foregoing conduct has caused material and substantial harm to and has impaired competition, in the United States and in interstate commerce, by, *inter alia*, artificially increasing and maintaining prices for, or reducing the use or output of, the Products sold in the United States for resale, and by restraining trade in the resale of Products in the United States, and from the United States to markets outside the United States, including India.

55.    As a direct and proximate result of the foregoing anticompetitive effects, Plaintiffs have suffered injury to their business and property, including by being deprived of the ability effectively to compete independently in the purchase of products for resale in the United States, and in the resale of the Products from the United States to end-users in India, free of Defendants' price maintenance requirements, and by being required to resell the Products at artificially inflated prices directly caused by Defendants' unlawful and anticompetitive conduct.

56.    Defendants acted intentionally, deliberately, willfully and with full knowledge in fixing minimum resale prices at which Plaintiffs could resell the Products.

57.    As a direct and proximate result of Defendants' unlawful price fixing arrangement, Plaintiffs have suffered monetary damages in an amount to be determined at trial, but in all events not less than $3.5 million.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
## BREACH OF CONTRACT

58.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 53 above as if set forth here in full.

NY #520628 v1

**EXHIBIT 5**

178

4-21-04

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MM GLOBAL SERVICES, INC., MM GLOBAL      :
SERVICES PTE. LTD., and MEGAVISA         :     Civil No. 3:02 CV 1107 (AVC)
SOLUTIONS (S) PTE. LTD.,                      :
                                           :
       Plaintiffs,                     :
                                           :
         -v-                       :
                                           :
THE DOW CHEMICAL COMPANY, UNION       :     April 21, 2004
CARBIDE CORPORATION, UNION CARBIDE      :
ASIA PACTIFIC, INC., UNION CARBIDE         :
CUSTOMER SERVICES PTE. LTD., and DOW    :
CHEMICAL PACIFIC (SINGAPORE) PTE. LTD., :
                                           :
       Defendants.                    :
                                           :

## OPPOSITION TO DEFENDANTS' MOTION FOR § 1292(B) CERTIFICATION
## OF ORDER DENYING MOTION TO DISMISS
## FOR LACK OF SUBJECT MATTER JURISDICTION

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One CityPlace
185 Asylum Street
Hartford, CT 06103-3402
(860) 297-3724

BINGHAM McCUTCHEN LLP
Richard S. Taffet (ct 10201)
399 Park Avenue
New York, New York 10022-4689
(212) 705-7729

THELEN REID & PRIEST LLP
Paul A. Winick (ct 21813)
Alyson L. Redman (ct 25494)
875 Third Avenue
New York, New York 10022
(212) 603-2000

Attorneys for Plaintiffs MM Global Service, Inc., MM Global Services Pte. Ltd.,
and Megavisa Solutions (S) Pte. Ltd.

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 3

ARGUMENT .............................................................................................................. 6

    I.      Denial of Defendants' Motion to Dismiss Presents No Exceptional
          Circumstances Warranting Certification of Interlocutory Appeal .......................... 6

    II.     Defendants Fail to Meet the Requirements of § 1292(b) ........................................ 9

          A.     The March 18 Order Does Not Present a Controlling
                 Question of Law ..................................................................................... 9

          B.     There is "No Substantial Ground for Difference of Opinion"
                 Concerning the Standard for Determining the Direct, Substantial,
                 and Reasonably Foreseeable Effect of Defendants' Price Fixing
                 Conspiracy ........................................................................................... 12

          C.     Interlocutory Certification Will Not Advance the Termination of
                 the Litigation But Will Further Delay It ................................................ 17

CONCLUSION ........................................................................................................... 19

In reaching the conclusion that plaintiffs have met their burden of establishing subject matter jurisdiction over their antitrust claims, as it did in the September 12, 2003 Ruling, the Court in the March 18 Order first considered plaintiffs' Amended Complaint, and specifically pointed to the allegation that "defendants coerced the plaintiffs into agreeing to fix the resale price of Union Carbide products in India, and that they did so in order to 'ensure that prices charged by [the] [p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users . . . in the United States as well as in other jurisdictions.'"[1] The Court further quoted from the Amended Complaint that:

> [a]s a <u>direct</u> and proximate result of [the] [d]efendants fixing of minimum resale prices and other terms of sale, competition in the sale and resale of [Union Carbide] products in and from the <u>United States</u> was improperly diminished and restrained . . .[8]

Focusing on this alleged conduct — "conduct involving quite possibly the largest industrial chemical manufacturers in the world"[2] — the Court stated that "it is not a stretch in logic, and quite

---

[1]    *Id.*

[8]    *Id.* (emphasis added). *See also* 283 F. Supp. 2d at 698. In the March 18 Order the Court further stated that "[t]he amended complaint alleges a price fixing conspiracy for product sales in India that was intended to prevent erosion to prices and, in this way, maintain artificially high prices for products that Union Carbide and Dow sold to end-users in the United States." *Id.* at 11-12. The quotations from the Amended Complaint make clear, however, that not only do plaintiffs allege that such was defendants' intent, but also that they succeeded in achieving the intended effect on prices in the United States.

[2]    March 18 Order at 12.

4