NOV 14 2000 19:08 FR    N MILSTEIN                    23400001916102 P.30/4

Class Vitamins in the United States and elsewhere. Bioproducts, Inc., directly and through

affiliates that it controls, and through actions in this country and internationally, has set prices

and allocated markets pursuant to illegal horizontal agreements, and those horizontal practices

were designed to have, and in fact did have, a substantial and adverse impact within the United

States.

   69. Various other persons, companies and corporations, some of the identities of

which are presently unknown, and which are not named as defendants herein, have participated

as co-conspirators with defendants in the violations alleged, and have performed acts and made

statements in the United States and foreign nations, in furtherance thereof.


## BACKGROUND FACTS

   70. Vitamins are organic compounds required in the diet of humans and animals for

normal growth and maintenance of life. Vitamins are essential sources of certain coenzymes

necessary for metabolism, the biochemical processes that support life. All known vitamins have

been synthesized chemically, and various such synthesized vitamins are manufactured and sold

by defendants and their corporate co-conspirators.

   71. The manufacture of vitamins, vitamin premixes and other bulk vitamin products is

a multibillion dollar-a-year industry worldwide. For example, in 1995, global sales for vitamins

A, B2 and E were approximately $574 million, $139 million, and $1 billion, respectively.

   72. During the Class Period, the world market for vitamins, vitamin premixes,

intermediates, precursors and other bulk vitamin products, including the Class Vitamins, was

dominated by three companies: Roche, Rhone-Poulenc and BASF. For example, these

-29-

defendants control between 70 to 95 percent of the world vitamin market for Vitamins A, B2 and E. Roche, BASF, and Rhone-Poulenc together control over 95 percent of the worldwide markets for vitamins A and E.

73.     During the Class Period, the conduct of defendants and their co-conspirators has taken place in and affected the interstate commerce of the United States, the internal commerce of foreign nations, and international trade.

74.     The conduct of defendants and their co-conspirators has directly, substantially and foreseeably restrained such trade and commerce.

75.     The Class Vitamins of Defendants are sold in interstate commerce in the United States. For example, Roche sells in interstate commerce vitamins such as vitamin A (acetate and palmatate), vitamin B2 (riboflavin), B5 (pantothenic acid), B9 (folic acid), vitamin C, vitamin E (D-Alpha and DL-Alpha), beta carotene, and vitamin H (biotin). BASF sells in interstate commerce vitamins such as vitamin A (acetate and palmatate), vitamin C, vitamin E (D-Alpha and DL-Alpha), vitamin B2 (riboflavin), vitamin B9 (folic acid) and beta carotene. Rhone-Poulenc sells vitamin A (acetate and palmatate), vitamin B12 (cyanocobalamin), and vitamin E (D-Alpha and DL-Alpha). LONZA sells in interstate commerce vitamin B3 (niacin and niacinamide). DuCoa sells vitamin B4 in interstate commerce.

76.     The bulk vitamin industry in the United States and foreign nations is characterized by economic conditions that are consistent with the conspiracy alleged herein. The Class Vitamins are considered to be commodities; there is a relatively small number of producers of these vitamins; and there are high barriers of entry due to the costly and sophisticated nature of vitamin manufacturing.

NOV 14 2000 19:09 FR     IN MILSTEIN                              23400001916102 P.32/4

## CRIMINAL PLEAS/INFORMATIONS

77.     On May 20, 1999, F. Hoffmann-La Roche Ltd. ("Roche Ltd.") entered a Plea

Agreement in the United States District Court for the Northern District of Texas with respect to

which Roche Ltd. was required to pay a fine of $500,000,000 and admitted:

> (a)     During the period of January, 1990 through at least February, 1999, (the "relevant period"), Roche Ltd., through several of its executives, officers, and employees, participated in a conspiracy with other vitamin manufacturers, the primary purpose of which was to fix, increase, and maintain the price and allocate the volume of, certain vitamins sold in the United States and elsewhere, and to allocate the volume of, certain vitamins sold in the United States. In furtherance of the conspiracy, Roche Ltd., through a number of its executives, officers and employees, engaged in conversations and attended meetings with representatives of other vitamin manufacturers. During such meetings and conversations, agreements were reached as to the prices at which the conspirators would sell certain vitamins and the timing of price increases, and the volumes of certain vitamins they would sell in the United States and elsewhere. Further, agreements were reached as to the submission of rigged bids for award and performance of contracts to supply certain vitamin premixes to customers located throughout the United States.

> (b)     During the relevant period, vitamins that were the subject of this conspiracy and sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution thereof, as well as payments thereof, traveled in interstate and foreign commerce. The business activities of Roche Ltd. and its co-conspirators, in connection with the production and sale of the vitamins affected by this conspiracy, were within the flow of, and substantially affected, interstate and foreign trade and commerce.

78.     Dr. Kuno Sommer, a high-ranking Roche Ltd. official, who was required to pay a

$100,000 fine and served time in a U.S. federal prison, entered a Plea Agreement on May 20,

1999 in the United States District Court for the Northern District of Texas, in which Dr. Sommer

admitted:

> (a)     During the relevant time period, Dr. Kuno Sommer was first the North American Regional Manager for vitamins and subsequently, the Director of Worldwide Marketing of vitamins for Roche Ltd., a corporation organized and existing under the laws of Switzerland. During the relevant period, Roche Ltd. was a manufacturer of various vitamins used to enrich human food, pharmaceutical products, and animal feed in

the United States and elsewhere.  During the relevant period, Roche Ltd. and Dr. Kuno Sommer were engaged in the sale of these vitamins in the United States and elsewhere.

(b)    During the relevant period, the defendant participated in a conspiracy with other vitamin manufacturers, and their officers and employees, the primary purpose of which was to fix, increase, and maintain the price and allocate the volume of, certain vitamins sold in the United States and elsewhere and to allocate customers in the United States.  In furtherance of the conspiracy, the defendant engaged in conversations and attended meetings with representatives of other vitamin manufacturers.  During such meetings and conversations, agreements were reached as to the volumes of certain vitamins the conspirators would sell, and the prices at which they would sell certain vitamins in the United States and elsewhere.  Further, agreements were reached resulting in the submission of rigged and non-competitive bids for the award and performance of contracts to supply certain vitamin premixes to customers located throughout the United States.

(c)    During the relevant period, vitamins that were the subject of this conspiracy and sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution thereof, as well as payments therefor, traveled in interstate and foreign commerce.  The business activities of Roche Ltd., Dr. Kuno Sommer, and co-conspirators, in connection with the production and sale of the vitamins affected by this conspiracy, were within the flow of, and substantially affected, interstate and foreign trade and commerce.

(d)    Dr. Sommer admitted to perjury in relation to false statements made during an interview with law enforcement officials of the United States Department of Justice, Antitrust Division, on March 12, 1997, where he stated that there was no conspiracy among the world's leading vitamins manufacturers.

79.    On May 20, 1999, BASF A.G. entered a Plea Agreement in the United States

District Court for the Northern District of Texas in which BASF A.G. was required to pay a fine

of $225,000,000 and admitted:

(a)    During the relevant period, BASF A.G., through several of its executives, officers, and employees, participated in a conspiracy with other vitamin manufacturers, the primary purpose of which was to fix, increase, and maintain the price and allocate the volume of, certain vitamins sold in the United States and elsewhere, and to allocate the volume of, certain vitamins sold in the United States.  In furtherance of the conspiracy, BASF A.G., through a number of its executives, officers and employees, engaged in conversations and attended meetings with representatives of other vitamin manufacturers. During such meetings and conversations, agreements were reached as to the prices at which the conspirators would sell certain vitamins and the timing of price increases, and the volumes of certain vitamins they would sell in the United States and elsewhere.

-32-

NOV 14 2000 19:09 FR    N MILSTEIN                    T    3400001916102 P.34/4

Further, agreements were reached as to the submission of rigged bids for award and performance of contracts to supply certain vitamin premixes to customers located throughout the United States.

(b)     During the relevant period, vitamins that were the subject of this conspiracy and sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution thereof, as well as payments thereof, traveled in interstate and foreign commerce. The business activities of BASF A.G. and its co-conspirators, in connection with the production and sale of the vitamins affected by this conspiracy, were within the flow of, and substantially affected, interstate and foreign trade and commerce.

80.     An Information was filed on August 19, 1999, by the United States of America

against Dr. Roland Brönnimann, President of the Fine Chemical and Vitamin Division of Roche,

Ltd., alleging that:

(a)     Beginning in part at least as early as January 1990 and continuing in part until February 1999, the exact dates being unknown to the United States, the defendant's corporate employer, F. Hoffmann-La Roche Ltd. ("Roche"), and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the price and allocating the volume of certain vitamins manufactured by the defendant and its co-conspirators and sold by them in the United States and elsewhere, and to allocate customers for vitamin premixes sold in the United States. The combination and conspiracy engaged in by the defendant and co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The defendant joined and participated in the charged conspiracy from at least as early as Spring, 1991 until at least February 1999.

(b)     The charged combination and conspiracy:

i.     consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators regarding certain vitamins manufactured by corporate conspirators and sold by them in the United States and elsewhere, the substantial terms of which were to:

(1)     fix, increase, and maintain prices and to coordinate price increases for the sale of such vitamins in the United States and elsewhere;

(2)     allocate among the corporate conspirators the volume of sales and market shares of such vitamins in the United States and elsewhere; and,

-33-

(3)   allocate among corporate conspirators all or part of certain contracts to supply vitamin premixes to various customers located throughout the United States and to refrain from submitting bids, or to submit collusive, non-competitive and rigged bids, therefor;

ii.   involved a changing group of conspirators and affected a changing group of vitamins at various points in time during the period covered by this Information, its scope adjusting over time to the manufacturers producing certain vitamins and participating in the combination and conspiracy; and,

iii.   affected at least the following vitamins for the indicated time periods during the combination and conspiracy charged in this Information:

(1)   vitamins A and E sold in the United States and elsewhere, from January 1990 into February 1999;

(2)   vitamin B2 (Riboflavin) sold in the United States and elsewhere, from January 1991 into at least Fall 1995;

(3)   vitamin B5 (CalPan and/or pantothenic acid) sold in the United States and elsewhere, from January 1991 into at least December 1998;

(4)   vitamin C sold in the United States and elsewhere, from January 1991 into at least the late Fall 1995;

(5)   beta carotene sold in the United States and elsewhere, from January 1991 into at least December 1998; and,

(6)   vitamin premixes, precursors and intermediates sold to customers located throughout the United States, from January 1991 into at least December 1997.

(c)   For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do including, among other things:

## Vitamins

i.   participating in meetings and conversations in the United States and elsewhere to discuss the prices and volumes of vitamins A and E, vitamin B2, vitamin B5, vitamin C, and beta carotene sold in the United States and elsewhere;

ii.     agreeing, during such meetings and conversations regarding such
vitamins, to fix, increase, and maintain prices at certain levels in the
United States and elsewhere;

iii.    agreeing, during such meetings and conversations regarding such
vitamins, to allocate among the corporate conspirators the approximate
volume of such vitamins to be sold by them in the United States and
elsewhere;

iv.     exchanging sales and customer information for the purpose of
monitoring and enforcing adherence to the above-described agreements;

v.      issuing price announcements and price quotations in accordance
with the above-described agreements;

vi.     selling such vitamins at the agreed-upon prices and in accordance
with the agreed-upon sales volume allocations in the United States and
elsewhere;

<u>Vitamin Premixes</u>

vii.    participating in meetings and conversations in the United States
and elsewhere to discuss the submission of prospective bids for contracts
to supply vitamin premixes to various customers located throughout the
United States;

viii.   agreeing, during such meetings and conversations, which corporate
conspirator would be designated the low bidder for particular contracts to
supply vitamin premixes to various customers located throughout the
United States;

ix.     agreeing, during such meetings and conversations, on the prices to
be submitted by the designated low bidders for particular contracts to
supply vitamin premixes to various customers throughout the United
States;

x.      refraining from bidding, or submitting intentionally high,
complementary and non-competitive bids, for particular contracts to
supply vitamin premixes to various customers throughout the United
States; and

xi.     selling vitamin premixes to various customers throughout the
United States at rigged and non-competitive prices.

81.     An Information was filed on September 30, 1998, by the United States of

America against Lonza, A.G., alleging that:

(a) Beginning at least as early as January 1992 and continuing until at least March 1996, the exact dates being unknown to the United States, the defendant and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the price and allocating the volume of niacin and niacinamide sold in the United States and elsewhere. The combination and conspiracy engaged in by the defendant and co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

(b) The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were:

    i.    to agree to fix and maintain prices and to coordinate price increases for the sale of niacin and niacinamide in the United States and elsewhere;

    ii.    to agree to allocate among the corporate conspirators the volume of sales of niacin and niacinamide in the United States and elsewhere; and

    iii.    to agree to allocate among the corporate conspirators customers of niacin and niacinamide in the United States and elsewhere.

(c) For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do, including, among other things:

    i.    participating in meetings and conversations in the United States and Europe to discuss the prices and volume of niacin and niacinamide sold in the United States and elsewhere;

    ii.    agreeing, during those meetings and conversations, to charge prices at certain levels and otherwise to increase and maintain prices of niacin and niacinamide sold in the United States and elsewhere;

    iii.    agreeing, during those meetings and conversations, to allocate among the corporate conspirators the approximate volume of niacin and niacinamide to be sold by each corporate conspirator in the United States and elsewhere;

    iv.    agreeing, during those meetings and conversations, to allocate among the corporate conspirators customers of niacin and niacinamide in the United States and elsewhere;

    v.    exchanging sales and customer information for the purpose of monitoring and enforcing adherence to the above-described agreement; and

NOV 14 2000 19:11 FR    N MILSTEIN                    T.   23400001916102 P.38/4'

    vi.    issuing price announcements and price quotations in accordance
with the agreements reached.

82.    An Information was filed on September 9, 1999, by the United States of America

against Eisai Co., Ltd. ("Eisai Ltd."), alleging that:

    (a)    Beginning at least as early as January 1991 and continuing into at least
February 1999, the exact dates being unknown to the United States, the defendant and
co-conspirators entered into and participated in a combination and conspiracy to suppress
and eliminate competition by fixing the price and allocating the volume of vitamin E
manufactured by the defendant and its co-conspirators and sold by them in the United
States and elsewhere.  The combination and conspiracy engaged in by the defendant and
its co-conspirators was in unreasonable restraint of interstate and foreign trade and
commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

    (b)    The charged combination and conspiracy consisted of a continuing
agreement, understanding, and concert of action among the defendant and co-conspirators
regarding vitamin E manufactured by the corporate conspirators and sold by them in the
United States and elsewhere, the substantial terms of which were to:

    i.    fix, increase, and maintain prices and to coordinate price increases
for the sale of vitamin E in the United States and elsewhere; and,

    ii.    allocate among the corporate conspirators the volume of sales and
market shares of vitamin E in the United States and elsewhere.

    (c)    For the purpose of forming and carrying out the charged combination and
conspiracy, the defendant and co-conspirators did those things that they combined and
conspired to do including, among other things:

    i.    participating in meetings and conversations to discuss the prices
and volumes of vitamin E sold in the United States and elsewhere;

    ii.    agreeing, during such meetings and conversations regarding
vitamin E, to increase and maintain prices in the United States and
elsewhere;

    iii.    agreeing, during such meetings and conversations regarding
vitamin E, to allocate among the corporate conspirators the approximate
volume of vitamin E to be sold by them in the United States and
elsewhere;

    iv.    exchanging sales and customer information for the purpose of
monitoring and enforcing adherence to the above-described agreements;

    v.    issuing price announcements and price quotations in accordance
with the above-described agreements; and

vi.    selling vitamin B at increased prices and in accordance with the agreed-upon sales volume allocations in the United States and elsewhere.

83.    An Information was filed on September 9, 1999, by the United States of America against Daiichi Pharmaceutical Co., Ltd., alleging that:

(a)    Beginning at least as early as January 1991 and continuing into at least February 1999, the exact dates being unknown to the United States, the defendant and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the price and allocating the volume of vitamin B5 (CalPan) manufactured by the defendant and its co-conspirators and sold by them in the United States and elsewhere.  The combination and conspiracy engaged in by the defendant and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

(b)    The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators regarding vitamin B5 (CalPan) manufactured by the corporate conspirators and sold by them in the United States and elsewhere, the substantial terms of which were to:

    i.    fix, increase, and maintain prices and to coordinate price increases for the sale of vitamin B5 (CalPan) in the United States and elsewhere; and,

    ii.    allocate among the corporate conspirators the volume of sales and market shares of vitamin B5 (CalPan) in the United States and elsewhere.

(c)    For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do including, among other things:

    i.    participating in meetings and conversations to discuss the prices and volumes of vitamin B5 (CalPan) sold in the United States and elsewhere;

    ii.    agreeing, during such meetings and conversations regarding vitamin B5 (CalPan) to fix, increase, and maintain prices at certain levels in the United States and elsewhere;

    iii.    agreeing, during such meetings and conversations regarding vitamin B5 (CalPan) to allocate among the corporate conspirators the approximate volume of vitamin B5 (CalPan) to be sold by them in the United States and elsewhere;

    iv.    exchanging sales and customer information for the purpose of monitoring and enforcing adherence to the above-described agreements;

with the above-described agreements; and

      vi.    selling vitamin B5 (CalPan) at the agreed-upon prices and in accordance with the agreed-upon sales volume allocations in the United States and elsewhere.

84.    An Information was filed on September 9, 1999, by the United States of America against Takeda Chemical Industries, Ltd., alleging that:

    (a)    Beginning at least in early 1991 and continuing into at least Fall 1995, the exact dates being unknown to the United States, the defendant and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the price and allocating the volume of vitamins B2 and C manufactured by the defendant and its co-conspirators and sold by them in the United States and elsewhere. The combination and conspiracy engaged in by the defendant and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

    (b)    The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators regarding vitamins B2 and C manufactured by the corporate conspirators and sold by them in the United States and elsewhere, the substantial terms of which were to:

      i.    fix, increase, and maintain prices and to coordinate price increases for the sale of vitamins B2 and C in the United States and elsewhere; and

      ii.    allocate among the corporate conspirators the volume of sales and market shares of vitamins B2 and C in the United States and elsewhere.

    (c)    For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do including, among other things:

      i.    participating in meetings and conversations to discuss the prices and volumes of vitamins B2 and C sold in the United States and elsewhere;

      ii.    agreeing, during such meetings and conversations regarding vitamins B2 and C, to fix, increase, and maintain prices at certain levels in the United States and elsewhere;

      iii.    agreeing, during such meetings and conversations regarding vitamins B2 and C, to allocate among the corporate conspirators the approximate volume of vitamins B2 and C to be sold by them in the United States and elsewhere;

iv.    exchanging sales and customer information for the purpose of monitoring and enforcing adherence to the above-described agreements;

v.    issuing price announcements and price quotations in accordance with the above-described agreements; and

vi.    selling vitamins B2 and C at the agreed-upon prices and in accordance with the agreed-upon sales volume allocations in the United States and elsewhere.

85.    An Information was filed by the United States on May 5, 2000 against Degussa-Hüls AG alleging, among other things, that:

(a)    Beginning at least as early as January 1992 and continuing until at least March 1998, the exact dates being unknown to the United States, the defendant and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the price and allocating the volume of niacin and niacinamide sold in the United States and elsewhere. The combination and conspiracy engaged in by the defendant and co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

(b)    The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were:

i.    to agree to fix and maintain prices and to coordinate price increases for the sale of niacin and niacinamide in the United States and elsewhere;

ii.    to agree to allocate among the corporate conspirators the volume of sales of niacin and niacinamide in the United States and elsewhere: and

iii.    to agree to allocate among the corporate conspirators customers of niacin and niacinamide in the United States and elsewhere.

(c)    For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do, including, among other things:

i.    participating in meetings and conversations in the United States and Europe to discuss the prices and volume of niacin and niacinamide sold in the United States and elsewhere;

ii.    agreeing, during those meetings and conversations, to charge prices at certain levels and otherwise to increase and maintain prices of niacin nd niacinamide sold in the United States and elsewhere;

-40-

iii.    agreeing, during those meetings and conversations, to allocate among the corporate conspirators the approximate volume of niacin and niacinamide to be sold by each corporate conspirator in the United States and elsewhere;

iv.    agreeing, during those meetings and conversations, to allocate among the corporate conspirators customers of niacin and niacinamide in the United States and elsewhere;

v.    exchanging sales and customer information for the purpose of monitoring and enforcing adherence to the above-described agreement; and

vi.    issuing price announcements and price quotations in accordance with the agreements reached.

86.    An Information was filed by the United States on May 5, 2000 against Nepera, Inc, alleging, among other things that:

(a)    Beginning at least as early as January 1992 and continuing until at least March 1998, the exact dates being unknown to the United States, the defendant and co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the price and allocating the volume of niacin and niacinamide sold in the United States and elsewhere. The combination and conspiracy engaged in by the defendant and co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1). The defendant joined and participated in the charged conspiracy from at least as early as January 1992 until at least July 1995.

(b)    The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were:

i.    to agree to fix and maintain prices and to coordinate price increases for the sale of niacin and niacinamide in the United States and elsewhere;

ii.    to agree to allocate among the corporate conspirators the volume of sales of niacin and niacinamide in the United States and elsewhere; and

iii.    to agree to allocate among the corporate conspirators customers of niacin and niacinamide in the United States and elsewhere.

(c)    For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do, including, among other things:

i.    participating in meetings and conversations in the United States and Europe to discuss the prices and volume of niacin and niacinamide sold in the United States and elsewhere;

ii. agreeing, during those meetings and conversations, to charge prices
at certain levels and otherwise to increase and maintain prices of niacin
and niacinamide sold in the United States and elsewhere;

iii. agreeing, during those meetings and conversations, to allocate
among the corporate conspirators the approximate volume of niacin and
niacinamide to be sold by each corporate conspirator in the United States
and elsewhere;

iv. agreeing, during those meetings and conversations, to allocate
among the corporate conspirators customers of niacin and niacinamide in
the United States and elsewhere;

v. exchanging sales and customer information for the purpose of
monitoring and enforcing adherence to the above-described agreement;
and

vi. issuing price announcements and price quotations in accordance
with the agreements reached.

87. An Information was filed by the United States on May 5, 2000 against Merck

KGaA alleging, among other things, that:

(a) Beginning at least in early 1991 and continuing into at least Fall 1995, the
exact dates being unknown to the United States, the defendant and co-conspirators
entered into and participated in a combination and conspiracy to suppress and eliminate
competition by fixing the price and allocating the volume of vitamin C manufactured by
the defendant and its co-conspirators and sold by them in the United States and
elsewhere. The combination and conspiracy engaged in by the defendant and its co-
conspirators was in unreasonable restraint of interstate and foreign trade and commerce in
violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1).

(b) The charged combination and conspiracy consisted of a continuing
agreement, understanding, and concert of action among the defendant and co-conspirators
regarding vitamin C manufactured by the corporate conspirators and sold by them in the
United States and elsewhere, the substantial terms of which were to:

i. fix, increase, and maintain prices and to coordinate price increases
for the sale of vitamin C in the United States and elsewhere; and

ii. allocate among the corporate conspirators the volume of sales and
market shares of vitamin C in the United States and elsewhere.

(c) For the purpose of forming and carrying out the charged combination and
conspiracy, the defendant and co-conspirators did those things that they combined and
0conspired to do including, among other things:

i. participating in meetings and conversations to discuss the prices
and volumes of vitamin C sold in the United States and elsewhere;

ii.    agreeing, during such meetings and conversations regarding
vitamin C, to fix, increase, and maintain prices at certain levels in the
United States and elsewhere;

iii.   agreeing, during such meetings and conversations regarding
vitamin C, to allocate among the corporate conspirators the approximate
volume of vitamin C to be sold by them in the United States and
elsewhere;

iv.    exchanging sales and customer information for the purpose of
monitoring and enforcing adherence to the above-described agreements;

v.     issuing price announcements and price quotations in accordance
with the above-described agreements; and

vi.    selling vitamin C at the agreed-upon prices and in accordance with
the agreed-upon sales volume allocations in the United States and
elsewhere.

88.    In Canada on September 22, 1999, F. Hoffman-LaRoche Ltd. pleaded guilty to
price-fixing in violation of Canadian competition laws and was fined $48 million.  Executives
Dr. Roland Brönnimann and Andreas Hari also pleaded guilty and were both fined $250,000
respectively.  BASF A.G. pleaded guilty to price fixing and was fined $19 million.  Rhone-
Poulenc SA pleaded guilty to price-fixing and was fined $14 million.  Daiichi Pharmaceutical
Co. Ltd. pleaded guilty to price-fixing and was fined $2.5 million.  Eisai Co. Ltd. pleaded guilty
to price-fixing and was fined $2.5 million.  Chinook Group. Ltd. pleaded guilty to price-fixing
and was fined $2.25 million; Canadian pharmaceutical company Roussel Canada, Inc., a
subsidiary of Hoechst Marion Roussel, S.A., pleaded guilty and was fined $370,000 under
Canada's Competition Act for international price-fixing and market-sharing involving vitamin B-
12 between 1990 and 1997.

## THE CONSPIRACY

89.    Defendants' activities comprised an over-arching, worldwide conspiracy to raise,
stabilize and maintain the price of vitamins.  This over-arching conspiracy was comprised, in

NOV 14 2000 19:13 FR     N MILSTEIN                    1     23400001916102 P.45/4'

turn, of a series of narrower sub-conspiracies, each focused on one vitamin, or a small group of vitamins. Each sub-conspiracy involved the global market for each vitamin or series of vitamins. All of the conspiracies were typified by certain common characteristics and activities, as set forth below.

90.    The conspiracies generally were carried out with the knowledge and consent of some of the highest officials within defendants. These officials not only participated in the conspiratorial meetings, but also received oral and written reports regarding the conspiracies' activities and effects.

91.    The conspiratorial meetings among defendants generally were held at hotels.

92.    The conspiracies for each vitamin generally were initiated through an "ice-breaking meeting" at which defendants met to discuss the viability of a price-fixing conspiracy for a particular vitamin, each participant's share allocation of consumers and markets, and the mechanisms of the conspiracy. The parties subsequently communicated with regard to the conspiracies through follow-up meetings throughout the world, as well as through regular telephone contact.

93.    The locations of the face-to-face meetings to initiate and monitor the conspiracies included Toronto, Canada; Wilmington, Delaware (USA); Mexico City, Mexico; Ludwigshaven, Germany; Atlanta, Georgia (USA); Amsterdam; Bruge, Belgium; Jahor Bahru, Malaysia; St. Louis, Missouri (USA); Detroit, Michigan (USA); Chicago, Illinois (USA); and Paris, France.

94.    The conspiracies were characterized by the following type of agreements and activities:

       (a)    agreements to allocate portions of the relevant market;

NOV 14 2000 19:14 FR      N MILSTEIN                    23400001916102 P.46/4'

(b)     agreements to increase prices of the products, often to specific target levels, which generally were not cost-based;

(c)     agreements to establish specific pricing tiers based on volume of product purchased per year;

(d)     agreements to price contracts on a quarterly, not annual, basis to increase defendants' ability to raise prices;

(e)     agreements as to which defendant would announce a price increase first, and which publication's price increase announcement would constitute the "official" signal to raise prices;

(f)     agreements to allocate customers and geographic regions among defendants, which included maintaining the status quo with respect to existing customers (if clients got switched from one conspirator to another, the balance was adjusted by taking a client from that company without competition or through negotiations between the two companies);

(g)     sales personnel of the defendants would pursue viable business opportunities, only to be told by more senior management to drop the projects because other defendants would not let that company participate in the targeted market;

(h)     within the conspiracy, certain customers of a defendant were considered its "house" accounts and a competitor's accounts were "pass" accounts, meaning they were to be passed over and not bid on;

(i)     many of the conspiracies began as United States or North American conspiracies and grew into international conspiracies, which followed the same patterns

and displayed the same characteristics as those established in the United States/North American conspiracies;

    (j)    the international conspiracies generally lead to an agreement between the North American and European defendants for "peaceful co-existence" in which the North American companies agreed to leave the European vitamin markets and the European companies agreed to leave the North American vitamin markets;

    (k)    agreements to meet periodically after the initiation of a conspiracy to discuss, monitor, and correct the allocations and revenues being obtained through the conspiracy;

    (l)    agreements to exchange information regarding price quotes to customers and to confirm transaction prices with customers;

    (m)    destruction of documents reflecting the price-fixing, market-allocation and bid-rigging conspiracies when defendants feared that the conspiracies had been discovered by antitrust officials in North America and elsewhere;

    (n)    bribes to officials who threatened to expose the conspiracies;

    (o)    termination and other retaliation against officials or employees who would not participate in the conspiracies or who threatened to expose the conspiracies; and

    (q)    lying to governmental investigators about the conspiracies and their scope.

95.    Defendants exercised an extraordinary level of control not only over the entirety of the worldwide vitamins markets, but also over activities within their competitors' companies. For example, in March of 1993, a senior Roche executive called Lonza headquarters in Switzerland to complain that a United States sales representative of Lonza was calling on "Roche customers." The Lonza sales representative was compelled by his superiors to travel to Roche

NOV 14 2000 19:20 FR        N MILSTEIN                    1       27200001916102 P.02/1

headquarters to personally explain his actions and apologize for his conduct, which conduct had
threatened the conspiracy.

## CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ.

23(b)(3), as representatives of the following classes (the "Classes" or "Plaintiff Classes"):

    (a)     <u>Domestic Purchasers</u> - all persons and entities domiciled in the United

States who directly purchased Class Vitamins from any defendant or its co-conspirators

from January 1, 1988 through February 1999 ("the Class Period"), for delivery outside

the United States, excluding all governmental entities, defendants, their co-conspirators,

and their respective subsidiaries and affiliates;

    (b)     <u>Foreign Purchasers</u> - all persons and entities domiciled outside the United

States who directly purchased Class Vitamins from any defendant or its co-conspirators

from January 1, 1988 through February 1999 ("the Class Period"), for delivery outside

the United States, excluding all governmental entities, defendants, their co-conspirators

and their respective subsidiaries and affiliates.

97.     Members of each Class are numerous and joinder is impracticable.

98.     Plaintiffs' claims are typical of the members of the Classes. Plaintiffs and all

members of the Plaintiff Classes were damaged by the same wrongful conduct by defendants and

their co-conspirators.

99.     Plaintiffs will fairly and adequately protect and represent the interests of the

Plaintiff Classes. The interests of plaintiffs are coincident with, and not antagonistic to, those of

the Classes.

··

NOV 14 2000 19:21 FR    N MILSTEIN                    7    27200001916102 P.03/1

100.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

101.    Questions of law and fact common to the members of the Classes predominate over questions, if any, that may affect only individual members because defendants have acted on grounds generally applicable to the entirety of the Classes.  Such generally applicable conduct is inherent in defendants' collusion.

102.    Questions of law and fact common to the Classes include:

(a)    whether defendants and their co-conspirators combined, agreed, and conspired among themselves to fix, maintain, or stabilize prices of, and allocate markets for Class Vitamins;

(b)    the existence and duration of horizontal agreements to fix, maintain, or stabilize prices of, and allocate markets for, Class Vitamins;

(c)    whether each defendant was a member of, or participant in the contract, combination and/or conspiracy as alleged;

(d)    whether defendants and their co-conspirators took steps to conceal their conspiracy from the plaintiffs and the Classes;

(e)    whether and to what extent the conduct of defendants and their co-conspirators caused injury to the business or property of plaintiffs and the Plaintiff Classes, and if so, the appropriate measure of damages;

(f)    whether the agents, officers or employees of defendants and their co-conspirators participated in telephone calls and meetings in furtherance of the conspiracy as alleged; and

-40-

NOV 14 2000 19:21 FR          N MILSTEIN                    1     27200001916102 P.04/1:

(g)     whether plaintiffs and members of the Classes are entitled to declaratory and/or injunctive relief.

103.     Class action treatment is the superior (if not the only) method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons around the world to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in management of this class action.

**Fraudulent Concealment**

104.     Plaintiffs did not discover and could not discover, through the exercise of reasonable diligence, the existence of the claims sued upon until recently because defendants and their co-conspirators actively, intentionally and fraudulently concealed the existence of the combination and conspiracy from plaintiffs by one or more of the following affirmative acts, including acts in furtherance of the conspiracy:

(a)     covert meetings in the United States and foreign nations in which the prices, sales, volumes of sales and markets for Class Vitamins were discussed and agreed;

(b)     allocating secretly among themselves customers and contracts for the sale of Class Vitamins;

(c)     intentionally submitting inflated bids to customers to make other bids appear legitimate;

(d)     intentionally bidding purportedly on a competitive basis when such bid was the result of collusion;

(e)     offering improper payments to witnesses who have knowledge of the existence of the conspiracy to keep them silent;

(f)     instructing members of the conspiracy at conspiracy meetings not to divulge the existence of the conspiracy to others not in the conspiracy;

(g)     confining the anticompetitive, unlawful plan to a small number of people and officials at each defendant company;

(h)     conducting covert telephone calls in the United States and foreign nations;

(i)     creating documents in the ordinary course of defendants' businesses without reference to conduct that constitutes an antitrust violation or anticompetitive action; and

(j)     participating in meetings and conversations to monitor and enforce adherence to the agreed-on prices and market shares.


## INJURY TO PLAINTIFFS AND THE CLASSES

105.     This combination and conspiracy has had the following effects, among others:

(a)     the price of Class Vitamins has been fixed, raised, maintained and stabilized at artificial and non-competitive levels;

(b)     buyers of Class Vitamins, including plaintiffs (and the Plaintiff Classes), have been deprived of free and open competition in the purchase of Class Vitamins; and

(c)     competition in the sale of Class Vitamins has been restrained.

NOV 14 2000 19:22 FR ... N MILSTEIN                1 ...  27200001916102 P.06/1:

106.    During the Class Period, plaintiffs have purchased Class Vitamins from defendants and others. By reason of the alleged violations set forth herein, plaintiffs paid more for Class Vitamins products than they would have paid in the absence of the illegal combination and conspiracy and, as a result, they have been injured in their business and property and have suffered damages in an amount presently undetermined.

**COUNT I**
**VIOLATION OF SHERMAN AND CLAYTON ACTS**
**(ON BEHALF OF DOMESTIC AND FOREIGN PURCHASERS)**

107.    Plaintiffs incorporate the allegations described in Paragraphs 1 through 105 above as if fully set forth herein.

108.    During the Class Period, defendants sold and shipped substantial quantities of Class Vitamins in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such products across state and national boundaries. Defendants' activities, and the sale of their products, have both taken place, and have had a substantial anticompetitive effect upon, interstate commerce within the United States and foreign commerce.

109.    Defendants' anticompetitive activities and their effects are in violation of both the Sherman and Clayton Acts.

110.    Defendants' anticompetitive activities and their effects have caused injury to the Plaintiff Classes both inside the United States and in foreign nations.

111.    Plaintiffs and the Plaintiff Classes seek damages for these injuries, injunctive relief, and any such other relief that the Court deems necessary and appropriate.

## COUNT II
## ~~VIOLATION OF FOREIGN ANTITRUST LAWS~~
## (ON BEHALF OF FOREIGN PURCHASERS)

112.    Plaintiffs incorporate the allegations described in Paragraphs 1 through 110 above as if fully set forth herein.

113.    During the Class Period, defendants sold and shipped substantial quantities of Class Vitamins in a continuous and uninterrupted flow of foreign commerce. Defendants received payment for such products across national boundaries. Defendants' activities, and the sale of their products, have both taken place, and have had a substantial anticompetitive effect upon, foreign commerce.

114.    Defendants' anticompetitive activities and their effects are in violation of the competition laws of the relevant foreign nations.

115.    Defendants' anticompetitive activities and their effects have caused injury to the Plaintiff Classes in foreign nations.

116.    Plaintiffs and the Plaintiff Classes seek damages for these injuries, injunctive relief, and any such other relief that the Court deems necessary and appropriate.

## COUNT III
## VIOLATION OF INTERNATIONAL LAW
## (ON BEHALF OF FOREIGN PURCHASERS)

117.    Plaintiffs incorporate the allegations described in Paragraphs 1 through 115 above as if fully set forth herein.

118.    International law is comprised of rules that have been accepted by the international community of states in the form of customary international law, international agreements, or by derivation from general principles common to the major legal systems of the world. Customary international law results from a general and consistent practice of states

NOV 14 2000 19:22 FR    N MILSTEIN                    1    27200001916102 P.08/1

followed by them from a sense of legal obligation. Widely accepted international agreements or common and pervasive legal principles can define and augment what nations view as mutual legal obligations.

119.    International treaties are considered to be incorporated into United States federal law. Customary international law is considered to be federal common law. Both of these are capable of being enforced by federal courts. Federal courts can ascertain what activities are proscribed by international law by consulting works of jurists, scholarly writings, by the general usage and practice of nations, and by judicial decisions recognizing and enforcing that law.

120.    International prohibitions against anticompetitive commercial activity have become so prevalent that they must be deemed to have risen to the level of the law of nations. Treaties, international agreements, scholarly writings, and the laws of the major legal systems of the world demonstrate the widely-accepted view that participation in anticompetitive commercial activity is universally harmful to basic human rights.

121.    In the last five to ten years, the number of countries that have antitrust laws in defense of free markets has increased to over eighty (80) countries, with an additional twenty-five (25) countries in the process of drafting such laws.

122.    For example, the United Nations adopted in 1980 "The Set of Multilaterally Agreed Equitable Principles and Rules for the Control of Restrictive Business Practices" ("The Set"), which sets forth what the member nations of the United Nations consider to be internationally-accepted principles prohibiting anti-competitive conduct. The Set reflects the view that multilaterally agreed equitable principles and rules for the control of restrictive business practices can contribute to attaining the objective of establishing a new international economic order by eliminating restrictive business practices adversely affecting international

trade, thereby contributing to the development and improvement of international economic

relations on a just and equitable basis. To further the goals of "promoting social welfare in

general and, in particular, the interests of consumers in both developed and developing

countries," The Set calls on commercial entities to refrain from engaging in restrictive

commercial practices, including price-fixing agreements, market or customer allocation

agreements, predatory behavior, discriminatory pricing, and abuse of dominant market positions.

123.    In 1998, the OECD, an organization of 29 industrialized nations, approved a

Counsel Recommendation Concerning Effective Action Against Hard Core Cartels. The OECD

characterized anticompetitive cartels as "the most egregious violation of competition law," which

"injure consumers in many countries by raising prices and restricting supply, thus making goods

and services completely unavailable to some purchasers and unnecessarily expensive for others."

The OECD in 2000 identified the Vitamins global cartel as one of the most harmful cartels ever

formed.

124.    On September 30, 1999, Joel Klein, then Assistant Attorney General, Antitrust

Division, U.S. Department of Justice, noted "the dawn of a new era in antitrust enforcement

against international cartels." He further noted the recognition by "people all over the world . . .

that cartels . . . are a true scourge of the world economy," that "don't just hurt consumers in the

U.S. or any single country . . .[but, a]lmost by definition, they hurt consumers world-wide."

125.    Defendants have engaged in anticompetitive activities in the United States and

world-wide which violate widely-accepted norms of international law, including: fixing the price

of vitamins; allocating vitamin customers, and committing other unlawful practices, as specified

herein, to inflate the prices of Class Vitamins worldwide.

126.    Defendants' anticompetitive activities violate international law.

127.    Defendants' illegal activities are the direct cause of harm to those purchasing Class Vitamins for delivery outside the U.S., who have been forced to pay higher and/or unnecessary costs as a result of these anticompetitive activities worldwide. Plaintiffs seek damages for this harm, as well as injunctive relief and any other relief that the Court deems necessary and appropriate.

### PRAYER FOR RELIEF

A.    That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given members of the Plaintiff Classes;

B.    That the unlawful combination and conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1), the antitrust laws of relevant foreign nations, and international law;

C.    That plaintiffs and each member of the Classes recover damages, as provided by law, determined to have been sustained by each of them (using such damage methodology as may be appropriate at trial), and that joint and several judgments in favor of the plaintiff Classes be entered against defendants, and each of them;

D.    That defendants be enjoined from continuing the unlawful combination and conspiracy alleged herein and other appropriate injunctive relief;

E.    That the plaintiffs and the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

NOV 14 2000 19:23 FR    EN MILSTEIN    7    27200001916102 P.11/1

F.    That plaintiffs and the Classes be granted such other, further and different relief as

the nature of the case may require or as may be deemed just and proper by this Court.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues triable of right by a jury.

Dated:  November 14, 2000

Stanley M. Chesley
Robert A. Steinberg
Robert Heuck II
WAITE, SCHNEIDER, BAYLESS,
  & CHESLEY CO., L.P.A.
1513 Fourth and Vine Tower
One West Fourth Street
Cincinnati, OH  45202
Tele:  (513) 621-0267
Fax:  (513) 381-2375

Howard Sedran
LEVIN FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tele: (215) 592-1500

Robert N. Kaplan
KAPLAN, KILSHEIMER & FOX, LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
Tele: (212) 687-1980

Roberta D. Liebenberg
FINE, KAPLAN & BLACK
1845 Walnut Street, 23rd Floor
Philadelphia, PA  19103
Tele:  (215) 567-6565

Michael D. Hausfeld D.C. Bar #153742
Ann C. Yahner  Bar #298513
Paul T. Gallagher  D.C.  Bar #439701
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005-3964
Tele:  (202) 408-4600
Fax:  (202) 408-4699

Robert A. Skirnick
MEREDITH COHEN GREENFOGEL
  & SKIRNICK, P.C.
63 Wall Street, 32nd Floor
New York, NY 10006
Tele: (212) 482-1250

Anthony J. Bolognese
SPECTOR, ROSEMAN,
  & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tele: (215) 496-0300

Ira Richards
RODRIGUEZ & RICHARDS, LLC
226 West Rittenhouse Square
Philadelphia, PA 19103
Tele: (215) 731-9004

Robert Lieff
BERNSTEIN
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111

Samuel D. Heins
HEINS, MILLS & OLSON, P.L.C.
700 Northstar East
608 2nd Avenue South
Minneapolis, MN 55402
Tele: (612) 338-4605

Linda Nussbaum
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS
100 Park Avenue
New York, NY 10017

Joseph Goldberg
HOLLANDER
  GOLDBERG & CLINE P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tele: (505/842-9960

Myroslaw Smorodsky
SMORODSKY & STAWNYCHY
75 Union Ave., P.O. Box 1705
Rutherford, New Jersey 07070

**PLAINTIFF'S COUNSEL**

**Of Counsel:**

Carlos Ernesto Gonzalez Ramirez
MORGAN AND MORGAN
Torre Swiss Bank Building
16th Floor
P. O. Box 1824
Panama 1, Rep. of Panama