

MM GLOBAL SERVICES INC., MM GLOBAL
SERVICES PTE. LTD., and MEGAVISA
SOLUTIONS (S) PTE. LTD.,

                      Plaintiffs,

         -v-

THE DOW CHEMICAL COMPANY, UNION
CARBIDE CORPORATION, UNION CARBIDE
ASIA PACIFIC, INC., UNION CARBIDE
CUSTOMER SERVICES PTE. LTD., and DOW
CHEMICAL PACIFIC (SINGAPORE) PTE. LTD.,

                      Defendants.

Civil No. 302 CV 1107 (AVC)

November 19, 2004

# MEMORANDUM OF LAW IN SUPPORT OF THELEN REID & PRIEST LLP MOTION TO WITHDRAW AS COUNSEL AND FOR THE IMPOSITION OF SECURITY PRIOR TO ANY RELEASE OF MEGA VISA'S FILES TO SUCCESSOR COUNSEL AND FOR THE IMPOSITION OF A CHARGING LIEN

THELEN REID & PRIEST
ATTORNEY-AT-LAW
875 THIRD AVENUE
NEW YORK, N.Y. 10022-6225
(212) 603-2000

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

MM GLOBAL SERVICES INC., MM GLOBAL SERVICES PTE. LTD., and MEGAVISA SOLUTIONS (S) PTE. LTD.,

          Plaintiffs,

     -v-

THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD., and DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD.,

       Defendants.

:
:
:
:
:
: Civil No. 302 CV 1107 (AVC)
:
:
:
:
:
:
: November 19, 2004
:
:
:

---

## MEMORANDUM OF LAW IN SUPPORT OF THELEN REID & PRIEST LLP MOTION TO WITHDRAW AS COUNSEL AND FOR THE IMPOSITION OF SECURITY PRIOR TO ANY RELEASE OF MEGAVISA'S FILES TO SUCCESSOR COUNSEL AND FOR THE IMPOSITION OF A CHARGING LIEN

### PRELIMINARY STATEMENT

Thelen Reid & Priest LLP, counsel of record for MM Global Services Inc., MM Global Services PTE. Ltd. and MegaVisa Solutions PTE. Ltd. (collectively, "MegaVisa") in the above captioned action (the "Action"), submits this memorandum of law in support of its motion seeking and order: (a) granting Thelen Reid, and the Thelen Reid attorneys who have individually appeared in this matter[1] leave to withdraw as counsel of record; (b) requiring MegaVisa to post security, in the amount of all sums owed for legal services provided by Thelen Reid, prior to any release of MegaVisa files currently in Thelen Reid's possession to successor counsel; and (c) granting Thelen Reid a charging lien, in the amount owed for legal services

---

[1] Four Thelen Reid lawyers have individually appeared in this case and seek leave to withdraw as counsel for Plaintiffs: Michael S. Elkin, Paul A. Winick, Alyson L. Redman and Susan B. McInerney (the "Individual Attorneys")

provided by Thelen Reid, upon funds that may become due and owing to MegaVisa by virtue of any settlement or judgment obtained by MegaVisa in the Action.

## STATEMENT OF FACTS

Pursuant to a written retainer agreement dated May 9, 2002, by and between Thelen Reid and MegaVisa Marketing Solutions Ltd., Thelen Reid agreed to provide legal representation to MegaVisa.  Pursuant to such agreement, MegaVisa agreed to be "responsible for paying [its] invoices directly in accordance with [Thelen Reid's] billing and payment policies."  Additionally, MegaVisa agreed to be billed a monthly statement and that such monthly "[s]tatements [were] due upon receipt."  See Affidavit of Paul A. Winick, November 19, 2004, at ¶ 2.

At the commencement of the case and through February, 2004 Richard S. Taffet ("Taffet"), a former Thelen Reid partner, was the lead lawyer at Thelen Reid responsible for this litigation.  When Taffet left Thelen Reid and joined  Bingham McCutchen in February 2004, MegaVisa instructed Thelen Reid to act as joint counsel with Bingham McCutchen in the ongoing litigation, with Taffet retaining his role as lead lawyer in the case.  Over several months, Thelen Reid worked with Taffet and MegaVisa on various activities in the case.  However, over time Taffet involved other lawyers at Bingham McCutchen in the case until, eventually, Taffet, and MegaVisa ceased to draw on Thelen Reid's resources.  As a result, since July 2004 Thelen Reid has, effectively, not been involved in the ongoing litigation.  Papers have been prepared and filed by Taffet and Bingham McCutchen on behalf of MegaVisa without Thelen Reid's participation or review prior to filing.  Winick Aff., ¶ 3.

Invoices for services rendered by Thelen Reid to MegaVisa since December 23, 2003 remain unpaid.  The last payment that Thelen Reid received was on March 17, 2004 in the

NY #624557 v7

amount of $50,000.  To date, MegaVisa still owes Thelen Reid $472,887.82, virtually all of such

balance representing work done while Taffet was still at Thelen Reid.  Despite Thelen Reid's

numerous requests to be paid, and MegaVisa's acknowledgment of the debt and promises to pay

all amounts due, payment has not been forthcoming.  MegaVisa has never disputed any of the

amounts due to Thelen Reid.  See Winick Aff., ¶ 4.

Thelen Reid has in its possession MegaVisa's original records.  Over recent months there

have been discussions between Thelen Reid and MegaVisa concerning payment of outstanding

charges and the turnover of client documents from Thelen Reid to Bingham McCutchen.

MegaVisa has promised payment repeatedly, and had scheduled and re-scheduled such promised

payments,  but has not in fact made any payments at all against its outstanding indebtedness, and

Thelen Reid has advised MegaVisa that it will assert its retaining lien against the client

documents until such time as MegaVisa has either paid its bills or provided adequate security for

such payment. See Winick Aff., ¶ 5.

## ARGUMENT

## I.    THELEN REID SHOULD BE PERMITTED
## TO WITHDRAW AS COUNSEL TO MEGAVISA.

Pursuant to District of Connecticut Local Rule of Civil Procedure 7(e) ("Local Rule

7(e)"), the Court should enter an order permitting Thelen Reid, counsel of record with Bingham

McCutchen for MegaVisa, to withdraw as counsel of record.

Local Rule 7(e) provides:

> Withdrawal of appearances may be accomplished only by leave of
> Court on motion duly noticed, and normally shall not be granted
> except *upon a showing that other counsel has appeared* or that
> the party has elected to proceed pro se, and that the party whose
> counsel seeks to withdraw has received actual notice by personal
> service or by certified mail of the motion to withdraw.  In cases
> where the party has failed to engage other counsel or file a pro se
> appearance, where good cause exists for permitting the withdraw

3

by the appearing counsel, the Court may grant the motion to withdraw the appearance after notice to the party that failure to either engage successor counsel or file a pro se appearance will result in the granting of the motion to withdraw and may result in a dismissal or default being entered against the party.
D. Conn., L.R. 7(e) (emphasis added).

Here, the client has not instructed Thelen Reid to withdraw in favor of Bingham McCutchen. Thelen Reid seeks permission to withdraw as counsel under this rule because MegaVisa has ceased paying its legal bills and has, in fact, constructively terminated Thelen Reid's services. As noted above, Taffet, formerly of Thelen Reid, has appeared in this action for MegaVisa along with his current firm, Bingham McCutchen. In February, 2004, when Taffet left Thelen Reid to join Bingham McCutchen, MegaVisa instructed Thelen Reid act as joint counsel with Bingham McCutchen in connection with the ongoing litigation, Taffet retaining his role as lead lawyer on the case. Over several months, Thelen Reid worked with Taffet on various activities in the case. However, over time, Taffet involved other lawyers at Bingham McCutchen in the case until, eventually, Taffet and MegaVisa ceased to draw on Thelen Reid's resources. As a result, since July 2004 Thelen Reid has not been involved in the ongoing litigation. Papers have been prepared and filed by Taffet and Bingham McCutchen on behalf of MegaVisa without Thelen Reid's participation in such preparation or review prior to filing. Thelen Reid has been constructively terminated from the case. Moreover, MegaVisa has not made any payments for legal services rendered totaling $472,887.82. A client's failure to pay attorneys' fees is ground for withdrawal.

MegaVisa will not suffer any prejudice as a result of Thelen Reid's withdrawal. As of the date hereof, depositions have not yet commenced in this case.

Based upon Bingham McCutchen's appearance in this case for MegaVisa, coupled with MegaVisa's non-payment for services received and its constructive termination of Thelen Reid

4

as counsel, it is respectfully submitted that the Court should enter an order granting Thelen Reid

and the Individual Attorneys leave to withdraw as counsel for MegaVisa.

## II.   MEGAVISA SHOULD BE REQUIRED TO POST
## SECURITY PRIOR TO THE RELEASE OF ITS FILES.

MegaVisa has not paid Thelen Reid for services rendered, and has instructed Thelen Reid

to transfer all client documents to Bingham McCutchen.  Thelen Reid has asserted a retaining

lien on those documents.  Accordingly, the Court should enter an order requiring MegaVisa to

post security for unpaid fees and disbursements prior to the release of Plaintiffs' files and records

currently in Thelen Reid's possession.

Connecticut recognizes that an attorney has a self-executing retaining lien on a client's

files until outstanding fees are paid.[2]  Marsh, Day & Calhoun v. Solomon, 529 A.2d 702, 705

(1987).  (Attorney entitlement to retaining lien where legal fees are owed defeats client's

counterclaim for the release of her files) (citing Gager v. Watson, 11 Conn. 168, 173 (1836)

(holding "[a]n attorney, as against his client, has a lien upon all papers in his possession, for his

fees and services performed in his professional capacity, as well as upon judgments received by

him").

In Marsh, Day the Court noted that, "[t]he most recent Connecticut Supreme Court case

to discuss the subject of retaining liens, Andrews v. Morse, 12 Conn. 444, 446 (1838), approved

of the Gager holding and stated: 'We only say, that [attorneys] have, in certain cases, of which

this is one, such a claim upon [judgments and papers] as courts of law and equity will protect and

enforce, until their lawful fees and disbursements are paid....' "  Id. at 705.

_____

[2] This matter is ancillary to an action pending in this District and, accordingly, Connecticut law should apply.  As
the Court knows, movant is a New York-based firm, and the Individual Attorneys are admitted pro hac vice to
practice before the Court in this matter.  New York law recognizes the same attorney charging and retaining liens as
does Connecticut.  New York Judiciary Law §475 (statutory charging lien); Goldman v. Rafael Estates, Inc., 269
A.D.2d 647, 649, 58 N.Y.S. 2d 168 (1st Dept. 1945) (the retaining lien…is a valuable right given by law to secure
[an attorney] for the payment of the reasonable value of the services which he had rendered…for the client.)

NY #624557 v7

MegaVisa has demanded the release of its files. Where a client makes a showing of "need" for files subject to a retaining lien, which it has not yet done, those files may be released upon either payment or the client furnishing adequate security for payment. Id. Accordingly, should MegaVisa make such a showing, Thelen Reid requests that the Court enter an order conditioning the transfer of documents to Bingham McCutchen upon MegaVisa posting security in favor of Thelen Reid in an amount sufficient to secure the debt in surety bond or other equivalent form.

### III.    THIS COURT SHOULD GRANT THELEN REID A CHARGING LIEN AGAINST AMOUNTS DUE AND OWING TO MEGAVISA AS A RESULT OF A SETTLEMENT OR JUDGMENT.

Thelen Reid also seeks an order imposing a charging lien in the amount of Thelen Reid's unpaid fees and disbursements upon funds that may become due and owing to MegaVisa by virtue of a settlement or judgment in this action.

Connecticut law recognizes charging liens. An attorney is entitled to an "equitable lien upon the avails [of his/her actions for a client] for the services and expenses in the suit[.]" See Cooke v. Thresher, 51 Conn. 105, 107 (1883). The court noted that such a "common law lien was recognized as an equitable means to enforce a client's agreement to pay fees from the judgment or settlement achieved by the efforts of counsel." Id. More recently, the Supreme Court of Connecticut has recognized that an attorneys "charging lien," is "a lien placed upon any money recovery or fund due the client at the conclusion of suit." See Marsh, Day, 529 A.2d at 705. The lien attaches to a recovery from either "[a] judgment or [a] settlement achieved by the efforts of counsel" See McNamara & Goodman, 696 A.2d 1328, 1332 (Conn. Super. Ct. 1997), and encompasses all sums owed back to the date of the fee agreement. Carbone Financing Services, LLC v. Hawley 560 LLC, No. CV00377347S, 2001 WL 1667879, at * 8 (Conn. Super. Ct. Dec. 11, 2001) (quoting Paine Webber, Inc. v. Chapman, Moran, Superior Court, judicial

6

district of Fairfield at Bridgeport, Docket No. 290715, (McGrath, J.) (September 7, 1994)).

Connecticut courts grant charging liens where there is a written fee agreement. See, eg., Gordon v. Ignal, No. CV96339700S, 2001 WL 290392, at * 6 (Conn. Super. Ct. Mar. 9, 2001) (underlying any charging lien must be an express or implied contract for fees entered into by the attorney and client); see also Carbone, 2001 WL 1667879, at * 8 (recognizing "the existence of an attorney's common law charging lien where, as here, there is a written agreement that entitles the attorney to obtain his fee from the recovery."). Thelen Reid and MegaVisa entered into such an express contract for fees in the form of a retainer agreement dated May 9, 2002. See Winick Aff., ¶ 6 and Exhibit A.

Thelen Reid has represented MegaVisa since May 9, 2002. Since Taffet's departure to Bingham McCutchen, MegaVisa has refused to pay Thelen Reid for its legal services rendered in the amount of $472,887.82. In order to secure payment for its services, the Court should enter an order granting Thelen Reid a lien in that amount upon any judgment or settlement proceeds that MegaVisa may obtain in this lawsuit.

**WHEREFORE**, Thelen Reid & Priest moves this Court to grant the following: (a) an order permitting Thelen Reid leave to withdraw as counsel; (b) an order requiring MegaVisa to post security prior to the release of MegaVisa's files currently in Thelen Reid's possession; and (c) an order granting Thelen Reid a charging lien in the amount of Thelen Reid's fees and disbursements upon funds that may become due and owing to MegaVisa by virtue of a settlement or judgment in this action.

NY #624557 v7

Dated:  November 19, 2004

Respectfully submitted,


THELEN REID & PRIEST LLP


By: _____
Paul A. Winick (ct 21813)
Alyson L. Redman (ct 25494)
875 Third Avenue
New York, New York  10022-6225
(212) 603-2000 (tel)
(212) 603-2001 (fax)

Attorneys for Plaintiffs MM Global Services Inc.,
MM Global Services Pte. Ltd. and MegaVisa
Solutions (s) Pte. Ltd.


To:

BINGHAM McCUTCHEN LLP
Richard S. Taffet, Esq.
Alicia L. Downey, Esq.
399 Park Avenue
New York, NY 10022-4689


ROBINSON & COLE LLP
Craig A. Raabe, Esq.
Edward J. Heath, Esq.
Elizabeth A. Fowler, Esq.
Stephen M. Deane, Esq.
280 Trumbull Street, 28th Floor
Hartford, CT 06103


MAYER, BROWN, ROWE & MAW LLP
Christopher J. Kelly, Esq.
1909 K Street
Washington, DC  20006-1157


WIGGIN & DANA LLP
Robert M. Langer, Esq.
Suzanne E. Wachsstock, Esq.
Steven Bruce Malech, Esq.
One City Place
185 Asylum Street
Hartford, CT 06103


MAYER, BROWN, ROWE & MAW, LLP
Andrew S. Marovitz, Esq.
Britt M. Miller, Esq.
Dana S. Douglas, Esq.
190 South LaSalle Street
Chicago, IL 60603


EIMER STAHL KLEVORN & SOLBERG, LLP
Andrew G. Klevorn, Esq.
Nathan P. Eimer, Esq.
Ryan S. Hedges, Esq.
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

8

NY #624557 v7

**UNPUBLISHED OPINIONS**

Westlaw.

Not Reported in A.
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
(Cite as: 2001 WL 1667879 (Conn.Super.))

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

CARBONE FINANCING SERVICES, LLC,
v.
HAWLEY 560, LLC et al.

No. CV00377347S.

Dec. 11, 2001.

MEMORANDUM OF DECISION RE MOTION FOR SUMMARY JUDGMENT # 158

B.J. SHEEDY, J.

**\*1** This matter involves the foreclosure of a mortgage note executed in favor of and held by the plaintiff. Before the court is the plaintiff's motion for summary judgment and a memorandum of law in support thereof, filed on August 23, 2001, and objections thereto filed by three of the named defendants in the matter. The plaintiff is Carbone Financing Services, LLC, and the six named defendants are Hawley 560, LLC; James R. Fitzpatrick; Morgan X. Helies; Complete Construction Co., Inc.; Blastech, Inc.; and Fay & Wright Excavating, Inc. The court, Mottolese, J., cited in the following three defendants upon motion by the plaintiff: Fitzco, LLC; Tilton and Associates, Inc., d/b/a A.M. Engineering, one of the Tilton companies; and Barry C. Knott.

The plaintiff alleges the following facts in its second amended complaint (the operative complaint), filed on December 18, 2000. On September 23, 1999, Hawley 560, LLC (hereinafter, "Hawley"), pursuant to the terms and conditions of a loan agreement of the same date, executed a mortgage note, for the principal amount of $4.1 million. As partial security for the note, on September 23, 1999, Hawley granted an open-end mortgage and security agreement and an assignment of leases and rents in favor of the plaintiff on a parcel of land located at 560 Hawley Lane, Stratford, Connecticut (hereinafter, "property"). The mortgage, security agreement, and assignment were recorded on September 24, 1999, in the Stratford land

records at volume 1518. As further security for the note, on September 23, 1999, James R. Fitzpatrick and Morgan X. Helies each executed a guaranty in favor of the plaintiff that absolutely and unconditionally guaranteed full and punctual payment and Hawley's performance of all liabilities, agreements, and other obligations to the plaintiff.

The plaintiff is the owner of the note, the loan agreement, the mortgage, the assignment, and both guaranties. Hawley is in default under the note, the loan agreement, and the mortgage for failure to make payment and to obtain releases of mechanic's liens. By letter dated August 1, 2000, the plaintiff made demand for payment on Hawley, Fitzpatrick, and Helies; no payment has been received to date. Hawley is the record owner of the premises and a notice of lis pendens has been served on Hawley.

The plaintiff accepts that other outstanding debt obligations precede and may have priority over its interest--specifically, real estate taxes due the city of Stratford; sewer assessments or use charges; and driveway, utility, and conservation easements as set forth in a deed dated September 22, 1999. The plaintiff alleges the existence of other interests which it states do not have priority over its interest because occurring subsequent in time--most particularly, Tilton and Associates, Inc. (hereinafter, "Tilton") for a mechanic's lien in the amount of $32,271.63; Fitzco, LLC (hereinafter, "Fitzco") for a mechanic's lien in the amount of $1,445,000; Manny's Excavating, LLC for a mechanic's lien in the amount of $96,700; Complete Construction Co., Inc. for a mechanic's lien in the amount of $51,374.47; Blastech, Inc., for a mechanic's lien in the amount of $136,250; Fay & Wright Excavating, Inc. for a mechanic's lien in the amount of $300,856.25; Atty. Barry C. Knott's (hereinafter, "Knott") Notice of Contract; and the Town of Stratford's conservation easement. The plaintiff seeks a foreclosure of the mortgage, immediate possession of the premises, a judgment of strict foreclosure, a deficiency judgment against Hawley and the two guarantors, Fitzpatrick and Helies, an appointment of receiver of rents, any other relief in equity, and monetary damages.

**\*2** Before this court is the motion for summary judgment only. On August 23, 2001, the plaintiff filed the present motion for summary judgment, claiming it is entitled to judgment as a matter of law

Not Reported in A.                                                                    Page 2
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
(Cite as: 2001 WL 1667879 (Conn.Super.))

because there is no genuine issue of material fact regarding either its ownership of the property and documents it holds or the non-payment of the mortgage note. Knott, Fitzco, [FN1] and Tilton have filed objections to the instant motion and supporting memoranda. These defendants assert there are genuine issues of material fact whether their liens and/or interests have priority over the plaintiff's mortgage. Oral arguments were heard on October 22, 2001. The court notes the plaintiff's memorandum addresses arguments as to Fitzco, Tilton, and Knott. As such, the court's decision addresses the merits of the plaintiff's motion only as to these defendants.

> FN1. Fitzpatrick and Fitzco, LLC have filed objections together. In their memorandum in objection to the plaintiff's motion, however, they address only Fitzco's mechanic's lien.

"[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ... The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law ... and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Internal citations and quotation marks omitted.) *Community Action for Greater Middlesex County, Inc. v. American Alliance Ins. Co.*, 254 Conn. 387, 397-98 (2000). "As the party moving for summary judgment, the plaintiff is required to support its motion with supporting documentation, including affidavits." *Heyman Associates No. 1 v. Insurance Co. of Pennsylvania*, 231 Conn. 756, 796 (1995). "Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact ... [the nonmovant] must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court." (Internal quotation marks omitted.) *Zeller v. Consolini*, 59 Conn.App. 545, 564 (2000). "A 'material fact' is a fact that will make a

difference in the result of a case." *Paul Revere Life Ins. Co. v. Pastena*, 52 Conn.App. 318, 321, cert. denied, 248 Conn. 917 (1999).

"The purpose of the mechanic's lien is to give one who furnishes materials or services the security of the building and land for the payment of his claim by making such claim a lien thereon ..." (Internal quotation marks omitted.) *F.B. Mattson Co. v. Tarte*, 247 Conn. 234, 237-38 (1998). General Statutes § 49-33(a) provides that a mechanic's lien may be claimed "for materials furnished or services rendered in the construction, raising, removal or repairs of any building or any of its appurtenances or in the improvement of any lot or in the site development or subdivision of any plot of land, and the claim is by virtue of an agreement with or by consent of the owner of the land upon which the building is being erected or has been erected or has been moved, or by consent of the owner of the lot being improved or by consent of the owner of the plot of land being improved or subdivided, or of some person having authority from or rightfully acting for the owner in procuring the labor of materials, the building, with the land on which it stands or the lot or in the event that the materials were furnished or services were rendered in the site development or subdivision of any plot of land ..." *Id.* "Although the mechanic's lien statute creates a statutory right in derogation of the common law ... its provisions should be liberally construed in order to implement its remedial purpose of furnishing security for one who provides services or materials ... [The] interpretation, however, may not depart from reasonable compliance with the specific terms of the statute under the guise of a liberal construction." (Internal citations and quotation marks omitted.) *New England Savings Bank v. Meadow Lakes Realty Co.*, 243 Conn. 601, 611 (1998).

**\*3** Section 49-33(d) provides, in pertinent part, "If any instrument constituting a valid encumbrance upon such land other than a mechanic's lien is filed for the record while the ... lot is being improved ... all such mechanic's liens originating prior to the filing of that instrument for record take precedence over that encumbrance and no such mechanic's lien shall have priority over any other such mechanic's lien." *Id.* "Certain equitable interests arising out of a contract for sale of land may, however, support a mechanic's lien on after-acquired property ... [Thus, where] the terms of contract of purchase contain a direction to the vendee to construct a building upon the premises, those who perform labor or furnish materials in order to enable the vendee to carry out that undertaking have a right of lien which will take preference over

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
**(Cite as: 2001 WL 1667879 (Conn.Super.))**

Page 3

even a purchase price mortgage." (Internal citations and quotation marks omitted.) *New England Savings Bank v. Meadow Lakes Realty Co.,* op. cit., 243 Conn. 619 (1998). Thus, "[w]here a party is not the record owner, or where the party owns an interest less than fee simple absolute, the Connecticut Supreme Court has, however, recognized mechanic's liens as valid where the party that had contracted for construction services did so to fulfill a condition set forth in the contract by which the vendee was to acquire the property." *Connecticut Concrete v. ARC Icesports Danbury, Inc.,* Superior Court, judicial district of Waterbury at Waterbury Complex Litigation Docket, Docket No. 160662 (February 8, 2001) (Hodgson, J.) (29 Conn. L. Rptr. 423).

In summary, "[i]n order to sustain a mechanic's lien under § 49-33(a), the defendants have to show, by probable cause, that [the record] owner or equitable owner of the property: (1) had an express agreement with the defendants to perform the work, (2) authorized its agent to make an express agreement with the defendants to perform the work or, (3) gave its consent to the work being performed." *Coughlin Realty v. Blastech,* Superior Court, judicial district of Middlesex at Middletown, Docket No. 092060 (March 13, 2001) (Arena, J.); see also, *Hall v. Peacock Fixture & Electric Co.,* 193 Conn. 290, 293 (1984).

### Tilton's Mechanic's Lien

The plaintiff asserts there are no genuine issues of material fact as to Tilton's mechanic's lien because it is invalid. Specifically, the plaintiff contends the commencement date stated in the lien is before the mortgage on the property was recorded and before Hawley obtained title to the property. In addition, Tilton's mechanic's lien does not include any work that was required to be performed under the purchase and sale agreement. In its objection, Tilton argues that it is a protected lienor because its lien is excepted from the rule against liens on after-acquired property. Tilton contends that it was performing work for Hawley, then the equitable owner of the property, as required by the purchase and sale agreement. Tilton also argues that, in the event the purchaser could not perform under the purchase and sale agreement, the work done by Tilton would benefit the seller because the seller would have a piece of land that received approval for a project. Thus, Tilton contends that its mechanic's lien is valid and should be given priority, or, in the alternative, that there is a genuine issue of material fact whether Hawley had a sufficient equitable interest to support Tilton's mechanic's lien.

**\*4** Tilton's mechanic's lien indicates that it furnished materials and performed services in the construction of land and buildings on the property; the work was commenced on November 5, 1998, and was completed on June 13, 2000 (Plaintiff's Exhibit 17.) The lien was filed and recorded on July 7, 2000 (Plaintiff's Exhibit 17.) The chain of title reflects that on September 22, 1999, the Tomasko family conveyed title to the property to TJP and LSP, LLC (hereinafter TJP). That deed was recorded in the Stratford land records on September 24, 1999. On the same date, September 22, 1999, TJP conveyed title to the property to Hawley, and such deed was recorded in the Stratford land records on September 24, 1999. (Hawley obtained title to the property through an assignment of the purchase and sale agreement between TJP and Eastman Pierce.) Hawley thus became the record owner of the property on September 24, 1999, after Tilton began work on the property. "Connecticut has always been a 'recording' state in the field of land transaction." *Marshall v. Soffer,* Superior Court, judicial district of New Haven at New Haven, Docket No. 407663 (December 10, 1998) (DeMayo, J.T.R.). General Statutes § 47-10 embodies this policy and provides, in pertinent part, "No conveyance shall be effectual to hold any land against any other person but the grantor and his heirs, unless recorded on the records of the town in which the land lies." Thus, at the time Tilton commenced work in relation to the property (November 5, 1998), the record owner was the Tomasko family. It follows that Tilton's lien is invalid unless an exception applies to it.

Tilton's arguments in support of the validity of its lien are similar to those made by the plaintiff-lienor in *Centerbrook, Architects and Planners v. Laurel Nursing Services, Inc.,* 224 Conn. 580 (1993). *Centerbrook* involved a plaintiff who sought to foreclose on a mechanic's lien for architectural and engineering services it provided on a parcel of land to enable the defendant to obtain permits to operate a day care center thereon. *Id.,* at 582-83. The trial court granted the defendant's motion for summary judgment and declared the plaintiff's mechanic's lien null and void. *Id.,* at 581-82. On appeal, the plaintiff argued that the trial court improperly held its lien null and void because the defendant held a sufficient equitable interest in the property to support a mechanic's lien. [FN2] The court rejected the plaintiff's argument and held that "in order for the buyer under a contract of purchase of real estate to have a sufficient equitable interest in the property to support a mechanic's lien in favor of the buyer's supplier of materials, the provision in the contract

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
(Cite as: 2001 WL 1667879 (Conn.Super.))

providing for the work on the property must be in some sense for the interest or at the behest of the seller of the property. The provision must require, as a condition of the seller's obligation under the contract, that the buyer perform the work at issue. The rationale underlying this principle is that the buyer under those circumstances is improving the land, not only for the buyer's own benefit, but also for the benefit of the record owner." *Id.*, at 588-89.

> FN2. In *Centerbrook,* the plaintiff and defendant entered into a contract on July 14, 1989, in which the defendant signed as the property owner and represented that it had or was acquiring title to the property. 224 Conn., at 582 (1993). However, on July 14, 1989, the defendant did not own and had not contracted to purchase the property. *Id.* On July 26, 1989, the defendant signed a purchase and sale agreement and obtained legal title to the property on October 16, 1989. *Id.* at 582-83. The purchase and sale agreement contained a provision that provided the "[o]ffer is subject to and conditional upon the buyer's ability to obtain the necessary permits and approvals from the various departments of the Town ... for the operation of a daycare/learning center at this site." *Id.* The plaintiff subsequently recorded its lien on December 7, 1989 and the lien stated that the plaintiff had a contract with the defendant "for work commencing July 14, 1989, and ending November 27, 1989 ..." *Id.,* at 583.

**\*5** Tilton contracted with Hawley to conduct work on the site by agreement dated November 5, 1998. Tilton contends it performed work pursuant to the purchase and sale agreement dated August 20, 1998. (Plaintiff's Exhibit 11.) Specifically, Tilton contends that paragraph seven of the agreement contains language that required Hawley to perform the work done by Tilton because Hawley was required to diligently seek approvals under the agreement. The plaintiff argues that the purchase and sale agreement does not contain any language that required Hawley to perform the work performed by Tilton.

Upon review of the purchase and sale agreement, the court finds that it does not contain mandatory language that required Hawley to perform work as a condition to taking title to the property. Rather, the language of paragraph seven provides that the purchaser "shall diligently seek" the specified approvals. [FN3] In fact, other language in paragraph

seven indicates that the purchaser has the "sole discretion" to abandon its efforts at any time after submitting its application to the Stratford Planning and Zoning Department. The court also notes that paragraph nineteen, subsection (i), of that agreement provides the "[p]urchaser shall have the '*unilateral right* ' to waive any and all of the contingencies set forth in this Agreement." This type of "provision can reasonably be viewed only as intended for the protection of the buyer ... and not for any benefit of the seller ..." 229 Conn., at 589. Thus, if the approvals had not been secured, it would have been Hawley--and not the Tomasko family or TJP--that would have had the choice of either waiving the condition and closing on the property or terminating the contract.

> FN3. "7. *APPROVALS* The parties acknowledge that the Purchaser is entering into this Agreement with the intention of securing all necessary approvals, including final site plan approval, and any and all other governmental approvals ... to develop and improve the Real Property by constructing a 150 room hotel and an 8,000 square foot restaurant (the "Intended Use") ... Purchaser shall diligently seek such Approvals. Purchaser's obligations hereunder are subject to Purchaser securing all the Approvals necessary for the development of the Real Property for the Use in accordance with Purchaser's plans ... Purchaser shall have the right exercisable at any time after submitting its application to the Stratford Planning and Zoning Department and in Purchaser's sole discretion to abandon its efforts to secure the Approvals in which event, upon Purchaser's written notice thereof to Seller, this Agreement shall be null and void and of no further effect and Purchaser's earnest money deposit, shall be returned to Purchaser, and Purchaser shall deliver to seller all work product, study or other material prepared by Purchaser."

Tilton argues, however, that the work it performed was for the interest of or at the behest of the seller, the Tomasko family. Tilton points to the last clause of paragraph seven; it provides that, in the event the purchaser abandons its application, the agreement becomes null and void and "the Purchaser shall deliver to the seller all work product, study or other material prepared by Purchaser." Tilton argues that, if Hawley abandoned its application for zoning

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
(Cite as: 2001 WL 1667879 (Conn.Super.))

Page 5

approvals, Tilton's work product would be delivered to the seller TJP-LSP and thus TJP-LSP would benefit from Tilton's work because it would have a piece of land that was approved for a project. The court is unpersuaded. Though the property was ultimately approved by the Stratford Planning and Zoning Department for a restaurant and hotel, no explanation is offered as to how the seller would have benefited had Hawley abandoned the approval process. (Of relevance is that the "seller" is TJP-LSP--and not the Tomasko family per se.) The court finds that Tilton has failed to sustain its burden of demonstrating there is a genuine issue of fact. Accordingly, the court grants the plaintiff's motion for summary judgment as to Tilton. [FN4]

> FN4. The second argument Tilton raises in support of the validity of its lien is that the seller of the property consented, by signing the purchase and sale agreement, to subject its property to mechanic's liens. Tilton contends that paragraph ten (a) supports its argument because it indicates that the seller understood that mechanic's liens could be filed on its property. Paragraph ten (a) provides that the "Purchaser and its authorized agents and employees shall have the right to enter the Real Property for the purposes of conducting, at its own expense, soil tests, inspections and planning, provided that such operations are conducted in such manner so as not to damage the Real Property or the Improvements that are a part thereof. Purchaser agrees to indemnify and to hold the Seller harmless from and against any and all mechanic's liens that may be filed against the Real Property ..." This paragraph simply requires the purchaser to indemnify and hold the seller harmless against all mechanic's liens filed. It does not indicate that the seller contractually consented to mechanic's lien being filed against its property and, thus, Tilton's interpretation cannot stand. In addition, the seller that Tilton references is the Tomasko family. They were not a party to the agreement nor did they sign the agreement. Thus, Tilton's argument fails. In either case, however, the Supreme Court has held that "[a] land owner does not subject his property to a mechanic's lien by simply allowing work to be done on it ... Nor does the owner's knowledge that the work is being done subject the property to a mechanic's lien ... The consent meant by the statute must be a consent that indicates an agreement that the owner of at least the land shall be, or may be, liable for the materials or labor ... Although an express contract is not necessary for such a consent, the services must be furnished under circumstances indicating an implied contract by the owner to pay for them." (Citations omitted.) *Centerbrook, Architects and Engineers v. Laurel Nursing Services, Inc., supra,* 224 Conn. at 591.

Fitzco's Mechanic's Lien

*6 The plaintiff asserts there are no genuine issues of material fact with regard to Fitzco's mechanic's lien because it is invalid. Specifically, the plaintiff contends the lien is invalid because the commencement date stated in the lien is before its mortgage on the property was recorded and before Hawley obtained title to the property. In addition, Fitzco's mechanic's lien does not include any work that was required to be performed under the purchase and sale agreement. The plaintiff also argues the lien is invalid because not signed under oath by the claimant, Fitzco. In its objection, Fitzco argues its lien is valid because Nicholas E. Owen, III, TJP's agent, consented to and authorized Fitzco to perform certain site development services, and, on TJP's behalf, agreed to be liable for such services in the event that Hawley did not acquire title to the property.

Fitzco's mechanic's lien indicates it furnished materials and performed services in the site preparation and installation of underground utilities at the property. The work commenced on September 23, 1999, and ended on August 3, 2000; the lien was filed and recorded on August 7, 2000. (Plaintiff's Exhibit 10.) The chain of title reflects that on September 22, 1999, the Tomasko family conveyed title to the property to TJP and LSP, LLC (hereinafter TJP) and such deed was recorded in the Stratford land records on September 24, 1999. On September 22, 1999, TJP conveyed title to the property to Hawley, and such deed was recorded in the Stratford land records on September 24, 1999. Hawley obtained title to the property by virtue of an assignment of the purchase and sale agreement between TJP and Eastman Pierce. (Plaintiff's Exhibit 6, pp. 13- 17.) [FN5] Hawley became the record owner of the property on September 24, 1999, after Fitzco began its work on the property. "Connecticut has always been a 'recording' state in the field of land transaction." *Marshall v. Soffer,* Superior Court,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
**(Cite as: 2001 WL 1667879 (Conn.Super.))**

Page 6

judicial district of New Haven at New Haven, Docket No. 407663 (December 10, 1998) (DeMayo, J.T.R.). General Statutes § 47-10 embodies this policy and provides, in pertinent part, "No conveyance shall be effectual to hold any land against any other person but the grantor and his heirs, unless recorded on the records of the town in which the land lies." Thus, when Fitzco commenced work in relation to the property the record owner was the Tomasko family. (Plaintiff's Exhibit 19.) Therefore, Fitzco's lien is invalid unless an exception applies to it.

> FN5. The court was not provided with a copy of that assignment.

Fitzco contracted with Hawley to conduct work on the site by agreement dated September 15, 1999, and such agreement was signed by Pillon, as a member of Hawley, and Fitzpatrick, as a contractor, on the same date. (Plaintiff's Exhibit 12.) Fitzco's lien is also subject to the rule against liens on after-acquired property. The same reasoning applicable to Tilton's lien applies as well to Fitzco's mechanic's lien. The purchase and sale agreement contains no language requiring Hawley to perform any work as a condition of taking title to the property. Nor has Fitzco provided the court any evidence Hawley had an equitable interest in the property sufficient to sustain a lien.

**\*7** Fitzco contends, however, that it had consent from both TJP and Hawley to perform the work. In support of its position, Fitzco provides the court with affidavits from Fitzpatrick and Nicholas E. Owen, III. Fitzpatrick avers that before September 23, 1999, Nicholas E. Owen, III, agent for TJP, requested, authorized, and expressly consented to Fitzco performing certain site development work in connection with the contemplated hotel and restaurant. (Affidavit of James Fitzpatrick, ¶¶ 3-4.) Fitzpatrick also avers that Owen, on behalf of TJP, promised to pay Fitzco for its services in the event that Hawley did not acquire title to the property. (Affidavit of James Fitzpatrick, ¶¶ 5- 6.) Owen states he, as TJP's agent, authorized Fitzco to perform certain site development work (Affidavit of Nicholas F. Owen, III ¶ 5.) .[FN6] Owen avers that, in the event Hawley did not acquire title to the property, TJP would pay for Fitzco's work because TJP would benefit from Fitzco's work. (Affidavit of Nicholas E. Owen, III, ¶ 6.) Owen also avers, however, that, because Hawley took title to the property, TJP is not liable for the services performed by Fitzco. (Affidavit of Nicholas F. Owen, III, ¶¶ 6-7.)

> FN6. The court notes that the first page of the affidavit and the signature page reflect a discrepancy as to who made the affidavit. During oral argument, counsel for the plaintiff expressed concern about the affidavit because the first page reflected that it was made by Owen, II, and the signature page reflected that it was signed by Owen, III. Counsel for Fitzco represented that the affidavit was made by Owen, III, and that the discrepancy was due to a typographical error. For these purposes, the court accepts the representation by Fitzco's counsel and treats the affidavit as having been made and signed by Owen, III.

The court finds that when Fitzco began the site development work, the owner of the property was the Tomasko family and neither Hawley nor TJP were equitable owners of the property. Although the Tomasko family conveyed title to the property to TJP and TJP subsequently conveyed title to Eastman Pierce on September 22, 1999, title to the property was not affected until the conveyances of September 22, 1999, were recorded on September 24, 1999. See General Statutes § 47-10. In order for Fitzco's lien to be valid, Fitzco needed consent from the Tomasko family or its authorized agent. "The consent meant by the statute must be a consent that indicates an agreement that the owner of at least the land shall be, or may be, liable for the materials or labor ... Although an express contract is not necessary for such a consent, the services must be furnished under circumstances indicating an implied contract by the owner to pay for them. (Citations omitted.)" *Centerbrook, Architects and Engineers v. Laurel Nursing Services, Inc., supra,* 224 Conn., at 591. Fitzco has not provided the court any evidence it had consent from the Tomasko family or that Owen or TJP were authorized agents of the Tomasko family such that consent from either would make Fitzco's lien valid. Fitzco has failed to sustain its burden of demonstrating a genuine issue of material fact exists. Accordingly, the court grants the plaintiff's motion for summary judgment as to Fitzco.

**Knott's Attorney's Charging Lien**

Knott claims he has by common law an attorney's charging lien by virtue of a Notice of Contract recorded in the Stratford land records, and that his lien is valid and should take priority over the plaintiff's mortgage. The Notice of Contract indicates Knott and Hawley had an agreement and that such agreement was comprised of two documents: a proposal letter from Knott dated January 20, 1999,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                    Page 7
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
(Cite as: 2001 WL 1667879 (Conn.Super.))

and an acceptance letter from Fitzpatrick dated February 11, 1999. (Plaintiff's Exhibit 14.) The Notice of Contract was recorded on March 22, 2000, and further provides that the agreement is on file at Knott's office. (Plaintiff's Exhibit 14.) The proposal letter advises Fitzpatrick that Hawley could obtain tax abatements for the property for six to seven years, that Knott would work on a contingency fee basis, that the contingency fee would amount to one third of any taxes Hawley would save as a result of the abatement, and that, if Fitzpatrick were interested, he should countersign the proposal letter or advise Knott as to what actions he should take. (Plaintiff's Exhibit 15.) Fitzpatrick's reply letter states he and Helies had discussed Knott's proposal and that Knott could begin to pursue the tax abatements only after Hawley was authorized to obtain all necessary building and zoning permits. (Plaintiff's Exhibit 15.) Fitzpatrick also advised Knott that, if Knott could do any work "within your office walls which could help you in your quest, then do so." (Plaintiff's Exhibit 15.) Knott alleges he began working on the tax abatement in January 1999, that the tax abatement application was submitted in October 1999, and that the application received final approval on October 25, 1999. He further alleges he was discharged by Hawley in April 2000.

*8 The plaintiff argues that, although Knott obtained the tax abatement for Hawley, Hawley did not realize or obtain the benefit of the tax savings because it did not sign the contracts that would have put the tax abatement into effect. Thus, the plaintiff contends that Knott did not generate a fund to which his lien could attach and which would give his lien priority over the plaintiff's mortgage. Knott contends the two letters constitute a contract between him and Hawley which provided that, if Knott successfully obtained the tax abatement, his fee would be one third of the tax savings. Knott argues that he successfully obtained the tax abatement for Hawley on October 25, 1999, when final approval for the tax abatement was obtained. Knott argues that Hawley's failure to sign the contracts to put the tax abatement into effect does not and should not deprive him of his one third fee because he earned his fee when final approval for the tax abatement was received. Thus, Knott contends that his lien is valid and should be given priority over the plaintiff's mortgage or, in the alternative, that there is an issue of fact as to whether Hawley benefited from Knott's work.

A special or charging lien "is a lien placed upon any money recovery or fund due the client at the conclusion of suit." *Marsh, Day & Calhoun v. Solomon,* 204 Conn. 639, 643 (1987). "It has long been held that an attorney has an equitable lien upon the avails [of his actions for a client] for the services and expenses in the suit." (Internal quotation marks omitted.) *Cooke v. Thresher,* 51 Conn. 105, 107 (1883); *Perlmutter v. Johnson,* 6 Conn.App. 292, 298 (1986), cert. denied, 200 Conn. 801 (1986), cert. denied, 479 U.S. 1035, 107 S.Ct. 886, 93 L.Ed.2d 839 (1987). Our Supreme Court first recognized a charging lien in *Cooke, supra,* wherein the Court indicated a charging lien "is a common law lien recognized as an equitable means to enforce a client's agreement to pay fees from the judgment or settlement achieved by the efforts of counsel." *Gordon v. Ignal,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 339700 (March 8, 2001) (Rush, J.). In *Marsh, Day & Calhoun v. Solomon, supra,* our Supreme Court approved (albeit in the context of retaining rather than charging liens) the principle that "an attorney who has worked on a matter shall be favored with regard to the asset he or she has worked to create." 204 Conn., at 644. Thus, our Supreme Court continues to recognize the existence of an attorney's common law charging lien where, as here, there is a written agreement that entitles the attorney to obtain his fee from the recovery. See also, *McNamara & Goodman v. Pink,* 44 Conn.Sup. 592, 601-02, 18 Conn. L. Rptr. 660 (1997).

An attorney's charging lien "may also be created by a contingency fee agreement in which the parties contract that the attorneys fees will come from the judgment recovered ... In the absence of statute or agreement indicating otherwise, the lien attaches to the judgment but relates to the commencement of services ." [FN7] *Paine Webber, Inc. v. Chapman, Moran,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 290715, (McGrath, J.) (September 7, 1994). The Supreme Court has stated that "no distinction is to be made [for charging liens brought against] recoveries achieved by judgment and those obtained by settlement." *McNamara & Goodman v. Pink,* 44 Conn.Sup. at 602.

FN7. "Ordinarily a contract providing that the attorneys fee will be a fixed percentage of the recovery does not, standing by itself, create [a charging] lien." Gordon H. Wentworth, Attorney's Liens--A Survey and a Proposal," 35 Conn. Bar Journal 191 (1961). "An agreement to pay a lawyer's contingent fee 'from' or 'out of the proceeds of the litigation is at least some indication of an intent to create an equitable lien, if not an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85
**(Cite as: 2001 WL 1667879 (Conn.Super.))**

Page 8

equitable assignment. And an agreement that the attorney will 'have' for his or her contingent fee a part of the very fund recovered, or other agreement of like substance, leaves little doubt that, at the least, an equitable lien is created in favor of the attorney." *Id.,* at 196.

**\*9** In the present case, Knott was employed by Hawley to provide multiple services in relation to the property. The Notice of Contract specifically relates to obtaining a tax abatement for the property. Knott obtained the abatement he was hired to obtain. That the defendant failed to sign the contract necessary to effectuate the tax relief sought cannot deprive Knott of the equitable lien he has and that is so notwithstanding the absence of either a court judgment or approved settlement agreement. [FN8] There is a genuine issue of material fact as to whether his work generated a "fund" to which an attorney's charging lien might attach as there is a genuine issue of material fact whether such lien has priority over the plaintiff's mortgage. There is insufficient evidence presented to conclude Hawley did not sign the contract in question and, thus, a genuine issue of material fact exists in that regard as well. The plaintiff having failed to make the requisite showing as to Knott, its motion for summary judgment as pertains to Knott is denied.

> FN8. See *Kubeck v. Cossette,* 28 Conn. L. Rptr. No. 1, 35 (November 6, 2000), and *Butterworth & Scheck, Inc. v. Cristwood Contracting, Inc.,* 25 Conn. L. Rptr. No. 4, 130 (September 27, 1999).

The motion for summary judgment is granted as to Tilton and Fitzco; it is denied as to Knott.

So Ordered,

2001 WL 1667879 (Conn.Super.), 31 Conn. L. Rptr. 85

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.
2001 WL 290392 (Conn.Super.)
**(Cite as: 2001 WL 290392 (Conn.Super.))**

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Irwin J. GORDON,
v.
Howard Evan IGNAL.

**No. CV96339700S.**

March 9, 2001.

MEMORANDUM OF DECISION RE: OBJECTION TO THE REPORT OF THE A.T.R.

RUSH.

*1 The plaintiff, Irwin Gordon, alleges the following facts in his one-count amended complaint. Between April and August 1990, Mercantile Bank of Kansas City (Mercantile Bank) retained the plaintiff, in writing, as an attorney in a collection matter against Robert and Carolyn Satawhite at a one-third contingency fee. The plaintiff commenced suit and, on December 10, 1990, a judgment was entered in favor of Mercantile Bank against the Satawhites in the amount of $7191.79. In March 1991, the plaintiff obtained an execution on the wages of Robert Satawhite. Sheriff Thomas English served the wage execution on Robert Satawhite's employer (the city of Bridgeport). On June 11, 1992, the defendant Howard Ignal and/or his law firm, Bridgeport Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C. f/k/a Ignal and Vogel, P.C., wrote to the comptroller and directed the comptroller to send all wage executions to the defendant's office. The sheriff and the plaintiff were not notified of this communication. From June 1992, to the date of the amended complaint, May 2, 1997, the city of Bridgeport sent all the deductions it took from Robert Satawhite's wages pursuant to the wage executions to the defendants. The plaintiff alleges that he has a charging lien on these funds. The plaintiff also seeks attorneys fees, sheriff fees and costs.

The plaintiff initially brought a small claims action

against Ignal. On December 12, 1996, the court granted Ignal's motion to transfer the case to the Superior Court. On November 12, 1997, the court, Melville, J., granted the plaintiff's motion to cite in Weinstein, Weiner, Ignal, Vogel and Napolitano, P.C. as an additional defendant. [FN1]

FN1. In his motion to cite in, the plaintiff claims that Ignal stated that the law firm of Weinstein, Weiner, Ignal, Vogel and Napolitano, P.C., f/k/a Ignal and Vogel, P.C. replaced the defendant in the collection matter and was therefore the proper defendant. In Ignal's memorandum in support of his motion for summary judgment filed on April 30, 1997, Ignal states that "Mercantile dismissed the plaintiff sometime in 1992, and retained the services of Weinstein, Weiner, Ignal, Vogel and Napolitano, P.C., f/k/a Ignal and Vogel, P.C."

The case was referred to an attorney trial referee who submitted a report on December 14, 1998, containing the following findings of fact: 1) the plaintiff was requested to undertake the collection of Mercantile Bank's claim against the Satawhites; 2) the plaintiff offered to undertake the claim at a one-third contingency fee, plus costs; 3) Mercantile Bank, agreed to retain the plaintiff; 4) the plaintiff commenced suit in Superior Court and obtained a judgment on behalf of Mercantile Bank against the Satawhites for $7191.79 including costs; 5) the plaintiff applied for and was issued an execution on the wages of Robert Satawhite, an employee of the city of Bridgeport; 6) the plaintiff forwarded the execution to Sheriff English who served the execution on Robert Satawhite's employer, on March 23, 1991; 7) the sheriff's execution fee of $451.37 has not been paid; 8) the total amount of the levy including the sheriff's fees was $7549.16; 9) the plaintiff received $1550 directly from the city of Bridgeport pursuant to the wage execution; 10) the plaintiff advised Mercantile Bank that the sheriff would be paid from the funds received by him pursuant to the wage execution; 11) on June 8, 1992, Howard Ignal of the law firm of Ignal & Vogel was retained by Mercantile Bank to replace the plaintiff as counsel in the Satawhite matter at a one-third contingency fee; 12) on June 11, 1992, the plaintiff was advised by Mercantile Bank to withdraw from

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                      Page 2
2001 WL 290392 (Conn.Super.)
**(Cite as: 2001 WL 290392 (Conn.Super.))**

the Satawhite matter and forwarded all funds and unused advanced costs in his possession to Mercantile Bank, which the plaintiff did, minus his fees; 13) on June 11, 1992, Ignal advised the city of Bridgeport of the change of counsel and directed the city to remit all further garnished funds in the Satawhite matter directly to him; Ignal did not advise either the plaintiff or the sheriff of his action; 14) the city of Bridgeport forwarded the balance of sums due, in the amount of $6009.16, directly to Ignal's office; 15) there was no evidence that Howard Ignal or his firm performed any services for Mercantile Bank other than to collect funds pursuant to the original wage execution; and 16) the law firm of Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C. is the successor firm to Ignal & Vogel P.C.

On the basis of these findings of fact, the attorney trial referee concluded that: "Plaintiff has a charging lien on funds received by the defendant by way of a wage execution on Judgment obtained by plaintiff's efforts in the *Mercantile Bank v. Satawhite* case." [FN2] The attorney trial referee recommended that judgment be entered in favor of the plaintiff for $2003.06 and that the plaintiff be responsible for and pay the sheriff's fees in the amount of $451.37.

> FN2. The attorney trial referee explained:
> A charging lien is a lien placed upon any money, recovery or fund due the client at the conclusion of suit. *Marsh, Day, and Calhoun v. Solomon,* 204 Conn. 639, 643, 529 A.2d 702 (1987). It is a claim by an attorney on the judgment, decree or award in a particular case. If the attorney got possession of the fund, he had a general lien. If he did not get possession of the fund, his lien was for services that brought the fund into existence. *In re Heinsheimer v. Schulte,* 214 N.Y. 361, 108 N.E. 636 (1915). The right of an attorney to reap benefits of his labor has been continuously recognized and labeled by the courts as a charging lien. *See 6 University of Bridgeport Law Review 77, 92.*

**\*2** On December 29, 1998, the defendants filed a motion to correct the attorney trial referee's report on the grounds that the findings of fact were erroneous because the facts established that Ignal was not acting individually in the Satawhite matter and that the plaintiff was discharged for cause for failure to remit in a timely manner. The attorney trial referee denied the motion to correct on December 29, 1998.

The defendants apparently did not file an exception to the attorney trial referee's report, however, on December 28, 1998, the defendants filed objections to the acceptance of the attorney trial referee's report on the grounds that: (1) the attorney trial referee erred in finding that Ignal was individually liable to the plaintiff; (2) the attorney trial referee erred in finding that Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C. was the successor law firm to Ignal & Vogel, P.C. because Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C. is not a party to the action and that even if it was the successor firm, there was no evidence that Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C. agreed to assume the liabilities of Ignal & Vogel, P.C.; (3) the attorney trial referee erred in entering a money judgment in favor of the plaintiff because the plaintiff requested only equitable relief; (4) the attorney trial referee erred in concluding that the plaintiff had a charging lien because the plaintiff failed to name a party necessary to this action and failed to prove he had a charging lien against the defendants; and (5) the attorney trial referee erred in determining that the plaintiff is entitled to judgment because the plaintiff was discharged for failure to remit in a timely manner. The file does not reflect that the plaintiff filed a written response to the defendants' objections.

"Procedures before attorney state trial referees are governed by Practice Book § § 434f through 444 [Practice Book (1998 Rev.) § § 19-8 through 19-18]. Attorney trial referees are empowered to hear and decide issues of fact ... The trial court, as the reviewing authority, may render whatever judgment appropriately follows, as a matter of law, from the facts found by the attorney trial referee." (Citations omitted.) *TDS Painting & Restoration, Inc. v. Copper Beach Farm, Inc.,* 45 Conn.App. 743, 750-51, 699 A.2d 173, cert. denied, 243 Conn. 908, 701 A.2d 338 (1997). Section 19-16 (1998 Rev.) provides in part: "If exceptions or objections have been seasonably filed, the case should be claimed for the short calendar for hearing thereon; and the court may, upon the decision as to them, forthwith direct judgment to be rendered." Section 19- 17 (1998 Rev.) provides in part: "(a) The court shall render such judgment as the law requires upon the facts in the report ... If the court finds that the [attorney trial referee] has materially erred in its rulings ... or that there are other sufficient reasons why the report should not be accepted, the court shall reject the report and refer the matter to the same or another [attorney trial referee] for a new trial or revoke the reference and leave the case to be disposed of in court." [FN3]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                          Page 3
2001 WL 290392 (Conn.Super.)
(Cite as: 2001 WL 290392 (Conn.Super.))

FN3. The 1998 revision of the Practice Book was in effect at the time the attorney trial referee issued his report and the defendants filed their objections. Sections 19-16 and 19-17 were amended effective January 1, 2000, but the amendments did not alter these sections in a manner that is material to this case.

The procedure a party must follow in order to object to an attorney trial referee's report and the scope of a trial court's review thereof depends upon the portion of the report that is challenged. As to the attorney trial referee's findings of fact, "[a] reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court ... the Appellate Court ... or the Superior Court reviewing the findings of ... attorney trial referees. See Practice Book § 443 [now § 19-17] ... This court has articulated that attorney trial referees and factfinders share the same function ... whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court ... The factual findings of a [trial referee] on any issue are reversible only if they are clearly erroneous ... [A reviewing court] cannot retry the facts or pass upon the credibility of the witnesses ... A finding of fact is clearly erroneous when there is no evidence in the record to support it ... or when although there is evidence to support it, the reviewing court on the entire evidence is left with definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Meadows v. Higgins*, 249 Conn. 155, 162, 733 A.2d 172 (1999). "[A] trial court cannot find additional facts or reject others unless a material fact has been found without evidence." *TDS Painting & Restoration v. Copper Beech Farm, supra*, 45 Conn.App. 751.

*3 At the time the attorney trial referee's report was issued and the defendants' motions were filed in this case, a party contesting an attorney trial referee's findings of fact was required to file a motion to correct the report pursuant to Practice Book § 19-12 and then an exception to the report pursuant to Practice Book § 19-13. [FN4] Section 19-12 (1998 Rev.) specifically provided, in part: "If either party desires to have the report or the finding corrected by striking out any of the facts found, or by adding further facts ... such party shall within two weeks after the filing of the report or finding file with the court a motion to correct setting forth the changes

and additions that are desired ..." Section 19-13 (1998 Rev.) specifically provided, in part: "If a committee fails to correct a report or finding in compliance with a motion to correct, the moving party may, within ten days after the decision on the motion to correct, file exceptions seeking corrections by the court in the report or finding. The court will not consider an exception unless its subject matter has been submitted to the committee in a motion to correct ... nor will the court correct a finding of fact unless a material fact has been found without evidence or the committee has failed to find an admitted or undisputed fact, or has found a fact in such doubtful language that its real meaning does not appear. *A party excepting on these grounds must file with the party's exception a transcript of the evidence taken before the committee,* except such portions as the parties may stipulate to omit." (Emphasis added.)

FN4. Sections 19-12 and 19-13 were repealed as of January 1, 2000 and § 19-14 has been amended twice. The commentary to Practice Book § 19-12 (2000 Rev.) states: "The amendments simplify the process by leaving all challenges to the report brought before the reviewing judge by way of objection; the reviewing judge will make the determination whether to rule on the objection or remand the case to the attorney trial referee for rehearing." In addition, the commentary to Practice Book § 19-14 (2000 Rev.) states: "With the repeal of Section 19-13 regarding exceptions, this section is the sole vehicle for review of the findings in the report. It is a simpler procedure which allows a more wide-ranging review of the findings."

When a party contests an attorney trial referee's legal conclusions, the court "must determine whether [legal conclusions] are legally and logically correct and whether they find support in the facts found by the [attorney trial] referee." (Internal quotation marks omitted.) *Villano v. Polimeni*, 54 Conn.App. 744, 747-48, 737 A.2d 950, cert. denied, 251 Conn. 908, 739 A.2d 264 (1999). At the time the defendants filed their objections, a party objecting to the attorney referee's conclusions of law was required to file an objection to acceptance of report pursuant to Practice Book § 19-14. At that time, § 19-14 stated: "(a) A party may file objections to the acceptance of a report on the ground that conclusions of fact stated in it were not properly reached on the basis of the subordinate facts found, or that the committee erred in rulings on evidence or other rulings or that there

Not Reported in A.
2001 WL 290392 (Conn.Super.)
(Cite as: 2001 WL 290392 (Conn.Super.))

Page 4

are other reasons why the report should not be accepted. (b) If an objection raises an issue of fact the determination of which may require the consideration of matters not appearing in the report or stenographic notes of proceedings before the committee, the adverse party shall, within two weeks after the filing of the objection, file a statement raising such issue." [FN5]

FN5. Effective January 1, 2000, § 19-14 was amended to provide: "A party may file objections to the acceptance of a report on the ground that conclusions of fact stated in it were not properly reached on the basis of the subordinate facts found, or that the ... attorney trial referee erred in rulings on evidence or other rulings or that there are other reasons why the report should not be accepted." Under this version, the objecting party was not expressly required to file a transcript. Effective January 1, 2001, § 19-14 was amended to specify that the objecting party must file a transcript. Currently § 19-14 provides: "A party may file objections to the acceptance of a report on the ground that conclusions of fact stated in it were not properly reached on the basis of the subordinate facts found, or that the committee or attorney trial referee erred in rulings on evidence or other rulings or that there are other reasons why the report should not be accepted. A party objecting on these grounds must file with the party's objections a transcript of the evidence taken before the committee, except such portions as the parties may stipulate to omit." According to the commentary: "This amendment clarifies the procedure in these matters." This suggests that the objecting party was also required to file a transcript under the 2000 version of § 19-14.

*4 In this case, the following objections made by the defendants are objections to the attorney trial referee's findings of fact: (1) that the attorney trial referee erred in finding that Ignal was individually liable to the plaintiff; (2) that the attorney trial referee erred in finding that Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C. was the successor law firm to Ignal & Vogel, P.C.; and (3) that the attorney trial referee erred in determining that the plaintiff was entitled to judgment because the plaintiff was discharged for failure to remit. These objections cannot be corrected because the defendants did not file an exception and a transcript of the proceedings.

It is axiomatic that [s]ection 440 [Practice Book (1998 Rev.) § 19-14] ... cannot be used to attack findings of fact." Iroquois Gas Transmission System v. Mileski, 43 Conn.App. 47, 52, 682 A.2d 140 (1996), cert. denied, 239 Conn. 936, 684 A.2d 707 (1996). "Th[e] exceptions must be accompanied by a transcript of the evidence taken before the referee, apart from such portions as the parties may stipulate to omit." (Emphasis added.) Garofalo v. Argraves, 147 Conn. 685, 687-88, 166 A.2d 158 (1960). When the party objecting to findings of fact fails to file a transcript with the trial court, "the trial court properly [concludes] that it [is] impossible for the court to ascertain whether there is support in the record for the referee's findings of fact." (Internal quotation marks omitted.) Meadows v. Higgins, supra, 248 Conn. 170 n. 10. In such circumstances, "the factual findings properly [stand] uncorrected and the [trial] court's role in [ruling on the objection is] limited to determining whether the subordinate facts found by the attorney referee were sufficient to support the referee's ultimate factual conclusions." (Internal quotation marks omitted.) Id. Because the defendants here did not file an exception and a transcript, "the court has no basis upon which to correct any finding of fact," Green & Gross P.C. v. Senie, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 340114 (September 10, 1998) (Mottolese, J.), and the court can only determine whether the facts found by the referee support the referee's conclusion.

The defendants' remaining objections arguably challenge the attorney trial referee's legal conclusion. Accordingly, the court must "review the referee's entire report to determine whether the recommendations contained in it are supported by findings of fact in the report ... [T]he trial court cannot accept an attorney trial referee's report containing legal conclusions for which there are no subordinate facts." Post Road Iron Works v. Lexington Development Group, Inc., 54 Conn.App. 534, 541, 736 A.2d 920 (1999).

*5 The defendants object that the referee erroneously "entered a money judgment in favor of the plaintiff" despite the plaintiff's failure to include a prayer for relief in his complaint. "Practice Book § 131 [Practice Book (1998 and 2001 Rev. § 10-20] states that a complaint 'shall contain a concise statement of the facts constituting the cause of action and, on a separate page of the complaint, a demand for relief which shall be a statement of the remedy or remedies sought.' " DiMartino v. Physicians Health Services,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
2001 WL 290392 (Conn.Super.)
**(Cite as: 2001 WL 290392 (Conn.Super.))**

Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 286993 (May 5, 1993) (Ballen, J.) (9 Conn.L.Rptr. 85). "In an ordinary civil case, the general rule is that a prayer for relief must articulate with specificity the form of relief that is sought ... A party who fails to comply with this rule runs the risk of being denied recovery." (Citations omitted.) *Stern v. Medical Examining Board,* 208 Conn. 492, 501, 545 A.2d 1080 (1988).

When a plaintiff seeks equitable relief, however, Practice Book § 10-27 states: "A party seeking equitable relief shall specifically demand it as such, unless the nature of the demand itself indicates that the relief sought is equitable relief." "Where the nature of the case and the nature of the plaintiff's demand is such that equitable relief is clearly being sought, a specific demand for equitable relief is not necessary." (Citation omitted.) *Dorsey v. Mancuso,* 23 Conn.App. 629, 634, 583 A.2d 646 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1234 (1991). In *Cooke v. Thresher,* 51 Conn. 105, 107 (1883), the Supreme Court indicated that a charging lien is a common law lien "recognized as an equitable means to enforce a client's agreement to pay fees from the judgment or settlement achieved by the efforts of counsel." *McNamara & Goodman v. Pink,* 44 Conn.Supp. 592, 600-01, 696 A.2d 1328, 18 Conn.L.Rptr. 660 (1997).

In this case, the attorney trial referee's recommendation that monetary judgment enter in favor of the plaintiff is legally and logically correct and is supported by the attorney trial referee's findings of fact. [FN6] As noted by this court in denying Ignal's motion for summary judgment, "The original complaint filed against Attorney Ignal requests a monetary award of approximately $2,500, which is the amount Attorney Gordon would have received for his legal services and the sheriff's fee had Attorney Ignal not interfered with Attorney Gordon's right to a charging lien." *Gordon v. Ignal,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 339700 (September 22, 1997) (Thim, J.). Therefore, the defendants' objection to the attorney trial referee's recommendation that a monetary judgment should be entered in favor of the plaintiff.

> FN6. On November 25, 1998, the plaintiff filed an amended complaint that included a prayer for relief to conform to proof at trial. The defendants filed a motion to strike the amended complaint. The court, Nadeau, J, granted the motion to strike "without

prejudice to a formal request made on January 4, 1999, to this court. Further, its resolution must precede any entertainment by the court of the defendant's attack on the report of the ATR." The record does not indicate that the plaintiff subsequently filed a request to amend.

The defendants object to the attorney trial referee's report on the grounds that the plaintiff failed to name a necessary party and the attorney trial referee erroneously concluded that the plaintiff had a charging lien against the defendants. As to the first part of this objection, the defendants apparently contend that Mercantile Bank was a necessary party to this action. Necessary parties are "[p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it ... [B]ut if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties ... In short, a party is necessary if its presence is absolutely required in order to assure a fair and equitable trial." (Internal quotation marks omitted; citations omitted.) *Biro v. Hill,* 214 Conn. 1, 5-6, 570 A.2d 182 (1990). "Ordinarily, an objection predicated on a claim of nonjoinder of a necessary or indispensable party does not go to the jurisdiction of the court ... Unless a defendant promptly raises the question of nonjoinder pursuant to applicable rules of practice, any such objection is deemed to have been waived, and cannot be raised at a later stage of the proceedings ... When, however, a suit cannot be disposed of properly on its merits in the absence of an indispensable party, the objection is not waived by failure to assert it in a motion to strike and may be raised on appeal." (Citations omitted.) *Gaudio v. Gaudio,* 23 Conn.App. 287, 305-06, 580 A.2d 1212, cert. denied, 217 Conn. 803, 548 A.2d 471 (1990).

*6 In this case, the attorney trial referee's findings of fact support the referee's legal conclusion and do not support the defendants' argument. The only finding the attorney trial referee entered regarding who had possession of the funds was his finding that as of June 11, 1992, Robert Satawhite's employer forwarded the funds directly to Ignal's office. The attorney trial referee did not enter a finding as to whether Mercantile Bank gained possession of the funds.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                          Page 6
2001 WL 290392 (Conn.Super.)
**(Cite as: 2001 WL 290392 (Conn.Super.))**

In the second part of this objection, the defendants contend that the attorney trial referee did not logically and correctly conclude that the plaintiff had a charging lien against the defendants. A charging lien "is a lien placed upon any money recovery or fund due the client at the conclusion of suit." *Marsh, Day & Calhoun v. Solomon*, 204 Conn. 639, 643, 529 A.2d 702 (1987). "It is noted that Connecticut law concerning attorney charging liens is relatively undeveloped. In *Andrews v. Morse*, 12 Conn. 444 (1838), the court recognized attorneys may have a lien on the judgment 'until their fees and disbursements are paid, subject to the equitable rights of others.' *Id.* 446. The [Supreme] court has since recognized the continued vitality of its holding, but has never actually applied the rule again. See *Marsh, Day & Calhoun v. Solomon*, [*supra*, 204 Conn. 644]; *Benjamin v. Benjamin*, 17 Conn. 110 (1838)." *Paine Webber, Inc. v. Chapman, Moran*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 290715 (September 7, 1994) (McGrath, J.). "In *Marsh, Day & Calhoun v. Solomon, supra*, [204 Conn. 644], the Supreme Court approved, albeit in the context of retaining rather than charging liens, the principle that an attorney who has worked on a matter shall be favored with regard to the asset he or she has worked to create. Such recognition suggests that the Supreme Court would continue to recognize the existence of a common law charging lien against a recovery secured by the efforts of an attorney where, as here, there is a written agreement that entitles the attorney to obtain his fee from the recovery." *McNamara & Goodman v. Pink, supra*, 44 Conn.Sup. 601-02, 18 Conn.L.Rptr. 660.

"An attorney's charging lien on a judgment is intended to secure compensation for services rendered to the client. 7 Am.Jur.2d. *Attorneys at Law* § 324 (1980 & Supp.1993). At common law, the lien gives an attorney the right to recover his fees and the money expended on behalf of the client from a judgment the attorney obtained for the client. *Id.* Underlying any charging lien must be an express or implied contract for fees entered into by the attorney and client. *Id.* Such a lien may also be created by a contingency fee agreement in which the parties contract that the attorneys fees will come from the judgment recovered. *Id.*, § 326." *Paine Webber, Inc. v. Chapman, Moran, supra*, Superior Court, Docket No. 290715. Thus, Connecticut law recognizes and will enforce an attorney's charging lien upon a fund created by litigation up to the amount expressly contracted for legal fees and costs by the client. See *McNamara & Goodman v. Pink, supra*, 44

Conn.Supp. 592, 696 A.2d 1328.

**\*7** In this case, according to the attorney trial referee's findings, the plaintiff and Mercantile Bank agreed that the plaintiff would undertake collection of the Satawhite matter for a one-third contingency fee. Thus, the findings indicate the plaintiff and Mercantile Bank had a valid contract for fees based on the amount of the judgment. The attorney trial referee also found that the plaintiff undertook the representation, obtained a judgment and initiated the collection thereof and that Mercantile Bank retained Ignal to replace the plaintiff in this matter and the balance for the funds collected on the judgment were sent directly to Ignal's office. Thus, the attorney trial referee's conclusion that the plaintiff had a charging lien is supported by the subordinate facts and is legally and logically correct.

Accordingly, defendants' objections are overruled and judgment may enter for the plaintiff in accordance with the referee's report.

2001 WL 290392 (Conn.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

This is to certify that on this 19th day of November, 2004, a copy of the foregoing has

been sent via FedEx to the following:

BINGHAM McCUTCHEN LLP
Richard S. Taffet, Esq.
Alicia L. Downey, Esq.
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

WIGGIN & DANA LLP
Robert M. Langer, Esq.
Suzanne E. Wachsstock, Esq.
Steven Bruce Malech, Esq.
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

ROBINSON & COLE LLP
Craig A. Raabe, Esq.
Edward J. Heath, Esq.
Elizabeth A. Fowler, Esq.
Stephen M. Deane, Esq.
280 Trumbull Street, 28th Floor
Hartford, CT 06103

MAYER, BROWN, ROWE & MAW, LLP
Andrew S. Marovitz, Esq.
Britt M. Miller, Esq.
Dana S. Douglas, Esq.
190 South LaSalle Street
Chicago, IL 60603

MAYER, BROWN, ROWE & MAW LLP
Christopher J. Kelly, Esq.
1909 K Street
Washington, DC  20006-1157

EIMER STAHL KLEVORN & SOLBERG, LLP
Andrew G. Klevorn, Esq.
Nathan P. Eimer, Esq.
Ryan S. Hedges, Esq.
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

_Ann Marie Folan_
Ann Marie Folan

NY #624557 v7