UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., AND MEGAVISA SOLUTIONS (S) PTE. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD., AND DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD., <br><br> Defendants. | CIVIL ACTION <br> NO. 3:02 CV 1107 (AVC) <br><br> April 6, 2005 |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO VACATE THE ORDER GRANTING RULE 12(b)(2) MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

BINGHAM McCUTCHEN LLP
Richard S. Taffet (ct 10201)
Alicia L. Downey (ct 22066)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (FAX)

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

*Attorneys for Plaintiffs MM Global Services Inc., MM Global Pte. Ltd.*
*and Megavisa Solutions (S) Pte. Ltd.*

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .................................................................................... 1

II.    PROCEDURAL BACKGROUND.................................................................................. 3

       A.     The November 17, 2003 Decision Granting the UCCS and Dow Singapore
              Motions to Dismiss ...................................................................................... 3

       B.     Defendants' Failure to Provide Documents, Information, and
              Knowledgeable Witnesses in Response to Plaintiffs' Personal Jurisdiction
              Discovery Requests.................................................................................... 5

III.   FACTS ESTABLISHING PERSONAL JURISDICTION OVER UCCS AND
       DOW SINGAPORE................................................................................................ 6

       A.     UCCS's and Dow Singapore's Purchases from UCC in Connecticut ................... 6

       B.     Visits to Connecticut by UCCS and Dow Singapore Directors, Officers,
              and Employees ......................................................................................... 9

IV.    ARGUMENT ...................................................................................................... 12

       A.     Both UCCS and Dow Singapore "Transacted Business" of a "Substantial
              Character" with UCC in the State of Connecticut ............................................ 12

V.     CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

*B.J. Semel Associates, Inc. v. United Fireworks Manufacturing Co.*, 355 F.2d 827
(D.C. Cir. 1965) ...................................................................................................14

*Dunham's, Inc. v. National Buying Syndicate of Texas*, 614 F. Supp. 616
(E.D. Mich. 1985) ...............................................................................................13

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927)...............3, 12

*Goldlawr Inc. v. Heiman*, 288 F.2d 579 (2d Cir. 1961)......................................................3

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 560 F. Supp. 730
(S.D.N.Y. 1983) ..........................................................................................3, 4, 12

*McCrory Corp. v. Cloth World, Inc.*, 378 F. Supp. 322 (S.D.N.Y. 1974)....................3, 12

*School District of Philadelphia v. Harper & Row Publishers, Inc.*,
267 F. Supp. 1006 (E.D. Pa. 1967) ................................................................12

*Turbine Engine Corp. v. Chromalloy America Corp.*, 265 F. Supp. 766
(D. Conn. 1967) ...............................................................................................13

*United States v. Burlington Industries, Inc.*, 247 F. Supp. 185 (S.D.N.Y. 1965).....3, 12,13

*United States v. Scophony Corp. of America*, 333 U.S. 795 (1948) ...................................13

## STATUTES AND RULES

Fed. R. Civ. P. 12(b)(2)........................................................................................................3

15 U.S.C. § 22...........................................................................................................1, 3, 14

LITDOCS/572103.1

## I.    PRELIMINARY STATEMENT

At the Court's invitation, plaintiffs MM Global Services, Inc., MM Global Services Pte.
Ltd., and Megavisa Solutions (S) Pte. Ltd. (collectively, "plaintiffs") submit this brief in support
of vacating the Court's prior dismissal, for lack of personal jurisdiction, of the claims against
Union Carbide Customer Services Pte. Ltd ("UCCS") and Dow Chemical Pacific (Singapore)
Pte. Ltd. ("Dow Singapore"). *See* Order dated July 8, 2004 (granting plaintiffs' motion for
reconsideration and authorizing plaintiffs to conduct personal jurisdiction discovery with respect
to UCCS and Dow Singapore).

As set forth below, the partial record developed to date overwhelmingly establishes that
both UCCS and Dow Singapore "transacted business" of a "substantial character" in
Connecticut, thereby creating personal jurisdiction under Section 12 of the Clayton Act, 15
U.S.C. § 22.[1]  Specifically, between 1993 and 2002, UCCS and Dow Singapore each purchased
chemicals and other products from Union Carbide Corporation ("UCC"), located in Danbury
Connecticut.  These purchases, totaling <u>billions of dollars</u>, qualify as "substantial purchasing
activity" for purposes of conferring personal jurisdiction.

UCCS and Dow Singapore may attempt to deny that they engaged in this substantial
purchasing activity with UCC in Connecticut, by arguing that the products being purchased were
frequently ordered from out-of-state customer service representatives and manufactured and
shipped from out-of-state facilities.  But the evidence establishes without question that
Connecticut-based UCC managers and logistics personnel were integrally involved in the
pricing, allocating, shipping, and accounting of virtually every single transaction.  Thus,
hundreds of thousands of dollars worth of invoices issued to UCCS and Dow Singapore are

---

[1] As set forth below, personal jurisdiction discovery is still ongoing.  This submission is
made without prejudice to plaintiffs' right to amend or supplement their proof as review of
defendants' document production continues, and as defendants continue to disclose additional
documents and information.

imprinted with UCC's Danbury address.  Moreover, UCCS's audited financial statements from 1993 through 2003 disclose millions of dollars in purchases from the company's "Holding Company," identified as Union Carbide Corporation, headquartered in Danbury, Connecticut at all relevant times.  The fact that such sales were partially facilitated by people located outside Connecticut does not defeat jurisdiction; there is no requirement that <u>all</u> aspects of a defendants' purchasing activity occur exclusively within the forum state.

In addition to their substantial purchasing activity, UCCS and Dow Singapore directors, officers, and employees regularly traveled to Danbury, Connecticut for business purposes.  Even a small sampling of travel and expense records from 1998, 1999, 2000, and 2001 shows that, while in the State, often for several days at a time, UCCS and Dow Singapore personnel not only conducted business but also spent thousands of dollars on local hotels, restaurants, greens fees, and limousine rides.  Because of defendants' professed inability to locate responsive documents, the full extent of UCCS and Dow Singapore business travel and expenditures in Connecticut has not been discovered.  It is reasonable to infer from the partial production of documents, however, that business trips to Connecticut were frequent, and aggregate expenditures were substantial enough to merit consideration at least as "a significant factor" in finding that UCCS and Dow Singapore, as well as UCAP[2] (collectively, the "Affiliate Defendants"), transacted business in this forum state within the meaning of § 12.

Based on this evidence, both UCCS and Dow Singapore are subject to personal jurisdiction in this Court, and the order granting dismissal should therefore be vacated.

---

[2] Plaintiffs respectfully refer the Court to the previously submitted evidence of UCAP employees' meetings in Connecticut, as summarized in Plaintiffs' Memorandum of Law in Opposition to Defendants UCAP, UCCS and Dow Singapore's Motions to Dismiss for Lack of Personal Jurisdiction dated July 3, 2003 ("Plaintiffs' Opposition Brief"), at pp. 6-7.

## II.    PROCEDURAL BACKGROUND

### A.    The November 17, 2003 Decision Granting the UCCS and Dow Singapore Motions to Dismiss

On May 30, 2003, defendants Union Carbide Asia Pacific, Inc. ("UCAP"), UCCS, and

Dow Singapore each moved under Fed. R. Civ. P. 12(b)(2) to dismiss the Amended Complaint

for lack of personal jurisdiction.  In a Memorandum of Decision dated November 17, 2003 (the

"Nov. 17, 2003 Decision"), the Court defined the issue for determination as:  "Whether the

defendants 'transact business' of a 'substantial character' in Connecticut," so as to establish

personal jurisdiction under Section 12 of the Clayton Act, 15 U.S.C. § 22.  Nov. 17, 2003

Decision at 6, *see Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 373

(1927); *Goldlawr, Inc. v. Heiman*, 288 F.2d 579, 581 (2d Cir. 1961), *rev'd on other grounds*, 369

U.S. 463 (1962).[3]

In determining whether to grant the motions before it, the Court relied on case law

recognizing that transacting business of a "substantial character" could be established by

evidence of purchases of "significant quantities" of merchandise from vendors in the forum state.

Nov. 17 Decision at 6-7, *citing, e.g., McCrory Corp. v. Cloth World, Inc.*, 378 F. Supp. 322, 324

(S.D.N.Y. 1974); *United States v. Burlington Indus., Inc.*, 247 F. Supp. 185, 187 (S.D.N.Y.

1965).  Likewise, the Court noted that evidence of attendance at meetings in the forum state, in

conjunction with purchases, is "'a significant factor in finding that [the defendant] transacts

business' in the forum."  Nov. 17, 2003 Decision at 7, *quoting Indian Head, Inc. v. Allied Tube*

*& Conduit Corp.*, 560 F. Supp. 730, 732 (S.D.N.Y. 1983).

---

[3] The Nov. 17, 2003 Decision addresses, but rejects, plaintiffs' contention that the
*Goldlawr* case does not require them to prove that defendants transacted business of a substantial
character specifically in Connecticut, as opposed to any domestic venue, in order to prevail.
Plaintiffs do not waive this argument, but in the interest of brevity, this submission will focus
primarily on the overwhelming proof of UCCS's and Dow Singapore's substantial business
transactions with UCC in Connecticut, in conjunction with their directors', officers' and
employees' regular visits to the State, as the grounds on which to vacate the Court's prior
decision.

The Court then considered the following facts:

- UCAP placed purchase orders with Connecticut-based Union Carbide for Union Carbide/Dow products through a centralized computer system controlled in Connecticut. Nov. 17, 2003 Decision at 7;

- UCAP and UCCS purchased Union Carbide products directly from Union Carbide in the U.S.; "These purchase orders created separate contracts between Union Carbide, UCAP, and UCCS." Nov. 17, 2003 Decision at 3;

- UCAP's annual sales figures in the United States (i.e., its purchases from UCC) totaled in the tens of millions at various times in 1993, 1997, and 2000. Nov. 17, 2003 Decision at 7; and

- UCAP representatives attended meetings, held training sessions, and maintained a voicemail box in Connecticut. Nov. 17, 2003 Decision at 7.

The Court ruled that these facts, "viewed in their totality," were enough to establish that UCAP "transacted business" of a "substantial character" in Connecticut. Nov. 17, 2003 Decision at 7-8.

In the case of UCCS, the Court noted that although there was evidence of "some business transactions with Connecticut" the record did not reveal "how much purchasing activity was done here." *Id.* at 8. The Court concluded that it lacked jurisdiction over UCCS, therefore, because of insufficient evidence that UCCS engaged in "substantial" purchasing activity. *Id.* at 8. The Court went on to conclude that it lacked jurisdiction over Dow Singapore because of insufficient evidence "that Dow Singapore had any contacts, substantial or not, within Connecticut." *Id.*

Plaintiffs moved for reconsideration on the ground that the record was undeveloped and they should be permitted to obtain, through discovery, evidence of UCCS's and Dow Singapore's purchases from UCC, travel to Connecticut by their directors, officers and employees, and other facts relevant to determining whether the requirements of Section 12 could be satisfied. The July 8, 2004 Order granting plaintiffs' motion for reconsideration ordered them to submit a proposed scheduling order governing personal jurisdiction discovery. On July 29, 2004, as directed by the Court, plaintiffs filed their Proposed Scheduling Order and served narrowly tailored personal jurisdiction document requests and interrogatories on UCCS, Dow Singapore, UCC, Dow, and UCAP.

**B.    Defendants' Failure to Provide Documents, Information, and Knowledgeable Witnesses in Response to Plaintiffs' Personal Jurisdiction Discovery Requests**

Under the Proposed Scheduling Order, to which defendants made no objection, personal jurisdiction discovery was to have been completed by September 24, 2004. As of the date of this submission, however, defendants have supplemented their personal jurisdiction discovery responses twice, and they still have not disclosed all the requested information, nor have they confirmed that all responsive documents have been produced. In discovery conferences among counsel and in related correspondence, defendants' counsel has in fact admitted that they failed to provide all the information they undertook to provide in response to the personal jurisdiction interrogatories. They have also indicated that more responsive documents likely exist, including additional travel records and invoices from purchases by UCCS and Dow Singapore, but the documents could not be easily located and therefore were not produced.

In addition to their admittedly limited production of responsive documents, defendants produced witnesses for depositions under Rule 30(b)(6) who either had no personal knowledge of any relevant facts (e.g., a Dow in-house lawyer named William Herr, whose only connection with this case is partial responsibility for overseeing records searches), or who were not competent to testify about all the matters as to which they were supposed to have been prepared (e.g., Chris Berti, a former customer service representative for UCC who had no knowledge of Dow Singapore's purchases from UCC and was unfamiliar with most of the documents produced in response to plaintiffs' personal jurisdiction requests). Initial attempts to depose UCCS and Dow Singapore officers and employees designated as 30(b)(6) witnesses were effectively thwarted by defendants' refusal to bring them to Hartford, and then, after plaintiffs' counsel offered to take depositions by video, by asserted scheduling and logistical difficulties.

In short, after protracted delays, the personal jurisdiction record is somewhat more developed, but it is by no means complete. Nevertheless, plaintiffs believe the limited quantum of new evidence precisely fills the gaps identified by the Court in the November 17, 2003 Decision, making it unnecessary to delay this filing any longer.

### III.   FACTS ESTABLISHING PERSONAL JURISDICTION
### OVER UCCS AND DOW SINGAPORE

The pleadings, plaintiffs' previous submission in opposition to the motions to dismiss for lack of personal jurisdiction and the additional evidence submitted filed herewith establish the following facts:

### A.   UCCS's and Dow Singapore's Purchases from UCC in Connecticut

At all relevant times for purposes of defendants' motions to dismiss, UCC's executive officers, business unit managers, and other key operations were physically located in or controlled from Danbury, Connecticut. *See* Downey Aff.[4] ¶ 2, Exhibit A (UCC SEC filings, May 12, 1994 10-Q, identifying Danbury, Connecticut address of principal executive offices); March 20, 1997 10-K at pp. 1 and 4, showing Danbury address of Chairman, President and CEO and of VP, CFO, and Controller); Sangvhi Decl.[5] ¶¶ 14-16. For some time after the merger with Dow closed in 2001, UCC maintained its headquarters in Danbury. Downey Aff. ¶ 3, Exhibit B (cover page to UCC 10-K filed February 28 2003, showing 39 Old Ridgebury Road, Danbury, Connecticut as "Address of principal executive offices").

UCCS and Dow Singapore are designated as the "payer," "ordering party" or party "sold to" on numerous UCC invoices imprinted with its Danbury, Connecticut address. *See, e.g.,* Downey Aff. ¶¶ 4-5, Exhibits C and D. The total number of such invoices is unknown, as defendants were purportedly not able to locate and produce all Danbury invoices issued to UCCS and Dow Singapore. The few samples that were produced, however, show approximately $15,065,000 in sales to UCCS in May through July 1995 alone; at least $105,452 in December 2000 and January 2001; $1,533,792 in November and December of 2001; $2,238,600 in January

---

[4] Affidavit of Alicia L. Downey, submitted herewith.

[5] Declaration of Sanjiv Sanghvi, sworn to December 19, 2002, and submitted as Exhibit 39 to the Affidavit of Richard S. Taffet that accompanied Plaintiffs' Opposition Brief of July 3, 2003.

2002; and $3,171 between January and July 2003. The available samples of Danbury invoices issued to <u>Dow Singapore</u> total approximately $69,335 in 2002; $606,832 in May to December 2003; and $306,415 in January and February 2004.

The above-referenced invoices reflect but a tiny portion of UCCS's and Dow Singapore's total purchases from UCC. According to Dow/UCC/UCAP's joint interrogatory answers, UCC's sales to UCCS of the "Products" at issue, during the relevant time period, were:

| Year | Revenue (US dollars) | Quantity (by weight in lbs.) |
|------|---------------------|------------------------------|
| 1996 | 13,683,581 | 44,920,507 |
| 1997 | $353,161,465 | 915,013,576 |
| 1998 | $250,920,435 | 787,061,112 |
| 1999 | Between $1 million and $250 million[6] | undisclosed |
| 2000 | Between $1 million and $250 million | undisclosed |
| 2001 | $971,851 | 681,901 |
| 2002 | $17,546,123 | 5,240,648 |
| 2003 | $7,752,036 | 1,642,028 |
| 2004 | $13,057,524 | 1,101,543 |

*See* Downey Aff. ¶ 6, <u>Exhibit</u> <u>E</u>, Dow/UCC/UCAP's Answer to First Personal Jurisdiction Interrogatory No. 1, at 9. UCC's total Product sales to Dow Singapore, from 2001 to 2004, were:

| Year | Revenue (US dollars) | Quantity (by weight in lbs.) |
|------|---------------------|------------------------------|
| 2001 | $971,851 | 681,901 |
| 2002 | $17,546,123 | 5,240,648 |
| 2003 | $7,752,036 | 1,642,028 |
| 2004 | $13,057,524 | 1,101,543 |

*See id.* at 7. According to defendants, these revenue figures were derived not only from a vast multitude of sales transactions, but also from the processing of "samples, returns, [and] exchanges." *See id.* Many if not all of these millions of dollars in transactions involved Connecticut-based personnel, just as did the millions of dollars in sales by UCC to UCAP.[7] Such

---

[6] The figures for 1999 and 2000 have been stipulated by the parties as estimates because defendants claim they are unable to produce complete documentation concerning such sales.

[7] *See* summary of evidence at pages 7-10 of Plaintiffs' Memorandum of Law in

(Footnote Continued on Next Page.)

Connecticut-based functions included, for example:

- **Coordination with managers.** For every bulk order, Product Marketing Managers located in Danbury were responsible, through discussions with the responsible Inventory Planner, for making sure that inventory was available to ship. Downey Aff., ¶ 7, <u>Exhibit F</u>, Berti Dep.[8] at 55-57.

- **Allocation of scarce product.** Danbury-based Marketing Managers would also get involved in non-bulk orders as needed, "where products were limited and sales control in very tight supply." Berti Dep. at 95. *See also* Downey Aff. ¶ 8, <u>Exhibit G</u> (January 1999 email from UCCS Marketing Manager Wilson Foo, forwarding new allocation plans, "I apologise <u>on behalf of Danbury</u> . . .") (emphasis added); Downey Aff. ¶ 9, <u>Exhibit H</u> (January 2001 email from Foo forwarding message from Danbury-based Global Business manager Kevin Dillan regarding future planned and unplanned cuts in shipments and reduced inventories).

- **Business and financial decisions.** Business Managers, "many of them in Danbury," provided input to Inventory Managers on pending orders for chemicals. Downey Aff. <u>Exhibit F</u>, Berti Dep. at 97. So did "financial people" and "product market managers," "many" of whom were located in Danbury. *Id.* at 98; *see also* Downey Aff. ¶ 10, Exhibit I (Aug. 8, 1995 memo from "Business Director" Walter Rosemund issued from Danbury). The Business Managers and/or Directors reported to Vice Presidents and General Managers located in Danbury. Sanghvi Decl. at ¶ 15.

- **Booking and shipping.** "[E]very <u>order</u> that was packaged or bulk has to go to a booking person. So if it was going to be booked on a vessel, it had to go—if we were doing the shipping and booking, <u>it would go through the booking department in Danbury</u>." Downey Aff. <u>Exhibit F</u>, Berti Dep. at 100-101 (emphasis added).[9] *See also, e.g.,* Downey Aff. ¶ 11, <u>Exhibit J</u> (samples of booking and shipping-related communications from 1997, 2000 and 2001, concerning sales to UCCS copied to Danbury-based UCC employees, including Fanny Nunez, Tom Makowski, Kevin McGee, and Ray Kelly).

- **Receipt and filing of invoices.** Defendants' partial production of "Document Transmittal" forms dated from 1995, 1996, and 1997 show that copies of invoices and other transaction-related documents concerning sales to UCCS were routinely and

---

(Footnote Continued from Previous Page.)

Opposition to Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint for Lack of Personal Jurisdiction, incorporated by reference herein.

[8] Transcript of the deposition of Christine Berti, October 1, 2004, pursuant to Rule 30(b)(6).

[9] Ms. Berti surmised that the booking department in Danbury might have remained open through early 2002. Berti Dep. at 102.

systematically sent to UCC Danbury personnel. *See, e.g.*, Downey Aff. ¶ 12, <u>Exhibit</u> <u>K</u>.

Furthermore, the record shows that sales of *Products* comprised a mere fraction of the total sales made by UCC to UCCS. Indeed, UCCS's audited annual reports and financial statements disclose <u>billions</u> of dollars in purchases from the company's "Holding Company," (and later, after the merger with Dow, the "Immediate Holding Company") identified in the reports as none other than UCC, with its principal executive offices in Danbury, Connecticut:

| Year | Total Purchases by UCCS from UCC (Singapore dollars) |
|------|------------------------------------------------------|
| 1994 | $ 272,137,886 |
| 1995 | 517,820,346 |
| 1996 | 540,612,820 |
| 1997 | 597,436,039 |
| 1998 | 560,373,208 |
| 1999 | 673,193,368 |
| 2000 | 697,530,786 |
| 2001 | 178,052,674 |
| 2002 | 1,742,376 |
| **TOTAL** | $4,038,899,503[10] |

Downey Aff., ¶13, <u>Exhibit</u> <u>L</u> (UCCS Annual Reports and Audited Financial Statements, 1994 through 2002 at pp. L11-12; L27-28; L42-43; L58-59; L72-73; L87-88; L108; L125; L148-49). As noted above, Danbury-based executives, managers, and operational personnel were deeply involved in critical aspects of these transactions.

**B.    Visits to Connecticut by UCCS and Dow Singapore Directors, Officers, and Employees**

In addition to their purchases from UCC in Danbury, UCCS and Dow Singapore engaged in other business transactions in the State of Connecticut. Wilson Foo, a UCCS Marketing Manager, maintained a Danbury voicemail address. *See* Downey Aff. ¶ 14, <u>Exhibit</u> <u>M</u> (November 2000 email from Foo referring to "my handphone . . . or Danbury voicemail"). Similarly, UCCS Assistant Treasurer Kamal Jain maintained email addresses in Danbury and

---

[10] Based on the exchange rate as of March 1, 2005, this is $2,487,962,094 in U.S. dollars.

Singapore. Downey Aff. ¶ 15, <u>Exhibit N</u> (email at page numbered D00321044 from Kamal Jain shows two addresses, "Kamal-DBY" and "Kamal" and he writes, "please send my message to Singapore e-mail address instead of Danbury").

Discovery has also revealed evidence that several of UCCS's directors traveled to Danbury multiple times during their terms[11]:

a.      Arjun Samtani was a director of UCCS from 1993, when UCCS was first incorporated, until sometime in 2001.[12]  While a UCCS director, Samtani visited Danbury several times. *See* Plaintiffs' Opposition Brief at 6-7, citing emails from Samtani reporting on meetings he attended in Danbury, agenda dated January 16, 1999 listing Samtani as speaker at product-training program in Danbury, and email referring to Samtani's anticipated attendance at credit conferences).

b.      Ronald Neri was a UCCS director from 1995 until 2001.[13]  Travel-related documents show that he visited Danbury at least four times—in June 1998, January 1999, June 1999, and July 1999.  His total expenses were at least $4,300.  Downey Aff. ¶ 16, <u>Exhibit O</u> (Neri travel records).

c.      V. Krishna Moorthy was a UCCS director from 1993 until approximately mid-1999.[14]  He traveled to Danbury at least four times—May 1998, August 1998, December 1998, and February 1999.  His business expenses totaled at least $4,500.  Downey Aff. ¶ 17, <u>Exhibit P</u> (Moorthy travel records).

---

[11] The UCCS directors are identified on the first page of every UCCS Annual Report. *See* Downey Aff., <u>Exhibit L</u> (pages L2, L15, L31, L45, L61, L76, L91, L112, L136).

[12] Samtani was also a managing director of UCAP.

[13] Neri was also UCC's Area Vice President for Asia Pacific.

[14] Moorthy was also an area business/product director for UCC.

    d.       Lawrence Cheung was a UCCS director from May 22, 1995 until 2001.[15]  There is documentary evidence that he traveled to Danbury in June 1998 and spent at least $1,700. Downey Aff. ¶ 18, Exhibit Q (Cheung travel records).

In addition to travel by its directors, UCCS managers and customer services representatives also took business trips to Danbury:

    a.       Kamal Jain, Assistant Treasurer of UCCS, traveled to Danbury in January 1999 and January/February 2000 and spent at least $700.  Downey Aff. ¶ 19, Exhibit R (Jain travel documents).

    b.       David Yap was UCCS's Area Credit Manager. *See* Affidavit of David Yap dated February 4, 2003, appended as Exhibit 40 to the Affidavit of Richard S. Taffet submitted with Plaintiffs' July 3, 2003 Opposition Brief. He traveled to Danbury in June 1999, where he spent at least $1,300.  Downey Aff. ¶ 20, Exhibit S (Yap travel records).

    c.       Beginning in 1997, an unknown number of UCCS customer service representatives traveled to Danbury to attend SAP R3 testing sessions. Downey Aff., Exhibit F, Berti Dep. at 28-29.  (SAP R3 was the "global [data] system for [ ] inventory, sales, financials, accounting, for all of Union Carbide," including all subsidiaries. Berti Dep. at 25-26.[16]).

Defendants claim to have been unable to retrieve more documents reflecting visits to Connecticut by Dow Singapore personnel, but there is evidence of similar contacts during the relevant time period:

    a.       Chris Lee, Dow Singapore's Marketing Manager for Specialty Products, traveled to Danbury in May 2001 and January 2002. Expenses for these two trips totaled $900.  Downey Aff. ¶ 21, Exhibit T (Lee travel records).

---

[15] Cheung was also an area business/product director for UCAP and post-merger, sales director (polyolefins and elastomers specialty products) for Dow Singapore.

[16] Brackets and ellipses indicate corrections to the transcript submitted after review by the deponent.

b.      Horace Tan, Dow Singapore's Marketing Manager for Wire & Cable, traveled to Danbury in October 2001, March 2002, June 2002, and December 2002, and spent at least $2,200.  Downey Aff. ¶ 22, Exhibit U (Tan travel records).

## IV.    ARGUMENT[17]

### A.    Both UCCS and Dow Singapore "Transacted Business" of a "Substantial Character" with UCC in the State of Connecticut.

For purposes of Section 12 of the Clayton Act, a corporation transacts business in a district "if, in fact, in the ordinary and usual sense, it transacts business therein of any substantial character."  *Eastman Kodak*, 273 U.S. at 373 (internal quotations omitted).  "In determining whether, in fact, a company transacts business in a particular judicial district, the sum total of sundry relevant activities considered in light of the circumstances of the particular case is more the question than the predomination of one fact over another."  *School Dist. of Philadelphia v. Harper & Row Publishers, Inc.*, 267 F. Supp. 1006, 1009 (E.D. Pa. 1967).  Thus, a combination of business activities in the forum state could constitute "transacting business," depending on the circumstances of the case.

In this case, the Court has already recognized that "[a] corporation transacts business of a substantial character in a forum state if it buys "significant quantities" of merchandise from vendors," "attended meetings in the forum," and "had phone listings in the forum."  Nov. 17, 2003 Decision at 6-7, *citing McCrory Corp.*, 378 F. Supp. at 324 (defendant's purchases from vendors in the forum totaled $286,000 over three years), *United States v. Burlington Indus., Inc.*, 247 F. Supp. 185, 187 (S.D.N.Y. 1965) (defendant's purchases in forum totaled approximately $2,000,000 over eight years); *Indian Head,* 560 F. Supp. at 731-32 (defendant maintained

---

[17] As noted in the November 17, 2003 Decision, "[w]ith regard to a motion to dismiss for lack of personal jurisdiction, 'in the absence of an evidentiary hearing, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff.'"  Nov. 17, 2003 Decision at 4.  "[R]egardless of controverting evidence put forth by the defendant, the court must resolve all doubts in the plaintiff's favor."  *Id.* at 4.

telephone listing in forum for two years, spent $937,000 for purchases of products and services in forum, and officers and staff members attended seminars and meetings in forum).

Consistent with the "plain remedial purpose of § 12," the threshold for substantiality is low. *See United States v. Scophony Corp. of Am.*, 333 U.S. 795, 806 (1948). The test is "whether or not the sales at issue would appear to be substantial from the average businessman's point of view." *Burlington Indus., Inc.*, 247 F. Supp. at 187-88 (defendants engaged in "continuing and substantial" business activity in New York where contracts for purchases of materials were authorized by New York personnel, although materials were neither manufactured nor shipped from New York). Frequency and continuity of contacts are also relevant to assessing the substantiality of a defendant's transactions of business in the forum. *See, e.g., Dunham's, Inc. v. National Buying Syndicate of Texas*, 614 F. Supp. 616, 625 (E.D. Mich. 1985) ("constant flow of paperwork from" defendants' affiliates in the forum state to defendant's out-of-state headquarters was factor relevant to finding substantial transaction of business); *Turbine Engine Corp. v. Chromalloy Am. Corp.*, 265 F. Supp. 766, 767 (D. Conn. 1967) (Section 12 satisfied by evidence of New York corporation's continuous and substantial business dealings with and deliveries made to Connecticut-based company).

This Court previously ruled that the evidence of UCAP's purchases from UCC, the fact that its managers maintained Danbury voicemail numbers, and their attendance at meetings and training sessions in Connecticut satisfied the requirements of Section 12. Although the full nature and extent of UCCS's and Dow Singapore's dealings with UCC in Connecticut are still unknown, plaintiffs believe there is more than sufficient evidence to fill the gaps identified by the Court in its November 17, 2003 Decision, especially with regard to both companies' substantial purchases from UCC in Danbury.

Millions of dollars of sales from UCC to UCCS and to Dow Singapore are documented by invoices issued by or at the direction of UCC/Dow in Danbury, Connecticut. *See* Downey Aff. Exhibits C and D. A vast number of these sales, as well as returns, credits, and the like, were approved or otherwise facilitated by Connecticut-based UCC managers and employees

(e.g., senior executives, business unit managers, product marketing managers, accounting and booking department personnel). Moreover, at least two UCCS managers, Wilson Foo and Kamal Jain held themselves out as being present in Connecticut by maintaining Danbury voicemail or email addresses in addition to their Singapore addresses. There is no reason to believe they were unique in this respect.

In light of the undisputable involvement of Connecticut-based personnel in approving, pricing, allocating, and shipping of each and every transaction between UCCS or Dow Singapore and UCC, it is irrelevant that UCCS and Dow Singapore may have placed orders with UCC via communications with customer service representatives physically located in other states, or that the products being purchased were shipped to and from locations outside Connecticut.[18] *See B.J. Semel Assocs., Inc. v. United Fireworks Mfg. Co.,* 355 F.2d 827, 831-32 (D.C. Cir. 1965) (in reversing order quashing service on Ohio corporation for improper venue under 15 U.S.C. § 22, despite evidence that Ohio company arranged transportation and accepted shipments from plaintiff F.O.B. only in Ohio, the Court was "unable to believe that the spirit of *Scophony* comports with allowing the seller's shipping practices to determine his amenability to suit under Section 12," where there was evidence of substantial volume of business with Washington, D.C.-based plaintiff and continuity in telephonic contacts related to the parties' business relationship).

---

[18] Defendants may attempt to argue that jurisdiction is defeated where the servers that ran UCC/Dow's centralized, networked global computer system may not have been not physically located in Connecticut. This fact, even if true, does not dispose of the issue, just as the physical location of a company's telephone equipment is irrelevant when weighing evidence of telephonic business communications. The UCC/Dow system was under the control of the company's Connecticut-based executive offices, where the CEO, CFO, Controller and the most senior sales executives and managers were located. Employees of UCCS and Dow Singapore had the same level of access to the centralized systems as their counterparts at UCC and Dow. Berti Dep. at 114-15. Furthermore, the documents submitted with Plaintiffs' July 3, 2003 Opposition Brief and those now submitted all reflect continuous, systematic communications between UCC and UCCS and between UCC and Dow Singapore via the CEBA and SAP R3 sales order entry systems as well as through the company's centralized email system. In all events, there can be no dispute that invoices concerning a huge volume of transactions indicate on their face that UCC in Danbury, Connecticut was the seller.

UCCS's and Dow Singapore's purchasing activities were facilitated by continuous and substantial contact between their employees and UCC employees in Danbury, thereby justifying the finding that personal jurisdiction exists over each of them. Yet there is still more evidence of business transacted in the State reflected in the travel and expense records of UCCS and Dow Singapore personnel.[19] As set forth above, even the tiny sampling of documents produced by defendants to plaintiffs shows a significant amount of routine business-related travel to Connecticut by UCCS and Dow Singapore directors, officers, and employees. While in the State, they golfed, rode in limos, stayed in local hotels, and bought meals in local restaurants. They were not tourists; they requested and received reimbursement for their business expenses. When this evidence of business travel is viewed in conjunction with the foregoing substantial purchasing activity and the use of Connecticut voicemail and email addresses, there can be little question that Section 12 confers personal jurisdiction with respect to both UCCS and Dow Singapore.

## V.    CONCLUSION

For the reasons set forth herein and in Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction filed July 3, 2003, the Court should vacate its November 17, 2003 rulings as to UCCS and Dow Singapore and deny their Motions to Dismiss.

---

[19] Although defendants may attempt to argue that any travel to Connecticut by UCCS's directors was exclusively in their capacity as UCAP or UCC employees, the evidence does not compel the conclusion that the companies segregated their activities in so precisely a manner. The reality was that executives such as Samtani, Neri, Moorthy, and Cheung were as closely affiliated with UCCS as they were with UCAP. Furthermore, given the interconnectedness between UCC and its foreign subsidiaries, they all must have discussed UCCS business in the course of their visits to Danbury. In any case, at this stage of the proceedings, any and all ambiguities must be resolved in plaintiffs' favor.

Dated:  April 6, 2005                    Respectfully submitted,


                                         **BINGHAM McCUTCHEN LLP**

                                         Richard S. Taffet (ct 10201)
                                         Alicia L. Downey (ct 22066)
                                         399 Park Avenue
                                         New York, NY  10022-4689
                                         (212) 705-7000 (tel)
                                         (212) 752-5378 (fax)

                                         -and-

                                         WIGGIN AND DANA LLP
                                         Robert M. Langer (ct 06305)
                                         Suzanne E. Wachsstock (ct 17627)
                                         One City Place
                                         185 Asylum Street
                                         Hartford, CT  06103
                                         (860) 297-3724 (tel)
                                         (860) 525-9380 (fax)