## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., ) ) ) ) ) | Civil No. 3:02 CV 1107 (AVC) |
| Plaintiffs, ) ) | |
| v. ) ) | April 27, 2005 |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. ) ) ) ) | |
| Defendants. ) ) ) | |

---

**MEMORANDUM OF DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD. IN OPPOSITION TO PLAINTIFFS' MOTION TO VACATE THE ORDER GRANTING RULE 12(B)(2) MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

Craig A. Raabe (ct 04116)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 05103-3497
(860) 275-8304

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
190 South La Salle Street
Chicago, Illinois 60603
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006-1157
(202) 263-3000

*Counsel for Dow Chemical Pacific (Singapore) Pte. Ltd.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................. ii

I.    PROCEDURAL HISTORY.............................................................................................1

II.   RELEVANT FACTS.......................................................................................................7

III.  DISCUSSION .............................................................................................................10

    A.    Plaintiffs Have Failed to Show that Dow Singapore "Transacts Business"
        in Connecticut Within the Meaning of Section 12 ............................................11

        1.    Dow Singapore's Purchases from UCC Do Not Constitute
            Transacting Business in Connecticut Within the Meaning of
            Section 12.........................................................................................11

        2.    Travel by Dow Singapore Employees to UCC Headquarters Does
            Not Mean that Dow Singapore Has "Transacted Business" in
            Connecticut Within the Meaning of Section 12 ......................................15

    B.    The Assertion of Personal Jurisdiction Over Dow Singapore in
        Connecticut Would Violate Due Process of Law ...............................................16

        1.    Plaintiffs Have Failed to Show the "Minimum Contacts"
            Necessary for Personal Jurisdiction over Dow Singapore to
            Comply with Due Process....................................................................17

        2.    The Evidence Demonstrates that Assertion of Personal Jurisdiction
            Over Dow Singapore Would Be Unreasonable and Unfair....................23

IV.   CONCLUSION ............................................................................................................27

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AGS International Services S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64
(D.D.C. 2004)..................................................................................................21

*Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987) .........................*passim*

*Ball v. Metallurgie Hoboken-Overpelt S.A.*, 902 F.2d 194 (2d Cir. 1990) .................10

*Brown v. Grand Hotel Eden*, No. 00 Civ. 7346 (NRB), 2003 WL 21496756
(S.D.N.Y. June 30, 2003).................................................................................11

*Burger King Co. v. Rudzewicz*, 471 U.S. 462 (1985) .................................................23

*Creighton Ltd. v. State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).................................22

*Dunham's Inc. v. National Buying Syndicate of Texas*, 614 F. Supp. 616
(E.D. Mich. 1985)............................................................................................17

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) ...............11

*Grappone Inc. v. Subaru of America Inc.*, 403 F. Supp. 123 (D.N.H. 1975)................17

*Hanson v. Denckla*, 357 U.S. 235 (1958)...........................................................17, 19

*Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460 (D.C. Cir. 1988) .........23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984)...........*passim*

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 560 F. Supp. 730
(S.D.N.Y. 1983) .................................................................... 12, 13, 15, 16

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945).................................16, 17

*Kulko v. California Superior Court*, 436 U.S. 84 (1978)......................................19, 20

*MM Global Services, Inc. v. Dow Chemical Co.*, 283 F. Supp. 2d. 689
(D. Conn. 2003)................................................................................................2

*McCrory Corp. v. Cloth World, Inc.*, 378 F. Supp. 322 (S.D.N.Y. 1974) .......... 3, 12, 13, 14

*Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)........ 16, 18, 23

*Milliken v. Meyer*, 311 U.S. 457 (1940).............................................................16, 17

*Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952)...........................19

**TABLE OF AUTHORITIES**
(cont'd)

Page(s)

*Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516 (1923) ................................ 20, 21, 23

*United States v. Burlington Industries, Inc.*, 247 F. Supp. 185 (S.D.N.Y. 1965)................. *passim*

*United States v. First National City Bank*, 379 U.S. 378 (1965)................................................27

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)........................................ 17, 23

**Statutes**

15 U.S.C. § 1......................................................................................................................................2

15 U.S.C. § 22............................................................................................................................*passim*

15 U.S.C.A. §22 (1970)..................................................................................................................17

3 A.L.R. Fed. 120............................................................................................................................17

Conn. Gen. Stat. § 33-920 ...............................................................................................................4

Conn. Gen. Stat. § 33-920(b)...........................................................................................................4

Conn. Gen. Stat. § 33-920(b)(2) ......................................................................................................5

Conn. Gen. Stat. § 33-920(b)(11) ....................................................................................................4

Conn. Gen. Stat. § 33-929(e)............................................................................................................2

Fed. R. Civ. P. 12(b)(2).................................................................................................................10

Fed. R. Civ. P. 12(b)(6)...................................................................................................................2

Fed. R. Civ. P. 30(b)(6)..........................................................................................................1, 6, 7, 8

iii

In March 2004, the Court granted Plaintiffs' motion to reconsider its November 17, 2003 order (the "Order") dismissing Plaintiffs' First Amended Complaint as to Union Carbide Customer Services Pte. Ltd. ("UCCS") and Dow Chemical Pacific (Singapore) Pte. Ltd. ("Dow Singapore") for lack of personal jurisdiction. Since then, pursuant to the Court's invitation, Plaintiffs have taken extensive discovery from the current and former Defendants through interrogatories, document requests, and Rule 30(b)(6) depositions. This discovery has yielded the revelations that: (1) Defendant Union Carbide Corporation ("UCC") generally placed its Danbury, Connecticut headquarters address on invoices; (2) UCC personnel in Connecticut had final authority over product allocation, and coordinated shipping arrangements; and (3) employees of Dow Singapore very rarely traveled to Connecticut to meet with UCC personnel. On the basis of this information, Plaintiffs moved to vacate the Order. But none of these revelations comes close to satisfying Plaintiffs' burden of showing that: (1) Dow Singapore "transacted business" in Connecticut within the meaning of Section 12 of the Clayton Act, 15 U.S.C. § 22 ("Section 12"); and (2) the assertion of personal jurisdiction over Dow Singapore is consistent with due process, as guaranteed by the Fifth Amendment to the Constitution. Therefore, the Court should deny the motion with respect to Dow Singapore.[1]

## I.    PROCEDURAL HISTORY

Plaintiffs filed suit in this matter in June 2002, asserting federal and state antitrust claims, breach of contract claims, and various tort claims against The Dow Chemical Company ("Dow"), a Delaware corporation based in Midland, Michigan, and UCC, a New York

---

[1]    As with the original motions to dismiss for lack of personal jurisdiction, Dow Singapore and UCCS are submitting separate memoranda in opposition to Plaintiffs' motion. This is in the interest of clarity because, of course, Dow Singapore and UCCS are separate corporate entities, and the facts with respect to personal jurisdiction are specific to the party as to whom jurisdiction is being asserted.

corporation based in Danbury, Connecticut.[2]   On March 24, 2003, Plaintiffs filed their First

Amended Complaint adding three new Singapore-based defendants:   Union Carbide Asia

Pacific, Inc. ("UCAP"), a Delaware corporation; UCCS, a Singapore corporation; and Dow

Singapore, another Singapore corporation (collectively the "Singapore Subsidiaries").  On May

30, 2003, each Singapore Subsidiary moved to dismiss the First Amended Complaint as to it for

lack of personal jurisdiction.

The Singapore Subsidiaries contended that there was no basis for personal jurisdiction

over them under either Section 12 or Connecticut's long-arm statute as to foreign corporations,

Conn. Gen. Stat. § 33-929(e).  They stated that they did not "transact business" in Connecticut

within the meaning of either Section 12 (*see, e.g.*, Mem. Supp. Dow Chemical Pacific

(Singapore) Pte. Ltd.'s Mot. Dismiss Lack Pers. Jurisd. at 15-17 (May 30, 2003) ("Mem. Defs.'

Mot. Dismiss")) or the long-arm statute (*see, e.g., id.* at 8-10).  Moreover, they all argued that,

even if the Court were to conclude that either former Defendant "transacted business" in

Connecticut within the meaning of either statute, the assertion of personal jurisdiction under that

statute would violate due process (*see, e.g., id.* at 11-12 (as to Connecticut long-arm statute), 17-

19 (as to Section 12)).

Plaintiffs opposed the Singapore defendants' motions, telling the Court that the Singapore

Subsidiaries "routinely placed Plaintiffs' product orders with UCC and Dow through a

centralized computer system housed in Connecticut for approval . . . ."  Mem. Opp. Defs' Mots.

Dismiss Pls.' First Am. Compl. Lack Pers. Jurisd. at 3 (July 3, 2003) ("Pls.' Opp. Mem."); *see

also id.* at 4 (the Singapore Subsidiaries "then entered these orders into the UCC global entry

---

[2]     On September 12, 2003, pursuant to Rule 12(b)(6), the Court dismissed all Plaintiffs' claims against Dow
and UCC except those for resale price maintenance (in violation of Section 1 of the Sherman Antitrust Act, 15
U.S.C. § 1), negligent misrepresentation, and breach of contract. *See MM Global Servs., Inc. v. Dow Chem. Co.*,
283 F. Supp. 2d. 689 (D. Conn. 2003).  The Court dismissed the same claims as to the Singapore Subsidiaries four
days later.

2

system . . . which was controlled by UCC in Connecticut"), 5 ("UCC's logging in of UCCS's
orders . . . occurred in Connecticut").  They alleged also that UCAP representatives attended
meetings and training sessions in Connecticut and communicated regularly with UCC by e-mail
concerning day-to-day business decisions, and that UCAP maintained a voice-mailbox at UCC's
Danbury headquarters.  *See id.* at 4.

After examining "the amended complaint and supplemental documents, including
affidavits and exhibits submitted in connection with [defendants'] motion[s]," this Court denied
UCAP's motion to dismiss but granted those of UCCS and Dow Singapore.  Mem. Decision re
Defs.' Mot. Dismiss (November 17, 2003) ("Mem. Op.") at 2.  The Court relied principally on
Plaintiffs' allegations that UCAP "placed purchase orders with Union Carbide for Union
Carbide/Dow products through a central computer system which Union Carbide controlled in
Connecticut."  *Id.* at 7.  Because the amount of purchases[3] that, according to Plaintiffs, UCAP
made through a Connecticut-based computer system exceeded the purchase amounts that gave
rise to personal jurisdiction in two cases in the Southern District of New York, the Court
"conclude[d] that UCAP was transacting business in the district of Connecticut."  *Ibid.* (citing
*McCrory Corp. v. Cloth World, Inc.*, 378 F. Supp. 322, 324 (S.D.N.Y. 1974), and *United States
v. Burlington Industries, Inc.*, 247 F. Supp. 185, 187 (S.D.N.Y. 1965)).  The Court also cited
Plaintiffs' allegations that "UCAP representatives attended meetings, held training sessions, and
maintained a voicemail box in Connecticut."  *Ibid.*  Although it had already held that UCAP's
purchases from UCC, allegedly through a Connecticut-based computer system, amounted to
"transacting business" in Connecticut for the purposes of Section 12, the Court stated further that

---

[3]     Although the Court and Plaintiffs have referred to these figures as "sales," they represent UCAP's
purchases from UCC – they are *UCC*'s sales.  UCAP did not sell products in the United States.  Plaintiffs confuse
the issue further in support of the current motion.  *See* Pls. Br. Supp. Mot. Vacate Order Granting R. 12(b)(2) Mots.
Dismiss First Am. Compl. Lack Pers. Jurisd. ("Pls. Br.") at 4 ("UCAP's annual sales figures in the United States
(i.e., its purchases from UCC)").

3

these activities, "viewed in their totality," also indicated that UCAP was "transacting business" there. *Id.* at 7-8.

The Court pointed out that satisfaction of Section 12 alone was not determinative of whether personal jurisdiction over UCAP was proper: "the next step is to determine if exercising that personal jurisdiction violates the constitutional precepts concerning Due Process." *Id.* at 8, n.1. However, stating that "the defendants do not contend that this Court's exercise of personal jurisdiction over UCAP would violate Due Process," the Court concluded that personal jurisdiction over UCAP was consistent with due process. *Ibid.*

The Court also held that UCAP was not subject to jurisdiction under Connecticut's long-arm statute because it was "not transacting business within the meaning of section 33-920." *Id.* at 11. As the Court observed, "the term 'transacting business' is not broadly interpreted in Connecticut." *Id.* at 10 (citation omitted). To illustrate, the Court cited the list of activities that the Connecticut long-arm statute explicitly defines as *not* "transacting business" for the purposes of the statute. *Id.* at 10, n.2 (citing Conn. Gen. Stat. § 33-920(b)). Noting in particular that the long-arm statute "explicitly provides that 'interstate commerce' does not constitute transacting business," the Court concluded that "placing orders in Connecticut for shipment to the Singapore-based UCAP cannot constitute transacting business." *Id.* at 11 (citing Conn. Gen. Stat. § 33-920(b)(11)). Thus, UCAP's alleged purchases of "Union Carbide/Dow products through a Connecticut-based centralized computer system" did not create personal jurisdiction under the long-arm statute. Similarly, the Court held that the "strategy meetings and training sessions UCAP [personnel] attended in Connecticut" did not constitute "transacting business" within the meaning of the state long-arm statute, as they fell within the excluded category of

4

"'meetings of the board of directors or shareholders or carrying on other activities concerning internal corporate affairs.'" *Id.* at 11 (quoting Conn. Gen. Stat. § 33-920(b)(2)).

The Court held that it lacked jurisdiction over UCCS and Dow Singapore under either statute. As to UCCS, Plaintiffs could point to only an unsubstantiated amount of purchase orders "placed with Union Carbide in Connecticut." *Id.* at 8. Because there was "no evidence that UCCS engaged in substantial purchasing activity," the Court held "that in the ordinary and usual sense of the term, UCCS does not transact business of a substantial character in Connecticut." *Ibid.* "Dow Singapore," the Court held, "does not transact business of a substantial nature in Connecticut," as "[t]he plaintiffs do not offer any proof that Dow Singapore had any contacts, substantial or not, within Connecticut." *Ibid.* Accordingly, Section 12 did not give the Court personal jurisdiction over UCCS or Dow Singapore. *See ibid.*

Similarly, the Court held that it lacked personal jurisdiction over UCCS and Dow Singapore under the state long-arm statute. Just as with UCAP, the allegations that UCCS "plac[ed] purchasing orders through the centralized computer system in Connecticut is insufficient" to constitute "transacting business." *Id.* at 12. And Plaintiffs had "not offer[ed] any proof that Dow Singapore transacted any business, or had any contacts with Connecticut." *Ibid.*

Plaintiffs moved for reconsideration, arguing that they had made a *"prima facie* showing of personal jurisdiction over UCCS and Dow Singapore." Mem. Supp. Pls.' Mot. Recons. Ct.'s Decision Defs.' Mot. Dismiss Lack Pers. Jurisd. at 2 (Dec. 4, 2003). Complaining that they were "limited in the evidence they could present to establish . . . personal jurisdiction" (*ibid.*), Plaintiffs requested that "[p]rior to dismissing UCCS and Dow Singapore . . . for lack of personal jurisdiction," they be allowed to take "limited discovery" on the jurisdictional question (*id.* at 10). This discovery, Plaintiffs explained, was to be "narrowly targeted and should not delay this

5

action at all." *Id.* at 11. This Court granted the motion, authorizing Plaintiffs to take further

personal jurisdictional discovery with respect to UCCS and Dow Singapore. Order re Mot.

Recons. at 1 (July 8, 2004).

Plaintiffs took this discovery. They served extensive interrogatories, document requests

and notices for Rule 30(b)(6) depositions on Defendants UCC, Dow and UCAP, as well as

former Defendants UCCS and Dow Singapore. These discovery requests were in addition to the

already pending merits discovery requests Plaintiffs had served on Defendants, requests that call

for documents and information relating to sales of Products from throughout the world over a

period of more than ten years. Nevertheless, Defendants and former Defendants searched in both

the United States and Singapore for documents and information responsive to the personal

jurisdiction discovery requests, and to identify persons knowledgeable about the broad topics in

Plaintiffs' Rule 30(b)(6) notices. Defendants and former Defendants produced tens of thousands

of pages of documents to the Plaintiffs, including records of travel to Connecticut by employees

of Dow Singapore and UCCS between 1998 and 2003. This thorough production disproves

Plaintiffs' baseless reference to "defendants' professed inability to locate responsive documents"

(Pls.' Br. at 2) and their equally unfounded assertion that "Defendants claim to have been unable

to retrieve more documents reflecting visits to Connecticut by Dow Singapore personnel" (*id.* at

11).

Plaintiffs also took two Rule 30(b)(6) depositions of highly knowledgeable corporate

representatives. Defendants also arranged the depositions of two employees based in Asia, but

Plaintiffs chose not to go forward with them. Defendants performed intensive searches of their

computerized data systems to compile all electronically available information concerning sales

of Products from UCC and Dow to the Singapore Subsidiaries. Where there were gaps in the

6

electronic information relating to UCC's sales to UCCS due to switches between enterprise software products, Defendants could have provided total sales information by manually recording information from individual invoices stored at Dow's records center. This Court, however, directed Defendants to curtail that search, which also related to Plaintiffs' merits document requests, and the parties agreed to stipulate that UCC's sales to UCCS fell into a range roughly comparable to the sales in other years.

In short, Defendants and former Defendants have withheld *no* requested information relating to personal jurisdiction from Plaintiffs. Plaintiffs themselves determined that the considerable information they obtained from Defendants and former Defendants is sufficient to "precisely fill[] the gaps identified by the Court in the [Order], making it unnecessary to delay this filing any longer." Pls.' Br. at 5.

Alleging that factual information they have discovered in the course of their additional personal jurisdiction discovery now demonstrates that UCCS and Dow Singapore were "transacting business" within the meaning of Section 12, Plaintiffs seek to vacate the Order. They do not contend that personal jurisdiction exists under Connecticut's long-arm statute. Nor do they suggest that their claims against either UCCS or Dow Singapore arise from or even relate to either Singapore Subsidiary's contacts with Connecticut.

## II.    RELEVANT FACTS

The evidence that Plaintiffs cite to bolster their contention that the Court has personal jurisdiction over UCCS and Dow Singapore boils down to three categories.

- **Sales data.** Plaintiffs point to the electronic data produced by Defendants reflecting the amount of Dow Singapore's and UCCS's purchases of Products from UCC during

7

the period 2001 to 2004. Pls.' Br. at 7.[4] They offer UCC's invoices for UCCS and Dow Singapore purchases to demonstrate that Defendants have made "purchases of 'significant quantities' of merchandise from vendors in the forum state." *Id.* at 3.

- **Internal involvement of UCC employees in Connecticut.** Plaintiffs point to evidence that some UCC employees based in Connecticut became involved with respect to internal UCC functions in connection with orders that *UCCS* placed with UCC. *Id.* at 8-9.[5]

- **Travel to Danbury.** Plaintiffs point to a total of six trips to Danbury between May 2001 and December 2002 by two Dow Singapore employees (*id.* at 11-12).

One critical fact goes unmentioned, at least in any forthright manner. Plaintiffs' additional discovery confirmed conclusively that, contrary to their repeated and insistent allegations in their submissions to this Court, the UCC computer system that UCCS utilized to place orders with UCC was *not* "housed in Connecticut" (Pls.' Opp. Mem. at 3), or "housed and accessed in Connecticut" (Mem. Law Supp. Pls.' Mot. Recons. Defs.' Mot. To Dism. for Lack of Pers. Jurisd. at 4 (Dec. 4, 2003); Pls.' Reply Supp. Mot. Recons. at 4 (Jan. 9, 2004)), and that, consequently, UCC did not "log[] in UCCS's orders . . . in Connecticut" (Pls.' Opp. Mem. at 5). The Court explicitly relied on these representations in concluding that UCAP was "transacting business" in Connecticut within the meaning of Section 12 based on its purchases from UCC. *See* Mem. Op. at 7. But discovery has shown that in fact UCC's computer system was *not*

---

[4]     In attempting to show UCCS's purchases of Products from UCC for the years 2001 through 2004, Plaintiffs erroneously repeat the figures for *Dow Singapore's* purchases. The correct dollar figures for UCCS's annual purchases of Products for 2001 through 2004, respectively, are $1,835,920.03, $3,037,817.91, $5186.58, and $0.

[5]     As Plaintiffs point out, although Christine Berti, who testified pursuant to Rule 30(b)(6), had detailed knowledge of the process by which UCC handled UCCS's orders, she had no knowledge of how UCC handled Dow Singapore's orders. *See id.* at 5. Although Defendants offered to identify and produce a witness knowledgeable about the handling of Dow Singapore's orders, Plaintiffs have chosen to go forward with their motion to vacate without obtaining this testimony. For the purposes of this motion, Dow Singapore has no objection to the Court assuming that, for a period of time after the Dow-UCC merger, UCC handled orders from Dow Singapore in a manner similar to that in which it handled orders from UCCS.

8

housed or based in Connecticut. Instead, it was located at UCC's facility in South Charleston,
West Virginia. Aff. William Leikhim at 3 (July 17, 2003) (Ex. 1); *see also* Tr. Dep. Christine
Berti at 32 (October 1, 2004) (Ex. 2) (UCC's SAP/R3 computer system "was located in West
Virginia"), 36 (mainframe for UCC's ISIS export computer system "was located in West
Virginia"). Plaintiffs appear to recognize that the further discovery has knocked the legs out
from under their most crucial allegation, now relying on the indisputable but irrelevant point that
UCC was headquartered in Danbury. *See* Pls.' Br. at 14 n.18.

Further, while Plaintiffs emphasize the evidence they have generated indicating that
Connecticut-based employees of UCC had a degree of involvement with orders such as those
placed by UCCS, they fail to discuss that this involvement was *internal* to UCC. Instead, when
UCCS placed orders with UCC, those orders were transmitted not to Danbury, but rather to
UCC's customer service centers in Houston, Texas (where UCC handled chemicals sales) and
Somerset, New Jersey (where UCC handled plastics sales). *See* Ex. 1 at 3 ("UCC's Customer
Service Representatives, who assisted the order filling process in the United States, were located
in either Houston, Texas, or Somerset, New Jersey"); Ex. 2 at 16-17 (concerning New Jersey
center), 54-55 (concerning Houston center).[6] When the orders were for products in bulk instead
of packages, the customer service representative consulted with both the inventory planner, who
for chemical products was located in Houston, and the product marketing manager, to confirm
that product was available in bulk. *See id.* at 56-57. Although some UCC product marketing
mangers were based in Danbury, others were based in Charleston, West Virginia. *See id.* at 98.
Ms. Berti confirmed that the product marketing manager did not become involved in orders "on a
day-to-day basis." *Id.* at 95. Instead, those managers became involved "[o]nly under

---

[6]     While Ms. Berti had no specific knowledge of how UCC handled orders from Dow Singapore after Dow's
acquisition of UCC, her understanding was that the locus of order-filling activity moved at some point to Midland,
Michigan, where Dow is headquartered. *See id.* at 101-02.

9

circumstances where products were limited and sales control in very tight supply"; then, "they might get involved," if contacted by the inventory planner. *Ibid.* Contrary to Plaintiffs' assertion, Ms. Berti did not testify that UCC's business managers, who oversaw groups of product marketing managers, ever became involved with individual orders. *Compare* Pls.' Br. at 8 ("Business Managers, 'many of them in Danbury,' provided input to Inventory Managers on pending orders for chemicals") (citing Ex. 2 at 97), *with* Ex. 2 at 97, ll. 9-21:

> Q    You say the inventory planner was a member of the business team. Who else was on the business team for a given product?
>
> A    The business manager.
>
> Q    Is that different from the marketing managers that we spoke about earlier?
>
> A    Yes.
>
> Q    And where were the business managers situated?
>
> A    It would depend on the business. There were many of them in Danbury for chemicals. They were in New Jersey for plastics.
>
> Q    Was there anybody else on the business team?
>
> A    Yes. You would have financial people.

## III.    DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, plaintiffs bear the burden of establishing that the court has jurisdiction over the defendant. Prior to jurisdictional discovery, plaintiffs must offer good faith pleadings that include "legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Ibid.* Here, following jurisdictional discovery, but before an evidentiary hearing has been held, plaintiffs must show more. Their "*prima facie* showing must

be factually supported." *Ibid.*.   Therefore, the Court should credit as true only those jurisdictional allegations that have evidentiary support. *See Brown v. Grand Hotel Eden*, No. 00 Civ. 7346 (NRB), 2003 WL 21496756, at *3 (S.D.N.Y. June 30, 2003) (finding additional discovery materials conclusively demonstrated lack of jurisdiction).   Under this standard, Plaintiffs' showings do not suffice to demonstrate that Dow Singapore has "transacted business" in Connecticut within the meaning of Section 12.   Moreover, even if one were to conclude that the evidence supported a finding that in fact Dow Singapore had "transacted business" in Connecticut, the same evidence indicates that the assertion of personal jurisdiction over Dow Singapore would not be consistent with due process.

A.    **Plaintiffs Have Failed to Show that Dow Singapore "Transacts Business" in Connecticut Within the Meaning of Section 12.**

As the Court has recognized, Plaintiffs concede that Dow Singapore "'do[es] not inhabit and [is] not found in Connecticut.'"   Mem. Op. at 6.   "Therefore," as the Court held, in determining whether personal jurisdiction over Dow Singapore is consistent with Section 12 of the Clayton Act, "the issue is whether [Dow Singapore] 'transact[s] business' of a 'substantial character' in Connecticut." *Ibid.* (quoting *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 373 (1927)).   Even after conducting further discovery, Plaintiffs still have failed to show that Dow Singapore has transacted *any* business in Connecticut, let alone business of a "substantial character."

1.    **Dow Singapore's Purchases from UCC Do Not Constitute Transacting Business in Connecticut Within the Meaning of Section 12.**

In its memorandum opinion on the original motion to dismiss for lack of personal jurisdiction, the Court stated that, for purposes of Section 12, "[a] corporation transacts business of a substantial character in a forum state if it buys 'significant quantities' of merchandise from

11

vendors." Mem. Op. at 6 (citing *McCrory*, 378 F. Supp. at 324. The Court cited three cases
from the Southern District of New York in which a defendant's purchases from suppliers in that
District were held to support a finding that the defendant "transacted business" there for the
purposes of Section 12. Mem. Op. at 6-7 (citing *McCrory*, *Burlington Industries*, 247 F. Supp. at
187, and *Indian Head Inc. v. Allied Tube & Conduit Corp.*, 560 F. Supp. 730 (S.D.N.Y. 1983)).
Clearly, the dollar value of the Products Dow Singapore purchased from UCC over the period
2001-2004 exceeds the purchase amounts that these three cases confronted. Each of these cases,
however, involved purchasing activity that not only involved the forum District but directly
focused on it.

In *McCrory*, Judge Pollack held that the defendant, a Missouri-based fabric retailer, had
transacted business of a substantial character through its purchases of about $287,000 in
merchandise for sale in its stores "from vendors located in New York." 378 F. Supp. at 324.
The context clearly indicates that these purchases took place *in* New York. There is no
suggestion that defendant bought the fabrics from those vendors at locations somewhere else. In
*Burlington Industries*, the defendant's purchases from New York-based J.P. Stevens & Co. were
part of the conduct held to constitute transacting business in the Southern District. There, the
defendant was clearly dealing with Stevens in New York through an entirely passive agent or
representative in California. The agent or representative had no authority of its own; it relayed
orders to Stevens' New York offices, where contracts were "prepared and typed," the contracts
were finally accepted after being signed by defendant, and to which the defendant made
payments. 247 F. Supp. at 187-88. In other words, the defendant was in all realistic regards
engaged directly in purchasing transactions in New York; the agent was nothing more than a
conduit between the defendant and Stevens' New York offices.

12

*Indian Head* involved a defendant that was thoroughly enmeshed in the Southern District of New York; the National Fire Protection Association's purchases there were only one facet of its overall entrepreneurial presence in the Southern District. The association owned a revenue-generating film library in Manhattan, and sold "publications, books, films and other materials" from the same address. 560 F. Supp. at 731. It also received over $39,000 annually in membership dues from within the District, and averaged over $48,000 annually over three years in contributions from within the Southern District. *See id.* The association also conducted seminars, committee meetings, and carried out fire investigations in the Southern District. *See id.* at 732. It also had significant membership and committee participation from within the Southern District. *See id.*

As we demonstrate below, the recent case law testing personal jurisdiction over foreign persons under due process makes the Section 12 analysis inconsequential, for it is clear that even if this purchasing activity is sufficient to satisfy Section 12, it does not satisfy due process. But even under Section 12 standards, the evidence relating to Dow Singapore's purchases falls short.

*McCrory, Burlington Industries* and *Indian Head* all involved actual purchasing activity *in the forum District.* In contrast, the evidence Plaintiffs cite shows purchasing activity that was in no way directed by Dow Singapore to Connecticut. Dow Singapore's computerized orders were routed to customer service centers in Texas and New Jersey, via a computer system based and operated in West Virginia. When products were in unusually short supply, the customer service representative and inventory planner might consult with the marketing manager for that product, who, depending on the particular product, *might* have been based in Connecticut – or Texas or New Jersey. This was not a communication that Dow Singapore or UCCS had any role in, and the location of the marketing manager was a matter of indifference to them. So was the

13

location of UCC's booking department, which made shipping arrangements. The booking department's activity was entirely internal to UCC; its location did not matter to Dow Singapore or UCCS, which were not in communication with it in any event.

Just as in connection with the due process test, "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984), (holding "of negligible significance" for due process minimum contacts analysis that defendant's customer paid it with checks drawn on bank in forum state). Ultimately, plaintiffs are asking the Court to confuse *UCC's* activities with those of Dow Singapore and UCCS. The evidence Plaintiffs have developed indicates that Dow Singapore and UCCS simply had no contact with Connecticut in connection with these orders. Although some activity took place in Connecticut in connection with them – at least until UCC's booking department was closed (*see* Ex. 2 at 102) – that activity was invisible to Dow Singapore and UCCS. It was *UCC*, not Dow Singapore and UCCS, that transacted business in Connecticut in connection with these orders.

Plaintiffs also attempt to ascribe some significance to the fact that UCC invoices frequently bore UCC's headquarters address. But this tells one nothing about the underlying transaction. Corporations frequently use their headquarters addresses in communications simply as a matter of corporate identity. And in an age where numerous corporate functions are delegated or even outsourced to any number of locations, the presence of any one address on an invoice is hardly indicative of where a transaction took place. In fact, as Ms. Berti's testimony made clear, the points of contact for international customers such as UCCS and Dow Singapore were in Texas and New Jersey. Connecticut-based UCC employees played only internal and

14

largely incidental roles with respect to the orders UCCS and Dow Singapore placed. The presence of the Danbury address on invoices does not change those simple facts.

> ### 2. Travel by Dow Singapore Employees to UCC Headquarters Does Not Mean that Dow Singapore Has "Transacted Business" in Connecticut Within the Meaning of Section 12.

Plaintiffs' personal jurisdiction discovery has yielded evidence of a total of six trips to Danbury, Connecticut between May 2001 and December 2002 by two Dow Singapore marketing managers. Plaintiffs present no evidence concerning the purposes of the trips – for instance, whether the trips were for Dow Singapore employees to generate business through contacts with customers, or rather were simply for internal meetings with corporate affiliates. The former prospect is highly implausible, as Dow Singapore had no authority or ability to market or sell products in the United States. *See* Decl. of Sam Ong at 3 (May 30, 2003) (Ex. 3). Plaintiffs attempt to compensate for this failure of proof by suggesting that "Defendants claim to have been unable to retrieve more documents reflecting visits to Connecticut by Dow Singapore personnel." Pls.' Br. at 11. But if this statement is true at all, that is only because Defendants have produced *all* travel expense documents in their possession reflecting travel by Dow Singapore personnel to Connecticut – in other words, Defendants are "unable to retrieve more documents" because none exist. Not surprisingly, Plaintiffs do not cite any authority suggesting that such a small number of visits to Connecticut over a year and a half could ever constitute "transacting business" of a "substantial character." there for the purposes of Section 12. Certainly *Indian Head*, the only case the Court cited with reference to the significance of travel into the forum district (*see* Mem. Op. at 7), does not lend Defendants any support. There, the defendant association's staff entered the Southern District of New York (where it already had a substantial presence) for at least four association-sponsored seminars that drew "approximately

15

438 people," at least six board or committee meetings, "three major on-site investigations" in the District. 560 F. Supp. at 732. Here, in contrast, the evidence indicates that Dow Singapore employees entered Connecticut a total of six times; there is no indication that their presence involved any transaction of business other than affairs internal to Dow Singapore and its corporate affiliates. By any reasonable standard, this cannot constitute "transacting business" of a "substantial character," as Section 12 requires. Plaintiffs therefore have shown no basis for disturbing the Court's correct determination that Section 12 provides no basis for an assertion of personal jurisdiction over Dow Singapore.

**B.     The Assertion of Personal Jurisdiction Over Dow Singapore in Connecticut Would Violate Due Process of Law.**

A case against a foreign defendant cannot proceed unless the defendant "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citing *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Thus, as the Court has recognized, a determination that Dow Singapore "transacts business" in Connecticut for the purposes of Section 12 does not mean that the Court may exercise personal jurisdiction over it. *See* Mem. Op. at 8 n.1 ("After determining that the court has personal jurisdiction . . ., the next step is to determine if exercising that personal jurisdiction violates the constitutional precepts concerning Due Process").

This inquiry entails two related tests: one as to "minimum contacts" and one as to "reasonableness," which goes to "fair play and substantial justice." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996) (recognizing the two-pronged test). Personal jurisdiction over Dow Singapore fails both these tests. Dow Singapore lacks the minimum contacts with Connecticut that are necessary for personal jurisdiction to satisfy due

16

process. Moreover, even if such minimum contacts existed, other important considerations demonstrate that the exercise of personal jurisdiction over Dow Singapore would be unreasonable, and thus not in keeping with "traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987) (quoting *International Shoe*, 326 U.S. at 316, and *Milliken v. Meyer*, 311 U.S. at 463).

      **1.**      **Plaintiffs Have Failed to Show the "Minimum Contacts" Necessary for Personal Jurisdiction over Dow Singapore to Comply with Due Process.**

For a defendant to have the necessary minimum contacts with a forum state, those contacts must be such "that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

The showing required to demonstrate the minimum contacts necessary for personal jurisdiction over a foreign defendant is greater than that for Section 12. *See Dunham's Inc. v. Nat'l Buying Syndicate of Tex.*, 614 F. Supp. 616, 624 (E.D. Mich. 1985) ("the concept of 'transacting business' [for Clayton Act purposes] is more lenient than that of 'minimum contacts' under *International Shoe*"); *Grappone, Inc. v. Subaru of Am., Inc.*, 403 F. Supp. 123, 134 (D.N.H. 1975) (noting "transacting business" under the Clayton Act is different from "transacting business" for long-arm purposes); *see also* 3 A.L.R. Fed. 120, Construction and Effect of Venue Provisions of §12 of the Clayton Act (15 U.S.C.A. §22) at § 4 (1970) ("The 'transacts business' clause of §12 of Clayton Act requires something less than 'doing of business' or 'carrying on business'").

As noted above, Plaintiffs' motion does not contend that their claims against Dow Singapore either arise from or relate to Dow Singapore's alleged contacts with Connecticut. Consequently, Plaintiffs must demonstrate that the Court may properly exercise general, rather than specific, personal jurisdiction over Dow Singapore.[7] They therefore must show "continuous and systematic general business contacts" with Connecticut. *Id.* at 415-16; *see also Metro. Life*, 84 F.3d at 567-68.[8] Under this standard, even contacts that have been held to satisfy Section 12 may yet fall short of what due process demands. Examination of *Helicopteros* shows that the facts Plaintiffs have put forward here are a case in point.

Petitioner in *Helicopteros*, Helicol, was a Colombian corporation that provided helicopter transportation under contract to oil and construction companies in South America. *See* 466 U.S. at 409. Following the fatal crash of one of its helicopters, the families of the victims, employees of a Peruvian pipeline consortium, sued Helicol in Texas state court. The parties did not "argue[] any relationship between the cause of action and Helicol's contacts with the State of Texas" (*id.* at 415 n.10); consequently, the Court looked to see whether general personal jurisdiction was warranted – specifically, whether Helicol had "continuous and systematic general business contacts" with the State of Texas. *Id.* at 416. The respondents contended that personal jurisdiction was proper based on: (1) the visit of Helicol's chief executive officer to Houston in order to negotiate with the consortium's Houston-based alter ego over the transportation contract with the consortium; (2) Helicol's purchase of over $4 million worth of helicopters and related equipment, representing about 80 percent of its fleet, from a Texas firm; (3) Helicol's acceptance of checks from the consortium drawn on a Houston bank; and (4) a number of trips by Helicol employees to Texas for training. *See id.* at 411.

---

[7]    *See Helicopteros*, 466 U.S. at 415 and n.10 (parties conceded general jurisdiction where they "have not argued any relationship between the cause of action and [defendant/respondent's] contacts with the [forum state]").
[8]    This standard is "more stringent" than that applied to assertions of specific jurisdiction. *Id.* at 568.

The Court disagreed, holding that Helicol lacked the minimum contacts with Texas necessary to support personal jurisdiction over it there. The Court made short work of the trip by Helicol's CEO to Houston and the consortium's use of a Houston bank for the checks with which it paid Helicol. The CEO's trip could not support personal jurisdiction because it "cannot be described or regarded as a contact of a 'continuous and systematic' nature." *Id.* at 416 (quoting *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 445 (1952)). The acceptance of the checks drawn on a Houston bank was "of negligible significance" in determining the extent of Helicol's contact with Texas. The Court observed that there was "no indication that Helicol ever requested" that a Texas bank be used, or even that there was any negotiation between Helicol and the consortium over the "location or identity of the bank on which checks would be drawn." *Ibid.* Such details are "generally of little consequence to the payee and . . . left to the discretion of the drawer." *Id.* at 416-17. "Such unilateral activity," the Court held, "of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Ibid.* (citing *Kulko v. California Superior Court*, 436 U.S. 84, 93 (1978) (holding it arbitrary to subject one parent to personal jurisdiction in a state where the other parent chooses to spend time while having custody of child pursuant to separation agreement) and *Hanson v. Denckla*, 357 U.S. at 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State")).

According to the Court, the Texas Supreme Court had focused on Helicol's helicopter purchases and the related training trips by its employees in finding contacts sufficient to support an assertion of jurisdiction. The Court rejected the Texas court's reasoning, holding that "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of

19

jurisdiction." 466 U.S. at 417. In so holding, the Court reaffirmed *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516 (1923) (Brandeis, J.). There, the Court held that New York courts could not subject a Tulsa clothing retailer to personal jurisdiction despite regular and direct contacts between the retailer and suppliers in New York comparable to those in *Burlington Industries*, *see supra* at 12. The retailer purchased "a large part of the merchandise to be sold at its store" from New York wholesalers. 260 U.S. at 518. "The purchases were made, sometimes by correspondence, sometimes, through visits to New York of one of its officers." *Ibid.* The Court held that the district court's holding that the New York courts lacked personal jurisdiction over the retailer was "clearly correct." *Id.* at 517. "Visits on such business, even if occurring at regular intervals, would not warrant the inference that the corporation was present within the jurisdiction of the state." *Id.* at 518 (citations omitted).

*Helicopteros* applied *Rosenberg*, holding that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." 466 U.S. at 418. The Court also rejected the argument that the Helicol employees' training trips to Texas "in any way enhanced the nature of Helicol's contacts with Texas." *Ibid.* Characterizing the training as "a part of the package of goods and services purchased by Helicol," the Court held that the "brief presence of Helicol employees in Texas for the purpose of attending the training sessions is no more a significant contact than were the trips to New York made by the buyer for the retail store in *Rosenberg*." *Ibid.* (citing *Kulko*, 436 U.S. at 93) (rejecting personal jurisdiction in California based on one-day and three-day stopovers there; basing jurisdiction on such visits "would make a mockery of" due process limits on personal jurisdiction).

*Helicopteros* makes clear that Dow Singapore lacks the minimum contacts with Connecticut that are necessary to support personal jurisdiction over it in this case. Like both Helicol and the retailer in *Rosenberg Bros.*, Dow Singapore is not licensed to do business in Connecticut. It has no offices or employees there. It has no agent there for service of process, and does not sell Products in or into Connecticut. It does not conduct marketing activities or other customer development there. As discussed above, the facts that Plaintiffs have elicited through their personal jurisdiction discovery show clearly that Dow Singapore had no contact with Connecticut in its purchases from UCC. The involvement of Connecticut-based UCC employees in connection with purchases by Dow Singapore, like the location of the bank on which the Peruvian consortium drew its checks to Helicol, had no impact on Dow Singapore. Whether those employees were located in Connecticut, Texas, New Jersey or elsewhere was a matter internal to UCC that had no bearing on how Dow Singapore submitted orders for Products. Consequently, the involvement of these UCC employees had no more significance to contacts between Dow Singapore and Connecticut than the Houston bank did to contacts between Helicol and Texas. It adds nothing to the sum of Dow Singapore's contacts with Connecticut.

Similarly, like the "brief presence" of Helicol's employees in Texas for training sessions (*ibid.*), the total of six visits to Connecticut by the two Dow Singapore employees could hardly be said to constitute the "continuous and systematic" contact required to make personal jurisdiction consistent with due process. *See also AGS International Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 76-77 (D.D.C. 2004) (14 trips to Washington, DC over three years by employees of defendant Peruvian joint venture "not 'continuous and systematic' as required by due process"; meetings with International Finance Corporation, which accounted for ten of

21

the trips, held "not of such significant frequency and volume' that [the joint venture] could reasonably anticipate being haled into court in the District for actions which occurred in Peru pursuant to a contract governed by Peruvian law") (citations omitted).

Moreover, even if one were to conclude that – contrary to the evidence relating to the manner in which UCC handled orders – Dow Singapore was making purchases from Connecticut, *Helicopteros* and *Rosenberg Bros.* make clear that these "mere purchases" do not support personal jurisdiction. *Helicopteros*, 466 U.S. at 418. If in fact Dow Singapore was purchasing Products from Connecticut, it was not because Dow Singapore was "purposefully availing itself of the benefits of the laws of [Connecticut] or of the United States"; instead, its activity in Connecticut was "necessitated by [UCC's] decision[s] to base itself there" and to assign certain responsibilities to some of its employees there. *Creighton Ltd. v. State of Qatar*, 181 F.3d 118, 128 (D.C. Cir. 1999) (citation omitted) (holding no personal jurisdiction over State of Qatar in Tennessee arising from Qatar's contacts with Tennessee-based contractor). To contend that Dow Singapore subjected itself to personal jurisdiction in Connecticut by virtue of purchases from UCC "seems to confuse a distant purchaser 'reaching out' to a seller in the forum state with a seller 'reaching out' to a distant state in order to do business there." *Ibid.*

Ultimately, *wherever* Dow Singapore was purchasing Products from UCC, it was not purchasing from that location because it wished to do business there, but rather because that location was where Dow Singapore had to go in order to obtain the Products it needed to sell in the Asia Pacific region. In doing so, Dow Singapore "[did] not thereby purposefully avail itself of the seller's state law, and [did] not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships its merchandise." *Ibid.*

(quoting *Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460, 464-65 (D.C. Cir. 1988)).

In sum, whatever the outcome of the analysis under Section 12, the evidence of Dow Singapore's contacts with Connecticut does not show the minimum contacts required for personal jurisdiction over Dow Singapore in this matter to comport with due process. The Court therefore should deny Plaintiffs' motion to vacate its Order.

### 2. The Evidence Demonstrates that Assertion of Personal Jurisdiction Over Dow Singapore Would Be Unreasonable and Unfair.

While the exercise of jurisdiction is generally favored if minimum contacts exist, "it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Metro. Life*, 84 F.3d at 568 (quoting *Burger King Co. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Thus, the second prong of the due process inquiry asks whether assertion of personal jurisdiction is reasonable under the circumstances of the particular case. *See ibid.* This inquiry ordinarily requires the Court to

> consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal*, 480 U.S. at 113 (quoting *World-Wide Volkswagen*, 444 U.S. at 292); *see Metro. Life*, 84 F.3d at 568 (citing *Asahi Metal*, 480 U.S. at 113-14); *see also* Mem. Defs.' Mot. Dismiss at 18-19 (May 30, 2003) (examining *Asahi Metal* factors). When the inquiry concerns the assertion of personal jurisdiction over an alien defendant, the interstate considerations are supplanted by consideration of "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the [American] court." *Asahi Metal*, 480 U.S. at 115.

23

In *Asahi Metal*, the Japanese petitioner sold valves it made to respondent, a Taiwanese maker of motorcycle tires. After a tire made by respondent, containing one of petitioner's valves, exploded on a California highway, the driver of the motorcycle involved filed a product-liability action in California state court against, among others, the respondent, which cross-claimed against petitioner, seeking indemnification. *See id.* at 105-06. The plaintiff and the respondent settled, leaving only respondent's indemnification claim against petitioner before the California court. *See id.* at 106. The Court held that, putting aside whether petitioner had the necessary minimum contacts with California, personal jurisdiction over petitioner was unreasonable, and therefore would "offend 'traditional notions of fair play and substantial justice.'" *Id.* at 113 (citations omitted).[9]    The Court's consideration of the reasonableness factors demonstrates the unreasonableness of jurisdiction over Dow Singapore here.

First, the Court observed, "the burden on the defendant in this case is severe." *Id.* at 114. Petitioner was required "not only to traverse the distance between [its] headquarters in Japan and the Superior Court of California . . ., but also to submit its dispute with [respondent] to a foreign nation's judicial system." *Ibid.* The Court emphasized the importance of this consideration: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Ibid.*

Next, the Court turned to the interests of the plaintiff and the forum in exercising jurisdiction over petitioner. "When minimum contacts have been established," these interests "often . . . will justify even the serious burdens placed on the alien defendant." *Ibid.* But the

---

[9]    Notably, a majority of the Court did not agree that petitioner Asahi Metal lacked the necessary minimum contacts with California. But these five justices joined Justice O'Connor's opinion for the Court that, regardless of minimum contacts, the exercise of personal jurisdiction over Asahi Metal was unreasonable, and thus violated due process. *See id.* at 103-04.

Court found those interests to be "slight." The original plaintiff had settled, leaving only the respondent, a Taiwanese corporation, as a claimant. The transaction between them took place in Taiwan, and petitioner shipped its valves from Japan to Taiwan. *See ibid.* Petitioner did not demonstrate "that it is more convenient for it to litigate its indemnification claim against [respondent] in California rather than in Taiwan or Japan." *Ibid.* Moreover, "[b]ecause the [respondent] is not a California resident, California's legitimate interests in the dispute have considerably diminished." *Ibid.* While the California Supreme Court had suggested that California had an interest in consumer protection through compliance with safety standards, the Court concluded that the remaining dispute was "primarily about indemnification rather than safety standards," a dispute as to which it was "not at all clear . . . that California law should govern." *Id.* at 114-15. Further, the State's interest in consumer protection would be achieved comparably by the application of California tort law against "those who use Asahi components in their final products, and sell those products in California." *Id.* at 115.

Finally, the heavy burden on petitioner and the slight interests of the plaintiff and the forum state made it unnecessary for the Court to examine the specific concerns of Japan or Taiwan. "In every case," the Court held,

> those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum state.

*Ibid.* The Court concluded that in light of "the international context," the "heavy burden" on petitioner, and the "slight" interests of the respondent and California, "the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair." *Id.* at 116.

25

Application of the same considerations here compels the conclusion that the exercise of personal jurisdiction over Dow Singapore would be equally "unreasonable and unfair." Personal jurisdiction over Dow Singapore would force it to "traverse" the comparably great "distance between [its] headquarters in [Singapore] and the [District of Connecticut]." *Id. at* 114. As with *Asahi Metal*, assertion of personal jurisdiction would compel Dow Singapore "to submit its dispute with [Plaintiffs] to a foreign nation's judicial system." *Ibid.* Plaintiffs' interest in subjecting Dow Singapore to the Court's personal jurisdiction is slight. As with *Asahi Metal*, there is no reason to believe that other forums, such as Singapore, would be any less convenient for Plaintiffs to resolve their dispute with Dow Singapore.[10]

Further, "[b]ecause the plaintiff is not a [Connecticut] resident, [Connecticut's] legitimate interests in the dispute have considerably diminished." *Ibid.* If there were anything to Plaintiffs' allegations that a resale price maintenance agreement between them and UCC and, later, Dow helped to prop up prices for the Products in the United States, Connecticut's interests would be served far more effectively by antitrust suits brought by Connecticut residents directly against whatever firms were behaving anticompetitively in the relevant geographic market that includes Connecticut. *Cf. id.* at 115 (California's interest in consumer safety better served by tort claims against firms using and selling petitioner's components in California). Finally, the "international context" (*id.* at 116) again weighs heavily in favor of not finding "the serious burdens on [Dow Singapore] outweighed by minimal interests on the part of [Plaintiffs] or [the state of Connecticut]" (*id.* at 115). As the Court admonished, "'Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" *Ibid.*

---

[10]    That the United States offers Plaintiffs a unique remedy – treble antitrust damages – only heightens the concerns the Court must weigh in considering the interests of other nations.

26

(quoting *United States v. First National City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)).

These considerations show that – regardless of whether Dow Singapore might be said to "transact business" in Connecticut for the purposes of Section 12, or have the indispensable minimum contacts with Connecticut pursuant to the first prong of the due process inquiry – the assertion of personal jurisdiction over Dow Singapore would be "unreasonable and unfair." Personal jurisdiction over Dow Singapore therefore is not consistent with due process.

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to vacate the Order with respect to Dow Singapore.

Dated:  April 27, 2005                       Respectfully submitted,

Craig A. Raabe (ct 04116)                    Andrew S. Marovitz (ct 25409)
Marian B. Manzo (ct 22068)                   Dana S. Douglas (ct 25412)
ROBINSON & COLE LLP                          MAYER, BROWN, ROWE & MAW LLP
280 Trumbull Street                          190 South La Salle Street
Hartford, CT  05103-3497                     Chicago, Illinois  60603
(860) 275-8304                               (312) 782-0600

                                             Christopher J. Kelly (ct 25410)
                                             MAYER, BROWN, ROWE & MAW LLP
                                             1909 K Street, N.W.
                                             Washington, D.C.  20006-1157
                                             (202) 263-3000

*Counsel for Dow Chemical Pacific (Singapore) Pte. Ltd.*

## CERTIFICATE OF SERVICE

This is to certify that a copy of this Memorandum of Dow Chemical Pacific (Singapore)

Pte. Ltd. In Opposition to Plaintiffs' Motion to Vacate the Order Granting Rule 12(b)(2) Motions

to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction was forwarded this

27th day of April, 2005, by first-class mail, postage prepaid, to the following counsel as follows:

Alicia L. Downey, Esq.
Bingham McCutchen, LLP
150 Federal Street
Boston, MA  02110


Richard S. Taffet, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022-4689


Suzanne Wachsstock, Esq.
Wiggin & Dana LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT  06911-0325

Robert M. Langer, Esq.
Steven Bruce Malech, Esq.
Wiggin & Dana LLP
One CityPlace
185 Asylum Street
Hartford, CT  06103

Michael S. Elkin, Esq.
Susan B. McInerney, Esq.
Alyson L. Redman, Esq.
Thelen Reid & Priest LLP
875 Third Avenue
New York, NY  10022-6225

Nathan P. Eimer, Esq.
Scott C. Solberg, Esq.
Andrew G. Klevorn, Esq.
Ryan S. Hedges, Esq.
Vanessa G. Jacobsen, Esq.
Eimer Stahl Klevorn & Solberg, LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL  60604


Marion B. Manzo