**Page 1**

```
 1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT
 2

 3

 4

 5   ...................................)
     MM GLOBAL SERVICES INC., MM GLOBAL )
 6   GLOBAL SERVICES PTE. LTD., and     )
     MEGAVISA SOLUTIONS (S) PTE. LTD.,  )
 7         Plaintiffs          ) Civil Action No.
     VS                        ) 302 CV 1107 (AVC)
 8   THE DON CHEMICAL COMPANY, UNION    )
     CARBIDE CORPORATION, UNION CARBIDE )
 9   ASIA PACIFIC, INC., UNION CARBIDE  )
     CUSTOMER SERVICES PTE. LTD. and    )
10   DON CHEMICAL PACIFIC (SINGAPORE)   )
     PTE. LTD.,                         )
11         Defendants         )
     ...................................)
12

13

14        DEPOSITION OF:  CHRISTINE BERTI
          DATE:  OCTOBER 1, 2004
15        HELD AT:  BINGHAM McCUTCHEN LLP
                    ONE STATE STREET
16                  HARTFORD, CONNECTICUT
17

18

19

20

21

22   Reporter: WENDY J. ALLEN, RFR, CRR, LSR #00221
              BRANDON SMITH REPORTING SERVICE
23                 44 Capitol Avenue
                   Hartford, CT 06106
24                 Tel (860) 549-1850
25

         Brandon Smith Reporting Service
```

**Page 3**

```
 1              I N D E X
 2
     WITNESS:                                     PAGE:
 3
     Christine Berti
 4        Direct Examination by Ms. Downey         6
          Cross-Examination by Mr. Kelly          110
 5        Redirect Examination by Ms. Downey      113

 6

 7   EXHIBITS:

 8   Plaintiff's Exhibit 1, Notice of Depositions for Dow,
     UCC and UCAP
 9   Plaintiff's Exhibit 2, Notice of Deposition for UCCS
     Plaintiff's Exhibit 3, Notice of Deposition for
10   Dow Chemical Pacific
     Plaintiff's Exhibit 4, Responses and Objections of
11   Defendants Dow, UCC and UCAP to Plaintiffs' First
     Set of Personal Jurisdiction Document Requests and
12   Interrogatories
     Plaintiff's Exhibit 5, Responses and Objections of
13   Defendants UCCS to Plaintiffs' First Set of Personal
     Jurisdiction Document Requests and Interrogatories
14   Plaintiff's Exhibit 6, Responses and Objections of
     Defendant Dow Chemical Pacific to Plaintiffs'
15   First Set of Personal Jurisdiction Document Requests
     and Interrogatories
16   Plaintiff's Exhibit 7, 9/7/04 letter to The Honorable
     Alfred V. Covello from Andrew S. Marovitz
17   Plaintiff's Exhibit 8, Plaintiff's Progress report
     as of 9/7/04
18   Plaintiff's Exhibit 9, 9/7/04 letter to Richard S.
     Taffet from Dana S. Douglas
19   Plaintiff's Exhibit 10, 8/19/98 memo from Amy Lee
     Plaintiff's Exhibit 11, order details
20   Plaintiff's Exhibit 12, Inter Company Price Workback For
     North America & Dow Company's Outside North America
21   Plaintiff's Exhibit 13, 6/13/04 E-mail to Ashish Mitra
     from Arpana Mody
22   Plaintiff's Exhibit 14, affidavit of Yap Poh Chye David
     Plaintiff's Exhibit 15, affidavit of Lawrence Cheung
23   Plaintiff's Exhibit 16, UCCS invoices
     Plaintiff's Exhibit 17, Dow Chemical Pacific invoices
24   Plaintiff's Exhibit 18, UCCS invoices
     Plaintiff's Exhibit 19, Dow Chemical Pacific invoices
25   Plaintiff's Exhibit 20, 11/11/98 memo with spreadsheets

         Brandon Smith Reporting Service
```

**Page 2**

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFF:
 3   ALICIA L. DOWNEY, ESQ.
     BINGHAM McCUTCHEN LLP
 4   150 Federal Street
     Boston, MA  02110-1726
 5
 6   REPRESENTING THE DEFENDANT:
 7   CHRISTOPHER KELLY, ESQ.
     MAYER, BROWN, ROWE & MAW, LLP
 8   1909 K Street, N.W.
     Washington, D.C. 20006-1101
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

             Brandon Smith Reporting Service
```

**Page 4**

```
 1
              I N D E X
 2
 3   Plaintiff's Exhibit 21, UCCS 12/31/00 annual report
     Plaintiff's Exhibit 22, UCCS 12/31/01 Report of the
 4   Directors and Financial Statements
     Plaintiff's Exhibit 23, UCCS 12/31/02 Report of the
 5   Directors and Financial Statements
     Plaintiff's Exhibit 24, UCCS 12/31/03 Report of the
 6   Directors and Financial Statements
     Plaintiff's Exhibit 25, Dow Chemical Pacific 12/31/99
 7   Report of the Directors and Financial Statements
     Plaintiff's Exhibit 26, Dow Chemical Pacific 12/31/00
 8   Report of the Directors and Financial Statements
     Plaintiff's Exhibit 27, Dow Chemical Pacific 12/31/01
 9   Report of the Directors and Financial Statements
     Plaintiff's Exhibit 28, Dow Chemical Pacific 12/31/02
10   Report of the Directors and Financial Statements
     Plaintiff's Exhibit 29, Dow Chemical Pacific 12/31/03
11   Report of the Directors and Financial Statements
     Plaintiff's Exhibit 30, CD
12   Plaintiff's Exhibit 31, 1996 Dow Singapore spreadsheets
     Plaintiff's Exhibit 32, 1997 Dow Singapore spreadsheets
13   Plaintiff's Exhibit 33, 1997 Dow Singapore spreadsheets
     Plaintiff's Exhibit 34, handwritten notes
14
15   (Exhibits retained by Attorney Downey)
16
17
18
19
20
21
22
23
24
25

             Brandon Smith Reporting Service
```

S T I P U L A T I O N S

1 
2 
3          It is stipulated by counsel for the parties
4  that all objections are reserved until the time of
5  trial, except those objections as are directed to the
6  form of the question.
7 
8          It is stipulated and agreed between counsel for
9  the parties that the proof of the authority of the
10 Commissioner before whom this deposition is taken is
11 waived.
12 
13         It is further stipulated that any defects in
14 the notice are waived.
15 
16         It is further stipulated that the reading and
17 signing of the deposition transcript by the witness may
18 be signed before any Notary Public.
19 
20 
21 
22 
23 
24 
25 

Brandon Smith Reporting Service

---

1  but just as a general rule, that's fine with me.
2          MS. DOWNEY:  Would you like this witness
3  to read and sign her deposition?
4          MR. KELLY:  Yes, we would, please.
5          MS. DOWNEY:  And will you agree that she
6  can sign it before any notary?
7          MR. KELLY:  Oh, yes, sure.
8          MS. DOWNEY:  Now, again, before we start
9  the deposition, I just want to note for the record that
10 yesterday the plaintiffs received a shipment of I
11 believe five boxes of additional documents from the
12 defendants.  We did not have time to review those
13 documents and make any decision about whether there were
14 documents material to this deposition, but should we
15 find such documents, we would reserve the right to
16 reopen this deposition and call Ms. Berti back at the
17 defendant's expense.
18         MR. KELLY:  And we'll certainly be glad
19 to talk with you about that, but first, from what I know
20 of those documents, I doubt that they will bear on her
21 testimony, but secondly, as you know, Alicia, we're in
22 the midst of a fairly enormous document production in
23 this matter, and the fact is, if we are going to go
24 forward with depositions like these now, it's got to be,
25 it's at your choice to proceed at this point, and we

Brandon Smith Reporting Service

---

1          (Deposition commenced at 10:15 a.m.)
2 
3          CHRISTINE BERTI, Deponent, having first
4  been duly sworn, deposes and states as follows:
5 
6          DIRECT EXAMINATION BY MS. DOWNEY:
7 
8      Q    Good morning, Ms. Berti.  Am I pronouncing
9  your name correctly?
10     A    Yes.
11     Q    I'm Alicia Downey.  I represent the plaintiffs
12 in this case, who are several parties, MM Global
13 Services Inc., MM Global Services PTE Limited, and
14 Megavisa Solutions PTE Limited.
15         MS. DOWNEY:  Now, before we begin the
16 deposition I'll ask your counsel if you will agree that
17 all objections other than as to form are reserved until
18 trial?
19         MR. KELLY:  I think what I'd rather do is
20 just conduct the deposition under the federal rules,
21 so...
22         MS. DOWNEY:  My understanding is that
23 under the federal rules typically all objections other
24 than to form are reserved until trial.
25         MR. KELLY:  That's my experience, too,

Brandon Smith Reporting Service

---

1  don't feel that there's any obligation on us to demand
2  that people like Ms. Berti inconvenience themselves to
3  come back a second time.  That said, we're glad to talk
4  with you about it, and certainly we want to be able to
5  accommodate you if we can, and if there's a serious
6  reason for doing it, we'll certainly cooperate.
7          MS. DOWNEY:  I'm just stating a
8  reservation of right.
9          MR. KELLY:  Okay.
10 BY MS. DOWNEY:
11     Q    And another preliminary matter is that it's
12 important for everyone to agree on abbreviations and
13 short names for the various companies involved here.  I
14 want to make sure that we're all talking about the same
15 corporation at the same time.  I'm going to propose the
16 following definitions, and please tell me whether you
17 think you can proceed on that basis, or whether they
18 seem ambiguous or unclear to you.
19         When I refer to Dow I want to refer to the Dow
20 Chemical Company, when I refer to UCC I'm referring to
21 Union Carbide Corporation, when I'm referring to UCAP or
22 U-C-A-P it's Union Carbide Asia Pacific, and when I
23 refer to Dow Singapore I'm talking about Dow Chemical
24 Pacific (S) PTE Limited, and finally, when I'm talking
25 about UCCS I'm talking about Union Carbide Customer

Brandon Smith Reporting Service

1    Services PTE Limited.  Does that make sense to you, Ms.
2    Berti?
3        A    Yes.
4        Q    Are you generally familiar with all those
5    companies, at least by name?
6        A    Yes.
7        Q    And if it's ever unclear which corporation I'm
8    talking about, will you agree to speak up and ask me to
9    clarify it?
10       A    Sure.
11       Q    Have you had your deposition taken before?
12       A    No.
13       Q    The general rules are that you are here
14   testifying under oath as you would in a courtroom.  When
15   you answer a question, it's important that you
16   articulate using words, yes or no, because the court
17   reporter can't pick up head shaking or other gestures.
18            If you need a break at any time, please let me
19   know, and I'll break off at the next available
20   opportunity.  If you can't understand a question, please
21   say so, and I will attempt to rephrase the question for
22   you.
23            At the end of the deposition the court
24   reporter will go back to her office and create a
25   transcript.  You will have an opportunity to review the
                  Brandon Smith Reporting Service

1    transcript and make corrections in writing, and I will
2    have the opportunity to take corrections such as those
3    and use them at the trial as if you had testified in
4    that manner here at the deposition.
5            Could you state your full name for the record,
6    please?
7        A    Yes.  It's Christine Ann Berti.
8        Q    What is your current address?
9        A    12 Logging Trail Lane, Brookfield,
10   Connecticut, 06804.
11       Q    How far is that from here?
12       A    About 50 miles, 60 miles.
13       Q    Are you currently employed?
14       A    No.
15       Q    What was your most recent employment?
16       A    With the Dow Chemical Company.
17       Q    At which facility?
18       A    Danbury, Connecticut.
19       Q    And what position did you hold?
20       A    I don't know, I didn't have a title, per se.
21   I don't even know for bookkeeping purposes what they had
22   on my record, to tell you the truth.
23       Q    What were your responsibilities?
24       A    My responsibilities were inputting requests
25   for access to certain databases that Dow Chemical
                  Brandon Smith Reporting Service

1    Company maintained.
2        Q    What department did you work for?
3        A    I don't recall the exact name of the
4    department.
5        Q    To whom did you report?
6        A    I reported to Brett, I'm sorry, I can't recall
7    his last name.
8        Q    Did anyone report to you?
9        A    No.
10       Q    How long ago did you stop working for Dow?
11       A    September 30th, 2002.
12       Q    At the time that you worked for Dow did you
13   hold any other position in any affiliated company
14   simultaneously?
15       A    No.
16       Q    What were the circumstances of your departure
17   from Dow?
18       A    Retirement.
19       Q    Do you currently receive any retirement
20   benefits from the company?
21       A    Yes, I do.
22       Q    What kind of benefits?
23       A    Pension.
24       Q    Any other benefits?
25       A    No.
                  Brandon Smith Reporting Service

1        Q    Are you being compensated in any way for
2    testifying today?
3        A    I have not been compensated.
4        Q    Have you asked to be compensated?
5        A    I have not.
6        Q    Let me place before you what has been
7    pre-marked as Plaintiff's Exhibit 1, which is the notice
8    of deposition under Rule 30(b)6 directed to defendants
9    Dow, UCC, and UCAP.  Have you seen this document before?
10       A    Yes, I have.
11       Q    And do you understand that you're testifying
12   today in the capacity of someone who has been designated
13   by the three corporations to speak on their behalf?
14       A    Yes.
15       Q    And do you consent to speak on behalf of the
16   corporations and give such testimony?
17       A    Yes.
18       Q    Let's turn to page 6 of Exhibit 1.  I'm
19   looking at the subject areas of examination, and it is
20   my understanding that you've been designated to testify
21   about subjects 2 and 4 on this list.  Could you take a
22   moment and read those and tell me whether my
23   understanding is correct?
24            MR. KELLY:  Excuse me, Alicia, we've also
25   designated her for number 3, which is the extent of
                  Brandon Smith Reporting Service

```
1    knowledge about who was on the other side of the orders.
2    You're right that that was blank on the sheet that we
3    sent you a couple weeks ago, but then, I've forgotten
4    whether it was you or Richard followed up and we did
5    name Ms. Berti for number 2 as well.  So if you'd
6    like --
7              MS. DOWNEY:  Thank you for the additional
8    information.
9              MR. KELLY:  Sure.  Sorry about that.
10             MS. DOWNEY:  That's all right.
11   BY MS. DOWNEY:
12        Q    Is it your understanding that you're here to
13   testify about topics 2, 3 and 4 on this list?
14        A    Yes.
15        Q    Are you prepared to testify about those
16   topics?
17        A    Yes.
18        Q    In what way have you prepared to testify about
19   these topics?
20        A    I wrote some notes to jog my memory, to try to
21   recall people that I worked with during the time.
22        Q    When were you first contacted about testifying
23   in this deposition?
24        A    I would say it was about a month ago.
25        Q    Who contacted you?
              Brandon Smith Reporting Service
```

```
1    know the name of it, but it was some kind of a report.
2         Q    Some kind of a what?
3         A    A report, a spreadsheet report.
4         Q    Was it a report that you believe had been
5    generated from the Dow database?
6         A    Correct.
7         Q    Did you speak with any current or former
8    employees of either Dow, UCC, or UCAP in preparation for
9    your deposition?
10        A    Yes.
11        Q    With whom did you speak?
12        A    Anne Sprauer.
13        Q    And who is Anne Sprauer?
14        A    She is a current customer service rep at Dow
15   Chemical in Midland, Michigan.
16        Q    Can you spell her last name?
17        A    S-P-R-A-U-E-R.
18        Q    Did you speak with anyone else?
19        A    Yes.
20        Q    Who?
21        A    Diane Pernini, P-E-R-N-I-N-I.
22        Q    And what is her position?
23        A    Retired from Union Carbide.
24        Q    Where is she located?
25        A    New Jersey.
              Brandon Smith Reporting Service
```

```
1         A    Sara Arons.
2         Q    In preparation for this deposition did you
3    meet with counsel?
4         A    Yes.
5         Q    Whom did you meet with?
6         A    Chris Kelly.
7         Q    How many times?
8         A    Once.
9         Q    Where?
10        A    Danbury, Connecticut.
11        Q    Was that at the Dow facility there?
12        A    Yes.
13        Q    And other than speaking with Mr. Kelly, what
14   else did you do when you were there at that time?
15        A    That was all.
16        Q    Did you review any documents?
17        A    Yes.
18        Q    Do you recall what documents you reviewed?
19        A    Yes.
20        Q    Please tell me which documents you reviewed?
21        A    This document.
22        Q    So the notice?
23        A    That's in front of me.
24        Q    Exhibit 1?
25        A    Correct.  And one other document.  I don't
              Brandon Smith Reporting Service
```

```
1         Q    What was her position?
2         A    Customer service rep at Weston Canal.
3         Q    Who else did you speak with?
4         A    That was all.
5         Q    And for what purpose did you speak with Ms.
6    Sprauer?
7         A    To confirm work process, order processing,
8    current work process and order processing.
9         Q    Any other reason?
10        A    No.
11        Q    And what was the purpose of your discussion
12   with Ms. Pernini?
13        A    To get names of customer service reps who
14   worked at the Weston Canal customer service center.
15        Q    Did she provide you with names?
16        A    Yes, she did.
17        Q    Did she provide them to you in writing?
18        A    No.
19        Q    Do you recall the names she provided you with?
20        A    Yes.
21        Q    What were they?
22        A    I have many.  Would you like me to read them
23   all to you?
24        Q    Well, why don't we make a copy of your notes
25   and we'll mark them and you can just identify it as the
              Brandon Smith Reporting Service
```

1    list that you created, all right?

2        A    Okay.

3            MS. DOWNEY:  Off the record.

4            (Off record.)

5            THE WITNESS:  There was another document

6    that I saw yesterday with Mr. Kelly, was a letter from

7    Y.M. Foo to -- I can't remember who it was to, but it

8    was regarding work process at Weston Canal for Mega

9    Global business.  It was dated December '96.

10   BY MS. DOWNEY:

11       Q    Returning to what's been marked now as Exhibit

12   34, could you just summarize for the record what this

13   is?

14       A    What this is is a list of Union Carbide

15   employees who handled international export customer

16   service from Weston Canal.  They may not have handled

17   any orders from Singapore, but they had international

18   export responsibility.

19       Q    Would they have handled orders from UCCS and

20   Dow Singapore?

21       A    They may or may not have.

22       Q    And with respect to each one of these people,

23   at which facility did they work?

24       A    Each person worked at Weston Canal.

25       Q    Where is that?

            Brandon Smith Reporting Service

---

1        A    Not to my knowledge.

2        Q    Where was he based?

3        A    Danbury, Connecticut.

4        Q    And for whom did Gene Fisher work for?

5        A    I do not know.

6        Q    Do you know where he was located?

7        A    I believe he was located in Weston Canal, New

8    Jersey.

9        Q    And Mr. Liveris, who did he work for?

10       A    I do not know the name of who he worked for.

11       Q    Do you know in which facility he worked?

12       A    Yes.

13       Q    Where?

14       A    Dow Midland, Michigan.

15       Q    And is it Neal Wyhs?

16       A    Neal Wyhs, W-Y-H-S.

17       Q    Do you know what company Mr. Wyhs worked for?

18       A    Yes, Union Carbide Corporation.

19       Q    And based in New Milford, Connecticut?

20       A    No, Danbury, Connecticut.

21       Q    Does that appear to be a residential address?

22       A    It does.

23       Q    Do you know whether he's retired from the

24   company?

25       A    I do not know for sure.

            Brandon Smith Reporting Service

---

1        A    New Jersey.

2        Q    For what period of time did these people have

3    this responsibility?

4        A    I do not know.

5        Q    I'm going to place before you what's been

6    marked as Plaintiff's Exhibit 4, which are the responses

7    and objections of Dow, UCC, and UCAF to a set of

8    document requests and interrogatories that the

9    plaintiffs served on them.  Have you ever seen this

10   document or any portion of it before?

11       A    No, I have not.

12       Q    Could you turn to page 10 of this document.

13   And do you see the chart listing the names of various

14   people, it continues from page 10 to page 11?

15       A    I do.

16       Q    Do the names of these people seem familiar to

17   you?

18       A    Many, yes.

19       Q    Which ones are familiar to you?

20       A    Kevin Dillan, Gene Fisher, Andrew Liveris,

21   Steve Meadows, Neal Wyhs.

22       Q    And do you know what company Mr. Dillan worked

23   for?

24       A    Union Carbide Corporation.

25       Q    And was he based in Michigan?

            Brandon Smith Reporting Service

---

1        Did you want to ask me about Steve Meadows,

2    too, or no?

3        Q    Oh, yes, thank you.  For whom did he work?

4        A    Union Carbide Corporation.

5        Q    Based where?

6        A    Danbury, Connecticut.

7        Q    And your knowledge is based on what you knew

8    as of the time you left the company, approximately 2002,

9    is that correct?

10       A    Yes.

11       Q    Do you have any more recent knowledge about

12   for whom these people worked and where they were based

13   currently?

14       A    No.

15       Q    Did you interact with any of these people on a

16   regular basis while you were employed by Dow?

17       A    Yes.

18       Q    Which ones?

19       A    Kevin Dillan, Steve Meadows, Neal Wyhs.

20       Q    And just describe generally the nature of the

21   interactions you had with them.

22           MR. KELLY:  Excuse me, before you answer,

23   Alicia, I'm glad to have Ms. Berti answer the question,

24   but I want to note that right now we're talking about

25   people who were identified in the interrogatory based on

            Brandon Smith Reporting Service

1   knowledge of the sales, whereas the topic of the
2   deposition has to do specifically with people who were
3   responsible for taking orders.
4       So I'm glad to have her give you some
5   testimony on this, but if -- what I can say is we're not
6   really prepared to testify in detail along the lines
7   you're going, so at some point I may have to intervene,
8   but for now I'm glad to go forward with that noted.
9   BY MS. DOWNEY:
10      Q   If you'd just tell me the nature of your
11  interactions here I can just decide whether we're on the
12  right track here or not, just generally.
13          MR. KELLY:  Go ahead and answer, that's
14  fine.
15          THE WITNESS:  Okay.  When I was a
16  customer service rep we would attend meetings or have
17  communication from the business regarding product
18  availability and the like, and these three gentlemen
19  were involved with various products that I handled as a
20  customer service rep at the Houston Customer Center, and
21  so I would have occasion to either speak with them in
22  person, or receive communication from them either by
23  E-mail or in writing.
24  BY MS. DOWNEY:
25      Q   That is probably a good point to go ahead and
                Brandon Smith Reporting Service

1   explore your employment history with the company with
2   Dow, with the other two companies, so that I can better
3   understand the basis of your experience.  You mentioned
4   that your last job had to do with helping people get
5   information from the database, is that correct?
6       A   No, it was inputting requests for access to
7   the database.
8       Q   Could you please outline your employment
9   history beginning with your first job out of school,
10  just job by job.
11      A   It's difficult because I haven't thought about
12  it in a long time since I went to work for Union
13  Carbide, but let me try to recall.  In about 1968 I went
14  to work in New Jersey for Lenox China as a secretary.
15      Q   Do you remember your next job after that?
16      A   My next job after that was mother.
17      Q   For how long did you work at that job?
18      A   I stayed at home as a mom until I went to work
19  with Union Carbide.  Well, correction, 1981 I went to
20  work for a temporary agency.
21      Q   And after that?
22      A   In 1982 I was hired on full-time at Union
23  Carbide Corporation.
24      Q   Which facility?
25      A   Danbury, Connecticut.
                Brandon Smith Reporting Service

1       Q   And what was your job at that time?
2       A   Secretary.
3       Q   Secretary to whom?
4       A   To the vice president of Union Carbide Africa
5   and Middle East.
6       Q   Do you remember the person's name?
7       A   Yes.  John Lykidis, L-Y-K-I-D-I-S.
8       Q   What was your next position?
9       A   Next position was in human resources with
10  UCAME, the aforementioned Union Carbide Africa and
11  Middle East Company, and my job responsibilities were to
12  handle all internationally assigned people in the area
13  of Africa and Middle East as far as salary, benefits, et
14  cetera.
15      Q   Do you remember approximately when you began
16  in the human resources position?
17      A   Approximately '84.
18      Q   And for how long were you doing that?
19      A   Until, for about two years.
20      Q   What did you do next?
21      A   At that time Union Carbide restructured out of
22  the area.  Companies no longer had their senior
23  management in the Danbury facility.  So the people that
24  I was working for and with went back out to the field,
25  and I then went to work for the battery division of
                Brandon Smith Reporting Service

1   Union Carbide in Danbury, Connecticut.
2       Q   What did you do for the battery division?
3       A   I was administrative assistant.
4       Q   And when did you take the next position and
5   what was it?
6       A   The battery division was sold to Ralston
7   Purina Company, Checkerboard Square, St. Louis,
8   Missouri, and I then moved with the Eveready Battery
9   Company people, I left Union Carbide to continue to work
10  for Eveready Battery Company in Trumbull, Connecticut.
11      Q   And approximately when was that?
12      A   It was about '87 to '89.
13      Q   What did you do with Eveready?
14      A   I was responsible for the office, the
15  maintenance, the management, and secretarial duties
16  together.
17      Q   What did you do after that?
18      A   Returned to Union Carbide.
19      Q   Was this in about 1989?
20      A   Correct.
21      Q   To what position?
22      A   To a secretary in the solvency coatings
23  materials division.
24      Q   Was this back in Danbury?
25      A   Correct.
                Brandon Smith Reporting Service

1    Q    And who did you work for?

2    A    I can't remember the name.

3    Q    What was your next position?

4    A    My next position was customer service rep.

5    Q    When did you take that up?

6    A    June of 1992.

7    Q    Was this with any particular division?

8    A    This was for the chemicals.

9    Q    And were you based in Danbury?

10    A    No, Houston, Texas.

11    Q    And how long did you work in that position?

12    A    Five years.

13    Q    So in approximately June of 1997?

14    A    Correct.

15    Q    What job did you then take?

16    A    I went on the Powernet project.

17    Q    What's that?

18    A    It was Union Carbide implementation of SAP R3.

19    Q    What is SAP R3?

20    A    It's a global system for data inventory,

21    sales, financials, accounting, for all of Union Carbide.

22    Q    When you say all of Union Carbide, would that

23    include the subsidiaries --

24    A    No.

25    Q    -- such as UCCS?

Brandon Smith Reporting Service

1    A    Because she was customer service rep in

2    Singapore.

3         MR. KELLY:  Alicia, I'll just mention

4    that I'm pretty confident that Mr. Chai, who Union

5    Carbide Services has designated as its witness for that

6    topic, will know as well and be able to fill you in on

7    that.

8    BY MS. DOWNEY:

9    Q    Now, what was your role in working for the

10    Powernet project?

11    A    I was involved with testing the system, with

12    helping with the design of the export order process in

13    the system.  I also was a part of the business recovery

14    team after implementation to help resolve problems in

15    the system after implementation.  I also was involved

16    with data discovery for implementation, future

17    implementations.  As I said, we implemented in stages,

18    or segments, as we called them.  And I also had a

19    training role.

20    Q    Have you told me all of the different things

21    that you did in connection with the Powernet project?

22    A    I may have missed some things, but I think I

23    touched on the key points.

24    Q    With respect to your training role, do you

25    know whether there were in-person training programs for

Brandon Smith Reporting Service

1         MR. KELLY:  I'm sorry, let me just remind

2    the witness that for the sake of the court reporter

3    especially we need to make sure that Alicia has finished

4    her question before you answer.

5    BY MS. DOWNEY:

6    Q    Do you need me to repeat the question?

7    A    Please.

8    Q    All right.  When you referred to all of Union

9    Carbide, do you mean to include subsidiaries such as

10    UCCS?

11    A    Yes.  However, implementation was at various

12    stages for different groups and regions.

13    Q    At some point did UCCS, tell me if I'm using

14    the wrong word, adopt SAP R3 as the system for its

15    inventory sales, financial, and other data?

16    A    I think so, but I'm not absolutely positive if

17    they did.

18    Q    Do you know who would know the answer to that

19    question?

20    A    Yes.

21    Q    Who?

22    A    I know Julinda Leung.

23    Q    Would you spell her name?

24    A    Sure.  J-U-L-I-N-D-A, capital L-E-U-N-G.

25    Q    Why do you think Julinda Leung would know?

Brandon Smith Reporting Service

1    the people who were going to use the SAP R3?

2    A    Absolutely, yes.

3    Q    Where were they held?

4    A    Various locations.

5    Q    Were any training programs held in

6    Connecticut?

7    A    Yes.

8    Q    Did you personally conduct any of the

9    training?

10    A    Actually, I think, if I can correct myself,

11    there weren't any formal training sessions that I recall

12    in Danbury.  What we did do in Danbury in a training

13    nature was had customer service reps come into Danbury

14    and they performed testing on the system.  This was

15    prior to implementation, that I was involved in teaching

16    them how to use the system only in a test environment,

17    not for the formal training.  Those sessions were

18    conducted at the respective sites.

19    Q    Do you know whether any customer service reps

20    employed by UCCS came to Danbury for testing sessions?

21    A    Yes, I believe that they did take part in the

22    testing sessions.

23    Q    Do you remember any of their names?

24    A    Julinda.

25    Q    Do you recall approximately when this would

Brandon Smith Reporting Service

1    have taken place?

2    A    No, I'm sorry, I don't recall.

3    Q    Do you remember anybody else from UCCS who

4    came to Danbury for a testing session?

5    A    No, I don't remember.

6    Q    Do you know whether anybody from Dow Singapore

7    came to Danbury for testing or training on SAP R3?

8    A    No, they did not.

9    Q    How long were you involved in the Powernet

10    project?

11    A    From '97 until the merger was final with Dow.

12    Q    And did you then take another position?

13    A    Yes.

14    Q    What was that?

15    A    I was training, I was a trainer for customer

16    service reps in Midland, Michigan.

17    Q    Did you move from Houston to Michigan to take

18    that position?

19    A    No.  I moved from Houston to Danbury in '97.

20    Q    So all of your work in the Powernet project

21    was back in Danbury?

22    A    Correct.

23    Q    And what type of training were you doing?

24    A    SAP R3 customer service rep training.

25    Q    Did employees of UCCS or Dow Singapore come to

Brandon Smith Reporting Service

---

1    the question.

2    THE WITNESS:  Would you repeat the

3    question again?

4    BY MS. DOWNEY:

5    Q    I will.  After the merger, do you know whether

6    employees of UCCS or Dow Singapore came to the United

7    States for training in the SAP R3 system?

8    A    I don't believe that they did.

9    Q    And for how long were you a customer service

10    rep training in Midland, Michigan?

11    A    Six months.

12    Q    What did you do after that?

13    A    I took a job with Dow located in Danbury,

14    Connecticut, which we spoke about before, doing the

15    system work.

16    Q    Can you tell me approximately when you began

17    that position?

18    A    That was after the training in '01, so it

19    would have been from sometime in '01 to 9/30/02 when I

20    retired.  It was about a year.

21    I remember the name of my boss.

22    Q    Go ahead.

23    A    Brent, it wasn't Brett, it was Brent Jensen.

24    Q    Do you remember Mr. Jensen's title?

25    A    No.

Brandon Smith Reporting Service

---

1    Michigan to participate in training?

2    A    No.

3    Q    Do you know how employees of UCCS and Dow

4    Singapore received any training on SAP R3 after the

5    merger became final?

6    A    No, they would have received training before

7    the merger.

8    Q    How were new employees trained?

9    A    I'm sorry, I don't understand, trained on

10    what?

11    Q    SAP R3.

12    A    After the merger?

13    Q    Yes.

14    A    New employees in general, or new customer

15    service reps?

16    Q    New customer service reps employed by UCCS and

17    Dow Singapore.  If you know.

18    MR. KELLY:  Objection.  Excuse me,

19    Alicia, just to be clear, this is you're asking after

20    the merger?

21    MS. DOWNEY:  Yes.

22    MR. KELLY:  I think maybe one problem

23    right there is I guess the question of how long UCCS

24    existed after the merger, so it may be that that might

25    be part of it.  But you can answer, if you understand

Brandon Smith Reporting Service

---

1    Q    Do you know whom he reported to?

2    A    No.

3    Q    You described generally the SAP R3, but more

4    specifically what did the system include in terms of

5    hardware?  And I don't mean specifically.  It's a

6    computer system, right?

7    A    It is a system, computer system, correct.

8    Q    Do you know whether it's a mainframe kind of a

9    system?

10    A    No, I do not.

11    Q    Do you know where it was physically located in

12    1997?

13    MR. KELLY:  Objection to form.  You can

14    go ahead and answer if you know where it was located.

15    THE WITNESS:  I believe it was located in

16    West Virginia.

17    BY MS. DOWNEY:

18    Q    Do you know whether components of the system

19    were located in Connecticut?

20    A    No, I do not know that.

21    Q    Finally, along this line of questioning, can

22    you just describe generally to me what it was you

23    trained customer service representatives to do with the

24    SAP R3?

25    A    I trained them how to enter orders into the

Brandon Smith Reporting Service

1    system and to find inventory, look at data that they
2    would need to do their job as a customer service rep in
3    the system.
4        Q    Did the order entry process include generating
5    an invoice?
6        A    No.  Not for export.  I trained both export
7    and domestic customer service reps, but for export it
8    did not generate an invoice, for domestic it did.
9        Q    Do you know whether invoices were generated
10   for export by some other means?
11       A    Yes.
12       Q    What was that means?
13       A    Freight forwarder.
14       Q    What's that?
15       A    It is an outside company that is a contractor
16   that provides a service to us by providing export
17   documents, invoices.
18       Q    Did you ever -- excuse me, did you finish your
19   answer?
20       A    I think I'm having a real bad day, because I
21   need to correct.
22       Q    That's all right, go ahead.
23       A    I'm sorry, I feel so stupid.  We did create
24   invoices out of SAP.  I guess I'm just nervous.  The
25   freight forwarder would provide bills of lading, ocean
         Brandon Smith Reporting Service

1    bills of lading, and any other documents needed to move
2    the material from the plant or warehouse overseas.
3        Q    Do you know where freight forwarder is
4    located?
5        A    We have several freight forwarders.  Freight
6    forwarder is a generic term.  We used two freight
7    forwarders, typically, Fritz Company and BDP.
8        Q    Do you know where they were located?
9        A    Yes.  We had BDP New York, we had Fritz in
10   Houston.
11       Q    Are you familiar at all with the CEBA system?
12       A    It is not a system.
13       Q    What is it?
14       A    It is an acronym, which means Carbide's Export
15   Business to Asia.
16       Q    Was there an order entry process associated
17   with that acronym?
18       A    No.
19       Q    And have you heard the initials CPCS before?
20       A    It doesn't ring a bell.
21       Q    Can you tell me what the predecessor system to
22   SAP R3 was?
23       A    Yes.
24       Q    What was it?
25       A    The export system was called ISIS, I-S-I-S.
         Brandon Smith Reporting Service

1    The domestic system was called TOPS, T-O-P-S.  Those
2    were used here in the U.S.  In several regions of the
3    world they used BPCS, B-P-C-S.
4        Q    Do you know whether UCCS used the BPCS system?
5        A    They did.
6        Q    And did the BPCS system provide data to any
7    other system of Union Carbide?
8        A    Yes.
9        Q    What system and how?
10       A    It provided information into ISIS.  I only
11   know from a customer service rep perspective, I don't
12   know financial, accounting, distribution, other areas of
13   corporate business, I'm only speaking on behalf of what
14   I know, which is customer service, and order entry.
15       Q    And the customer service information would
16   include information about sales, for example, to
17   customers?
18       A    Can you -- I don't understand what you're
19   trying to ask me.
20       Q    I'm not making it -- it's not a complicated
21   question, but as opposed to financial and distribution,
22   the things you say you're not sure whether they're on
23   the system or not, from the customer service
24   representative perspective, can you just describe a
25   little bit more specifically the types of information
         Brandon Smith Reporting Service

1    that would come from the BPCS system to the ISIS system.
2        A    Yes, I can.  The customer name, the customer
3    ordering product, the quantity of product, the price of
4    the product, the delivery, expected delivery date at the
5    customer, the terms of sale, and any other pertinent
6    information to the order, for instance, text information
7    that may be required to process the order in ISIS.
8        Q    Do you know where the ISIS system was
9    physically located in the United States?
10            MR. KELLY:  Objection to form.  You can
11   answer the question, if you understand it.
12            THE WITNESS:  I believe the mainframe for
13   the ISIS system was located in West Virginia.
14            (Off record.)
15            MS. DOWNEY:  Back on the record.
16            I believe Ms. Berti wants to make a
17   clarification.  Please go ahead.
18            THE WITNESS:  Thank you.  Regarding
19   invoicing, before we had implemented SAP R3, when we
20   were using ISIS, our freight forwarders always created
21   an invoice for us out of their own system.  So the
22   export invoice was not created out of ISIS, but it was
23   created out of the freight forwarder's own stand-alone
24   system.  They worked on behalf of Union Carbide
25   Corporation.  They had our power of attorney to sign for
         Brandon Smith Reporting Service

10/1/2004 Berti, Christine (pp. 1 - 11)

1   us.  So they created the export invoice out of their own
2   system in-house, not out of ISIS.
3               After we implemented SAP R3, we gave the
4   freight forwarders limited access to SAP, and they went
5   into SAP and completed the invoice in SAP, the data for
6   the invoice, in other words, adding on freight charges,
7   actual quantities shipped, in the case of a bulk
8   shipment where you have a variation of what was ordered
9   and what is shipped, they would put actual quantities in
10  there, and close out the invoice and SAP in the data.
11  The physical piece of paper that went with the clearance
12  documents I believe came out of their own freight
13  forwarder system and not SAP.
14  BY MS. DOWNEY:
15      Q    All right.  Let me show you what's been marked
16  as Exhibit 5, which are the answers to interrogatories
17  by UCCS.  Have you ever seen Exhibit 5 before?
18      A    No.
19      Q    To your knowledge, did you contribute any
20  information that was used in the preparation of Exhibit
21  5?
22      A    No.
23      Q    Could you please turn to page 7.  Directing
24  your attention to the bottom paragraph beginning with
25  "Upon information and belief," you'll notice there's a
                Brandon Smith Reporting Service

10/1/2004 Berti, Christine (pp. 1 - 118)

1   list of names, and they are identified as individuals
2   who may have been responsible for placing orders to
3   purchase products from Dow or UCC.  Do you recognize any
4   of those names?
5       A    Yes.
6       Q    And whom do you recognize?
7       A    Belinda Koh, Rashida, Rozi, Patricia Wan.
8       Q    Were they all customer service
9   representatives?
10      A    Yes.
11      Q    And to your knowledge, were they all employed
12  by UCCS?
13      A    Yes.
14      Q    How do you know that?
15      A    From working with them while I was in Houston,
16  receiving orders and communication.
17      Q    Do you know whether any of them received
18  training on the SAP R3 system?
19      A    I can't say for sure.  I'm not sure.
20      Q    Should Julinda Leung be on this list as well?
21      A    I don't know.  I don't know what the list is
22  supposed to do, or be.
23      Q    It says individuals may have been responsible
24  for placing orders to purchase products from Dow or UCC
25  on behalf of UCCS, which I know it doesn't say that, but
                Brandon Smith Reporting Service

2004 Berti, Christine (pp. 1 - 118)

1   that's -- is Julinda Leung a person like that?
2               MR. KELLY:  Objection to the form of the
3   question.  I just note that the question that was asked
4   in the interrogatory is right there next to number 2,
5   and it says identify any and all persons responsible for
6   placing the orders to purchase products from Dow, UCC
7   and UCAP respectively?
8               THE WITNESS:  Should I answer?
9               MR. KELLY:  If you understand the
10  question, sure.
11              THE WITNESS:  My answer would be this:
12  During the years that I was a customer service rep we
13  had many other people that I worked with at Union
14  Carbide Customer Services, and so I don't know what time
15  frame this is referring to that these people worked,
16  or -- at one point in time Julinda Leung was a customer
17  service rep, but at the point in time that this question
18  was referring to at a specific date or time, she may not
19  have been.
20  BY MS. DOWNEY:
21      Q    Turn to page 9 of Exhibit 5, please.  If you
22  look at this list of names, which continues from page 9
23  to page 12, can you just identify for me people who you
24  recognize?
25      A    Yes, I can.  Wilson Foo.
                Brandon Smith Reporting Service

10/1/2004 Berti, Christine (pp. 1 - 118)

1       Q    How do you know Mr. Foo?
2       A    Through communication about customer orders.
3       Q    In what period of time?
4       A    It would have been sometime between '92 and
5   '97, when I was a customer service rep.
6       Q    Did you have any contact with him after 1997?
7       A    No.
8       Q    Is there anybody else you recognize?
9       A    Yes.  Nora Hsu.
10      Q    How do you know Ms. Hsu?
11      A    I handled orders for Taiwan, and I was in
12  contact with her regarding orders for those customers.
13      Q    And for what period of time?
14      A    '92 to '97.
15      Q    Any contact with her after '97?
16      A    No.
17      Q    Who else do you recognize?
18      A    Belinda Koh.
19      Q    And what was your interaction with her?
20      A    As a customer service rep receiving orders
21  from '92 to '97.
22      Q    Anybody else?
23      A    Dicky Leung.
24      Q    How do you know him?
25      A    I know him in his role as market manager, from
                Brandon Smith Reporting Service

1   business meetings that would be held on our site in
2   Houston, communication that we would receive relating to
3   customer service.
4        Q     In what period of time?
5        A     '92 to '97.
6        Q     And did you have any contact with him after
7   that?
8        A     No.
9        Q     Anybody else on the list?
10       A     Ron Neri.
11       Q     How do you know him?
12       A     I know him -- I worked with him in Danbury,
13  and I've known him for many years.
14       Q     For what period of time did you work with him
15  in Danbury?
16       A     I didn't work with him in Danbury.  I knew him
17  in Danbury.  I've probably known Ron for 20 years.  I
18  probably knew him when I started out at Union Carbide in
19  '82.
20       Q     Do you know which corporation employed him?
21       A     At what time?
22       Q     In the time you knew him, and if it's more
23  than one corporation, that would be the case.
24       A     When I knew him he was working in Danbury
25  it would have been Union Carbide Corporation.  When I
        Brandon Smith Reporting Service

---

1   knew him he also worked for UCAME, Union Carbide Africa
2   Middle East, in Greece.  I also know that he worked for
3   Union Carbide Asia Pacific in Singapore.
4        Q     Do you know if he worked for UCCS or Dow
5   Singapore?
6        A     He did not work for UCCS.  I do not know if he
7   ever worked for Dow Singapore.  My guess is no.
8        Q     Who else on this list do you recognize?
9        A     Paul Ng.
10       Q     How do you know him?
11       A     As a market manager, basically through
12  communication.
13       Q     For what period of time?
14       A     '92 to '97.
15       Q     And any interaction after that?
16       A     No.
17             Rashida was a customer service rep at UCCS.  I
18  dealt with her and met her and dealt with her from '92
19  to '97.
20       Q     Where did you meet her?
21       A     In Singapore.  I also met Nora Hsu from
22  Taiwan.
22       Q     And what was the purpose of your travel to
24  Singapore?
25       A     I was on Union Carbide business.
        Brandon Smith Reporting Service

---

1        Q     What was the business?
2        A     To discuss order process between Union Carbide
3   Customer Services and the Houston Customer Center.
4        Q     Who else do you recognize?
5        A     Albert Poh.  He was a sales manager in
6   Singapore.  And I knew him from '92 to '97.
7        Q     When you were in Texas, correct?
8        A     Correct.
9        Q     Anybody else?
10       A     Yes, Rozi, the next, from '92 to '97 as a
11  customer service rep.
12       Q     Were both Mr. Poh and Rozi -- it's actually
13  Ms. Rozli, R-O-Z-L-I -- employed by UCCS?
14       A     Rozi was.  I do not think Albert Poh was
15  employed by Union Carbide Customer Services.
16       Q     Do you recognize anybody else?
17       A     Arjun Samtami.
18       Q     And who was his employer?
19       A     I can't say for sure.  I think he was employed
20  by UCAP.
21       Q     How do you know him?
22       A     I know him because of attending meetings with
23  him.  He had some responsibility for the UCCS operation
24  at some point in time during '92 to '97 when I was
25  working, and visits to the Houston Customer Center.
        Brandon Smith Reporting Service

---

1        Q     Who else do you know?
2        A     Ronnie Tan.  Malaysia, he handled orders for
3   Malaysia, and he was market manager for that country,
4   and I had occasion to communicate with him regarding
5   Malaysian orders from '92 to '97.
6        Q     The next person?
7        A     Patricia Wan, I know her because she was a
8   customer service rep at UCCS, and I would communicate
9   with her between '92 and '97.
10             David Yap.
11       Q     How did you know Mr. Yap?
12       A     I know him because he -- through communication
13  as a customer service rep.  He was involved with credit,
14  and we had to be involved with debit memos and credit
15  memos from time to time as customer service reps, so I
16  know him through that communication.
17       Q     Anybody else?
18       A     John Yinoyines.
19       Q     Who did he work for?
20       A     I don't know.  I only just really know him by
21  name, that's all.
22       Q     I want to give you what's been marked as
23  Exhibit 6.  If you could please turn to page 8 of
24  Exhibit 6, and directing your attention to paragraph,
25  what is really the third indented paragraph beginning
        Brandon Smith Reporting Service

1    with "Upon information and belief," there's another list
2    of names of "individuals who may have been responsible
3    for placing orders to purchase products from Dow or
4    UCC." If you look on the first page of this Exhibit 6
5    you'll see these are the answers of Dow Chemical Pacific
6    Singapore, or the company that we're calling Dow
7    Singapore for today.
8        A    Okay.
9        Q    Do you recognize any of these names?
10       A    Only Rozi.
11       Q    And did you have any dealings with Rozi while
12   she was placing orders on behalf of Dow Singapore?
13       A    No.
14       Q    Had you left your position by the time Dow
15   Singapore began placing orders?
16       A    I never dealt with Dow Singapore, so I don't
17   know when they -- I don't think they were placing orders
18   in '97, and I had left my position in '97.
19       Q    Do you know who would know about orders placed
20   by Dow Singapore?
21       A    I'm not sure I understand what you're asking
22   me. Placed by Dow Singapore to Union Carbide
23   Corporation?
24       Q    I'll strike that. If you turn to page 10,
25   there's another chart of names, and I just ask whether
                 Brandon Smith Reporting Service

---

1        Q    What's the difference?
2        A    One is at Dow, and one was at Union Carbide.
3    SAP R2 was at Dow Chemical, SAP R3 was the operating
4    system for Union Carbide prior to the merger, and used
5    by Dow Chemical for a period of time after the merger.
6    It's no longer being used by customer service reps to
7    this day.
8        Q    So what is being used currently?
9        A    R2.
10       Q    And approximately when was the use of R3
11   finally phased out?
12       A    I'm not sure. I'm not sure that it was gone
13   by the time I left in '02, so I'm not sure when it was
14   phased out.
15           MR. KELLY: We'll be glad to check on
16   that, Alicia, and get you a firm answer on that.
17           MS. DOWNEY: Off the record.
18               (Off record.)
19           MS. DOWNEY: Back on the record.
20   BY MS. DOWNEY:
21       Q    I just have one more question to ask you with
22   Exhibit 7, which I believe is still before you, correct?
23       A    Yes.
24       Q    And on page 2 of Exhibit 7 where we saw the
25   reference to the SAP R2 system, do you recall that?
                 Brandon Smith Reporting Service

---

1    you recognize anybody on this list?
2        A    Ron Neri again.
3        Q    Right, we talked about him earlier.
4        A    Rozi again. David Yap, as mentioned before.
5    Spyro Petsalis on this list, page 11.
6        Q    How do you know him?
7        A    Only just from business meetings. Just barely
8    know him, just know --
9        Q    Do you know his employer?
10       A    His employer? At the time when I knew him it
11   was Union Carbide. And then John Yimoyines, as
12   mentioned earlier.
13       Q    Let me place what's been marked as Exhibit 7
14   before you, and ask you to -- first I'll just ask, have
15   you ever seen Exhibit 7 before?
16       A    No.
17       Q    If you turn to page 2 of Exhibit 7, to the
18   paragraph right in the middle of the page beginning with
19   "Defendants have produced," do you see a reference to
20   SAP R2 system?
21       A    Yes.
22       Q    Is there an SAF R2 system?
23       A    Yes.
24       Q    And is there an SAF R3 system?
25       A    Yes.
                 Brandon Smith Reporting Service

---

1        A    Yes.
2        Q    And you see the statement that "Defendants
3    have produced the available information from the SAP R2
4    system," et cetera? Did you assist in any way in the
5    gathering of those documents and information that's
6    referred to in this paragraph?
7        A    From R2?
8        Q    Yes.
9        A    No.
10       Q    Let me just place what has been marked as
11   Exhibit 9 before you. Ms. Berti, have you ever seen
12   Exhibit 9 before?
13       A    No.
14       Q    Do you see in the second paragraph of Exhibit
15   9 the statement, "The information produced was generated
16   by the SAP system, which maintains sales information for
17   all of the defendants." Can you tell by looking at that
18   statement which SAP system is referred to?
19       A    Just by that statement, no, but by reading on
20   further, it appears to me that it came from R2, because
21   of the order number sequencing, and by the Dow Chemical
22   Company being identified as number 01, I believe that
23   that would have come from R2 and not R3.
24       Q    And do you know whether the SAP R2 system
25   maintains sales information for sales by Dow or UCC to
                 Brandon Smith Reporting Service

**[Page 49]**

1  UCCS?

2          MR. KELLY:  Objection to form, but you

3  can answer it, if you understand it.

4          THE WITNESS:  Let's say it again so I

5  understand it.

6  BY MS. DOWNEY:

7      Q    All right, strike it, I'll get more basic.  Do

8  you know whether the SAP R2 system maintained all the

9  sales information for UCCS?

10         MR. KELLY:  Objection as to form.

11         THE WITNESS:  I don't know that.

12  BY MS. DOWNEY:

13     Q    Do you know whether the SAP R2 system

14  contained any information inputted by UCCS?

15     A    Not to my knowledge.

16     Q    Did the SAP R2 system contain information

17  inputted by Dow Singapore?

18     A    That's my understanding, yes.

19     Q    What kind of information?

20     A    It's my understanding from conversations with

21  people at Dow that they would have put in orders and

22  sales information into the R2 system.

23     Q    Are you as knowledgeable about the SAP R2

24  system as you are about the SAP R3 system?

25     A    Not at all.

        Brandon Smith Reporting Service

**[Page 50]**

1      Q    Do you know who would be more knowledgeable

2  about the SAP R2 system?

3      A    I believe almost any customer service rep at

4  Dow Chemical in Midland would be familiar with at least

5  the customer service information that is in R2.

6      Q    Is it your understanding that the R2 system is

7  accessible by the customer service representatives in

8  Dow Singapore?

9      A    That's my understanding, yes.

10     Q    And you are aware of any other information

11  that Dow Singapore uses the R2 system to maintain?

12         MR. KELLY:  Objection as to form.

13         THE WITNESS:  I can't speak specifically

14  for Dow Singapore, but I know in general R2 maintains

15  information such as inventory quantities, financials,

16  accounting, vendor information, et cetera, in addition

17  to orders.

18  BY MS. DOWNEY:

19     Q    And do you know whether the R2 system is the

20  only order entry system in use by Dow Singapore?

21     A    I don't know that for a fact since I've never

22  visited there or been a party to that information, but I

23  would assume that it is, because I believe it's the only

24  order entry system that is used by Dow Chemical.

25     Q    And is that true, to the best of your

        Brandon Smith Reporting Service

**[Page 51]**

1  knowledge, globally, that is, the R2 is the order system

2  used by Dow Chemical and all of its global subsidiaries?

3      A    That is my understanding, yes.

4      Q    Before we get to the other documents, with

5  respect to the R3 system with which you're more

6  familiar, is it fair to say that that was the only

7  system in use by UCCS to place orders with UCC?

8      A    Correct.  As soon as we implement, upon

9  implementation of R3, it would have been the system that

10  would be, that was used.

11     Q    And is it your understanding that in fact UCCS

12  used the R3 system in order to purchase certain products

13  from UCC during that period of time?

14         MR. KELLY:  Objection as to form.

15         THE WITNESS:  I believe that it is.  As I

16  stated before, I wasn't sure if R3 was implemented in

17  all of the regions.  I believe that it was.  It wasn't

18  during the time when I was working as a customer service

19  rep between '92 and '97 and personally taking orders,

20  but I believe that they did use SAP R3 to enter orders

21  at some time after I left the customer service job.

22  BY MS. DOWNEY:

23     Q    Do you know if the same is true with respect

24  to Dow Singapore, whether Dow Singapore used the R3

25  system to purchase certain products from UCC?

        Brandon Smith Reporting Service

**[Page 52]**

1      A    They would not have used SAP R3, no.

2      Q    Did UCCS, to your knowledge, use the R3 system

3  to purchase certain products from Dow Chemical?

4      A    I'm not sure, because that would have been a

5  transitional process.  When the merger occurred Union

6  Carbide used R3, Dow used R2.  There was a transitional

7  period where the two systems were up and running, and

8  then eventually R3 was taken down and R2 used

9  exclusively.

10         MR. KELLY:  Alicia, do you mean there, do

11  you mean, Dow Chemical, by Dow Chemical do you mean

12  specifically Dow Chemical as opposed to Union Carbide?

13  Because, of course, after the merger it's all one happy

14  family, so I just want to make sure we answer your

15  question with the precision it deserves.

16         MS. DOWNEY:  Well, I didn't mean -- I

17  meant as opposed to Union Carbide, because I had asked

18  the same question with respect to Union Carbide and

19  meant to make a distinction.

20  BY MS. DOWNEY:

21     Q    Did you want to change your answer based on

22  that clarification?

23     A    I don't think so.

24     Q    Okay.  Let's look at Exhibit 10.  If you could

25  just take a moment to review Exhibit 10 and let me know

        Brandon Smith Reporting Service

10/1/2004 Berti, Christine (pp. 1 - 118)

1  when you are ready for a question.
2      A    I'm finished reading.
3      Q    Can you identify Exhibit 10?
4      A    I don't know what you mean by identify.
5      Q    Do you know what it is?
6      A    Seems to be an E-mail or a letter.
7      Q    It appears to be from Amy Lee at UCCS,
8  correct?
9      A    Right.
10     Q    Do you know who that is?
11     A    I do.
12     Q    Who is she?
13     A    She was in sales in Singapore, and she handled
14  bulk products.
15     Q    And this E-mail refers to the bulk order
16  process, correct?
17     A    Correct.
18     Q    Are you familiar with the bulk order process?
19     A    Yes.
20     Q    Can you explain to me, then, what the bulk
21  order process was?
22     A    At Union Carbide?
23     Q    As described in this E-mail.  Do you need me
24  to be more specific?
25     A    I can take it point by point and explain

10/1/2004 Berti, Christine (pp. 1 - 118)

1  what's going on.  Would that be the best?
2      Q    Sure.
3      A    When Amy says in her first bullet, "When order
4  is finalized with Dicky," Dicky Leung, he would be
5  responsible for this BAM product that was mentioned, the
6  500 metric tons of BAM.  So Amy Lee is discussing with
7  the customer that they need to make sure that Dicky
8  Leung says it's okay that they have 500 metric tons of
9  this product to be available to ship on this vessel
10  that's going to be loading sailing August 21.  Once that
11  is agreed upon, that this customer can have that 500
12  metric tons of BAM available, then the Houston Customer
13  Center would put the order into the ISIS system.
14     Q    How would the Houston Customer Center get the
15  order?
16     A    The order would at that time in '98, I believe
17  that they were still on BPCS, so a customer service rep
18  at UCCS would input the order into BPCS.  There was an
19  automatic feed into ISIS of partial information.  It
20  wouldn't be enough to complete the order for further
21  processing, so it would be an incomplete status, and it
22  would be received in Houston by a customer service rep
23  responsible for that particular country.
24     Q    Now, there is a reference in the paragraph
25  toward the bottom middle portion to the CEBA system,

10/1/2004 Berti, Christine (pp. 1 - 118)

1  C-E-B-A system.  Do you know what that refers to?
2      A    That CEBA system is misleading.  There was no
3  such thing as a CEBA system.  CEBA was an acronym for a
4  work process which I had mentioned before, Carbide's
5  export business to Asia.  It was a work process.  It
6  wasn't an entity, it wasn't a company, it was a group of
7  people who were trying to figure out the best way to
8  work on the order processing.
9      Q    Were some of those people located in the
10  Danbury facility?
11     A    No, only in Singapore.  Sometimes people used
12  UCCS and CEBA as meaning the same thing.  The UCCS was
13  really an output of the CEBA work process.  When it was
14  decided to create Union Carbide Customer Service
15  Singapore, the CEBA work process was what initiated
16  that.
17        So when Dicky Leung agreed to the process of
18  providing 500 metric tons, it says in the second bullet,
19  "If product is not available, UCC on receipt of order
20  can straightaway inform you."  It would be another check
21  with the product marketing manager in the U.S. of bulk
22  loads to make sure that product was available for this
23  customer as a second check.
24     Q    Do you know where the product marketing
25  manager for the BAM product was located?

10/1/2004 Berti, Christine (pp. 1 - 118)

1      A    He would have been in Danbury.
2      Q    Is that where all the product marketing
3  managers are located, or were at that time?
4      A    No.  For that product the market manager would
5  have been located in Danbury.  In addition to the
6  product market manager, it would have, an inventory
7  planner would have also been a part of the decision,
8  too.
9      Q    And where would the inventory planner be
10  situated?
11     A    In Houston.
12     Q    Are you done with your description of the
13  process?
14     A    Other than -- not quite finished.
15     Q    All right.
16     A    In the final detail Amy is confirming that
17  there was an order placed in the system, in the ISIS
18  system, as you see the number noted there in that last
19  large paragraph, 67 dash, that was an order in the ISIS
20  system, and that booking details on a vessel sailing
21  August 21 would be available.  That's it.
22     Q    Thank you.
23     A    You're welcome.
24     Q    Do you know whether this bulk order process
25  was in use for all of the products that UCCS handled?

1          MR. KELLY:  Objection as to form.

2          THE WITNESS:  Generally, yes.

3   BY MS. DOWNEY:

4      Q    And in those instances would a marketing

5   manager be involved in the way that you just described?

6          MR. KELLY:  Objection as to form.

7          THE WITNESS:  A marketing manager and an

8   inventory planner would discuss every bulk vessel to

9   make sure inventory was available for that particular

10  customer, so it would be looked at by a market manager

11  and an inventory planner.

12  BY MS. DOWNEY:

13     Q    Was it the case that all of the inventory

14  planners that you're familiar with were in Houston,

15  Texas?

16     A    For chemicals.  For the chemicals that we

17  handled they were located in Houston.  For other

18  products they were in different locations.

19     Q    And for the chemicals that you're familiar

20  with, were the marketing managers all in Danbury,

21  Connecticut?

22     A    Yes.

23     Q    Here is Plaintiff's Exhibit 11.  Ms. Berti, as

24  you look at Exhibit 11, is this document something

25  you've seen before?

            Brandon Smith Reporting Service

---

1      Q    And what's your best recollection about that

2   period, when that period of time was?

3      A    I don't know exactly the dates, but it was

4   sometime after the official, the merger closed with Dow

5   and Union Carbide.

6      Q    Do you see the reference to charge order

7   number/PO number?

8      A    I do.

9      Q    And then the numbers that follow in the box?

10  Are you aware of any significance to the numbers?  Are

11  they in some sort of code at all?

12     A    The first number would have been a sequential

13  number generated by the system, the SAP system, just a

14  sequential number with no meaning to each digit, a

15  random.  The next number and the second number after the

16  slash appears to me to be the customer's purchase order

17  number.  The customer would provide that number to us

18  for use on documents.

19     Q    Let me show you what's been marked as

20  Plaintiff's Exhibit 13.  Have you ever seen Exhibit 13

21  before?

22     A    No.

23     Q    You see a reference to the subject as Megavisa

24  orders through Singapore, correct?

25     A    Correct.

            Brandon Smith Reporting Service

---

1      A    No.

2      Q    Do you have any idea what the document is?

3      A    It looks to me that it has to do with an

4   order.

5      Q    Let me back up.  Is this form something you're

6   familiar with?

7      A    No.

8      Q    Let me show you what's been marked as

9   Plaintiff's Exhibit 12, and I'll ask you whether this is

10  a form that you've ever seen before?

11     A    No, it is not.

12     Q    Do you know what an intercompany price

13  workback is?

14     A    No, I don't.

15     Q    Do you see the reference in the next line to

16  "New procedure to follow for all sales between R3 and

17  R2."  Was it your understanding that there were sales

18  between R3 and R2?

19         MR. KELLY:  Objection as to form.

20         THE WITNESS:  There was definitely a

21  transitional process after the physical merger date for

22  order entry using both systems for a period of time, and

23  so the two systems did have to talk to each other for a

24  period of transition.

25  BY MS. DOWNEY:

            Brandon Smith Reporting Service

---

1      Q    And this is an E-mail from Arpana Mody.  Do

2   you know who that is?

3      A    I do not.

4      Q    Do you know who Ashish Mitra is?

5      A    I do not.

6      Q    You see the period of time, the date of the

7   E-mail is June 13th, 2001?

8      A    Yes.

9      Q    At that time do you know whether Dow Singapore

10  was using the R2 system?

11     A    I do not know.  It would be my best guess that

12  they were.

13     Q    I'm going to place a group of documents that

14  have been marked as Plaintiff's Exhibit 16 before you.

15  And why don't you take a minute to skim through the

16  documents.  Have you ever seen documents similar to the

17  ones in Exhibit 16 before?

18         MR. KELLY:  Should she skim through them

19  before you ask her?

20         THE WITNESS:  Yes.

21  BY MS. DOWNEY:

22     Q    Can you identify them, please?

23     A    They look to be invoices.

24     Q    And what are they invoices related to?

25     A    To the sale of products that were manufactured

            Brandon Smith Reporting Service

1     by Union Carbide.
2        Q    Can you tell who the purchasing party is?
3        A    Yes, I can.
4        Q    And where do you find that on this form?
5        A    It's called ordering party.
6        Q    And do the forms indicate the selling party?
7        A    Only in that the selling party is in the
8     heading of the invoice.
9        Q    And is that at the top of the page underneath
10    the large print Union Carbide Corporation where it says
11    "A subsidiary of the Dow Chemical Company, 39 Old
12    Ridgebury Road, Danbury, Connecticut, 06817"?
13              MR. KELLY:   Objection to form.
14              THE WITNESS:   It's not labeled selling
15    party, but that would be who the invoice would be coming
16    from, yes.
17    BY MS. DOWNEY:
18       Q    Do you know how an invoice such as these that
19    are in Exhibit 16 are generated?
20       A    It looks to me like it was generated out of
21    the freight forwarder system, or SAP R3, but it looks to
22    me like it probably came out of the freight forwarder.
23       Q    Can you tell at all which freight forwarder
24    could have generated it?
25       A    Not that I can see written on the document
              Brandon Smith Reporting Service

1     itself.
2        Q    Directing your attention to the entry in the
3     upper fourth of the page, account number, can you see
4     the 55 on the right-hand side?
5        A    Yes.
6        Q    Do you know whether that account number is any
7     sort of code that you can translate?
8        A    I believe that I have seen the 55 before,
9     which refers to a particular company of Dow.  It's a
10    coding that they use in their system.
11       Q    Do you know what it stands for?
12       A    I can't say for sure.
13       Q    Do you know whether an index of the codes used
14    in the SAP systems, both R3 and R2, exist anywhere?
15       A    I'm sure that they do.
16       Q    Do you know whether the rest of the account
17    number is something you can translate?
18       A    No.
19       Q    Now, if you just look at the upper right-hand
20    corner of these invoices, I will represent to you I
21    attempted to put them into date order, and it looks as
22    if the range is from November 2001 to -- actually I'll
23    ask you to stop the third document from the back.  Let
24    me refer to the Bates number, which is in the bottom
25    right-hand corner.  I'm looking at D028086.
              Brandon Smith Reporting Service

1        A    Okay.
2        Q    Are you looking at the same one?
3        A    Yes.
4        Q    And that goes to July 2003.  To your
5     knowledge, were invoices such as this generated
6     throughout that period of time in connection with sales
7     from the Danbury, Connecticut UCC facility to UCCS?
8              MR. KELLY:   Objection as to form.
9              THE WITNESS:   Would you ask me the
10    question again, please?
11    BY MS. DOWNEY:
12       Q    Okay.  Do you know whether invoices such as
13    these on Danbury, Connecticut letterhead where the
14    ordering party is UCCS were generated from November 2001
15    through July 2003?
16              MR. KELLY:   Objection as to form.
17              THE WITNESS:   I mean I can see the
18    documents in front of me, so it appears that that's the
19    way that they were printing.
20    BY MS. DOWNEY:
21       Q    Do you know the purpose for which these
22    documents were generated, generally?
23       A    Yes.
24       Q    What was the purpose?
25       A    The purpose was for, twofold.  Number one, to
              Brandon Smith Reporting Service

1     clear the goods.  An official invoice is required to
2     clear goods when they're imported into another country.
3        Q    Are you talking about clearing customs?
4        A    Clearing customs, right.  And number two, in
5     order to get payment for the sale of the goods when an
6     invoice that has the Danbury, Connecticut letterhead on
7     it was paid.
8        Q    Was payment made to Danbury, Connecticut, if
9     you know?
10       A    I do not know.
11       Q    Do you know whether ultimately the Danbury,
12    Connecticut facility would receive the payment from the
13    sales that are reflected on invoices with Danbury,
14    Connecticut letterhead?
15       A    Are you asking if Danbury, Connecticut would
16    physically receive the funds?  Was that your question?
17       Q    Or would be credited with the funds, that is,
18    paid in some way.
19              MR. KELLY:   Objection as to form.
20              THE WITNESS:   I do not know if Danbury,
21    Connecticut was ever involved with any funds received on
22    behalf of orders that were billed to these customers.
23    BY MS. DOWNEY:
24       Q    Do you know who would know?
25       A    I would think somebody in the financial area.
              Brandon Smith Reporting Service

1    Q    Let me just direct your attention to the last
2    three pages of Exhibit 17.
3         MR. KELLY:  Alicia, while she's looking
4    at that, we'll be glad to check to verify what you were
5    asking about, but I did notice on each of these there's
6    an instruction for remitting payment to UCC in
7    Amsterdam.
8         MS. DOWNEY:  Well, the question was
9    really, too, then, what would happen to the payment
10   after that.
11        MR. KELLY:  I understand that, you
12   followed up with that.
13        MS. DOWNEY:  We would probably like a
14   witness that would testify about that, and if that's the
15   limit of her knowledge, then I'll leave it right there.
16   BY MS. DOWNEY:
17   Q    The last three pages of Exhibit 16 are Union
18   Carbide invoices to UCCS in which there is no address
19   underneath the Union Carbide Corporation.
20   A    Right.
21   Q    Do you know why that is?
22   A    I believe I do.
23   Q    Why?
24   A    It was discovered in Houston that when
25   invoices were printing out of the system with Union
          Brandon Smith Reporting Service

1    A    No, not to my knowledge, no.
2    Q    Let's look at what's been marked as
3    Plaintiff's Exhibit 17, and I'll ask you to please
4    identify the documents that are part of Exhibit 17 for
5    me, if you can.
6    A    These again appear to be invoices for
7    shipments that were made.
8    Q    And who was the buyer?
9         MR. KELLY:  Objection as to form.
10        THE WITNESS:  It appears that the buyer
11   is the ordering party, Dow Chemical Pacific Singapore.
12   BY MS. DOWNEY:
13   Q    And you'll see that the Danbury, Connecticut
14   address appears at the top of each of these invoices,
15   too, do you see that?
16   A    Yes.
17   Q    And the latest date in this pile at the back
18   is February 2004, so is it fair to say that the Danbury,
19   Connecticut invoice letterhead was still in use even
20   after you say it was brought to your attention that that
21   was somehow incorrect?
22        MR. KELLY:  Objection as to form.
23        THE WITNESS:  I see that they are on
24   these invoices, yes.
25   BY MS. DOWNEY:
          Brandon Smith Reporting Service

1    Carbide Corporation's name and the Danbury address, that
2    that was not correct, that it should have been the
3    Houston address, because that is where the invoices were
4    coming from, Union Carbide in Houston, Texas for orders
5    for chemicals.  The system, the SAP system, was
6    eventually corrected, or the address was just left off
7    in this case.
8    Q    Was that a discovery that you were involved
9    in?
10   A    I was in Houston Customer Center when it was
11   brought to my attention that these invoices could not be
12   used to clear customs in Mexico when they had a Danbury
13   address when they were actually physically coming from
14   Houston, and so it was brought to my attention while I
15   was in Houston that the invoice should not reflect
16   Danbury, but rather Houston.
17   Q    And do you recall approximately when that took
18   place?
19   A    I don't remember.  It was very shortly after
20   the start-up of R3.
21   Q    Now, with reference to Exhibit 16, other than
22   the presence of Danbury, Connecticut in the letterhead
23   of this invoice, does the invoice on it indicate
24   anywhere the involvement of anyone in Danbury,
25   Connecticut in this order process?
          Brandon Smith Reporting Service

1    Q    Do you know whether the decision to
2    discontinue the use of Danbury, Connecticut invoice
3    letterhead applied to all sales of the products, or just
4    sales of product going to Mexico?
5    A    I am not sure.  I know for a fact that they
6    were changed for the invoices going through Mexico, and
7    I do not know for sure on the other invoices at that
8    time.
9    Q    Let's look at what's been marked as
10   Plaintiff's Exhibit 18.  Can you identify the documents
11   that are part of Exhibit 18?
12   A    These all look like invoices.
13   Q    And the letterhead on these invoices is the
14   Dow Chemical Company, 2030 Willard H. Dow Center,
15   Midland, Michigan, 48674, correct?
16   A    Yes.
17   Q    And the ordering party in each of these is
18   UCCS, correct?
19   A    No.
20   Q    No?  Did you find one that's not?
21   A    Yes.
22   Q    Which one is that?
23   A    Invoice --
24   Q    I think I found it, the bottom number is
25   D028059?
          Brandon Smith Reporting Service

1    A    Correct.

2         MS. DOWNEY:  So I'll take that out of

3    Exhibit 18.

4         MR. KELLY:  Okay.

5         MS. DOWNEY:  Put it on the table.  We're

6    going to put it into the next exhibit.  Just hold it

7    right there.  Good.

8    BY MS. DOWNEY:

9    Q    Now that we have removed that invoice, these

10   are all invoices in which the ordering party is UCCS, am

11   I now correct?

12   A    Yes.

13   Q    And is it your understanding that during the

14   period of time covered by these invoices, that these

15   invoices would have been generated in Texas?

16        MR. KELLY:  Objection as to form.

17   BY MS. DOWNEY:

18   Q    Strike that.  Do you know whether there's any

19   significance to the fact that the Midland, Michigan

20   address appears on these invoices?

21   A    Because they came from the Dow Chemical

22   Company, not Union Carbide, and Dow Chemical was

22   located, their customer service was in Midland,

24   Michigan.

25   Q    Is that just an assumption you're making, or

          Brandon Smith Reporting Service

---

1    assumption that the seller is at the top of the

2    letterhead.

3    BY MS. DOWNEY:

4    Q    In your work as a customer service

5    representative, did you work at all with invoices such

6    as those in Exhibit 19?

7    A    I worked with invoices, but not this type of

8    an invoice, because these are all Dow, and when I was a

9    customer service rep I worked only for Union Carbide

10   Corporation.

11   Q    Do you have any knowledge as to how the

12   invoices in Exhibit 19 and Exhibit 18 were generated?

13   A    It is my guess that they were generated out of

14   R2, because of the terminology used, ordering party is

15   an SAP R2 terminology.

16   Q    With respect to the exhibits that are part of

17   Exhibit 16 and 17, that have Union Carbide Corporation

18   at the top, are you able to tell me what part of the

19   order process these invoices play?

20        MR. KELLY:  Objection as to form.

21        THE WITNESS:  I'm not sure of your

22   question.

23   BY MS. DOWNEY:

24   Q    I'll rephrase.  Do you have any greater

25   understanding of the role that the Union Carbide

          Brandon Smith Reporting Service

---

1    do you know that for a fact?

2    A    Well, that's what it says on the invoice.  It

3    says the Dow Chemical Company.  The other invoices said

4    Union Carbide Corporation, these say the Dow Chemical

5    Company.

6    Q    So --

7    A    That Dow Chemical customer service was in

8    Midland, Michigan, not in Houston.

9    Q    And if you look at Exhibit 19, to which we

10   will now add document D028059.

11        (Off record.)

12   Q    With respect to Exhibit 19, I believe we

13   stopped at the point where I had asked you to identify

14   what they were, and I apologize if you're repeating

15   yourself, but just to get us reoriented, can you

16   identify the documents that are part of Exhibit 19?

17   A    They look like they're invoices for shipments

18   made to customers.

19   Q    And can you tell from the invoice who the

20   selling party is?

21        MR. KELLY:  Objection as to form.  Are

22   you asking as to each individual one?

23        MS. DOWNEY:  Yes.

24        THE WITNESS:  The selling party is not

25   identified as the seller, but one would make an

          Brandon Smith Reporting Service

---

1    invoices played in the order process?

2         MR. KELLY:  Objection as to form.

3         THE WITNESS:  I think, as I mentioned

4    earlier, I think the only two reasons for the invoice

5    were to clear customs, as a customs clearance document,

6    and as a document to trigger payment from the

7    responsible party to make payment.

8    BY MS. DOWNEY:

9    Q    Did the customer service representative at

10   Union Carbide handle this invoice in any way during the

11   order process?

12   A    The export customer service representative,

13   export only, did not routinely handle this invoice for a

14   customer.  That was done by our freight forwarder.

15   Q    Do you know how the freight forwarder would

16   get the information that appears on this invoice?

17   A    Yes.

18   Q    How?

19   A    They would get that from our system.  They had

20   access to ISIS, when we had ISIS up, and they had access

21   to SAP R3 when we were running SAP.  They also had their

22   own stand-alone system which generated most of the

23   documents, their own in-house system.

24   Q    When you say that at some point in your

25   employment in customer service center it was brought to

          Brandon Smith Reporting Service

1  your attention that the Danbury, Connecticut, the use of

2  the Danbury, Connecticut address in the invoices was

3  incorrect, do you recall who brought that to your

4  attention?

5      A    I do.

6      Q    Who?

7      A    It was a customer service rep handling Mexico

8  orders at the Houston Customer Center.  I believe his

9  name was Ray Rodriguez.

10      Q    Do you know what steps were taken to address

11  the concern he raised?

12      A    Yes.  I believe he changed the invoice

13  manually.

14      Q    Do you know what he changed it to?

15      A    To the address at Houston, at the Houston

16  customer service center in Houston, Texas.  I do

17  remember the address, if you need it.

18      Q    Well, that's all right, because let's look

19  again at Exhibit 19, and look up the last four pages,

20  beginning with document D028093, which are Union Carbide

21  invoices with the Houston, Texas address on them, is

22  that correct?

23      A    It is a Houston address.  That's not where I

24  worked.

25      Q    Does this look like the address that Mr.

        Brandon Smith Reporting Service

---

1      A    We had many, we had nine locations in Texas,

2  in Houston, I believe, some like seven or nine

3  locations, offices.

4      Q    Do you believe there was a reason other than

5  addressing the concerns of Mexican customs that the

6  Houston address appeared, then, on these invoices?

7      A    These didn't have anything to do with our

8  customer center or with shipments to Mexico.  These are

9  going to Malaysia.

10      Q    Do you have any idea, then, why the Houston

11  address appears on these invoices?

12      A    My guess is this 400 West Sam Houston Parkway

13  South address is where the customer service rep for this

14  product may have been located.

15      Q    If you look at the dates of these invoices,

16  they are all in the 2004 time frame.  Is it your

17  understanding that these would have been generated

18  through the R2 system?

19      A    That would be my guess, yes.

20      Q    Do you have any knowledge as to how or why a

21  customer service representative would enter a particular

22  address onto an invoice in the R2 system?

23          MR. KELLY:  Objection as to form.

24          THE WITNESS:  No, I don't.

25  BY MS. DOWNEY:

        Brandon Smith Reporting Service

---

1  Rodriguez would have changed manually for the purpose of

2  sales going to Mexico?

3      A    No.

4          MR. KELLY:  Alicia, I'm sorry, I'm not

5  finding it.  I'm sure it's me.

6          MS. DOWNEY:  Last four pages.

7          MR. KELLY:  No, it's not.

8          THE WITNESS:  It's the last two in mine,

9  and then I do have two more that I found.

10          MR. KELLY:  Have you got a duplicate

11  copy?

12          MS. DOWNEY:  Off the record.

13          (Off record.)

14          MS. DOWNEY:  Back on the record.

15  BY MS. DOWNEY:

16      Q    Can you tell by looking at these last four

17  pages whether these would have been invoices that Mr.

18  Rodriguez or somebody under his direction would have

19  manually changed?

20      A    They are absolutely not.

21      Q    And how can you tell that?

22      A    Because that was not where we worked.

23      Q    Do you know, then, what the significance of

24  the appearance of the Houston, Texas address on these

25  invoices is?

        Brandon Smith Reporting Service

---

1      Q    Is it your understanding that at some point

2  invoices, at some point earlier than 2004 invoices on

3  the Union Carbide Corporation letterhead had a Houston,

4  Texas address on them?

5      A    I'm sorry, could you repeat that?

6      Q    Strike the question.  Is it your understanding

7  that there exist invoices with the Union Carbide name at

8  the top and underneath there is a Houston, Texas

9  address?

10      A    Yes.

11      Q    Do you know whether any of those invoices

12  concerned transactions with UCCS?

13      A    I don't think so.

14      Q    Do you know whether any of those invoices

15  concerned transactions with Dow Singapore?

16      A    I'm sure that they would not.

17      Q    Directing your attention back to Exhibit 16,

18  can you tell looking at the form who placed,, that is the

19  actual person, who placed this order?

20          MR. KELLY:  We're looking at the order

21  that's on the first page of Exhibit 16?

22          MS. DOWNEY:  With reference to the form,

23  yeah.  If there's anyplace on these forms where we would

24  find a code or a name of the person who placed the

25  order.

        Brandon Smith Reporting Service

1    THE WITNESS:  I do not see that.

2  BY MS. DOWNEY:

3    Q    And do we find anywhere on the form an

4  indication of who accepted the order on behalf of Union

5  Carbide?

6    MR. KELLY:  Objection as to form.

7  BY MS. DOWNEY:

8    Q    With UCC?

9    MR. KELLY:  I'm sorry, objection as to

10  form.

11    THE WITNESS:  I don't see anything like

12  that.

13  BY MS. DOWNEY:

14    Q    Is there anything on the form that indicates

15  whether the order was placed through the R2 or the R3

16  system?

17    A    There is nothing on the form that indicates

18  which system this came out of, R2, R3, or a freight

19  forwarder system.

20    MS. DOWNEY:  Off the record.

21    (Off record.)

22    MS. DOWNEY:  Back on the record.

23  BY MS. DOWNEY:

24    Q    For the record, I have marked a CD-ROM

25  delivered to us by defendant's counsel as Plaintiff's

Brandon Smith Reporting Service

---

1  Exhibit 30.  I have placed the CD-ROM into the drive

2  that is attached to the laptop computer that Ms. Berti

3  is now sitting in front of, and I'm going to just open

4  the first, the CD-ROM we received had four Excel

5  spreadsheet files.  Are you familiar with Excel, Ms.

6  Berti?

7    A    Yes.

8    Q    Each one is labeled, and I'll try to cite the

9  label as we go through, but the first one I'd like to

10  look at, I've opened already, is something that's

11  entitled UCCS 2001 to present.xls.  Have you ever seen

12  this spreadsheet before?

13    A    I don't think so.

14    Q    Can you tell looking at the spreadsheet where

15  the source of the information is?

16    MR. KELLY:  Alicia, if I could suggest,

17  if we have the hard copy close at hand, we could at

18  least see the entire page, which might be helpful just

19  to put it into context.

20    MS. DOWNEY:  We will be able to do that

21  for a couple of the spreadsheets, I don't know if we can

22  for the others, because I discovered this morning,

23  there's a question.

24    MR. KELLY:  Okay.

25  BY MS. DOWNEY:

Brandon Smith Reporting Service

---

1    Q    UCCS 2001 to present is --

2    A    Can we scroll?  Am I allowed to scroll, touch

3  the computer?

4    MS. DOWNEY:  Off the record.

5    (Off record discussion.)

6    MS. DOWNEY:  Back on the record.

7  BY MS. DOWNEY:

8    Q    Are you able to provide me with an indication

9  of what the different headings mean?

10    A    Yes, I think so, in most cases.

11    Q    And are you familiar with the headings through

12  your work with the database that you did before you

13  retired?

14    A    This looks like it came out of R2, and I never

15  worked in R2, but I am somewhat familiar with some of

16  the terminology in SAP R2.

17    Q    All right.  Doing the best that you can, then,

18  starting with the column at the top, the column on the

19  far left, can you just help me understand what each

20  column is referring to?

21    A    Invoicing SAP company code, I believe, is

22  their global system of identifying different Dow

23  companies.  As we had seen in an invoice before, company

24  55 equals a Dow company.  Company 01 for their financial

25  reporting, sales reporting, et cetera, is a code in the

Brandon Smith Reporting Service

---

1  system that they use to identify a company.

2    Q    Do you know what the 01 code identifies, which

3  company?

4    A    I don't know off the top of my head which

5  company.  If 1 look at the liable name, it says SAP

6  company code, liable code, and liable name, it may mean

7  that 01 refers to this, but I can't say that for

8  certain.  I'm not sure.

9    MS. DOWNEY:  It sounds to me like we

10  don't have a competent witness here with respect to the

11  R2 spreadsheet, so I think -- what do you suggest?

12    MR. KELLY:  Here's what I suggest.  I

13  mean I think you're right, obviously she can't answer as

14  to that column.  I think there are a lot of other

15  columns where I think she would be very helpful, but I

16  can actually give you the answer on what the codes mean,

17  and in fact I think it's even in one of the letters.

18  BY MS. DOWNEY:

19    Q    I'll represent to you we've been told 01

20  stands for Dow itself.

21    A    Okay.

22    Q    Is there any way looking at that spreadsheet

23  or using your knowledge of the R2 system that you can

24  tell what address would have appeared on the invoice

25  that corresponds to the particular transaction that

Brandon Smith Reporting Service

1   appears in that row?

2        MR. KELLY:  Objection as to form.

3        THE WITNESS:  Not if that's all that I

4   see.  From what I see on the screen, no, I would not

5   know what the address was.

6   BY MS. DOWNEY:

7        Q    And you understand that each row represents

8   a particular transaction between Dow and UCCS, is that

9   correct?

10       A    I would say that each line indicates a

11  transaction, I don't know who they're between.

12       Q    Do you know what the ship to codes refer to,

13  can you translate them, that are in column G?

14       A    I can't translate it only looking at column G,

15  but if I look at column H it says the ship to name, so I

16  would assume that the ship to code corresponds with the

17  ship to name in H, but just looking at G I would never

18  know what that number meant.

19       Q    Do you see in column L, invoice header number,

20  do you know what that refers to?

21       A    I don't.  I would just assume that it is the

22  invoice that was generated from R2, the system generated

23  number.

24       Q    And is that talking about the particular paper

25  invoice that's generated?

         Brandon Smith Reporting Service

---

1   location, and then they were archived.  Our freight

2   forwarder also kept a copy of every invoice for every

3   shipment that they ever did for Union Carbide at their

4   facility in either Texas or New York.  Dow in Midland

5   doesn't do export invoices, they would do that in their

6   region, I understand, so I would assume they would have

7   some rule about keeping an invoice.

8        Q    With respect to the Union Carbide sales, was

9   it the practice to send a copy of the paper invoice to

10  Danbury, Connecticut?

11       A    No.

12       Q    In column P there is an abbreviation GMID.  Do

13  you know what that stands for?

14       A    I do.

15       Q    What is it?

16       A    That is an R2 acronym for a code corresponding

17  to a product.  A GMID is the R2 code for a product.

18       Q    Can you tell looking at the small sample of

19  numbers that's on the first page of the spreadsheet --

20  strike that.

21            Do the numbers indicate in some way which

22  particular product, or is it with a category of product?

23       A    I don't know how the GMID is formed, if it's a

24  random number or if it has any meaning to it in R2.

25       Q    And column Q says GMID short text, what is

         Brandon Smith Reporting Service

---

1        A    Right.

2        Q    So is it your understanding that each one of

3   these transactions, for each one of these transactions

4   there is a corresponding paper invoice?

5        A    For each transaction here is a corresponding

6   paper invoice.  However, on the spreadsheet I see that

7   there may be duplicate invoice header numbers on

8   different lines, like 10 and 11 have the same, so those

9   may have been two different products that were on the

10  same order, so one order or one invoice may have

11  multiple lines on the spreadsheet.

12       Q    I understand.  When the invoices are

13  generated, was it the practice of UCC to keep a copy of

14  the invoice?

15       A    Yes, always.

16       Q    Do you know whether it was the practice of Dow

17  Chemical to keep copies of the invoices that were on

18  its --

19       A    It is.

20       Q    Do you know where they are stored?

21       A    I can speak for export only, or -- well, I'm

22  sorry, I don't know where they're stored.  I know that

23  when we were at Union Carbide we kept a paper copy of

24  the invoice in our folder at our desk in Houston, and

25  those were kept for a period of seven years at our

         Brandon Smith Reporting Service

---

1   that?

2        A    That is the description of what the GMID

3   refers to, the product description in a short form, so

4   that somebody would understand what that product is, but

5   it's not its trademarked or official proper name that

6   would go on an invoice.

7        Q    Column R, it says invoice item amount USD.  Is

8   that the amount of the invoice in U.S. dollars?

9        A    Correct.  For that item, not for the total

10  invoice, but just for that item, that line item on the

11  invoice.  There may be more than one item on that

12  invoice.

13       Q    And column S, invoice, looks like QTY in

14  recording UOM.  What is that?

15       A    Invoice quantity in recording units of

16  measure.  So it's 6,000 pounds.  The quantity is 6,000

17  in S, and in T the unit of measure that it's been

18  recorded in has been pounds.

19       Q    Now, based on the label of the file that we

20  were given as indicating UCCS sales, are you sure that

21  these all represent data from the R2 system?

22       A    Yes, positive.  Because of the labels on the

23  headings.  GMID is an R2 acronym, liable party is an R2

24  acronym.

25       Q    Is there a possibility that some of this data

         Brandon Smith Reporting Service

1   was transferred from the R3 system into the R2 system?

2      A   It should not be based on the dates that I

3   see.

4      Q   And why is that?

5      A   Because of the cutover date, I would think

6   that -- I could be wrong.  Some of the dates in 2002 I

7   would expect that the orders would be entered in R2

8   only.  There may have been some earlier dates where

9   information got transferred from R3 to R2.

10     Q   We're next going to look at a file that was

11  labeled Dow Singapore 1986.xls.  This one I do believe

12  we have a hard copy for, which might be easier for you,

13  but if you need refer to the computer, just let me know.

14  Can you just confirm for me that this document appears

15  to be what you see on the screen?

16         MS. DOWNEY:  And I understand you don't

17  have to go through it line by line.

18         THE WITNESS:  It does.

19         MR. KELLY:  At least from what you can

20  see on the screen right now, we've got it at a hundred

21  percent, so we see over to column J, but we don't have

22  any reason to think that the rest is something else.

23  BY MS. DOWNEY:

24     Q   I have marked this as Plaintiff's Exhibit 31,

25  that's what we're referring to now.  Is this a

Brandon Smith Reporting Service

1   spreadsheet that would have been generated in the

2   ordinary course of business at Dow Singapore, if you

3   know?

4      A   I would not know about Dow Singapore in 1996.

5   I had no dealings with them at that point.

6      Q   Did you help in any way with the compilation

7   of this spreadsheet?

8      A   No.

9      Q   Do you know anybody with the first initial

10  T. Chase?

11     A   No.

12     Q   Can you tell looking at this Plaintiff's

13  Exhibit 31 what system the information came from?

14     A   No.  No, I cannot.  I don't have any knowledge

15  of what Dow Singapore would have been using in 1996.

16         MR. KELLY:  Excuse me, Alicia, maybe it's

17  not clear, and this is of course due partly to the file

18  title, but this title might suggest that this document

19  was created in 1996 as a contemporaneous document, but

20  if I remember right, what it reflects is transactions

21  from '96, and then instead the document itself was

22  actually generated sometime within the last --

23         MS. DOWNEY:  Well, I'll represent to you,

24  we can figure out exactly when the document was

25  generated because there's --

Brandon Smith Reporting Service

1          MR. KELLY:  There's Medadata.

2          MS. DOWNEY:  That's right.  Let's go to

3   the properties.

4          MR. KELLY:  How marvelous that the

5   Medadata is still on there.

6          THE WITNESS:  Created, is that what

7   you're looking for?

8          MR. KELLY:  Right.  So it was created

9   fairly recently, and I bet that's where T. Chase comes

10  from, Tyler Chase, very nice guy.

11  BY MS. DOWNEY:

12     Q   So we've just looked at the properties of the

13  particular spreadsheet and we're just confirming for

14  everybody's better understanding that this is a

15  compilation of data that I believe extends back to 1996,

16  but 31, Exhibit 31 itself is not a document that's

17  apparently created in 1996, but was apparently created

18  in August or September of 2004.  Is that correct?

19     A   Right, that's what we saw.

20     Q   Do you have any idea how this document was

21  created?

22     A   No.

23     Q   Do you have any understanding of the codes

24  that appear at the top column, on the top row?

25     A   No.

Brandon Smith Reporting Service

1      Q   Do these look like R3 codes?

2      A   No.

3      Q   Do they look like R2 codes?

4      A   No.

5      Q   Did you want to say something else about it?

6      A   Yes.

7      Q   All right, go ahead.

8      A   I just wanted to confirm that they did not

9   look like R2 codes.  I hadn't looked enough to say that,

10  and I confirm it now.

11     Q   Do you have any idea who might be able to

12  translate this document for us?

13         MR. KELLY:  Objection to form.  Alicia,

14  is there any question as to whether this is

15  incomprehensible?

16         MS. DOWNEY:  Well, there are some codes

17  in there in different types of descriptions.  I guess I

18  would also ask a competent witness whether there's any

19  way of telling, for example, under transaction type or

20  document type, what that means, what the significance of

21  that is, I would ask her whether there's any indication

22  on here whether invoices were generated in connection

23  with each of these transactions, whether the invoices

24  have the Danbury, Connecticut address on them or not,

25  and my sense is that Ms. Berti is not going to be able

Brandon Smith Reporting Service

1    to help us in that regard, is that right?

2         MR. KELLY:  Well, I think that maybe with

3    some questions you could discern whether these are

4    transactions that would have involved Union Carbide at

5    all as opposed to Dow, for instance, in 1996, but then,

6    I mean, but of course, I mean, then that takes us to the

7    next question, okay, fine, what does it mean, and so

8    then what we haven't done yet, at least, is to find out

9    as for a particular column whether Ms. Berti looking at

10   it right now can ascertain what's there, and I'm glad to

11   have you ask those questions.

12        MS. DOWNEY:  Well, I understand Ms. Berti

13   is here on behalf of not only UCC and UCAME, but also

14   Dow, and it appears we're running into difficulties of

15   getting information about Dow systems as opposed to UCC

16   systems.

17   BY MS. DOWNEY:

18   Q    I don't want you to guess.  If you can give me

19   an informed answer about some of these questions, then

20   I'll proceed, but if they are just guesses or

21   assumptions, then I would prefer to wait until we get a

22   witness who knows more about it.  So how would you like

23   to proceed, Ms. Berti?

24   A    Well, if the question is whether it came out

25   of R2 or R3, I could not answer.  I could answer you

          Brandon Smith Reporting Service

---

1    in preparation for your deposition today?

2    A    Of the ones I've seen so far I have not.

3    There was one spreadsheet that I looked at with Attorney

4    Kelly yesterday, but I don't remember the number of it,

5    and it was just one piece of paper.

6    Q    Was it an R2 or an R3 spreadsheet?

7    A    I don't know what it was.

8    Q    What did the spreadsheet have on it?

9    A    It had data from -- sales data.

10   Q    Were they sales between UCCS and UCC?

11   A    I only looked at it for a minute.  I just, I

12   really, it didn't stick in my head.  It was something

13   that I just took a brief look at.

14        MR. KELLY:  Alicia, I'll be glad to pull

15   it up for you afterwards and send you a copy of the one.

16   It was, I can tell you, it was one of the fairly short

17   sheets, I believe, showing transactions sales to Dow

18   Chemical Pacific.  So it was an Excel spreadsheet as

19   opposed to the ones generated from the Amy database.

20   I'll have to go back and dig out the copy, but I'll be

21   glad to provide it to you.

22        MS. DOWNEY:  All right.

23        (Off record.)

24        MS. DOWNEY:  Back on the record.

25   BY MS. DOWNEY:

          Brandon Smith Reporting Service

---

1    that it definitely did not come out of R3, but if this

2    was all data from the year 1996 only, and no

3    subsequent years, then I could tell you that there would

4    be no invoice from the Houston address or a Danbury

5    address with the Dow Chemical name on it, with

6    certainty.

7    Q    But let me just confirm, then, you're not able

8    to tell me, though, how Exhibit 31 was compiled?

9    A    Correct.

10        MR. KELLY:  And Alicia, just to be clear

11   to a painful degree, we don't have any objection to your

12   discerning how these spreadsheets got generated.  Our

13   understanding was that that particular topic, that

14   specific topic was not within the scope of what Ms.

15   Berti would be here to testify about, but obviously it's

16   certainly a relevant topic, and we don't have any

17   objection to your pursuing that with a 30(b)6 witness,

18   we just didn't prepare Ms. Berti to testify about that

19   specific item today.

20        MS. DOWNEY:  Thank you.

21        MR. KELLY:  You're quite welcome.

22   BY MS. DOWNEY:

23   Q    I think just for the record, the two

24   spreadsheets, am I correct that you did not review any

25   of these spreadsheets in either electronic or paper form

          Brandon Smith Reporting Service

---

1    Q    Are you familiar with the process by which an

2    order would be placed for purchasing products from UCCS

3    to UCC?

4    A    Yes.

5    Q    Would you please describe that process.

6    A    Where would you like me to begin?

7    Q    Well, we looked at the bulk order process

8    earlier.  Is that in some way different from the typical

9    order process?

10        MR. KELLY:  Objection as to form.

11        THE WITNESS:  It is similar, but it has

12   its differences, particularly as regards booking and

13   product availability, but the order process itself in

14   the system is very similar.

15   BY MS. DOWNEY:

16   Q    All right, let's go step by step, then.

17   A    Okay.

18   Q    Am I correct that a customer service

19   representative at UCCS in Singapore would initiate the

20   order process in some way?

21        MR. KELLY:  Objection as to form.

22        THE WITNESS:  They initiated the process

23   in the system, but the customer in the region would have

24   initiated that order with the salesman originally, and

25   then that order would wind up at Union Carbide Customer

          Brandon Smith Reporting Service

1   Services in Singapore for processing in the system.
2   BY MS. DOWNEY:
3       Q    All right.  And did the processing include a
4   transaction between UCCS and UCC?
5       A    I don't know what you mean by a transaction.
6       Q    The purchase of product for resale to the
7   customer.
8       A    Yes.
9       Q    And is Exhibit 16 and the invoices we see in
10  Exhibit 16, are those examples of transactions between
11  UCCS and Union Carbide for the purchase of products for
12  resale to certain customers?
13              MR. KELLY:  Objection as to form.
14              THE WITNESS:  Yes, they are.
15  BY MS. DOWNEY:
16      Q    What would the UCCS customer service
17  representative physically do to place the order?
18      A    Are you talking about the time frame when I
19  was there at the Houston Customer Center from '92 to
20  '97, or after we implemented SAP R3?
21      Q    I think for our purposes the relevant time
22  period would be between 1999 and 2003, so after the
23  implementation of R3.
24      A    Okay.  I don't think R3 was implemented in
25  '99, but I could be wrong, but we'll talk about R3.  The
              Brandon Smith Reporting Service

---

1   customer service rep at UCCS would enter in all the
2   information that they had available to them from the
3   customer.  They would enter the order with the sold to
4   party, the ship to party, the terms of sale, the terms
5   of delivery, the port of discharge, at the customer, the
6   product names, the quantity, the price, and any other
7   information in text that we might need to process that
8   order.  The order was placed on a hold.
9       Q    And this is all within the R3 system?
10      A    Within the R3 system.  It was placed on a hold
11  so that the order would not proceed to go to be placed
12  on the plant or warehouse that was sourcing the product,
13  so there would be no product held at that time.
14           The order would be then looked at by a
15  customer service rep in Houston, they a report under their
16  name, they could find the order that they were
17  responsible for, and they would then review that order,
18  and complete that order placing the order on the correct
19  plant for sourcing.  Any instructions that needed to go,
20  supplemental instructions that had to go to the freight
21  forwarder would be placed on that order.
22           The customer service rep, depending on the
23  product that was ordered, might have to check a
24  spreadsheet or an E-mail for product availability,
25  depending on what product line was that we were
              Brandon Smith Reporting Service

---

1   ordering, check with the inventory planner, or one of
2   the tools for inventory that we had available to us as
3   customer service reps, and then the order would be
4   placed on the plant or warehouse, and the customer
5   service rep would also notify the freight forwarder of
6   the order being placed into the system.
7       Q    Did the marketing manager for the particular
8   product in question play any role in the order process?
9       A    Not on a day-to-day basis, no.
10      Q    Under certain circumstances would the
11  marketing manager become involved in some way?
12      A    Only under circumstances where products were
13  limited and sales control in very tight supply, they
14  might get involved.
15      Q    And in those type of circumstances how would
16  they become involved?
17      A    Typically they would be involved by contact
18  from the inventory planner.  The inventory planner was
19  typically our first line of communication about product
20  availability.
21      Q    And how did the inventory planner obtain
22  information about product availability?
23      A    The inventory planner, depending on the
24  product, played different roles.  They were always
25  involved, they were always a member of the business
              Brandon Smith Reporting Service

---

1   team, so they would be involved in business team
2   meetings to understand the business plan, the business
3   strategy, potential plant shutdowns, these kind of
4   things that a normal business team would be involved in
5   on a routine basis.
6       Q    Do they report --
7              MR. KELLY:  I'm sorry, Alicia, I don't
8   mean to interrupt, but I think Ms. Berti wasn't through.
9   BY MS. DOWNEY:
10      Q    Why don't you finish up your answer, go ahead.
11      A    And an inventory planner would have access to
12  what was available in inventory.  They would help to set
13  the production schedule for that inventory, most often.
14  They would determine when a product would be produced at
15  a particular plant.  If it was short, in short supply,
16  depending on the type of product, again, if it were a
17  bulk chemical that was produced at a plant at, say,
18  Texas City that was on a 24/7, 365 day a year
19  production, there wasn't ss much scheduling as something
20  that had to use one product using the same line and you
21  had to change from one product to another product in
22  order to produce it.  So depending on the product that
23  we were talking about in chemicals, the inventory
24  planner would play a more involved role in scheduling,
25  or a less involved role in scheduling, but always was
              Brandon Smith Reporting Service

1  the person you would go to to check availability of a
2  product for an order.
3    Q    What I asked you, though, was where the
4  inventory planner got their information from?
5    A    They got their information from the system.
6    Q    Which system?
7    A    The SAP system. And by talking to individuals
8  from the business.
9    Q    You say the inventory planner was a member of
10  the business team. Who else was on the business team
11  for a given product?
12    A    The business manager.
13    Q    Is that different from the marketing managers
14  that we spoke about earlier?
15    A    Yes.
16    Q    And where were the business managers situated?
17    A    It would depend on the business. There were
18  many of them in Danbury for chemicals. They were in New
19  Jersey for plastics.
20    Q    Was there anybody else on the business team?
21    A    Yes. You would have financial people.
22    Q    Where were the financial people generally
23  located?
24    A    They could be at various places. They could
25  be in West Virginia, they could be in New Jersey, they

---

1  could be in Danbury.
2    Q    Who else was on the business team?
3    A    Product market managers.
4    Q    Are they the people we spoke about earlier?
5    A    Yes.
6    Q    And so for chemicals they were located in
7  Danbury?
8    A    Many of them. Some were located in
9  Charleston, West Virginia.
10    Q    To whom did the inventory planners report?
11    A    I believe that they -- well, let me step back.
12  The inventory planners in Houston had a team, and they
13  had a team leader that they reported to on a day-to-day
14  basis. There's functional reporting and other, and I
15  don't know which is what, but they had a team leader
16  that they reported to for when they reported to work and
17  this and that, but from a business perspective they also
18  reported to, I believe, the business manager. They
19  would have a dual reporting.
20    Q    Let's pick up where we left off in the order
21  process, in which I believe that the inventory planner
22  has weighed in and the customer service representative
23  in Texas has accepted the order on behalf of Union
24  Carbide, or UCC. What happens next?
25        MR. KELLY: Objection as to form.

---

1        THE WITNESS: The next, once the order
2  leaves the customer service rep in Houston, it is
3  received by the shipping location, the plant or
4  warehouse or terminal that is going to fill the order.
5  If it's going to go on a ship, if it's a package order,
6  it's going to go to the booking department to make
7  vessel space for the container. The booking department
8  is in Danbury, Connecticut. They book the vessel space
9  based on the availability of the product and the
10  customer's requested delivery date.
11        If product is available, it's in the
12  system, it's ready to ship. Each plant or warehouse for
13  the chemicals that we handled had a certain amount of
14  lead time that we needed to give them for export orders,
15  so we would bill that in to the available date that we
16  would place on the order, and then we would send that
17  order to booking, to the plant.
18        The plant would get the order ready, the
19  product ready to ship according to the booking
20  instructions that the booking department would send down
21  to the plant or warehouse that was doing the physical
22  shipping. The plant then would arrange for
23  transportation. If it was a package shipment, they
24  would arrange for transportation in a truck, or someone
25  to come in, pick it up, and take it to the pier or port

---

1  where it was going to be delivered for shipment on the
2  vessel.
3        When it was finished being booked and
4  after it had been shipped by the plant or warehouse, the
5  order then was given to the freight forwarder who would
6  input the final quantity shipped and the freight charges
7  for invoice purposes, and prepare any other documents
8  like ocean bills of lading, various certificates that
9  customers might require, or whatever, and that would
10  basically complete the export order process.
11  BY MS. DOWNEY:
12    Q    Do you have any knowledge about the payment
13  process for these orders?
14    A    You mean how Union Carbide Customer Services
15  remitted payment to Union Carbide Corporation?
16    Q    Yes.
17    A    I don't have any firsthand knowledge on that,
18  but I believe that they remitted via monthly statements,
19  and it was a wire transfer of some sort.
20    Q    Did the customer service representatives in
21  Houston have any direct contact with the booking
22  department in Danbury, Connecticut?
23    A    Yes.
24    Q    What sort of contact?
25    A    Well, every order that was packaged or bulk

1  had to go to a booking person.  So if it was going to be
2  booked on a vessel, it had to go to -- if we were doing
3  the shipping and the booking, it would go through the
4  booking department in Danbury.
5      Q    Now, with reference to the invoices that we
6  saw in Exhibit 17, which are addressed to Dow Singapore,
7  are you able to tell me whether orders such as these
8  from Dow Singapore to Union Carbide followed the same
9  procedure that you just outlined for me?
10     A    These orders I don't believe follow the same
11 procedure that I just outlined.
12     Q    Do you know whether any orders placed by Dow
13 Singapore to Union Carbide followed the procedure that
14 you just described?
15     A    From Dow Singapore to Union Carbide.  No, I
16 don't recall seeing Dow Singapore orders to Union
17 Carbide.
18     Q    Is that just something you don't know anything
19 about?
20         MR. KELLY:  Objection to the form.
21         THE WITNESS:  Well, at this point in time
22 of these invoices from January 14th, 2002, to February
23 9th, 2004, this was after the Houston Customer Center
24 was closed.  This was after, I believe, the Weston Canal
25 customer center was closed, so there was no hand-off of
            Brandon Smith Reporting Service

---

1  orders to anyone in a customer service job in either
2  Houston or Weston Canal at that point in time because
3  all of the customer service that was -- I may be wrong
4  about the January 2002, but certainly by the end of,
5  when I left the company in September 30th of 2002, there
6  was nobody doing Union Carbide customer service in
7  Danbury or Houston or Weston Canal at all.  Everything
8  was being done out of Midland, Michigan.
9      Q    Was there still a booking department in
10 Danbury, Connecticut?
11     A    No.
12     Q    Do you have any understanding of when the
13 booking department in Danbury, Connecticut closed?
14     A    I don't know exactly when they closed.  It was
15 likely sometime in 2001, but it could have been early
16 2002.
17     Q    Can you tell with respect to transactions
18 between Dow Singapore and Union Carbide, UCC, whether
19 the business managers and marketing managers were still
20 involved in the way you've earlier described?
21     A    This was such a transitional time that the
22 business managers and marketing managers would likely
23 have all changed or been doing different things.  There
24 were many different work processess once we were under
25 the Dow subsidiary of Dow Chemical.  Many work processes
            Brandon Smith Reporting Service

---

1  were completely changed from what had gone on previous
2  to the Dow merger.
3      Q    So is the answer to my question you don't
4  know?
5      A    Okay, I guess it is.  Sorry.
6          MR. KELLY:  Alicia, as you probably
7  guessed, we're certainly glad to get that information
8  for you, but there's a reason Ms. Berti doesn't know, is
9  because we just didn't take that on as part of her
10 topic, but that's not to say that you're not entitled to
11 learn that if you'd like it.  We'd be glad to get that
12 information.
13         MS. DOWNEY:  Thank you.
14         MR. KELLY:  My pleasure.
15         MS. DOWNEY:  Do you know if that's
16 something Mr. Herr will know anything about?
17         THE WITNESS:  I don't think it's within
18 the scope of the subject we had allocated to him, but
19 you know what we could do, what I'll be glad to do is
20 after we're done we can talk off line either right here
21 or on the phone, and I'll be glad, we can figure out
22 what the best way would be to get you that information.
23 BY MS. DOWNEY:
24     Q    Let me put before you what I've marked as
25 Exhibit 20.  Exhibit 20 appears to be an E-mail dated
            Brandon Smith Reporting Service

---

1  November 11, 1998.  The author is F.S. Foo at UCAP.  Ms.
2  Berti, do you recognize that name?
3      A    I don't think so, no.
4      Q    There's a carbon copy to Lawrence Cheung,
5  C-H-E-U-N-G.  Did you know Lawrence Cheung?
6      A    No.
7      Q    And the subject of the E-mail is equipment
8  manufacturer priority.  If you turn the page there are
9  references to different equipment manufacturers and the
10 location of those manufacturers, types of equipment.  Is
11 this anything that you are familiar with at all?
12     A    No.
13     Q    Have you ever heard of Royle, R-O-Y-L-E,
14 U.S.A., that appears on the front?
15     A    No.
16     Q    Have you ever heard of Davis Standard?
17     A    No.
18     Q    Do you know what the references are to the
19 types of equipment that are in the second column?
20     A    No.
21     Q    Do you have any knowledge of purchases of
22 materials or equipment by UCCS other than purchases it
23 made from UCC?
24     A    No.
25     Q    And is the same true with respect to Dow
            Brandon Smith Reporting Service

```
1    Singapore?
2        A    The same is true.
3        Q    I'll just show you what's been marked as
4    Exhibit 21.  Exhibit 21 is the UCCS annual report for
5    the year-ended December 31, 2000.  Is this a document
6    that you've ever seen before, Ms. Berti?
7        A    No, I have not.
8        Q    Do you have any knowledge of the references in
9    this document to the accounting of UCCS?
10       A    No.
11       Q    And would the same be true with respect to
12   annual reports of Dow Singapore?
13       A    The same would be true.
14       Q    Let me give you what's been marked as
15   Plaintiff's Exhibit 14.  You have not seen Exhibit 14
16   before, have you?
17       A    That's correct.
18            MR. KELLY:  Objection, leading.  Entirely
19   correct.
20            MS. DOWNEY:  Well, the witness is a
21   hostile witness, I can lead.
22            MR. KELLY:  You can see how she's been
23   playing hide the ball with you all day.
24   BY MS. DOWNEY:
25       Q    All right, let me direct your attention to
```

```
1        Q    If you look at the two flow charts, let's
2    start with the first one, can you isolate the portion of
3    this chart that concerns orders placed by UCCS with UCC?
4        A    Yes.
5        Q    And what portion is that?
6        A    We're looking on Legacy interface?
7        Q    Yes.
8        A    BPCS system arrow to ISIS order, or ISIS order
9    file, ISIS system, and then back again.
10       Q    And what is the reference to ISIS order status
11   file, what is that?
12       A    The ISIS system generated a status back to
13   UCCS that the order, with the order number, that the
14   order had been placed.
15       Q    And all of Union Carbide used the ISIS system
16   for their global ordering process at that time, is that
17   correct?
18            MR. KELLY:  Objection to form.
19            THE WITNESS:  No, it is not correct.  I
20   don't think that everybody used ISIS.  There were some
21   other businesses the latex business, I think, that
22   were using BPCS for their expert order system for some
23   point in time.  So the majority of export customer
24   service reps used ISIS, and everyone in Houston used
25   ISIS.
```

```
1    paragraph 12 of page 2 of Exhibit 14.  This, by the way,
2    is an affidavit that was an affidavit of David Yap, or
3    Yap Poh Chye David, that was filed earlier in another
4    case.  I just want to direct your attention to paragraph
5    12 in which Mr. Yap states, "Annexed hereto and marked
6    YPC-1 is copy of an order processing flow chart during
7    the Legacy and SAP interfaces respectively," and if you
8    continue to read paragraph 12, just let me know when
9    you're done reading it.
10       A    Okay.
11       Q    Is the Legacy system the same as the ISIS
12   system?
13       A    Yes.
14       Q    And is the SAP system he's referring to here
15   the SAP R3?
16       A    Yes.
17       Q    And if you look at the exhibit to his
18   affidavit, which are the last two pages, there is a flow
19   chart entitled CEBA/SAP Updates.  Have you ever seen
20   this flow chart before?
21       A    No.
22       Q    If you turn to the next page, the subject
23   title is Current-CEBA-SAP Interface.  Have you ever seen
24   this flow chart before?
25       A    No.
```

```
1    BY MS. DOWNEY:
2        Q    If you review Mr. Yap's affidavit at paragraph
3    12, is there anything in there that you disagree with?
4    Strike that.
5            Are the statements in paragraph 12 consistent
6    with your understanding of the ISIS system?
7        A    Are consistent with my understanding of the
8    ISIS system, yes.
9        Q    And are the statements in paragraph 13
10   consistent with your understanding of the ISIS system?
11       A    Yes.
12       Q    Turning to the second flow chart, does that
13   represent the SAP R3 process?
14       A    Part of it does.
15       Q    And which part?
16       A    Of the part between the CEBA CSR and the SAP
17   system and the UCSR.  I guess the whole, what I'm trying
18   to say is that the whole flow is correct, but it is not
19   complete from what a UCSR would do in the system or the
20   hand-offs that we had, but between Union Carbide
21   Customer Services and SAP it would be correct.
22       Q    Do you have a general familiarity with the
23   sequence in transactions between Dow Singapore and UCC?
24   My understanding is you don't, but I want to see whether
25   that's true.
```

1    A    That's true, I do not, with Dow Singapore and
2  UCC, no.
3    Q    And you don't have any general familiarity
4  with transactions between Dow Singapore and Dow?
5    A    I have some familiarity with that process.
6    Q    And is that the process that's undertaken
7  through the SAP R2 system?
8    A    Yes.
9    Q    And am I correct that the SAP R2 system, like
10  the SAP R3 system, is the central system for placing
11  orders to Dow that Dow Singapore had to use?
12        MR. KELLY:  Objection as to form.
13        THE WITNESS:  You're correct that that is
14  the central order processing system that Dow Singapore
15  uses.
16        MS. DOWNEY:  Let me just circle back to
17  the deposition technicalities, because you're a former
18  employee and not a current employee or a managing agent.
19  I just want to verify for the record with Mr. Kelly that
20  the parties, in fact, agree that Ms. Berti's testimony
21  will be effective under Rule 30(b)6 for all purposes in
22  which Rule 30(b)6 testimony can be used, is that
23  correct?
24        MR. KELLY:  Sure, subject to objections
25  that we've made to questions.
         Brandon Smith Reporting Service

1        MS. DOWNEY:  I understand.
2  BY MS. DOWNEY:
3    Q    And Ms. Berti, are you represented personally
4  by Mr. Kelly today?
5    A    Yes.
6    Q    Are you involved in any sort of litigation or
7  dispute with Dow, UCC, or UCAME?
8    A    No.
9        MS. DOWNEY:  Off the record.
10        (Off record.)
11        MS. DOWNEY:  Back on the record.
12        Ms. Berti, at this time I have no further
13  questions, subject to the reservation of rights I made
14  at the beginning of the deposition, and to the extent
15  that any supplemental information we receive from the
16  defendants leads us to conclude that we need to bring
17  you back, whether or not Mr. Kelly agrees at this point,
18  we should just cross that bridge when we come to it, but
19  thank you very much, and if Mr. Kelly has questions for
20  you, he may proceed.
21
22        CROSS-EXAMINATION BY MR. KELLY:
23
24    Q    Thank you.  Ms. Berti, let me just ask you a
25  couple questions about the cutover from the ISIS system
         Brandon Smith Reporting Service

1  to SAP R3.  Did that cutover happen at the same time for
2  all parts of UCC's business?
3    A    No.  The cutover from our Legacy systems to
4  SAP happened in stages, or segments, we called them,
5  segments 1, 2, 3 and 4.  In segment 1 we had the
6  financials went in, in segment 2 we had the inventory
7  and plants, in segment 3 was the order processing sales
8  information, and segment 4 was some businesses that did
9  not come in in segment 3, some loose ends, Canada came
10  on and some other businesses that we had on the side.
11    Q    Am I right, then, that it's segment 3 that
12  dealt with the cutover to SAP R3 with respect to the
13  kind of data input that the customer service
14  representatives handled?
15    A    That's correct.
16    Q    Can you just give us an idea of the difference
17  between, say, the beginning of segment 3 and what marked
18  the beginning of segment 3 and what marked the end of
19  it?
20    A    The beginning of segment 3 was when we
21  actually started entering data into R3 itself.  Data was
22  moved from Legacy into R3, and we stopped entering data
23  into our Legacy system as a customer service rep, and we
24  entered into SAP only.  Some of the plants and
25  warehouses used dual systems for the time being for a
         Brandon Smith Reporting Service

1  comfort level for them and for some reporting which was
2  not complete when we started SAP R3 up.  That would mark
3  the beginning when we started entering, when they
4  flipped the switch to say now begin entering your orders
5  into the system.
6        The segment didn't really, the next segment
7  didn't begin until it was ready, the data was ready in
8  the system for those transactions to begin.  So in other
9  words, as soon as one segment was implemented, the data
10  discovery began on the next segment immediately by the
11  team that was to do that, then get it input into the R3
12  system.
13    Q    Was there any particular event connected with
14  the end of segment 3?
15    A    No.
16    Q    For instance, at the end of segment 3 had
17  people stopped entering data into SAP R2?
18    A    No, SAP R2 was not involved in the Powernet
19  project.
20    Q    Excuse me, now I'm doing it and I apologize.
21  Of course, SAP R2 is down.  I meant to say ISIS instead
22  of SAP R2.  I'm sorry about that.
23    A    Now I forgot your question.
24    Q    It's a good question to forget.  Let me try
25  again.  I'm wondering what the end of segment 3 meant,
         Brandon Smith Reporting Service

1    whether at that point people had stopped entering data

2    into the Legacy system?

3         A    I would say each segment had a beginning, but

4    maybe didn't have a defined end.  I would say that the

5    beginning of it was when data began being entered into

6    the SAP R3 system, no longer the Legacy system, and all

7    the data from ISIS was transferred into SAP R3 prior to

8    even the implementation of segment 3.  So anything that

9    would not be finished in the Legacy system by the

10   designated cutover date was transferred into R3 to be

11   completed in R3.

12        Q    So the cutover date is the start of segment 3?

13        A    Correct.

14             MR. KELLY:  I don't think I have any

15   other questions.  Thank you.

16             MS. DOWNEY:  Two follow-up questions.

17

18        REDIRECT EXAMINATION BY MS. DOWNEY:

19

20        Q    Now, we talked a lot about how the UCCS

21   customer service representatives had access to the SAP

22   R3 system for placing orders, do you recall that?

23        A    Yes.

24        Q    Did others at UCCS have access to the SAP R3

25   system for the purpose of generating and storing

                 Brandon Smith Reporting Service

---

1    R2, would personnel at Dow Singapore have the -- strike

2    that.

3             Would the corresponding personnel, Dow

4    Singapore and Dow Chemical in the U.S., have the same

5    level of access to SAP R2?

6         A    Yes.

7         Q    Depending on their function?

8         A    Yes.

9             MS. DOWNEY:  Those are all my questions.

10   Thank you very much.

11

12             (Deposition concluded at 3:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                 Brandon Smith Reporting Service

---

1    financial information?

2         A    Yes.

3         Q    And did others at UCCS use the SAP R3 system

4    to obtain information about inventory in plants?

5         A    They could have.  They had access to the

6    information.  They didn't routinely use it, but they had

7    access to the data.

8         Q    Did the personnel at UCCS have the same access

9    to the SAP R3 system as UCC personnel in the United

10   States?

11        A    A customer service rep was a customer service

12   rep in the system.  Each individual within Union Carbide

13   Corporation was designated with an SAP R3 role.  So if

14   you were a customer service rep, you had security in the

15   system to see those things that a customer service rep

16   needed to do their job, and nothing else.  So if I was a

17   customer service rep in the U.S. or if I was a customer

18   service rep in Singapore, I had the same security in the

19   system to see the same things and perform the same

20   transactions.  If I were a freight forwarder, I could

21   not do the same thing as a customer service rep, nor if

22   I was an accountant could I do the same thing as a

23   customer service rep.  So security was role-related in

24   SAP.

25        Q    And just based on your understanding of SAP

                 Brandon Smith Reporting Service

---

1                        JURAT

2

3

4             I, CHRISTINE BERTI, do hereby certify that

5    the foregoing testimony given by me on October 1, 2004,

6    is true and accurate, including any corrections noted on

7    the corrections page, to the best of my knowledge and

8    belief.

9

10

11

12             _____

13                  CHRISTINE BERTI

14

15

16

17        At            in said County of

18   , this      day of         , 2004,

19   personally appeared CHRISTINE BERTI, and he/she made

20   oath to the truth of the foregoing corrections by

21   him/her subscribed.

22

23   Before me,              , Notary Public

24

25             My Commission Expires:

                 Brandon Smith Reporting Service

10/1/2004 Berti, Christine (pp. 1 - 11)

```
1                    TRANSCRIPT CORRECTIONS
2
3                    REPORTER:  WENDY ALLEN
4   CASE STYLE:    MM GLOBAL SERVICES INC., MM GLOBAL
                   SERVICES PTE. LTD., and MEGAVISA
5                  SOLUTIONS (S) PTE. LTD.,
                         VS
6                  THE DOW CHEMICAL COMPANY, UNION CARBIDE
                   CORPORATION, UNION CARBIDE ASIA PACIFIC,
7                  INC., UNION CARBIDE CUSTOMER SERVICES
                   PTE. LTD
8   PAGE    LINE              CORRECTION
9
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25                          NAME:_____

                            DATE:_____
                Brandon Smith Reporting Service
```

4/26/2005  3:08 PM                                    117

10/1/2004 Berti, Christine (pp. 1 - 118)

```
1   STATE OF CONNECTICUT
2        I, WENDY J. ALLEN, a Registered Professional
    Reporter/Commissioner within and for the State of
3   Connecticut, do hereby certify that I took the
    deposition of Christine Berti, on October 1, 2004, at
4   the offices of Bingham McCutchen LLP, One State Street,
    Hartford, Connecticut.
5
         I further certify that the above named deponent was
6   by me first duly sworn to testify to the truth, the
    whole truth and nothing but the truth concerning his/her
7   knowledge in the matter of the case of MM GLOBAL
    SERVICES INC., MM GLOBAL SERVICES PTE. LTD., and
8   MEGAVISA SOLUTIONS (S) PTE. LTD., VS THE DOW CHEMICAL
    COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA
9   PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD,
    now pending in the United States District Court,
10  District of Connecticut.
11       I further certify that the within testimony was
    taken by me stenographically and reduced to typewritten
12  form under my direction by means of COMPUTER ASSISTED
    TRANSCRIPTION; and I further certify that said
13  deposition is a true record of the testimony given by
    said witness.
14
         I further certify that I am neither counsel for,
15  related to, nor employed by any of the parties to the
    action in which this deposition was taken; and further,
16  that I am not a relative or employee of any attorney or
    counsel employed by the parties hereto, nor financially
17  or otherwise interested in the outcome of the action.
18       WITNESS my hand and seal this 6th day of
    October, 2004.
19
20
21              _____
                Wendy J. Allen, RPR
22              Commissioner
23  My commission expires
    April 3, 2005
24
25          Brandon Smith Reporting Service
```

4/26/2005  3:08 PM                                    118