discovery on or before March 1, 2005.[4] Yet over a period of almost five months, between March 2, 2005 and July 26, 2005, plaintiffs received 21 boxes of paper documents, 9 hard drives, and 26 CDs containing hundreds of thousands of badly disorganized documents. Downey Decl. ¶ 29. While defendants have issued a series of letters purporting to identify the sources and subject matter categories of their documents,[5] they classify the bulk of their 462,538 documents as "relating to business activities." Regardless of whether such classifications comply with the letter or the spirit of the February 7, 2005 Scheduling Order—and plaintiffs submit they do not—the practical result is that plaintiffs remain unable to assess, with a reasonable degree of confidence, whether and to what extent defendants have complied with their discovery obligations. Also unknown is whether defendants will continue producing documents even further past the deadline and into the deposition phase of discovery.

Since the June 29, 2004 Order issued, the documents produced consist of disorganized masses of tens of thousands of business records, unsorted by date, author, or subject matter. In addition, defendants created 1.5 million images from original electronic files using a process that rendered those documents unsearchable through any electronic means and, in thousands of instances, resulted in blank, unreadable, or missing images. From March 1 to July 1, 2005, defendants refused to provide plaintiffs with any sort of index to the documents. Without an index, plaintiffs and their counsel were forced to open tens of thousands of electronic image files one by one and review them, page by page, on a computer screen.

Furthermore, in the course of their painfully slow review, plaintiffs soon discovered that

---

[4] *See* Downey Decl., Exhibit B, Feb. 7, 2005 Scheduling Order.

[5] The most recent of these is dated July 29, 2005. *See* Downey Decl. Exhibit C8, Letter from D. Douglas to R. Taffet dated July 29, 2005.

thousands of the electronic documents were non-responsive, unreadable, or missing altogether. Since March 1, 2005, plaintiffs' attorneys have devoted approximately 60% of their time in this case to the process of identifying and trying to get defendants to timely resolve the gross technical and substantive deficiencies in their document production, at a cost to plaintiffs of at least $300,000, not including counsel fees and expenses incurred in connection with this opposition and cross-motion. *See* Downey Decl. ¶ 30. From April through July, plaintiffs' officers and employees also spent hundreds of hours reviewing the defendants' non-restricted documents, thousands of which were discovered to be blank, non-responsive or unreadable. *See* Declaration of Ajay Mittal ("Mittal Decl.") ¶ 3, 6. Such efforts involved out-of-pocket costs to plaintiffs of at least an additional $100,000. *Id.* at 3. In short, a huge amount of effort and expense incurred over the past four months could have been avoided entirely, had defendants complied with the Court's Orders and the Rules of Civil Procedure.

For all these reasons, plaintiffs' cross-motion should be granted in all respects.

## II.  BACKGROUND
### A.  The June 29, 2004 Discovery Order.

On September 18, 2002, Plaintiffs served their First Request for Production of Documents and First Set of Interrogatories on Dow and UCC. Dow's and UCC's objections were detailed, but their substantive responses were perfunctory. Upon the filing of the Amended Complaint on March 24, 2003, Dow, UCC, and the three newly named defendants filed motions to dismiss, and merits discovery was postponed. After the September 12, 2003 ruling,[6] defendants sought reconsideration of the Court's denial of their motions to dismiss for lack of

---

[6] *See MM Global Servs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689 (D. Conn. 2003).

subject matter jurisdiction.

On April 21, 2004, defendants filed a motion for a protective order seeking to preclude plaintiffs from obtaining discovery regarding, *inter alia*, defendants' global price-setting policies and their interactions with each other, their competitors, and plaintiffs' customers. Plaintiffs cross-moved to compel pursuant to Fed. R. Civ. P. 37.

On June 29, 2004, the Court issued a twelve-page ruling (the "June 29, 2004 Order"[7]), which stated, in pertinent part:

- "[T]he plaintiffs must have the opportunity to discover documents regarding the sales of products outside of India in order to prove that the defendants' conduct had an effect on U.S. commerce." June 29, 2004 Order at page 8. The relevant time period for this discovery is "January 1993 to the present." *Id.* at page 9;

- As to requests for documents and information evidencing communications between any defendant and any end user customer of plaintiffs, "once the plaintiffs identify the end users, the defendants are to produce such requested documents." *Id.* at 9-10; and

- As to the requests for documents evidencing premerger communications between Dow and UCC, "the court orders the defendants to produce such documents dated August 1996 to the present." *Id.* at 12.

Defendants moved for reconsideration and clarification of the June 29, 2004 Order. On August 17, 2004, the Court issued an order reiterating that responsive documents from all of defendants' locations were "probative and must be produced," because plaintiffs' Sherman Act claims "implicate all global markets for the products."[8] The Order directed defendants to begin to comply with the discovery demands at issue, but invited them to propose "less burdensome

---

[7] Defendants' Exhibit 25 submitted in support of their Motion for Protective Order.

[8] Downey Decl., Exhibit D, August 17, 2004 Order. *See also MM Global Servs., Inc. v. Dow Chem. Co.*, 329 F. Supp. 2d 337 (D. Conn. 2004) (denying defendants' renewed motion to dismiss for lack of subject matter jurisdiction).

LITDOCS/607896.1

alternatives" in a telephonic status conference scheduled for that afternoon.

### B. Defendants Propose a Protocol for an Initial Phase of Merits Discovery.

In a subsequent telephonic conference with the Court on August 26, 2004, defendants agreed to report on the efforts they were making to respond to numerous still-outstanding discovery requests. Defendants' counsel's follow-up letter to the Court dated September 7, 2004 described ongoing efforts to retrieve the additional documents called for under the previous discovery orders, claiming that defendants had already produced "all responsive, non-privileged documents of which [they are] aware that referred to Megavisa."[9]

At an in-person status conference on October 6, 2004, defendants' counsel explained that their search for responsive documents had been more difficult than anticipated because of the number of locations that needed to be searched and the manner in which their clients maintained their records. Downey Decl. ¶ 28. He stated that they were using a master index to determine which boxes of records in storage would be most likely to contain responsive information, but the problem was that their efforts to filter out non-responsive records still left a large quantity of documents to be reviewed. *Id.*

In a letter following the status conference, plaintiffs' counsel set forth the understandings reached among the parties and the Court.[10] In accordance with the Court's direction, the defendants were to propose a document discovery plan designed to provide plaintiffs with certain key categories of documents, while lessening defendants' claimed burden. Plaintiffs' counsel's

---

[9] Downey Decl., Exhibit E, Letter from A. Marovitz to the Court, dated September 7, 2004. Notwithstanding this categorical statement, according to the index that was provided by defendants ten months later, at least 1,300 documents referring to Megavisa or MM Global were produced after March 1, 2004.

[10] Downey Decl., Exhibit F, Letter from R. Taffet to A. Marovitz, dated October 8, 2004.

LITDOCS/607896.1

letter reminded defendants' counsel that, consistent with the parties' discussions with the Court, any proposed plan needed to include a process and timeline for retrieving and producing electronic documents, including "searchable Word documents, Excel spreadsheets, PowerPoints and the like." Further, the letter made clear that:

> the procedures we are now discussing are <u>without prejudice</u> to or waiver of any party's rights concerning discovery. In addition, <u>this first step is not intended to require defendants to address all of the outstanding discovery requests</u>, but rather to allow for <u>a systematic approach</u> to eventually getting there. [*Id.* (emphasis added).]

Defendants' counsel responded the same day in a letter in which he took no issue with any of the above points, but reiterated that the goal was to "reach consensus on the approach to be taken so that we can focus on the documents that are most directly relevant to the case and that Plaintiffs say they want . . . , and <u>to avoid the production of invoice after invoice</u>."[11]

The October 15, 2004 letter setting forth defendants' proposed search protocol followed.[12] The proposal described in detail the steps defendants would take, using their discovery protocol, to lessen the burden on themselves "<u>while avoiding unnecessary time and expense</u>." *Id.* at page 5 (emphasis added). It was agreed that certain categories of so-called "product-specific documents" (such as technical specifications, chemical analyses, etc.) would not be produced. *Id.* at page 2.

Plaintiffs did not object in principle to the protocol as outlined, but did raise specific

---

[11] *See* Downey Decl., <u>Exhibit G</u>, Letter from A. Marovitz to R. Taffet, dated October 8, 2004 (emphasis added).

[12] *See* Downey Decl., <u>Exhibit H</u>, Letter from A. Marovitz to R. Taffet, dated October 15, 2004. The October 15, 2004 letter further discloses that the primary reasons for the ongoing delays and difficulties in defendants' document search process were attributable to: the Dow-UCC merger in 2001; company-wide enterprise accounting system changeovers at both UCC and Dow; post-merger changes in product-naming conventions; and major restructurings and reorganizations of functional departments and global businesses. *See id.* at pages 1, 3.