by defendants for fees and expenses incurred as a direct result of the improper manner of their document production. Despite this warning, defendants continued to take the position that the disarray of their document production was plaintiffs' problem, not theirs.

Finally, in early May, defendants' counsel indicated that his clients would consider producing an index to the electronic production. Plaintiffs' request remained under consideration until, in a letter dated May 20, 2005, defendants offered a fully searchable database of all the documents produced in the case—at an initial charge to plaintiffs of $685,000.[27] Plaintiffs declined this proposal and demanded an answer to their original request. Again the response was that defendants would take the matter into consideration.

By letter dated May 25, 2005, plaintiffs advised the Court of the ongoing difficulties they were experiencing and the positions taken by defendants, and requested an in-person status conference.[28] While that conference was pending, the problems described in a follow-up letter to defendants' counsel dated June 6, 2005 continued to hinder plaintiffs' ability to prepare their case, much less identify the remaining substantive deficiencies in defendants' production.[29]

On Friday, June 10, 2005, the parties received an electronic notice for an in-person status conference with the Court on June 21, 2005. That same Friday, by email time-stamped 11:28 p.m., defendants' counsel transmitted a proposed template for an index, the delivery of which would be conditioned on plaintiffs agreeing that it would "completely resolve[ ] the issues we

---

[27] Downey Decl. Exhibit P, Letter from C. Kelly to R. Taffet, dated May 20, 2005.

[28] See Downey Decl., Exhibit Q, Letter from R. Taffet to the Court dated May 25, 2005.

[29] See Defendants' Exhibit R, Letter from R. Taffet to A. Marovitz dated June 6, 2005.

have been discussing regarding indices, databases, metadata production and the like."[30]  By return email, plaintiffs' counsel noted that the proposed template was "a start," but that there could still be difficulties identifying untitled documents; for that reason, "at a minimum there should be a field that provides a description of the subject matter or topics of each document."[31]

At the June 21 status conference, plaintiffs' counsel described several serious technical and substantive deficiencies in defendants' document production and delays and burdens caused by defendants' failure to address those deficiencies timely and completely.  Downey Decl. ¶ 33.  Defendants' counsel tried to downplay the significance of these issues as "to be expected" in making such a large production.  *See also* Combined Brief at page 4 & note 3.  He further admitted that counsel had not actually reviewed defendants' electronic production before delivering it to plaintiffs and so they had been unaware of such issues until plaintiffs raised them.  *Id.*  He stated that his clients were in the process of addressing the error messages, missing email attachments, and unreadable spreadsheets, and that an index would be produced to plaintiffs no later than July 1, 2005.  *Id.*

Defendants shipped an index on Friday, July 1, 2005, along with various other materials.  Yet neither the July 1 index nor the revised index that was delivered a week later contained a subject matter field, as requested in Mr. Taffet's June 13 email.  The most recent version of the index indicates that at least 10,569 documents are titled "Unknown" or "Illegible" and over 5,751 documents have no titles at all.[32]  Downey Decl. ¶ 35.  The subject matters of those

---

[30] Downey Decl. Exhibit S at page 2, Email from A. Marovitz to R. Taffet, dated June 10, 2005.

[31] Downey Decl. Exhibit S at page 1, Email from R. Taffet to A. Marovitz, dated June 13, 2005.

[32] For example, document D00451992 - D00452183 appears to be a compilation of presentations made at a 1995 conference entitled "Power Cable: 2000 and Beyond." This 191-page document appears to be the

(Footnote Continued on Next Page.)

documents cannot be discerned from the index and they will not be included in any "title" search results with documents to which they may relate. In addition, although the index provides a guide to a fair portion of the documents that defendants produced, lingering technical problems caused by having to incorporate multiple productions into the existing database continue to make document retrieval difficult and time-consuming. *Id.*

### E.    Facts Relevant to Potential Spoliation of Documents.

As noted above, plaintiffs stated in October 2004 that defendants' search protocol would have to include searching the electronic files (including emails) of the persons identified by the parties in their interrogatory responses and likely possessing relevant knowledge. These individuals included former employees of UCC, UCAP, Dow, and their affiliates, many of whom were directly involved in the decisions and events described in the allegations of plaintiffs' initial and Amended Complaints.

Plaintiffs became concerned about potential spoliation of relevant documents and evidence when they questioned the absence of any references in the Designation Letters to more than 80 UCC and Dow employees who had been identified in the parties' interrogatory responses.[33] Defendants produced additional documents later that month and in May, but emails and documents created by many key former employees continued to be absent, leading plaintiffs, in the parties' periodic meet-and-confer teleconferences, to request more detailed explanations as to how and when such documents had been disposed of.

---

(Footnote Continued from Previous Page.)

type of strategy document that is responsive to the February 7, 2005 Scheduling Order. On the corresponding entry in defendants' index, however, the only field with any information in it is the confidentiality designation, thereby rendering this document "unfindable" through any electronic search.

[33] Downey Decl. Exhibit T, Letter from A. Downey to A. Marovitz, dated March 23, 2005.

Defendants have declined to disclose what specifically happened to any missing individual employees' files.[34] In conference calls and correspondence, they have disclosed a general practice under which departing employees provided "access" to their electronic documents to their successors. In response to the Current Requests, they have suggested different scenarios generally applicable to responsive documents no longer in their possession, i.e., loss or destruction due to "equipment or software failures, compliance with information management and records retention requirements, and/or human error."[35] This does not explain, however, why significant categories of potentially relevant documents created or maintained by specific individuals are still unaccounted for.

    **F.    Facts Relevant to the Parties' Dispute Over Misuse of the "Counsel Only" Restrictions on Defendants' Documents.**

The Stipulated Protective Order entered December 18, 2002, provides that a party producing "Confidential Material" may "make such designation only as to material that the [party] in good faith believes constitutes proprietary information, confidential business information or trade secret information, etc."[36] Under Paragraph D, "'Confidential Material' that is current or recent information that is highly competitively sensitive . . . or otherwise highly sensitive may be designated 'Counsel Only—Confidential Material.'"[37] The significance of this designation to plaintiffs is that no employee or officer may review such documents or be

---

[34] *See, e.g.*, Downey Decl. <u>Exhibit A</u> at page 26, Answer to Int. 25.

[35] *See id.* at page 27.

[36] Downey Decl., <u>Exhibit U</u> at page 2, ¶ B, December 18, 2002 Stipulated Protective Order.

[37] *Id.* at page 4, ¶ D.

informed of their contents.[38] Because such designations significantly affect the receiving party's ability to analyze and use such documents, "[t]he burden of establishing that information has been properly designated . . . is on the party making such designation."[39]

Plaintiffs first questioned the quantity and rationale of defendants' "Counsel Only" designations by letter dated October 4, 2004.[40] Twenty-five days later, by letter dated October 29, 2004, defendants submitted a lengthy list of re-designated documents with a letter stating:

> Consistent with our commitment to review our confidentiality designations as to documents Defendants have produced to Plaintiffs over the last two months, . . . we are re-designating the following ranges of documents pursuant to the Stipulated Protective Order . . .[41]

The problem arose again after March 1, 2005, in connection with defendants' designation of over 535,000 pages of electronic documents as "Counsel Only." Plaintiffs again objected, in a letter dated March 7, 2005, and in a March 15, 2005 conference call.[42] By letter dated March 23, 2005, plaintiffs challenged all the "Counsel Only" designations on the grounds that defendants had misdesignated thousands of documents in violation of the Stipulated Protective Order.[43] The issue was brought to the Court's attention by letter dated March 29, 2005, in which plaintiffs asked the Court to direct defendants to re-designate all "Counsel Only" documents except to the extent that defendants could show cause, on or before April 6, 2005, for maintaining a

---

[38] *Id.* at page 3, ¶ C.

[39] *Id.* at page 9, ¶ L.

[40] *See* Downey Decl., Exhibit V at page 3, Letter from A. Downey to C. Kelly, dated October 4, 2004.

[41] Downey Decl., Exhibit W, Letter from C. Kelly to A. Downey, dated October 29, 2004.

[42] See Downey Decl., Exhibit N, Letter from R. Taffet to A. Marovitz, dated March 7, 2005.

[43] Downey Decl., Exhibit T, at pages 2-3, Letter from A. Downey to A. Marovitz, dated March 23, 2005.

LITDOCS/607896.1