# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil No. 3:02 CV 1107 (AVC) |
| v. | ) ) ) | September 12, 2005 |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' COMBINED REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND OPPOSITION TO CROSS-MOTION TO COMPEL FURTHER RESPONSES TO DISCOVERY, TO REMOVE "COUNSEL ONLY" DESIGNATIONS, AND FOR SANCTIONS

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  05103-3497
(860) 275-8304

Nathan P. Eimer (ct 23693)
Scott Solberg (phv 0234)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL  60604
(312) 660-7600

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
71 S. Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006-1157
(202) 263-3000

*Counsel for Defendants The Dow Chemical Company,*
*Union Carbide Corporation and Union Carbide Asia Pacific, Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .......................................................................................... 1

II.   PLAINTIFFS HAVE FAILED TO COUNTER DEFENDANTS' SHOWING
      THAT THE CURRENT REQUESTS WOULD IMPOSE UNDUE BURDEN
      AND EXPENSE ON DEFENDANTS ............................................................ 6

      A.    Plaintiffs' Requests Are Duplicative And/Or Irrelevant........................ 7

            1.    Many of Plaintiffs' Requests Are Duplicative........................... 7

            2.    The Current Requests That Are Not Duplicative Are Irrelevant .............. 8

      B.    The Current Requests Would Impose Enormous and Undue Additional
            Burden And Expense ......................................................................... 9

      C.    The Organization of Defendants' Production Fully Complied With Rule
            34(b) ................................................................................................ 12

      D.    The Court Should Not Compel Any Further Response To The
            Interrogatories Relating To Document Search And Retention And The
            Document Request For Defendants' Document Indices And Databases............. 14

III.  PLAINTIFFS HAVE SHOWN NO CAUSE FOR ABANDONING THE
      COURT'S PROTECTIVE ORDER AND REMOVING DEFENDANTS'
      CONFIDENTIALITY DESIGNATIONS ...................................................... 16

IV.   PLAINTIFFS' MOTION FOR SANCTIONS IS BASELESS........................ 18

      A.    Defendants' Document Productions ................................................... 18

      B.    Plaintiffs Have Failed To Show Any Basis For Sanctions ................... 24

V.    CONCLUSION........................................................................................... 30

## I.    Introduction

Plaintiffs' opposition to Defendants' motion fails to address the following key facts:

- This case is about Defendants' relationship with a former distributor in India, *not* about their relationships with distributors all the over the rest of the world.

- Over two years ago, Plaintiffs received a substantial production of documents, giving them ample discovery on all three of their surviving claims;

- More recently, Defendants spent well over $4 million to identify and produce the documents Plaintiffs most desired from their global document requests purportedly relating to the merits of the three surviving claims;

- Defendants' document production effort, pursuant to a protocol provided *in advance to Plaintiffs*, yielded over 1.5 million pages of responsive documents, for which Defendants provided a fully searchable index containing the very same objective coding data contained in Defendants' own document database; and

- Only now that Plaintiffs have received this enormous production, they have demanded another global search for documents and information, much of which duplicates their prior demands, and the rest of which is irrelevant to the merits of their surviving claims.

Instead of confronting these facts, Plaintiffs add still more complaints and demands. Although the recent production is the result of Defendants' adherence to the protocol provided in advance to them and submitted to the Court, Plaintiffs complain about it now as if *they* had not demanded irrelevant documents in the first place. Although Defendants have engaged responsively with Plaintiffs whenever Plaintiffs have notified them of concerns about particular documents' confidentiality designation, Plaintiffs call for the Court to scuttle the Stipulated Protective Order's dispute-resolution process. Although Plaintiffs' own document productions have been in hard copy, they complain about the particular electronic format in which Defendants produced documents – a format that readily lends itself to scanning and optical character recognition. Although Plaintiffs' document productions were in no discernible order, they complain about the manner in which Defendants' document production was organized, a manner that unquestionably complied with the Federal Rules of Civil Procedure.    While

Plaintiffs have produced their documents with no accompanying index or other identifying information, let alone a fully searchable index like the one Defendants have produced to them, they insist that they are entitled to free access to Defendants' proprietary electronic document database. And finally, while Plaintiffs' own chief executive admitted that Plaintiffs have discarded documents while this case has been pending, they suggest spuriously that *Defendants* have engaged in document spoliation.

Aside from all of these inconsistencies, Plaintiffs' situation is a classic example of the basis for the old saying, "be careful what you wish for." Their document requests[1] have asked for every piece of paper in the world, created over a span of 20 years, related to a list of 153 Products and countless end users. For example, Plaintiffs' earlier requests demanded, among other things, each document concerning:

- prices for or pricing of Products sold or distributed, directly or indirectly, to end-users, regardless of location *worldwide* (Second Request, ¶ 7 (Ex. 4)); and

- "the manufacture, sale, offer for sale or distribution *in any geographic market or territory* by any person other than [Defendants] of any products that are competitive with the Products" (Third Request, ¶ 1 (Ex. 5)).

Defendants undertook massive efforts to find and produce documents, in both electronic and paper form, responsive to Plaintiffs' requests. Br. 2-4. Even though the protocol narrowed the

---

[1] *See* Plaintiffs' First Request to Defendants for Production of Documents and Plaintiffs' First Set of Interrogatories (Sept. 18, 2002) ("First Request") (Ex. 3); Plaintiffs' Second Request to Defendants for Production of Documents and Plaintiffs' Second Set of Interrogatories (Oct. 15, 2003) ("Second Request") (Ex. 4); Plaintiffs' Third Request for Production of Documents (Apr. 2, 2004) ("Third Request") (Ex. 5); Plaintiffs' First Set of Personal Jurisdiction Document Requests and Interrogatories (July 23, 2004) (Ex. 6); and Plaintiffs' Third Set of Interrogatories and Fourth Request for Production of Documents (May 16, 2005) ("Plaintiffs' Current Request") (Ex. 7). We refer to all the requests listed in this footnote except for Plaintiffs' Current Request as the "earlier requests."

Due to a duplication error, certain of our exhibits to our Opening Brief were filed with the Court out of order. Accordingly, we have resubmitted with this filing all of the exhibits cited in both the present brief and our Opening Brief.

search to files most likely to contain the responsive documents most significant to Plaintiffs, the search still yielded a production (the "earlier production") of over 1.5 million pages. Plaintiffs now express surprise that each and every document that they demanded was not, by their standards, exactly what they hoped it to be.

It is ironic, to say the very least, that Plaintiffs now complain about the documents that they demanded and received. Defendants have made the point repeatedly, both in meet-and-confer sessions with Plaintiffs, and in submissions to this Court, that Plaintiffs' earlier requests, even as modified, sought the production of documents well outside the bounds of the allegations in their Complaint. Plaintiffs now blame Defendants for giving them what they wished for. But this 1.5 million page production was not a document dump intended to bury Plaintiffs. As the protocol bears out, Defendants' efforts were focused strictly on reducing impact and burden while still meeting Plaintiffs' requests. Indeed, of the over 100 exhibits Plaintiffs have introduced in only the first three merits depositions, nearly all come from the earlier production. And Plaintiffs did not deny, when asked by the Court during the June 2005 status conference, that Defendants had produced to them the types of responsive documents and information they had requested. Ex. 30, ¶ 9 (Declaration of Andrew S. Marovitz). In fact, the Court rejected at that same conference many of the complaints that Plaintiffs now raise in their brief. Wondering whether Plaintiffs were overly focused on individual "leaves" when they already had the "trees," the Court rebuffed Plaintiffs' repeated complaints about Defendants' discovery efforts. *Id.*

In any event, producing the 1.5 million pages hardly ended Defendants' undertakings. When Plaintiffs alerted Defendants that certain documents were overlooked, Defendants investigated, found the missing documents and produced them. When Plaintiffs could not load the electronic documents on their computers, Defendants reformatted the electronic production

and sent additional electronic copies. When Plaintiffs asked to speak with a technical expert to help load the documents, Defendants made him available. When Plaintiffs requested a paper index of the documents, Defendants provided a fully searchable index containing key information on *each* document Defendants have produced in this litigation.

Now, Plaintiffs turn those very efforts against Defendants. Perversely, they twist Defendants' massive document search and follow-up efforts into evidence of *non*-compliance, despite this Court's earlier recognition that the vast production Plaintiffs demanded would take time and entail some uncertainty. Mistakenly claiming that Defendants did not conduct a document-by-document review of their earlier "Counsel Only" designations, Plaintiffs ask this Court to remove *all* of those designations from sensitive documents, despite the fact that doing so conflicts with the Stipulated Protective Order that has been in place from the inception of this case. Finally, Plaintiffs cloak their rhetoric with empty righteousness, requesting sanctions against Defendants for doing what they promised.

All these complaints are a diversion from the real subject of this dispute and of Defendants' Motion for Protective Order: Plaintiffs' Current Requests. The Court has given Plaintiffs every chance to obtain discovery to demonstrate that this case is within the Court's subject matter jurisdiction. *See MM Global Services, Inc. v. The Dow Chemical Co.*, 2004-1 WL 556577 *6 (D. Conn. 2004) (granting motion to reconsider but declining to dismiss for lack of subject matter jurisdiction "[i]n the absence of additional discovery"). They have gotten this discovery, not only in the earlier production, but also in the many documents produced in *forum non conveniens* discovery. But now, just as Defendants were completing their massive earlier production, the Current Requests reduced it to a dry run, directing Defendants not only to compile and organize for Plaintiffs the information contained in documents Defendants have

4

already produced, but also to search again worldwide for even more documents and information, this time including numerous remote locations that the search protocol excluded from the earlier production's scope. The result will be even more of *the very same types of documents* that Plaintiffs complain should not have been produced in the earlier production.

Plaintiffs demand this new multimillion-dollar document production on the justification that, in essence, Defendants produced too many documents on too many days, and organized the documents consistently with the Federal Rules of Civil Procedure rather than in a manner that Plaintiffs prefer. Plaintiffs complain about each of these natural consequences of their own document requests as if those broad requests had no connection with the consequences. Their solution, the Current Requests, would duplicate much of Defendants' earlier effort and extend to irrelevant documents and information, at terrific expense to Defendants while shedding no new light on the dubious merits of Plaintiffs' claims.

Defendants respectfully suggest that the time has come to declare that this case is about the merits, and not an arena for dealing with burdensome, costly and time-consuming discovery requests. Plaintiffs have had ample discovery. If there were any real evidence that there was a meaningful connection between the sale and distribution of the Products in India and United States commerce, Plaintiffs would have obtained it. That there is no such evidence will be the basis for a summary judgment motion Defendants will file with respect to the antitrust claim. Plaintiffs fall far short of providing any serious justification for their latest round of discovery requests, instead choosing to focus on petty complaints regarding a 1.5 million-page production. Plaintiffs do not need the discovery requested in their Current Requests; compelling it would more than double the already substantial costs Defendants incurred in responding to the earlier requests. Further, Plaintiffs have shown no legitimate need for the Court to depart from the

confidentiality-designation process it has established, and no basis whatever for their diversionary request for sanctions. The Court therefore should grant Defendants' Combined Motion for a Protective Order and deny Plaintiffs' Cross-Motion.

## II.    Plaintiffs Have Failed To Counter Defendants' Showing That The Current Requests Would Impose Undue Burden and Expense on Defendants.

Plaintiffs complain in one breath that Defendants produced too may documents in response to the earlier requests, then in another breath that they need more. Defendants have produced an enormous number of documents in response to Plaintiffs' earlier requests under a document search protocol provided, in advance, to Plaintiffs. Plaintiffs had every opportunity to comment on the search protocol during its development; if it was as defective as they now suggest, they could have conveyed that information to Defendants. Instead, Plaintiffs stood by while Defendants carried out the protocol, and only later announced that another massive global search is necessary to elicit the documents and information that they desire. This is exactly the scenario behind the Court's direction that the parties meet and confer about Defendants' document search protocol – so that Plaintiffs would receive the types of documents they wanted through *that* search, and Defendants would avoid incurring significant discovery costs only to have to go back and re-do the document production all over again. It is one thing to review the production and seek targeted supplemental productions; it is quite another to tell Defendants to start over.

Here, despite their protestations, Plaintiffs are not flying blind. They already have introduced over 100 documents – nearly all from Defendants' production – as exhibits during the first series of merits depositions in this case. These actions undermine Plaintiffs' rhetoric. And while Plaintiffs undoubtedly have devoted substantial hours to reviewing Defendants' production, that should be no surprise in light of the wide net they cast in the discovery pool

6

fishing for documents relating to "pricing" and "competition" from Defendants. That wide net caused Defendants to spend over $3.5 million to respond to Plaintiffs' requests (Ex. 8, ¶ 14 (Declaration of William H. Herr, Managing Counsel, Legal Department (June 21, 2005)), millions more than Plaintiffs complain about now.

### A.    Plaintiffs' Requests Are Duplicative And/Or Irrelevant.

Most significantly, Plaintiffs have failed to counter Defendants' demonstration (Br. 12-14) that each of Plaintiffs' Current Requests relating to merits discovery is either duplicative, irrelevant or both.

### 1.    Many of Plaintiffs' Requests Are Duplicative.

Defendants' opening brief demonstrated conclusively that Interrogatories No. 1 through 10 and 13 through 22 and Document Request No. 1 (which demands each document identified in the interrogatories) in the Current Requests are duplicative of Plaintiffs' earlier requests. Br. 15-16; *see* Ex. 26 (chart comparing Plaintiffs' Current Requests to earlier requests).

As Plaintiffs concede in their own brief, many of the interrogatories in the Current Requests "echo" their earlier document requests (Pls. Br. 3), as do the documents to be identified in these interrogatories. As to the duplicative interrogatories, Plaintiffs contend that Defendants, not they, should have to go through the documents they demanded in order to extract relevant information for their use. *Id.* This response indicates that the duplicative Current Requests are designed at best to force Defendants to extract and compile for Plaintiffs the information contained in the documents called for in the earlier requests, and at worst to impose on Defendants another round of global document searches, not for the sake of discovery but rather for the sake of economic coercion.

### 2.    **The Current Requests That Are Not Duplicative Are Irrelevant.**

Two examples illustrate Plaintiffs' failure to counter Defendants' showing that the Current Requests that are not duplicative of prior discovery requests are plainly irrelevant. First, as Plaintiffs themselves admit, Interrogatories No. 1-6 expressly demand, "[f]or each distribution channel [i.e., distributors and sales agents] and Product, . . . the names of the distributors and sales agents, the terms of their relationships with defendants, the prices at which Products were sold to or through them, and a description of the type of documents used in those transactions." Pls. Br. 32.    But none of Plaintiffs' claims has anything to do with Defendants' relationships with *other* distributors and sales agents all over the world.    Comparison of the details of Defendants' relationships with those other distributors and sales agents to the details of their relationships with Plaintiffs has no bearing whatsoever on Plaintiffs' claims.    Variations in business terms between multiple parties is not an element of a claim for resale price maintenance, nor for breach of contract or negligent misrepresentation.    Plaintiffs do not, for example, allege that there was ever a contractual commitment, or that Defendants ever led them to believe, that Defendants would enjoy the same terms as did other agents or distributors.    Nor would their resale price maintenance claim depend on whether Defendants dealt on the same terms with other distributors or agents.

Similarly, Plaintiffs have failed to show that Interrogatories No. 7 and 8, concerning sales to end users all over the world, are relevant, except with respect to end users in the United States and India.    Plaintiffs contend that the identity of each end user around the world to which a Defendant sold each Product, and the prices at which Defendants sold each such Product, would tend to prove "defendants' global price-fixing efforts . . . by comparing the prices at which different products were sold at different times through different channels."    Pls. Br. 33.

8

Plaintiffs' vague explanation shows that they have no idea how they would utilize this information to demonstrate the price fixing they infer, but have not even alleged. Further, their argument simplistically ignores the interrelationship of variables involved in pricing around the world, such as quality, volume, transportation, and the like. With the exception of Indian End Users, the information clearly has nothing to do with resale price maintenance in India, and except as to American end users, it has no bearing on the alleged conspiracy's effect on United States commerce.[2]

### B.    The Current Requests Would Impose Enormous and Undue Additional Burden And Expense.

Attempting to respond to the Declaration of William H. Herr, in-house director of discovery for Defendant The Dow Chemical Company ("TDCC"),[3] on the likely cost of compliance with Plaintiffs' Current Requests, Plaintiffs settle for misguided sniping. Pls. Br. at 26-27. But they fail to undermine Mr. Herr's succinct and well-informed explanation that Plaintiffs' requests would impose an enormous and undue burden on Defendants.

Not surprisingly, Plaintiffs' complaints about the earlier production itself lead them to discount Mr. Herr's use of the cost of that production as a predictor of the likely cost of compliance with the Current Requests. *Ibid.* But Plaintiffs do not quarrel with the accuracy of Mr. Herr's report that the earlier production cost at least $3.5 million. Moreover, as Mr. Herr is the designated deponent for both TDCC and UCC on discovery issues under Rule 30(b)(6), Plaintiffs could long since have deposed him by now had they wished to test the veracity of his

---

[2] As explained above, to the extent that the interrogatories do call for relevant information, they are duplicative of the earlier requests.

[3] Mr. Herr also provides similar services to Defendants Union Carbide Corporation ("UCC") and Union Carbide Asia Pacific, Inc. ("UCAP") pursuant to service agreements between TDCC and the other two Defendants. Ex. 8, ¶ 1.

Declaration, including the legitimacy of the expenses incurred in connection with the earlier production.

While Plaintiffs question the basis for Mr. Herr's estimate that complying with Plaintiffs' Current Requests will cost Defendants $4 million, they present no legitimate basis for skepticism. Plaintiffs fail to confront Mr. Herr's description of the process that Defendants would have to employ to respond to the Current Requests (Ex. 8, ¶¶ 16, 18-19). As Mr. Herr states, Defendants do not maintain centralized lists of the information requested by the Current Requests.[4] Thus, to provide Plaintiffs with information such as the identity of every distributor and sales agent used by Defendants globally over the last twenty years, Defendants would have to go to every subsidiary and affiliate worldwide to gather the information. *Id.* at ¶¶ 18-19. Having overseen Defendants' earlier production, and monitored its costs, Mr. Herr simply took these recently-incurred costs and applied them to his estimate of the amount of time and resources that would be required to compile the information requested by the Current Requests and to produce the related documents. Plaintiffs had ample opportunity to depose him on this subject but did not. Having failed to do so, Plaintiffs are in no position to challenge the *bona fides* of his Declaration.

What is more, Plaintiffs' own brief implicitly admits that gathering the information responsive to the Current Requests is not as simple as they suggest. For example, with respect to Interrogatory No. 1, asking for the identity of each of Defendants' distributors, Plaintiffs suggest

---

[4] Plaintiffs mischaracterize Mr. Herr's statement that Defendants "have not compiled information responsive to Plaintiffs' requests in connection with this case" (Ex. 8, ¶ 19) to suggest that "a reasonable inference is that responsive information might have been compiled, albeit not 'in connection with this case' but that defendants refuse to disclose it" (Pls. Br. 28). Read in context, Mr. Herr's Declaration explains the arduous process that Defendants would have to undertake to compile the information requested by Plaintiffs, and then states that Defendants have not undertaken this process for their own use in this case. It does not suggest even remotely that Defendants have compiled the information for some other purpose and are withholding it. This is more of the same kind of evidence-free speculation that informs Plaintiffs' theory of some global conspiracy between TDCC and UCC before their merger transaction.

that Defendants could search their production for documents similar to documents entitled "Distributor Price List," refer to those documents by bates number in the discovery response, then "*verify that [Defendants] produced all such lists*." Pls. Br. 26. The catch is that Defendants could never verify that all such documents were produced unless Defendants reviewed documents related to distributors worldwide; even then, Defendants could not certify that their response is complete, due to the twenty-year time period subject to the request.[5] Thus, Plaintiffs are not suggesting that Defendants merely return to their document production to compile information; they also demand that Defendants confirm that all responsive information globally has been collected and produced. Such an undertaking was not contemplated by Defendants' search protocol, and is exactly what the Court aimed to prevent when it instructed the parties to develop a less burdensome manner of discovery.

The Federal Rules provide the Court with the means to stop Plaintiffs' abuse of the discovery rules: this Court may curb otherwise proper discovery where, as here, "the discovery sought is unreasonably cumulative or duplicative" or the "burden or expense of the proposed discovery outweighs its likely benefit...." Fed. R. Civ. P. 26(b)(2)(i) and (iii). Plaintiffs' attempts to distinguish Defendants' cases on this point ignore their underlying theme: that courts must step in to stop abuses of the discovery process. Here, as in *Cummings v. General Motors Corp.*, 365 F.3d 944, 953-54 (10th Cir. 2004), Plaintiffs' Current Requests are "overly broad in scope, duplicative of prior requests and unduly burdensome," and "Plaintiffs' failure to frame precise discovery requests and notices in accordance with the provisions of the rules" have made

---

[5] Plaintiffs suggest, without explanation, that their Current Requests do not ask for the production of invoices and routine transaction documents. Pls. Br. 27. Nearly every interrogatory demands the identification of all documents concerning the subject of the interrogatory, and Current Document Request No. 1 explicitly requests the production of all documents so identified. In any case, these invoices and other transactional documents are exactly the types of documents Defendants would have to collect and review in order to produce information such as the prices charged to all end users worldwide over the last twenty years. Ex. 8, ¶¶ 16, 18-19. Thus, even if Defendants did not have to *produce* these documents, they still would have to *locate* them and extract the demanded transactional information from them.

discovery needlessly burdensome, leading to "numerous miscommunications and unnecessary disputes" between the parties.    Similarly, as in *Bonnell v. Com. Realty Trust*, 63 F.R.D. 616, 617-18 (E.D. Pa. 1974), where the court upheld the denial of a motion to compel a second set of interrogatories and document requests, the documents and information the Current Requests demand have already been produced in response to earlier discovery requests.

## C.    The Organization of Defendants' Production Fully Complied With Rule 34(b).

Plaintiffs characterize Defendants' document production as "badly disorganized" (Pl. Br. 6), "disorganized masses of tens of thousands of business records" (*ibid.*), and "a morass of unintelligible business records" (*id.* at 39).    There is no denying that the production was huge, even after the search protocol streamlining.    But it was hardly disorganized.    Defendants produced documents "as they are kept in the usual course of business." Fed. R. Civ. P. 34(b).[6] The electronic production was assigned bates label prefixes by custodian. Thus, for example, all of Kevin Dillan's electronic documents produced pursuant to the protocol were produced with the prefix DEBA.    Lawrence Cheung's documents produced pursuant to the protocol bear the prefix DEAG.    To guide Plaintiffs, Defendants provided source description lists that, for each custodian, showed the applicable bates range, custodian, custodian's job title and product division, the location from which the documents were collected, and general subject matter descriptions of the documents.    Defendants also have provided Plaintiffs, free of charge, with an electronic index of every document Defendants produced in this litigation.    This index, which Plaintiffs can easily incorporate into their own chosen database product, provides them with the same objective document coding fields that Defendants use in their database.

---

[6] The suggestion that production in this format is not consistent with Defendants' document search protocol (*see* Pl. Br. 39) is incomprehensible.  The protocol focuses not on the manner of production, but on what would be searched. Had the protocol indicated that Defendants would *not* produce documents in accordance with Fed. R. Civ. P. 34(b), Plaintiffs surely would have objected.

Now compare Plaintiffs' own production to see the stark contrast. Plaintiffs produced all of their documents in hard copy, forcing Defendants to incur the entire cost of creating a database of the documents. The production bears no discernible sign of organization. Even though Plaintiffs are using a database program much like Defendants', Plaintiffs provided Defendants with no index of Plaintiffs' production, gratis or otherwise. Plaintiffs' production is not bates labeled by custodian, or by any other discernible criterion, and because Plaintiffs' production source description list fails to identify the custodian of any document, or the product division to which the documents relate, Defendants have no idea which custodian held what documents. *See, e.g.*, Ex. 31 (Letter from C. Guizzetti to A. Marovitz, dated June 6, 2005).

Neither side, of course, gets to dictate the organization of the other side's document production. To the contrary, Rule 34(b) explicitly allows the *producing* party to decide whether to produce documents "as they are kept in the usual course of business *or* . . . organiz[ing] and label[ing] them to correspond with the categories in the request." Fed. R. Civ. P. 34(b) (emphasis added). But it is obvious that Defendants produced documents organized in conformity with Rule 34(b). The same cannot be said of Plaintiffs.

Defendants organized their production by custodian; Plaintiffs did not. Defendants provided useful information on the documents' sources; Plaintiffs did not. Defendants identified documents by general subject area; Plaintiffs did not. Defendants gave Plaintiffs a searchable electronic index to their entire production; Plaintiffs have not given Defendants an index of any kind. For Plaintiffs, then, to contend that the organization of Defendants' document production justifies a massive new round of discovery, let alone sanctions, is absurd.

In fact, the very timing of the Current Requests indicates that Plaintiffs' attempts to justify them on the basis of the organization of the earlier production are pretextual. Plaintiffs

13

served the Current Requests on May 15, only ten days after Defendants produced the last of the documents from the earlier production that had been re-designated for confidentiality. Plaintiffs themselves acknowledge that the Current Requests were not the result of a careful and thorough review: "From April *through July*, plaintiffs' officers and employees also spent hundreds of hours reviewing the defendants' non-restricted documents . . . ." Pls. Br. at 7 (emphasis added). Defendants issued the Current Requests in mid-*May*, in the midst of these "hundreds of hours." Rather than take the time needed to review the overwhelming number of documents *they themselves had demanded*, and find within them the information they seek, Plaintiffs evidently decided it would be easier to ask Defendants to do Plaintiffs' work for them. The complaint about the earlier production's organization is a futile attempt to deflect responsibility for the natural and predictable consequences of their earlier requests. That they would use this also as a purported justification for a second, even larger, global document collection and review process – which has the additional tactical benefit of doubling Defendants' discovery costs while distracting them from probing Plaintiffs' claims – shows that Plaintiffs' discovery strategy seeks not to win on the merits, but to abuse the liberal discovery rules in order to bludgeon Defendants into submission by visiting huge litigation costs upon them. Defendants respectfully suggest that it is time for the Court to stop these abuses.

**D.    The Court Should Not Compel Any Further Response To The Interrogatories Relating To Document Search And Retention And The Document Request For Defendants' Document Indices And Databases.**

Plaintiffs' Third Interrogatories No. 24-29 request information regarding Defendants' document search protocol, as well as Defendants' policies regarding the retention of documents. Defendants provided responses to these requests. Defendants TDCC and UCC have designated Mr. Herr to testify on these subjects as a Rule 30(b)(6) deponent. If Plaintiffs believe they are

14

entitled to additional information in response to these interrogatories, they can ask for that information during Mr. Herr's 30(b)(6) deposition, which they only requested on September 1, 2005.

Plaintiffs' Fourth Document Request No. 2 runs afoul of the attorney work product doctrine. The request demands "[a]ll indices, databases, or reference tables prepared or used by [Defendants] in connection with searching for, producing, retrieving or reviewing documents responsive to Plaintiffs' First, Second, Third, and Fourth Requests for Production of Documents." Ex. 7. On its face, this request clearly calls for Defendants' attorney work product – in particular, Defendants' document database. This demand is unsupportable; Defendants offered Plaintiffs an exact duplicate copy of the very same document database used by Defendants (minus Defendants' attorney opinion work product), provided that Plaintiffs agree to share the costs of creating the database. When Plaintiffs rejected this offer, Defendants nonetheless provided them with an index of Defendants' production containing all of the objective field coding from Defendants' database at no cost to Plaintiffs. Defendants' database is not maintained in the ordinary course of business, but rather was created specifically for the purposes of this litigation. Even aside from the presence of attorney opinion work product in the database, including attorneys' impressions and analyses of documents, the use of a document request to gain access to this costly database is inherently unfair. Plaintiffs should not be allowed to piggyback on Defendants' work product and its associated expense – especially since, as discussed above, Plaintiffs have provided Defendants with neither an index for their production nor the detailed source information that Defendants provided to Plaintiffs. *See Portis v. City of Chicago*, 2004 WL 1535854, at *4 (N.D. Ill. July 7, 2004) ("[i]n order to avoid seriously prejudicing plaintiffs . . . the City must contribute its fair share of the expenses

15

plaintiffs incurred to produce the database" where there are cost-saving interests in database sharing and holding that the City's "fair share" was 50% of the database's cost); *Fauteck v. Montgomery Ward & Co.*, 91 F.R.D. 393, 398 (N.D. Ill. 1980) ("as to the element of unfairness that would result from a forced disclosure of a compilation made at great expense to the defendant, this problem can be offset by requiring plaintiffs to share defendant's costs").

### III. Plaintiffs Have Shown No Cause For Abandoning The Court's Protective Order And Removing Defendants' Confidentiality Designations.

The Court's Protective Order, stipulated to by the parties and entered by the Court in December 2002, establishes straightforward rules for a producing party's confidentiality designations and for resolving disputes over such designations. The criteria for "Confidential Material" and "Counsel Only Confidential Material" are explained in the Protective Order, at paragraphs B and E, respectively. If a party disagrees with the designation of a particular document as "Confidential Material" or "Counsel Only Confidential Material," that party "shall provide to the producing party written notice of its disagreement with the designation at any time." Ex. 32 ¶ L. The parties are then to try to resolve the dispute "in good faith on an informal basis." *Id.* Then, "[i]f the dispute cannot be resolved, the party challenging the designation may request appropriate relief from the Court." *Id.* There is no provision, however, that a party may foist a class of designated documents back onto the producing party and force it to re-evaluate them wholesale.

Defendants have followed the approved procedure. Whenever Plaintiffs have raised the propriety of a document's confidentiality designation, Defendants have reviewed the document and provided Plaintiffs with a response. Plaintiffs do not and cannot cite a *single instance* in which they have brought an allegedly misdesignated document to Defendants' attention and

Defendants have improperly refused to redesignate the document. In other words, the meet-and-confer process has worked exactly as it ought to.

Undeniably, the sheer size of the earlier production and the time constraint imposed by the March 1 production deadline made it impossible to conduct a document-by-document confidentiality review prior to the production. Defendants therefore preliminarily assigned the "Counsel Only" designations to documents maintained by TDCC's global business directors, knowing that those custodians maintain some of the most confidential and proprietary documents created within TDCC's business. *See* Ex. 30, ¶ 8 (Declaration of A. Marovitz). But Plaintiffs' suggestion that Defendants have not conducted, and indeed refused to conduct, a document-by-document confidentiality review of the documents produced in the earlier production (Pls. Br. 21) is patently false. After Plaintiffs notified Defendants that some documents containing no sensitive business information had been designated as "Counsel Only," Defendants undertook a document-by-document review of all of the documents that had been so designated.[7] Defendants completed the re-designation review of some 57,000 images within the month.

Thereafter, the parties continued to utilize the Protective Order's dispute resolution process. On July 15, 2005, Plaintiffs complained that a handful of documents continued to be improperly designated as "Counsel Only," and suggested that Defendants re-review their confidentiality designations. Ex. 34 (Letter from A. Downey to A. Marovitz, D. Douglas, and S. Solberg, dated July 15, 2005). Defendants reviewed the documents Plaintiffs cited and promptly agreed to reduce the level of confidentiality assigned them, in accordance with the Stipulated Protective Order. Ex. 35 (Letter from D. Douglas to A. Downey dated July 21, 2005). Just as

---

[7] In response to Plaintiffs' complaint that this re-designation review was hindering their review of Defendants' production because "Counsel Only" documents were produced alongside documents that had not been so designated, Defendants promptly sent Plaintiffs a production hard drive containing all of the recently-produced documents that had not been so designated. *See* Ex. 33 (Letter from D. Douglas to R. Taffet, dated April 2, 2005).

17

the Stipulated Protective Order contemplated, when Plaintiffs notified Defendants of improper confidentiality designations, Defendants responded cooperatively.

What Defendants have refused to do, however, is to conduct *yet another* wholesale review of all their designations, as Plaintiffs have demanded.  Plaintiffs argue that the Court should abrogate the Stipulated Protective Order's dispute-resolution process and order the categorical removal of the remaining "Counsel Only" designations.  But Plaintiffs cannot explain why the process set forth in the Stipulated Protective Order will not continue to suffice to resolve disagreements over confidentiality designations.  Plaintiffs apparently wish to punish Defendants for declining to incur yet more costs that, like those connected with the Current Requests, will not further the resolution of this litigation.  The Stipulated Protective Order's dispute resolution process has worked and will continue to do so, as long as Plaintiffs are not permitted to circumvent it.  Accordingly, the Court should deny Plaintiffs' request to remove all "Counsel Only" designations from Defendants' production.

## IV.    Plaintiffs' Motion For Sanctions Is Baseless.

As noted above, Plaintiffs' focus on sanctions is an attempt to divert this Court's attention from the fact that their new requests (1) admittedly "echo" many of their earlier ones and (2) demand other documents not relevant to the claims at issue.  Even so, Plaintiffs' sanctions-happy approach to the litigation is unwarranted on its face.  A brief overview of Defendants' production, within the context of Plaintiffs' accusations, demonstrates this.

### A.    Defendants' Document Productions

As outlined in the Introduction (*see supra*), for the past two years, Plaintiffs have had 80,000 of the key documents for this case. These substantive documents – produced during the initial, *forum non conveniens* phase of this case – included documents that mentioned MegaVisa, the basic transaction documents, documents from Dow India and e-mails regarding prices paid

for the Products. These documents – which are relevant to all three of Plaintiffs' remaining counts (resale price maintenance, breach of contract and tort claims) – were produced from the following sources:

- UCC's Vermont document repository;

- UCC's Archive Master Index files;

- Union Carbide Corporation Singapore files;

- Dow Chemical Pacific (Singapore) files;

- Dow Chemical International Private Ltd. files;

- Dow Chemical Asia Pacific files;

- Dow Europe files related to Plaintiffs;

- TDCC files related to Plaintiffs;

- UCC files related to Plaintiffs;

- E-mail from the United States, Singapore, India and Europe related to Plaintiffs; and

- Files of relevant employees as requested by Plaintiffs.

Unsated by these documents, Plaintiffs pressed for global discovery. The parties disputed the propriety of Plaintiffs' global requests, and this Court ultimately granted in part and denied in part the parties' discovery motions regarding them. *See* Order (June 29, 2004). Among other things, the Court required Plaintiffs to identify the End Users subject to the discovery request and required Defendants to produce documents beyond those relating solely to India.[8] Following a motion for clarification about the scope of the Order – and following Plaintiffs' usual request for

---

[8]Plaintiffs' Complaint had not identified the specific "Products" or "End Users" at issue.

sanctions as a result[9] – the Court denied the sanctions motion and suggested that the parties explore "less burdensome alternatives" to the worldwide discovery requested by Plaintiffs. *See* Order (August 17, 2004).

Defendants began the arduous process of developing a worldwide document collection plan, as well as proposing less burdensome alternatives of discovery to Plaintiffs. Defendants proposed to collect responsive documents relating to the United States, India and the Asia Pacific. *See* Ex. 38, ¶ 7 (Declaration of D. Douglas). When Plaintiffs rejected this offer (*see id.*), Defendants began collecting documents from the location where the widest range of documents related to markets worldwide are maintained: the UCC and TDCC document storage warehouses. To that end, Defendants' outside counsel traveled to the warehouses to make a preliminary assessment of whether the documents maintained in the warehouses were responsive to Plaintiffs' earlier requests. *Id.* at ¶ 3. After reviewing a sample of the boxes of documents, counsel determined that the documents were responsive to Plaintiffs' earlier requests related to the sales, marketing, manufacture, pricing, allocation and shipment of Products as well as terms of sales to End Users. *See, e.g.* Ex. 3, Document Request Nos. 3, 5, 7, 8, & 26; Ex. 4, Document Request Nos. 7, 15 & 30. A team of paralegals was quickly assembled to help review the 1,014 boxes identified as potentially containing responsive documents. Ex. 38, ¶ 5. As the enormity of the project became more clear, attorneys, contract paralegals and additional full-time paralegals were added to the document review. *Id.* This team included lawyers and paralegals from five different offices of two separate law firms *Id.*

Defendants began their rolling production of these numerous boxes of responsive documents on September 29, 2004. Ex. 39 (Letter from A. Marovitz to R. Taffet, dated Sept. 29,

---

[9] *See* Plaintiffs' Cross-Motion To Compel Compliance with the Court's June 29, 2004 Order and for Sanctions (July 20, 2004).

2004). Upon beginning to receive the documents that they had demanded, Plaintiffs requested an in-person status conference with the Court, where they explained that they no longer wanted to receive routine transaction documents (despite the fact that their earlier requests contained no such limitation). Ex. 30, ¶ 3. On October 6, 2004, after learning of the burden of the task undertaken by Defendants, the Court instructed Defendants to stop reviewing the transaction documents and to develop a plan to collect the types of documents Plaintiffs intended to target in their earlier requests. *Id.*

Defendants did just that. They kept Plaintiffs' counsel and the Court informed, in writing, of the massive search that was being undertaken and the types of documents that were being produced. *See* Ex. 9 and 10. Defendants detailed the kinds of files that would be searched to ensure that their efforts would be directed at the documents Plaintiffs most wanted, making further widespread searches unnecessary. As identified in our earlier brief (at 3-4), Defendants collected files containing

> strategic planning documents; e-mails from persons identified in the interrogatory answers; board presentations and minutes; documents regarding Plaintiffs; documents regarding End-Users in India and the U.S.; documents evaluating competition regarding the Products; presentations, budgets, forecasts and similar documents discussing competition for, market share of and pricing of the Products; marketing materials; documents related to the merger transaction between TDCC and UCC; Product-specific materials; trade association files; and accounting system data reflecting sales of the Products.

*See* Ex. 9, at 3 (identifying types of files to be searched and methodology). They did so after their counsel interviewed top executives across the country to locate responsive documents. They also did so by engaging an electronic discovery consultant to help search through Defendants' massive data for responsive electronic files.

Unmoved by these efforts, Plaintiffs continued to demand (1) that Defendants produce documents more quickly and (2) that Defendants provide more information about the sources of

the documents being produced. Ex. 30, ¶ 5. Despite the fact that Defendants already had been producing the documents in the order in which they were maintained in the usual course of business, Defendants agreed to provide Plaintiffs with an even more specific identification of the source of the documents' collection.

Plaintiffs also demanded that the Court enter an order setting a production deadline and requiring a certification that Defendants' production was complete. *Id.* at ¶ 6. The Court rejected Plaintiffs' suggestion that the Court require Defendants to certify the completion of their production, because of the complexity of the issues involved and the size of the requested subject matter. *Id.* The Court also instructed the parties to draft an order pertaining to the production date and specification of production materials. The parties drafted the language relying on Defendants' October 15 and December 14 letters and set a general production date of March 1, 2005. The Court entered this order on February 7, 2005. *Id.* at ¶ 7.

In the meantime, Defendants continued to review and process documents for production. On January 12, 2005, Defendants produced three boxes of documents. Ex. 40 (Letter from D. Douglas to R. Taffet, dated January 12, 2005. Two days later, Defendants produced another 22 boxes. Ex. 41 (Letter from D. Douglas to R. Taffet. Dated January 14, 2005). On March 1, 2005, Defendants completed their paper production with the production of another 21 boxes of documents. Ex. 42 (Letter from A. Marovitz to R. Taffet, dated March 1, 2005). The same day, Defendants also completed the bulk of their electronic production with the production of over 1 million pages of electronic documents. All of the documents contained in the electronic production were labeled with bates numbers assigned by custodian – thus, Plaintiffs need only look at a document's bates label to determine from which custodian's files the document was produced.

Not surprisingly, the electronic portion of the production presented several unique issues. Some electronic documents were difficult to process for production. Still, production of these documents followed as they were processed on March 2, 4 and 9. As Defendants undertook to describe the documents contained in the electronic production, they noticed that electronic documents had not yet been produced from custodians' files whose last names began with the letter "B." Defendants quickly raised this issue with their electronic discovery experts, who discovered that those custodians' electronic files had been inadvertently missed during the collection of electronic data. These custodians' electronic files were collected, processed and promptly produced on March 29, 2005, along with files of Lawrence Cheung that had been maintained on CD and were therefore not gathered during the collection of data from TDCC's servers. With the exception of documents identified by the electronic discovery expert as potentially privileged, Defendants believed in good faith that they had produced all responsive, non-privileged documents subject to the Court's February 7, 2005 Order and that Plaintiffs would bring any perceived deficiencies to Defendants' attention.

On March 23, 2005, Defendants received a letter from Plaintiffs stating that Defendants had neglected to collect the files of over 80 individuals. Ex. 43 (Letter from A. Downey to A. Marovitz, dated March 23, 2005). Defendants investigated the matter, and determined that, of the 80 individuals Defendants had named, only eight had files that still needed to be collected and processed for production.[10] Ex. 44 (D. Douglas letter to A. Downey, dated March 29, 2005). Those documents were quickly retrieved, processed and, on May 2, 2005, produced. Plaintiffs also notified Defendants that Defendants' production contained error messages where Plaintiffs

---

[10] The remainder of the individuals were no longer employed by Defendants and their documents, if they exist at all, are no longer maintained on Defendants' servers in a manner that would allow Defendants to identify those documents as having been maintained by those individuals.

believed documents should have been produced. Ex. 45 (Email from A. Downey to D. Douglas, dated May 24, 2005). Again, Defendants followed up with their electronic discovery experts, who discovered a transmission error had produced the error messages, and re-processed the affected documents, to the extent possible. These documents were produced on July 8, 2005.[11]

It is hardly appropriate, in a production of this magnitude from this many sources requiring the expenditure of so much money and time – not to mention the repeated follow-up efforts when requested – that Defendants should be required to respond to yet another sanctions motion from Plaintiffs. Defendants have gone above and beyond their obligations under the discovery rules, at great expense, to provide Plaintiffs with the discovery they requested and to respond to Plaintiffs' questions regarding Defendants' production.

### B.    Plaintiffs Have Failed To Show Any Basis For Sanctions.

As recounted above, Plaintiffs' purported grounds for sanctions are little more than makeweight support for their failure to demonstrate that their newly requested discovery is relevant, and in any event simply do not square with the facts. Indeed, Plaintiffs' sanctions argument seems to boil down to the complaint that Defendants produced too many documents on too many days in a format that Plaintiffs would not have chosen, had the Federal Rules given them that option. Plaintiffs completely ignore the fact that many of their complaints apply with more force to their own production: as noted above and more specifically below, Plaintiffs did not produce a single electronic document, a single index, or any individual custodian references for the paper documents they did provide.

Indeed, each of Plaintiffs' arguments is undermined by the actual facts. First, Plaintiffs neglect to mention that this Court already rejected their demand that Defendants be required to

---

[11] Defendants received subsequent isolated complaints about document size and format, and responded promptly to each, accommodating Plaintiffs' requests.

certify completeness by March 1, because of the likely size of the production. *See* Ex. 46 (E-mails from R. Taffet to A. Marovitz and attached drafts of discovery scheduling order, dated January 3, 2005, January 6, 2005); Ex. 47 (Letter from A. Marovitz to Hon. A. Covello with attached proposed discovery scheduling order, dated January 12, 2005). The Court recognized that in a case this large, there likely would be additional, follow-up productions, which, of course, there were.

Likewise, Plaintiffs also complain about the fact that Defendants produced electronically maintained documents in TIF format. As Defendants previously explained to Plaintiffs and this Court, Defendants produced their electronic production in TIF format because (1) TIF productions are customary in the District of Connecticut; (2) TIF documents can be bates labeled and designated for confidentiality while native files cannot; and (3) production of documents in TIF format guards against the inadvertent manipulation of documents after production and prevents the expense of later having to confirm that documents produced in native format and used as exhibits by the parties were not in fact manipulated. Ex. 48 (Declaration of Craig A. Raabe). Based upon this explanation, the Court did not require Defendants to reproduce their entire electronic production in native format. Even so, when Plaintiffs complained about format problems with a specific set of Excel spreadsheets in the electronic production, Defendants *agreed* to produce those files in their native format and actually did so.[12] Ex. 49 (Letter from D. Douglas to R. Taffet, dated July 1, 2005).

Plaintiffs also take issue with the number of blank pages and documents that Plaintiffs claim that they did not want produced. While there is little doubt that some blank pages and other documents have been produced within the 1.5 million page production, there were in fact

---

[12] To preserve the integrity of the document, Defendants agreed to produce it in native format on the condition that, if Plaintiffs use the document as an exhibit, they use the TIF production copy.

some blank pages that appeared in the responsive documents themselves, particularly in spreadsheets. In any event, complaining about blank pages seems somewhat trivial, given the fact that blank pages can be easily and quickly skipped by reviewers during the review process – that is, unless one wishes to count them for purposes of a sanctions motion.

Plaintiffs' next suggestion – that Defendants improperly produced documents such as product brochures, invoices, material safety data sheets, and bills of lading, which, although unquestionably responsive to the actual requests, Plaintiffs indicated they did not wish to receive – is no basis for sanctions. Many such documents were attached to other responsive documents, and thus needed to be produced.[13] Further, as Plaintiffs and this Court are aware, Defendants hired a sophisticated electronic discovery expert to search through the massive amount of files maintained on Defendants' electronic servers. With requests as broad as the requests served by Plaintiffs, and Plaintiffs' unending accusations that Defendants are trying to hide the documents Plaintiffs want, Defendants and their discovery expert chose to capture more documents rather than fewer in an effort to ensure that responsive, non-privileged documents were included within the production. The very fact that Plaintiffs took the time to argue over these allegedly irrelevant documents, rather than simply push them aside, is clear evidence of Plaintiffs' intent to make this case about discovery rather than the merits. Casting a wide net in a case this broad in order to ensure that Plaintiffs have all of the documents that they requested cannot serve as a basis to impose sanctions.

In their most baseless argument, Plaintiffs argue that Defendants should be sanctioned because Defendants have a searchable database that they have not been willing to provide to

---

[13] For example, Plaintiffs' earlier requests instruct Defendants to produce documents that are stapled or attached to responsive documents. Documents such as certificates of analysis and material safety data sheets typically were found attached to documents such as order forms and transaction documents, which were collected and produced under Plaintiffs' Second Document Request No. 7, which requires the production of all documents related to the pricing of Products to End-Users. Ex. 4.

Plaintiffs free of charge. As shown above, Defendants offered to provide Plaintiffs with an exact duplicate of the objective portion of their document database provided that Plaintiffs pay half the cost of creating the database, or $685,000.[14]  Ex. 50 (Letter from C. Kelly to R. Taffet, dated May 20, 2005). After Plaintiffs rejected this offer, Defendants then agreed to provide Plaintiffs with a searchable index of Defendants' document production.   This comprehensive index provides Plaintiffs with the same objective information that Defendants coded in their database.[15] Plaintiffs make much noise over the fact that they requested a "Subject" field that was not included in the index, but they overlook the fact that Defendants' database never contained such a field, and Defendants committed to providing only the objective information that they had. Not surprisingly, Plaintiffs' brief provides no support for the proposition that Plaintiffs can shift their own litigation costs to Defendants in this regard. In light of the fact that the index already lists the "Titles" of the relevant documents, such a Subject field was not developed by Defendants.

Defendants do not dispute that creating their database has been costly. But this cost cannot serve as a basis for the Plaintiffs to gain access to the database free of charge. Similarly, while converting electronic document images into searchable text is not cost-free, Defendants are not obligated to produce their documents in a searchable format. ***Plaintiffs have not produced a single document to Defendants in electronic format, let alone in a searchable electronic format.*** Instead, Defendants bore the cost of performing optical character recognition in order to build a searchable database from Plaintiffs' documents.   ***Nor have Plaintiffs provided Defendants with any index, searchable or otherwise, to their documents.*** Yet Plaintiffs would have the Court sanction the Defendants for having provided them *only* with electronic document

---

[14] Defendants created the database solely for the purposes of this litigation.

[15] These coding fields include: To, From, Copy, Title, Author, Date, and Confidentiality Designation.

images, readily convertible into searchable text, and a fully searchable index to all the documents Defendants have produced in this matter. Plaintiffs' complaints do not warrant serious attention.

Finally, Plaintiffs accuse Defendants of spoiling certain documents. This grave accusation is false and Plaintiffs know it. Last October, Defendants agreed to search the electronic files of all individuals named in discovery. Ex. 9. Defendants did just that – the name of every individual named in discovery was provided to TDCC's information technology department, which searched TDCC's servers for documents maintained by those individuals. Those files that were found were provided to Defendants' electronic discovery expert to search for documents responsive to Plaintiffs' earlier discovery requests. Responsive, non-privileged documents were processed for production. When Plaintiffs pointed out that Defendants had designated no documents maintained by certain individuals named in discovery, Defendants went back and re-checked their search. Ex. 44 (Letter from D. Douglas to A. Downey, dated March 29, 2005). All newly discovered documents were processed and produced. *Id.* Plaintiffs, however, continued to question whether Defendants had searched properly for responsive documents. Ex. 52 (Letter from R. Taffet to A. Marovitz, dated June 8, 2005). In response, Defendants explained their document retention policies. Ex. 53 (Letter from A. Marovitz to R. Taffet, dated June 23, 2005). Moreover, Defendants already had produced documents setting forth their document retention policies early in the production. *See* Ex. 54 (Defendants' Response No. 26 to Plaintiffs' Fourth Request for Production of Documents (May 16, 2005) (citing bates label references for production copies of TDCC's and UCC's document retention policies)).

Still, the events of this case took place many years ago and many individuals named in discovery are no longer employed by Defendants. Many of them retired around the time of

TDCC's acquisition of UCC, well before Plaintiffs filed suit. Simply stated, many documents that Plaintiffs have demanded ceased to exist long before this litigation commenced as a result of valid records management programs. Empty allegations and innuendo are insufficient to support a spoliation claim and should not be credited by this Court.[16]

---

[16] Amazingly, Plaintiffs' own 30(b)(6) designee, Ajay Mittal, testified that that documents were destroyed *after* Plaintiffs filed this case but *before* Plaintiffs responded to Defendants' merits document discovery. *See* Ex. 55 at 116-122 (Deposition of Ajay Mittal, July 28, 2005). *These* are facts that give rise to concerns about spoliation.

## IV.    CONCLUSION

Defendants respectfully request that the Court grant Defendants' Combined Motion for a

Protective Order and deny Plaintiffs' Cross-Motion to Compel Further Responses to Discovery,

to Remove "Counsel Only" Designations, and for Sanctions.

Respectfully submitted,

Craig A. Raabe (ct 04116)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  05103-3497
(860) 275-8304

Nathan P. Eimer (ct 23693)
Scott Solberg (phv 0234)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL  60604
(312) 660-7600

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
71 S. Wacker Drive
Chicago, IL  60606
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, DC  20006-1157
(202) 263-3000

***Counsel for Defendants The Dow Chemical Company,***
***Union Carbide Corporation and Union Carbide Asia Pacific, Inc.***

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing *DEFENDANTS' COMBINED REPLY IN SUPPORT*

*OF MOTION FOR PROTECTIVE ORDER AND OPPOSITION TO CROSS-MOTION TO COMPEL FURTHER R*

*ESPONSES TO DISCOVERY, TO REMOVE "COUNSEL ONLY" DESIGNATIONS, AND FOR SANCTIONS* as

mailed via first-class mail, postage prepaid, on this 12th day of September, 2005, to the following

counsel of record:

Richard S. Taffet, Esquire
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

Suzanne Wachsstock, Esquire
Wiggin & Dana LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325

Robert M. Langer, Esq.
Wiggin & Dana LLLP
CityPlace
185 Asylum Street
Hartford, CT 06103


Jason M. Kuselias