UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

MM GLOBAL SERVICES, INC., MM GLOBAL
SERVICES PTE., LTD., AND MEGAVISA
SOLUTIONS (S) PTE, LTD.,

                             Plaintiffs,

           v.

THE DOW CHEMICAL COMPANY, UNION
CARBIDE CORPORATION, UNION CARBIDE
ASIA PACIFIC, INC., UNION CARBIDE
CUSTOMER SERVICES PTE. LTD., AND DOW
CHEMICAL PACIFIC (SINGAPORE) PTE. LTD.,

                           Defendants.

CIVIL ACTION
NO. 3-02 CV 1107 (AVC)

October 3, 2005

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR CROSS-MOTION TO
COMPEL FURTHER RESPONSES TO DISCOVERY, TO REMOVE "COUNSEL
ONLY" DESIGNATIONS, AND FOR SANCTIONS**

BINGHAM McCUTCHEN LLP
Richard S. Taffet (ct 10201)
Alicia L. Downey (ct 22066)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

-and-

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

*Attorneys for Plaintiffs MM Global Services Inc., MM Global Pte. Ltd.
and Megavisa Solutions (S) Pte. Ltd.*

# TABLE OF CONTENTS

Table of Authorities .......................................................................................................... ii

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     UPDATE ON STATUS OF DISCOVERY ........................................................ 4

III.    ARGUMENT ............................................................................................................ 8

        A.     Defendants Fail to Rebut Plaintiffs' Showing of the Relevance and Need
               for Responses to the Current Requests .................................................. 8

        B.     Defendants Cannot Show Undue Burden In Complying With the Current
               Requests .................................................................................................. 10

        C.     The Problems With Defendants' Document Production Are Real, Not
               Pretextual ................................................................................................ 12

        D.     Defendants' Criticism of Plaintiffs' Document Production Is Baseless ............. 14

        E.     Plaintiffs Should Be Permitted to Explore the Possibility that Defendants
               Failed to Preserve Relevant Documents ............................................... 15

        F.     Defendants' "Counsel Only" Documents Merit No Further Special
               Protection ................................................................................................ 17

        G.     Plaintiffs Have Demonstrated Ample Basis For an Award of Sanctions ........... 19

IV.     CONCLUSION ...................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Ahern v. Trans Union LLC*, 3:01 Civ. 02313, 2002 WL 32114492
(D. Conn. Oct. 23, 2002)............................................................................................11

*Cavaliere v. Margaretten & Co.*, No. 94 CV01928, 1996 WL 637834
(D. Conn. Mar. 28, 1996)...........................................................................................8

*Compagnie Francaise d'Assurance Pour Le Commerce Exterior v. Phillips
Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y. 1984)..........................................................11

*In re Folding Carton Antitrust Litigation*, 83 F.R.D. 260 (N.D. Ill. 1979) ........................8

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 179 F.R.D. 77
(D. Conn. 1998) .........................................................................................................20

*Omega Engineering, Inc. v. Omega, S.A.*, 3:98 Civ. 2464 (AVC), 2001 WL
173765 (D. Conn. Feb. 6, 2001) ................................................................................11

### RULES

Fed. R. Civ. P. 37(b) .........................................................................................................20

# I.    PRELIMINARY STATEMENT

Plaintiffs MM Global Services, Inc., MM Global Services Pte., Ltd., and Megavisa Solutions (S) Pte., Ltd. (collectively, "plaintiffs") hereby respond to the arguments submitted by defendants The Dow Chemical Company ("Dow"), Union Carbide Corporation ("UCC"), and Union Carbide Asia Pacific, Inc. ("UCAP") (collectively, "defendants") in opposition to Plaintiffs' Cross-Motion for various forms of discovery-related relief.  From defendants' submission, two conclusions can be drawn:

*First, defendants should be sanctioned for failing to comply with the Court's Orders.* On June 29, 2004, August 17, 1004, and February 7, 2005, defendants were told by the Court *when* and *how* to comply with plaintiffs' outstanding discovery requests.  In their Combined Reply and Opposition brief filed September 12, 2005  ("Combined Reply/Opp."), they cite no facts or legal authority excusing them from the consequences of their noncompliance with these Orders.

Nowhere in defendants' papers do they deny, for they cannot, that their initial phase of merits document production did meet the deadline set forth in the February 7, 2005 Scheduling Order, or that tens of thousands of their electronic documents are missing, untraceable, or unreadable, or that even today their document production remains incomplete in material respects.  Indeed, defendants have only just now disclosed that they gathered, reviewed, numbered, and indexed more than 200,000 additional pages of paper documents before October 6, 2004, but *never produced them.*[1]  The delays and deficiencies go far beyond what defendants call "petty complaints."

---

[1] See accompanying Supplemental Declaration of Alicia L. Downey ("Downey Suppl. Decl.") ¶ 11.  This huge gap in defendants' production was discovered only because plaintiffs' searches of the electronic index repeatedly identified entries for which they could not find any corresponding hard copy or electronic documents.  Plaintiffs had no access to any of these documents while preparing for and taking depositions of defendants' 30(b)(6) witnesses in July and August.  Defendants have now produced 66 boxes containing the missing documents, but that will not change the fact that they were withheld for a year.

Rather than acknowledge and admit that their discovery efforts over the past twelve months were intended to and in fact resulted in plaintiffs wasting hundreds of hours and hundreds of thousands of dollars reviewing and trying to make sense of an impenetrable document production, defendants presume to tell the Court what this case is about, and to argue, on this basis, that plaintiffs' discovery rights should be limited. Yet again they miscast this case as one that concerns limited geography (i.e., only India and the U.S.) and limited issues (i.e., the effects on U.S. commerce caused by sales to Indian end users). The Court has rejected such a narrow view of the issues presented on multiple occasions. The Court should do so once more.

***Second, defendants' objections to the Current Requests are invalid.*** Defendants' objections to responding to the Current Requests are based on (a) false distinctions between what is and is not relevant to this case, (b) misrepresentations regarding their compliance with plaintiffs' previous requests, (c) unsupported assumptions and generalizations as to the likely burden of compliance; and (d) a deliberate misreading of plaintiffs' discovery requests. Indeed, the bulk of their brief does little more than repeat the arguments they presented in support of their initial Motion for Protective Order. Those arguments, which were and still are unsupported by any apt legal authority or specific facts, are no more persuasive now for having been stated another two or three times.

Another false premise underlying defendants' opposition to further discovery is their deliberate misreading of plaintiffs' past and current discovery requests. Defendants want the Court to believe that the mess they made of their document production and the months it has taken plaintiffs to wade through a morass of irrelevant, unrequested, and unreadable material, are just "the natural consequences" of propounding overbroad requests. *See* Combined Reply/Opp. at 5, 6. Plaintiffs' previous requests were not unreasonably broad, and, furthermore, this argument ignores the numerous discovery conferences and agreements reached among counsel over the past eighteen months, as well as the Court's Orders dated June 29, 2004 and August 17, 2004. Taken together, the requests, agreements, and Orders provided defendants with the guidance they needed to be able to respond fully without incurring any undue burden. Against

this backdrop, they have failed to offer any compelling reason why the Current Requests should remain completely unanswered.

Defendants purport to bolster their arguments with the presumptuous declaration that plaintiffs do not *need* any more documents because plaintiffs' claims have no merit. After all, they say, "[i]f there were any real evidence that there was a meaningful connection between the sale and distribution of the Products in India and United States commerce, Plaintiffs would have obtained it." *See* Combined Reply/Opp. at 5. As a threshold matter, it is notable that this argument is directly akin to the one made by defendants throughout this case—in essence, they should not be put to the trouble of defending because in their view there is no merit to the claims asserted against them. The Court has already made it clear that the evidence will be dispositive of this issue, and not defendants' wishful declarations. This is not the juncture of the case for the merits of plaintiffs' case to be addressed. At the appropriate time plaintiffs will present evidence (some of which has already been conclusively established), demonstrating, among other things: defendants' admissions that they fixed the minimum resale prices at which plaintiffs could sell their products; the direct and immediate link between and the dependent nature of defendants' price fixing conduct and the anticompetitive effects resulting from such conduct in the United States; conduct by defendants that constitutes breach of contract as alleged by plaintiffs; and proof that they tortiously harmed plaintiffs in a manner that resulted in the destruction of plaintiffs' business, notwithstanding extraordinary measures taken by plaintiffs to mitigate against such a result.

If defendants' argument were to be accepted by this or any other federal court as grounds for truncating discovery, the Rules of Civil Procedure would be nullified. As eager as defendants may be to seek summary judgment, they should know that until they have complied with their obligations, any such motion would be premature. The same is the case with defendants' argument that plaintiffs have not demonstrated a need for more discovery because they took depositions using exhibits selected from defendants' productions. First, depositions of defendants' witnesses, including Rule 30(b)(6) witnesses, are far from complete. Even now

defendants are resisting and delaying making such witnesses available.[2]  Second, determining the

likely success of plaintiffs' claims certainly is not a function of which documents are used in

selected depositions.  Third, irrespective of what documents may have been chosen to be used in

depositions of defendants' witnesses, they have no excuse for withholding relevant documents or

for the manner in which they have sought to impose unnecessary and undue burdens and costs on

plaintiffs.

     In sum, defendants' submissions make it plain that all they are trying to do—just as they

did a year ago—is seek reconsideration of substantive matters on which the Court has already

ruled.  The Court should reject this latest invitation to adopt defendants' view of the merits.

Defendants should be required to comply with the Court's Orders and their discovery

obligations, and in light of their gross and unapologetic abuse of both, they should be sanctioned

accordingly.

## II.     UPDATE ON STATUS OF DISCOVERY

     Since plaintiffs filed their Cross-Motion, there have been further developments

concerning the discovery issues now before the Court.  (Plaintiffs will of course provide a further

update to the Court in the event that their request for oral argument on their Cross-Motion is

granted.)  Briefly, the Court should be aware of the following:

### 1.     *Defendants Withheld More Than 200,000 Pages of Documents From Production.*

     On September 22, 2005, in a conference call among counsel to discuss various ongoing

discovery-related issues, including the scheduling of further depositions, defendants' counsel

---

[2] For example, on June 20, 2005, defendants identified John Yimoyines and Kevin Dillan,
two key witnesses formerly employed by UCC and now employed by Dow, as 30(b)(6)
witnesses to testify on numerous topics on behalf of UCC and Dow.  Ever since then, plaintiffs
have fruitlessly asked for dates on which to take their depositions.  As of the date of this
submission, it now appears that defendants will not make Mr. Yimoyines available until
November 9, 2005, at the earliest, while Mr. Dillan has been proposed for December 8-9, 2005.
*See* Downey Suppl. Decl. ¶ 12.

disclosed, for the first time, that defendants did not produce approximately 200,000 pages of documents that, before October 6, 2004, had been gathered, Bates-numbered, indexed and placed "in the pipeline" for production.[3]  Downey Suppl. Decl. ¶ 11.  Defendants' disclosure was prompted only by questions raised by plaintiffs' counsel after confusing and time-consuming searches for documents that appeared on the index but could not be located.  Not until September 30, 2005, did defendants concede that such documents should be produced.  Sixty-six new boxes of paper documents were delivered to plaintiffs' counsel, finally, on October 3, 2005.[4]

## 2.      Defendants' 30(b)(6) Witnesses Identified Categories of Key Documents Which Were Unidentifiable From Defendants' Production.

During Mr. Neri's deposition on August 23, 2005, Exhibit 101 was identified as setting forth certain merger integration activities undertaken by groups identified as the Integration Executive Committee, Integration Team, Integration Program Team, etc.  Downey Suppl. Decl. Ex. A.  Mr. Neri testified that these teams, which included both UCC and Dow personnel, "would be put together in committees in like what they called . . . a clean room."  Downey Suppl. Decl. Ex. B, Neri Dep. at 87.  They dealt with "confidential information that couldn't be shared with anyone else."  Id. at 92.

Using only the index and vague subject matter categories provided by defendants, plaintiffs have been unable to locate any work papers, communications, or output of these groups that should have been produced in response to their outstanding request for merger-related

---

[3] The only explanation offered by defendants for withholding these documents is their claim that in the October 6, 2004 status conference, the Court *directed* them to cease their production efforts so that less burdensome alternatives could be pursued.  The defendants do not explain, however, why the Court would order them not to produce responsive documents that neither the Court nor the plaintiffs knew were ready to be produced.

[4] To plaintiffs' knowledge, defendants had the option of producing these documents in electronic format; as they have indicated, all of their reside in their own fully searchable database.  They chose not to do so, even though it would be far less expensive and far less unwieldy.  That they elected to ship 66 boxes of paper on a day's notice is just further evidence of defendants' intent to prevent efficient access to their production, while purporting to "give plaintiffs what they want."

documents. Indeed, this category of merger-related documents is one that plaintiffs have repeatedly and unsuccessfully asked defendants to locate in their production. *See, e.g.,* Downey Aug. 5 Decl. Ex. R at page 2 (raising questions about defendants' production of merger-related documents). As of the date of this submission, therefore, plaintiffs still have no way of determining what has or has not been produced in response to the Court's June 29, 2004 Order granting plaintiffs' motion to compel in this regard.

Eugene Fisher, UCC's former export sales director based in Danbury, testified in his deposition that he circulated monthly written lists, or "scrolls," of the global "floor price" for each Wire & Cable Product during the relevant time period. Downey Suppl. Decl. Ex. C, Fisher Dep. at 39 ("There was only one floor price, and the same telex went to everybody."). He stated that these were kept on file on paper and on computers "ad infinitum." *Id.* at 42. Using the index provided by defendants, however, plaintiffs have been unable to verify that any such lists were produced, much less locate them in the over 150 boxes and 1.5 million electronic images delivered by defendants.

On September 30, 2005 defendants at least represented that they would attempt to identify these documents from among those produced, but as has been their *modus operandi* throughout, they gave no indication of when such steps would actually be taken. Thus, not only have plaintiffs been deprived of the opportunity to use these documents in connection with Mr. Fisher's deposition, plaintiffs also face the prospect of being deprived of them for upcoming depositions of defendants' additional witnesses.

### 3.    *Defendants Have Improperly Asserted the Attorney-Client Privilege and Work Product Doctrine to Withhold Responsive Documents.*

On August 31, 2005, defendants' counsel sent a letter asking plaintiffs to return or destroy more than 130 documents on the grounds that they were "inadvertently" produced privileged communications. Downey Suppl. Decl. Ex. D. The letter provided no information concerning the basis for the belated designation of these documents as "privileged." Although the letter indicated that defendants would be producing certain of the documents in redacted form

"shortly after the [Labor Day] holiday weekend," redacted versions were not delivered until September 30, 2005, and still more followed on October 3, 2005. *Id.*; Downey Suppl. Decl. <u>Ex. E</u>.

According to the letter that accompanied the redacted documents, defendants changed their mind, again, and have now withdrawn the privilege claim as to twenty-five of the documents. Downey Suppl. Decl. <u>Ex. E</u>. Forty-one have been designated as "privileged in their entirety," while the rest are presumably included in the set of redacted documents. *Id.* The September 29 letter repeats the demand for the return or destruction of the now-reduced number of "privileged" documents, but still does not suggest any basis for the belated designation. They are not even identified as communications between defendants and their attorneys. For that reason, plaintiffs have informed defendants that they will decline to return or destroy the documents until there is some basis upon which to conclude that the documents (in whole or in part) are in fact immune from discovery, and even assuming such a basis exists, that the documents were in fact produced inadvertently. Plaintiffs have requested such explanations, but defendants have given no indication that they will be forthcoming.

Plaintiffs' position regarding the foregoing belated claim of privilege is further warranted based upon defendants' claims of privilege generally. Defendants' privilege log raises systemic questions about the validity of their claims of privilege and work product as the basis for withholding responsive information and documents. *See* Downey Suppl. Decl. <u>Ex. F</u>. Many of the communications listed in the log do not reflect that any lawyer was the author or recipient, and many were apparently sent or copied to third parties (e.g., D00000008, from Citibank; D00000017, from State Bank of India; D00000440A, from plaintiffs' principal Ajay Mittal; DP0007483 and DP0003398-3402, from Ronald Neri to Lawrence Cheung (both businesspeople)). Furthermore, despite the existence of the Stipulated Protective Order, many documents have apparently been withheld or redacted because, according to the log, they are "work product" concerning "current business involving End User(s)" (e.g., D0000018) or they contain "proprietary info re: non-responsive products and end users," "proprietary info re: sales

- 7 -

data and forecasts," and the like (e.g., D00417254; D00417326, D00418100, D00419230), or they contain "personal and irrelevant information" (e.g., D00380275). On the face of the log, therefore, it appears defendants have invoked nonexistent privileges to avoid producing perhaps hundreds of documents, including those concerning their business dealings with plaintiffs' former customers.

In light of the above, plaintiffs have requested defendants' counsel to reconsider the withholding of such documents, but other than the typical "we will consider it" response, defendants have done nothing to explain their abusive assertion of claims of privilege.

## III.    ARGUMENT

### A.    Defendants Fail to Rebut Plaintiffs' Showing of the Relevance and Need for Responses to the Current Requests.

Defendants claim that certain of the Current Requests are duplicative and those that are not duplicative, are irrelevant. These are not arguments; they are conclusions. Notably, defendants cite no case in which a party was granted immunity from further discovery under circumstances remotely similar to those presented here. The Combined Reply and Opposition does not even attempt to distinguish the cases cited in support of plaintiffs' motion to compel.[5]

Defendants' argument that the information plaintiffs seek is "irrelevant" requires the Court to accept their tunnel vision as to what is "relevant"—a vision this Court has already

---

[5] *See, e.g.*, *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 260, 264-65 (N.D. Ill. 1979) (ordering responses to interrogatories where there was no assurance that documents produced in response to previous document requests would fully provide answers); *Cavaliere v. Margaretten & Co.*, No. 94 CV01928, 1996 WL 637834 (D. Conn. Mar. 28, 1996) (denying motion to compel where responding party had sufficiently "identified the documents that contain the information sought); *Nonferrous BM Corp. v. Daniel Caron Ltd.*, No. 94 Civ. 7705, 1996 WL 208182 (S.D.N.Y. Apr. 26, 1996) (ordering sworn answers to interrogatories where defendant had failed to provide a 'detailed specification as to which documents contain the answers [to the interrogatory]' and where 'defendant [would] be able to extract the information from the documents more quickly than [the] plaintiff, and with substantially less burden'); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y. 1984) (granting motion to compel answers to 183 interrogatories with 500 subparts where defendant's response was " to foist a mass of records on his interrogator when their deciphering [was] feasible only for one familiar with the records").

rejected on numerous occasions. They claim that plaintiffs "have not even alleged" global price-fixing efforts by defendants, relieving them of any duty to conduct global searches for information. Combined Reply/Opp. at 8-9. Likewise, information that "has nothing to do with resale price maintenance in India," they say, is irrelevant. *Id.* at 9. The Court has rejected such assertions on several previous occasions. The law of this case is that plaintiffs did allege *global* price-fixing efforts by defendants. *See* Downey Aug. 5 Decl. Ex. D, August 17, 2004 Order ("plaintiffs specifically allege that their Sherman Act claims implicate all global markets for the products"). The law of this case is that the plaintiffs' antitrust claims do *not* exclusively concern resale price maintenance "in India." *See id.*; *see also* Defendants' Ex. 25, June 29, 2004 Order at 8. Whether in a discovery motion or motion for summary judgment, defendants cannot prevail by falsely framing the issues.

Defendants' relationships with their other distributors are another subject that defendants insist is "irrelevant." As a threshold matter, defendants do not offer any response to plaintiffs' argument that such information bears directly on showing the pretextual nature of defendants' "credit squeeze" on plaintiffs in late 2001. *See* Plaintiffs' Initial Brief dated August 5, 2005 ("Plaintiffs' Initial Brief"), at 32. That is reason alone to compel responses to Interrogatories 1-6 and 11-12.

In addition, plaintiffs allege they were independent resellers of defendants' products (see Amended Compl. ¶¶ 20-26), and, thus, defendants' conditioning their sales to plaintiffs on plaintiffs' agreement to minimum resale prices was unlawful under the Sherman Act. Although the evidence developed to date conclusively establishes that this was the nature of the parties' relationship and that defendants admittedly fixed the minimum resale prices plaintiffs could charge,[6] defendants no doubt will attempt to ignore this evidence and seek to characterize their

---

[6] *See*, e.g., Downey Suppl. Decl. Ex. G, Moorthy Dep. at 256 (Megavisa "had to discuss every sale, they had to talk to the UCAP product directors or sales managers" and obtain approval for the price to their end users).

conduct as not constituting price fixing, perhaps by arguing that plaintiffs were merely agents and not resellers of the products. This being the case, the similarities and differences between defendants' relationships with distributors and agents and their relationship with plaintiffs are plainly relevant to the issue of plaintiffs' role in defendants' distribution chain.

Furthermore, defendants have the ability to comply with the requests for information concerning other distributors and agents. For example, there is evidence that UCC used a "standard distributor contract."[7] Likewise, Ronald Neri, the former president of UCAP, was able to recall in his deposition that a New Zealand entity had a relationship with UCAP governed by standing letter agreements, although he could not recall their terms in any detail.[8] Plaintiffs' Cross-Motion regarding these and the other interrogatories (Nos. 7-8, 9-10, 13-15, 16-17, 18-23) for which plaintiffs have offered sufficient justification in their Initial Brief should therefore be granted.

**B.     Defendants Cannot Show Undue Burden In Complying With the Current Requests.**

Defendants try to persuade the Court to accept, at face value, the repeated assertion that responding to the Current Requests will require them to embark on "another round of global document searches" at a likely expense of millions of dollars. Combined Reply/Opp. at 7. Nothing in defendants' latest submission sheds any more light on why this assertion should warrant releasing them from their discovery obligations now, any more so than in June 2004, when the Court found this same argument to be wanting and unsupported.[9] The mere fact that some knowledgeable people may no longer work for defendants is not necessarily an obstacle to compliance. Indeed, defendants have been working closely with several of their former and current employees, certain of whom were even produced as 30(b)(6) witnesses. They have had

---

[7] Downey Suppl. Decl. Ex. H, Ex. 117.

[8] Downey Suppl. Decl. Ex. B, Neri Dep. at 179-80.

[9] See Defs. Ex. 25, June 29, 2004 Order at 9.

ample opportunity to ask them for responsive information and to inquire about the whereabouts of records containing such information.[10] Nothing in their submission establishes that responsive records are in fact unavailable or that people who might have or know where to find responsive information are in fact unavailable or unwilling to share what they know.

Defendants also suggest that because plaintiffs have not yet taken Mr. Herr's deposition, they have no right to point out that his declaration fails to justify a blanket protective order against responding to the Current Requests.[11] Combined Reply/Opp. at 10. The cases cited by plaintiffs and in the Court's June 29, 2004 Order make clear that the burden is on defendants to show, with *specific facts*, why responding to *each* request and interrogatory poses a *specific, undue* burden. *See, e.g., Ahern v. Trans Union LLC*, 3:01 Civ. 02313, 2002 WL 32114492, *1 (D. Conn. Oct. 23, 2002); *Omega Engineering, Inc. v. Omega, S.A.*, 3:98 Civ. 2464 (AVC), 2001 WL 173765, *2 (D. Conn. Feb. 6, 2001); *Compagnie Francaise d'Assurance Pour Le Commerce Exterior v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984). As previously commented, Mr. Herr's declaration does not meet this standard. It contains only conclusory and argumentative generalizations unsupported by hard data, such as actual invoices or cost estimates for what might be the specific future work actually necessary to respond to plaintiffs' discovery requests.[12] In short, plaintiffs are not to blame when defendants fail to meet their burden of proof.

---

[10] *See, e.g.*, Downey Suppl. Decl. <u>Ex. B</u>, Neri Dep. at 16-19, <u>Ex. G</u>, Moorthy Dep. at 13-14. (testimony by Messrs. Neri and Moorthy regarding their preparation sessions with defendants' counsel).

[11] This argument is patently ridiculous. Plaintiffs have waited for over one year for defendants to designate 30(b)(6) witnesses in response to Notices of Deposition that issued in May 2004. Mr. Herr was designated as a witness in June 2005, while documents were still "rolling in" from defendants. In a meet and confer telephone conference held in July, defendants' counsel was specifically asked to provide dates on which Mr. Herr would be available. Downey Suppl. Decl. ¶ 13. Since that time, repeated oral and written requests to schedule the deposition went unanswered. As of the date of this submission, defendants have indicated that Mr. Herr will not be available until at the earliest November 29. *Id.*

[12] This is in sharp contrast to plaintiffs' submissions, which describe and quantify precisely the defects found in the document production that Mr. Herr's clients spent $3.5 million

(Footnote Continued on Next Page.)

- 11 -

Defendants likewise continue to bemoan the asserted need to search for "twenty years" worth of information and documents. *See, e.g.*, Combined Reply/Opp. at 10. This, too, shows the empty nature of their arguments. Defendants overlook the Court's June 29, 2004 Order, which defined much shorter relevant time periods applicable to various subject matters. They also apparently have forgotten that, in opposing defendants' previous motion for protective order, plaintiffs stated that they would agree to a shorter relevant time period. Here, too, the basic premise of defendants' claim of undue burden is simply wrong and yet another reason to grant the Cross-Motion to Compel.

Finally, it is telling that nowhere in their submission do defendants offer the Court even the suggestion of less burdensome approaches to obtaining and producing all or a portion of the requested information. Plaintiffs do not know the intricacies of defendants' internal information- and document-gathering systems. Indeed, defendants have steadfastly refused to disclose such information. *See, e.g.*, Downey Aug. 5 Decl., Ex. A, Current Requests, Answer to Interrogatory No. 26. Plaintiffs have no basis for knowing whether and in what way to compromise regarding the Current Requests. The fact that defendants insist on nothing less than full immunity from discovery reveals that their intent is not to lessen any undue burden, but to avoid discovery on the merits to the greatest extent possible.

## C.    The Problems With Defendants' Document Production Are Real, Not Pretextual.

Defendants claim they produced documents "as they are kept in the usual course of business." They claim they went beyond the requirements of Rule 34 by providing "bates label prefixes by custodian" and by providing plaintiffs with an electronic index to their production. As a threshold matter, the assertion that defendants maintained their records in the same manner

---

(Footnote Continued from Previous Page.)

to compile, the time it took plaintiffs to review, discover, and confront defendants about those defects, and the categories of costs incurred by plaintiffs because of defendants' noncompliance with the Court's Orders.

that they were produced is manifestly false. The defects in their electronic production alone, in conjunction with their own counsel's admissions to the Court that they never even bothered to review their productions before shipping them to plaintiffs and that they delegated the sorting and imaging of the documents to a third-party vendor, put the lie to such a statement. Defendants do not dispute that thousands of blank or nearly blank images pad their production or that emails were produced without their attachments. *See* Plaintiffs' Initial Brief at 15. They do not dispute that approximately 25,000 electronic spreadsheets were converted into thousands of imaged pages of unintelligible and unusable materials now entirely separated from whatever files to which they originally pertained. *See id.* Plaintiffs are now forced to use pages-long cross-reference lists (the most recent version of which was only produced on September 30, 2005) to make any sense of the gross disorganization of the production. This is not a situation either contemplated or condoned by Rule 34.

Moreover, as noted in their Initial Brief, long before receiving defendants' disastrous electronic production, plaintiffs alerted them to similar problems encountered with the hard copy production. Plaintiffs' Initial Brief at 11. Anticipating that there would be a need to search electronic documents and emails electronically, plaintiffs specifically requested, as early as November 2004, that such documents be produced "in searchable format." Downey Aug. 5 Decl. Ex. N. Defendants did not tell plaintiffs or the Court of their intent to deny this request, however, until after they began producing electronic documents in March 2005. Once they shipped the first collection of such documents, the problems became evident.[13]

---

[13] Mr. Raabe attempts in his Declaration to justify the manner of defendants' electronic document production by asserting that it conformed with Connecticut practice. Mr. Raabe omits any mention of whether Connecticut practice condones the deliberate stripping of all meta data and other tools that would have given plaintiffs the ability to conduct text searches for documents. Also, it is surely not the practice in Connecticut to produce electronic documents that are illegible, out of order, and missing attachments, not to mention, over-redacted and misdesignated as "privileged" or "Counsel Only" when they are no such thing.

- 13 -

Defendants' assertion that they provided "an electronic index of every document Defendants produced in this litigation" (see Combined Reply/Opp. at 12) is as false as their assertion that they complied with Rule 34. As addressed in plaintiffs' prior submission, tens of thousands of documents are *not* identified by the index and, thus, they are effectively inaccessible. See Plaintiffs' Initial Brief at 37. Furthermore, it has now been revealed that for the past three months since it was delivered, the index includes at least 200,000 documents that defendants did *not* produce.

Plaintiffs have already acknowledged that, even with its limitations, they are better off with the index than they were without it. As they have already demonstrated to the Court, however, there remain significant obstacles, both technical and substantive, to reviewing and making use of the production in any efficient and meaningful way. Also—and defendants do not deny this—the index delivered to plaintiffs was only made available by defendants months after it was requested, only days before plaintiffs began taking depositions, and only after defendants repeatedly changed their position to avoid providing it. By the time the index was delivered, plaintiffs had already been required to expend enormous amounts of time and money to address technical problems and to comb through hundreds of thousands of documents. *See* Plaintiffs' Initial Brief at 17-18. Defendants' continued resistance to disclosure of their database and indices ignores the fact that their own conduct led directly to the compelling need for such materials.

### D.    Defendants' Criticism of Plaintiffs' Document Production Is Baseless.

Defendants try to divert the Court's attention from their misconduct by asserting that *plaintiffs'* document productions were inadequate for not being indexed or organized for defendants' benefit. Plaintiffs have complied with the February 7, 2005 Scheduling Order and all prior Orders of the Court, and defendants have not shown otherwise. Documents were produced in this case either as maintained by plaintiffs in the course of their business or in response to specific requests (e.g., plaintiffs' financial statements or the documents produced in response to Dow's Second Set of Document Requests). In all events, plaintiffs' entire document

- 14 -

production is only a fraction of the size of defendants' "document dump," and there has been no showing of any practical difficulty in gaining access to the information contained therein.

Defendants' argument is misleading, if not deliberately disingenuous, because it was the selective "protocol" *they* proposed that created the need to identify their documents by subject matter and by custodian. Not surprisingly, defendants now say little in defense of subject matter categories such as "relating to business activities," even as they suggest that plaintiffs should be estopped to demand answers to discovery because they did not provide equally hollow descriptions of their business records.

The Court should also know this: In April 2005, Eimer Stahl attorney Vanessa Jacobson asked plaintiffs' counsel to produce the bulk of plaintiffs' original document production (approximately 100,000 pages) for a second time, so that they could arrange to have them scanned into computer images by a vendor of their own choosing. Downey Suppl. Decl. ¶ 14. In response to this request, plaintiffs' counsel were reluctant to relinquish possession of the documents (most of which were original business records), and therefore urged defendants' counsel to inspect the documents in person and allow plaintiffs' counsel to arrange for reproducing them through our vendor. *Id.* Ms. Jacobson declined and insisted on delivery of the documents to defendants' chosen vendor for scanning. *Id.* Had defendants' counsel bothered to inspect the original documents for themselves they would have seen documents collected in binders, file folders of different colors, and the actual manner in which documents were attached to and filed next to each other. *Id.* But having chosen not to do so, they received the documents as *their* vendor organized them. Their claim that there were deficiencies in the organization of plaintiffs' production, therefore, is at best based on pure ignorance. To the extent there appear to be any problems, it is defendants or their own vendor who must bear responsibility.

### E.    Plaintiffs Should Be Permitted to Explore the Possibility that Defendants Failed to Preserve Relevant Documents.

Defendants' heated denials that they improperly spoliated documents are off the mark. Plaintiffs have not yet been provided with complete information in response to the discovery

requests designed to explore this issue, and the relief sought by plaintiffs on this motion, therefore, is an order compelling more detailed responses to Interrogatories 24-29 of the Current Requests. By arguing as they do, it is now clear that defendants want to prevent any opportunity for this inquiry to proceed, notwithstanding the showing already made that serious questions exist concerning defendants' possible spoliation of evidence. *See* Plaintiffs' Initial Brief at 18-19.

Avoidance of responding to this discovery also cannot be premised, nor have defendants even sought to do so, upon an argument that such discovery would be unduly difficult or burdensome. Indeed, as noted above, defendants have the ability to contact many of the former employees whose email files are missing and, in the process, they will likely learn something about what became of their documents.[14] Defendants want to be fully relieved, however, of any duty even to investigate the disposition of the missing files. Their extreme position is contrary to the Rules, unsupported by any case law, and should be rejected.

While decrying the injustice of having to answer questions about why individual witnesses' files cannot be located or their apparent destruction explained, defendants point to testimony by plaintiffs' principal officer, Ajay Mittal, that they characterize as an "amazing" admission that "Plaintiffs have discarded documents while this case has been pending." See Combined Reply/Opp. at 2, 29 n.16. Even if this were such an amazing fact, which it is not, it would be no reason to relieve defendants from explaining the absence of key records from their production. What defendants fail to mention in their submission is that Mr. Mittal testified that while this litigation has been pending, the only documents destroyed by plaintiffs were copies of documents that had already been supplied by plaintiffs to their attorneys for review, storage, and

---

[14] For example, Mr. Neri disclosed that upon his retirement immediately after the merger, he turned over all of his files to Dow executive Patrick Ho. Downey Suppl. Decl. Ex. B, Neri Dep. at 8-10. It would have been a simple matter for defendants to contact Mr. Ho and ask about the disposition of Mr. Neri's files.

production to defendants to the extent required.  *See* Downey Suppl. Decl. Ex. I, Mittal Dep. at
120-21.

      **F.**    **Defendants' "Counsel Only" Documents Merit No Further Special
            Protection.**

      Defendants' arguments regarding the redesignation of documents improperly marked

"Counsel Only" is equally disingenuous.  Plaintiffs are not asking the Court to abandon the

Stipulated Protective Order, but simply to enforce it by its terms.  Since last fall, each and every

time plaintiffs have challenged defendants' "Counsel Only" designations of individual

documents, defendants have promptly conceded that they were misdesignated and withdrawn the

designations.  *See* Plaintiffs' Initial Brief at 20-22.  In the status conference on March 31, 2005,

the most recent occasion on which this issue was raised with the Court, it was made clear to

defendants that the Order required them to perform a document-by-document review to ensure

accurate designations, not only as to documents already produced but on a going forward basis as

well.  The Court in no way sanctioned a process under which defendants could "preliminarily"

apply blanket designations over thousands of documents (without disclosing at the time of

production that these designations were only "preliminary") and then wait for plaintiffs to raise

questions.

      The statements in Mr. Marovitz's declaration concerning what was said in the March 31

call regarding "Counsel Only" designations are inaccurate, in that defendants' counsel did not

explain, at least not in any manner that was clear to plaintiffs' counsel, that the improper

designations had only been made on a "preliminary" basis.  Moreover, defendants never

"agreed" to review their documents one by one, because if they had, plaintiffs would not have

been forced to bring the issue to the Court's attention by their letter dated March 29, 2005.

Downey Aug. 5 Decl., Ex. X, page 4.  As they do again in their Combined Reply and

Opposition, defendants' counsel argued in the March 31 status conference that they should not

have to revisit or even explain their designations unless and until *plaintiffs* offer a document-by-

document justification for doing so.  This argument did not prevail in March and it should not prevail now.

Under the Stipulated Protective Order in this case it is not plaintiffs' burden to demonstrate that abusive and unjustified " Counsel Only" designations should be removed.  By its terms, the Order places the burden on the producing party to justify all "Counsel Only" designations. *See* Plaintiffs' Initial Brief at 19-20 (see also Downey Aug. 5 Decl. Ex. U, Order at page 9, ¶ L.)  The only explanation offered by defendants, however, is Attorney Marovitz's statement that "global business directors . . . maintain some of the most confidential and proprietary documents created within the business," and thus, "certain" of their documents were assigned the "Counsel Only" designation in blanket fashion.  Marovitz Decl. ¶ 8.  In other words, defendants have absolutely no idea whether the documents they claim should be classified as "Counsel Only" actually contain any information that warrants such heightened protection, or even information that warrants any confidentiality protection at all.  The abusive nature of this approach, to say nothing of defendants' blatant violation of the Protective Order, is made even more clear by the sheer quantity of documents for which they demand the heightened protection of a "Counsel Only" designation, while at the same time failing to provide any justification for such treatment.  Their limited efforts at correcting the most obvious errors have only led to additional confusion and inconvenience.  Thus, as of the date of this submission, with their production of 66 new boxes of documents, defendants have withdrawn the "Counsel Only" designations from a substantial quantity of records, even though the documents remain stamped as such and the index still reflects the original misdesignation.

The egregiousness of defendants' dissembling on this issue is made even more apparent by their own conduct.  Belying any need for maintaining the "Counsel Only" designations is defendants' continued public disclosure of such documents when they desire to do so.  For example, the submission of the exhibits to their Combined Reply and Opposition filed on September 12, 2005, was the second time that they filed documents designated "Counsel Only"

- 18 -

with the Clerk without taking any steps whatsoever to protect such documents from public disclosure.[15] *See* Defendants' Combined Reply/Opp. Exhibits 12, 13, 19, 20, 27.

Such actions only confirm that defendants are not really concerned with the protection of extremely confidential information. Rather, consistent with their approach throughout, they just want to erect as many barriers as possible to make it difficult, if not impossible, and extremely expensive, for plaintiffs to proceed with discovery in this case. It is little wonder, therefore, that they have not even bothered to find out what is in the documents they are seeking to have treated as "Counsel Only," much less explain such information to either the plaintiffs or the Court.

### G.    Plaintiffs Have Demonstrated Ample Basis For an Award of Sanctions.

Defendants' response to plaintiffs' concerns about the timing and manner of their document production is a sly wink and a wisecrack: "Be careful what you ask for." But neither Rule 34 nor the Orders of this Court ever directed or condoned a "protocol" under which defendants could make incomplete responses based upon their unilateral determination of what should and should not be produced, or to make responses in a manner that has created undue problems and expense in connection with the review of documents. Rule 34 and this Court's Orders also do not condone defendants' arbitrary decisions concerning when they will respond to plaintiffs' discovery requests. To the contrary, the Court's Order set firm deadlines, all of which defendants have simply ignored as they made additional documents available in dribs and drabs, as plaintiffs repeatedly discover gross failures of production. The Court is well aware of the rulings it has made concerning the scope of the discovery with which defendants were ordered to comply. What defendants have done in this case falls far short of the obligations contemplated by those rulings, and their continuing arrogance in deeming themselves above the rules (including as directed by the Court) should no longer be left unaddressed.

---

[15] As noted in Plaintiff's Initial Brief at 42, the first time they did so was in connection with the filing of the same exhibits in support of their initial Motion for Protective Order.

Defendants' breathless attacks on plaintiffs' motives for seeking sanctions also miss the point; they are based on the demonstrably false premise that defendants have fully complied with their discovery obligations. It is now beyond dispute that they have not. For all the reasons set forth in plaintiffs' initial submission, and in light of the newest information set forth herein about the gaps and omissions in their document production and their improper designation of documents as "privileged" or "work product," defendants have violated and they continue to violate the June 29, 2004, August 17, 2004, and February 7, 2005 discovery Orders, as well as the December 18, 2002 Stipulated Protective Order. Plaintiffs have demonstrated that defendants' extraordinary delays and the massive, inexcusable deficiencies in their document production caused plaintiffs to incur enormous, unnecessary effort and expense. Yet plaintiffs ask only for the "mildest sanction" that is within the Court's power to order. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 179 F.R.D. 77, 80 (D. Conn. 1998). They ask for compensation for the effort and expense they incurred because defendants did not do what they were ordered to do and what they told plaintiffs and the Court they would do. *See* Fed. R. Civ. P. 37(b)(E).

## IV.    CONCLUSION

Plaintiffs are not seeking an unfair advantage and they are not asking defendants to do their work for them. Defendants have spent vast resources on preventing plaintiffs from gaining meaningful access to relevant, responsive documents. They have withheld documents, and they have buried documents in an impenetrable mountain of business records. For reasons they will not disclose, they have designated vast portions of their production as "Counsel Only" and therefore off-limits to plaintiffs' principals. As the Court suggested several months ago, and as illustrated by the numerous cases cited by plaintiffs, these are circumstances in which it is fair to require defendants to reimburse plaintiffs for the extraordinary expenses incurred in attempting to obtain compliance with basic discovery obligations. The Court should deny the Motion for Protective Order and grant Plaintiffs' Cross-Motion in its entirety.

Respectfully submitted,

**BINGHAM McCUTCHEN LLP,**

/s/ alicia L. Downey /gcr

Richard S. Taffet (ct 10201)
Alicia L. Downey (ct 22066)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

-and-

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on this 3rd day of October, 2005, a copy of the foregoing has been

hand-delivered to the following:

Craig A. Raabe
Stephen M. Deane
Robinson & Cole LLP
280 Trumbull Street, 28th Floor
Hartford, CT  06103

and sent via FedEx to the following:

Andrew S. Marovitz
Britt M. Miller
Dana S. Douglas
Mayer Brown Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606-4637

Christopher J. Kelly
Mayer Brown Rowe & Maw LLP
1909 K. Street, N.W.
Washington, DC  20006

Nathan P. Eimer
Andrew G. Klevorn
Scott C. Solberg
Ryan S. Hedges
Vanessa G. Jacobsen
Eimer Stahl Klevorn & Solberg LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604

/s/ Alicia L. Downey g.c.r.
Alicia L. Downey

cc:     The Honorable Alfred V. Covello (via hand delivery)
        United States District Court
        450 Main Street
        Hartford, CT  06103