

# Maximizing Value through Merger Integration



Slides from Corporate Leadership Team meeting, August 26, 1999

©1999 The Dow Chemical Company

EXHIBIT 101 Neri 8-23-05

Attachment 4(c)-180

August 26, 1999

Confidential - Counsel Only

D079881



Confidential - Counsel Only    D079914

**Page 6**

1 the best of your ability and to the best of your
2 knowledge.
3     I am going to attempt to allow you to finish
4 the question -- finish your answer before I ask the next
5 question. I would ask that you allow me to finish the
6 question before you provide your answer.
7     Your attorney may assert certain objections.
8 We will hear him and we will proceed in that after his
9 right to assert objections.
10     If you need to take a break, please let me
11 know. And we will accommodate you so long as there is
12 no question that's pending at that time.
13     Lastly, I must ask you to try to remember to
14 answer orally. The court reporter cannot take down
15 shakes of your head or other gestures and the like.
16  A. Okay.
17  Q. Is that all right?
18  A. That's fine.
19  Q. Okay. Are you presently employed, sir?
20  A. No, I am not.
21  Q. How long have you been retired?
22  A. June 1, 2001.
23  Q. And what was the last position you held prior
24 to your retirement?
25  A. President of Union Carbide Asia Pacific.

**Page 7**

1  Q. How long did you hold that position?
2  A. From '95 -- six years, just a little over six
3 years.
4  Q. Starting in sometime in 1995?
5  A. Officially, January 1st, '95.
6  Q. Now, are you aware, sir, that you are appearing
7 here today pursuant to both a subpoena and a notice of
8 deposition as a representative of Union Carbide Asia
9 Pacific?
10  A. Yes.
11     MR. TAFFET: Why don't we mark this Exhibit as
12 99.
13     (Plaintiffs' Exhibit No. 99 was marked for
14 identification.)
15  Q. I have handed you, Mr. Neri, a copy of a
16 document entitled "Subpoena in a Civil Case."
17  A. Uh-huh.
18  Q. And I would ask you if this is the subpoena
19 that you understand you are appearing here in connection
20 with.
21  A. Yes.
22  Q. Okay. Now, were you aware -- or are you aware
23 that this subpoena calls for you to produce any
24 documents that may have been in your possession relating
25 to the subject matters set forth in this subpoena?

**Page 8**

1  A. Yes.
2  Q. And have you provided to your attorney any
3 documents that would be responsive to the subpoena?
4  A. I have no documents. I left everything in my
5 office in Singapore when I retired. Turned it over.
6  Q. Now, you say you left everything in your office
7 in Singapore. What do you mean by that, sir?
8  A. I turned it over to the Union Car -- I mean,
9 the Dow Asia Pacific people who were responsible for the
10 region, who assumed my responsibilities after the
11 merger.
12  Q. Who was that?
13  A. Patrick Ho.
14  Q. Anybody else?
15  A. He was the primary guy that I -- he may have
16 transferred some of the local things to other people,
17 but it was -- he was the person I transferred it over
18 to.
19  Q. What was his position?
20  A. He was president of Dow Asia Pacific. I can't
21 remember what Dow calls that region. But we were
22 Asia Pacific; and they're Dow, I think Pacific.
23  Q. Was it the Dow operation that assumed the
24 responsibility for the same operations that
25 Union Carbide Asia Pacific had responsibility for?

**Page 9**

1     MR. SOLBERG: Object to the form.
2  A. It was the Dow Asia Pacific company who assumed
3 the responsibilities for UCAP.
4  Q. Now, regarding the materials that you left
5 which Mr. Ho took --
6  A. Uh-huh.
7  Q. -- responsibility for, what did those materials
8 comprise?
9  A. Just our -- our, you know, monthly reports,
10 financial statements, board minutes, any business
11 information that we had, primarily for the functional
12 activities or the H&R and administrative activities for
13 the region.
14  Q. Was that both in paper and in electronic
15 formats?
16  A. Yes. Mostly paper.
17  Q. Did you use a computer during the time that
18 you --
19  A. Yes, I -- yes, I did. I'm sorry.
20  Q. Rule No. 3: Please allow me to finish my
21 question.
22  A. Yes. I'm sorry.
23  Q. Let me, just so the record is clear.
24  A. That's fine.
25  Q. Did you use a computer during the time that you

**Page 10**

1 were employed by Union Carbide Asia Pacific?
2  A. Yes, I did.
3  Q. And what type of documents did you maintain on
4 the computer?
5  A. Essentially e-mails, just really e-mail
6 communications.
7  Q. And as far as you know, were all of your e-mail
8 and other electronic files left for Mr. Ho when you
9 departed approximately June 2001?
10  A. Yes.
11  Q. Do you have any understanding of what Mr. Ho
12 did with those materials once you retired?
13  A. No.
14  Q. Are you familiar with what the document
15 retention policy was for Union Carbide Asia Pacific at
16 the time you retired?
17  A. Yes.
18  Q. What was it?
19  A. Well, we received a letter every year from our
20 legal people telling us which documents, the retention
21 periods. I can't remember the exact dates, but they
22 were -- depended upon the document. Mostly it was like
23 seven years. Some were a little less. Some were a
24 little more.
25      And then we were told to go through our

**Page 11**

1 files. Unless there were certain documents that there
2 were any legal issues or depositions or concerns being
3 involved, that we had to isolate those. The rest we
4 were told to destroy. And then we were signed off on
5 whether we did it or not to the corporation.
6  Q. Do you recall the last letter of that nature
7 that you received prior to your retirement?
8  A. Not specifically, no. But I'm assuming it
9 would have been at the end of year 2000.
10  Q. Was --
11  A. It usually came at the end of the year.
12  Q. Do you recall during the first half of 2001,
13 after the time you would have ordinarily received such a
14 letter, and your retirement, that you took steps
15 consistent with the policy to discard or maintain any
16 particular documents?
17  A. No.
18  Q. Do you recall whether at that time there was
19 any pending legal actions that required you to keep any
20 documents consistent with the policy?
21  A. The only one that I recall was Bhopal, and
22 those were already set aside and we were -- most of
23 those had been sent back to the corporation. But
24 anything that was still in our office, we had that
25 maintained in a separate file.

**Page 12**

1  Q. Okay. Now, you said that --
2      Well, let me ask you this: Do you recall
3 sometime during the last six months of your employment
4 at UCAP --
5      And if it's all right with you, I'll refer to
6 Union Carbide Asia Pacific as UCAP for brevity's
7 purposes, sir.
8  A. That's fine.
9  Q. -- that there was occasion where you purged
10 your e-mail files or other electronic documents?
11  A. No.
12  Q. Now, you commented that of the documents that
13 you recall being left in your office, at least in part
14 they related to functional activities. What did you
15 mean by "functional activities"?
16  A. What I mean by functional activities are those
17 activities that relate to personnel management of the
18 people.
19  Q. Do you distinguish functional activities from
20 other activities of UCAP?
21  A. Yes.
22  Q. What do you distinguish them from?
23  A. Commercial business activities.
24  Q. What would be an example of a commercial or
25 business activity?

**Page 13**

1  A. Our business -- we had business directors for
2 lines, what we called "lines of businesses," which would
3 be things like wire and cable -- the wire and cable
4 business, the solvent and monomer business, the
5 industrial petrochemical business. Those were lines of
6 business. The latex business.
7  Q. Did you have responsibility for the commercial
8 and business activities of UCAP?
9  A. No. Only in one business area, the latex
10 business, I had the commercial responsibility for latex
11 emulsions. And I had the functional responsibility for
12 the total region.
13  Q. Okay. Now, you mentioned that the only legal
14 issue or event that you recall related to your treatment
15 of certain documents in a way consistent with the
16 company's document retention program was -- involved
17 Bhopal?
18  A. Correct.
19  Q. Do you recall when that first came to your
20 attention, the Bhopal incident, that caused you to have
21 to retain documents in a particular way?
22  A. Well, when I first moved over there, every --
23 the first year I got the document retention policy
24 letter.
25  Q. Which would have been sometime in 1995?

Page 14

1  A. Probably late '95.
2  Q. And at that time were there documents relating
3 to Bhopal that you were receiving?
4  A. No.
5  Q. So what were the type of documents that you
6 were required to maintain and send over to the
7 corporation in the United States?
8  A. They were the documents that were there from
9 the previous years and -- and the issues relating to
10 Bhopal at that time.
11  Q. Okay. So we have an understanding, when you
12 assumed the presidency of UCAP sometime in 1995, did you
13 undertake to review documents that were held by UCAP by
14 your predecessor?
15  A. Yes.
16  Q. What type of documents did you review?
17  A. It was annual reports, financial statements,
18 economic reports about the region, business plans,
19 annual -- our annual budgeting process and business
20 plans, historical information on our administrative
21 and -- sales and admin. costs, historical information on
22 sales volumes, information on the personnel, the
23 quarterly results reviews of all the people and how they
24 were ranked relative to their peers.
25  Q. Did you continue to receive and maintain these

Page 15

1 types of documents -- documents relating to these types
2 of subjects, I should say, during the time that you were
3 president of UCAP?
4  A. Yes, I did.
5  Q. And were these types of documents left at the
6 time of your retirement?
7  A. Yes, exactly the same type of documents.
8  Q. Let me show you a document that's been
9 previously marked as Exhibit 2, Plaintiffs' Exhibit 2 --
10  A. Okay.
11  Q. -- for purposes of these depositions.
12  A. Uh-huh.
13  Q. I'm going to ask you to take a moment, and ask
14 you whether you've ever seen this document before.
15  A. Yes.
16  Q. You have?
17  A. Yes, I have.
18  Q. Okay. And do you understand that you are being
19 presented here as a witness on behalf of UCAP to testify
20 concerning certain subject areas set forth in this
21 document?
22  A. Yes.
23  Q. Do you have an understanding of which of those
24 subject matters they are?
25  A. Yes, I do.

Page 16

1  Q. Rather than try to test your memory --
2  A. Yes.
3  Q. -- let me just try to go through them.
4    Would it be correct that you are here as the
5 designated representative of UCAP for subject area one?
6  A. Yes.
7  Q. And two?
8  A. Yes.
9  Q. And four and five?
10  A. Yes.
11  Q. And eight?
12  A. Yes.
13  Q. Nine?
14  A. Correct.
15  Q. Twelve?
16  A. Yes.
17  Q. Eighteen?
18  A. Yes.
19  Q. And 24 and 25?
20  A. Yes.
21  Q. Have I missed any that you understand that you
22 are --
23  A. No.
24  Q. -- designated for?
25    Now, in preparation for this deposition, did

Page 17

1 you take any steps in preparation?
2  A. Yes.
3  Q. What were those?
4  A. I reviewed documents that were sent to me by
5 the attorneys, and I had a meeting with the attorneys to
6 review the documents and to review some of the issues
7 that I would be dealing with in representing
8 Union Carbide Asia Pacific in this.
9  Q. Who sent you the documents that you reviewed?
10  A. I think it was Scott's firm.
11  Q. Mr. Solberg's?
12  A. Right.
13  Q. Do you recall approximately when that occurred?
14  A. I received them last week.
15  Q. Do you recall the volume of documents that was
16 provided to you?
17  A. It was about six inches, four inches or so.
18  Q. Six inches?
19  A. Yeah.
20  Q. What kind of documents were those?
21  A. Various documents. There were these types of
22 documents, as well as --
23  Q. "These types," meaning?
24  A. The ones you just showed me.
25  Q. Okay.

Page 18

1  A. The --
2  Q. The subpoenas?
3  A. The subpoenas and the notice. We had the -- I
4  had some e-mails, copies of e-mails, between different
5  people in the organization. I had annual reports from
6  Union Carbide Singapore. I had some reports, monthly
7  reports and quarterly reports, of business reports from
8  a couple of the businesses, such as wire and cable and
9  the solvents and vinyl monomer business and the
10 specialty chemical business.
11 Q. And do you recall any others?
12 A. Not offhand, no. That's probably it.
13 Q. Okay. And then you say you've met with the
14 lawyers in preparation for this deposition as well,
15 correct?
16 A. Yes, sir.
17 Q. Who is that?
18 A. The three people in this room: Dana, Sara, and
19 Scott.
20 Q. Okay. And did that occur over the last few
21 days?
22 A. Yes.
23 Q. When did that occur?
24 A. Yesterday.
25 Q. For approximately how long did you meet?

Page 19

1  A. I guess about seven hours.
2  Q. Now, in your preparations, did you make
3  inquiries or review materials relating to activities
4  that occurred subsequent to your retirement from UCAP?
5  A. Yes.
6  Q. What were those specific types of materials?
7  A. The one I recall had to do with the
8  finalization of some of the wire and cable claims.
9  Q. What are you referring to in connection with
10 the finalization of wire and cable claims?
11 A. Well, some of the letters that were written
12 regarding the settlement of the -- the customers in
13 India. I think it was Finolex and the other one that
14 they finally had the claim. Some of that was done after
15 I had retired.
16 Q. Okay.
17 A. The final letters, documentation.
18 Q. Was Sterlite a --
19 A. Sterlite, right.
20 Q. That was the other customer --
21 A. Right.
22 Q. -- in India?
23 A. Uh-huh.
24 Q. Any other documents that you can recall that
25 related to activities after your retirement?

Page 20

1  A. No.
2  Q. Now, other than discussions with your -- with
3  the attorneys, did you have any discussions with anyone
4  else?
5  A. No, not relating to this.
6      You should be aware that I have had discussions
7  with other people that may or may not be associated with
8  this that were Carbide employees. Charles Zeynel is a
9  friend of mine. He was employed by MM Global. He and
10 I, with wives, before I left for Florida, went out to
11 dinner. The subject did come up that he was involved
12 with Ajay, but we never discussed any of the details of
13 this.
14 Q. When was that dinner? Sorry to interrupt.
15 A. That was about two years ago. I was -- it was
16 right before we left. It was in Connecticut, and we
17 just got together before I left.
18     About two years ago, approximately.
19 Q. Have you spoke to Mr. Zeynel --
20 A. Yes.
21 Q. -- after that?
22 A. I did. I had a phone discussion with Charlie
23 probably four months ago. Because I'm involved with a
24 volunteer group called SCORE, Senior Corps of Retired
25 Executives, and I had a customer who was making product

Page 21

1  out of cement. And there was some technology issues,
2  and I know Charlie's current role is he's involved with
3  selling cement additives. So I called him to see if he
4  knew anyone in Florida, and he gave me a name of a man
5  in Bradenton, which I put in touch with this gentleman.
6      And he also told me that he was moving to
7  Fort Myers, for the second home, so we'd get together at
8  some point. And he also mentioned that he no longer was
9  involved with -- with MegaVisa, with Ajay. He had
10 resigned from that because he was too fully occupied
11 with his current job.
12 Q. Any discussions concerning this case?
13 A. No.
14 Q. Any other discussions with Mr. Zeynel --
15 A. No.
16 Q. -- related --
17 A. No. I had a discussion, exchange in e-mail,
18 with John Yimoyines because John was involved -- because
19 I knew he was involved with this, and I got my subpoena.
20 And I hadn't heard anything from Union Carbide or Dow,
21 so I wrote an e-mail to John asking if I was going to
22 be -- if someone was going to get ahold of me, if they
23 were aware of this. So John, I think, sent that on to
24 Sara. So that was it.
25 Q. Did Mr. Yimoyines respond to your e-mail?

86

1 team. I have no idea who that was.
2  Q. Now, if you turn to page 18 --
3  A. Uh-huh.
4  Q. -- there's --
5     I apologize for the state of the copy here.
6  A. Uh-huh.
7  Q. But the title on this page is "Integration Principles and Guidelines."
9     Are these integration principles and guidelines something that was shared with you by Dow?
11 A. Possible. I mean I -- this may have been in the presentation, but I don't recall this specifically. But I can't say for sure.
14 Q. Well, let me direct your attention to the -- I think it's the fifth principle or guideline.
16 A. Uh-huh.
17 Q. It says, "Share knowledge and information openly." Do you see that?
19 A. Yes, I do.
20 Q. Is that a principle or guideline that was relayed to you as part of the integration -- as part of the merger process?
23 A. It depends upon how you define what knowledge and information. It was very clear to us on what we could and could not talk about.

87

1  Q. What could you talk about?
2  A. As I said previously, administrative things, people, performance ratings, policies and procedures, administrative policies and procedures, travel policies, things like that.
6  Q. A couple of pages later, on page 21, at the top, is another integration principle and guideline. And the first box there is a bullet point that says, "Keep Union Carbide people engaged in the integration process." Do you see that?
11 A. Yes, I do.
12 Q. Were you provided a formal document which defined what the integration process was?
14 A. I don't recall that I was provided a formal document about that.
16 Q. Were you ever told in some other manner of what the integration process was?
18 A. Yes, some of it.
19 Q. What were you told?
20 A. I was told that there would be people that would be put together in committees in like what they called -- I think it was a clean room. And those people were sworn to secrecy in the outside. And they were some retired people, some current people from both businesses, and they were sharing some information that

88

1 couldn't be shared with the rest of the corporation.
2    We had one person at our organization that was involved with that, and that was Marshall Sprigg, who was involved with the distribution side of our business. And he was on that committee, the joint integration committee.
7  Q. What was his position in your business?
8  A. He was distribution manager.
9  Q. For UCAP?
10 A. Yes.
11 Q. What did his role --
12 A. His role?
13 Q. What did he do?
14 A. Was to try to optimize the distribution channels of the company from -- you know, he had people that he worked with functionally that were in distribution in the United States. And together they would try to find the lowest-cost way to get product to the market.
20 Q. This was logistics, --
21 A. Yes.
22 Q. -- shipping, things, like that?
23 A. Correct.
24 Q. Do you know of anybody else of the business managers -- let me rephrase it.

89

1    Do you know of any business managers, either in Union Carbide Corporation or UCAP, who participated in these white-room groups?
4  A. No. No, I don't remember of any of them. I -- I don't know who was for the corporation. I can't recall. But there were none in UCAP.
7  Q. Who was responsible for identifying the people who would partake in these white-room exercises?
9  A. It was the -- I believe it was the corporate functional people and business people.
11 Q. Let me ask you to turn to page 35 of this document.
13 A. 35?
14 Q. Yes, sir. It's Bates numbered D 079914.
15 A. I notice something here you -- I think Deloitte Consulting, they may have been the ones that managed those groups for Dow --
18 Q. Okay.
19 A. -- now that I see it in there.
20    So that might be the -- 35.
21 Q. Yes, sir.
22 A. Okay.
23 Q. Title here is "Team Structure."
24 A. Uh-huh.
25 Q. And my question is: There are certain business

23 (Pages 86 to 89)

90

1 leaders identified?
2  A.  Yes.
3  Q.  And does this refresh your recollection who the
4 Union Carbide business leaders who participated in these
5 efforts were?
6  A.  Yes. They're listed here, right, yeah. These
7 are all VP/GMs mostly.
8  Q.  And they're all on the Union Carbide side?
9  A.  And Dow.
10  Q.  So Mr. McMaster, is that Lee McMaster?
11  A.  Yes, it is.
12  Q.  And Mr. Wolf, do you recognize who that is?
13  A.  Yeah. He was our chief financial officer and
14 treasurer of the corporation, Union Carbide.
15  Q.  And Mr. Saviaro, he was your boss?
16  A.  At the end, he was my boss. Lee was at the
17 beginning.
18  Q.  Okay. At this point in time, was Mr. McMaster
19 a product VP, I believe you mentioned?
20  A.  Yes. He had the specialty products I think at
21 that time, if I'm not mistaken.
22  Q.  And the next four people, were they Dow people
23 or UCC people?
24  A.  They're all Dow people.
25  Q.  Then we get to specialty chemicals, and there's

91

1 a Mr. Liveress.
2  A.  He's now the chairman of Dow Chemical. He was
3 with Dow Chemical at the time. A president, I'm sorry,
4 not a chairman.
5  Q.  He was with Dow at the time as well?
6  A.  Yes, sir.
7  Q.  Any other UCC people identified here?
8  A.  Not in that box.
9  Q.  Okay.
10  A.  There's some in the integration program team.
11  Q.  Who were they? The people with the UCC --
12  A.  Yes.
13  Q.  -- by their name?
14  A.  Roger Staub, Mel Kessinger, and Dave Brucker.
15  Q.  What were their position?
16  A.  Dave Brucker was vice president of operations.
17 Mel Kessinger is vice president of HR. And Roger Staub
18 was -- I can't remember Roger's last title. He had run
19 the polyethylene business and the licensing business for
20 a long time. I guess he was running the licensing
21 business at that time.
22  Q.  And then under "Program Management Office,"
23 there's a box. Do you have any understanding what the
24 program management office was?
25  A.  Where is this?

92

1  Q.  Within the integration program team.
2  A.  Oh. No. I don't know -- I don't know Drake.
3 I know Burke. Burke was on the financial side of our
4 business.
5  Q.  Do you know what the program management office
6 was?
7  A.  No, I do not.
8  Q.  And then there is -- below the integration
9 team, there are business teams and functional teams.
10  A.  Uh-huh.
11  Q.  Do you know what they refer to?
12  A.  I assume these were the teams that were put
13 together in these clean rooms to deal with confidential
14 information that couldn't be shared anywhere else. I
15 assume. I'm not sure.
16  Q.  Okay. And as you --
17  A.  About the only one I know of is the supply
18 chain.
19  Q.  Yes.
20  A.  And that's what Marshall Sprigg was in.
21  Q.  Okay. You anticipated my next question in some
22 respects; that would it be accurate that you're not
23 familiar with who has populated each of these business
24 teams or functional teams?
25  A.  Not at all. My understanding is, most of them

93

1 were retired people, recently retired, that weren't
2 directly involved with the business.
3      MR. TAFFET:  Let's mark this next.
4      (Plaintiffs' Exhibit No. 102 was marked for
5 identification.)
6  Q.  I've handed you a document we've marked as
7 Exhibit 102. And it's a three-page document marked
8 M 45710 through 45712. The top page is an e-mail from
9 Katherine Seah, S-e-a-h, to a number of people. Subject
10 is FTC filing.
11      Have you ever seen this document before?
12  A.  Not this particular one, no.
13  Q.  When you say you have not seen this particular
14 document, why did you qualify your answer in such a
15 manner?
16  A.  I'm trying to remember if I saw -- if this was
17 done with other businesses on prior --
18      I can't recall seeing it, no. And --
19  Q.  Well -- go ahead. I'm sorry.
20  A.  That's all.
21  Q.  Were you aware of efforts to gather information
22 for the Federal Trade Commission?
23  A.  Yes.
24  Q.  What are you aware of in that regard?
25  A.  Only that they were asking for specific

**Page 177**

1  A.  They're sales managers in the United States,
2  regional sales managers.
3  Q.  And were you familiar with the price
4  implementation team, the formation of it, prior to the
5  time that you received a copy of Mr. Batt's e-mail?
6  A.  No.
7  Q.  Once you received this e-mail, did you have any
8  discussions about what the price implementation team was
9  all about?
10  A.  Not really, because I knew -- because we had
11  had a conference call -- Dr. Joyce had a conference call
12  for all the key managers in the world at one time, to
13  voice his concern of feedstock costs and the need to
14  raise prices while trying to maintain our customer
15  relationships.  So I knew because of that conference
16  call that there would be actions taken, and there was
17  requests that we try to do whatever we can to support
18  the need to bring prices up.
19  Q.  And would it be fair to say that you did take
20  steps and actions to have prices increased in the
21  various products?
22  A.  My personal involvement was to send this
23  message out to people and say, "Here's some ideas that
24  have been generated.  Maybe they can be used here.
25  So -- and along with anything else you can do to support

**Page 178**

1  this need to raise prices."
2  Q.  And do you know if this price implementation
3  tool was used in the UCAP region?
4  A.  I'm assuming some of the pieces were used to
5  try to get customers to understand why we were trying to
6  raise prices.
7  Q.  Now, what were the tools that are referenced
8  here?
9  A.  Well, it was things to talk about, like why do
10  we need to do it, what's happened, what's happened to
11  our raw material costs, why do we need to get the prices
12  up now; if we don't get them up and we can't make a
13  legitimate profit, then we can't be viable in
14  the business for long, we can't support R&D, we can't
15  support the kind of customer service and support that
16  customers want and expect from us.  And it was just to
17  try to sell the need to raise prices.
18      So they were just ideas and facts and
19  information that you could use to put behind your sales
20  effort to try to sell.  It was tools to sell, to sell a
21  price increase.
22  Q.  Okay.  Now, did the -- the -- were the -- I'm
23  sorry.
24      Were the affiliates asked to take these steps
25  as well?

**Page 179**

1  A.  Yes.  That's -- all these people you see here
2  are salespeople in the affiliate companies.
3  Q.  Okay.  And this was sent also to MegaVisa?
4  A.  Yes.  As you can see, it was also sent to
5  Andrew Robertson in New Zealand.  It's the same type of
6  arrangement where they are a distributor, broker for us
7  in New Zealand representing us.
8  Q.  Now, concerning the New Zealand entity, were
9  you aware whether there were the same type of letter
10  agreements that we reviewed earlier today with the
11  New Zealand entities?
12  A.  They had letter agreements.  I can't -- and I
13  don't know if it was exactly the same.  I think there
14  was some differences because of the fact that it was
15  India and -- but there were agreements.  But I can't
16  tell you exactly what they were and how they related.
17  Q.  Were you involved in preparation of the
18  agreements with the New Zealand company?
19  A.  No.  It was done before I arrived.
20  Q.  Before you arrived?
21  A.  Yes.
22  Q.  Other than the New Zealand company and
23  MegaVisa, are you aware of any other companies that had
24  agreements of the type that we've been discussing?
25  A.  No.  I think that was it.

**Page 180**

1  Q.  As best you can recall, did the New Zealand
2  agreements address the passage of title to the
3  New Zealand company?
4  A.  I don't recall.
5  Q.  Do you recall whether those agreements talked
6  about the passage of risk of loss to the New Zealand
7  company?
8  A.  I don't recall.
9  Q.  Do you recall whether the agreements with the
10  New Zealand company included a discount of the selling
11  price to it for products?
12  A.  They received a commission.
13  Q.  They received a commission.
14      Do you recall whether the New Zealand company
15  obtained product from Union Carbide in the
16  United States?
17  A.  Through UCAP they -- they worked through UCAP
18  just like everyone else did, like an affiliate did.
19  Q.  And do you recall what products by product
20  division the New Zealand company was --
21  A.  It was mostly SIM products --
22      MR. SOLBERG:  Wait.  Let him finish his
23  question.
24  A.  I'm sorry.  I've been pretty good so far.
25  Q.  Yes, you have.

**Page 38**

```
 1              EUGENE JAY FISHER
 2     Q    The O and R did?
 3     A    Yes. It locked at the price, the net
 4   back at FAS Houston, or FAS Long Beach or whatever
 5   the port of disembarkation of the goods was.
 6     Q    When did you develop the floor price
 7   that you are referencing?
 8     A    1982. It was a non-ending document.
 9     Q    What do you mean?
10     A    The day I went into the job, I realized
11   that I had to develop a way of managing the
12   profitability of the business, which translated to
13   price, but price in the export market varies.
14        Costs get shifted and whatever else, and
15   I could not resolve all of that and develop a
16   price list for every customer and every product
17   abroad. I was not making the calls on the
18   customer. What I did know was how much money we
19   were asked to make or what was the percent return
20   that we were asked to make, and that was the basis
21   of the floor price, which was indicative of the
22   desired returns that we wanted.
23        So, I issued on a worldwide basis one
24   number for each product, and that was the floor
25   price, and that was the amount of money that I
```

**Page 39**

```
 1              EUGENE JAY FISHER
 2   desired or we desired as a business to come back
 3   and to be reported on our O and R so we could
 4   determine its profitability on that particular
 5   transaction.
 6     Q    That was to each of the regions that you
 7   mentioned?
 8     A    There was only one floor price, and the
 9   same telex went out to everybody.
10     Q    That continued until the time you left
11   Dow?
12     A    It maybe continues even now.
13     Q    Yes?
14     A    Yes, until I left Dow. This was a very
15   good mechanism, and it was something that I
16   explained to all of the people, that -- that it
17   could not be run customer by customer, place by
18   place. It was not like a domestic piece of
19   business where essentially everybody paid the same
20   price because we were dealing with one currency.
21   We were dealing with other things, and it was
22   irrelevant. You know, there was no way -- the
23   only thing this could be controlled or -- or -- or
24   not even controlled, but we were asked to meet a
25   specific return of money to the business.
```

**Page 40**

```
 1              EUGENE JAY FISHER
 2     Q    When you developed a floor price --
 3     A    Yes.
 4     Q    -- for each product --
 5     A    Yes.
 6     Q    -- did the specific floor prices change
 7   on a regular basis?
 8     A    Of course.
 9     Q    What was the regular basis?
10     A    Do you pay more for gasoline now than
11   you did last year? It has to do with the price of
12   oil, price of our raw materials, our labor
13   component.
14     Q    How often -- I am sorry.
15     A    And so on.
16     Q    Was there a regular period when you
17   reviewed floor price?
18     A    Yes. Yes.
19        You know, for instance, we would say,
20   hey, you know, ethylene is now 17 cents a pound,
21   and I would increase the floor price by $45 a ton
22   to reflect that, or if it went down, maybe I would
23   try to keep that margin for a while, you know,
24   until there may be pressure on the floor price,
25   and we would lower domestic prices and so on.
```

**Page 41**

```
 1              EUGENE JAY FISHER
 2        That floor price represented something
 3   that came to a domestic return, you know, and was
 4   compared to what we would do for that same product
 5   in the domestic market.
 6     Q    How did it compare to what you would do
 7   for the same product in the domestic market?
 8     A    The floor price that I developed looked
 9   to reflect what we were getting to the price sold
10   to a domestic customer. I had -- I had access to
11   the domestic scrolls, and I was -- and I spoke
12   with the business managers and the financial
13   people, and I talked about the costing structure
14   and other things like that, and how to price the
15   product and what is the expected return that we
16   wanted on these particular products. It was a
17   business, we were there to make money.
18     Q    Let me go back to this concept of scroll
19   for a second.
20     A    It is not a concept, it is a reality.
21     Q    In some respects, you anticipated my
22   question.
23        Was this a document that was made
24   available to you?
25     A    Every month.
```

## Page 42

**EUGENE JAY FISHER**

2  Q  Every month?
3  A  Yes. And we kept them on file, and we
4  kept them -- year end scrolls for ad infinitum
5  until we developed computers, then all of that
6  stuff was available to us. There were hard copies
7  of our scrolls that were kept, you know, on
8  record. We could look at what we did, and a
9  product to our customers in 1978 or whatever, I
10 could find that.
11 Q  All right.
12    MR. EIMER: Let me interrupt for a
13 minute. Mr. Fisher is a diabetic. We are
14 going to try to break every hour.
15    MR. TAFFET: Do you want to take a break
16 now?
17    MR. EIMER: Yes, and we will get some
18 carbohydrates.
19    MR. TAFFET: I am glad you mentioned
20 that, and, of course, we should accommodate
21 that.
22    MR. EIMER: Otherwise we will have a
23 short deposition.
24    (Brief Recess)
25 Q  When you provided your floor prices to

## Page 43

**EUGENE JAY FISHER**

2  the various regions throughout the world, what did
3  the business --
4  A  Let's call it floor price.
5  Q  The floor price?
6  A  Okay. It was one number for each
7  product.
8  Q  Okay.
9    When you provided your floor price for
10 each product to the business managers in each
11 region, what did they do with it?
12 A  They went to negotiate. Somebody said
13 give us a price, and they -- and they translated
14 that floor price into whatever based upon the
15 terms of what the customer wanted to buy, whatever
16 that price would be, and it would vary.
17 Q  Let me make sure I understand you. In
18 translating the floor price into the price that
19 the customer would want to pay, what price are you
20 referring to as respects what the customer would
21 want to pay?
22 A  There was a price that the customer
23 wanted to pay.
24 Q  Okay?
25 A  And the salespeople wherever in the

## Page 44

**EUGENE JAY FISHER**

2  world would look at manufacturers that contribute
3  to what the final cost is, and -- and that would
4  have to do with shipping, the U.S. dollar,
5  insurance cost and freight of all of the things
6  that are involved and the mode of shipping.
7  Q  That would be a CIF price?
8  A  Yes.
9  Q  In developing the CIF price, were the
10 business managers allowed to agree to a price that
11 would result in a price below your floor price?
12 A  Yes.
13 Q  How did that work?
14 A  The floor price, they had $50 below the
15 floor price leeway to give without asking for
16 approval from me to do that.
17 Q  That was the case throughout the time?
18 A  Worldwide.
19 Q  And throughout?
20 A  Forever, forever. It was stipulated in
21 the floor pricing documents, something to that
22 effect.
23 Q  Was there a mechanism that if the
24 regional business managers disagreed with your
25 floor price, that they could appeal to somebody

## Page 45

**EUGENE JAY FISHER**

2  else?
3  A  I would say, yes.
4  Q  How did that work?
5  A  I don't know, I was not -- I am not in
6  his head, the business manager. I can't talk to
7  that.
8  Q  Who would have the authority to grant
9  the approvals?
10 A  Certainly, Mr. Yimoyines. Certainly,
11 the people with the -- with the -- with the profit
12 and loss responsibility.
13 Q  And --
14 A  The business managers.
15 Q  Those people were the people that we
16 referred to earlier, Ms. Waag, Mr. Lloyd,
17 Mr. Du --
18 A  It -- it was --
19 Q  -- and the like?
20 A  It was not an accepted power.
21 Q  What do you mean by that?
22 A  I was supposed to be the focal point.
23 If they didn't like what I was doing, I was not in
24 their mind, they could do whatever they want if
25 they felt that they wanted to do that, you know,

**MAYER BROWN ROWE & MAW**

August 31, 2005

BY FACSIMILE & U.S. MAIL

Alicia L. Downey, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110-1726

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

**Dana S. Douglas**
Direct Tel (312) 701-7093
Direct Fax (312) 706-8662
dsdouglas@mayerbrownrowe.com

*MM Global Services, et al. v. The Dow Chemical Company, et al.*, Civil No. 3:02 CV 1107 (AVC)

Dear Alicia:

After Defendants received your August 1, 2005 email notifying us of the receipt of a privileged document produced at DEBJ0041219, Defendants undertook to review the July 8 and 23 productions to determine whether any additional privileged documents were inadvertently produced.

As a result of this investigation, Defendants request the return of the attached list of privileged documents.

Please return all copies of these documents or destroy them and represent that all copies have been destroyed. Defendants note that certain of these documents contain non-privileged communications in addition to privileged communications. Defendants expect to re-produce these documents in redacted format shortly after the holiday weekend.

As a result of the discovery of these inadvertently produced documents, Defendants continue to review their productions for privileged documents. We will notify you of the need to return or destroy any other inadvertently produced, privileged documents as soon as possible.

We appreciate your cooperation.

Sincerely,

*Dana S. Douglas*

Dana S. Douglas

cc: Robert M. Langer, Esq.
    Richard S. Taffet, Esq.

Berlin Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete y Nader S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

Mayer, Brown, Rowe & Maw LLP

Alicia L. Downey, Esq.
August 29, 2005
Page 2

    Craig A. Raabe, Esq.
    Scott C. Solberg, Esq.
    Christopher J. Kelly, Esq.
    Andrew S. Marovitz, Esq.

Inadvertently Produced Privileged Documents to be Removed From Production
*MM Global Services, et al. v. The Dow Chemical Company, et al.*, Civil No. 3:02 CV 1107 (AVC)

DEAA0067442-67443
DEAA0067449-67450
DEAT0006444-6446
DEAT0006527-6529
DEAZ0004328-4329
DEAZ0004335-4342
DEAZ0004435-4464
DEAZ0004465-4466
DEAZ0004486-4519
DEAZ0004735-4762
DEAZ0007177
DEAZ0007180-7182
DEAZ0007185-7203
DEAZ0007204-7205
DEAZ0019834-19864.0001
DEBJ0003013-3014
DEBJ0003047-3074
DEBJ0003075-3076
DEBJ0003141-3144
DEBJ0036862-36872
DEBJ0040982-40984
DEBJ0040985-40987
DEBJ0041192-41193
DEBJ0041219-41222
DEBJ0041223-41225
DEBJ0041230-41231
DEBJ0041325-41326
DEBL0027006-27008
DEBL0027011-27012
DEBL0027013
DEBL0027171
DEBL0027174-27175
DEBL0027170
DEBL0027172-27173
DEBL0027178-27180
DEBL0027181-27182
DEBL0027185-27188
DEBL0027220-27223
DEBL0027226-27229
DEBL0027658-27661
DEBL0027664-27671
DEBL0027692-27694
DEBL0027734-27736
DEBL0027739-27742
DEBL0027743-27744

Inadvertently Produced Privileged Documents to be Removed From Production
*MM Global Services, et al. v. The Dow Chemical Company, et al.*, Civil No. 3:02 CV 1107 (AVC)

DEBL0027755-27757
DEBL0027762-27764
DEBM0027763-27783
DEBM0028293-28295
DEBO0054131-54133
DEBQ0032289-32291
DEBR0026573-26579
DEBS0002529-2530
DEBS0002531-2535
DEBS0002536-2538
DEBS0002539-2541
DEBS0033411-33412
DEBS0033861-33863
DEBT0019768-19787
DEBT0019788-19802
DEBT0019881-19895
DEBT0019896-19914
DECE0006581-6584
DECE0006586-6587
DECE0006603-6604
DECE0006616-6617
DECE0006618-6619
DECE006645-6648
DECF0044888-44890
DECF0044913-44914
DECG0014110-14111
DECG0014112-14113
DECG0015411-15414
DECG0015434-15438
DECG0015439-15441
DECG0015473
DECG0015474-15475
DECG0015486
DECG0015487-15488
DECG0015489-15490
DECG0015491-15493
DECG0015496-15497
DECH0023890-23892
DECH0024137-24139
DECH0024772-24773
DECH0024832-24833
DECH0024834-24835
DECH0024839-24842
DECH0024900-24902
DECH0024905-24907

Inadvertently Produced Privileged Documents to be Removed From Production
*MM Global Services, et al. v. The Dow Chemical Company, et al.*, Civil No. 3:02 CV 1107 (AVC)

DECH0024912-24914
DECI0084425-84446
DECI0084447-84466
DECI0084775-84800
DECJ0031006-31008
DECJ0031073-31076
DECJ0031087-31089
DECJ0031091-31093
DECJ0031112
DECJ0031113-31114
DECJ0031115
DECJ0031116
DECJ0031117
DECJ0031118
DECJ0031119
DECJ0031268-31271
DECJ0031288-31290
DECK0066015-66018
DECK0066890-66891
DECO0006928-6930
DECO0006935-6939
DECO0013174-13177
DECO0013178-13181
DECO0013182-13185
DECO0013186-13187
DECO0013188-13190
DECO0013191-13193
DECO0013274-13275
DECO0013278-13280
DECO0013287-13289
DECO0013292-13294
DECO0013299-13301
DECO0013312-13314
DECO0013315-13318
DECO0013319-13321
DECO0013361-13364
DECT0038392-38394
DEDC0012895-12896
DEDC0013143-13145
DEDC0013146-13147
DEDC0037680-37682
DEDC0037685-37687
DEDC0037692-37694



September 29, 2005

BY UPS OVERNIGHT AND FACSIMILE

Alicia L. Downey, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110-1726

*MM Global Services Inc. et al. v. The Dow Chemical Company et al*, Civil No. 3:02 CV 1107 (AVC)

Dear Alicia:

As we discussed during our meet-and-confer session on September 22, I have enclosed redacted copies of certain of the documents referenced in my August 31, 2005 letter to you. These documents are as follows:

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

**Dana S. Douglas**
Direct Tel (312) 701-7093
Direct Fax (312) 706-8662
dsdouglas@mayerbrownrowe.com

| | | |
|---|---|---|
| DEAA0067442-67443 | DEBL0027739-27742 | DECJ0031006-31008 |
| DEAA0067449-67450 | DEBL0027755-27757 | DECJ0031073-31076 |
| DEAT0006444-6446 | DEBL0027762-27764 | DECJ0031268-31271 |
| DEAT0006527-6529 | DEBM0027763-27783 | DECK0066015-66018 |
| DEAZ0004435-4464 | DEBR0026573-26579 | DECO0006928-6930 |
| DEAZ0004486-4519 | DEBS0033411-33412 | DECO0013174-13177 |
| DEAZ0004735-4762 | DEBT0019768-19787 | DECO0013178-13181 |
| DEAZ0019834-19864.0001 | DECE0006586-6587 | DECO0013182-13185 |
| DEBJ0003013-3014 | DECE0006603-6604 | DECO0013186-13187 |
| DEBJ0003075-3076 | DECE006645-6648 | DECO0013188-13190 |
| DEBJ0040982-40984 | DECF0044888-44890 | DECO0013191-13193 |
| DEBJ0040985-40987 | DECF0044913-44914 | DECO0013274-13275 |
| DEBJ0041223-41225 | DECG0014110-14111 | DECO0013278-13280 |
| DEBJ0041325-41326 | DECG0014112-14113 | DECO0013287-13289 |
| DEBL0027006-27008 | DECG0015411-15414 | DECO0013292-13294 |
| DEBL0027011-27012 | DECG0015434-15438 | DECO0013299-13301 |
| DEBL0027179 | DECG0015439-15441 | DECO0013315-13318 |
| DEBL0027185-27188 | DECG0015492 | DECO0013319-13321 |
| DEBL0027220-27223 | DECH0023890-23892 | DECO0013361-13364 |
| DEBL0027226-27229 | DECH0024772-24773 | DECT0038392-38394 |
| DEBL0027658-27661 | DECH0024839-24842 | DEDC0013143-13145 |
| DEBL0027664-27671 | DECH0024900-24902 | DEDC0037680-37682 |
| DEBL0027692-27694 | DECH0024905-24907 | DEDC0037685-37687 |
| DEBL0027734-27735 | DECH0024912-24914 | DEDC0037692-37694 |

Berlin  Brussels  Charlotte  Chicago  Cologne  Frankfurt  Houston  London  Los Angeles  New York  Palo Alto  Paris  Washington, D.C.
Independent Mexico City Correspondent:  Jauregui, Navarrete y Nader S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

Alicia L. Downey, Esq.
September 29, 2005
Page 2

Please immediately return all previously produced copies of these documents or certify their destruction.

The following documents, which also were listed in my August 31st letter, are privileged in their entirety:

| | | |
|---|---|---|
| DEAZ0004328-4329 | DEBT0019788-19802 | DECI0084425-84446 |
| DEAZ0004335-4342 | DEBT0019881-19895 | DECI0084447-84466 |
| DEAZ0004465-4466 | DEBT0019896-19914 | DECI0084775-84800 |
| DEAZ0007177 | DECE0006616-6617 | DECJ0031087-31089 |
| DEAZ0007180-7182 | DECE0006618-6619 | DECJ0031091-31093 |
| DEBJ0036862-36872 | DECG0015473 | DECJ0031112 |
| DEBJ0041219-41222 | DECG0015474-15475 | DECJ0031117 |
| DEBL0027181-27182 | DECG0015486 | DECJ0031288-31290 |
| DEBL0027743-27744 | DECG0015487-15488 | DECK0066890-66891 |
| DEBM0028293-28295 | DECG0015489-15490 | DECO0006935-6939 |
| DEBO0054131-54133 | DECG0015496-15497 | DECO0013312-13314 |
| DEBQ0032289-32291 | DECH0024137-24139 | DEDC0012895-12896 |
| DEBS0002529-2530 | DECH0024832-24833 | DEDC0013146-13147 |
| DEBS0033861-33863 | DECH0024834-24835 | |

Again, please immediately return all copies of these documents or certify their destruction.

Finally on this topic, pursuant to our meet-and-confer obligations, Defendants re-reviewed the documents listed in my August 31st letter and have decided not to request the return or destruction of the following documents:

| | | |
|---|---|---|
| DEAZ0007185-7203 | DEBL0027171 | DEBS0002539-2541 |
| DEAZ0007204-7205 | DEBL0027172-27173 | DECE0006581-6584 |
| DEBJ0003047-3074 | DEBL0027174-27175 | DECG0015491 |
| DEBJ0003141-3144 | DEBL0027178 | DECG0015493 |
| DEBJ0041192-41193 | DEBL0027180 | DECJ0031113-31114 |
| DEBJ0041230-41231 | DEBL0027736 | DECJ0031115 |
| DEBL0027013 | DEBS0002531-2535 | DECJ0031116 |
| DEBL0027170 | DEBS0002536-2538 | DECJ0031118 |
| | | DECJ0031119 |

Please note that certain of these documents are duplicates of each other.

Alicia L. Downey, Esq.
September 29, 2005
Page 3

On a separate topic, as you requested, I have enclosed a disk containing a report that links attachments produced during June and July of 2005 with those attachments' previously produced parent documents.

Very truly yours,

*Dana S. Douglas*

Dana S. Douglas

Encls.
cc (w/o encls.):

    Nathan P. Eimer
    Christopher Kelly
    Robert M. Langer
    Andrew S. Marovitz
    Craig A. Raabe
    Scott Solberg
    Richard S. Taffet