10

Moorthy

1
2    A.   Yes.
3    Q.   Also, just to be sure we have a complete
4  understanding, you're appearing in connection with
5  the chemical products that were sold to plaintiffs
6  in this case as distinct to Wire and Cable
7  products; is that correct?
8    A.   Yes, but with the exception that
9  specialty chemicals, monomers and products are not
10  in my jurisdiction, wasn't my jurisdiction.
11    Q.   It was not in your jurisdiction?
12    A.   Yes.
13    Q.   You're referring to the exhibit, the
14  second page of the exhibit, to Exhibit 1 here?
15    A.   Yes, Exhibit -- yeah, right.
16    Q.   That was not within your jurisdiction?
17    A.   That's right.
18    Q.   I have seen a reference to a category of
19  products named solvents, intermediates or monomers
20  or SIM products?
21    A.   Yes.
22    Q.   Are those products reflected in the
23  exhibit at all to --
24    A.   They are already in Exhibit A1.
25    Q.   A1, under the "Industrial Performance

11

Moorthy

1
2  Chemicals"?
3    A.   That's right.
4    Q.   Could you identify for us -- let me
5  withdraw that and ask the question differently.
6    Are the SIM products separately
7  organized under the "Industrial Performance
8  Chemicals" as distinct from other industrial
9  performance chemicals?
10    A.   They're all included in the list of
11  "Industrial Performance Chemicals."
12    Q.   Also, included in the list of
13  "Industrial Performance Chemicals" are nonsolvents,
14  intermediates and monomer products; is that fair?
15    A.   I don't understand your question.
16    Q.   Are all the industrial performance
17  chemicals SIM products?
18    A.   I wouldn't know.
19    Q.   Did you have responsibility for all of
20  products that are identified in the "Industrial
21  Performance Chemicals" in Exhibit 1?
22    A.   Yes, overall I had the responsibility.
23    Q.   Now, Exhibit 1 requests the production
24  of any documents concerning subject matters that
25  may have been in your possession beginning on page

12

Moorthy

1
2  6 of Exhibit 1?
3    A.   Yes.
4    Q.   Did you review this --
5    A.   Yes.
6    Q.   -- document?
7    A.   Yes.
8    Q.   Did you have any documents in your
9  possession that were responsive to these subject
10  matters?
11    A.   No.  I retired in 1999.
12    Q.   When in 1999, sir?
13    A.   January 1999.  So I don't have any of
14  the documents with me.  It was all left to my
15  successors who took over for me.
16    Q.   Would that include calendars or diaries
17  from your --
18    A.   Yes, sir.
19    Q.   -- from your period prior to retirement?
20    A.   Yes.
21    Q.   Allow me to ask some additional
22  preliminary questions.
23    Am I correct that you are being
24  represented today by Mr. Solberg?
25    A.   Yes.

13

Moorthy

1
2    Q.   And he's your attorney for purposes of
3  this --
4    A.   Yes.
5    Q.   -- of this deposition?
6    A.   Yes, sir.
7    Q.   And have you retained him personally or
8  has his defense of you been provided by UCAP?
9    A.   UCAP.
10    Q.   And UCAP, whatever the fee arrangement
11  is with Mr. Solberg, that's UCAP's business, and am
12  I correct that you don't have anything to do with
13  that?
14    A.   No, I do not.
15    Q.   Did you prepare for this deposition?
16    A.   Did I prepare for the deposition?
17    Q.   Yes, sir.
18    A.   Yes, I had a discussion with him before
19  the deposition.
20    Q.   With Mr. Solberg?
21    A.   Yes, with Mr. Solberg.
22    Q.   When did that discussion occur?
23    A.   Yesterday.
24    Q.   Prior to yesterday, did you have any
25  discussions with Mr. Solberg?

4  (Pages 10 to 13)

14

```
1              Moorthy
2    A.   We had a general conversation --
3    •THE WITNESS:  Around what, two, three
4  weeks ago?
5       MR. SOLBERG:  Yes.
6    A.   Yes, two, three weeks ago.
7    Q.   You met with Mr. Solberg yesterday?
8    A.   Yes.
9    Q.   That was in New York here?
10   A.   In New York.
11   Q.   Did you review any documents?
12   A.   I didn't have any documents with me with
13 the exception of one document, which I gave to him,
14 which -- which was an affidavit which Ajay Mittal
15 had given to me way back, you know, so that I gave
16 to him, because I don't have any other documents.
17   Q.   If it's permissible with your counsel,
18 if I may review that.
19      MR. SOLBERG:  Yes (handing).
20      MR. TAFFET:  Why don't we mark this as
21 Exhibit 3, if that's fine.
22      MR. SOLBERG:  That's fine.  Should we
23 make some copies of it?
24      MR. TAFFET:  Yes, maybe that's a better
25 idea.
```

15

```
1              Moorthy
2      (Plaintiffs' Exhibit 3, affidavit,
3   marked for identification, as of this date.)
4    Q.   Mr. Moorthy, I've handed you a document
5  we've marked as Exhibit 3 to your deposition.  I
6  believe you indicated that this is the one document
7  you provided to Mr. Solberg yesterday during your
8  preparation; is that correct?
9    A.   That's right.
10   Q.   And during your meeting with
11 Mr. Solberg, did you review other documents?
12   A.   No, I didn't have any documents with me.
13   Q.   Did Mr. Solberg provide you with any
14 documents?
15   A.   Yes, he had shown me some copies of
16 e-mails and others relating to the company Visa
17   Q.   Do you recall the specific e-mails?
18   A.   No, there were a whole bunch of e-mails.
19 Nothing specific that I can recall from that.
20   Q.   And were there any documents other than
21 e-mails that you can recall?
22   A.   No, sir.
23      MR. SOLBERG:  I would like to clarify.
24 We did look at other documents yesterday.
25      THE WITNESS:  Such as?
```

16

```
1              Moorthy
2      MR. SOLBERG:  The letter agreements.
3      THE WITNESS:  Oh, yeah.
4      MR. SOLBERG:  There were documents that
5  we reviewed in preparing for his deposition.
6    Q.   Based on Mr. Solberg's clarification,
7  Mr. Moorthy, do you recall any of the documents
8  that you reviewed yesterday other than there were
9  some e-mails?
10   A.   No, other documents, no, I don't recall
11 anything.
12   Q.   The letter agreements, for example, that
13 Mr. Solberg references, do you recall those?
14   A.   Yes.
15   Q.   Any others?
16   A.   No.
17   Q.   Now, prior to today have you discussed
18 this case with anybody other than Mr. Solberg or
19 other lawyers for UCAP, Union Carbide or Dow
20 Chemical?
21   A.   No.
22   Q.   Have you inquired of anybody at any of
23 those companies concerning facts that existed after
24 your retirement from whatever company you retired
25 from in January of 1999?
```

17

```
1              Moorthy
2    A.   I didn't understand, you said "facts."
3    Q.   Let me rephrase.
4      Have you discussed prior to today, other
5  than with counsel, any issues related to this case
6  or that might be related to this case with anybody
7  else who was employed at either UCAP, Union Carbide
8  or Dow regarding information arising after you
9  retired in January 1999?
10   A.   We had had some general conversation
11 with some of my colleagues relating to this case.
12   Q.   You say "we" had such discussions, who
13 are you referring to?
14   A.   I talked to within my office one guy
15 called Tyson Keel, who was my successor, and Navin
16 Chandra, who was working for the company Visa
17 Petrochemicals back in India.  I think these are
18 the two people I can recollect.
19   Q.   Do you recall when you spoke with
20 Mr. Keel?
21   A.   Keel may have been about a couple of
22 months ago.
23   Q.   Is Mr. Keel still employed by any of the
24 defendants in this lawsuit?
25   A.   I don't think so.
```

**5  (Pages 14 to 17)**

254

Moorthy

1 implemented, correct?
2
3    A.   You're not right because I went on
4 explaining that the basis of the floor price or
5 basis of any price is based on the net back to the
6 company, the corporation, and the freight and the
7 insurance, and then how can you say that I don't
8 know anything at all about this floor price.
9    Q.   Here is a very direct question.  You can
10 answer it yes or no.
11       Did UCAP set the floor prices for each
12 product, chemical products only?
13       MR. SOLBERG:  Object to the form.
14    A.   Did UCAP set the floor price for the
15 chemical products?  I'm not aware of UCAP setting
16 any floor prices for any of the chemical products.
17    Q.   Did Union Carbide Corporation set the
18 floor price for the chemical products?
19       MR. SOLBERG:  Object to form and
20 foundation.
21    A.   Union Carbide Corporation had
22 discussions with the business directors and the
23 sales managers and based on the net back to the
24 corporation, we had a general idea as to what is
25 the prices at which we can sell in various

255

Moorthy

1
2 affiliate countries.
3    Q.   Can you answer my question now?
4       Did Union Carbide Corporation set the
5 floor price for the chemical products?
6    A.   I don't know.
7    Q.   You say there was a minimum price that
8 was generally made known to the affiliates.  Do I
9 recall your testimony correctly?
10    A.   I said the minimum -- the price at which
11 the sales managers could sell to the affiliates
12 were known to the sales manager based on the net
13 back to the corporation.
14    Q.   And that was conveyed to the affiliates?
15    A.   I don't think so, it was conveyed to the
16 affiliates.
17    Q.   But how did the affiliates know how to
18 negotiate a price with the end users if they didn't
19 know what the minimum price was?
20    A.   Virtually for all sales to the
21 affiliates, I mean if you take very specifically
22 for Megavisa, each sale they would come to the UCAP
23 sales managers and discuss with them.  There was
24 no -- every sale had to be discussed with the
25 affiliate -- excuse me, with the UCAP sales

256

Moorthy

1
2 manager.  In Megavisa's case, basically they were
3 only an indent business.  They had to discuss every
4 sale, they had to talk to the UCAP product
5 directors or sales managers.
6    Q.   And obtain a U/A for the price?
7    A.   That's right.
8    Q.   And on occasion the U/A was issued for
9 the price, correct?
10    A.   Majority of the occasions the U/A was
11 issued.
12    Q.   On occasion the U/A was not issued,
13 correct?
14    A.   Based on -- again, as I told you, based
15 on the net back to the corporation.
16    Q.   That was because the sale price, the CIF
17 price was too low?
18       MR. SOLBERG:  Object to form.
19    Q.   Correct?
20    A.   The CIF price did not give adequate net
21 back to the corporation.
22    Q.   Right.
23       And as far as you are aware that process
24 or that approach worked -- withdrawn.
25       The work was followed in connection with

257

Moorthy

1
2 the sale of all chemical products, not just from
3 your division?
4    A.   That's right.
5       MR. SOLBERG:  Richard, is now a good
6 time for a break?
7       MR. TAFFET:  Do you want to take a
8 break?
9       MR. SOLBERG:  Yes.
10       MR. TAFFET:  Let me try to wrap up this
11 line.
12       MR. SOLBERG:  I don't mean to cut you
13 short, but when you do have a good breaking
14 point.
15       MR. TAFFET:  Excellent.
16    Q.   Are you aware of any instances where the
17 UCAP product or sales manager was required to
18 confer with the Danbury product or sales managers
19 regarding obtaining approval for issuing a U/A for
20 a CIF price?
21    A.   Could you repeat the question, please?
22       MR. TAFFET:  Read it back.
23       MR. SOLBERG:  Objection.
24       (Record read.)
25    Q.   Do you recall any instance where the

12  (Pages 254 to 257)

**Moh, Wendy (W)**

| | |
|---|---|
| **From:** | ucarb/northameri/lloydka |
| **Sent:** | Thursday, January 22, 1998 11:06 PM |
| **To:** | LAWRENCE CHEUNG |
| **Cc:** | E Q JIMENEZ; NERI.RG |
| **Subject:** | Distributors |

```
Microsoft Mail v3.0 (MAPI 1.0 Transport) IPM.Microsoft Mail.Note
From: Lloyd KA (Keith)
To:  Cheung L (Lawrence)
     Fisher EJ (Eugene)
Cc:  Ryan FD (Don)
     Neri R (Ron)
     Waag GG (Grace)
     Du LC (Luke)
     Jimenez EQ (Noli)
Subject: Distributors
Date: 1998-01-22 09:05
Priority: 3
Message ID: 8632869BA092D1119A8300805FBE20B7
Conversation ID: Distributors
```

------------------------------------------------------------------------

```
I would like to add my 10 cents to the discussions re Mega Visa and
VinMar...There is a well established UCC policy that requires our
distributors to be under contract. The latest version of the Standard
Distributor contract not only spells the commercial aspects, territory,
obligations etc but addresses our Responsible Care needs.  I don't know if
Mega Visa is under this contract, but if they are not, they should be.
Likewise if we go forward with Vin Mar or some other 3rd Party they should be
placed under contract.  This will then give us the teeth we need to govern
their behavior. Let me know if you need a copy of the contract form.  Keith
```



EXHIBIT
117
Neri

DS 251406

Page 118

1  Q.  And do they still exist today?          12:16
2  A.  I have no idea, and I don't see a reason    12:16
3 for us to keep those anymore because we're not in    12:16
4 the business --                              12:16
5  Q.  But you --
6  A.  -- for so many years.                    12:16
7  Q.  Sorry.  You don't know whether or not they    12:16
8 were kept?                                   12:16
9  A.  They were kept, but I don't know whether    12:16
10 they still exist in the office.               12:16
11  Q.  If they're not in the office, would they    12:16
12 have been destroyed?                         12:16
13  A.  Probably.                              12:16
14  Q.  And when would that have occurred?        12:16
15  A.  We moved office this year, and a lot of    12:16
16 information that was not required which was     12:16
17 collected over a long period of time was destroyed.  12:17
18  Q.  When did you move offices this year?      12:17
19  A.  Four months back or five months back.     12:17
20  Q.  And which office are you talking about now,  12:17
21 Visa India or a different one?                12:17
22  A.  Via India, as it was Visa Singapore.      12:17
23  Q.  I'm sorry?                             12:17
24  A.  As it was Visa Singapore.  Both offices we  12:17
25 moved.  And all the relevant information which we   12:17

Page 119

1 had no need for.  We're not dealing in wire and    12:17
2 cable compound, we don't need stacks and stacks of  12:17
3 papers of wire and compound information.  It's been  12:17
4 destroyed.                                   12:17
5  Q.  So if you had information that related to   12:17
6 wire and cable or to other products that you    12:17
7 weren't dealing with anymore that you regarded to   12:17
8 be irrelevant, those were destroyed?          12:17
9  A.  Yes, sir.                              12:17
10  Q.  Were any officials other than Visa India or  12:17
11 Visa Singapore officials involved in the process of  12:18
12 deciding what would be kept and what would be   12:18
13 destroyed?                                  12:18
14  A.  I'm sorry.  Can you repeat that question.   12:18
15  Q.  Was anyone other than an employee of Visa   12:18
16 India or Visa Singapore involved in the process of  12:18
17 what would be kept and what would be destroyed?   12:18
18  A.  No, sir.                              12:18
19  Q.  Did you retain any materials at all in your  12:18
20 offices that related to any of the chemicals or   12:18
21 wire and cable?                             12:18
22  A.  No, sir.  It's been four years plus of --   12:18
23 three, four years now.  So we have been out of the  12:18
24 market, and we don't intend to be in that market   12:18
25 anymore.  It's been destroyed for us, so we    12:18

Page 120

1 destroyed all that information.               12:18
2  Q.  Did you ever circulate any kind of a       12:18
3 directive or instruction to Visa India, Visa    12:18
4 Singapore, Global Singapore or Global Houston to   12:19
5 preserve all relevant documents that could possibly  12:19
6 be related to this litigation?                12:19
7  A.  Never.  Whatever we retained was sent to    12:19
8 our counsels.                               12:19
9  Q.  Every single sheet of paper that you had    12:19
10 regarding to -- regarding -- strike that.      12:19
11      Every single piece of paper you had in your  12:19
12 files at the time of the lawsuit, March of 2003,   12:19
13 every sheet was sent to your counsel?         12:19
14  A.  Yes, sir.  It costed a lot of money also.   12:19
15  Q.  And there was no paper at all that related   12:19
16 to wire and cable, chemicals or the relationship   12:19
17 between the plaintiffs and the defendants that you  12:19
18 had in your office as of March of 2003 that was not  12:20
19 sent to your counsel; is that correct?        12:20
20  A.  Whatever was retained was sent to the      12:20
21 counsels, to the best of my knowledge.         12:20
22  Q.  Whatever was retained as of when?         12:20
23  A.  As of 2002, when we filed the suit in June   12:20
24 2002.  My dates are fine.  25th of June 2002.   12:20
25  Q.  When you moved, did you also move your      12:20

Page 121

1 electronic document systems as well?          12:20
2  A.  Yes, sir.                              12:20
3  Q.  And were -- was information from those      12:20
4 systems that related to wire and cable and related   12:20
5 to the chemicals of any kind that you handled for   12:20
6 Carbide, was that moved or was that destroyed?   12:20
7  A.  Everything that was there until June       12:20
8 2000 -- June of 2002 was given to the counsels.  If  12:21
9 there was anything that got missed out, I do not   12:21
10 know of; but I don't think there was much that got  12:21
11 missed out.  But everything else has been      12:21
12 destroyed.                                  12:21
13  Q.  So all of -- all of the internal business   12:21
14 plans, ways to get customers, micro-level       12:21
15 information that you've described, all of that was   12:21
16 sent to plaintiffs' lawyers, correct?         12:21
17  A.  To the best of my knowledge, yes, sir.     12:21
18  Q.  And all of your internal business plans on   12:21
19 a macro level also would have been sent to counsel,  12:21
20 correct?                                    12:21
21  A.  Yes, sir.                             12:21
22  Q.  Isn't it true that Mega Visa India asked    12:22
23 representatives of the defendants to make joint   12:22
24 visits with them to Mega Visa branch operations and  12:22
25 to speak directly with their customers?        12:22

31 (Pages 118 to 121)