# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. <br><br> Defendants. | Civil No. 3:02 CV 1107 (AVC) <br><br> November 1, 2005 |

## DEFENDANT THE DOW CHEMICAL COMPANY'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MOTION TO COMPEL AND IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER PRECLUDING THE DEPOSITION OF ANDREW N. LIVERIS

Craig A. Raabe (ct 04116)
Edward J. Heath (ct 20992)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  05103-3497
(860) 275-8304

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
71 S. Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006-1157
(202) 263-3000

*Counsel for Defendants The Dow Chemical Company*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................................ 2

III. ARGUMENT ..................................................................................................................... 7

    A. Noticing The Deposition Of A Top Company Official Is Inappropriate Before Exhausting Less Intrusive Means Of Discovery And Showing That The Official Is Uniquely Capable Of Providing The Desired Information. .......... 8

    B. Plaintiffs Have Not Demonstrated That Mr. Liveris Uniquely Possesses Personal Knowledge Of The Information At Issue............................................. 11

IV. CONCLUSION ................................................................................................................ 16

Defendant The Dow Chemical Company ("TDCC") submits the following memorandum of law in response to the motion to compel the deposition of Andrew N. Liveris, President and Chief Executive Officer of TDCC, submitted by plaintiffs MM Global Services, Inc., MM Global Services Pte. Ltd., and Mega Visa Solutions (S) Pte. Ltd (collectively "plaintiffs") and in support of TDCC's motion for a protective order precluding Mr. Liveris's deposition.

## I.   **INTRODUCTION**

Plaintiffs' motion to compel supplies no basis whatsoever for the deposition of Mr. Liveris to proceed. To the contrary, the proposed deposition should be precluded because it is manifestly improper. The law is clear that a litigant must demonstrate that a high-level executive has unique, personal knowledge of the matters in dispute before the deposition will be permitted. Plaintiffs have not so much as attempted to muster any such evidence here—nor is there any. Plaintiffs pepper their brief with the terms "primary" and "unique" in describing Mr. Liveris's purported knowledge but never establish "good cause" (or any cause) to believe this is so. Fed. R. Civ. P. 26(b)(1).

Mr. Liveris's affidavit, submitted with this memorandum of law, shows the extent of plaintiffs' overreaching. Far from having any unique or superior information probative of plaintiffs' breach of contract, antitrust and negligent misrepresentation claims related to their distributorship arrangement with defendants in India, Mr. Liveris's affidavit confirms his lack of firsthand knowledge regarding these subjects. *See* Ex. 1 hereto. While Mr. Liveris might have knowledge of the business units in general or the merger agreement by virtue of his position, that can hardly substitute for, or even add to, the more focused information plaintiffs can obtain from other deponents within TDCC—or its co-defendants—who had direct involvement with the

relationship between plaintiffs and defendants and whose testimony can be elicited on a much less intrusive basis.

The "interrogatory answers and the other evidence obtained to date" to which plaintiffs obliquely refer supports, rather than "belies" (Pls. Mem. 10), this conclusion. No discovery or document has revealed—as required—that Mr. Liveris can contribute anything beyond that of other potential deponents. *See infra* pp. 4-7. TDCC, Union Carbide Corporation ("UCC"), and Union Carbide Asia Pacific, Inc. ("UCAP") already have agreed to present eight other present or former senior company officials in response to plaintiffs' Rule 30(b)(6) depositions, and recently received notices for the depositions of four other officials. Plaintiffs neglect to mention this fact or to set out why these depositions are insufficient (nor could they possibly make such a showing when the depositions have yet to be taken).

Under these circumstances, plaintiffs' effort to depose Mr. Liveris serves no purpose other than harassment and should be quashed.

## II.  FACTUAL BACKGROUND

This case concerns plaintiffs' non-exclusive role in the distribution of certain chemical and polymer products (the "Products") in India. First Am. Compl. ("Compl.") ¶ 1. The initial understandings were entered into between plaintiffs and an Asian subsidiary of UCC, not TDCC (which, incidentally, did not enter into the merger transaction until 2001). *Id.* ¶ 26.

Plaintiffs' entire complaint stems from this Indian arrangement. Plaintiffs allege that defendants "compelled Plaintiffs to agree to engage in a resale price maintenance conspiracy," Compl. ¶ 27; and after the TDCC-UCC merger was announced in 1999, "undertook efforts to establish [TDCC] * * * in place of Plaintiffs as a direct seller of Products to end-users in India" through "surreptitious and bad faith conduct" (*id.* ¶ 32) which included "misrepresent[ing] an

intent to maintain a relationship with Plaintiffs" (*id.* ¶ 40) and constituted a breach of contract. Plaintiffs further allege that defendants "unlawful[ly] terminat[ed] * * * the [parties'] contractual relationship" in 2002. *Id.* ¶¶ 50, 61.

Andrew N. Liveris has been President and Chief Executive Officer ("CEO") of TDCC since November 2004. From November 2003 to November 2004, he was TDCC's President and Chief Operating Officer. Mr. Liveris was President of Performance Chemicals Business Group for TDCC for the three years prior to that (2000-2003), and Vice-President of Specialty Chemicals for TDCC from 1998-2000. *See* Ex. 1 ¶ 1. Throughout his tenure, he was never involved in TDCC's relationship with plaintiffs and had no communications or contacts with them regarding the allegations of the Complaint. *Id.* ¶ 4. He was not involved in, and has no personal knowledge of, any pricing discussions or decisions regarding amounts that plaintiffs should charge customers for the sale of the Products or how much plaintiffs should pay to defendants or their affiliates with respect to those sales. *Id.* He was not involved in the implementation or termination of plaintiffs, and had no communications or contact with plaintiffs with respect to the agreement. *Id.* Those responsibilities fell to other employees, as plaintiffs' own complaint admits. *See, e.g.,* Compl. ¶¶ 41, 44, 47 (naming the "managing director of Dow's India subsidiary" and "its marketing director in India" as interacting with plaintiffs). Moreover, we are not aware of a single document produced in discovery by plaintiffs that bears Mr. Liveris's name and plaintiffs have not identified any. *See* Pls. Mem. 8 (discussing documents produced by defendants).

Permitting plaintiffs to take Mr. Liveris's deposition, where his knowledge is, at best, secondhand and general, would be extremely burdensome to him, as well as to TDCC as a company. His day-to-day responsibilities as TDCC's President and CEO are extensive, requiring

an enormous time commitment and frequent international travel. Ex. 1 ¶ 5. For this reason, though agreeing to produce a wide range of witnesses, TDCC objected to Mr. Liveris's deposition and conferred in good faith with plaintiffs to request that they voluntarily withdraw the notice. TDCC's attorneys spoke by phone with plaintiffs' attorneys on September 22 and 30, 2005, asking for an explanation as to why plaintiffs had sought to depose TDCC's CEO. Plaintiffs provided little by way of response, other than to note that Mr. Liveris's name had appeared in the parties' discovery responses and had been mentioned in the depositions (but not with respect to any of the plaintiffs). Plaintiffs' brief is no different. Pls. Mem. 2, 5-6. The brief still does not provide a specific explanation as to any *facts* about any of the plaintiffs that Mr. Liveris supposedly possesses with respect to the claims alleged, other than to point to testimony indicating that he had supervisory responsibility for certain businesses and that he had knowledge of the merger agreement between TDCC and UCC. *See id.* at 5-6 (discussing Neri deposition).

None of the discovery responses suggest that Mr. Liveris is uniquely positioned to testify about the facts relevant to any of plaintiffs' three claims. Plaintiffs observe that Mr. Liveris's name appears in "various" TDCC discovery responses, as though this were enough to warrant deposing him. Pls. Mem. 2 & n.2. It is not. For example, in several instances, Mr. Liveris was identified by TDCC only because *plaintiffs* expressly requested information about him. *E.g.*, TDCC's Ans. & Obj. to Pls. First Set of Interrogs., at 19-21 (Ex. 2); TDCC's Suppl. Resp. & Obj. to Pls. Second Set of Interrogs., at 6-7 (Ex. 3). TDCC indicated in another response that because of his "job responsibilities"—and necessarily limited in "scope * * * based upon those job responsibilities"—Mr. Liveris may "have knowledge" regarding defendants' sales of Products to their subsidiaries in Singapore (through which plaintiffs contend certain unlawful

-4-

activities were conducted). Third Suppl. Resp. & Obj. of Defs. to Pls. First Set of Personal Jurisdiction Document Requests and Interrogs., Ans. to Interrog. No. 4, at 11-12 (Ex. 4). As TDCC specifically noted in the response, that identification reflects nothing more than that Mr. Liveris's prior position as President of Performance Chemicals Business Group meant he "generally had global responsibility for products and groups of products" and may have information at that level—not that he has direct or intimate familiarity with the "deal" between plaintiffs and a foreign UCC subsidiary. *Id.*

Plaintiffs' own discovery responses similarly reflect that any testimony Mr. Liveris may provide would be anything but "unique" or "superior" as to their claims. In their responses on the merits, plaintiffs identified Mr. Liveris as *one of eighty-seven* of defendants' present or former employees who "may have knowledge" regarding the "nature, extent, or cause of any injuries or damages that Plaintiffs suffered." Pls. Ans. & Obj. to Defs. First Set of Interrogs. on Merits Discovery, Ans. to Interrog. No. 8, at 10 (Ex. 5). In their responses on the subject of jurisdiction and venue, plaintiffs also identified "Andrew Liveris * * * and those that directly report to him" (again along with numerous others) as potentially "contributing" to alleged misconduct that may have occurred in Connecticut—where *UCC* is headquartered. Pls. Ans. to Defs. First Set of Interrogs. on Jurisdiction and Venue Issues, Ans. to Interrog. Nos. 1 & 11, at 4, 13 (Ex. 6). That, in each instance, Mr. Liveris is but one in a long list of individuals speaks volumes as to the limited amount of relevant information, if any, his deposition might reveal.[1]

The deposition testimony to date confirms Mr. Liveris's lack of personal knowledge about this dispute. During the recent depositions of Messrs. Neri, Fisher and Cheung, plaintiffs

---

[1] These responses are notably absent from plaintiffs' brief. Instead, plaintiffs refer only to their identification of Mr. Liveris as a potential witness in their Rule 26(a)(1) initial disclosures, which cannot possibly support the contention that he must be deposed. Pls. Mem. 5. Nearly three years have passed since plaintiffs made those preliminary disclosures, and that Mr. Liveris has "relevant personal knowledge" (*id.*) of plaintiffs' Indian distributorship arrangement has not been borne out.

learned only that, besides being president of TDCC, Mr. Liveris was part of the UCC/TDCC merger integration team, had responsibility post-merger for Industrial Products & Chemicals ("IPC"), and had been Vice-President of Specialty Chemicals (so had responsibility for that business after the merger agreement was completed). Neri Dep. at 90-91, 286-287 (Ex. 7). Plaintiffs make much of both Mr. Liveris's post-merger positions and his participation in the so-called "clean room" merger discussions, but again do not bother to explain why either justifies his deposition. The reason for that is readily apparent—the testimony is unremarkable. At best, Mr. Neri's testimony on this score and on which plaintiffs exclusively rely, substantiates what is already known: that Mr. Liveris is (and was) a high-ranking individual in TDCC with concomitant responsibilities and knowledge. Nothing Mr. Neri said suggests that, in any of his TDCC roles, including with respect to the merger, Mr. Liveris was engaged in any discussions or decisions with respect to plaintiffs' claims in particular or the prices plaintiffs charged customers. *See, e.g.,* Neri Dep. 286-287 ("I think it must have been Liveress [sic]" who was "responsible" for IPC and specialty chemicals after the merger); *id.* at 90-91 (agreeing that Mr. Liveris was listed as part of the integration team) (Ex. 7).[2] Indeed, the purpose of the "clean room" was to ensure that UCC and TDCC, as competitors, were not violating any antitrust laws by improperly exchanging pricing or other sensitive business information with each other prior to the consummation of their merger (*see* Neri Dep. 83-88)—which has nothing at all to do with plaintiffs' allegations of a "resale price maintenance" conspiracy directed at "ensur[ing] that prices charged by Plaintiffs to end-users in India would not cause an erosion to [defendants']

---

[2] Plaintiffs embellish what Mr. Neri actually said by characterizing his testimony as "ma[king] clear" that Mr. Liveris was "integral" to the merger and assumed specific responsibility for "distribution" of specialty chemicals thereafter. Pls. Mem. 5-6. That was not Mr. Neri's testimony. *See, e.g.,* Neri Dep. at 90-91 (integration team included Liveris ); *id.* at 287 ("All I know is who was responsible for the [specialty chemical] business * * * I can't answer who was responsible for the distribution.") (Ex. 7).

prices" in the United States. Compl. ¶ 29. Moreover, Mr. Cheung, then the Asia Pacific Area Director, affirmatively testified that UCC and TDCC did not engage in any discussions regarding pricing prior to the transaction. Cheung Dep. at 581 (Ex. 8).

Compare and contrast Mr. Liveris's substantively non-existent role in this matter to that of Ajay Mittal, the chief executive of plaintiffs, who has been deposed because of his substantial, personal involvement in the communications and transactions underlying the parties' dispute. Plaintiffs chose to proffer Mr. Mittal as a 30(b)(6) witness to cover **75%** of the Rule 30(b)(6) deposition topics—33 of the 44 topics—served by defendants. *See* Email from R. Taffet to Counsel dated June 20, 2005 (Ex. 9) and Email from R. Taffet to Counsel dated July 26, 2005 (Ex. 10) (identifying 30(b)(6) deponents). In contrast, defendants have not proffered Mr. Liveris to address a single Rule 30(b)(6) topic—not one—served by Plaintiffs.[3]

Because plaintiffs have made no showing that Mr. Liveris has any personal knowledge about their claims which exceeds that of any other TDCC, UCC, or UCAP personnel, the appropriate result is that his deposition be quashed.

## III.   ARGUMENT

A court may for "good cause" either "order discovery of any matter relevant to the subject matter involved in the action" or enter an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26 (b)(1), (c). Here, there is "good cause," not to compel Mr. Liveris's deposition, but to prevent it. From the very beginning, plaintiffs have systematically demonstrated their willingness to exploit the federal rules on discovery—first through harassing document requests and now through their insistence that Mr. Liveris's deposition is necessary despite the fact that he has no personal

---

[3] Defendants advised plaintiffs that they had no intention of calling Mr. Liveris as a witness at trial and, if this changed for any reason, defendants would make him available for a deposition.

-7-

knowledge about plaintiffs' claims beyond that of any other TDCC, UCC, or UCAP personnel. This is exactly the type of situation in which courts have routinely protected chief executives and high-level corporate officials from discovery harassment, and plaintiffs have done nothing to demonstrate that they can satisfy the high standard imposed to take the deposition of TDCC's CEO. TDCC's motion for a protective order should be granted and plaintiffs' motion to compel denied.

### A. Noticing The Deposition Of A Top Company Official Is Inappropriate Before Exhausting Less Intrusive Means Of Discovery And Showing That The Official Is Uniquely Capable Of Providing The Desired Information.

Federal Rule of Civil Procedure 26(c) authorizes a protective order to shield a party from discovery that is unduly burdensome or oppressive. In addition, discovery requests may be limited under Rule 26(b)(2) where "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive," and where "the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought." This provision was added to the Rules in 1983 "to encourage judges to be more aggressive in identifying and discouraging discovery overuse," so that even a party pursuing what might "otherwise [be] a proper subject[] of inquiry" will not be permitted to do so (including by virtue of a motion to compel). Fed. R. Civ. P. 26 Advisory Committee Notes. "An unnecessary deposition of a chief executive officer," one district court has observed, "appears to be precisely the kind of situation to which [the 1983 amendments to Rule 26] were directed." *Alpex Computer Corp. v. Nintendo Co.*, No. 86 Civ. 1749 (KMW), 1988 WL 87511, at *5 n.3 (S.D.N.Y. Aug. 16, 1988). *See also In re Subpoena Issued to Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) ("judges may prevent the proposed deposition when the facts and circumstances are such that it creates an inappropriate burden or hardship").

The Supreme Court has stressed that courts must vigilantly protect against abusive "in terrorem" demands to depose a party's officers. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975). Courts throughout the country have recognized that attempts to depose CEOs and other executives at the "apex" of a company pyramid often have no purpose other than harassment. *See, e.g., Consolidated Rail Corp. v. Primary Indus. Corp.*, Nos. 92 Civ. 4297 (PNL), 92 Civ. 6313 (PNL), 1993 WL 364471, at *1 (S.D.N.Y. Sept. 10, 1993) ("unfettered discovery" of high-level executives may "serve as a potent tool for harassment in litigation"); *Cantor v. Equitable Life Assurance Soc'y*, No. CIV. A. 97-5711, 1998 WL 544962, at *2 (E.D. Pa. Aug. 27, 1998) (deposition of high corporate officials "would constitute an annoyance and harassment"). Accordingly, such depositions are regularly barred unless the requesting party has exhausted less burdensome avenues for obtaining the desired information and thereby established that the official is uniquely positioned to provide the information requested. *See, e.g.,* Jill N. Goldsmith, *Courts Tend to Limit Depositions of High-Level Execs*, Nat'l L.J., Oct. 8, 2001, at C2; *Colonial Capital Co v. General Motors Co.*, 29 F.R.D. 514, 518 (D. Conn. 1961) (precluding oral deposition of General Motors' CEO before written interrogatories were propounded).

In addition, the broad and demanding responsibilities of top corporate executives justify protection. Their schedules are inevitably tight, and the time required to prepare for and appear at depositions often results in lost opportunities to add value to their companies and in "disruption of their business." *Consolidated Rail*, 1993 WL 364471, at *1. As one court explained in quashing a noticed deposition of Chrysler's CEO, a company's chairman is "a singularly unique and important individual who can be easily subjected to unwarranted harassment and abuse. He has a right to be protected, and the courts have a duty to recognize his

vulnerability." *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985). Moreover, the broad-ranging responsibilities of a large-company CEO make it unlikely that he or she will have firsthand information about the details sought by the requesting party. *See Juliano v. ITT Corp.*, Civ. No. 90-1575 (CSF), 1991 WL 3303, at *3 (D.N.J. Jan. 2, 1991) (granting protective order where deposition of corporate CEO could not have "any bearing" on relevant issues).

In light of these concerns, depositions of CEOs and other high-level executives are allowed only if that individual has "superior or unique personal knowledge" of discoverable information, which is "truly" and demonstrably unique in that the requesting party has first attempted to obtain the information through less intrusive methods. *Baine v. General Motors Corp.*, 141 F.R.D. 332, 333-335 (M.D. Ala. 1991). Those less intrusive methods must also have proven to be "unsatisfactory, insufficient or inadequate." *In re Daisy Mfg. Co.*, 17 S.W. 3d 654, 656-57 (Tex. 2000). A protective order will issue, therefore, when a plaintiff seeks to depose an "apex" official "absent a reasonable indication of the officer's personal knowledge of the case and absent exhaustion of less intrusive discovery methods." *Liberty Mut. Ins. Co. v. Superior Ct.*, 13 Cal. Rptr. 2d 363, 365 (App. 1992) (relying on federal case law); *Armstrong Cork Co. v. Niagara Mohawk Power Corp.*, 16 F.R.D. 389, 390 (S.D.N.Y. 1954) (quashing "shotgun" deposition notice of officers and directors with no personal knowledge); 8 Charles A. Wright *et al.*, Fed. Prac. & Proc. Civ. 2d § 2037 (a court may bar the deposition of a "very high corporate officer unlikely to have personal familiarity with the facts of the case").

Even where the high company official may have relevant personal knowledge, the discovering party may not go straight to the top (*Liberty Mut.*, 13 Cal. Rptr. 2d at 364), but must "first attempt to depose lower level employees" to seek the desired information, *First Fidelity Bancorp. v. National Union Fire Ins. Co.*, Civ. A. No. 90-1866, 1992 WL 46881, at *4 (E.D. Pa.

Mar. 5, 1992). *See also Filetech, S.A. v. France Telecom, S.A.*, No. 95 CIV. 1848 (CSH) 1999 WL 92517, at *2 (S.D.N.Y. Feb. 17, 1999) (granting protective order against deposition of company chairman where "lesser France Telecom employees are available to furnish information" on the "narrow" matter at issue). Thus, in *Thomas v. IBM*, 48 F.3d 478, 482-84 (10th Cir. 1995), the court of appeals upheld a protective order against the deposition of IBM's CEO, where the plaintiff "made no attempt to demonstrate that the information she seeks to obtain from [the CEO] could not be gathered from other IBM personnel, for whom a deposition might have been less burdensome." Similarly, in *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979), the court of appeals upheld a bar on the deposition of Upjohn's president before depositions of other Upjohn employees showed it was necessary.

This well-recognized body of law prohibits the deposition of Mr. Liveris. Plaintiffs have not and cannot establish any of the preconditions required to depose TDCC's President and CEO, as we explain next.

### B. Plaintiffs Have Not Demonstrated That Mr. Liveris Uniquely Possesses Personal Knowledge Of The Information At Issue.

Plaintiffs have not offered any evidence that Mr. Liveris is the sole source of information—or even *a* source of information—with respect to the allegations in *any* of the three remaining causes of action in the Complaint. He was not identified as having participated in any of the conduct alleged with respect to plaintiffs' negligent misrepresentation claim. *See* Mittal Dep. at 158-60 (July 27, 2005) (Ex. 11) & DX 11 at 16-17 (identifying participants and individuals with knowledge) (Ex. 12). He was not employed by UCC at *any* time, let alone the time that UCC is accused of having breached its contract with plaintiffs by failing to ship Products to India in 1999 (*see* Ex. 1 ¶ 1 (Liveris has never worked for UCC) & Compl. ¶¶ 33-37 (alleging breach of contract)), and had nothing to do with the decisions whether to fulfill

plaintiffs' orders in 2001 and 2002. Ex. 1 ¶ 4. He did not participate at any time in any discussions that involved the termination or continuation of plaintiffs' distributorship or the prices they charged end-users, including in carrying out his duties related to the merger. *Id.* The fact that Mr. Liveris's present and former titles indicate his general responsibility, to varying degrees, for the business units that manufactured the 150+ Products that plaintiffs claim are at issue here is far too thin a reed to support a demand for his deposition on the resale price maintenance claim (or any other), particularly given the absence of any role by Mr. Liveris in establishing the prices at which the Products were sold.

To suggest, as plaintiffs do, that Mr. Liveris's "sufficiently high * * * rank[] [in] management" is enough in itself to compel his testimony is to turn the requirements for deposing executive officers on their head. Pls. Mem. 10. It is precisely because of his "high rank" that plaintiffs are obliged to establish his deposition is essential. There is, however, nothing to show the deposition should proceed.

To the contrary, plaintiffs may well be able to obtain the information desired through their depositions of lower-level employees. *See Murray v. County of Suffolk*, 212 F.R.D. 108, 110 (E.D.N.Y. 2002) (granting protective order absent showing that the information sought from high government official was unavailable from other sources, including the eight scheduled depositions of other county personnel). Mr. Liveris may have been named in certain discovery responses, but the witnesses that defendants have already committed to produce are far more likely to have pertinent knowledge. Defendants are proffering eight witnesses to testify, for example, as to defendants' organization and operations, the distributorship contract, competition relating to sales of Products in India, communications between any of the defendants and plaintiffs, and any effect of the TDCC-UCC merger on the parties' Indian distributorship

arrangement. *See* Pls. Rule 30(b)(6) Notice, Ex. A (Ex. 13). These witnesses either hold, or held, senior company positions within defendants and, with one exception, each was named in those same discovery responses that identify Mr. Liveris as an individual "with knowledge." *See supra* pp. 4-6. The witnesses to be produced by TDCC are its *Business Vice President, Performance Chemicals*; *Business Director, Amines*; *Finance Manager, Dow India*; *Senior Account Manager, BS&M*; and *Managing Counsel, Legal Department*.[4] Additional witnesses to be produced by UCAP are its *Former President*; *Former Business Director/General Manager for Industrial Performance Chemicals*; and *Director, BS&M*.

Before seeking "apex"-type discovery, plaintiffs must conduct these depositions and demonstrate that Mr. Liveris is the only repository of relevant information available to them. Until plaintiffs exhaust such alternative and available avenues for less-intrusive discovery, they cannot satisfy the high standard for obtaining a president and CEO's deposition—particularly because plaintiffs appear to believe that these 30(b)(6) witnesses and Mr. Liveris may possess knowledge *on the same subjects*. *See, e.g., Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 682 (7th Cir. 2002) (plaintiff's "failure to take advantage" of "other reasonably available means of discovery" "casts serious doubt over her claim that [the Vice-President and Controller] possessed information that was more than marginally relevant to her civil action"). That presumed, and likely, overlap in knowledge strongly suggests that both the 30(b)(6) depositions and other discovery will demonstrate the pointlessness of deposing TDCC's President and CEO. *See Colonial Capital*, 29 F.R.D. at 518 (since plaintiff "has already taken the depositions of twelve officers and employees of General Motors," it seems "no good purpose would be served by requiring [its CEO] to submit to an oral examination at this time"); *Stone v. Morton Int'l, Inc.*,

---

[4] Some of these witnesses will testify on behalf of UCC and UCAP as well. TDCC's Managing Counsel for its legal department, William Herr, is the sole individual who was not also identified in the parties' discovery responses.

170 F.R.D. 498, 504 (D. Utah 1997) (where "references to [Vice President were] vague and slim," his deposition could not be taken "without first showing compliance with Rule 30(b)(6) F.R.C.P. or other discovery methods and the reasonable exhaustion of the relevant subject matter"); *Baine*, 141 F.R.D. at 336 (plaintiffs must "take the corporate deposition before noticing any deposition of [a vice president]"). Indeed, courts do not permit depositions of senior executives that are simply repetitive, and that sort of duplicative discovery is to be avoided, in any event. *See Consolidated Rail*, 1993 WL 364471, at *1 (holding it "appropriate to preclude a redundant deposition of a highly-placed executive"); *Hughes v. General Motors Corp.*, 1974 U.S. Dist. LEXIS 8036, at *2 (S.D.N.Y. June 18, 1974) (barring deposition of GM's president where the desired information was "available through other employees" and thus would "at best result in a duplication of testimony).

Moreover, as noted above (*supra* at 3), we are not aware that Mr. Liveris's name appears on a single document produced by plaintiffs in this litigation. While plaintiffs argue that his name appears on 330 documents (Pls. Mem. 8) *of the 1.5+ million pages of documents produced by defendants*, that is hardly surprising given the breadth of discovery demanded by plaintiffs on topics having nothing to do with India and/or the MegaVisa plaintiffs. Plaintiffs themselves concede that, in the universe of documents produced, those "sent from and to Mr. Liveris" are "relatively smaller in number" than for the other witnesses whose testimony they wish to compel. Pls. Mem. 8 n.14. This most certainly does "diminish" the asserted "need for his deposition" (*id.*) because it bears out that Mr. Liveris is, at best, a person on the periphery in terms of this dispute. Citing document titles as somehow "evidencing" that Mr. Liveris "possesses highly pertinent information" (*id.*) does not prove otherwise—especially when he has attested to having no involvement in any relationship with plaintiffs, Ex. 1 ¶ 4. *Liberty Mut.*, 13

Cal. Rptr. 2d at 365 (where president and CEO submitted declaration indicating "he had no knowledge * * * of any facts alleged in [the] complaint," that he received letters regarding plaintiff's claims did not justify his deposition).

Plaintiffs' motion to compel the deposition of Mr. Liveris is just another instance of their willingness to abuse discovery proceedings as a means to bludgeon defendants. These tactics are consistent with plaintiffs' earlier decision to serve discovery requests aimed at requiring defendants to go back and re-do their entire paper production just as the last responsive documents were being gathered. Now plaintiffs insist on the deposition of TDCC's President and CEO despite the fact that they can point to no basis that would support a need to take the deposition of the company's highest-ranking corporate officer.

In any event, plaintiffs may not start discovery at the top of the corporate pyramid. The governing case law requires that they first seek the desired information through less disruptive means. Defendants have fully cooperated in that respect, supplying plenty of witnesses with far more relevant and focused knowledge than Mr. Liveris. His deposition should be quashed. **IV.**

### **CONCLUSION**

For the foregoing reasons, TDCC respectfully requests that the Court enter an order denying plaintiffs' motion to compel and precluding the deposition of TDCC's President and CEO, Andrew N. Liveris.

Respectfully submitted,

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, IL  60606-4637(860) 275-8304
(312) 782-0600

Craig A. Raabe (ct 04116)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 05103-3497

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006-1157
(202) 263-3000

*Counsel for Defendant The Dow Chemical Company*

## CERTIFICATE OF SERVICE

This is to certify that a copy of this Memorandum of Law in Response to Plaintiffs' Motion to Compel and in Support of its Motion for a Protective Order Precluding the Deposition of Andrew N. Liveris was forwarded this 1st day of November, 2005, by first-class mail, postage prepaid, to the following counsel:

Alicia L. Downey, Esq.
Bingham McCutchen, LLP
150 Federal Street
Boston, MA  02110-1726

Richard S. Taffet, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022-4689

Suzanne Wachsstock, Esq.
Wiggin & Dana LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT  06911-0325

Robert M. Langer, Esq.
Steven Bruce Malech, Esq.
Wiggin & Dana LLP
One CityPlace
185 Asylum Street
Hartford, CT  06103

Christopher J. Kelly, Esq.
Mayer Brown Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

Nathan P. Eimer, Esq.
Andrew G. Klevorn, Esq.
Ryan S. Hedges, Esq.
Eimer Stahl Klevorn & Solberg, LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604

Paul A. Winick, Esq.
Michael S. Elkin, Esq.
Susan B. McInerney, Esq.
Alyson L. Redman, Esq.
Thelen Reid & Priest LLP
875 Third Avenue
New York, NY  10022-6225

_____
Craig A. Raabe