UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., AND MEGAVISA SOLUTIONS (S) PTE. LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 3:02 CV 1107 (AVC) |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD., AND DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD., | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## SUPPLEMENTAL DECLARATION OF ALICIA L. DOWNEY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF WITNESSES PURSUANT TO RULE 30

Alicia L. Downey, declares as follows:

1.      I am a partner in the firm of Bingham McCutchen LLP, co-counsel for plaintiffs

in the above-captioned action.  I submit this Supplemental Declaration to put before the Court

certain documents in further support of Plaintiffs' Motion to Compel Production of Witnesses

Pursuant to Rule 30.  Unless otherwise stated, I make this Supplemental Declaration on personal

knowledge.

2.      Attached hereto as Exhibit 1 is a true and correct copy of relevant pages from the

rough transcript of the deposition of John P. Yimoyines taken on November 10, 2005.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a document produced by

defendants and marked as Defendants' Deposition Exhibit 25.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a document produced by

defendants and marked as Plaintiffs' Exhibit 147.

I declare, under the penalty of perjury, that the foregoing is true and correct.  Signed this

15th day of November 2005.

Alicia L. Downey

## CERTIFICATE OF SERVICE

This is to certify that on this 16th day of November, 2005, a copy of the foregoing was

sent by telecopier and first-class mail to the following:

Craig A. Raabe
Robinson & Cole LLP
280 Trumbull Street, 28th Floor
Hartford, CT  06103

Andrew S. Marovitz
Mayer Brown Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606-4637

Christopher J. Kelly
Mayer Brown Rowe & Maw LLP
1909 K. Street, N.W.
Washington, DC  20006

Scott C. Solberg
Eimer Stahl Klevorn & Solberg LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604

/s/ Alicia L. Downey
Alicia L. Downey

cc:     The Honorable Alfred V. Covello (via hand delivery)
        United States District Court
        450 Main Street
        Hartford, CT  06103

111005WA.TXT

16    over lie, I could do that.

17    Q    No, the document will speak for itself, and I

18    could point out some though for example if you go to

19    78, the page that has the last two numbers 78?

20    A    Right.

21    Q    The Roman Numeral is maximize value of

22    existing business, and I think you would agree with me

23    that that corresponds with the heading on 72, and then

24    the row plan numbers on the pages do track each other?

25    A    Certainly maximize value existing business, I


Brandon Smith Reporting Service

ROUGH DRAFT

123

1    see that.  I see maintain safe and reliable

2    operations.  I see maximizing EP by variable margin

3    improvement, but then I do not see the detail here.

4    Q    The detail, right.

5    A    So I guess then --

6    Q    I just said the heading sir.

7    A    Well, the headings seem to match with the

8    document that the earlier document.

9    Q    Was it part of Mr. Ungerleider's job to

10    identify the critical business issues for 2001?

11    A    It was part of Mr. Ungerleider's team of which

12    testifies leader, so therefore I would hold him

13    accountable to identify the critical business issues

14    for 2001 and come and review them with me.

15    Q    When was the first time that you had any

16    discussions within your organization concerning the

17    distribution channels to India?

18                MR. MAROVITZ:  Objection to fcrm.
                              Page 111

19          THE WITNESS:  We had so much to do to

20     bring SPD into wire and cable, and we parceled it out,

21     all the various ways, all the various things that had

22     to be done to various organizations.  The discussion

23     of how we would sell in Asia was left to UCAP, so that

24     UCAP probably should have been thinking about how

25     they're going to service, how this new Dow, if you

Brandon Smith Reporting Service

ROUGH DRAFT

124

1      will, organization is going to service Asia, post

2      merger, is a discussion that should have been taking

3      place I'll say between first CC and Lawrence, and then

4      consulting Markus and then coming forward with a plan

5      as to how they were going to service their market.

6      There were clearly objectives that Dow had people, we

7      had people, not so much in wire and cable, but in

8      other businesses, so if you got, you know, too many

9      salespeople, how are you going to do it, how can we

10     leverage what we do, best practices, with what Dow

11     does, so clearly all those conversations are taking

12     place around the globe from February 7th on.

13     Q     Did you consider defining the Indian market

14     channel as a critical business issue for 2001?

15     A     No.

16     Q     Can you turn to page, the last two numbers of

17     which are 80.  If you to look at the entry Roman one,

18     capital E, gain value by applying best practices and

19     sales and marketing, and the second number one under

20     that, and then read across the columns?

21     A     Consolidate agents and distributors.

                        Page 112

111005WA.TXT

22    Q    Yes, sir.

23    A    Indian market channel defined.

24    Q    That's under criteria for success, correct?

25    A    That's correct.


Brandon Smith Reporting Service

ROUGH DRAFT

125

1    Q    Do you recall any involvement you had in

2    connection with defining the Indian market channel at

3    or about the time that this document was created?

4    A    In doing these things, one had to look at the

5    ways you do business, and how you do business.  My

6    position on this was, has been, and always will be,

7    our best channel to the Indian market was through

8    Megavisa.

9    Q    Let me ask you a question.  Were you having

10    discussions in March of 2001 with your business team

11    concerning defining the Indian market channel?

12    A    No.

13    Q    Were you having those discussions in April of

14    2001?

15    A    The issue may have been raised to me by

16    others.  My position was, is, anals will be the best

17    way to the Indian market is through Megavisa, for wire

18    and cable compound.

19    Q    If you go to the column that's titled

20    owner/team, in the same matter?

21    A    Yes.

22    Q    It says Cr/quote RM M apostrophe S close

23    quote.

24    A    Um-hmm.

Page 113

111005WA.TXT

25    Q    Do you know who Cr is?


Brandon Smith Reporting Service

ROUGH DRAFT

126

1     A    Christer Rundlof.

2     Q    Do you know what RM M would relate to?

3     A    Regional market managers.

4     Q    Who would they be?

5     A    Well, in the case of UCAP would be either

6    Lawrence or CC depending upon when the transition took

7    place, in the case of Europe it's Francois Bruart in

8    the case of Latin America it's Angel more always.

9     Q    And the person who preceded Francois?

10    A    That's correct.

11    Q    When do you recall talking about for the first

12   time direct sale of non-wire and cable products to end

13   users and customers, I'm sorry, on users in India?

14              MR. MAROVITZ:  Objection to form and

15   foundation.

16   BY MR. TAFFET:

17    Q    Post day one.

18              MR. MAROVITZ:  Same objection.

19              THE WITNESS:  Just to be clear, you said

20   non-wire and cable.

21    Q    That's right?

22    A    Products.

23    Q    Um-hmm?

24              MR. MAROVITZ:  Same objection.

25              MR. EIMER:  Same objection.

111005WA.TXT

1            THE WITNESS:  Me talking about that, that
2    was your question.
3        Q    Yes?
4        A    The second half of 2001.
5        Q    Who did you have those discussions with?
6        A    Well, we're going to discussions now, I don't
7    remember discussions as much as I remember e-mails, so
8    I don't know if that's in the terms of discussion.
9        Q    Let me substitute the word communications.
10       A    Fine.  I'm going to say Markus and Lawrence.
11       Q    Do you recall what the occasion was that
12   started the e-mail communications that you're
13   referencing here?
14       A    Somewhere Mr. This time period, and I don't
15   know about if it's a specific one that you have in
16   your hand, but somewhere Mr. This time period
17   chemicals was doing the very thorough to look at their
18   distribution channels in India, and either Markus or
19   Lawrence made me aware of this, and that's what I
20   remember.  But chemicals was doing a review as we were
21   of all of our distribution channels globally.
22       Q    Did you actually undertake a review of the
23   wire and cable distribution channel in India?
24       A    Yes.  And we concluded that the as I maintain,
25   the best way was, is, anals would be, through

                 Brandon Smith Reporting Service

1    Megavisa.

111005WA.TXT
2      Q    What was involved in that review process, what
3    steps did you take?
4      A    We looked at our alternate way to get to the
5    customer base in India.
6      Q    What was the alternate way that you looked at?
7      A    Through Dow's sales force on the ground in
8    India.
9      Q    Why was that less attractive than me go a
10   Visa?
11     A    Me go a Visa had better contacts with the
12   customers and more sellers knowledgeable in the wire
13   and cable products in India.
14     Q    Any other factors that made you prefer playing
15   a Visa over the alternate way?
16              MR. MAROVITZ:  Objection to form.
17              THE WITNESS:  I thought I could trust
18   Ajay Mittal.
19     Q    Was Mr. Ungerleider located in Danbury
20   effective February 7th, 2001?
21     A    Yes, he was.
22     Q    How long did he remain in that location?
23              MR. MAROVITZ:  Objection, foundation.
24              THE WITNESS:  Through early summer of
25   2002.


              Brandon Smith Reporting Service
                                    ROUGH DRAFT
                                         129
1    BY MR. TAFFET:
2      Q    Where did he relocate to at that point?
3      A    Houston Texas.
4              MR. MAROVITZ:  Same objection.

111005WA.TXT
```
 5   BY MR. TAFFET:
 6   Q    And did he relocate after that to Midland?
 7   A    Yes.
 8   Q    Why don't we take a lunch break?
 9   A    Okay.
10                   (Off record.)
11   Q    Mr. Yimoyines, do you recall receiving any
12   reports from people in India concerning Megavisa soon
13   after day one?
14   A    Not specifically.
15   Q    Generally?
16   A    Like we said earlier are I received a lot of
17   reports and a lot mails but I couldn't put my finger
18   on one specifically about Megavisa and India in that
19   time period.
20   Q    Do you remember receiving a report in that
21   time period from Ravi Muthukrishnan, specifically
22   concerning Megavisa?
23   A    No.
24   Q    Why don't we explore that a little bit.
25        The reporter has handed you Plaintiff's
```

Brandon Smith Reporting Service
ROUGH DRAFT

130
```
 1   Exhibit is 47, Mr. Yimoyines, as we have been doing,
 2   if you care to look at this document, please so.
 3   A    Okay.
 4   Q    Have you ever seen this document or any part
 5   of it before?
 6   A    Yes.
 7   Q    Which part?
```

111005WA.TXT
8      A     I saw the last, I guess pages 903, 904, and

9   905 on Monday in my review with counsel.

10     Q     First time you saw those?

11     A     Yes.

12     Q     If you to look at the first page of this

13   document, 900, you see there's a, the first e-mail,

14   it's to Horacio Percossi and Ashish Mitra from Ravi

15   Muthukrishnan, and it refers to an attached summary of

16   discussions with Megavisa that morning, and that

17   e-mail is dated February 13th, 2001.  Do you see that?

18     A     Yes.

19     Q     Did you have knowledge that Mr. Muthukrishnan,

20   Ravi, or anybody else at Dow was meeting with Megavisa

21   at this time?

22     A     Not at this time.

23     Q     Mr. Muthukrishnan, let me first ask you for a

24   clarifying question, perhaps you know, is it Mr.

25   Muthukrishnan or Mr. Ravi always get confused on that?


Brandon Smith Reporting Service
ROUGH DRAFT

131

1      A     I think it Muthukrishnan, we can refer to him

2   at Ravi if you like, make it easier for both of us.

3      Q     That'll be fine.  He copies a Walter Scherrer

4   on his e-mail, do you know who that is?

5      A     No, I don't.

6      Q     And he copies Markus Wildi.

7      A     Yes.

8      Q     At this time I believe you testified yesterday

9   Markus Wildi was part of your strategy team?

10     A     Which had not met yet, or had not been founded

Page 118

111005WA.TXT
```
11   yet or had not been chartered.  So he's not yet a part
12   of my strategy team.
13      Q    Deaf reporting responsibilities or
14   relationship with you at this time?
15      A    We both reported to row Mayo Kreinberg.
16      Q    If you go back to the part of the document
17   that you said you had seen previously, you did review
18   this on Monday you say?
19      A    Yes.
20      Q    There's a heading which on the first page of
21   the, this part of the document, 903, Megavisa
22   solutions PT E LTD, do you see that?
23      A    Yes.
24      Q    On the second sentence reads Union Carbide
25   sells to Megavisa solutions Pte Ltd on a FOB basis
```

Brandon Smith Reporting Service

ROUGH DRAFT

132

```
1    which in turn enters into a CIF arrangement with
2    Indian customers.
3       A    Sorry I lost you there, where are?  You.
4       Q    I'm sorry, it's the second sentence.  In that
5    section.
6       A    Oh, okay.  Union Carbide sells to Megavisa,
7    okay, got it.
8       Q    When you read that on Monday, did you
9    understand what that meant?
10      A    I didn't have particularly concern on this.  I
11   mean here's Ravi going in apparently -- frankly when
12   we to look at this on Monday we weren't sure who this
13   was, and this clarifies something, because there's no
```

Page 119

111005WA.TXT
14      date on this document, there's a date, yes, there is,

15      February 13th, but it doesn't show who actually did

16      this document. We assume it was Ravi. This clarifies

17      it because now it's attached to this document. But I

18      didn't pay particular attention to that line. Ravi

19      certainly was not authorized by me to go talk to

20      Megavisa about the wire and cable business.

21          Q      Do you know if he was authorized by anybody?

22          A      No, I don't.

23          Q      At this point in time were there different

24      channels of communication with Megavisa between the

25      chemical business and the wire and cable business, or

Brandon Smith Reporting Service

☐                                                                ROUGH DRAFT

133

1       had it been centralized?

2           A      It hadn't been formed yet. Day one was

3       February 7th, people are assuming things here that

4       aren't agreed to. In this front e-mail they refer to

5       lock down. Lock down was a process where we got

6       together really for the first time as business groups

7       and talked about how we thought we'd do business. So

8       lock down hadn't occurred yet. This is rather

9       presumptuous, frankly, the way this is done. If you

10      to look you'll see on the top E list, let me to look

11      to make sure what I'm going to say is true, I think

12      it's true, there's no heritage Union Carbide people

13      copied on any of these copy lists, so.

14          Q      Well, let me just explore that with you a

15      little bit. If you go to the first e-mail before

16      Ravi's memorandum, which I believe starts on the

Page 120

111005WA.TXT
17    bottom of page 901, I just want to take the e-mails in
18    order.
19        A    So which one, we're looking at the one that
20    has one line on page 901?
21        Q    And then carries offer, that's correct.
22        A    Okay.
23        Q    And it's from Mr. Fox to the people indicated
24    dated January 31, '01.
25        A    Yes.


Brandon Smith Reporting Service

ROUGH DRAFT

134

1        Q    Then Mr. Wildi is included in the people who
2    this is sent to?
3        A    Right.
4        Q    He is legacy Dow, correct?
5        A    Yes, he is.
6        Q    On the carryover page it reads, the businesses
7    will obviously want to address the issue?
8        A    Let me make sure I'm with you, I got it.
9    Okay.
10        Q    The businesses will obviously want to address
11    the issue of whether we want to continue with Megavisa
12    once the merger is complete or prefer to deal with
13    accounts direct, want to rationalize distributors from
14    doing this.  I think we need to act as one company as
15    far as possible and ensure that we honor contractual
16    and ethical standards of Dow in respecting tenure, et
17    cetera.  And that was on January 31, 2001, correct,
18    before day one?
19        A    That's correct.

Page 121

111005WA.TXT
20    Q    After day one was that issue raised with you
21    by Mr. Fox or any of the other people who were copied
22    on this e-mail within the first three months following
23    day one?
24              MR. MAROVITZ:  Objection to form.
25              MR. EIMER:  Same objection.


              Brandon Smith Reporting Service
                                      ROUGH DRAFT
                                        135
1              THE WITNESS:  The question was, was this
2    issue raised to me by anyone.
3    BY MR. TAFFET:
4    Q    Well, by the people who are identified on this
5    e-mail, whether Mr. Wildi?
6    A    Yes.
7    Q    Jergen Volkerlor and I VO Percossi and Graham
8    Fox?
9    A    Yes.
10   Q    who?
11   A    Mr. Wildi.
12   Q    What did he say to you?
13   A    Mr. Wildi wanted my opinion of what we should
14   do with wire and cable and Megavisa.
15   Q    And you gave him the opinion that you stated
16   earlier today?
17   A    The opinion I gave him was, my opinion at the
18   time, which was, that Megavisa was doing a good job, I
19   felt we should be with them and we should stay with
20   them, that was my opinion at the time.
21   Q    Did he talk to you about the need to speak as
22   one company?

                     Page 122

111005WA.TXT

23    A    No.

24    Q    Did he talk to you about the fact that Ravi

25    would be acting as the single point of contact for


Brandon Smith Reporting Service

ROUGH DRAFT

136

1    these purposes?

2    A    No.

3    Q    And now if we go up the chain of e-mails here,

4    the next one is February 2, '01, still before day one,

5    correct?

6    A    Yes.

7    Q    And this is from more and I show perk as I to

8    Mr. Graham with various people on copy.  The first

9    paragraph reads, Graham, we have discussed this

10   situation with Ashish and I also received some input

11   from UCC both in Geneva as well as through J Sakaan,

12   S-A-K-A-A-N, period close quote.  Do you know who an

13   individual named Sakaan is or was?

14   A    Yes.

15   Q    Who is he or was he?

16   A    He was at the time of this e-mail Union

17   Carbide's I guess we'd call him country manager in the

18   U/A, united Arab republic of which do by, his office

19   was in do by, he ran a latex plant also so he had kind

20   of two hats.

21   Q    And what involvement do you know of that he

22   had in talking with Dow people before day one

23   concerning Megavisa?

24        MR. MAROVITZ:  Objection to form and

25   foundation.

Page 123

111005WA.TXT

1              THE WITNESS:  I know of none.

2    BY MR. TAFFET:

3        Q     What operations did UCC have in again Eva?

4              MR. MAROVITZ:  Objection to form.

5              THE WITNESS:  Union Carbide at the time

6    had a sales office, and I believe, yeah, it was still

7    open, an R&D facility in Geneva, and in fact it was

8    the headquarters of Union Carbide Europe, although it

9    was a shadow of what it had been say five years

10   before.

11   BY MR. TAFFET:

12       Q     And do you have any knowledge concerning any

13   discussions between Union Carbide and Dow in Geneva

14   concerning Megavisa?

15       A     No.

16             MR. MAROVITZ:  Objection to form.

17   BY MR. TAFFET:

18       Q     That includes prior to day one?

19             MR. MAROVITZ:  Same objection.

20             THE WITNESS:  Yes.

21   BY MR. TAFFET:

22       Q     Have you made any efforts to make inquiries on

23   that subject matter for purposes of this deposition?

24       A     No.  The subject of my deposition is wire and

25   cable.

111005WA.TXT

1    Q    That's what you were told?

2              MR. MAROVITZ:  Objection.

3              MR. EIMER:  Objection to the question.

4              MR. MAROVITZ:  We don't want you to

5    answer questions, you shouldn't answer questions.

6              MR. TAFFET:  What's the base of your

7    understanding that you're only here to talk about wire

8    and cable.

9              MR. MAROVITZ:  Let me finish Richard

10   before you ask the next question, on the basis of

11   privilege.  Now go ahead, Richard.

12   BY MR. TAFFET:

13   Q    What's the basis that for your statement that

14   you're here only to talk about wire and cable I'm I'll

15   and John, I'm going to instruct you not to answer to

16   the extent any understanding you have is the result of

17   conversations between Mr. Marovitz and yourself or

18   between me and you and with respect to those

19   conversations I would instruct you not to answer.

20   Beyond that you can answer the question if you come to

21   some understanding of that side from discussions with

22   suits?

23   A    Okay.  The grid that's if your hand, that you

24   have the benefit of the looking at, I don't, in most

25   cases indicates that I'm speaking on behalf of wire

Brandon Smith Reporting Service

ROUGH DRAFT

139

1    and cable.  However, I'll stand corrected, there are

2    some areas where I am indicated to speak broader than

3    wire and cable.  So I will retract my statement and

Page 125

111005WA.TXT

4      stand corrected.

5      BY MR. TAFFET:

6          Q     And if you, the grid that you're referencing

7      is Exhibit 130, just if you care to look at it again.

8          A     Yes, I would.

9          Q     And my question.

10         A     I plead to put it together with the other one.

11         Q     My question is only going to be, Mr.

12     Yimoyines, that based on the grid, topics 29 and 31

13     are ones that you've been designated to speak for

14     Union Carbide, without limitation, correct?

15         A     Yes.

16         Q     Now, you had referred to the phrase lock down

17     just a few moments ago.  And I'm not sure I understood

18     the complete or was able to get a complete

19     understanding of what lock down meant in connection

20     with day one or the effective date of the merger or

21     acquisition.

22         A     Lock down was a concept, the first time after

23     day one, after the closing of the transaction, that we

24     could sit down, Union Carbide and Dow, in one room and

25     discuss business transactions, and then come to

                    Brandon Smith Reporting Service
                                              ROUGH DRAFT

                                                   140

1      conclusions, you know, exchange confidential

2      information and things like that and make close off

3      now, it's time we can really go to work.  So each of

4      the various businesses then scheduled a series of

5      meetings, in a hotel, somewhere around the world, and

6      met and we were essentially locked down in that hotel
                              Page 126

111005WA.TXT

7   until we got permission from the business president

8   that you could go home now, you did enough work.

9       Q    When was the first time that you were a lock

10  down with Ravi?

11      A    Never.

12      Q    Were you ever in a to look down with Mr. Perk

13  as I?

14      A    No.

15      Q    Were you ever in a lock down with anybody from

16  Dow India?

17      A    No.

18      Q    Just going back to Exhibit 147 for a moment,

19  you'll see in the, on the first page, 900, there's an

20  e-mail, the second e-mail in the string there, from

21  Mr. Perk as I to Ravi and Ashish Mitra with copies to

22  others where Mr. Perk as I says, Ravi, I support that

23  you continue as focal point.  Do you recall any

24  discussions with Mr. Perk as I regarding Ravi acting

25  as the focal point vis-a-vis Megavisa?


Brandon Smith Reporting Service

⬜                                          ROUGH DRAFT

                                                    141

1       A    Between me and Mr. Perk as I?

2       Q    Yes.

3       A    No.

4       Q    Were you ever consulted by anybody regarding

5   Ravi acting as the focal point in connection with

6   Megavisa?

7       A    No.

8       Q    Do you know what the relationship was between

9   the Indian company Megavisa solutions and any of the

                    Page 127

111005WA.TXT

10    plaintiffs in this case?

11    A    No.

12    Q    Do you recall that immediately after day one

13    efforts were made to garner an understanding of what

14    the legal or contractual relationship was between

15    Megavisa and the legacy Union Carbide companies?

16    A    I'm not aware of that activity.

17    Q    Do you recall Mr. Cheung advising you that he

18    was involved in assisting in that activity?

19    A    To my recollection, Mr. Cheung was involved in

20    assessing the position that wire and cable would take

21    vis-a-vis the Megavisa relationship.

22    Q    Were you aware, and I'm talking right now

23    within the first week after day one, Mr. Wildi making

24    inquiries concerning the Megavisa relationship and

25    asking Mr. Cheung to assist him in that regard?

Brandon Smith Reporting Service

ROUGH DRAFT

142

1    A    What I can say is that when Wildi came to lock

2    down, he was briefed on the Megavisa relationship,

3    therefore some prework must have been done.

4    Q    What was the, when was that lock down?

5    A    Roughly two weeks after day one.

6    Q    Where was that held?

7    A    Houston, Texas.

8    Q    In a particular hotel?

9    A    Oh, boy.  You want to guess?

10    Q    No, that's okay.  If you don't recall, that's

11    fine.  How long did the lock down last?

12    A    About four days.

Page 128

111005WA.TXT

13    Q    Who was the leader of the sessions?

14    A    Row Mayo Kreinberg.

15    Q    How many people attended?

16    A    Oh, 60 to 80, in that range.

17    Q    And over the course of the four days how much

18    discussion focused on Megavisa or any of the

19    plaintiffs?

20                MR. MAROVITZ:  Objection to foundation.

21                THE WITNESS:  Five minutes.

22    BY MR. TAFFET:

23    Q    Who participated in that discussion?

24    A    The participants with an opinion were myself,

25    Lawrence, Keith, Markus, Grace, there were other

Brandon Smith Reporting Service

1    people in the room.  I mean we had the whole business

2    team in there and we handled a series of all kind of

3    discussions we had to handle, and this one was

4    discussed.

5    Q    Was there any attendees other than wire and

6    cable people?

7    A    Not, the way it worked is that each of the

8    businesses had a room and people like Wildi spent team

9    with each of the businesses to discuss specific issues

10    to, in his case Asia.

11    Q    What was the opinion that Mr. Wildi asserted?

12    A    I think Markus didn't, Markus did not have an

13    opinion.  He was seeking our counsel.

14    Q    Within the five minutes that you said was

15    devoted to me go Visa, who voiced an opinion?

111005WA.TXT

16    A    Hard to say, but the consensus of the group
17    that wire and cable was best suited, and that was our
18    opinion at that time, to keep Megavisa as our
19    distributor.
20    Q    And Mr. Wildi, did he make any mention of the
21    issues relating to Megavisa's relationship on the
22    chemical side?
23                MR. MAROVITZ:  Objection to form.
24                THE WITNESS:  Wildi was aware that the
25    chemical side was reviewing the distributorship, but

Brandon Smith Reporting Service

ROUGH DRAFT

144

1    we discussed all of our distributors, and we talked
2    about consolidation of distributorships and that
3    really applied in countries where Dow had a
4    distributor and Union Carbide had a distributor, so
5    that discussion didn't apply to Megavisa because
6    Megavisa was the only distributor for wire and cable,
7    the only agent for wire and cable in India, so we
8    didn't have to talk about how do you solve that
9    problem.  The problem and why Megavisa was only a five
10    minute discussion was an easy discussion.  We had some
11    real problems in other areas of the world where each
12    of us had a distributor and that creates an issue of
13    now how do you deal with that.  Those were much
14    lengthier conversations.
15    Q    Am I correct that Mr. Wildi did not raise the
16    issue of whether sales should be made directly by Dow
17    to customers in India?
18                MR. MAROVITZ:  Objection to form.
                        Page 130

111005WA.TXT

19              THE WITNESS:  Markus wanted that to be
20      considered, and certainly it was an option that we
21      should consider.  The opinion, the predominantly from
22      the Union Carbide side was, Markus, we can study it,
23      but we already know the conclusion.
24      BY MR. TAFFET:
25          Q    Did you after that study it?


                Brandon Smith Reporting Service
                                        ROUGH DRAFT
                                                    145

1           A    Yes.
2           Q    Who did you assign to that task?
3           A    Oh, boy.  Well, I would say Lawrence.  I
4       assigned Lawrence to that task.
5           Q    Over what period of time did Lawrence study
6       that?
7           A    I don't think Lawrence ever studied it, I
8       think Lawrence knew the answer.  The answer was keep
9       Megavisa, that was our opinion, or answer at that time
10      as the wire and cable agent.
11          Q    Did anybody bring to your attention, again
12      let's take the first six months after day one, for our
13      focus right now, did anybody let you know that
14      inquiries were being made of Megavisa concerning the
15      details of what their wire and cable distribution was?
16              MR. MAROVITZ:  Objection to form.
17              THE WITNESS:  Markus is Swiss, Markus has
18      to be convinced, he's a stubborn guy so in his due
19      diligence process I'm sure that Markus wanted to get
20      his own answer on this.  He left Houston taking our
21      recommendation but not U and A.  He had yet to be
                        Page 131

111005WA.TXT

22    convinced.  It wasn't natural for Dow when you have a

23    direct sales channel in an area to use a distributor.

24    BY MR. TAFFET:

25        Q    Just preliminarily I'm curious, what is the


Brandon Smith Reporting Service

ROUGH DRAFT

146

1    fact that he is Swiss have to do with that?

2        A    Stubborn.

3        Q    I see.

4        A    It's like being from Missouri, right?  Show

5    me.

6        Q    I don't know.

7        A    That's a pretty common saying.

8        Q    I see.  Why did Markus Wildi have to be

9    convinced?

10        A    I just said, it was unnatural for Dow where

11    you have an existing sales channel, direct sales

12    channel, to use a distributor.

13        Q    But why would Mr. Wildi need to be convinced,

14    why couldn't you just make that unilateral decision?

15            MR. MAROVITZ:  Objection to form and

16    foundation.

17            MR. EIMER:  Asked and answered.

18            THE WITNESS: Mr. Wildi and I were new

19    business associates he didn't know me, I didn't know

20    him.  I wouldn't have taken one of his recommendations

21    like that at face value.  I want my own opinion.

22    BY MR. TAFFET:

23        Q    Well, ultimately making the decision whether

24    to go direct or stay with Megavisa, whose decision

Page 132

111005WA.TXT

25    ultimately was that?


Brandon Smith Reporting Service

ROUGH DRAFT

147

1      A     A joint decision in such a case, between

2    Markus and I, but Lawrence is the one who's the common

3    thread of recommending.

4      Q     And based on that, Mr. Cheung's views were

5    given weight by both you and Mr. Wildi, as you

6    understand?

7      A     Yes, but probably more weight by me because I

8    knew Cheung for three years now and willed I just met

9    him.

10     Q     Sure, sure.  Let me show you a document we've

11   marked previously as, well, we haven't marked it,

12   defendants have marked it as Exhibit 25.

13           Have you ever seen this document before?

14     A     No.  Makes me angry.

15     Q     Why?

16     A     I don't know why Ravi is soliciting

17   information on wire and cable.

18     Q     I take it from that comment that you were not

19   aware at the time that he was doing this?

20     A     That's correct.  At this time I don't know who

21   Ravi is.

22     Q     You communicated with him over the course of a

23   year or so on occasion.

24     A     Not on April 6, 2001.

25     Q     No, I didn't say that, sir, but you have had

111005WA.TXT

1    communications with him?

2    A    He mail transfers, yes.

3    Q    Just ask you to turn to the third page of this

4    document.  The last four numbers are 2102.  And

5    there's a heading number 5, historical sales of

6    Megavisa, and then there's a chart which indicates

7    sales and metric tons from 95 through 2000, do you see

8    that?

9    A    Yes I do.

10   Q    In looking at that, do you have a basis to

11   tell me today whether those volumes comport with your

12   understanding of the volume of wire and cable

13   compounds that Megavisa was selling in the various

14   years?

15              MR. MAROVITZ:  Objection to form.

16              MR. EIMER:  Same objection.

17              THE WITNESS:  I can't attest to numbers

18   being precisely accurate, but the trend certainly is

19   there.

20   BY MR. TAFFET:

21   Q    And in 1999 there was in fact a significant

22   increase in the sale of wire and cable compounds,

23   correct?

24   A    That's correct.

25   Q    And that's consistent with your recollection

Brandon Smith Reporting Service

1    of what the trend was?

111005WA.TXT

2    A    Yes.

3    Q    And that was the period I believe you

4    testified either yesterday or earlier today that

5    indeed Megavisa was working hard to increase their

6    prices and still make sales?

7              MR. MAROVITZ:  Objection to form.

8    BY MR. TAFFET:

9    Q    In 1999?

10             MR. MAROVITZ:  Objection to form.

11             THE WITNESS:  Yes, 1999 is an interesting

12   year, though, if we broke 1999 up in halves I think we

13   would see the first half of the year was in fact, had

14   much larger sales and than the second half of the your

15   because although they were attempting to get their

16   prices up so that our netbacks would increase, they

17   were not able to do it fast enough since our basic

18   floor price at Houston which in fact is our netback,

19   would in fact, they were not able to meet it.

20   BY MR. TAFFET:

21   Q    And then that carried over to 2,000 where you

22   see the dramatic decrease?

23   A    Yes, aggravated by the feed stock issues that

24   we spoke about earlier.

25   Q    Notwithstanding your lack of knowledge of Mr.,


                Brandon Smith Reporting Service
                                        ROUGH DRAFT

                                        150

1    of Ravi's activities in this time frame, vis-a-vis

2    Megavisa, do you have any understanding that Ravi was

3    not authorized to communicate with Megavisa and obtain

4    this type of information concerning wire and cable?

                    Page 135

5      MR. MAROVITZ:  Objection to form.

6              THE WITNESS:  He was not authorized by

7    me.  I was the global vice president of business.

8    BY MR. TAFFET:

9    Q    Was he not authorized officially by Dow?

10   A    Where I run the global wire and cable

11   business, I would say he was not authorized officially

12   by Dow to investigate the wire and cable business.

13   Q    Were you aware approximately in the same time

14   frame, and I use the word approximate, I don't mean to

15   pin you down to a specific day or month, spring,

16   summer of 2001, of investigations being done by Dow

17   personnel of Megavisa's operations?

18             MR. MAROVITZ:  Objection to form.

19             MR. EIMER:  Same objection.

20             THE WITNESS:  Sometime in this time

21   period Lawrence, Markus, made me aware that the

22   chemical guys were really taking a close to look at

23   Megavisa and trying to determine whether they were

24   going to continue to use Megavisa as their sales

25   channel in India.


Brandon Smith Reporting Service

ROUGH DRAFT

151

1    BY MR. TAFFET:

2    Q    And was that understanding that you had about

3    that activity limited to taking a to look in

4    connection with chemical businesses?

5    A    As I said earlier, Markus, I don't know when

6    Markus finally crossed the line, you know, the time

7    period we're talking about and came on board and said

Page 136

111005WA.TXT

8    that he in fact supported the use of Megavisa as the

9    wire and cable distributor, so it's kind of as we

10   talked about counsel in the time period, it's a little

11   bit nebulous, but until Markus crossed the line, there

12   could have been some to look at the wire and cable

13   business.

14       Q    When you say crossed the line again, what line

15   are we talking about specifically?

16       A    Join the ban wagon, the idea that at that

17   point in time that it was the opinion of my staff and

18   myself, heritage Union Carbide people, that we should

19   maintain Megavisa as our sales channel in India, that

20   was our opinion at that time, as I said earlier, I

21   maintained that opinion right through the time when

22   Megavisa decided that they would in fact did not want

23   to be our agent for wire and cable.  The opinion was

24   changed, since then with some of the actions and the

25   by the plaintiffs.


                  Brandon Smith Reporting Service

                                        ROUGH DRAFT

                                            152

1        Q    Let's mark this as our next exhibit.

2    (Plaintiff's Exhibit 148 , marked for identification)

3        Q    Let me hand you a document we've mark as

4    Exhibit 148.  My question is going to be whether

5    you've ever seen this before?

6        A    Just looking at the first page, well, let me

7    look and I'll tell you, make sure we give the right

8    answer here.  Because counsel has told me that I must

9    tell the truth.

10   BY MR. TAFFET:

111005WA.TXT
11    Q    What else has counsel told you?

12    A    That's what counsel told me, it will the

13    truth.

14    Q    Told you nothing else, huh?

15              MR. EIMER:  I'm going to object now.

16    You're clearly invading the attorney-client privilege

17    and I'll instruct him not to answer.

18              MR. TAFFET:  He told me something, I want

19    to see how much he's waived.

20              MR. EIMER:  He hasn't waived anything, so

21    I'll instruct you not to answer regarding your

22    conversations with counsel.

23              THE WITNESS:  Your question was?  I'm

24    sorry.

25    BY MR. TAFFET:


              Brandon Smith Reporting Service
                                        ROUGH DRAFT
                                             153

1    Q    Did you ever see this before?

2    A    No.

3    Q    If you go to the second page the last three

4    numbers on the stamped designation is 996.  The first

5    sentence reads, it has been earlier decided in an

6    internal meeting at Dow India that each salesperson

7    would visit a branch office of Megavisa to assess the

8    operations.  Do you see that?

9    A    Yes, I do.

10   Q    Were you ever apprised of that decision made

11   internally at a meeting at Dow India?

12   A    No.

13   Q    Who's directing the operations of Dow India at

                   Page 138

111005WA.TXT
14    this time, this is May of 2001?

15    A    The country manager at the time is Ravi.  And
16    who was he responsible to further up the chain.
17                 MR. MAROVITZ:  Objection to foundation.
18                 THE WITNESS:  I think we went through
19    that yesterday and not chemicals guy but my impression
20    is that he was responsible to Graham daily who was,
21    Graham can I'm sorry, Graham Fox, who was in do buy
22    and Graham Fox is responsible to Europe.
23    BY MR. TAFFET:
24    Q    If your review of this document if you go to
25    the last page, your recommendation, which reads, the

Brandon Smith Reporting Service
ROUGH DRAFT
154

1    major customers should be assimilated into the Dow at
2    the earliest.  Did anybody apprise you of that
3    recommendation as of this time, this time being May
4    15th, 2001, or thereabouts?
5                 MR. MAROVITZ:  Objection to foundation
6    and to form.
7                 THE WITNESS: No.
8    (Plaintiff's Exhibit 149 , marked for identification)
9    I'm going the hand you Exhibit 149.  Okay.
10    Q    Have you ever seen this document before?
11    A    No.
12    Q    Let me first ask you, do you know who Ashish
13    Mitra is?
14    A    No.
15    Q    And if you go to the last page here, the
16    recommendations that are identified there, even

Page 139

111005WA.TXT
17    without being aware of this document were the

18    recommendations identified there ever conveyed to you

19    in or about this time frame?

20              MR. MAROVITZ:  Objection to form and

21    foundation.

22              THE WITNESS: No.

23    BY MR. TAFFET:

24       Q    At this time frame do you know whether Howard

25    Ungerleider was involved in any activities being under

Brandon Smith Reporting Service
ROUGH DRAFT

155

1    and the by Dow India?

2              MR. MAROVITZ:  Objection to foundation.

3              THE WITNESS:  I'm not sure I understand,

4    the word involve as you've used it in the context.

5    BY MR. TAFFET:

6       Q    Sure.  Was Mr. Ungerleider communicating with

7    Ravi or anyone else at Dow India during this time

8    frame?

9              MR. MAROVITZ:  Objection to foundation.

10              MR. EIMER:  Objection.

11              THE WITNESS:  I don't know.

12    BY MR. TAFFET:

13       Q    Well, during this time frame was Mr.

14    Ungerleider and Mr. Rundlof involved in defining the

15    Indian market channel?

16              MR. MAROVITZ:  Same objection.

17              THE WITNESS:  We look at an earlier

18    document of the objectives that the Howard's business

19    team ace called it were working on.  Howard delegated

Page 140

111005WA.TXT
20    responsibilities to certain people to look at certain
21    issues, certain situations, coming out of the day one
22    activities, as we saw the Indian distribution channel
23    was one of the those activities.  Christer Rundlof is
24    a surrogate for the global MM T's, if you will, the
25    folks that would in fact to look at it, Christer was

Brandon Smith Reporting Service

ROUGH DRAFT

156

1     the guy in the U.S., so that it was easy for Howard to
2     say, hey Christer, you're two doors down from me, you
3     core nature this activity with me, the person really
4     that would be to look at it would have either been
5     Cheung or Tan depending on where we were in the
6     transition of Tan or Cheung.
7         Q    Do you know if Mr. Rundlof was engage in
8     communications through any means with individuals at
9     Dow India during this time frame?
10        A    It would be very unusual for hundred love
11    North American sales manager was.
12        Q    Do you know?
13        A    No.
14        Q    Do you know whether Mr. Cheung was in
15    communication with the Dow India people in the time
16    frame concerning the recommendations that we just
17    reviewed?
18        A    I know that Mr. Cheung at some point in time
19    here began to receive information about what I'll say
20    the chemical people were, allow the chemical people
21    were progressing with their assessment of the
22    distribution channel in India.

Page 141

111005WA.TXT
23    Q    Do you know when that was?

24    A    In this time period.

25    Q    Down what form those communications took?


Brandon Smith Reporting Service

1     A    At this point in time e-mail.

2     Q    Who was Mr. Cheung communicating with that you

3     know of?

4     A    My understanding that Mr. Cheung and/or Mr.

5     Wildi were receiving communications or updates from

6     Ravi.

7     Q    And is it my understanding correct that they

8     were not passing those along to you during this time

9     period?

10    A    Oh, some of them got to my desk.

11    Q    Some of them?

12    A    Yes.  But at this point in time.  But at this

13    point in time Megavisa is less than a half a percent

14    of my global business, so that I got other priorities.

15    Q    And that's because the prices in India did not

16    meet your floor pricing, correct?

17    A    Its because the profitability of the business

18    when we to look at our netbacks, our floor prices in

19    Houston, didn't generate the profitability.  I don't

20    even know what the netbacks are, the actual numbers

21    nor am I concerned, I'm concerned about the

22    profitability of the business.

23    Q    And that's because the U/A prices, or the

24    prices that were being discussed between UCAP and

25    Megavisa were not U/A he'd because they would not

Page 142

111005WA.TXT

1    provide the profitability that you required at this
2    time?
3        A    They will not meet the floor price.
4        Q    Let me show you a document we've mark as
5    Exhibit 150.  Just take a moment and to look through
6    it.
7                MR. MAROVITZ:  For the record I think
8    this document is subject to a motion between the
9    parties.
10               MR. TAFFET:  I don't think it is, not
11   this document, I think it's the documents which you've
12   improperly marked as privileged.
13               MR. MAROVITZ:  I don't want to get into
14   editorializing or arguing that motion here, I just
15   want to note that I think this is subject to a dispute
16   between the parties currently, and I'm certainly not
17   going to stop the witness from answering questions
18   about it, but I want the record to be clear that we're
19   not waiving our position in respect to that because as
20   has been pointed out this document did come from the
21   files of Megavisa.
22               MR. TAFFET:  And indeed let the record
23   reflect that we have inquired of defendants to take
24   into account the fact that this document has come from
25   the files of Megavisa and they have not responded with

111005WA.TXT
14    A    The answer is no.

15    Q    Putting the document to the side, were there

16    discussions that you were having in connection with

17    wire and cable sales in the 2001 time period involving

18    the transfer from an R 2 S AP system to an R 3 SAP

19    system?

20              MR. MAROVITZ:  Objection to form and

21    foundation.

22              THE WITNESS:  Yes.

23    BY MR. TAFFET:

24    Q    What were those discussions?

25    A    Dell had an R 2 SAP system, carbide had an R 3


Brandon Smith Reporting Service
ROUGH DRAFT
175

1    SAP system, the decision.

2    (Dow that that had to be made is we had to go to one

3    platform, are we going to move to an R 2 or an R 3

4    platform.

5    Q    And what was that decision, do you recall?

6    A    Well, it changed, ultimately we went to an R 2

7    system.

8    Q    Did that have an impact on filling orders in

9    the 2001 time frame?

10    A    I don't believe so.

11    Q    Do you know what weather that change occurred?

12    A    Sorry, I stepped on your question, excuse me.

13    Q    Do you know when the change occurred from our

14    2 to R 3?

15    A    No, and the Ron that it doesn't stick in my

16    mind like the transition to R 3 was because that was a

111005WA.TXT
17    monumental task and this was a smooth transition, so I
18    don't know.
19        Q    Do you recall discussions with your business
20    team regarding Megavisa that the position was to
21    continue to make use of Megavisa until the Indian
22    volume could justify additional sales resources on the
23    ground?
24                MR. MAROVITZ:  Objection to form.
25                MR. EIMER:  Same objection.

                Brandon Smith Reporting Service
                                        ROUGH DRAFT
                                        176
1                THE WITNESS:  I don't specifically
2     remember that, but that could have been an idea that
3     someone put forward.
4         Q    You don't recall that as being wire and
5     cable's position?
6         A    That's not a position, that's an opinion of an
7     individual, you know, there's a lot of people that
8     have opinions of how things should be done and they're
9     free in an organization like mine to express their
10    opinion.  When we come to a consensus and make a
11    scission, then it's a decision.
12        Q    Do you recall Mr. Cheung advising you that he
13    had stated that position to Ravi?
14        A    No, I do not.
15        Q    Let me hand you Exhibit 87.
16        A    I've reviewed the document.
17        Q    Have you ever seen this document before?
18        A    No.
19        Q    Does it refresh your recollection in any way
                        Page 159

111005WA.TXT
20   that Mr. Cheung's position as of December 5, 2001, was

21   to continue to make use of Megavisa until our Indian

22   volume could justify additional sales resources on the

23   ground?

24              MR. MAROVITZ:  Objection to form.

25              THE WITNESS:  No, I think what has to be

Brandon Smith Reporting Service

ROUGH DRAFT

177

1   noted here is Mr. Cheung now is an N a different role,

2   has a different responsibility Mr. Cheung now is a

3   regional sales manager for Dow polyolefins and

4   elastomers in a territory that involves India, so Mr.

5   Cheung's perspective now is looking at all of the

6   sales polyolefins and elastomers in India, so it's

7   broader than just wire and cable, so that if Cheung

8   can build up the volume of everything else that

9   polyolefins and elastomers brings into India, then

10  Cheung can increase the sales force, then he can

11  approach me and he can ask if we would go along with

12  this suggestion.  This is a kind of a back of the

13  envelope, Ravi asking what are you think can, this is

14  what I'm thinking.

15  Q    How do you know that, you never saw this

16  before, sir?

17  A    Because I know what Cheung was doing at the

18  time.  He was in a different position.

19  Q    But, okay I didn't ask the question

20  adequately.  How down that this was back of envelope

21  if you've never seen this before, you talked to Mr.

22  Cheung about this?

Page 160

111005WA.TXT
23     A     I read what Mr. Ravi, he says I know your on

24     vacation, please respond at your Earl lest

25     convenience.


Brandon Smith Reporting Service

ROUGH DRAFT

178

1     Q     Plan Cheung puts forward our position,

2     correct, yes or no?

3                    MR. MAROVITZ:  Objection to form.

4                    MR. EIMER:  Object to form,

5     argumentative.

6     BY MR. TAFFET:

7     Q     You can answer?

8     A     The question is who is our.

9     Q     That's what Mr. Cheung said, correct?

10    A     But who is our.

11    Q     He was still reporting to you at this point in

12    this time, correct?

13                   MR. MAROVITZ:  No.

14    Q     In December 2001?

15    A     No, sir.

16    Q     Who was reporting to?

17    A     Mr. Wildi.

18    Q     Noticed reporting relationship with you?

19    A     That is correct.

20    Q     What involvement did Mr. Tan have at this time

21    concerning discussions relating to Megavisa?

22    A     Mr. Tan was the --

23                   MR. MAROVITZ:  Sorry John, object to

24    form.  Go ahead.

25                   THE WITNESS:  Mr. Tan was the market

Page 161

111005WA.TXT

Brandon Smith Reporting Service

ROUGH DRAFT

179

1    manager for wire and cable compound in Asia Pacific.

2    BY MR. TAFFET:

3        Q    And what was he communicating with you in

4    connection with dealing with Megavisa, do you know?

5        A    At this point in time.

6        Q    Yes.

7        A    I don't know specifically, but I think Mr. Tan

8    was still in line with the strategy that Megavisa was

9    our agent and should remain to be so.

10       Q    There was some interfacing with the people in

11   India, Dow India, concerning direct sales and credit

12   limits for me go Visa?

13               MR. MAROVITZ:   Objection to form,

14   foundation.

15               MR. EIMER:   Same objection.

16               THE WITNESS:   There's always someone

17   interfacing with customers on credit terms.

18   BY MR. TAFFET:

19       Q    But who was it at this time?

20       A    I don't know.

21       Q    Let me show you a document at this been mark

22   as Exhibit 22.   Defendant's Exhibit 22.   Did you ever

23   see this document?

24       A    I haven't finished reading it.   Is it

25   important that I do?

Brandon Smith Reporting Service

ROUGH DRAFT

180

111005WA.TXT

1    Q    I don't know, sir, my question was have ever
2    seen it before?
3    A    I reserve the right to go back and read the
4    document, but I'll answer your question, yes.
5    Q    When did you see it?
6    A    I believe the first time I saw this document
7    was when it was sent to me by Mr. Charles Inel as an
8    attachment to an e-mail that he sent me.
9    Q    Do you recall any communications with Ravi
10   once you saw it?
11   A    Once I saw it, no.  No, I would make that a
12   flat out no.
13   Q    You never spoke to Ravi about Mr. Mittal's
14   letter here?
15   A    The only time I was in a conversation with
16   Ravi there was a conference call one day and I
17   couldn't even tell you when, that was the only time I
18   ever heard his vase, and then we were several
19   participants in that call and I'm sure that this
20   letter, maybe not specifically, but the subject matter
21   of the day was discussed.
22   Q    What did you discuss during that call?
23   A    This is the first time that I really became
24   aware that chemicals was, had made their decision that
25   they were moving away from Megavisa and at this time

Brandon Smith Reporting Service

ROUGH DRAFT

181

1    Megavisa had already been made aware of it, and that
2    was their decision.
3    Q    Do you know when that was, for the call?

111005WA.TXT

4       A    Early 2002.

5       Q    And who told you that information that you had

6    just explained?

7       A    I don't know specifically who said it.

8       Q    Did you respond?

9       A    I responded that our position wire and cable

10   was that we were going to maintain Megavisa as our

11   agent.

12      Q    Were you the point of contact for the wire and

13   cable side of the issue, the issue being continued

14   relationships with Megavisa?

15               MR. MAROVITZ:  Objection to form.

16               THE WITNESS: No.

17   BY MR. TAFFET:

18      Q    Who was?

19      A    It would be at this time Mr. Tan and Mr. Wildi

20   marked for identification.

21      Q    I'm going to hand and you document we've mark

22   as Exhibit 151, sir.  Have you ever seen this document

23   before, sir?

24      A    No.

25      Q    Are you familiar with an entity named VEE mall

Brandon Smith Reporting Service

ROUGH DRAFT

182

1    agency?

2       A    No.

3       Q    Have you taken any steps to acquaint yourself

4    with any knowledge concerning VEE mall agency?

5       A    No.

6       Q    And that was for purposes of this deposition,

Page 164

111005WA.TXT

16    and we wanted to keep it, but then Mittal turns around

17    and sues us because we're his club into Dow so he goes

18    after his friends, I mean it's kind of crazy.

19         Q     Did you talk to Mr. Mittal why he sued you,

20    did you discuss with him that he has a big a beef with

21    the them cal side as with the wire and cable side?

22              MR. MAROVITZ:  Objection to form.

23              MR. EIMER:  Same objection.

24              THE WITNESS:  I discussed things in this

25    time period more with Mr. Zeinel than Mr. Mittal, I


                Brandon Smith Reporting Service
                                          ROUGH DRAFT
                                               207

1     was so angry with Mr. Mittal I didn't care to speak

2     with him at this point in time.

3     BY MR. TAFFET:

4          Q     Sure.  Did you express any of your anger at

5     your breath rent and other colleagues on the chemical

6     side for impacting the wire and cable side by their

7     decisions?

8              MR. MAROVITZ:  Objection to form.

9              MR. EIMER:  Object to the form,

10    mischaracterizes his testimony.

11              THE WITNESS:  Yes.

12    BY MR. TAFFET:

13         Q     Who did you talk with?

14         A     Mr. Fox.

15         Q     What did you took with Mr. Fox about?

16         A     I told Mr. Fox that he wasn't giving my friend

17    Mr. Mittal due consideration.  I was particularly

18    angry by this that, Mr. Fox came by to say hole low at
                        Page 187

111005WA.TXT

19    breakfast, didn't have the time to sit down with Mr.

20    Mittal and settle this, and this was damaging,

21    damaging my wire and cable relationship.  I was not

22    happy at all with Mr. Fox.

23        Q    How did Mr. Fox respond?

24        A    He said the decision had been made.

25        Q    Did that anger you further?


Brandon Smith Reporting Service

ROUGH DRAFT

208

1    A    Certainly.

2        Q    At that point you thought you deserved more

3    consideration as a senior executive at Dow?

4        A    No, businesses have the right to make the

5    right decision for their business, you try not to

6    impact another business when you make a decision.

7    This decision impacted my business, I didn't have the

8    basis to judge whether this was the right decision for

9    the chemical business.  They made what they felt was

10    the right decision for the chemical business.  It had

11    a negative impact on my business.

12        Q    Just ask you to turn to the second page of the

13    document.  Did you read this, the report of this

14    meeting?

15        A    Which one, the number 4.

16        Q    Yes, sir, I'm sorry.

17        A    Yes I did.

18        Q    And specifically the last line, I'm sorry, the

19    last sentence, which reads, Ravi also commented to the

20    team that to be fair to Mittal MV did pay back Dow

21    based on the schedules agreed by both companies after

Page 188

22    discovering the invoicing problems over dust.  Did you

23    have any information to the extent that that was not

24    accurate?

25    A    No.


Brandon Smith Reporting Service

ROUGH DRAFT

209

1     Q    Now, in the next two sections, there's items

2     blacked out.  Do you recall what was included had

3     those items?

4     A    No, I do not.

5     Q    Now, in item 7 Mr. Cheung is writing first

6     what his target is.  And he writes, start manage the

7     second sentence, quote, I don't believe that we could

8     or we should continue the business relationship with?

9               MR. MAROVITZ:  V with the current

10    development.  Do you see that.

11              THE WITNESS:  Yes I do.

12    Q    Do you recall talking with him about that

13    position?

14    A    Let me go back and to look at the date of this

15    e-mail.  We're into March now.  The first that I heard

16    of this from Cheung would have been in this e-mail.

17    Q    Right.

18    A    I believe before we established a position

19    Megavisa came to the same conclusion and informed us

20    that they no longer wanted to continue the wire and

21    cable relationship.

22    Q    From whom, who from Megavisa told you that?

23    A    Mr., it was actually came from Dow, Mr. VIP he

24    will Babu, is that his name, the guy who was the

Page 189

111005WA.TXT

25    polyolefins and elastomers sales representative who

Brandon Smith Reporting Service

ROUGH DRAFT

210

1    met with I believe Mr. Moti and Mr. Moti inform him of

2    Mr. Mittal's decision, Mr. Mittal didn't feel that he

3    had to call me on that decision, so he informed me

4    through channels as you accused me earlier of

5    informing him through channels.

6        Q    Never accused you. Do you know when that

7    communication reached you through channels from Mr.

8    Babu?

9        A    I'm sure you got the letter, but in March of.

10        Q    You don't know if it was before or after this

11    e-mail?

12        A    We're in a very dynamic fast moving area here,

13    it's pretty close though this e-mail from Cheung, if I

14    had to guess, it's in the same month. It's a guess,

15    but in the same time period.

16        Q    Now, on the last page there's a comment which

17    reads, about four lines before the blacked out part,

18    quote, we need to negotiate with MV that Babu will

19    have to go with MV to deal with all customers directly

20    if we believe this option will work. And he refers to

21    the option spoken of earlier. In this section. If

22    you need to read it please do?

23        A    I think I know what the option is, the option

24    is for us to take over the sales directly.

25        Q    Did you discuss that option with Mr. Cheung?

 1    A    I think again counsel that there was no

 2    opportunity because in this dynamic situation things

 3    moved very fast and the distributorship was dead

 4    before there was any chance to discuss the plan.

 5    (Plaintiff's Exhibit)

 6    Q    Handing you Exhibit 158 circumstance you had

 7    said there's quite a number of e-mails around this

 8    time, but I direct your attention specifically just to

 9    the very top.  The rest of the document is the same as

10    we just reviewed.

11    A    Yes.

12    Q    Do you recall receiving a copy of this e-mail

13    from Mr. Wildi to Mr. Cheung agreeing that, quote, we

14    should strongly consider taking the WC distributorship

15    away from MV?

16    A    Yes.

17    Q    And did you agree with that?  I'm sorry if you

18    answered that question.

19            MR. MAROVITZ:  Objection to form.

20            THE WITNESS:  The problem here was that I

21    felt like I was the captain of this sinking ship that

22    based upon the decision taken by chemicals based upon

23    the actions taken by Ajay Mittal, what point was there

24    anymore.  I tell you that, I mean this is Sunday, I

25    probably saw this Monday morning, thought to myself,

 1    wow, so but Wildi does say, discuss in person next

111005WA.TXT
2  week, that's with Cheung, and my expectation would be
3  that they would discuss it in person and one of them
4  would come back to me and/or Howard & we would talk
5  about whether this was the action that we would
6  support.
7      Q     And you kept Howard advised, Howard
8  Ungerleider advised of this development?
9      A     I kept Howard, Howard was busy working his
10  turn around plan, if you will, so that certain issues
11  I kept here were involved in and since Howard was new
12  to this kind of thing he didn't have the relationship
13  Megavisa, and we kind of kept him away from this,
14  although he did, he was certainly informed, yes.
15      Q     I'm handing you Exhibit 159, sir, and this
16  reflects your forwarding of the e-mail to Mr.
17  Ungerleider with the comment, no action required.
18  FYI.
19      A     Yes.
20      Q     What did no action required mean?
21      A     No Howard, you don't have to do anything, I'm
22  in the midst of this, we both don't have to spend or
23  waste our time, spend our time on this, I've got it.
24      Q     Now, Mr. Wildi had e-mail we just looked at a
25  moment ago, Exhibit 158 said, that he strongly or he

Brandon Smith Reporting Service

☐                                                ROUGH DRAFT

213

1  agreed that, quote, we should strongly consider taking
2  the W&C distributorship away from MV, period, let's
3  first get input from the lawyers.  Close quote.  Did
4  he talk to you about getting input from the lawyers?

Page 192

111005WA.TXT

5          MR. MAROVITZ:  Go ahead and answer that

6     question John but don't obviously there F there is any

7     attorney-client communication I'm instructing you not

8     to provide that, the question is asked is a fair one,

9     it's a yes or no.

10              THE WITNESS: No.

11     BY MR. TAFFET:

12        Q    Did you take steps to get input from the

13     lawyers?

14        A    No.

15        Q    Whose Lynn SC H E FS K Y?

16        A    Lynn she have ski was a Dow attorney who

17     worked for polyolefins and elastomers in Midland

18     Michigan.

19        Q    Let me hand you Exhibit 160.  And again, just

20     referring you to the top portion, I'll represent to

21     you the e-mails after that are the same as we've

22     reviewed.  And it appears that it's an e-mail from you

23     to Lynn she have ski and Lawrence Cheung dated March

24     7, 2002.  Does this refresh your recollection that you

25     were seeking input from lawyers at Dow concerning the

                Brandon Smith Reporting Service
                                          ROUGH DRAFT

                                               214

1     subject matter of Mr. Cheung's March 2nd e-mail?

2        A    There's a lot of subject matter in Mr.

3     Cheung's e-mail.  Which particular part of his e-mail

4     I was seeking counsel on I can't be sure from the

5     exhibit you've handed me.

6        Q    My question though is sir were you seeking

7     counsel by this e-mail to Lynn she have ski regarding

                        Page 193