UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MM GLOBAL SERVICES INC.,            :
MM GLOBAL SERVICES PTE. LTD.,       :
and MEGAVISA SOLUTIONS (S)          :
PTE. LTD.,                          :
  Plaintiffs.                       :
                                    :
VS.                                 :  Civil No.  3:02CV1107(AVC)
                                    :
THE DOW CHEMICAL COMPANY,           :
UNION CARBIDE CORPORATION, and      :
UNION CARBIDE ASIA PACIFIC, INC.,   :
UNION CARBIDE CUSTOMER              :
SERVICES PTE. LTD., and DOW         :
CHEMICAL PACIFIC (SINGAPORE)        :
PTE. LTD.,                          :
      Defendants.                   :

### MEMORANDUM OF DECISION RE THE PLAINTIFFS' MOTION TO VACATE THE ORDER GRANTING RULE 12(b)(2) MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

This is an action for damages arising out of a business arrangement pursuant to which the plaintiffs purchased chemicals, polymers, and other products from the defendants and resold them to customers located in India.  The amended complaint alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and common law tenets concerning breach of contract and negligent misrepresentation.

The plaintiffs, MM Global Services, Inc., MM Global Services Pte. Ltd., and Megavisa Solutions (S) Pte. Ltd. (collectively, "plaintiffs") have filed the within motion to vacate a previous order of the court dismissing two party defendants, Union Carbide Customer Services Pte. Ltd. ("UCCS") and Dow Chemical Pacific (Singapore) Private Ltd. ("Dow Singapore"), for lack of personal

jurisdiction.  The issue presented is whether, in light of new evidence obtained through personal jurisdiction discovery, the court has personal jurisdiction over the defendants, UCCS and Dow Singapore.

For the reasons that hereinafter follow, the court concludes that it does have personal jurisdiction with respect to UCCS and Dow Singapore.  The motion to vacate the order granting rule 12(b)(2) motions to dismiss for lack of personal jurisdiction is therefore GRANTED.

## **FACTS**

Examination of the amended complaint and supplemental documents, including affidavits and exhibits submitted in connection with the instant motion, set forth the following undisputed material facts.

1. Background

The defendant, Union Carbide Corporation ("Union Carbide") is engaged in the manufacture and sale of chemicals, polymers, and other specialty products to customers located in the United States and throughout the world.  Union Carbide is incorporated in New York and has its corporate headquarters and principal place of business in Danbury, Connecticut.

In December 1984, lethal gas escaped from Union Carbide's plant in Bhopal, India. The leak caused the death of 3,800

persons and injuries to an additional 200,000.[1]

Union Carbide thereafter ceased selling products directly to customers in India.  In 1987, Union Carbide appointed the plaintiff, Mega Vista Marketing Solutions Ltd. ("MVMS") as a non-exclusive distributor to maintain Union Carbide's access to the Indian marketplace.  In 1993, Union Carbide requested that MVMS form separate corporate affiliates and open offices outside of India that would buy Union Carbide products in the United States and resell them to end-users in India.

Over the next decade, Union Carbide would distribute its products, according to differing agreements, in Asia through other entities, including: (1) Mega Global Services, Inc. ("MMGS"), a Texas corporation with a principal place of business in Houston; (2) Mega Global Services, Inc. - Singapore ("MMGS-S"), a business entity organized under the laws of Singapore with a principal places of business in that country; and (3) Mega Vista Solutions (S) Pte. Ltd. ("MVS"), a business entity organized under the laws of Singapore with a principal place of business in that country.  In addition, Union Carbide formed the defendant, Union Carbide Asia Pacific, Inc. ("UCAP") and the defendant, Union Carbide Customer Services Pte Ltd ("UCCS") to assist product sales in India. UCAP is a corporation

---

[1]In February 1989, Union Carbide and its Indian affiliate were ordered to pay a total of $470 million for all civil claims arising from the tragedy.

3

organized under the laws of Delaware with a principal place of business in Singapore. UCCS is a corporation organized under the laws of Singapore with a principal place of business in that country.

In or around August 1999, Union Carbide announced a plan of merger with the co-defendant herein, Dow Chemical Company ("Dow"). Dow is a corporation organized under the laws of Delaware, with a principal place of business in Midland, Michigan. The amended complaint alleges that with the plan of merger, the need dropped for the re-sale services in India previously performed by MVMS, MVS, MMGS and MMGS-S. Consequently, the amended complaint alleges that Union Carbide and its affiliates ceased acting consistently with their alleged contractual and legal obligations and, in particular, undertook efforts to establish Dow, untainted by the Bhopal tragedy, in place of the plaintiffs as a direct seller of products to end-users in India.

On February 6, 2001, Union Carbide merged with a subsidiary of Dow and became a wholly owned subsidiary of Dow.  At around this time, Dow also created the defendant, Dow Singapore. Dow Singapore is a wholly owned subsidiary of Dow and is incorporated in Singapore with a principal place of business in that country. Dow created Dow Singapore to effectuate sales of Union Carbide products to the plaintiffs and to further Union Carbide and Dow's

4

relationship with the plaintiffs. On January 16, 2002, Dow Singapore advised MVS that, effective March 31, 2002, MVS would no longer be a distributor for Union Carbide products other than wire and cable compounds. MVS refused to continue the relationship with Dow Singapore on those terms.

On June 25, 2003, the plaintiffs MVMS (India), MVS (Singapore), MMGS (Texas) and MMGS-S (Singapore) commenced this lawsuit against the defendants, Union Carbide Corporation (Connecticut), Dow Chemical Company (Michigan), Union Carbide Asia Pacific, Inc. ("UCAP") (Singapore), Union Carbide Customer Service Pte. Ltd. ("UCCS") (Singapore), and Dow Chemical Pacific Private Ltd. (Singapore). The amended complaint alleges that, from 1993 through March 2002, Union Carbide and Dow, directly and through the above named affiliates, compelled the plaintiffs to agree to engage in a price maintenance conspiracy with respect to the resale of Union Carbide products in India, and refused to accept orders or cancelled accepted orders if the prospective resale prices to end-users in India were below certain levels. According to the amended complaint, Dow and Union Carbide sought to "ensure that prices charged by [the][p]laintiffs to end-users in India for [p]roducts would not cause erosion to prices for the [p]roducts charged by [Union Carbide] and Dow to end-users... in the United States as well as in other jurisdictions..," and that,

> [a]s a direct and proximate result of
> [the][d]efendants fixing of minimum

5

> resale prices and other terms of sale,
> competition in the sale and resale of
> [Union Carbide] products in and from the
> United States was improperly diminished and
> restrained...

Further, the amended complaint alleges that, among other things, starting in mid-1999 and continuing until 2002, Union Carbide, acting through the defendants, UCAP and UCCS, refused to authorize orders placed by the plaintiffs for Union Carbide products and arbitrarily declined to fill orders that had been placed and accepted, knowing that such actions would "severely damage[ ][the] plaintiffs' relationships with long term strategic customers."

On May 30, 2003, the defendants, UCAP, UCCS, and Dow Singapore filed a motion to dismiss this action as to them only for lack of personal jurisdiction. On November 17, 2003, the court granted the motion as to UCCS and Dow Singapore and denied the motion as to UCAP. On December 4, 2003, the plaintiffs moved for reconsideration of that order, arguing that the record was undeveloped and that the plaintiffs should be allowed to obtain, through discovery, evidence of UCCS's and Dow Singapore's contacts with Connecticut. On July 8, 2004, the court granted the plaintiffs' motion for reconsideration.

On July 8, 2004, the court authorized the plaintiffs to conduct additional personal jurisdiction discovery. On April 6,

2005[2], the plaintiffs moved to vacate the order dismissing Dow
Singapore and UCCS for want of personal jurisdiction, arguing
that UCCS and Dow Singapore do "transact business" of a
substantial character" in Connecticut, creating jurisdiction
under section 12 of the Clayton Act.

2. <u>New Discovery</u>

Discovery conducted in connection with the instant motion
demonstrates that:

A. <u>UCCS</u>

UCCS in Singapore placed purchase orders for Union Carbide
products through a centralized computer system located in West
Virginia.  These orders were transmitted to Union Carbide
customer service centers in Houston, Texas or Somerset, New
Jersey.  When UCCS placed orders for products in bulk, a customer
service representative in Texas or New Jersey consulted with both
an inventory planner, who was located in Houston, Texas, and a
product marketing manager, who was located in Danbury,
Connecticut[3], to confirm the product was available.  For non-bulk
orders, a product marketing manager in Connecticut might get
involved if contacted by an inventory planner.  If Union Carbide
handled the shipping and booking for a bulk order, it would go

---

[2] The plaintiffs claim that the defendants have not
disclosed all the requested information.

[3] Some Union Carbide product marketing managers were based
in Charleston, West Virginia.

through its booking department in Danbury.  Copies of invoices and other transaction-related documents concerning sales to UCCS were sent to Union Carbide Danbury personnel.  These purchase orders created separate contracts between Union Carbide and UCCS. Union Carbide primarily produced these products in the Gulf States area of the United States.

Recent discovery[4] has shown that, (1) from May through July 1995, UCCS purchased $15,065,000 worth of product from Union Carbide; (2) from December 2000 to January 2001, UCCS purchased $105,452 worth of product from Union Carbide; (3) from November to December of 2001, UCCS purchased $1,533,793 worth of product from Union Carbide; (4) in January 2002, UCCS purchased $2,238,600 worth of product from Union Carbide; and (5) from January to July 2003, UCCS purchased $3,171 worth of product from Union Carbide.  Further, between 1998 and 1999, UCCS directors[5] made several trips to Danbury, including one director's trip to speak at a product-training program.  A UCCS marketing manager maintained a voice mail address and an UCCS Assistant treasurer maintained a Danbury e-mail address.  Several managers made trips to Danbury, along with an unknown number of customer service representatives.

_____

[4]This evidence has been obtained from invoices imprinted with Union Carbide's Danbury address.

[5] All of these directors also worked for either Union Carbide, Union Carbide Asia Pacific, or Dow Singapore.

B. <u>Dow Singapore</u>

Recent discovery[6] has shown that, (1) in 2002, Dow Singapore purchased $69,335 worth of product from Union Carbide; (2) from May to December 2003, Dow Singapore purchased $606,832 worth of product from Union Carbide; and (3) from January to February 2004, Dow Singapore purchased $306,415 worth of product from Union Carbide.  Dow Singapore orders utilized the same Connecticut resources as UCCS.  Two Dow Singapore marketing managers made trips to Danbury between May 2001 and December 2002.

## STANDARD

"When a defendant challenges personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of showing through actual proof that the court has jurisdiction over the defendant."  <u>Divicino v. Polaris Indus.</u>, 129 F. Supp. 2d 425, 428 (D. Conn. 2001) (<u>citing</u> <u>Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 566-567 (2d Cir. 1996)).  Where a "court [has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need only make a prima facie showing of jurisdiction through its own affidavits and supporting materials."  <u>Marine Midland Bank, N.A. v. Miller</u>, 664 F.2d 899, 904 (2d Cir. 1981).  Where as here, however, "the parties have

---

[6]This evidence has been obtained from invoices imprinted with Union Carbide's Danbury address.

conducted extensive discovery regarding the defendant[s'] contacts with the forum state, but no evidentiary hearing has been held- 'the plaintiff[s'] prima facie showing, necessary to defeat a jurisdiction testing motion must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant.'" Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Circ.1996) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)).

With regard to a motion to dismiss for lack of personal jurisdiction, "in the absence of an evidentiary hearing, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff." Sherman Assocs. v. Kals, 899 F. Supp. 868, 870 (D. Conn. 1995); see also Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 768 (2d Cir. 1983); Divicino v. Polaris Indus., 129 F. Supp. 2d 425, 428 (D. Conn. 2001). In addition, "regardless of the controverting evidence put forth by the defendant, the court must resolve all doubts in the plaintiff[s'] favor." United States Surgical Corp. v. Imagyn Med. Techs., Inc., 25 F. Supp. 2d 20, 44 (citing A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)); see also Divicino, 129 F. Supp. 2d at 428.

**DISCUSSION**

1.  Personal Jurisdiction under the Clayton Act

The plaintiffs first move to vacate the order granting the defendants' motions to dismiss for lack of personal jurisdiction, arguing that the defendants, UCCS and Dow Singapore, do transact business in Connecticut, creating jurisdiction under section 12 of the Clayton Act.  Specifically, they argue that "the partial record developed to date [including the defendants travel to Connecticut] overwhelmingly establishes that both UCCS and Dow Singapore 'transacted business' of a 'substantial character' in Connecticut, thereby creating personal jurisdiction under Section 12 of the Clayton Act."

In response, the defendant, UCCS, does not dispute that it 'transacted business' of a 'substantial character' in Connecticut within the meaning of Section 12 of the Clayton Act, but maintains that, ultimately, jurisdiction is not authorized because such an assertion would violate constitutional due process.

The defendant, Dow Singapore, however, does dispute any assertion that Dow Singapore is engaged in business of a substantial character in Connecticut, claiming that "Dow Singapore's purchases from [Union Carbide] do not constitute transacting business within the meaning of section 12 [of the Clayton Act]" and travel by Dow Singapore employees to [Union

Carbide] headquarters does not mean that Dow Singapore has 'transacted business' in Connecticut within the meaning of section 12."

A. Dow Singapore and Section 12 of the Clayton Act

In Goldlawr Inc. v. Heiman, 288 F.2d 579, (2d Cir. 1961), the United States Court of Appeals for the Second Circuit held that "a suit against a corporation under the antitrust laws may be brought, namely, in a district where it is an inhabitant and also where "it may be found or transacts business."[7] Id. at 581, rev'd on other grounds, 369 U.S. 463 (1962). The "necessary effect" of the Clayton Act "was to enlarge the local jurisdiction of the district courts so as to establish the venue of such a suit not only . . . in a district where the corporation resides or is 'found,' but also in any district in which it 'transacts business' – although neither residing nor 'found' therein." Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 373 (1927). The Clayton Act "supplements the remedial provision of the [Antitrust] Act for the redress of injuries resulting from

_____

[7]While the focus of the argument concern Connecticut contacts, "[w]here[, as here,] Congress has spoken by authorizing nationwide service of process, . . . the jurisdiction of a federal court need not be confined by the defendant's contacts with the state in which the federal court sits. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 369 (3d cir. 2002). Accordingly, "a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts, [not just those contacts found in the particular state where the federal court sits"). Id.

illegal restraints upon interstate trade, relieving the injured
person from the necessity of resorting for the redress of wrongs
committed by a nonresident corporation, to a district, however
distant, in which it resides or may be 'found.'"  <u>Id.</u> at 373-74.
The Supreme Court set out the test for determining when a
corporation transacts business in a district for the purposes of
Section 12 of the Clayton Act.  <u>Id.</u> at 373.  A corporation is
transacting business "if, in fact, in the ordinary and usual
sense, it transacts business therein of any substantial
character.  <u>Id.</u>  "The words 'transact business' are used in the
'practical, everyday business or commercial sense.'" <u>United
States v. Burlington Industries, Inc</u>. 247 F. Supp. 185, 187
(S.D.N.Y. 1965).  (quoting <u>United States v. Scophony Corp.</u>, 333
U.S. 795, 807 (1948)).  This test "is a practical and common-
sense test, designed to facilitate plaintiffs' choice of forum,
and is applied under the particular facts presented by each case
upon a liberal inquiry as to whether a corporation is involved in
commercial dealings, in the ordinary and usual sense, of any
substantial character in the proposed forum district."  <u>Turbine
Engine Corp. v. Chromally American Corp.</u>, 265 F. Supp. 766, 767
(D. Conn. 1967).

A corporation transacts business of a substantial character
in a forum if it buys "significant quantities" of merchandise
from vendors.  <u>McCrory Corp v. Cloth World, Inc.</u>, 378 F. Supp.

322, 324 (S.D.N.Y. 1974).  The court in McCrory reasoned that

"substantial purchasing activity [i.e. $286,000 over three years]

can be the basis of a determination that a corporation 'transacts

business' in a district, even if those purchases were not related

to the claim for relief. Id.;  See U.S. v. Burlington Industries

Inc., 247 F. Supp. 185, 187 (S.D.N.Y. 1965) ($2,000,000 in

purchases over several years was sufficient).  Substantial

purchases in the district is "a factor which several courts have

found sufficient to satisfy the 'transacting business' standard

set forth in [section] 12."  Indian Head, Inc. v. Allied Tube &

Conduit Corp.,560 F. Supp. 730, 731 (S.D.N.Y. 1983).  In Indian

Head, the court held that the defendants who operated a film

library, had phone listings in the forum, had substantial sales

and purchases in the forum, and attended meeting in the forum

transacted business under section 12 of the Clayton Act.  Id. at

730.  There, the court determined that the fact that the

defendant attended meetings in the forum was "a significant

factor in finding that [the defendant] transacts business" in the

forum.  Id. at 732.  Contacts such as these, "while not

themselves dispositive, are also relevant in determining whether

venue and jurisdiction are proper."  Id.  "It is the totality of

the acts and conduct . . . which must govern."  Burlington

Industries Inc., 247 F. Supp. at 188.

In this case, Dow Singapore placed purchase orders with

Union Carbide, a corporation with its principal place of business in Danbury, Connecticut.  Sales from Union Carbide to Dow Singapore, based on invoices imprinted with Union Carbide's Danbury address, amount to $69,335 in 2002; $606,832 in May to December 2003; and $306,415 in January and February 2004. Because these figures exceed the sales figures in Burlington and McCroy, the court concludes that Dow Singapore was transacting business in the "everyday or business sense" in the District of Connecticut.  See McCrory Corp. v. Cloth World, Inc., 378 F. Supp. 322, 324 (S.D.N.Y. 1974); U.S. v. Burlington Industries, Inc., 247 F. Supp. 185, 187 (S.D.N.Y 1965).  Moreover, Dow Singapore had additional business transactions with Connecticut as Dow Singapore marketing managers made trips to Danbury between 2001 and 2003.  When viewed in their totality, the court concludes that Dow Singapore transacts business of a substantial character in Connecticut.

B. Personal Jurisdiction and Constitutional Due Process

Even if the court determines that it has jurisdiction under Section 12 of the Clayton Act, it must still determine whether exercising that personal jurisdiction violates constitutional precepts concerning due process.  International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

The defendant, UCCS argues that "the exercise of personal jurisdiction over UCCS offends constitutional due process."

15

Specifically, UCCS argues that "UCCS does not have sufficient minimum contacts with the forum for personal jurisdiction" and "the exercise of personal jurisdiction over UCCS would offend traditional notions of fair play and substantial justice." For its part, the defendant, Dow Singapore responds that "the assertion of personal jurisdiction over Dow Singapore in Connecticut would violate [d]ue [p]rocess of [l]aw." Specifically, Dow Singapore argues that "plaintiffs have failed to show the 'minimum contacts' necessary for personal jurisdiction over Dow Singapore to comply with due process" and "the evidence demonstrates that assertion of personal jurisdiction over Dow Singapore would be unreasonable and unfair."

The due process clause protects a nonresident defendant from being subject to the binding judgment of a state with which it lacks meaningful minimum contacts. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985). "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." Metropolitan Life, 84 F.3d at 567. "In determining whether minimum contacts exist, the court considers the relationship among the defendant, the forum, and the litigation." Chaiken v. VV Publ'g Corp., 119 F.3d 1018, 1027 (2d Cir. 1997) (citation and quotations omitted).

The personal jurisdiction inquiry for federal question

16

cases, however, differs from the inquiry in diversity cases. United States of America v. Swiss American Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). The "constitutional limits of the court's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the due process clause of the Fifth Amendment." Id. (quoting United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992) (Pleasant St. I)). "Under the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." Id.

For purposes of the minimum contacts inquiry, a distinction is made between "specific" jurisdiction and "general" jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984). Specific jurisdiction exists when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." Id. "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." Carefirst of Maryland v. Carefirst Pregnancy Ctrs., 334 F.3d 390, 397 (4th Cir. 2003). "A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the

forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984). In order to support the assertion of jurisdiction, the general business contacts must be continuous and systematic. <u>Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez</u>, 305 F.3d 120, 127 (2d Cir. 2002).

In this case, the court need not assess whether the plaintiffs have demonstrated systematic and continuous business contacts because, for the foregoing reasons, this case is a specific jurisdiction case. A finding of specific jurisdiction requires a three part analysis:

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum.

> Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws.

> Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

<u>Swiss American Bank, Ltd.</u>, 274 F.3d at 621.

Applying the first prong of the test, the court observes that the amended complaint alleges that Union Carbide and Dow

"directly and through the above named affiliates [including Dow Singapore and UCCS]" engaged in price fixing conspiracy with respect to product sales in violation of federal antitrust law. Dow Singapore and UCCS's chemical purchases were part and parcel to that antitrust activity.  The court therefore concludes that Dow Singapore and UCCS's contacts "arise[] out of" the conduct that underlies the litigation.

In applying the second prong, i.e., whether Dow Singapore or UCCS have availed themselves of the privileges of the forum's laws, the court may look to the value and volume of sales.  <u>See</u> <u>Asahi Metal Indus. Co.</u>, 480 U.S. at 122 (Stevens, J., concurring in part and concurring in the judgment); see also <u>Butler v. Beer Across America</u>, 83 F. Supp. 2d 1261, 1267 (N.D. Ala. 2000).  The volume and value of sales here were substantial– more than adequate to demonstrate purposeful availment.

Finally, in assessing whether the assertion of jurisdiction comports with principles of fair play and substantial justice, that is, whether it is reasonable, the court looks to, among other things, the burden on the defendants in litigating in a foreign forum, the interest in the forum in adjudicating the dispute, and the interests of the plaintiffs in obtaining efficient and convenient relief.  <u>World Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 292 (1980).

As the particular defendants here, UCCS and Dow Singapore,

19

are foreign affiliates of a domestic corporation that also has been sued in this case, the burden of litigating here is not a consideration that weighs substantially in favor or dismissal. Further, as UCCS and Dow Singapore allegedly participated in the antitrust conspiracy, maintaining their presence in this action furthers the plaintiffs interest in obtaining efficient and convenient relief. Finally, because, at bottom, the plaintiffs allege that our domestic market was injured by the activities alleged in the amended complaint "national interests in furthering the policies of [American antitrust law] militates in favor of exercising personal jurisdiction." See Pinker v. Roche Holdings Ltd., 292 F.3d 361, 372 (3d. Cir. 2002).

**CONCLUSION**

The court concludes that it has personal jurisdiction over Dow Singapore and UCCS. Accordingly, the plaintiffs' motion to vacate the order granting Rule 12(b)(2) motions to dismiss (document # 282) is GRANTED.

It is so ordered this 12 th day of December, 2005, at Hartford, Connecticut.


_____
        Alfred V. Covello
United States District Judge


20