## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:02 CV 1107 (AVC) |
| v. | ) ) ) | |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., DOW CHEMICAL COMPANY PACIFIC (SINGAPORE) PTE. LTD., and UNION CARBIDE CUSTOMER SERVICE PTE. LTD. | ) ) ) ) ) ) ) ) | January 23, 2006 |
| Defendants. | ) ) ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
71 S. Wacker Drive
Chicago, Illinois 60606

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006-1157

Nathan P. Eimer (ct 23693)
Scott C. Solberg (phv 0234)
EIMER STAHL KLEVORN
 & SOLBERG LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Craig A. Raabe (ct 04116)
Jason M. Kuselias (ct20293)
Elizabeth R Leong (ct24453)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 05103-3497

*Counsel for Defendant*
*The Dow Chemical Company and Dow*
*Chemical Pacific (Singapore) Pte. Ltd.*

*Counsel for Defendants*
*Union Carbide Corporation,*
*Union Carbide Asia Pacific,*
*Inc., and Union Carbide*
*Customer Service Pte. Ltd.*

*Counsel for all Defendants*

# INTRODUCTION

The dispositive facts of this case are straightforward and undisputed. Plaintiffs contend that these facts establish defendants engaged in resale price maintenance in violation of the United States antitrust laws.[1] Not so. Resale price maintenance involves a manufacturer selling its products to a distributor and then agreeing with the distributor to maintain artificially inflated prices. To be guilty of resale price maintenance, it is axiomatic that the manufacturer does something beyond merely refusing to deal with the distributor. Here, none of the essential elements of resale price maintenance is present.

Plaintiffs had a limited and well-defined role.[2] They were not typical distributors, purchasing and warehousing products for resale. Instead, plaintiffs were commission-compensated middlemen of defendants' products in India, doing business on a transaction by transaction basis. Plaintiffs never purchased any product from defendants, except to fill a specific order of a specific customer in India. (India, it should be noted, was one of the world's lowest priced markets for defendants' goods.) The wholesale price plaintiffs paid to defendants

---

[1] While the individual corporate identities of the various parties are ultimately important to issues of liability in this case, they are not critical to this motion because the fundamental legal issues raised here work to the benefit of all defendants regardless of their individual circumstances. That said, it is worth noting that defendant The Dow Chemical Company ("TDCC") never made any direct sales to and had no direct contractual relationship with any plaintiff at any time. Defendant Union Carbide Corporation, meanwhile, did make some sales to one of the plaintiffs prior to 1998, but thereafter all sales were made by Union Carbide Customer Services, Pte. Ltd. Similarly, the three plaintiff entities each operated in different time periods with little or no overlap. These points of distinction, however, are not critical to this motion and, as such, we have used the simplified "plaintiffs" and "defendants" throughout this brief to avoid unnecessary complication. In adopting this convention, each individual defendant expressly reserves its right to subsequently raise any argument or defense unique to its particular situation that may serve to limit or eliminate its ultimate liability in this case.

[2] All factual references in this introduction are made elsewhere in the brief with specific references to the Local Rule 56(a)(1) statement.

was determined, on an order by order basis, by a simple pricing formula: the proposed retail price to the Indian purchaser (commonly referred to as the "CIF" price) less insurance, freight and plaintiffs' fixed commission resulted in the wholesale price (commonly referred to as the "FAS" price).

The process—known in Asian commerce as "indenting"—worked as follows: Once plaintiffs' India-based sales agent found a prospective Indian customer willing to pay a certain price for a certain volume of product, it would contact defendants' regional office in Singapore to inquire as to whether defendants were willing to sell on the proposed terms. Each proposal was invariably presented in terms of the agreed pricing formula:

*proposed CIF price – [commission, freight, and insurance] = FAS price*

Plaintiffs concede this was a "simple mathematical formula" and that all parties knew the value of the various components used to convert CIF prices to FAS prices under the formula.

Upon receiving an indent proposal from plaintiffs, defendants would in their sole discretion either accept or reject the proposed sale. While plaintiffs might have wished that defendants would agree to cut their prices on certain transactions to permit plaintiffs to make additional sales (and thereby earn additional commissions), there is simply nothing in antitrust law that requires a manufacturer to sell products to a distributor on terms demanded by the distributor. Quite the contrary, it is fundamental in antitrust law that a manufacturer is always free to sell (or not) depending on the terms being offered.

As such, defendants were free to reject any proposed transaction for any reason, including that the wholesale price they would receive was too low. Plaintiffs build their entire

case on the fact that defendants, in rejecting certain proposed indent sales, occasionally stated that the CIF price was "too low." But whether the parties spoke in terms of CIF prices or FAS prices is wholly irrelevant, because everyone agrees that a conversion from CIF to FAS was a simple mathematical calculation. Any such statements therefore have absolutely nothing to do with resale price maintenance. In the end, defendants' unilateral decisions to accept (or reject) plaintiffs' proposed transactions for products exported to and sold exclusively in India simply do not constitute resale price maintenance in violation of the United States antitrust laws. *See* pages 11-19, below.

The record facts establish another fatal flaw in plaintiffs' resale price maintenance claim, namely that plaintiffs were never constrained by the pricing formula. Plaintiffs were at all times free to sacrifice their own commission (thereby reducing the retail price to the purchaser) to make a sale. Likewise, plaintiffs routinely increased the retail price to the purchaser (above the price it proposed to defendants) to maximize profits. In other words, plaintiffs concede they routinely sold products at prices both above and below the proposed resale price associated with defendants' pricing formula. Plaintiffs' candid admission that they freely disregarded the allegedly "fixed" resale price additionally precludes a finding of resale price maintenance.

With the futility of plaintiffs' resale price maintenance claim exposed by the record facts, plaintiffs have recently tried a new approach, suggesting that defendants violated U.S. law by unilaterally prohibiting plaintiffs from reselling defendants' products in areas other than India. Even if this claim was properly plead (which it was not), it could not save plaintiffs'

case from summary judgment. The unilateral conduct complained of is not illegal under the Sherman Act. *See* pages 19-21, below.

Finally, the Court should dismiss plaintiffs' pendent contract and tort claims. Those claims (which are governed by Singapore and India law, respectively) involve a dispute between the two Singapore-based plaintiffs and the Asian-located subsidiaries of Union Carbide and The Dow Chemical Company. Dismissal is thus proper under the doctrine of forum non conveniens. *See* pages 21-27, below.

## STATEMENT OF UNDISPUTED FACTS

A.    THE PARTIES.

Union Carbide Corporation ("Union Carbide") was a global chemical and polymer company, having annually sold billions of dollars of products around the world. (Defendants' Local Rule 56.1 Statement ("Stmt") ¶ 1). In addition to its own domestic marketing force, Union Carbide had regional marketing offices located in Europe, Latin America, and the Far East. (Stmt ¶ 2). Defendant Union Carbide Asia Pacific, Inc. ("UCAP") was a wholly-owned subsidiary of Union Carbide responsible for marketing Union Carbide's products in the Asia Pacific region. (Stmt ¶ 3). UCAP's territory covered fifteen countries in the region, including India. (Stmt ¶¶ 4-5). India was historically one of UCAP's lowest priced and least significant markets. (Stmt ¶ 5). Each country in UCAP's region was home to a separately incorporated Union Carbide affiliate that was responsible for marketing Union Carbide's

4

products in that country.  (Stmt ¶ 6).  These separately incorporated Union Carbide affiliates
were commonly referred to as the "country companies."  (Stmt ¶ 7).

   Prior to 1987, Union Carbide's products were distributed in India by Union
Carbide India Ltd. ("UCIL"), an Indian based joint venture between Union Carbide and the
Indian Government.  (Stmt ¶ 8).  In addition to manufacturing certain agricultural chemicals and
other products for the Indian market, UCIL's marketing department also brokered the sale of
other domestically produced Union Carbide products to customers in India.  (Stmt ¶ 9).  In
December 1984, lethal gas escaped from one of UCIL's manufacturing facilities in Bhopal,
India, resulting in the deaths of numerous area residents.  In the aftermath of this event, Union
Carbide sold its interest in UCIL and discontinued sales of product directly to customers in India.
(Stmt ¶ 10).

   In 1987, several former members of UCIL's marketing department formed Visa
Petrochemicals Pvt. Ltd ("Visa Petrochemicals"). (Stmt ¶ 11).  UCAP appointed Visa
Petrochemicals to act as a non-exclusive sales agent for Union Carbide products in India.  (Stmt
¶ 12).  Visa Petrochemicals served as a commission based broker in a role known as an
"indentor" or "indent agent" in the parlance of Indian import commerce.  (Stmt ¶ 13).  As an
indent agent, Visa Petrochemicals did not purchase Union Carbide products for its own account
or otherwise keep an inventory of goods in stock for resale to end users.  (Stmt ¶ 14).  Instead,
Visa Petrochemicals would canvass the Indian marketplace for potential purchasers of Union
Carbide's various products.  (Stmt ¶ 15).  Once a potential purchaser made an offer to buy a

certain volume of product at a certain price, Visa Petrochemicals would submit the proposed indent order to UCAP for approval. (Stmt ¶ 16).

Under the terms of a standard indent, the indentor (Visa Petrochemicals) had no authority to bind the supplier (Union Carbide) and the indent offer only became a binding contract once Union Carbide accepted the proposed terms, including any letter of credit arrangements. (Stmt ¶ 17). Visa Petrochemicals earned a commission on each sale that it brokered. (Stmt ¶ 18). This arrangement between Visa Petrochemicals and Union Carbide was memorialized in a letter dated November 16, 1987. (Stmt ¶ 19).

In 1993, the owners of Visa Petrochemicals sold the business to a holding company controlled by Ajay Mittal. (Stmt ¶ 20). Visa Petrochemicals went through two name changes—first becoming Mega Visa Marketing and Engineering Limited and later Mega Visa Marketing and Solutions Limited—but the change was in name only; all three names refer to the same entity (hereinafter "Visa India"). (Stmt ¶ 21). At about the same time, in March or April of 1993, Mr. Mittal incorporated plaintiff MM Global Services, Inc. ("Global Houston") to serve as a middleman between Union Carbide and UCAP on the one hand, and Visa India and the Indian purchaser on the other. (Stmt ¶ 22). Global Houston had two employees officed in Houston, Texas. (Stmt ¶ 23). As a result of Global Houston's formation, UCAP terminated its direct agency relationship with Visa India on April 5, 1993. (Stmt ¶ 24). Thereafter, Visa India continued to serve as indentor of Union Carbide manufactured goods, but its relationship with Union Carbide became indirect, with Global Houston serving as intermediary. (Stmt ¶ 25). The

6

arrangement between UCAP and Global Houston was memorialized in a letter dated November April 5, 1993.  (Stmt ¶ 26).[3]

Defendant Union Carbide Customer Services Pte. Ltd, ("UCCS") began regional service activities in Singapore in the mid-1990's.  (Stmt ¶ 28).  Functions relating to billing and customer service that were previously handled by each individual country company were consolidated in UCCS.  (Stmt ¶ 29).  UCCS took over all billing and customer service responsibilities for the UCAP region.  (Stmt ¶ 30).  By the mid-1990's, Global Houston stopped purchasing export goods directly from Union Carbide: it bought from UCCS in Singapore instead.  (Stmt ¶ 31).

Beginning in 1997, plaintiff MM Global Services Pte., Ltd. ("Global Singapore") took over Global Houston's role as the middleman for sales into India.  (Stmt ¶ 32).  By mid-1998, Global Houston had ceased all operations.  (Stmt ¶ 33).  Two years later, in 2000, Global Singapore ceased doing petrochemicals business.  (Stmt ¶ 34).  Another Singapore company and subsidiary of Visa India, Mega Visa Solutions (S) Pte. Ltd. ("Visa Singapore") took Global Singapore's place in the relationship with UCAP.  (Stmt ¶ 35).  The arrangement between Visa Singapore and UCAP was memorialized in a letter dated June 27, 2000.  (Stmt ¶ 36).  Visa Singapore thus became the middleman between Union Carbide, UCAP and UCCS on the one hand, and Visa India and the Indian purchaser on the other.  (Stmt ¶ 37).

---

[3] On September 8, 1995, UCAP authored a second letter. (Stmt ¶ 27).  The 1995 letter differed from the 1993 letter in two respects: (1) title to the goods was to pass "when products has effectively passed the ship's rail at the point of shipment" rather than "at the ship rail or inlet flange"; and (2) the 1995 letter explicitly stated that plaintiffs could sell only in India.

On February 6, 2001, Union Carbide merged with a wholly-owned subsidiary of The Dow Chemical Company ("TDCC").  (Stmt ¶ 40).  UCC remains a wholly-owned subsidiary of TDCC.  (Stmt ¶ 41).  Dow Chemical Pacific (Singapore) Pte. Ltd. ("Dow Singapore") is a Singapore corporation and is a wholly-owned subsidiary of TDCC.  (Stmt ¶ 42).  On or about January 16, 2002, approximately one year after the merger, an affiliate of TDCC in India notified Visa Singapore that it was terminating plaintiffs' distributorship for all products other than wire and cable compounds.  (Stmt ¶ 43).  Less than six months later, plaintiffs filed this suit.

## B.    THE TRANSACTIONS.

Although the relationship between plaintiffs and defendants spanned many years and involved several entities, key facts remained constant throughout.

*First*, each of the challenged transactions between plaintiffs and defendants was the product of a separate agreement to fill a specific indent order of a specific Indian customer and thus, in those transactions, plaintiffs never held any inventory of product to "resell" to any customer.  (Stmt ¶¶ 38, 53).[4]  For example, once Visa India found a prospective Indian customer willing to pay a certain retail price for a certain volume of product, it would contact UCAP to obtain approval of the proposed terms.  (Stmt ¶ 54).  If a proposed transaction was approved,

---

[4] On those few occasions when Visa India did sell product from its own stock (typically small volume sales of some specialty chemical acquired from UCC through plaintiffs), Visa India set the retail price unilaterally with no input or interference from Union Carbide or UCAP.  (Stmt ¶¶ 38-39).

UCAP would authorize UCCS to process the order and to invoice one of the plaintiffs. (Stmt ¶ 55).

    *Second*, defendants' wholesale price to plaintiffs for indent orders was always derived by the following formula: the proposed CIF retail price *minus* [insurance, freight and commission] *equals* the FAS wholesale price. (Stmt ¶ 44). As such, a direct arithmetic connection existed between the FAS price and the CIF price proposed by plaintiffs. (Stmt ¶ 45).[5] Mr. Sanjiv Sanghvi, the president of Global Houston (and a director of Visa Singapore) testified that "[i]t's a simple mathematical formula" to convert CIF prices to FAS prices. *See* January 12, 2006, Deposition of Sanjiv Sanghvi ("Sanghvi Dep.") at 73-74.[6] All parties involved in the process, including Visa India, UCAP, UCCS, Union Carbide and (at different times) each of the plaintiffs, were fully aware of how the formula worked and the value of the various components that were netted out to arrive at the wholesale price. (Stmt ¶ 46).

    Defendants would occasionally reject a proposed transaction because they were not satisfied with the wholesale price that they would obtain under the pricing formula. (Stmt ¶ 49). In rejecting a transaction, defendants' concern was that the netback to the company (profit) was too low. (Stmt ¶ 50). On those occasions when defendants were unwilling to provide the

---

[5] To expedite the order process, UCAP occasionally supplied Visa India (and the other country companies in its region) with a list of the "floor" prices. (Stmt ¶ 47). The floor prices were typically expressed in terms of the FAS price, though occasionally the parties' correspondence referred to "CIF" floor prices. (Stmt ¶ 48).

[6] A true and correct copy of the rough transcript of the Sanghvi Dep. is at Tab 15 of Defendants' Appendix of Evidence in Support of Their Motion for Summary Judgment ("Def. Appx."), filed contemporaneously herewith. When the official transcript is finished, defendants will substitute the official transcript and update all necessary citations.

requested price support, plaintiffs were still free to reduce the retail price by sacrificing their own commission, and, in fact, plaintiffs did so from time to time to make such sales.  (Stmt ¶ 51).

*Third*, plaintiffs routinely sold products to customers at prices both above and below the allegedly fixed retail price.  As noted above, plaintiffs were free to reduce their commission to reduce the retail price to the customer and, on occasion, did so.  (Stmt ¶ 51).  Plaintiffs also routinely increased the retail price to the customer beyond the price suggested by the wholesale formula to increase their income.  (Stmt ¶ 52).

*Fourth*, plaintiffs' relationship with defendants was always non-exclusive.  (Stmt ¶ 56).  As such, defendants were not obligated to use plaintiffs' for any sales.  (Stmt ¶ 56).

*Fifth*, the defendants imposed an "India only" territorial restriction on plaintiffs.  (Stmt ¶ 57).  Such restrictions were not unusual, with other multinational companies imposing similar "India only" territorial restrictions on plaintiffs.  (Stmt ¶ 58).  Moreover, plaintiffs even imposed territorial restrictions on their own subagents.  (Stmt ¶ 59).  Plaintiffs complied with defendants' "India only" territorial restriction.  (Stmt ¶ 60).  In fact, plaintiffs concede they did not object to this territorial restriction when they received the 2000 letter.  (Stmt ¶ 61).

## ARGUMENT

Plaintiffs and their predecessors served as UCAP's primary distributor in India for roughly a decade and a half before Union Carbide was acquired by TDCC.  After that transaction, Dow Singapore and other entities of TDCC opted to do the majority of their business with their own established affiliate in India instead of with plaintiffs, with whom they had no previous relationship.  Having no basis to challenge the diminution of their role (none of the

defendants was contractually obligated to deal with plaintiffs), plaintiffs' U.S. lawyers concocted an antitrust claim. The commission-based pricing formula that plaintiffs had operated under for roughly a decade and a half was suddenly illegal under United States antitrust law. Plaintiffs' claim should be seen for what it is: a baseless retaliatory lawsuit manufactured by counsel using inference upon unsupportable inference. Millions of pages of documents have been produced, millions of dollars have been spent by the defendants, and innumerable hours have been wasted by the Court, counsel and company witnesses. It is time for this litigation to end.

* * * *

As a threshold matter, claims under the Sherman Act are governed by a four year statute of limitations. 15 U.S.C. § 15b.[7] The present action was filed on June 25, 2002, and, therefore, only those transactions occurring after June 25, 1998, can provide a potential basis for Sherman Act liability. *See, e.g., Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997)* (observing that, in antitrust cases, a plaintiff cannot "recover for injuries caused by other earlier predicate acts that took place outside the limitations period").[8] Plaintiffs acknowledged this bar. [Video][9] The record facts show that during the limitations period, substantially all of the relevant transactions were between Visa Singapore and UCCS or Dow Singapore (both also based in

---

[7] For the Court's convenience, the electronic version of this brief contains video clips of certain deposition testimony and is hyperlinked to other documentary evidence and case authorities. To access these features, press "CTRL" on your keyboard and click the computer mouse on the blue hyperlink. Following the link to each video clip is the specific citation to the deposition transcript.

[8] *See also Applera Corp. v. MJ Research Inc.*, 349 F.Supp.2d 338, 352 fn.16 (D. Conn. 2004) ("damages are limited to the four years immediately preceding the filing of the lawsuit").

[9] December 14-16, 2005, Deposition of Ajay Mittal ("Mittal III Dep") at 642. A true and correct copy of the Mittal III Dep. is at Tab 19 of Def. Appx.

Singapore) to supply end-users in India.  Plaintiffs have admitted that Global Houston (the only

U.S.-based plaintiff) had ceased operations by mid-1998 (Stmt ¶ 33), and therefore any antitrust

claim that it may have had is presumably time-barred.   Moreover, plaintiffs expressly waived

any claim for the year 1999 during their recent Rule 30(b)(6) deposition.  [Video][10]  Thus, any

alleged antitrust claim is limited to, at most, the last six months of 1998 and the period from

January 2000 until the plaintiffs and defendants parted ways.

I.      **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT I OF
        PLAINTIFFS' COMPLAINT.**

Defendants are entitled to summary judgment on Count 1 because the conduct

plaintiffs complain of is not illegal under the Sherman Act.  Section 1 of that Act makes illegal

"[e]very contract, combination …, or conspiracy, in restraint of trade…." 15 U.S.C. sec. 1.

Under the undisputed facts of this case, however, no reasonable jury could find defendants liable

for violating Section 1.[11]

A.      **No Reasonable Jury Could Conclude that Defendants Engaged in Resale
        Price Maintenance.**

Although minimum resale price maintenance agreements are illegal *per se*, *see*

*Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U.S. 373 (1911), manufacturers like defendants

here are always free to sell (or not) depending on the terms being offered.  *See United States v.*

---

[10] Mittal III Dep. at 563.

[11] Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment must be granted unless the non-moving party comes forward with facts supported by admissible evidence that would enable a reasonable jury to find in its favor. *Id.* at 322-23.  Additionally, in deciding whether to grant summary judgment, the Court must take into account the "substantive evidentiary standards that apply to the case," including the applicable burden of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

_Colgate & Co._, 250 U.S. 300 (1919).   In _Colgate_, the Supreme Court confirmed that the

Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer . . . freely

to exercise his own independent discretion as to the parties with whom he will deal." _Id._ at 307.

The _Colgate_ Court continued: "of course, [the manufacturer] may announce in advance the

circumstances under which he will refuse to deal." _Id._

      The principle expressed in _Colgate_ remains fundamental in antitrust law. _See,_

_e.g._, _Monsanto Co. v. Spray-Rite Service Corp._, 465 U.S. 752, 761 (1984) (relying on _Colgate_

and noting that independent manufacturer action, including the termination of a dealer in

response to complaints about price-cutting from other dealers, would not violate the Sherman

Act). Although the distributor prevailed in _Monsanto_, the Supreme Court emphasized the high

standard of evidence necessary to establish a violation in situations like these:

> The correct standard is that there must be evidence that tends to exclude the possibility of
> independent action by the manufacturer and distributor.  That is, there must be direct or
> circumstantial evidence that reasonably tends to prove that the manufacturer and others
> had a conscious commitment to a common scheme designed to achieve an unlawful
> objective.

465 U.S. at 768.  In sum, "[i]ndependent action is not proscribed." _Id._ at 761.  _See also Sweeney_

_& Sons, Inc. v. Texaco, Inc._, 637 F.2d 105, 110-11 (3d Cir. 1980) (holding that, under _Colgate_,

"[u]nilateral action, no matter what its motivation, cannot violate [Section] 1").

      The undisputed facts here establish that defendants' conduct was lawful.  In each

transaction the wholesale price paid to defendants by plaintiffs was mechanically derived from a

formula understood by all parties.  (Stmt ¶¶ 44-46) [Video][12]  Specifically, once Visa India found

a prospective Indian customer willing to pay a certain price for a certain volume of product, it

would contact UCAP to ask whether defendants were willing to deal on the proposed terms.  A

typical request looked like this:

> "Dear Noli [at UCAP]
>
> As per our telecom i [sic] am sending you the deatils [sic] of pricing for W/C [wire and cable] 77, Nicco Telelink [the customer] for 225 MT [metric tons] of [Product A] and 357 MT of [Product B].
>
> CIF Price : usd 698
> Insurance : usd    2
> Freight    : usd 100
> _____
> Nett Price : usd 596
> Less C3    : usd  18
> _____
> FAS Price : usd 578
>
> I look forward to your U/A [Understanding and Agreement].
>
> Thanks and regards,
>
> Paresh Zaveri"[13]

*See* Plaintiffs' Deposition Exhibit, 24.[14]

---

[12] Mittal III Dep. at 462.

[13] "C3" refers to a commission of 3% to plaintiffs.  (Stmt ¶ 64).   "U/A" was a commonly used shorthand for "understanding and agreement."  (Stmt ¶ 65).

[14] A true and correct copy of Plaintiffs' Deposition Exhibit 24 is at Tab 20 of Def. Appx.

In response to this particular proposal, Noli Jiminez of UCAP emailed his counterpart at UCCS instructing UCCS to process the order (with a "cc" to Mr. Zaveri) as follows:

> "dear yvonne,
>
> confirm u/a to order entry of below order.
>
> thanks/regards
>
> noli"

See id.[15] The pricing formula could not have been more straightforward. The value of the various components was known to all parties and, therefore, whether plaintiffs' request was put in terms of the CIF price or the FAS price was irrelevant to defendants who were at all times concerned, and legitimately so, with the "netback" – the net funds returned defendants for the sale. (Stmt ¶¶ 46, 50) [Video][16] Importantly, plaintiffs routinely deviated from the proposed CIF price and sold products at prices both below and above that price. (Stmt ¶¶ 51-52) [Video][17] Even though the sales at prices above the proposed CIF price arguably defrauded UCCS and TDCC out of sales income to which they were entitled under the formula, defendants did not concern themselves with this practice or even inquire into it. Defendants' concern was always their netback, not plaintiffs' retail prices.

---

[15] Navin Chandra, former president of Visa India, explained the negotiation process. [Video] (November 17, 2005, Deposition of Navin Chandra ("Chandra Dep.") at 63-64). A true and correct copy of the Chandra Dep. is at Tab 8 of Def. Appx.

[16] Chandra Dep. at 76-77.

[17] Mittal III Dep. at 492-94.

Plaintiffs build the entire case on the fact that defendants, in rejecting certain proposed indent sales, occasionally stated that the CIF price was "too low." But whether the parties spoke in terms of CIF or FAS prices is wholly irrelevant, because everyone agrees that a conversion from CIF to FAS was a simple mathematical calculation and defendants were only concerned with the netback. [Video][18]

In sum, defendants' occasional refusals to sell do not constitute antitrust violations for the reasons discussed in *Colgate* and *Monsanto*. Each of the challenged transactions between plaintiffs and defendants was the product of a separate agreement to fill a specific order of a specific Indian customer. (Stmt ¶ 53). None of them involved sales by plaintiffs from an inventory of product they held for resale.[19] (Stmt ¶ 53) [Video][20]; [Video][21] As commission-based middlemen with no financial stake in the products themselves, plaintiffs were never at risk of falling market prices.[22] [Video][23]; [Video][24] Plaintiffs were nevertheless

---

[18] Chandra Dep. at 227-229. In fact, Navin Chandra testified that it would not have been possible for defendants' to unilaterally fix resale prices in India. [Video] Chandra Dep. at 117-19.

[19] While Visa India (which is not a plaintiff) did stock and sell certain Union Carbide products, these sales are not the subject of plaintiffs' resale price maintenance claims, and it is admitted that defendants had no input into the resale price that Visa India charged for these "ex-stock" sales. (Stmt. ¶¶ 38, 39).

[20] Mittal III Dep. at 415-17.

[21] Chandra Dep. at 47-48.

[22] "[A] principal determining a selling agent's sale price, customers, or territory is not engaged in a vertical conspiracy – or at least not of the unlawful kind." 7 Antitrust Law ¶ 1473b, at 305-307. *See also* Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025, 1031 n.5 (2d Cir. 1979) (No antitrust conspiracy where "the sugar broker acted solely as a conduit through which Amstar would negotiate the initial distribution of its sugar" and plaintiff's "sole function was to supply Amstar with potential customers. The terms and price of a resultant sale were exclusively determined by Amstar.") While title to the goods technically passed to (and through) plaintiffs while the goods were in transit, antitrust law looks to the economic substance of the transaction, rather than the form. *United States v. Sealy, Inc.*, 388 U.S. 350, 352 (1967). Judge Posner explained in the context of resale price maintenance: "[T]he rule against resale price maintenance presupposes that the middlemen – dealers or distributors

able to reap the benefits when market prices rose. For example, as retail prices in India rose, so did plaintiffs' commission income. Plaintiffs were at all times free to try to maximize that income by extracting as high a retail price as they could from the Indian purchasers. But plaintiffs do not complain about their inability to raise retail prices or to compete for high priced orders. Plaintiffs instead complain of their inability to secure low priced orders due to defendants' refusal to provide price support. In other words, plaintiffs complain that defendants were unwilling to cut prices to permit plaintiffs to make additional sales (and thereby earn additional commission income). But that is not a cognizable claim under the Sherman Act. Under *Colgate* and *Monsanto* a manufacturer is always free to sell (or not) depending on the terms being offered.

The Seventh Circuit rejected a similar claim for this reason in *Khan v. State Oil Company*, 143 F.3d 362 (7th Cir. 1998). In that case the defendant, State Oil, entered into an agreement with Khan to lease and operate a retail gasoline station owned by State Oil. The agreement provided that State Oil would supply gasoline to Khan at a price equal to the "suggested retail price" set by State Oil, less a margin of 3.25 cents per gallon. The agreement further provided that if Khan resold the gasoline at a price higher than State Oil's suggested retail

---

-- to which the rule applies have the capacity and incentive to set resale prices. This in turn requires in the usual case that the middleman perform extensive functions in distribution, such as warehousing and delivery. If he is merely an order taker, his costs will be a trivial fraction of the total costs of the product, so that to make him determine the final price to charge the consumer would be telling the tail to wag its dog." *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1438 (7th Cir. 1986). Here, like in *Morrison*, the substance of the parties' relationship was that plaintiffs served as mere brokers or order takers for defendants' products. For present purposes, however, the Court need not decide this issue, as a finding of agency is not necessary to defendants' present motion.

[23] Chandra Dep. at 62.

[24] Chandra Dep. at 85.

price, any excess was to be rebated to State Oil. <u>143 F.3d at 363</u>.  Khan sued under the Sherman

Act, asserting that State Oil's pricing formula was *per se* illegal because it placed an effective

ceiling on his retail pricing.  The United States Supreme Court rejected per se liability and

remanded for a determination of whether State Oil's maximum resale price-fixing violated the

"rule of reason."  *State Oil Co. v. Khan*, <u>522 U.S. 3 (1997)</u>, overruling <u>*Albrecht v. Herald Co.*,</u>

<u>390 U.S. 145 (1968)</u>.

On remand, Khan abandoned his maximum price-fixing claim, arguing instead

that the pricing formula amounted to minimum resale price maintenance because the fixed 3.25

cent margin between his wholesale price and State Oil's "suggested" retail price did not allow

him to to sell below the suggested retail price. <u>143 F.3d at 364</u>.  The Seventh Circuit rejected

Khan's new argument as "plainly without merit" and "frivolous":

> *A supplier is free to charge any price he wants to his retailers.*  The fact that the higher
> that price is, the higher the retailer's price will have to be unless he is willing to sell
> below his cost has never been thought to be price-fixing.  Suppose State Oil's suggested
> retail price for some grade of gasoline was $1 per gallon.  Then its price to Khan would
> have been 96.75 [cents].  *If Khan had wanted to sell the gasoline for only 50 [cents],
> would this mean that State Oil would be required by the Sherman Act to reduce its price
> to Khan to 46.75 [cents], so that Khan's margin would be unimpaired?  That is the
> implication in Khan's argument, and it has no basis in antitrust law.*

<u>143 F.3d at 364</u> (emphasis added).

The same result is required here.  As in *Kahn*, defendants here charged a

wholesale price to plaintiffs that was a function of plaintiffs' proposed retail price.  Doing so did

not set a minimum resale price, either expressly or impliedly.  Plaintiffs were always free to

sacrifice their margin to make a sale and occasionally did so.  (Stmt ¶ 51).  Nor did defendants'

method of setting a wholesale price deprive them of their unquestioned right to refuse to sell to

plaintiffs when the contemplated wholesale price was unacceptably low.  While plaintiffs may

have wished that defendants would agree to cut wholesale prices even further to maximize

plaintiffs' income, defendants were under no obligation to do so: "[A] supplier is under no

obligation to lower his price to his customer just because the customer wants to resell the

supplier's product for less than the supplier has suggested without sacrificing any of his profit

margin." *Id.*[25]

Indeed, this case presents an even clearer case than *Khan*, where the plaintiff had

an exclusive arrangement that required him to purchase gasoline only from State Oil.  In this

case, by contrast, plaintiffs' relationship with defendants was non-exclusive.  (Stmt ¶ 56).

[Video][26]  Thus, absent some evidence of collusion among suppliers (which is not alleged), "a

dealer who wanted to pursue a low-price strategy could seek out a supplier who shared his

goals." *Khan*, 143 F.3d at 364.

In the end, plaintiffs' attempt to force defendants' conduct into the rubric of

minimum resale price maintenance, thereby falling under the *per se* rule, is futile.  Plaintiffs

---

[25] Plaintiffs' complaint is premised on defendants' conduct *in responding to* plaintiffs' requests for price support to meet local competition in India.  Not only was Union Carbide free to provide -- or to refuse to provide -- such support in its sole discretion, but on those occasions that it did agree to provide support, it was free to impose pricing restrictions to ensure that the discount was in fact being passed on to plaintiffs' customers.  *See AAA Liquors, Inc. v. Joseph E. Seagram and Sons, Inc.*, 705 F.2d 1203, 1204 (10th Cir. 1982) (no violation where price formula set dealer's gross profit margin and required dealer to pass discount to the customer; "A supplier who grants discounts to a retailer to permit the retailer to charge competitive prices has a legitimate interest in making sure the retailer receiving the discount is not pocketing the price support instead of passing it on to its customers."); *Butera v. Sun Oil Co.*, 496 F.2d 434 (1st Cir. 1974) (holding that a supplier's formula based price support to its dealers was not resale price maintenance: "A producer like Sun may legitimately tailor its wholesale price to the rise and fall of the market.").

[26] Chandra Dep. at 47.

admit they were not required to sell products at the allegedly fixed retail price.  In fact, plaintiffs admit they routinely sold products at prices both above and below the allegedly fixed retail prices.  (Stmt ¶¶ 51-52).  Moreover, plaintiffs admit that they did not suffer any harm from the allegedly fixed prices.[27]  (Stmt ¶ 62).  As Mr. Mittal explained, plaintiffs' damages were not based on the prices defendants sold products at but instead "[i]t was on the basis that they refused to sell us products."  (Stmt ¶ 62) [Video][28]; [Video][29]  Plaintiffs' claim is thus based on their belief that defendants were obligated to sell them an unlimited amount of products at the prices desired by plaintiffs.  (Stmt ¶ 62)  [Video][30]  But this is unsupportable.  Defendants' refusal to sell falls squarely within the rule articulated in *Colgate*.  Plaintiffs' claim for vertical price fixing therefore fails as a matter of law.

**B.     The Unilaterally Imposed Territorial  Restrictions Do Not Provide a Basis for Liability Under the Sherman Act.**

Plaintiffs' recent complaint about the territorial restrictions imposed by defendants fares no better.  While the amended complaint does not allege this vertical non-price restraint as a basis for Sherman Act liability, plaintiffs' Rule 30(b)(6) witness repeatedly mentioned plaintiffs' inability to resell Union Carbide's products in the United States as a source

---

[27] Mr. Mittal testified that he believed plaintiffs could have sold products at prices fifteen percent higher then they actually did.  [Video] (Mittal III Dep. at 398).   This curious fact is probably explained by Mr. Mittal's candid admission regarding the allegedly fixed prices, namely that they were sometimes above the prevailing market price, sometimes at the prevailing market price, and sometimes below the prevailing market price.  (Stmt ¶ 63) [Video] (Mittal III Dep. at 441-42).   Similarly, Mr. Sanghvi testified that he was "not aware of" any instance in which "the prices charged by any of the plaintiffs or by Visa India to end-users in India was unfair."  Sanghvi Dep. at 112-15.

[28] Mittal III Dep. at 651-52.

[29] Mittal III Dep. at 453-54.

[30] Mittal III Dep. at 648-49.

of plaintiffs' alleged injury.[31]  To the extent that defendants' refusal to allow plaintiffs to sell in the United States could be understood as an additional basis for liability, it too fails to support an antitrust claim.  Such unilaterally imposed restraints are not illegal under the Sherman Act.

In *Monsanto* the Supreme Court made explicit that "[i]ndependent action is not proscribed."  465 U.S. at 761 (a "manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply").  As a corollary of this rule, the Court also noted that a dealer's decision to follow the manufacturer's suggested resale prices creates no cause of action.  *Id.* ("a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination").  This basic principle dooms plaintiffs' territorial restraint allegation.

The Sixth Circuit Court of Appeals applied *Monsanto* to dispose of a virtually identical claim in *Int'l Logistics Group, Ltd. v. Chrysler Corporation*, 884 F.2d 904 (6th Cir. 1989).  In that case, Chrysler sold engines for export at unit prices that were substantially below its domestic unit price for the same engine.  Chrysler's marketing policies prohibited its distributors from reselling the discounted international engines to customers in the United States, and warned that any refusal to comply would result in cancellation of all future orders.  The plaintiffs, two distributors, violated this prohibition by purchasing engines at export-only prices and then reselling them to dealers in the U.S. at prices substantially below Chrysler's prices to its domestic dealers.  *Id. at 906*.  After Chrysler cancelled the distributors' contracts, the distributors brought suit under the Sherman Act.  Relying on *Monsanto* and other precedent, the

---

[31] July 27, 2005, Deposition of Paresh Zaveri ("Zaveri Dep.") at 17-19, 26. The Zaveri Dep. is located at Tab 10 in Def. Appx.

court affirmed a directed verdict against plaintiffs on the grounds that there was no combination or conspiracy as required under Section 1: "[I]t is inappropriate to consider intraband restraints as 'agreements' to conspire and manufacturers are permitted to *unilaterally* impose appropriate restraints without giving rise to a cognizable antitrust violation." *Id.* at 907 (emphasis in original). The Court explained: "[A] conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source." *Id.*

Plaintiffs' claim here fails for the same reason: The export only restriction was unilaterally imposed by defendants and, as such, there is no contract, combination or conspiracy as required for liability under Section 1. Union Carbide (through its foreign affiliates) had its own sales force in virtually every country in the world other than India where, for legal and practical reasons associated with Bhopal, its ability to conduct business was limited. In opting to use plaintiffs as middlemen for the India market, defendants expressly prohibited plaintiffs from selling to customers outside of India. Plaintiffs clearly understood this "India-only" restriction and complied with it. (Stmt ¶¶ 57, 60).[32] Under these undisputed facts, any complaint about Union Carbide's unilateral territorial restriction necessarily fails for the reasons expressed in *Monsanto* and *Chrysler*.

In the end, under the undisputed facts in the record and established legal precedent, no reasonable jury could find that defendants violated Section 1 of the Sherman Act.

---

[32] Plaintiffs' objection to the "India-only" restriction is curious in that others imposed similar restrictions on plaintiffs (Stmt. ¶ 58) and plaintiffs impose territorial restrictions on their own subagents. In fact, Mr. Mittal testified that the purpose of plaintiffs' territorial restrictions is to prevent intrabrand competition. Mr. Mittal explained that if the subagents started to compete, plaintiffs would intervene: "We would take care of it. We would say this is your territory, this is your territory." (Stmt ¶ 59) [Video] (Mittal III Dep. at 590-92).

Defendants are therefore entitled to summary judgment on Court I of the First Amended Complaint.

**III.     THE COURT SHOULD DISMISS THE REMAINING FOREIGN-LAW CLAIMS ON FORUM NON CONVENIENS GROUNDS.**

A key factor in this Court's earlier decision not to dismiss the foreign-law claims on forum non conveniens grounds was the Court's belief that Singapore was not an adequate alternate forum to hear a private U.S. antitrust cause of action pursuant to the Sherman Act. *See* Ruling on the Defs. Motion to Dismiss for Forum Non Conveniens at 17 (April 17, 2003) ("FNC Ruling I").[33] But once this Court concludes that plaintiffs' Sherman Act claim cannot stand, all that is left is a commercial dispute between the two Singapore-based plaintiffs and the Asian-located subsidiaries of Union Carbide and TDCC.  The breach of contract claim involves the transaction-by-transaction dealings between plaintiffs and their counterparties at UCAP and UCCS, and, later, Dow Singapore and Dow India. The negligent misrepresentation claim centers on plaintiffs' interactions with the personnel at TDCC's Asian subsidiaries. The overwhelming contacts that these claims and their resolution have to Singapore establish that Singapore is the proper forum.  This Court should therefore exercise its discretion to dismiss them so that they may be adjudicated there.

---

[33] The Court's denial of the renewed Motion to Dismiss in March 2004 adopted "the same reasons set forth in the April 17, 2003 decision." Denial of Defs. Renewed Motion for Dismissal on Grounds of Forum Non Conveniens (March 24, 2004) ("FNC Ruling II").

A.     The Relevant Standard

"The common law has long permitted dismissal of suits where jurisdiction and venue are proper, but another forum is substantially more convenient." *Capital Currency Exch. N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 606 (2d Cir. 1998). Motions to dismiss on forum non conveniens grounds "'lie[] wholly within the broad discretion of the district court.'" FNC Ruling I, at 9 (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001), and *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)).

Courts employ a two-pronged analysis: "First, a court must determine whether an adequate alternative forum exists." FNC Ruling I, at 10 (citing *Capital Currency Exch.*, 155 F.3d at 609, and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). As this Court observed, "'[a]n alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" FNC Ruling I, at 10 (quoting *Capital Currency Exch.*, 155 F.3d at 609, and *Piper Aircraft*, 454 U.S. at 254 n.22).

If an adequate alternative forum exists, the Court then determines which forum 'will be the most convenient and will best serve the ends of justice.'" FNC Ruling I, at 10 (quoting *Capital Currency Exch.*, 155 F.3d at 609). To that end, it will "weigh the private and public factors identified in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ("the *Gilbert* factors"). The private-interest Gilbert factors include "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of [the] premises; and (5) all other factors

that might make the trial quicker or less expensive.'" FNC Ruling I, at 10-11 (quoting *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29-30 (2d Cir. 2002) (citations omitted). The public-interest Gilbert factors include "'(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law.'" FNC Ruling I, at 11 (quoting *DiRienzo*, 294 F.3d at 31 (citations omitted)). The uncontroverted facts establish that Singapore is the proper forum.

B.     Singapore is an Adequate Forum.

When this Court first denied Defendants' Motion to Dismiss on Forum Non Conveniens grounds, it concluded that Singapore was not an adequate alternative forum because "Singapore purportedly does not recognize any causes of action for antitrust injury," and Plaintiffs therefore "would have 'no remedy at all' for the defendants' alleged resale price fixing." FNC Ruling I, at 17 (quoting *DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir. 2000)). The Court also noted that neither TDCC nor Union Carbide had at that time "offered voluntarily to consent to the jurisdiction of the Singapore courts." *Id.* at 13.

These two once-determinative facts are now inapposite. Once this Court has disposed of the antitrust claim, a Singaporean court can adjudicate the entire dispute. In fact, this Court previously concluded that "the 'essential subject matter' of the contract, fraud and other common law tort causes of action can be addressed adequately by a Singapore court." FNC Ruling I at 15-16 (quoting *Capital Currency Exch.*, 155 F.3d at 611). In addition,

25

defendants have told this Court that TDCC and Union Carbide would consent to personal jurisdiction in Singapore as a condition for the dismissal of this case. *See* Defs. Mem. in Support of Motion to Modify the Court's Ruling of April 17, 2003 Denying Defs. Forum Non Conveniens Motion (May 1, 2003), at 6-7. As the Court has recognized, this is sufficient to make the alternative forum adequate with respect to service. FNC Ruling I, at 13-14. As such, the reasons for concluding Singapore was not an adequate forum no longer exist. The first prong—whether an adequate alternative forum exists—has therefore been answered in the affirmative.

C.    The *Gilbert* Factors Now Weigh in Favor of Singapore.

Applying the Gilbert factors to the current record facts establishes that Singapore "'will be the most convenient [forum] and will best serve the ends of justice.'" FNC Ruling I, at 10 (quoting Capital Currency Exch., 155 F.3d at 609, and *Piper Aircraft*, 454 U.S. at 254 n.22). When the Court first denied Defendants' Motion to Dismiss on Forum Non Conveniens grounds, it evaluated the private interest factors and concluded that the witness-availability factor "points in favor of maintaining the suit" in Connecticut. *Id.* at 20.[34]  Without the antitrust claim, this factor strongly favors Singapore. The fully developed record confirms the relevant witnesses to the common-law claims include a range of Indian and Singaporean witnesses presently or formerly affiliated with UCAP and Dow Singapore, and the employees of plaintiffs, who, to

---

[34] The Court considered the "access to evidence" and "cost of witness attendance" factors neutral as between Connecticut and Singapore.

defendants' knowledge, have no further presence in the United States.[35]   In fact, the significance of defendants' foreign based subsidiaries is confirmed by the letter of Mr. Taffet, counsel for plaintiffs, which emphasizes the importance of obtaining information known only by the U.S. defendants' overseas subsidiaries or affiliates.[36]   Moreover, Union Carbide itself is no longer located in Connecticut, having moved its corporate headquarters to Houston, Texas.[37] Consequently, once this Court disposes of the antitrust claim, very few (if any) relevant witnesses to the remaining claims will be found in Connecticut, or even North America.

The remaining private interest factors confirm that Singapore is the proper forum. As discussed above, the relevant evidence is in Asia (factor 1).  Thus, the cost associated with forcing willing witnesses residing in Asia to come to Connecticut (factor 3) is prohibitive. Moreover, the delay and expense entailed in developing a record through testimony and evidence primarily located in India and Singapore so that a Court in Connecticut may hear the case (factor 5) would place an unreasonable burden on defendants.

With respect to the public-interest, the Court originally concluded that "the local interest in this dispute is sufficient to warrant litigation in this forum." *Id.* at 23 (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 169 (2d Cir. 1991)).  The present record establishes that no such local interest exists.  Since the Court first denied defendants' forum non

---

[35] Global Houston, which had two Texas employees, is not connected to the common-law claims.  Having ceased all operations in 1998, it left the business by the time of the events that give rise to those claims.

[36] It is at this point unclear whether Mr. Taffet still represents all three plaintiffs in this matter.  The June 22, 2004, Letter from Richard S. Taffet to the Honorable Alfred V. Covello is at Tab 21 in Def. Appx.

[37] See http://www.dow.com/../ucc/locations/hstncorp.htm.

conveniens motion, it determined that Singapore law will govern the breach of contract claim (283 F. Supp. 2d at 699), and Indian law will govern the negligent misrepresentation claim (*Id.* at 705). The disposition of the one claim in this case governed by U.S. law (Count I) will leave the Court in a position where it will be applying exclusively non-U.S. law to a dispute involving events that transpired in Asia with no significant connection to the United States. Put another way, without the antitrust claim, a Connecticut forum would apply Indian and Singaporean law, and only Indian and Singaporean law, to resolve an Asian business dispute. The local interest in resolving such a dispute is, at most, *de minimis*. Keeping this dispute in Connecticut would therefore impose "jury duty on a community with no relation to the litigation." Without any countervailing benefit, such a burden cannot be justified.

In sum, Singapore is the proper forum for the resolution of the common-law claims. Singapore is the home of the two plaintiffs. It is the site of much of the conduct surrounding the claims. Most (if not all) of the relevant evidence and witnesses are located in Asia. Singapore is also the source of law that will decide the contract claim. Moreover, there has already been a related proceeding in Singapore, where Dow Chemical Pacific (Singapore) Pte Ltd. sued Visa Singapore for payment of over one million dollars in unpaid invoices for products sold and delivered between October 2001 and March 2002. The public interest in having this dispute resolved in Connecticut (to the extent any exists) does not justify the burden and expense doing so would impose on defendants. Therefore, if the Court enters summary judgment in favor of defendants on the U.S. antitrust claim, it should dismiss the two remaining claims so that they may be adjudicated in a Singapore proceeding.

## CONCLUSION

For the foregoing reasons, defendants respectfully submit that the Court should grant summary judgment in defendants' favor on plaintiffs' antitrust claim (Count I of the First Amended Complaint), and that the Court should then dismiss the remaining foreign law claims under the doctrine of forum non conveniens.

Respectfully submitted,

_____
Craig A. Raabe

| | | |
|---|---|---|
| Andrew S. Marovitz (ct 25409)<br>Dana S. Douglas (ct 25412)<br>MAYER, BROWN, ROWE<br> & MAW LLP<br>71 S. Wacker Drive<br>Chicago, Illinois 60606<br>(312) 782-0600 | Nathan P. Eimer (ct 23693)<br>Scott C. Solberg (phv 0234)<br>EIMER STAHL KLEVORN<br> & SOLBERG LLP<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604<br>(312) 660-7600 | Craig A. Raabe (ct 04116)<br>Jason M. Kuselias (ct20293)<br>Elizabeth R. Leong (ct24453)<br>ROBINSON & COLE LLP<br>280 Trumbull Street<br>Hartford, CT 05103-3497<br>(860) 275-8304 |
| Christopher J. Kelly (ct 25410)<br>MAYER, BROWN, ROWE<br> & MAW LLP<br>1909 K Street, N.W.<br>Washington, D.C. 20006-1157<br>(202) 263-3000 | | |
| *Counsel for Defendants*<br>*The Dow Chemical Company*<br>*and Dow Chemical Pacific*<br>*(Singapore) Pte. Ltd.* | *Counsel for Defendants*<br>*Union Carbide Corporation,*<br>*Union Carbide Asia Pacific,*<br>*Inc., and Union Carbide*<br>*Customer Services Pte. Ltd.* | *Counsel for all Defendants* |

## CERTIFICATE OF SERVICE

This is to certify that a copy of DEFENDANTS' BRIEF IN SUPPORT OF THEIR

MOTION FOR SUMMARY JUDGMENT was forwarded this 23rd day of January, 2006, via

hand-delivery to:

> Robert M. Langer, Esq.
> Wiggin & Dana LLP
> One CityPlace
> 185 Asylum Street
> Hartford, CT 06103

and via Federal Express to:

> Alicia L. Downey, Esq.
> Bingham McCutchen, LLP
> 150 Federal Street
> Boston, MA 02110-1726

> Richard S. Taffet, Esq.
> Bingham McCutchen LLP
> 399 Park Avenue
> New York, NY 10022-4689

> Suzanne Wachsstock, Esq.
> Wiggin & Dana LLP
> 400 Atlantic Street
> P.O. Box 110325
> Stamford, CT 06911-0325

Craig A. Raabe