UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 3:02 CV 1107 (AVC) <br><br> January 23, 2006 |

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

| Andrew S. Marovitz (ct 25409) | Nathan P. Eimer (ct 23693) | Craig A. Raabe (ct 04116) |
| Dana S. Douglas (ct 25412) | Scott C. Solberg (phv 0234) | ROBINSON & COLE LLP |
| MAYER, BROWN, ROWE | EIMER STAHL KLEVORN | 280 Trumbull Street |
| & MAW LLP | & SOLBERG LLP | Hartford, CT 05103-3497 |
| 71 S. Wacker Drive | 224 South Michigan Avenue | (860) 275-8304 |
| Chicago, Illinois 60606 | Suite 1100 | |
| (312) 782-0600 | Chicago, IL 60604 | |
| | (312) 660-7600 | |
| Christopher J. Kelly (ct 25410) | | |
| MAYER, BROWN, ROWE | | |
| & MAW LLP | | |
| 1909 K Street, N.W. | | |
| Washington, D.C. 20006-1157 | | |
| (202) 263-3000 | | |

*Counsel for Defendant* | *Counsel for Defendants* | *Counsel for all Defendants*
*The Dow Chemical Company* | *Union Carbide Corporation,* |
*and Dow Chemical Pacific* | *Union Carbide Asia Pacific,* |

*(Singapore) Pte. Ltd.*    *Inc., and Union Carbide Customer Service Pte. Ltd.*

1. Union Carbide Corporation ("Union Carbide") was a global chemical and polymer company, having annually sold billions of dollars of products around the world. First Amended Complaint ("FAC"), ¶ 9[1]; Answer and Affirmative Defenses of Defendant Union Carbide Corporation to the First Amended Complaint ("UCC Answer"), ¶ 9;[2] Answer and Affirmative Defenses of Defendant The Dow Chemical Company to the First Amended Complaint ("TDCC Answer"), ¶ 9;[3] Defendant Union Carbide Asia Pacific, Inc.'s Answer and Additional Defenses to Plaintiffs' First Amended Complaint, ("UCAP Answer"), ¶ 9.[4]

2. In addition to its own domestic marketing force, Union Carbide had regional marketing offices located in Europe, Latin America, and the Far East. Deposition of Eugene Jay Fisher ("Fisher Dep.") at 32-33.[5]

3. Union Carbide Asia Pacific, Inc. ("UCAP") was a wholly-owned subsidiary of Union Carbide responsible for marketing Union Carbide's products in the Asia

---

[1] A true and correct copy of the FAC is at **Tab 1** of Defendants' Appendix of Evidence in Support of Their Motion for Summary Judgment ("Def. Appx."), filed contemporaneously herewith.

[2] A true and correct copy of the UCC Answer is at **Tab 2** of Def. Appx.

[3] A true and correct copy of the TDCC Answer is at **Tab 3** of Def. Appx.

[4] A true and correct copy of the UCAP Answer is at **Tab 4** of Def. Appx.

[5] A true and correct copy of the Fisher Dep. is at **Tab 5** of Def. Appx.

Pacific region. August 23, 2005, Deposition of Ronald G. Neri ("Neri Dep.) at 39[6]; July 21, 2005, Deposition of Venketraman Moorthy ("Moorthy Dep.") at 30-31, 75-76[7].

4.  UCAP's territory covered fifteen countries in the region. Moorthy Dep. at 30.

5.  India, one of the countries in UCAP's territory, was historically one of UCAP's lowest priced and least significant markets. Neri Dep. at 194, 197-198. November 17, 2005, Deposition of Navin Chandra ("Chandra Dep.") at 31, 117-18, 200[8]; Moorthy at 65, 162.

6.  Each country in UCAP's region was home to a separately incorporated Union Carbide affiliate that was responsible for marketing Union Carbide's products in that country. Moorthy Dep. at 30-31.

7.  These separately incorporated Union Carbide affiliates were commonly referred to as the "country companies." Neri Dep. at 42; Chandra Dep. at 26.

8.  Prior to 1987, Union Carbide's products were distributed in India by Union Carbide India Ltd. ("UCIL"), an Indian based joint venture between Union Carbide and the Indian Government. Moorthy at Dep. 153-54; Chandra Dep. at 26.

9.  In addition to manufacturing certain agricultural chemicals and other products for the Indian market, UCIL's marketing department also brokered the sale of other domestically produced Union Carbide products to customers in India. Moorthy Dep. at 153.

---

[6] A true and correct copy of the Neri Dep. is at **Tab 6** of Def. Appx.

[7] A true and correct copy of the Moorthy Dep. is at **Tab 7** of Def. Appx.

[8] A true and correct copy of the Chandra Dep. is at **Tab 8** of Def. Appx.

10.     In December 1984, lethal gas escaped from one of UCIL's manufacturing facilities in Bhopal, India, resulting in the deaths of numerous area residents. FAC ¶ 16; UCC Answer ¶ 16; TDCC Answer ¶ 16; UCAP Answer ¶ 16. In the aftermath of this event, Union Carbide sold its interest in UCIL and discontinued sales of product directly to customers in India. Fisher Dep. at 64-66; Chandra Dep. 17-18.

11.     In 1987, Visa Petrochemicals Pvt. Ltd ("Visa Petrochemicals") was formed by several former members of UCIL's marketing department. Moorthy Dep. at 154-55; July 27, 2005, Deposition of Ajay Mittal ("Mittal Dep.") at 20[9]; Chandra Dep. at 17-18.

12.     UCAP appointed Visa Petrochemicals to act as a non-exclusive sales agent for Union Carbide products in India. Chandra Dep. at 21; Neri Dep. at 112; Mittal Dep. at 36.

13.     Visa Petrochemicals served as a commission based broker in a role known as an "indentor" or "indent agent" in the parlance of Indian import commerce. Neri Dep. at 112; Mittal Dep. at 34-36, Chandra Dep. at 28-30.

14.     As an indent agent, Visa Petrochemicals did not purchase Union Carbide products for its own account or otherwise keep an inventory of goods in stock for resale to end users. Chandra Dep. at 29-30.

15.     As an indent agent, Visa Petrochemicals would canvass the Indian marketplace for potential purchasers of Union Carbide's various products. Mittal Dep. at 34-35; Chandra Dep. at 29; July 27, 2005, Deposition of Paresh Zaveri ("Zaveri Dep.") at 53.[10]

---

[9] A true and correct copy of the Mittal Dep. is at **Tab 9** of Def. Appx.

[10] A true and correct copy of the Zaveri Dep. is at **Tab 10** of Def. Appx.

4

16.     Once a potential purchaser made an offer to buy a certain volume of product at a certain price, Visa Petrochemicals would submit the proposed indent order to UCAP for approval. Chandra Dep. at 29-30.

17.     Under the terms of a standard indent, the indentor (Visa Petrochemicals) had no authority to bind the supplier (Union Carbide) and the indent offer only became a binding contract once the supplier accepted the proposed terms, including any letter of credit arrangements. Mittal Dep. at 35-36, Chandra Dep. at 29-30.

18.     As an indent agent for Union Carbide, Visa Petrochemicals earned a commission on each sale that it brokered. Mittal Dep. at 36, 38; Chandra Dep. at 42-43; Moorthy Dep. at 80-81.

19.     The arrangement between Visa Petrochemicals and Union Carbide was memorialized in a letter dated November 16, 1987. Defendants' Exhibit 3.[11]

20.     In 1993, the owners of Visa Petrochemicals sold the business to a holding company controlled by Ajay Mittal. Mittal Dep. at 17-18; Moorthy Dep. at 163; Chandra Dep. at 22, 127.

21.     Although Visa Petrochemicals then became Mega Visa Marketing and Engineering Limited and later Mega Visa Marketing and Solutions Limited, the change was in name only; all three names refer to the same entity. Mittal Dep. at 18-19. This entity will hereinafter be referred to as "Visa India."

---

[11] A true and correct copy of Defendants' Exhibit 3 is at **Tab 11** of Def. Appx.

22. In March or April of 1993, Mr. Mittal incorporated plaintiff MM Global Services, Inc. ("Global Houston") to serve as a middleman between Union Carbide and UCAP on the one hand, and Visa India and the Indian purchaser on the other. Mittal Dep. at 13, 45-46; Moorthy Dep. at 150-51.

23. Global Houston had two employees officed in Houston, Texas. Mittal Dep. at 13-14, 45; Chandra Dep. at 33.

24. UCAP terminated its direct agency relationship with Visa India on April 5, 1993. Moorthy Dep. at 165-66; Defendants' Exhibit 2[12]; Chandra Dep. at 41-42.

25. Thereafter, Visa India continued to serve as indentor of Union Carbide manufactured goods, but its relationship with Union Carbide became indirect, with Global Houston serving as intermediary. Moorthy Dep. at 150-51, 152, 165, 172, 174-75, 320-21; Chandra Dep. 36.

26. The arrangement between Union Carbide and Global Houston was memorialized in a letter dated November April 5, 1993. Defendants' Exhibit 2.

27. On September 8, 1995, UCAP authored a second letter explaining the arrangement to Global Houston. Defendants' Exhibit 6.[13]

---

[12] A true and correct copy of Defendants' Exhibit 2 is at **Tab 12** of Def. Appx.

[13] A true and correct copy of Defendants' Exhibit 6 is at **Tab 13** of Def. Appx.

28.     Union Carbide Customer Services Pte. Ltd, ("UCCS") began regional service activities in Singapore in the mid-1990's. Neri Dep. at 42; Moorthy Dep. at 185; August 3-5, 2005, Deposition of Lawrence M.S. Cheung ("Cheung Dep.") at 21.[14]

29.     Functions relating to billing and customer service that were previously handled by each individual country company were consolidated in UCCS. Neri Dep. at 33-34; Cheung Dep. at 22-24; 94-95.

30.     UCCS took over all billing and customer service responsibilities for the UCAP region. Neri Dep. at 33-34, 38; Moorthy Dep. at 31-32.

31.     By the mid-1990's, plaintiffs no longer purchased directly from Union Carbide and instead bought product from UCCS. Cheung Dep. at 389, 391; Moorthy Dep. at 185-86; January 12, 2006, Deposition of Sanjiv Sanghvi ("Sanghvi Dep.") at 275.[15]

32.     Beginning in 1997, plaintiff MM Global Services Pte., Ltd. ("Global Singapore") took over Global Houston's role as the middleman for sales into India. Mittal Dep. at 58-59, 65.

33.     By mid-1998, Global Houston had ceased all operations. Mittal at Dep. 49-50, 51.

34.     Global Singapore ceased doing petrochemicals business in 2000. Mittal Dep. at 57.

---

[14] A true and correct copy of the Cheung Dep. is at **Tab 14** of Def. Appx.

[15] A true and correct copy of the rough transcript of the Sanghvi Dep. is at **Tab 15** of Def. Appx. When the official transcript is finished, defendants will substitute the official transcript and update all necessary citations.

35.  Another Singapore company and subsidiary of Visa India, Mega Visa Solutions (S) Pte. Ltd. ("Visa Singapore") took Global Singapore's place in the relationship with UCAP. Mittal Dep. at 63-64, 66.

36.  The arrangement between Visa Singapore and defendants was memorialized in a letter dated June 27, 2000. Defendants' Exhibit 7.[16]

37.  Visa Singapore thus became the middleman between Union Carbide, UCAP and UCCS on the one hand, and Visa India and the Indian purchaser on the other. Mittal Dep. at 63-64, 66-68.

38.  With few exceptions, plaintiffs generally did not hold any inventory of product to resell to any customer. Mittal Dep. at 125; Chandra Dep. at 39-40.

39.  On those few occasions when Visa India did sell product from their own stock (typically small volume sales of some specialty chemical acquired from UCC through plaintiffs), Visa India set the resale price unilaterally with no input or interference from Union Carbide or UCAP. Mittal at 126-27, 129; Chandra 59.

40.  On February 6, 2001, Union Carbide merged with a wholly-owned subsidiary of The Dow Chemical Company ("TDCC"). FAC ¶ 12; UCC Answer ¶ 12; TDCC Answer ¶ 12; UCAP Answer ¶ 12.

41.  Union Carbide remains in existence as wholly-owned subsidiaries of TDCC. FAC ¶ 12; UCC Answer ¶ 12; TDCC Answer ¶ 12; UCAP Answer ¶ 12.

---

[16] A true and correct copy of Defendants' Exhibit 7 is at **Tab 16** of Def. Appx.

42. Dow Chemical Pacific (Singapore) Pte. Ltd. ("Dow Singapore"), is a Singapore corporation and a wholly-owned subsidiary of TDCC. FAC ¶ 13; UCC Answer ¶ 13; TDCC Answer ¶ 13; UCAP Answer ¶ 13.

43. On or about January 16, 2002, approximately one year after the merger, an affiliate of TDCC in India notified Visa Singapore that it was terminating plaintiffs' distributorship for all products other than wire and cable compounds. Defendants' Exhibit 33[17]; July 28, 2005, Deposition of Ajay Mittal ("Mittal II Dep.") at 238-39.[18]

44. Defendants' wholesale price to plaintiffs was derived by the following formula: the proposed CIF retail price *minus* [insurance, freight and commission] *equals* the FAS wholesale price. Mittal Dep. at 119-120; Chandra Dep. 68-71, 164; Zaveri Dep. at 21, 55, 68-70; Chueng Dep. at 123; December 14-16 Deposition of Ajay Mittal ("Mittal III Dep.") at 462.[19]

45. A direct arithmetic connection existed between the FAS price and the CIF price proposed by plaintiffs. Mittal III Dep. at 476; Sanghvi Dep. at 62-63; 73-74.

46. All parties involved in the process, including Visa India, UCAP, UCCS, Union Carbide and (at different times) each of the plaintiffs, were fully aware of how the formula worked and the value of the various components that were netted out to arrive at the

---

[17] A true and correct copy of Defendants' Exhibit 33 is at **Tab 17** of Def. Appx.

[18] A true and correct copy of the Mittal II Dep. is at **Tab 18** of Def. Appx.

[19] A true and correct copy of the Mittal III Dep. is at **Tab 19** of Def. Appx.

wholesale price. Mittal Dep. at 119-120; Zaveri Dep. at 70; Chandra Dep. 68-71, 164; Sanghvi Dep. at 73-74.

47.  To expedite the order process, UCAP occasionally supplied plaintiffs (and the other country companies in its region) with a list of the "floor" prices. August 26, 2005, Fisher Dep. at 37, 44; Chandra Dep. at 87-88; Cheung Dep. at 270.

48.  The floor prices were typically provided in terms of the FAS price. Chandra Dep. at 88-89; Fisher Dep. at 37.

49.  Defendants would occasionally reject a proposed transaction because they were not satisfied with the wholesale price that they would obtain under the pricing formula. Moorthy Dep. at 97, 141, 143-44, 249-50, 256.

50.  In rejecting a transaction, defendants' concern was that the netback to the company (profit) was too low. Mittal Dep. at 134; Chueng Dep. at 26, 59-60, 74, 100, 118, 399, 403-04, 550, 579-80; Moorthy Dep. at 46-47, 89, 94-95, 141.

51.  On those occasions when defendants were unwilling to provide the requested price support, plaintiffs were still free to reduce the retail price by sacrificing their own commission, which they did from time to time. Chandra Dep. at 77-78, 89. Mittal III Dep. at 493-94.

52.  Plaintiffs also increased the retail price to the customer beyond the price suggested by the wholesale formula to increase their profit. Mittal III Dep. at 486-87; 487-88; 492-93; Sanghvi Dep. at 87-92.

53. Each of the challenged transactions between plaintiffs and defendants was the product of a separate agreement to fill a specific indent order of a specific Indian customer and thus, in those transactions, plaintiffs never held any inventory of product to "resell" to any customer. Neri Dep. at 126, Mittal Dep. at 99; Chandra Dep. at 39-40, 46, 48; Moorthy Dep. at 255-56; Mittal III Dep. 415-417; 419-420; 449.

54. Once Visa India found a prospective Indian customer willing to pay a certain retail price for a certain volume of product, it would contact UCAP to obtain approval of the proposed terms. Neri Dep. Dep. at 105-06; Mittal Dep. at 122-23; Moorthy Dep. at 140-41, 225, Plaintiffs' Exhibit 24[20]; Zaveri Dep. at 55-56.

55. If a proposed transaction was approved, UCAP would authorize UCCS to process the order. Moorthy Dep. at 67-68.

56. Plaintiffs' relationship with defendants was always non-exclusive. Neri Dep. 95, 192; Chandra Dep. 46-47; Mittal Dep. at 183-184. As such, defendants were never obligated to use plaintiffs for sales. Sanghvi Dep. at 79-80.

57. Defendants imposed an "India only" territorial restriction on plaintiffs. Mittal Dep. at 116-17; Chandra Dep. at 44-45; Zaveri Dep. at 17-19. Sanghvi Dep. at 81-82.

58. Other multinational companies have imposed similar "India only" territorial restrictions on plaintiffs. Mittal Dep. at 112-13.

59. Plaintiffs imposed territorial restrictions on their own subagents. Mittal Dep. at 79; Mittal III Dep. at 590-92.

---

[20] A true and correct copy of Plaintiffs' Exhibit 24 is at **Tab 20** of Def. Appx.

60. Plaintiffs complied with this "India only" territorial restriction. Mittal Dep. at 43-44, 46, 91-92; Zaveri Dep. at 26, 43-44.

61. Plaintiffs did not object to the "India only" territorial restriction when they received the 2000 letter. Mittal Dep. at 117-118; Sanghvi Dep. at 81-82.

62. Plaintiffs were not harmed by the prices but instead by defendants' refusal to sell them products. Mittal III Dep. at 398; 648; 651-52.

63. The allegedly fixed prices were sometimes above the prevailing market price, sometimes at the prevailing market price, and sometimes below the prevailing market price. Mittal III Dep. at 441-42.

64. "C3" refers to a commission of 3% to plaintiffs. Chandra Dep. at 70.

65. "U/A" was a commonly used shorthand for "understanding and agreement." Chandra Dep. at 72; Fisher Dep. at 99.

Respectfully submitted,

_____
Craig A. Raabe

| | | |
|---|---|---|
| Andrew S. Marovitz (ct 25409) | Nathan P. Eimer (ct 23693) | Craig A. Raabe (ct 04116) |
| Dana S. Douglas (ct 25412) | Scott C. Solberg (phv 0234) | Jason M. Kuselias (ct20293) |
| MAYER, BROWN, ROWE | EIMER STAHL KLEVORN | Elizabeth R. Leong (ct24453) |
| & MAW LLP | & SOLBERG LLP | ROBINSON & COLE LLP |
| 71 S. Wacker Drive | 224 South Michigan Avenue | 280 Trumbull Street |
| Chicago, Illinois 60606 | Suite 1100 | Hartford, CT 05103-3497 |
| (312) 782-0600 | Chicago, IL 60604 | (860) 275-8304 |
| | (312) 660-7600 | |
| Christopher J. Kelly (ct 25410) | | |
| MAYER, BROWN, ROWE | | |
| & MAW LLP | | |
| 1909 K Street, N.W. | | |
| Washington, D.C. 20006-1157 | | |
| (202) 263-3000 | | |
| | | |
| *Counsel for Defendants* | *Counsel for Defendants* | *Counsel for all Defendants* |
| *The Dow Chemical Company* | *Union Carbide Corporation,* | |
| *and Dow Chemical Pacific* | *Union Carbide Asia Pacific,* | |
| *(Singapore) Pte. Ltd.* | *Inc., and Union Carbide* | |
| | *Customer Services Pte. Ltd.* | |

## CERTIFICATE OF SERVICE

This is to certify that a copy of DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT was forwarded this 23rd day of January, 2006, via hand-delivery to:

Robert M. Langer, Esq.
Wiggin & Dana LLP
One CityPlace
185 Asylum Street
Hartford, CT 06103

and via Federal Express to:

Alicia L. Downey, Esq.
Bingham McCutchen, LLP
150 Federal Street
Boston, MA 02110-1726

Richard S. Taffet, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

Suzanne Wachsstock, Esq.
Wiggin & Dana LLP
400 Atlantic Street
P.O. Box 110325
Stamford, CT 06911-0325

_____
Craig A. Raabe