UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE., LTD., MEGAVISA SOLUTIONS (S) PTE, LTD., AND ADVENT MANAGE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD., AND DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
NO. 3-02 CV 1107 (AVC)

January 5, 2007

| | |
|---|---|
| UNION CARBIDE CUSTOMER SERVICES PTD. LTD.,<br><br>Plaintiff-in-Counterclaim,<br><br>v.<br><br>MM GLOBAL SERVICES PTE. LTD. AND AJAY MITTAL,<br><br>Defendants-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF MM GLOBAL SERVICES PTE. LTD. AND AJAY MITTAL'S JOINT MOTION TO DISMISS THE COUNTERCLAIMS OF UNION CARBIDE CUSTOMER SERVICES PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(1), 12(b)(6) AND 9(b)**

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT 06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

BINGHAM McCUTCHEN LLP
Richard S. Taffet (ct 10201)
Alicia L. Downey (ct 22066)
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

*Attorneys for Defendants-in-Counterclaim MM Global Services Pte. Ltd. and Ajay Mittal*

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ............................................................... 1

II.  RELEVANT ALLEGATIONS AND UNDISPUTED FACTS ...................................... 4

    A.  The Allegations on Which UCCS Bases Its Counterclaims ................................. 4

        1.  The Parties ................................................................. 4

        2.  The Finolex Settlement and the Alleged Promise Not to Sue ................... 4

        3.  The Sterlite Settlement ..................................................... 6

        4.  Global Singapore's Initiation of a Lawsuit Alleging Breach of
            Contract Based on the 1999 Unfulfilled Orders ........................... 7

    B.  Undisputed Evidence That UCCS Did Not Fund Either the Finolex or the
        Sterlite Settlements ............................................................ 7

    C.  Undisputed Evidence That UCCS Has Not Funded the Defense of
        Plaintiffs' Contract Claims ..................................................... 10

    D.  Undisputed Evidence Negating Allegations of Reasonable Reliance ................. 12

III.  ARGUMENT ....................................................................... 14

    A.  UCCS's Counterclaims Should Be Dismissed For Lack of Subject Matter
        Jurisdiction. ................................................................. 14

        1.  UCCS Lacks Constitutional Standing Because It Suffered No
            Actual Injury. ........................................................... 15

        2.  UCCS Cannot Satisfy the Prudential Requirements for Standing
            Where It Has Based Its Claims on Alleged Harm Done to Third
            Parties .................................................................. 16

    B.  All of the Counterclaims Should Be Dismissed For Failure to State a
        Claim Upon Which Relief Can Be Granted ...................................... 17

        1.  UCCS's Causes of Action Are Governed by Singapore Law ................. 17

        2.  Counts I and II Should Be Dismissed Because UCCS Does Not
            Properly Allege That It Is a Party to Any Contract with Global
            Singapore ............................................................... 18

        3.  Counts I and II Should Be Dismissed Because the Alleged
            Contract Terms Are Too Indefinite to Form an Enforceable
            Contract to Indemnify or Not to Sue UCCS. ............................. 20

        4.  Count II is Barred by the Statute of Frauds ............................. 22

C.    Count III Should Be Dismissed Because an Affirmative Cause of Action for Promissory Estoppel Does Not Exist Under Singapore Law..........................24

D.    UCCS's Tort Claims (Counts IV, V, and VI) Are All Time-Barred. ..................25

E.    Count IV Should Be Dismissed Because UCCS Failed to Plead the Essential Elements of a Claim for Negligent Misrepresentation. ........................25

F.    Counts IV, V, and VI Are Not Pleaded With Particularity.................................27

G.    Count VII Should Be Dismissed Because UCCS's Claim for Recoupment Is Not Based on Any Cognizable Right of Recovery Against the Counterclaim Defendants.....................................................................................28

H.    Alternatively, All of the Counterclaims Should Be Dismissed on Summary Judgment ............................................................................................29

        1.    UCCS Cannot Prove That It Suffered Any Damages..............................30

        2.    Count I Should Be Dismissed Because UCCS Is Precluded From Proving a Breach of the Alleged Contract to "Handle" the Sterlite Claim "to the Satisfaction of Union Carbide." .......................................30

        3.    Counts III, IV, V, and VI Should Be Dismissed Because UCCS Is Precluded From Establishing the Requisite Reasonable Reliance...........31

IV.    CONCLUSION............................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................................15

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ......................................................29

*Armstrong v. Rohm Haas Co.*, 349 F. Supp. 2d 71 (D. Mass. 2004) ................................20

*Baker v. Property Investors of Connecticut*, 338 F. Supp. 2d 321 (D. Conn. 2004) ...14, 16

*Barrows v. Jackson*, 346 U.S. 249 (1953) .........................................................................15

*Batson-Cook Co. v. Industrial Steel Erectors*, 257 F.2d 410 (5th Cir. 1958) ...................21

*Benicorp Insurance Co. v. National Medical Health Card System, Inc.*,
   447 F. Supp. 2d 329 (S.D.N.Y. 2006) ..........................................................................21

*In re Blech Sec. Litig.*, 928 F. Supp. 1279 (S.D.N.Y. 1996) ..............................................27

*Blue Cross of California v. Smithkline Beecham Clinical Laboratories*,
   108 F. Supp. 2d 116 (D. Conn. 2000) ....................................................................25, 29

*Bryant v. Maffucci*, 923 F.2d 979 (2d Cir. 1991)................................................................29

*Buker v. National Management Corp.*, 448 N.E.2d 1299 (Mass. App. Ct. 1983).............21

*Caparo Indus. Plc v. Dickman,* 2 AC 605 (1999)...............................................................26

*Chem-Tek, Inc. v. General Motors Corp.,* 816 F. Supp. 123 (D. Conn. 1993)..................19

*Clarke v. Max Advisors, LLC,* 235 F. Supp. 2d 130 (N.D.N.Y. 2002) ..............................30

*C.R. Klewin, Inc. v. Flagship Prop. Inc.*, 600 A.2d 772 (Conn. 1991)..............................23

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775 (2d Cir. 2003)............................30

*Davidson v. General Motors Corp.*, 786 N.E.2d 845 (Mass. App. Ct. 2003) ...................32

*Dow & Condon, Inc. v. Brookfield Development Corp.*, 833 A.2d 908 (Conn.
   2003) .............................................................................................................................19

*Dunham v. Dunham*, 528 A.2d 1123 (Conn. 1987) ..........................................................21

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003)................................................................................31, 32

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) ...................................................................14

*Finance One Public v. Lehman Brothers Spec. Financing*, 414 F.3d 325
    (2d Cir. 2005)..............................................................................................................18

*Flast v. Cohen*, 392 U.S. 83 (1968) ..................................................................................15

*Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260 (N.Y. 1977)......................................23

*Garcia v. Spanish Broadcasting System, Inc.*, 1993 WL 177936 (S.D.N.Y. 1993) ..........27

*Genovese v. J.N. Clapp Co.*, 495 A.2d 1079 (Conn. App. Ct. 1985) ................................28

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) .....................................15

*Golden Buddha Corp. v. Canadian Land Co.*, 931 F.2d 196 (2d Cir. 1991).....................31

*Hanks v. Powder Ridge Restaurant Corp.*, 885 A.2d 734 (Conn. 2005)...........................21

*Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9 (2d Cir. 1986) ..........................................29

*Koehler v. Bank of Bermuda*, 209 F.3d 130 (2d Cir. 2000)...............................................27

*L.C.L. Theatres v. Columbia Pictures Industrial*, 566 F.2d 494 (5th Cir. 1978)...............23

*Lamont v. Woods*, 948 F.2d 825 (2d Cir. 1991)................................................................16

*In re Leslie Fay Cos. Sec. Litig.*, 918 F. Supp. 749 (S.D.N.Y. 1996)...............................27

*Lipton v. The Nature Co.*, 71 F.3d 464 (2d Cir. 1995)......................................................29

*Los Angeles v. Lyons*, 461 U.S. 95 (1983) .......................................................................15

*Manley v. Ambase Corp.*, 337 F.3d 237 (2d Cir. 2003).....................................................22

*Manning v. Utilities Mutual Insurance Co., Inc.*, 254 F.3d 387 (2d Cir. 2001) ...............30

- iv -

*Martin v. American Equity Ins. Co.*, 185 F. Supp. 2d 162 (D. Conn. 2002) ....................27

*Martin v. Dupont Flooring System, Inc.*, 2004 WL 726903 (D. Conn. Mar. 31, 2004) ...................................................................................................................30

*Midwest Generation, LLC v. Carbon Processing and Reclamation*, 445 F. Supp. 2d 928 (N.D. Ill. 2006)...........................................................................................23

*MM Global Services v. The Dow Chemical Co.*, 283 F. Supp. 2d 689 (D. Conn. 2003) .....................................................................................................17, 18

*Murray v. Xerox Corp.*, 811 F.2d 118 (2d Cir. 1987).......................................................32

*NatTel, LLC v. SAC Capital Advisors*, 2005 WL 2253756 (D. Conn. Sept. 16, 2005) ...........................................................................................20

*North Central F.S., Inc. v. Brown*, 951 F. Supp. 1383 (N.D. Iowa 1996) ........................27

*Nucor Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 1993 WL 723500 (S.D. Ind. Feb. 23, 1993) ...........................................................................................18

*O'Connor v. O'Connor*, 519 A.2d 13 (Conn. 1986)..........................................................17

*The "Pacific Vigorous,"* 3 SLR 374 (High Court 2006)...................................................24

*Pilarczyk v. Morrison Knudsen Corp.*, 965 F. Supp. 311 (N.D.N.Y. 1997).....................27

*Premier Capital, Inc. v. Grossman*, 789 A.2d 565 (Conn. App. Ct. 2002) ......................28

*Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 703 A.2d 1132 (Conn. 1997) ............................................................................................................17

*Schneider v. Revici*, 817 F.2d 987 (2d Cir. 1987)............................................................21

*Sea-land Service, Inc. v. Cheong Fook Chee Vincent*, 3 SLR 631 (Court of Appeal 1994)...............................................................................................24

*Simon v. Castello,* 1997 WL 148243 (S.D.N.Y. 1997).....................................................27

*Solaia Technology LLC v. ArvinMeritor, Inc.*, 2006 WL 695699 (N.D. Ill. Mar. 16, 2006)............................................................................................23

- v -

*Statewide Grievance Committee v. Egbarin*, 767 A.2d 732 (Conn. App. Ct. 2001) .........27

*Stern v. General Elec. Co.*, 924 F.2d 472 (2d Cir. 1991) ..................................27

*Suffield Dev. Assocs. Ltd. P'Ship v. Soc. for Savings,* 708 A.2d 1361 (Conn. 1998) ..........................................................................................20

*Sullivan v. Syracuse Housing Authority*, 962 F.2d 1101 (2d Cir. 1992)......................15, 16

*Teevee Toons, Inc. v. Gerhard Schubert Gmbh*, 2006 WL 2463537 (S.D.N.Y. 2006) ...........................................................................16

*Three Crown Ltd. v. Caxton Corp.,* 817 F. Supp. 1033 (S.D.N.Y. 1993) .........................27

*Tomlinson v. Board of Education*, 629 A.2d 333 (Conn. 1993) .......................................19

*Torringford Farms Ass'n, Inc. v. City of Torrington*, 816 A.2d 736, 741 n.9 (Conn. App. Ct. 2003) .................................................................18

*Trans-World (Aluminum) Ltd. v. Cornelder China,* 3 SLR 501 (2000) ...........................26

*United States Brass Corp. v. Dormont Manufacturing Co.*, 2006 WL 894887 (D. Colo. March 31, 2006).........................................................................21

*United States Fidelity & Guaranty Co. v. S.B. Phillips Co.*, 359 F. Supp. 2d 189 (D. Conn. 2005) ..............................................................................14, 16

*Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982)...................................................................15

*Village on Canon v. Bankers Trust Co.*, 920 F. Supp. 520 (S.D.N.Y. 1996) ...................26

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................15

*Wight v. Bankamerica Corp.*, 219 F.3d 79 (2d Cir. 2000)...............................16

*Williams v. Utica College of Syracuse University*, 453 F.3d 112 (2d Cir. 2006).............30

*Williams v. White Mountain Construction Co.*, 749 P.2d 423 (Colo. 1988) ....................21

*Wurtsbaugh v. Banc of America Sec. LLC*, 2006 WL 1683416 (S.D.N.Y. 2006).............32

LITDOCS/665185.1

## STATUTES & RULES

C.G.S. § 52-577 .................................................................................25

Fed. R. Civ. P. 9(b) ...............................................................1, 3, 27, 32

Fed. R. Civ. P. 12(b)(1)...............................................................1, 16, 32

Fed. R. Civ. P. 12(b)(6)..........................................................1, 16, 20, 32

Fed. R. Civ. P. 13 .................................................................................2

Fed. R. Civ. P. 56(c) ............................................................................29

Singapore Civil Law Act, ch. 43.............................................................22

Singapore Limitation Act, ch. 163..........................................................24

U.S. Const. art. III, § 2.........................................................................15

## SECONDARY SOURCES

59 Am. Jur. 2d, Parties § 32 (2006) ......................................................19

9(2) Halsbury's Laws of Singapore (Equity and Trusts)...........................28, 29

7 Halsbury's Laws of Singapore (Contracts)..........................................19, 24

J.D. Davies, *Promises in Equity,* 2000 Sing. J. Legal Stud. 162, 165, 183 (2000) ..........24

Lee Pey Woan, Pearlie Koh, Tham Chee Ho, *Commercial Laws of Singapore* (Singapore Academy of Law 2006)................................................26

Williston on Contracts § 4:18 (4th ed. 1990) .......................................20

9 Williston on Contracts § 24:1 (4th ed. 2005) ....................................23

## I.     PRELIMINARY STATEMENT

Plaintiff MM Global Services Pte. Ltd. ("Global Singapore") and Ajay Mittal (collectively, the "Counterclaim Defendants") submit this brief in support of their joint motion to dismiss the counterclaims of Union Carbide Customer Services Pte. Ltd. ("UCCS") on multiple, various grounds.

First, the counterclaims must be dismissed because UCCS has suffered no injury-in-fact from the alleged conduct, and as a result, lacks standing to assert the counterclaims. Pursuant to Fed. R. Civ. P. 12(b)(1), therefore, the Court lacks subject matter jurisdiction over the counterclaims. Second, even if UCCS had the requisite standing, its pleading fails to state any claim upon which relief may be granted, and is otherwise deficient for failure to plead fraud with particularity. Finally, to the extent it is even necessary for the Court to reach such issues, the undisputed record evidence submitted herewith conclusively negates one or more essential elements of each of UCCS's counterclaims—including the elements of damages and reasonable reliance—making it appropriate for the Court to treat the instant motion as one for summary judgment. *See* Fed. R. Civ. P. 12(b)(6).

UCCS's pleading sets forth seven counts, each allegedly arising out of the settlement of separate lawsuits initiated in 2000 by two Indian customers of Global Singapore—Finolex Cables Ltd. ("Finolex") and Sterlite Industries (India) Limited ("Sterlite"). There is no dispute, and indeed the counterclaims allege, that these lawsuits were the result of Union Carbide Corporation's ("UCC's") refusal to fill certain orders placed by Global Singapore and accepted by UCC in 1999 (the "1999 Unfilled Orders"). *See* Answer, Affirmative Defenses and Counterclaims of Defendant Union Carbide Customer Services Pte. Ltd. to the First Amended Complaint ("Counterclaims") ¶¶ 9, 10, 24, 26. Specifically, UCCS alleges that:

- By reason of its purported refusal to contribute money to the Sterlite settlement, Global Singapore breached a written contract with "the UCC Companies" to "handle any other action/s instituted by any other Indian W&C customers to the satisfaction of Union Carbide" (Count I) (*see* Counterclaims ¶¶ 33-40);

- In filing the Complaint in this case in 2002, the Counterclaim Defendants breached an oral contract between themselves and "the UCC Companies" that provided "that if the UCC Companies helped [Global Singapore and Mittal] resolve the dispute with Finolex, Global Singapore would not bring suit against the UCC Companies based on the 1999 Unfilled Orders" (Count II) (*see id.* at ¶¶ 41-46);

- Alternatively, the Counterclaim Defendants' filing of the Complaint breached an agreement not to sue arising by way of promissory estoppel, based on promises supposedly made by Global Singapore and Mittal to "the UCC Companies" and detrimental reliance by "the UCC Companies" on those promises (Count III) (*see id.* at ¶¶ 47-52);

- The Counterclaim Defendants made false representations and supplied false material facts to "the UCC Companies" on which "the UCC Companies justifiably and reasonably relied" to their detriment by agreeing to pay the Finolex and Sterlite settlements (Counts IV, V, and VI) (*see id.* at ¶¶ 53-75); and

- UCCS is entitled to "recoupment," i.e., a deduction of its alleged damages from any recovery by Global Singapore in the event of a determination that UCCS is liable to Global Singapore based on the 1999 Unfilled Orders (*see id.* at ¶¶ 76-79).

As set forth below, however, it is clear that UCCS did not incur any actual expense in connection with payment of the Finolex and Sterlite settlements for which it now demands reimbursement. Undisputed witness testimony by "the UCC Companies" and documents in the record establish conclusively that it was UCC—not UCCS—that funded both settlements.[1] Record evidence also precludes a finding that UCCS incurred any legal or other expenses in connection with defending against the contract claims alleged in the First Amended Complaint based upon the 1999 Unfulfilled Orders. In fact, UCCS ceased operations prior to the commencement of this case.

Each and every count of UCCS's counterclaims also fails to state a cognizable cause of action under applicable law. The contract claims (Counts I and II) fail because the allegations

---

[1] Neither UCC nor UCAP asserted any counterclaims with their Answers to the First Amended Complaint, and under Fed. R. Civ. P. 13 they are now time-barred from doing so.

and the documents incorporated by reference into UCCS's pleading do not permit an inference that UCCS was a party to the alleged agreements or that UCCS and the Counterclaim Defendants agreed to the terms alleged. The applicable Statute of Frauds independently bars UCCS's oral contract claim (Count II), where the alleged contract was inherently incapable of being performed within one year of its making. Singapore law does not authorize affirmative claims for promissory estoppel, and thus Count III must also be dismissed for failure to state a claim.

UCCS's tort claims (Counts IV, V, and VI, asserting negligent misrepresentation, fraudulent misrepresentation and fraud, respectively), are barred by the applicable three-year statute of limitations. Even if these claims were timely, they violate Fed. R. Civ. P. 9(b), inasmuch as they are not alleged with the requisite particularity, most notably with regard to identification of misrepresentations made specifically to UCCS—as opposed to "the UCC Companies"—on which UCCS actually relied to its detriment. In addition, UCCS's negligent misrepresentation claim (Count IV) fails to allege all of the essential elements of such a claim under Singapore law, including the existence of a "special relationship" between the Counterclaim Defendants and UCCS.

UCCS's recoupment claim (Count VII) is necessarily dependent on UCCS's ability to state a cognizable claim for recovery of damages from the Counterclaim Defendants. The fatal deficiencies in Counts I-VI, therefore, also require dismissal of this count.

Should UCCS's pleading somehow be deemed facially adequate, the entirety of the counterclaims are subject to dismissal in light of the undisputed evidence negating the allegations that UCCS suffered any compensable damages, i.e., the same proof that UCCS lacks Article III standing. Independently, Counts III, IV, V, and VI—all of which depend on allegations of UCCS's detrimental reliance on the Counterclaim Defendants' alleged promises and representations—are defeated by the admissions of UCC and UCAP witnesses and documents in the record establishing that neither UCCS, nor even "the UCC Companies," actually or reasonably relied on such promises and representations.

Former UCC executive John Yimoyines and former UCAP executive Lawrence Cheung identified themselves in their deposition testimony as two of the key decisionmakers with regard to the Finolex and Sterlite settlements—Yimoyines on behalf of UCC and Cheung on behalf of UCAP.  They and other UCC personnel involved in the negotiations (e.g., UCC business manager Keith Lloyd) were closely advised by UCC attorneys at all relevant times.  Yimoyines and Chueng admit, and numerous documents in the record corroborate, that the Sterlite settlement was "personally negotiated" by UCC on its own behalf and entered at the direction of UCC in-house counsel and senior management.  Yimoyines further admits that when counsel expressly advised him to obtain a release from Global Singapore, he chose to reject that advice.

For all of the aforementioned reasons, UCCS's counterclaims should be dismissed.

## II.     RELEVANT ALLEGATIONS AND UNDISPUTED FACTS

### A.     The Allegations on Which UCCS Bases Its Counterclaims

#### 1.     The Parties

UCCS and Global Singapore are both Singapore corporations that maintain principal places of business in Singapore.  *See* Counterclaims ¶¶ 1, 3.  UCCS alleges that Global Singapore "is run and controlled by Ajay Mittal."  *Id.* ¶ 4.  For purposes of its counterclaims, UCCS defines itself, together with defendants UCAP and UCC as "the UCC Companies."  *Id.* ¶ 2.

#### 2.     The Finolex Settlement and the Alleged Promise Not to Sue

In 1999, "the UCC Companies were unable to fill all of the wire and cable orders that had been placed by Global Singapore on behalf of purchasers in India ('1999 Unfilled Orders')."  Counterclaims ¶ 9.  "As a result of the 1999 Unfilled Orders, one purchaser, [Finolex], brought suit against, among others, Global Singapore, for failing to fill its orders."  *Id.* ¶ 10.  There is no allegation that Finolex ever sued or sought redress from UCCS.  *See id.; see also* UCCS Answer ¶ 37 ("UCCS admits that two end-user customer [*sic*] in India, Sterlite and Finolex, asserted claims against one or more of the Plaintiffs and/or UCC alleging the breach of certain sales contracts for wire and cable products.").

UCCS alleges that "[t]o induce the UCC Companies' assistance in resolving the litigation against Global Singapore, Ajay Mittal, speaking on behalf of himself and Global Singapore, repeatedly made it clear to the UCC Companies in numerous telephone conversations with John Yimoyines of UCC and others that neither he [i.e., Mittal] nor Global Singapore would bring suit against the UCC Companies based on the 1999 Unfilled Orders."  Counterclaims ¶ 13; *see also* ¶ 43.[2]

Exhibit A to UCCS's Counterclaims is a May 4, 2000 email, which on its face indicates it was sent by Mittal to Yimoyines and copied to UCAP executives Cheung and Ron Neri, and not to UCCS.  *See id.* ¶ 14; *see also* ¶ 42.  According to UCCS, the email "again assured [Yimoyines, but not UCCS] that neither he [Mittal] nor Global Singapore would bring suit against the UCC Companies based on the 1999 Unfulfilled Orders," by way of the following language:

> I am also glad to inform you that with settlement between MM Global& [*sic*] Finolex in place, I can confirm that there will be no more issue of any liability on part of Union Carbide, . . .

Omitted from UCCS's allegations is the rest of the sentence quoted above:

> any future claim in this issue of Finolex will be handled by MM Global independently."

*See* Counterclaims Exhibit A (emphasis added); *see also* Counterclaims ¶ 49.  Read as a whole, Mittal's statement refers to "no more issue of any liability" on UCC's part in the event of any future claim by Finolex.

---

[2] UCCS alleges that after Finolex filed suit but before the settlement was reached, Mittal told Cheung, "a director of UCCS," that he and Global Singapore would not initiate a legal action against the UCC Companies seeking indemnification for the Finolex claim.  Counterclaims ¶ 11. In the entirety of UCCS's pleading, this is the sole allegation identifying any statement even arguably made to a representative of UCCS, but it describes an undertaking that is distinct from the alleged bases of UCCS's counterclaims, i.e., broad promises to "handle" all future claims to UCC's satisfaction and not to sue for contractual damages based on the 1999 Unfulfilled Orders.

UCCS further alleges that a June 5, 2000 letter from Global Singapore manager Paresh Zaveri "summarize[ed] the terms of the Finolex settlement" and "memorialized the parties' agreement that Global Singapore would handle any other disputes regarding the 1999 Unfulfilled Orders on their own, without involving the UCC Companies." Counterclaims ¶¶ 20-21; *see also* ¶¶ 35, 36, 48. The letter is addressed to:

> Mr. Lawrence Cheung
> Area Director
> Wire & Cable Polymer Business
> <u>Union</u> <u>Carbide</u> <u>Asia</u> <u>Pacific</u>

The relevant paragraph of the Zaveri letter states in full:

> <u>In</u> <u>an</u> <u>unlikely</u> <u>event</u> <u>of</u> <u>Finolex</u> <u>Cable</u> <u>not</u> <u>abiding</u> <u>by</u> <u>its</u> <u>commitment</u>, we confirm that MM Global will handle any further action and consequence there of independently without any further recourse to or claim against <u>Union</u> <u>Carbide</u>. MM Global Services Pte. Ltd. further assures <u>Union</u> <u>Carbide</u> of its commitment to handle any other action/s instituted by any other Indian W & C customers to the satisfaction of <u>Union</u> <u>Carbide</u>.

Counterclaims Exhibit B (emphasis added); *see also* Counterclaims ¶¶ 21, 35, 36, 48. The letter is not addressed to UCCS, and it does not name or otherwise refer to UCCS.

UCCS alleges that "the UCC Companies agreed to help Ajay Mittal and Global Singapore resolve the dispute with Finolex and pay a significant portion of the settlement based on the agreement . . . that Ajay Mittal and Global Singapore would be responsible for resolving any future disputes regarding the 1999 Unfilled Orders and would not sue the UCC Companies." Counterclaims ¶ 19. "[I]n reliance on" these alleged agreements, UCCS alleges that it "paid US$280,000 in settlement of the Finolex action." *Id.* ¶¶ 22, 44.

### 3.  The Sterlite Settlement

Soon after the Finolex settlement was complete, another Indian customer, Sterlite, brought an action "against Global Singapore, UCC, and UCAP, seeking US$1.8 million." *See* Counterclaims ¶ 26; *see also* UCCS Answer ¶ 37. There is no allegation that Sterlite ever sued or sought redress from UCCS. *See* Counterclaims ¶ 26; *see also* UCCS Answer ¶ 37. UCCS

6

alleges that in September 2000, Mittal met with employees of "the UCC Companies" and recommended payment to Sterlite of roughly half of the $1.8 million claim.  Counterclaims ¶ 27.

"Sterlite eventually agreed to settle the dispute for US$1,000,000, roughly the amount proposed by Ajay Mittal, and the agreement was signed on October 12, 2000."  Counterclaims ¶ 28.  Mittal and Global Singapore allegedly "refused to contribute any money to the settlement with Sterlite."  *Id.* ¶ 29; *see also* ¶ 39.  According to the counterclaims, UCCS was "forced to pay" the entire settlement amount of $1,000,000.  *Id.* ¶ 30; *see also* ¶¶ 40, 45.  Based on these events, UCCS further asserts that "Global Singapore did not handle the action to the satisfaction of the UCC Companies and thus breached the valid and enforceable contract [memorialized in the Zaveri letter, Counterclaims Exhibit B]."  *Id.* ¶¶ 36, 38.

> **4.    Global Singapore's Initiation of a Lawsuit Alleging Breach of Contract Based on the 1999 Unfulfilled Orders**

The basis of UCCS's counterclaims includes the June 25, 2002 filing of certain breach of contract claims set forth in the Complaint in this case against UCC and UCAP, "in spite of [Global Singapore's and Mittal's] repeated representations, promises and assurances to the contrary."  Counterclaims ¶ 32; *see also* ¶¶ 46, 67.  As a result of this allegedly wrongful filing, UCCS alleges that "the UCC Companies have been forced to pay the costs and fees associated with defending this action."  *Id.* ¶¶ 46, 52, 59, 67, 75.

> **B.    Undisputed Evidence That UCCS Did Not Fund Either the Finolex or the Sterlite Settlements**

As noted above, UCCS alleges that it "paid US$280,000 in settlement of the Finolex action."  Counterclaims ¶ 22 (emphasis added); *see also* ¶ 44.  Allegedly, UCCS was also "forced to pay the US$1,000,000 to extinguish the Sterlite claim."  *Id.* ¶ 30; *see also* ¶¶ 40, 45.

The record evidence, including uncontested testimony by the 30(b)(6) corporate designees of UCC and UCAP, conclusively proves that both settlements were entirely funded by UCC and that UCCS's role was limited merely to the processing and transmittal of UCC's funds to Global Singapore, which in turn paid the Indian customers.  *See, e.g.,* Declaration of Alicia L. Downey ("Downey Decl.") Ex. A (Neri Depo. Ex. 114 at D00545, UCC credit memo dated

October 6, 2000, crediting UCCS in amount of $1 million for "Sterlite Settlement"; *id.* at D00539, letter from UCCS directing transfer of $1 million to Global Singapore; *id.* at D00542, letter from Global Singapore directing transfer of $1 million to Sterlite). *See also* Downey Decl., Ex. B (Cheung Depo. Tr. at 468-69: "[N]ormally after the business folks like me in Union Carbide Asia Pacific conclude the deal, we will pass onto UCCS—people like Arjun Samtani, Kamal Jain. They will process for us. . . . "[M]y memory [is] . . . we conclude[d] a deal with Megavisa on Sterlite about a million dollars. And after that we passed the direction to UCCS to process.") (emphasis added).

Ronald Neri, a former UCAP executive and corporate designee pursuant to Rule 30(b)(6), testified that the settlements with both Finolex and Sterlite were funded by UCC. *See* Downey Decl. Ex. C (Neri Depo. Tr. at 263):

> Q.    Is it accurate, then, that the actual moneys that were paid for the Sterlite and Finolex settlements from the Union Carbide side were funded by Union Carbide Corporation rather than UCAP at the end of the day?
>
> A.    That's correct.

Lawrence Cheung likewise testified that when he agreed to the Finolex settlement, he did so in his capacity as a representative of UCAP, and, further, that it was UCC's North America operations that funded the settlement:

> Q.    Do you recall who made the final decision to settle the matter with Finolex?
>
> . . .
>
> A.    The final decision was made in Singapore, when Ajay came in to meet with me.
>
> Q.    Yes. And who made the final decision?
>
> A.    I represent Union Carbide Asia Pacific, to conclude the final settlement with Ajay Mittal.
>
> . . .
>
> Q.    . . . [D]id you conclude that settlement based upon the authority granted

to you by Mr. Yimoyines?

. . .

A.      For this type of claim number, we go back to the manufacturing site to get their consensus.

Q.      And Mr. Yimoyines gave you his consensus to conclude the settlement at the four hundred thousand dollar level?

A.      He did.

Q.      And from [whose] budget was that amount paid?

A.      This is an exceptional claim.  I don't think it's in any budgets.

Q.      Well, for this exceptional claim, <u>who</u> <u>actually</u> <u>made</u> <u>the</u> <u>payment</u>?

A.      Whatever manufacturing sites are liable for this type of situation, <u>those manufacturing sites need to pay for</u> it.

Q.      <u>So in this instance it was Union Carbide Corporation</u>?

[ . . . Objection to form]

A.      <u>North America operation</u>.[3]

In a May 2000 email, John Yimoyines, then a Danbury-based UCC executive with responsibility for the Wire & Cable business, complimented Cheung for "an excellent job of controlling <u>the cash outlay from UCC</u>" in connection with the Finolex settlement.  Downey Decl. <u>Ex. D</u> (D00361).   Yimoyines's deposition testimony also confirms that UCC "bore the full expense" of the Sterlite settlement:

A.      If there's a valid order, and the product is delivered to the customer, and we do not receive payment, we would first have MM Global approach the customer.  The way the transaction is set up is that if we couldn't be paid by the customer, we would look to MM Global.  However, that wasn't [the] practice, as is shown how we backed up MM Global in Sterlite.  They got totally out of the middle of such a situation, and we stood up behind them, because in fact they were just a middleman, an agent, and we were doing business with Sterlite.

---

[3] Downey Decl. <u>Ex. B</u>, Cheung Depo. Tr. at 464-65 (emphasis added).

9

Q.    And that you're relating to the settlement with Sterlite, that "you," being Union Carbide, bore the full expense for that?

A.    That's correct.[4]

Correspondingly, internal emails produced by the defendants show on their face that the expense of the Sterlite settlement was entered "in UCC books," and "the business impact was recorded on domestic books in September [2000] . . ."  Downey Decl. Ex. A (D00543) (emphasis added).

### C.    Undisputed Evidence That UCCS Has Not Funded the Defense of Plaintiffs' Contract Claims

Under Counts II-VI, UCCS alleges that as result of the wrongful filing of the Complaint by the Counterclaim Defendants, "the UCC Companies have been forced to pay the costs and fees associated with defending this action."  Counterclaims ¶¶ 46, 52, 59, 67, 75.  Nowhere does UCCS specifically allege that it—as opposed to UCC or UCAP—has actually incurred such expenses.

The evidence in the record negates any inference that UCCS itself has "been forced to pay the costs and fees associated with defending this action."  Shortly after the merger of Dow and UCC became effective in early 2001, UCCS's customer service operations in Singapore were phased out along with UCC's other subsidiary customer service operations.[5]  Indeed, UCCS's own pleading alleges, in the past tense, that it "had" a principal place of business in Singapore.  UCCS Answer ¶ 11.

By the time UCCS was first named a defendant upon the filing of the First Amended Complaint in May 2003, the company had no employees and was defunct for all practical purposes.  This is reflected in UCCS's 2003 audited financial statement prepared by Deloitte &

---

[4] Downey Decl. Ex. E, Yimoyines Depo. Tr. at 420-21 (emphasis added).

[5] Christine Berti, a former Dow customer service representative and 30(b)(6) corporate designee for Dow, UCC, and UCAP, testified that after the merger, UCC's U.S.-based order processing branches were likewise shut down, so that by the end of September 2002, "[e]verything was being done out of Midland, Michigan."  Downey Decl. Ex. F (Berti Depo. Tr. at 101-02).

Touche, which discloses that "[t]he majority of the company's operations were transferred to a related company in 2001." Downey Decl. Ex. G (DS252813 at 8, Note 1). Moreover, "[t]he company did not engage any employee for the financial year ended December 31, 2003 and 2002. The administrative support was provided by a related company." Downey Decl. Ex. G (DS252818 at 13, Note 13). UCCS's 2002 and 2003 audited financial statements do not show any legal expenses incurred during those years. *Id.* Ex. G; Ex. H.

In a July 3, 2001 email, Arjun Samtani, then a Dow Singapore employee, confirmed that UCCS's function had been taken over by Dow Singapore:

> . . . The physical flow of the product was always from UCC plant/stocking point to customer in India. All commercial negotiations was done on a CIF basis and freight and commission was backed out to arrive at FAS basis. Currently, Dow Chemical Pacific S'pore is doing the same thing for UCC products.

*See* Downey Decl. Ex. I (Yimoyines Depo. Ex. 150).

Dow in-house counsel William Herr attested to the existence of contracts between Dow and UCC and UCAP under which he has provided legal services. See Downey Decl. Ex. J (Declaration of William H. Herr dated June 21, 2005 ("Herr Decl.") at ¶ 1). In a 2004 deposition in which he was the 30(b)(6) corporate representative of UCCS, he denied ever providing such services to UCCS. *See* Downey Decl. Ex. K (Herr Depo. Tr. at 14: "Q. Have you ever provided services to either Dow Singapore or UCCS? A. No, not to my knowledge.").

In support of a motion for protective order filed by Dow, UCC and UCAP, Herr averred that "Defendants [defined in ¶ 1 of his Declaration as Dow, UCC, and UCAP] have incurred approximately $1,000,000 in legal review expenses from September 2004 through February 2005. Defendants have incurred over $2,500,000 in discovery support vendor costs from September 2004 through May 2005. . . . Since September 2004, Defendants have spent in excess of $3,500,000 responding to Plaintiffs' discovery requests." *See* Downey Decl. Ex. J (Herr Decl. at ¶¶ 13-14). At no time has Herr attested to the existence of any legal expenses incurred by UCCS in connection with the defense of this case.

11

A January 2003 internal email exchange among various Dow employees reveals that the cost of defending this litigation has in fact been allocated among different relevant business lines, not charged to inactive overseas subsidiaries such as UCCS:

- From Banita Lam, Controllers—Hong Kong Polyolefins: "Recently there is a law case in US regarding Megavisa, the distributor in India. It should handle multiple businesses and Wire & Cable is one of them. Do you have any chance to get 2000 or 2001 UCC sales to Megavisa by businesses so we can establish the split for the legal fee in US?"

- Lawrence Cheung responds: "W&C should bear a lot less cost because of the following reasons: (1) The legal problem was created mainly by the non-W&C businesses as they were the ones proposed the changes to distributors in India w/o understandings of the MV's background. . . ."

- Banita Lam responds: "Thanks for the background information. Should we communicate with Other Business (the majority should be Performance Chemicals) to take up at least 90% of the cost?"

*See* Downey Decl. Ex. L (Yimoyines Depo. Ex. 164).

### D.    Undisputed Evidence Negating Allegations of Reasonable Reliance

UCCS alleges that "the UCC Companies" reasonably relied on representations, promises, and assurances "that they would not bring suit against the UCC Companies if the UCC Companies helped settle the Finolex dispute." *See* Counterclaims ¶¶ 49-50, 55-57, 65, 73. The testimony of John Yimoyines and documents in the record prove otherwise.

In response to Dow's termination of plaintiffs' distributorship in 2002 and before the Complaint was filed in this case, Mittal tried to negotiate a settlement of Global Singapore's claims based on the 1999 Unfulfilled Orders. In response to these attempts, Dow personnel exchanged emails concerning the basis for the claims. In his deposition Yimoyines identified several of these communications, all of which reflect that he and the "UCC team" certainly had not been misled into settling with either Finolex or Sterlite but had done so on advice of their own counsel, as stated in this February 11, 2002 email he received from Cheung:

The W&C cases were caused by the change of the inventory position . . . in USA & the sudden increase of market prices. . . . Asia was also suffered the financial crisis & the UCC team had decided to move the volume to India but subsequently

UCC regretted the decision & decided not to honor the contracts. The customers brought UCC to court & the Danbury legal dept. advised that we could not afford any risk in India and suggested we paid the claims. UCC decided to negotiate directly with customers instead of going through MegaVisa. UCC managed to settle some of the claims at a big discounts & some of them were small that UCC decided not to take care of them.[6]

Yimoyines's responsive email reiterated the role of the UCC legal department in directing the settlements, including settlement of the Sterlite claim[7]:

Lawrence is correct—the business felt that there was no basis for the complaints and wanted to fight the second one out in Indian court—we were overruled by the UCC legal department who escalated it to the UCC CEO. Although MV was present UCC personally negotiated and settled a grievance for almost $3MM for about $1MM. UCC bore the total cost and the customer dropped the court action. Mega-Visa assured us that there would be no further issues—they would handle them—it would be important to find out if we have this in writing.[8] Keith Lloyd (business manager—retired) and Tom LaForge (attorney retired) handled the details of the settlement.[9]

---

[6] Downey Decl Ex. M (Yimoyines Depo. Ex. 155); *see also* Ex. E (Yimoyines Depo. Tr. at 447-49).

[7] There are numerous documents produced by defendants that show on their face that UCC and UCAP were being advised by in-house and outside counsel concerning the settlement negotiations. *See* Downey Decl. Exs. N–P (samples of email communications to and from attorneys William Sin (counsel for UCAP), Robert Butler (UCC Legal Department), Thomas LaForge (UCC Legal Department), William Krohley (of Kelley Drye Warren LLP), and Shabbir Wakhariya (of Kelley Drye Warren LLP). Many of these communications are redacted in their entirety, presumably because they contain confidential legal advice. The involvement of UCC's counsel was no secret; in September 2000, almost a month before the settlement negotiations with Sterlite, UCC's outside counsel at Kelley Drye contacted Global Singapore's counsel directly to discuss the case. Downey Decl. Ex. P.

[8] The only writing generated by Global Singapore after the Sterlite settlement is appended as Exhibit C to UCCS's Counterclaims. On its face, it limits Global Singapore's undertaking to handle any further action and consequences "[i]n the unlikely event of Sterlite Industries not abiding by its commitment." Nowhere does it state that Global Singapore would never sue UCC, UCAP, or UCCS.

[9] Downey Decl. Ex. M (Yimoyines Depo. Ex. 155).

13

Yimoyines testified that the above references to the "customer complaints" were to the Finolex and Sterlite claims.  Downey Decl. Ex. E (Yimoyines Depo. Tr. at 450).

In a March 3, 2002 email, Cheung reiterated that the "history of MV's W&C business" included "the out of court settlement with one customer plus a commercial settlement with another big customer under the direction of the corporate management with the pressure of legal advice from Bob Butler."  Downey Decl. Ex. Q (DECO0013166) (emphasis added).

Yimoyines testified about UCC's motivation for settling, which had nothing to do with representations by the Counterclaim Defendants:  " . . . we wanted, in fact, to settle this.  We do stand behind our commitments, and we really did not need to be in court in India at this moment in time."  Downey Decl. Ex. E (Yimoyines Depo. Tr. at 451) (emphasis added).  Yimoyines also admitted that he was expressly advised by UCC counsel that he needed to obtain a written release of claims from Global Singapore, but he declined to so do:

> A. . . . you know, it's very curious, but in the Sterlite thing, we had a settlement agreement with Sterlite, and I never asked for one with MegaVisa.  There were attorneys in Danbury who told me I should have gotten one.  I said I don't need one, MegaVisa is my partner, I trust MegaVisa, and to ask Ajay to sign such an agreement would be an insult.  Boy, was I wrong.

Downey Decl. Ex. E (Yimoyines Depo. Tr. at 452-53) (emphasis added).

## III.    ARGUMENT

### A.    UCCS's Counterclaims Should Be Dismissed For Lack of Subject Matter Jurisdiction.

"The court lacks subject matter jurisdiction when the plaintiff has no standing to pursue the action. . . .  A federal court must dismiss a claim, and may do so sua sponte, whenever it is established that the court lacks subject matter jurisdiction."  *United States Fidelity & Guar. Co. v. S.B. Phillips Co.*, 359 F. Supp. 2d 189, 199 (D. Conn. 2005) (emphasis added).[10]

---

[10] A party asserting claims bears the burden of proving it has standing to bring an action.  *Baker v. Property Investors of Conn.*, 338 F. Supp. 2d 321, 326 (D. Conn. 2004) (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).  In determining a party's standing to assert a particular claim, the Court must "accept as true all material allegations of the complaint, and construe the

(Footnote Continued on Next Page.)

14

The doctrine of standing, which addresses the question of "whether the [plaintiff] is entitled to have the court decide the merits of the dispute or of particular issues," embraces both "constitutional" and "prudential" requirements.  *Warth v. Seldin*, 422 U.S. 490, 498, (1975) (*citing Barrows v. Jackson*, 346 U.S. 249, 255-56 (1953)).   The constitutional requirements derive from Article III of the Constitution, which provides that the "judicial power" of the United States extends only to "cases" or "controversies."  *See* U.S. Const. art. III, § 2.  The core purpose of Article III is to limit federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process."  *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (*quoting Flast v. Cohen*, 392 U.S. 83, 97 (1968)).  Even when these constitutional minima are satisfied, a court may nevertheless deny standing for prudential reasons, as for example where the asserted injury constitutes a "generalized grievance" that is more appropriately addressed in the representative branches.  *See Allen v. Wright*, 468 U.S. 737, 751 (1984) (discussing prudential limits on exercise of federal jurisdiction).

### 1.    UCCS Lacks Constitutional Standing Because It Suffered No Actual Injury.

To meet the minimum constitutional requirements for standing, a plaintiff must allege an "actual or threatened injury" to himself that is "fairly traceable" to the allegedly unlawful conduct of the defendant and is "likely to be redressed by the requested relief."  *Allen*, 468 U.S. at 751 (citing *Valley Forge*, 454 U.S. at 472); *Baker*, 338 F. Supp. 2d at 326 (quoting *Los*

---

(Footnote Continued from Previous Page.)

complaint in favor of the complaining party."  *Gladstone*, *Realtors v. Village of Bellwood*, 441 U.S. 91, 109 (1979) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  Along with the allegations made in the complaint, the Court may consider such other facts and circumstances as may be evident from the record.  *See Gladstone*, 441 U.S. at 109 n.22; *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1107 (2d Cir. 1992).

*Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). Speculative or hypothetical harm is not sufficient. *Baker*, 338 F. Supp. 2d at 326.

As set forth above, UCCS cannot show that it has suffered any actual harm as a result of the Counterclaim Defendants' alleged conduct. It paid for neither settlement and has incurred no out-of-pocket legal fees to defend against claims that it asserts were released long ago. In light of these facts, the Court need not even reach any other issues raised in this motion, but can and should dismiss the entire counterclaim pursuant to Rule 12(b)(1).

> **2.    UCCS Cannot Satisfy the Prudential Requirements for Standing Where It Has Based Its Claims on Alleged Harm Done to Third Parties.**

Courts must exercise judicial restraint in standing determinations. *See Teevee Toons, Inc. v. Gerhard Schubert Gmbh*, 2006 WL 2463537, slip op. at 3-4 (S.D.N.Y. 2006) (citing *Lamont v. Woods*, 948 F.2d 825, 829 (2d Cir. 1991); *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d at 1106). "Foremost among the prudential requirements is the rule that a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Wight v. Bankamerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000); *United States Fidelity*, 359 F. Supp. 2d at 199-200 (dismissing claims for lack of standing because plaintiffs were not parties to the sued upon contract).

Assuming, *arguendo*, that UCCS could proffer evidence of injury-in-fact (despite the fact that the record shows that UCC was the party responsible for funding the Finolex and Sterlite settlements and for deciding to settle those matters), it is apparent that UCCS's counterclaims are an ill-disguised attempt by UCC to obtain relief that it waived when it failed to bring any similar counterclaim at the time it served its Answer. To permit UCCS to be used as a proxy for reviving time-barred counterclaims belonging to UCC would undermine the prudential requirements of Article III standing.

**B.      All of the Counterclaims Should Be Dismissed For Failure to State a Claim Upon Which Relief Can Be Granted.**

**1.      UCCS's Causes of Action Are Governed by Singapore Law.**

In its 2003 ruling on defendants' motions to dismiss pursuant to Rule 12(b)(6), the Court identified the considerations for determining what law applied to the plaintiffs' contract and tort claims.  *See MM Global Servs. v. The Dow Chemical Co.,* 283 F. Supp. 2d 689, 699 (D. Conn. 2003).[11]  Under this same test, each of UCCS's counterclaims should be governed by Singapore law.

Counts I-III seek to enforce alleged agreements among UCCS (a Singapore corporation resident in Singapore), Global Singapore (a Singapore corporation resident in Singapore), and Ajay Mittal, an individual allegedly "responsible for controlling and running" Global Singapore. Counterclaims ¶¶ 1, 3, 4.  UCCS supposedly incurred damages when it "paid" to settle the Finolex and Sterlite claims.  *See id.* ¶¶ 22, 30, 40, 45, 51.  The letters appended to the counterclaims as Exhibits B and C indicate they were sent from Global Singapore to UCAP, which was also located in Singapore.  *See* UCCS Answer ¶ 10.  These allegations and documents support the conclusion that Singapore law applies to Counts I (breach of contract), II (breach of

---

[11] The test for determining the law applicable to contract claims examines:

> (a) the place of contracting, which is the place where occurred the last act necessary to give the contract binding effect; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*MM* Global, 283 F. Supp. 2d at 699 (citing *Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co.,* 243 Conn. 401, 408-14, 703 A.2d 1132 (1997)). The determination of which law governs tort claims considers:

> (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the residence, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered."

*MM Global*, 283 F. Supp. 2d at 703 (citing *O'Connor v. O'Connor*, 201 Conn. 632, 652, 519 A.2d 13 (Conn. 1986)).

oral agreement), and III (promissory estoppel).[12]  Indeed, there are no allegations suggesting that any place other than Singapore has a more "significant relationship" to the alleged conduct giving rise to the claims or UCCS's alleged injury.

Counts IV-VI for negligent misrepresentation, fraudulent misrepresentation, and fraud are based on allegations of false representations, promises and assurances that "Global Singapore would not bring suit against the UCC Companies based on the 1999 Unfilled Orders." Counterclaims ¶ 43, *see also* ¶¶ 54, 55, 61, 62, 69, 70.  These promises are allegedly reflected at least in part by statements set forth in the appended letters from Global Singapore to UCAP. UCCS's damages are again alleged to be its payment of the Finolex and Sterlite settlements. *See id.* ¶ 22; *see also* ¶¶ 57-58, 65-66, 73-74.  In light of these allegations, Singapore law should govern Counts IV-VI.

With respect to Count VII, UCCS's recoupment claim is governed by the same test applicable to tort claims, and thus Singapore law governs it, too.  *Fin. One Pub. v. Lehman Bros. Spec. Financing,* 414 F.3d 325, 336 (2d Cir. 2005) (applying New York choice of law test for tort claims to setoff claim).

### 2.    Counts I and II Should Be Dismissed Because UCCS Does Not Properly Allege That It Is a Party to Any Contract with Global Singapore or Mittal.

"Under Singapore law, the elements of a cause of action for breach of contract are the same as exist under the common law of this country and consist of allegations constituting: (a) the existence of a contract or agreement; (b) the defendant's breach of the contract or agreement; and (c) damages resulting from the breach."  *MM Global,* 283 F. Supp. 2d at 702 (citing

---

[12] Promissory estoppel is a contract-based claim and subject to the same choice of law considerations as claims for breach of contract.  *See Torringford Farms Ass'n, Inc. v. City of Torrington*, 816 A.2d 736, 741 n.9 (Conn. App. Ct. 2003) (observing that a claim for promissory estoppel sounds in contract); *Nucor Corp. v. Aceros Y Maquilas De Occidente, S.A. De C.V.*, 1993 WL 723500, at *4 (S.D. Ind. Feb. 23, 1993) (applying same choice of law test to contract and promissory estoppel claims).

18

Affidavit of Edward Lam Chung Weng at ¶¶ 6-8; *Chem-Tek, Inc. v. General Motors Corp.,* 816 F. Supp. 123, 130 (D. Conn. 1993)).  Because Singapore law is identical to U.S. common law for contracts, U.S. cases may be used to illustrate the required analysis.  *See id.* (relying on U.S. cases in applying Singapore law).

"It is well settled that one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract."  *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 833 A.2d 908, 913 (Conn. 2003) (quoting *Tomlinson v. Board of Educ.*, 629 A.2d 333 (Conn. 1993); *see* 7 HALSBURY'S LAWS OF SINGAPORE (CONTRACTS)§ 80.421 (LexisNexis Singapore 2005) ("only a person who is a party to a contract can sue on it") (Legal Compendium, Tab 1[13]); 59 Am. Jur. 2d, Parties § 32 (2006) ("It is axiomatic that "a third person not a party to a contract or in privity with it cannot enforce the contract or as a party plaintiff assert a cause of action based upon the contract.").

Under Count I, UCCS alleges that "[t]he Zaveri Letter memorialized the parties' agreement."  Counterclaims ¶ 21; *see also* ¶¶ 35, 36.  As noted above, UCCS was not a party to the lawsuits initiated by Finolex and Sterlite, and nothing in UCCS's pleading permits an inference that it was a party to the settlement negotiations.  The Zaveri letter is addressed to Cheung at UCAP, in Cheung's capacity as Area Director of UCAP.  There is no mention of UCCS.  *See* Counterclaims Exhibit B.  On its face, the letter does not "memorialize" or even permit an inference that UCCS was party to an agreement with Global Singapore or Mittal.

Count II is based on allegations that the Counterclaim Defendants orally told "the UCC Companies" that no suits would be filed against them, as memorialized in an email from Mittal to Yimoyines and copied to UCAP managers Cheung and Neri.  These allegations fail to describe any statements made to UCCS, and, indeed, none of the documents incorporated by

---

[13] For the Court's convenience, copies of Singapore cases and other legal authorities have been compiled in the accompanying Legal Compendium.

reference in the Counterclaims mention UCCS or any agreement with Global Singapore and UCCS.[14]

In light of the foregoing, UCCS has failed to state a claim for breach of any written or oral contract, and Counts I and II must be dismissed.

        **3.**      **Counts I and II Should Be Dismissed Because the Alleged Contract Terms Are Too Indefinite to Form an Enforceable Contract to Indemnify or Not to Sue UCCS.**

"Under established principles of [Connecticut] contract law, an agreement must be definite and certain as to its terms and requirements" before it is enforceable. *NatTel, LLC v. SAC Capital Advisors*, 2005 WL 2253756, at **11-12 (D. Conn. Sept. 16, 2005) (dismissing contract claims because the language of the promise was extremely vague, did not contain a time frame for completion, and did not obligate the defendant to take any particular steps) (quoting *Suffield Dev. Assocs. Ltd. P'ship v. Soc. for Savings*, 708 A.2d 1361, 1366 (Conn. 1998)); *Armstrong v. Rohm Haas Co.,* 349 F. Supp. 2d 71, 78 (D. Mass. 2004) ("In order to create an enforceable contract, '[i]t is a necessary requirement that [the] agreement . . . be sufficiently definite to enable the courts to give it exact meaning.'") (quoting Williston on Contracts § 4:18 (4th ed. 1990)).

Courts have held that promises to "take care of things" or to "handle things" are insufficient as a matter of law to evidence an enforceable contract. *See, e.g., NatTel*, 2005 WL 2253756 at *11 (dismissing plaintiff's claim for breach of contract because "a representation

---

[14] To the extent that the Court considers the Finolex and Sterlite settlement agreements sufficiently integral to UCCS's pleading to be considered on a 12(b)(6) motion, it also should be noted that they reflect that UCCS was not a party to either agreement, and neither agreement nor their corresponding letters of understanding mention UCCS by name.  Downey Decl. Ex. R (Mittal Depo. Ex. 114, letter of understanding regarding Finolex settlement); Ex. S (Mittal Depo. Ex. 111, Finolex Deed of Compromise & Settlement dated June 14, 2000); Ex. T (Mittal Depo. Ex. 112, October 2, 2000 Memorandum of Understanding regarding Sterlite settlement); Ex. U (Mittal Depo. Ex. 110, Sterlite Deed of Compromise & Settlement dated October 12, 2000).

indicating an intent to treat plaintiff . . . 'fairly, equitably and honestly' at some undefined point in the future cannot give rise to contractual liability"); *Dunham v. Dunham,* 528 A.2d 1123, 1129 (Conn. 1987), *overruled on other grounds*, 584 A.2d 445 (Conn. 1991) (dismissing contract claim because promise to "take care" of plaintiff with respect to a piece of real property was not sufficiently definite to create an enforceable contract to convey that property); *see also Buker v. Nat'l Mgmt. Corp.*, 448 N.E.2d 1299, 1303 (Mass. App. Ct. 1983) (defendant's oral promise to "work things out" was too vague to constitute the basis of a modified contract).

An agreement or covenant not to sue is held to an even higher standard and "must be strictly construed against the party asserting its existence. Moreover, its wording must be clear and unequivocal." *E.g., Benicorp Ins. Co. v. Nat'l Medical Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 339 (S.D.N.Y. 2006) (quoting *Schneider v. Revici,* 817 F.2d 987, 993 (2d Cir. 1987)). Indemnity contracts are subject to the same heightened burden. *See, e.g., Hanks v. Powder Ridge Restaurant Corp.,* 885 A.2d 734, 739 (Conn. 2005) (requiring indemnity provisions to be unambiguous and understandable such that "a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon . . . the law demands . . . that such provisions be clear and coherent") (citations and internal punctuation omitted); *Batson-Cook Co. v. Indus. Steel Erectors,* 257 F.2d 410, 412 (5th Cir. 1958) ("The purpose to impose this extraordinary requirement on the Indemnitor must be spelled out in unmistakable terms. It cannot come from reading into the general words used the fullest meaning which lexicography would permit."); *see also United States Brass Corp. v. Dormont Mfg. Co.,* 2006 WL 894887, at **2-3 (D. Colo. March 31, 2006) (refusing to enforce alleged agreement to indemnify where contractual language that party "accepted all obligations associated with being manufacturer of the product" did not "clearly and unequivocally" create an indemnity agreement); *Williams v. White Mountain Constr. Co.,* 749 P.2d 423, 426 (Colo. 1988) (holding that "'Don't worry about it—we will take care of it if anything happens'" combined with a reassurance after the accident that the contractor would take care of any problems was not sufficiently clear to be a contract to indemnify). The unequivocal language requirement extends

21

to identification of the party seeking indemnification; if that party is not clearly identified, courts will not enforce it in its favor. *See Manley v. Ambase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003) (refusing to indemnify "Manley P.C." where indemnity agreement identified indemnitee only as "Manley," an individual).

In light of the foregoing, the statement in the Zaveri letter (Counterclaims Exhibit B) that Global Singapore would "handle any other action instituted by any other Indian W&C customers to the satisfaction of Union Carbide," even assuming *arguendo* it concerned UCCS's satisfaction, is insufficient on its face to establish a "clear and unequivocal" promise either not to sue UCCS or to indemnify it against future claims. Nowhere in the Zaveri letter does Global Singapore undertake to contribute any money to future settlements or to take any other specific steps. Similarly, Mittal's email (Counterclaims Exhibit A) stating, "I can confirm that there will be no more issues of any liability on part of Union Carbide, any future claim in this issue of Finolex will be handled by MM Global independently" does not clearly and unequivocally reflect a promise to indemnify or not to sue UCCS based on the Unfulfilled 1999 Orders. Such a meaning cannot be ascribed to that statement, where the sentence, read in its entirety, is so obviously limited to addressing future Finolex claims.

In short, the documents proffered by UCCS as memorializing its alleged agreements with the Counterclaim Defendants cannot be read to support UCCS's breach of contract claims, and Counts I and II must be dismissed.

### 4. Count II is Barred by the Statute of Frauds.

As noted above, UCCS alleges that an oral covenant not to sue was formed when Global Singapore and Ajay Mittal allegedly told the UCC Companies "that no suits would be filed against them, including the following written statement made by Ajay Mittal: 'I am glad to inform you that with settlement between MM Global & Finolex in place, I can confirm that there will be no more issues of any liability on part of Union Carbide.'" Counterclaims ¶ 42.

The Statute of Frauds bars oral contracts that cannot be performed within one year of contracting. *See* Singapore Civil Law Act, ch. 43 § 6, *available at* http://statutes.agc.gov.sg/

("No action shall be brought against . . . any person upon any agreement that is not to be performed within the space of one year from the making thereof . . . unless the promise or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person lawfully authorised by him.") (Legal Compendium, Tab 2). A contract that cannot be performed within one year of contracting includes agreements not to sue over claims that might arise more than one year in the future. *C.R. Klewin, Inc. v. Flagship Prop. Inc.*, 600 A.2d 772, 778 (Conn. 1991) ("the critical test" in determining whether an oral agreement is within the one-year provision of the statute of frauds "is whether by its terms the agreement is not to be performed within a year, so that the statute will not apply where the alleged agreement contain[s] [no] provision which directly or indirectly regulated the time for performance") (citing *Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 265 (1977) (internal quotation marks omitted)); *see Solaia Technology LLC v. ArvinMeritor, Inc.,* 2006 WL 695699, at *11-12, 14 (N.D. Ill. Mar. 16, 2006) (holding that Statute of Frauds barred enforcement of alleged oral covenant not to sue where language of agreement did not contain an explicit time frame and alleged oral contract was intended to preclude suit on claims arising from a patent that did not expire for more than one year (citing 9 Williston on Contracts § 24:1 (4th ed. 2005) ("[A]n oral contract to forbear bringing suit on a certain claim for more than a year has been held unenforceable.")).

To the extent UCCS relies on Mittal's email as partly comprising the alleged contract, contracts that are partially written and partially oral are treated as oral contracts. *See L.C.L. Theatres v. Columbia Pictures Indus.*, 566 F.2d 494, 496 (5th Cir. 1978) ("[w]hen a contract is partially written and partially oral, the contract will be treated as an oral contract") (citations omitted); *Midwest Generation, LLC v. Carbon Processing and Reclamation,* 445 F. Supp. 2d 928, 935-36 (N.D. Ill. 2006) (dismissing breach of contract claim on grounds that an email was "insufficient written evidence of an oral contract to satisfy the statute of frauds.").

UCCS's allegations describe an oral agreement that, by its terms, obligated Global Singapore to forbear from exercising its legal rights to bring suit for the full duration of the

applicable statute of limitations, i.e., six years for contract actions.  *See* Singapore Limitation Act, ch. 163, Part II, § 6, *available at* http://statutes-agc.gov.sg/ (Legal Compendium, <u>Tab</u> <u>3</u>).  As the very terms of this alleged oral contract necessarily required continuing performance in excess of one year, it is unenforceable under the Statute of Frauds, and hence, Count II fails to state a claim upon which relief can be granted.[15]

## C.    Count III Should Be Dismissed Because an Affirmative Cause of Action for Promissory Estoppel Does Not Exist Under Singapore Law.

Under Singapore law, a party asserting promissory estoppel must prove (1) a representation by one party; (2) inducing action by the other party; (3) to that party's detriment. *See The "Pacific Vigorous,"* 3 SLR 374, 380 (High Court 2006) ("The defendant would not have been in a position to raise common law estoppel or a promissory estoppel. In both cases, there would have to be some sort of acting on the representation. The representee must have acted on the representation to his detriment.") (Legal Compendium, <u>Tab</u> <u>4</u>).  However, "[i]t is trite law that promissory estoppel can only be used as a shield and not a sword to enforce any rights."  *See Sea-land Service, Inc. v. Cheong Fook Chee Vincent*, 3 SLR 631, 637 (Court of Appeal 1994) (Legal Compendium, <u>Tab</u> <u>5</u>); *see also* 7 HALSBURY'S LAWS OF SINGAPORE (CONTRACTS), *supra* at § 80.080 (stating that it has been long established under English and Singapore law that promissory estoppel "cannot be used as a cause of action in and of itself") (Legal Compendium, <u>Tab</u> <u>1</u>).  That is, where there already exists a contract, the doctrine acts only to prevent a party from enforcing an existing contractual right that it represented to the other party it would forbear when the other party acted in reliance on that representation.  *See* J.D. Davies, Promises in

---

[15] The facts of this case further demonstrate the applicability of the Statute of Frauds.  UCCS claims that an email and oral statements created a contract in 2000 in which Global Singapore and Mittal agreed not to sue "the UCC Companies."  UCCS further alleges that Global Singapore and Mittal breached this contract by bringing suit against UCC and Dow in 2002.  UCCS clearly contemplates that Global Singapore and Mittal had contractual obligations that extended for more than one year (i.e., into at least 2002) after allegedly entering into a contract in 2000.

Equity, 2000 Sing. J. Legal Stud. 162, 165, 183 (2000) ("[Promissory] estoppel [is] accepted in Singapore; but . . . acceptance is only up to a certain point" in that it "is thought to operate only within certain existing relationships and only then as a defense") (Legal Compendium, Tab 6).

UCCS has not pleaded promissory estoppel as a defense but as an affirmative claim. As pleaded, this cause of action does not exist under Singapore law and should be dismissed.

### D.     UCCS's Tort Claims (Counts IV, V, and VI) Are All Time-Barred.

Connecticut General Statutes § 52-577 provides that "[n]o action founded upon a tort shall be brought but <u>within three years from the date of the act or omission complained of</u>."[16] UCCS alleges that in 2000, it allegedly paid the Finolex and Sterlite settlements supposedly in reliance on the Counterclaim Defendants' statements of "false material facts." *See* Counterclaims ¶¶ 20, 28, 57-58, 65-66, 73-74.

At the latest, therefore, UCCS's tort-based causes of action accrued as of June 25, 2002, when Global Singapore, with the other plaintiffs, filed the Complaint against "the UCC Companies," thereby revealing the alleged falsity of the prior statements. *Id.* ¶ 32; *see also id.* ¶¶ 59, 67, 75. Accordingly, UCCS was required to bring its claims by June 25, 2005 at the absolute latest. The counterclaims, however, were not asserted until January 11, 2006. There is no allegation or evidence that the limitations period was tolled either by operation of law or by agreement, and, thus, Counts IV, V, and VI are time-barred.

### E.     Count IV Should Be Dismissed Because UCCS Failed to Plead the Essential Elements of a Claim for Negligent Misrepresentation.

A party asserting a claim for negligent misrepresentation under Singapore law must plead that the parties shared a special relationship such that the defendant owed the plaintiff a

---

[16] The Connecticut statute of limitations for UCCS's causes of action applies even though they are otherwise governed by Singapore law. *See Blue Cross of Cal. v. Smithkline Beecham Clinical Laboratories*, 108 F. Supp. 2d 116, 123 n.3 (D. Conn. 2000) ("Under the Connecticut rule, limitations periods are set by the law of the forum state.").

heightened duty of care. *See* Lee Pey Woan, Pearlie Koh, Tham Chee Ho, "Commercial Laws of Singapore," ch. 8, § 8.10.7 (Singapore Academy of Law 2006), *available at* http://www.singaporelaw.sg/content/8contract.pdf (negligent misrepresentation "requires proof that there is a 'special relationship' between the parties which places the representor under a duty to take reasonable care in furnishing information or advice to the representee, and that the representor has failed to do so") (Legal Compendium, <u>Tab 7</u>); *Trans-World (Aluminum) Ltd. v. Cornelder China,* 3 SLR 501, 521032 (2000) ("[T]he necessary relationship between the maker of a statement or giver of advice ('the adviser') and the recipient who acts in reliance upon it ('the advisee') may typically be held to exist where (1) the advice is required for a purpose, whether particularly specified or generally described, which is made known, either actually or inferentially, to the adviser at the time when the advice is given; (2) the adviser knows, either actually or inferentially, that his advice will be communicated to the advisee, either specifically or as a member of an ascertainable class, in order that it should be used by the advisee for that purpose; (3) it is known either actually or inferentially, that the advice so communicated is likely to be acted upon by the advisee for that purpose without independent inquiry; and (4) it is so acted upon by the advisee to his detriment.") (citing *Caparo Indus. Plc v. Dickman,* 2 AC 605, 638 (1999)) (Legal Compendium, <u>Tab 8</u>); *cf. Village on Canon v. Bankers Trust Co.,* 920 F. Supp. 520, 531 (S.D.N.Y. 1996) ("Under New York law, there is no action for negligent misrepresentation of a promise of future conduct unless there is a special relationship between the parties.").

UCCS's counterclaim is devoid of any allegations that it had the requisite special relationship with the Counterclaim Defendants, and hence, this claim must be dismissed.

**F.      Counts IV, V, and VI Are Not Pleaded With Particularity.**

Under the Federal Rules of Civil Procedure, to survive a motion to dismiss, claims for fraud, fraudulent misrepresentation,[17] and negligent misrepresentation must all be pleaded with particularity. Fed. R. Civ. P. 9(b); *Pilarczyk v. Morrison Knudsen Corp*., 965 F. Supp. 311, 323 (N.D.N.Y. 1997) ("The particularity requirements of Rule 9(b) apply to claims of negligent misrepresentation . . .") (citing *Simon v. Castello*, 1997 WL 148243 at *2 (S.D.N.Y. 1997); *In re Leslie Fay Cos. Sec. Litig.*, 918 F. Supp. 749, 766 (S.D.N.Y. 1996); *Garcia v. Spanish Broadcasting System, Inc.*, 1993 WL 177936, at *3 (S.D.N.Y. 1993)).[18] The "allegations must specify (1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements fraudulent." *Koehler v. Bank of Bermuda,* 209 F.3d 130, 136 (2d Cir. 2000) (affirming dismissal of fraud claims for failure to plead fraud with specificity).

Both the party making the statements and the party to whom the statements were made must be identified with specificity. *See, e.g., In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) ("Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations.'") (quoting *Three Crown Ltd. v. Caxton Corp.*, 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993)); *North Central F.S., Inc. v. Brown,* 951 F. Supp. 1383, 1408 (N.D. Iowa

---

[17] Fraudulent misrepresentation and fraud are identical causes of action under Singapore law. *See* Affidavit of Edward Lam Chung Weng, Docket No. 22, at ¶ 16. Fraudulent misrepresentation and fraud are also considered the same tort under Connecticut law. *Statewide Grievance Committee v. Egbarin*, 767 A.2d 732, 738 (Conn. App. Ct. 2001).

[18] The requirements of Rule 9(b) apply even though Singapore substantive law governs the merits of the fraud claims. *See, e.g., Stern v. General Elec. Co.*, 924 F.2d 472, 476 n.6 (2d Cir. 1991) ("[a]lthough the requirement that a shareholder derivative plaintiff allege fraud or bad faith is a matter of [New York] state law, the Federal Rules of Civil Procedure govern the degree of particularity with which such an allegation must be made in a federal complaint."); *Martin v. American Equity Ins. Co.*, 185 F. Supp. 2d 162, 164 (D. Conn. 2002) ("[i] this diversity case, Connecticut law defines the elements of a cause of action for bad faith. However, federal law governs the degree of particularity with which such an allegation must be pled in a federal complaint.").

1996) (dismissing fraud claims for lack of particularity where plaintiff made only "conclusory allegations that an agent of a defendant made misrepresentations to unidentified persons, possibly including the plaintiffs or some of the plaintiffs").

The counterclaims here allege no more than statements and representations made to "the UCC Companies." The documents appended thereto reflect communications only with UCC and UCAP, not UCCS. In the absence of specific allegations describing allegedly negligent or fraudulent misrepresentations of material fact addressed to <u>UCCS</u>, the fraud and misrepresentation counterclaims fail the most basic pleading requirements and should not be allowed to survive.

### G. Count VII Should Be Dismissed Because UCCS's Claim for Recoupment Is Not Based on Any Cognizable Right of Recovery Against the Counterclaim Defendants.

Under both Singapore and Connecticut law, "[a]n equitable set-off is one imposed by the courts in order to do equity as between the claimant and defendant and . . . operates in complete or partial defeasance of the plaintiff's claim."). 9(2) HALSBURY'S LAWS OF SINGAPORE (EQUITY AND TRUSTS) § 110.182 (LexisNexis Singapore 2003) (Legal Compendium, Tab <u>9</u>); *Premier Capital, Inc. v. Grossman,* 789 A.2d 565, 570 (Conn. App. Ct. 2002) (citation omitted) ("Recoupment . . . refers to the defendant's right, in the same action, to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which he or she sues or because the plaintiff has violated some legal duty in the making or performance of that contract . . . "); *see also Genovese v. J.N. Clapp Co.,* 495 A.2d 1079, 1081 (Conn. App. Ct. 1985) ("The defense of recoupment has two characteristics: (1) the defense arises out of the transaction constituting the plaintiff's cause of action; and (2) it is purely defensive, used to diminish or defeat the plaintiff's cause, but <u>not</u> <u>as</u> <u>the</u> <u>basis</u> <u>for</u> <u>an</u> <u>affirmative</u> <u>recovery</u>.") (citation omitted) (emphasis added).

A party seeking recoupment under Singapore law must prove three elements. 9(2) HALSBURY'S LAWS OF SINGAPORE (EQUITY AND TRUSTS), *supra* at § 110.401 (Legal Compendium, Tab <u>9</u>). First, the counterclaim for recoupment must "flow[] out of and [be]

28

inseparably connected with the dealings and transactions which also give rise to the claim." *Id.* Second, there must "be some special equity to call for a set-off." *Id.* Third, the "same persons must be involved in both claims <u>and</u> be <u>beneficially</u> <u>entitled</u> to what each claims against the other." *Id.* (emphasis added).   A party may not seek recoupment on the basis of a third party's claim: "If either is merely a nominee for another in respect of his claim, the condition fails to be satisfied." *Id.*

In this case, as set forth above, UCCS has failed to state any claim for relief on its affirmative causes of action, and it is barred from asserting whatever right UCC might have once had to seek recoupment against Global Singapore and Mittal.  In the absence of any "beneficial entitlement" to a recovery by UCCS, Count VII must be dismissed.

### H.    Alternatively, All of the Counterclaims Should Be Dismissed on Summary Judgment.

Summary judgment shall be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). "While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, . . . a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Lipton v. The Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987)). "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  *Lipton*, 71 F.3d at 469 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original)); *Blue Cross of Cal. v. Smithkline Beecham Clinical Laboratories, Inc.*, 108 F. Supp. 2d 116, 121 (D. Conn. 2000) (citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991)).

### 1.    UCCS Cannot Prove That It Suffered Any Damages.

The Counterclaim Defendants are entitled to summary judgment on all of the counterclaims because it is admitted that UCCS did not sustain the damages alleged to have resulted from the Counterclaim Defendants' conduct.  *See supra* at 7–12.  Damages are an essential element of UCCS's counterclaims for affirmative relief, each of which fails in the absence thereof.  *See, e.g., Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) ("In order to establish a prima facie case of negligence . . . , a claimant must demonstrate that: (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach.") (internal quotation marks omitted); *Dallas Aerospace, Inc. v. CIS Air Corp*., 352 F.3d 775, 788 (2d Cir. 2003) (negligent misrepresentation requires: "(1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage"); *Manning v. Utilities Mut. Ins. Co., Inc*., 254 F.3d 387, 400 (2d Cir. 2001) (elements of fraud "include representation of a material existing fact, falsity, scienter, deception, and injury.") (internal quotation marks omitted); *Martin v. Dupont Flooring Sys., Inc*., 2004 WL 726903, *3 (D. Conn. Mar. 31, 2004) ("In Connecticut, plaintiffs claiming breach of contract must prove the following elements: the existence of a contractual agreement; breach of such agreement; and the plaintiff suffered resulting damages."); *Clarke v. Max Advisors, LLC,* 235 F. Supp. 2d 130, 141 (N.D.N.Y. 2002) (granting summary judgment where proof of damages was absent, noting that under New York law, "the establishment of damages suffered is an essential element of a breach of contract cause of action").

### 2.    Count I Should Be Dismissed Because UCCS Is Precluded From Proving a Breach of the Alleged Contract to "Handle" the Sterlite Claim "to the Satisfaction of Union Carbide."

UCCS alleges that Global Singapore breached its letter agreement with "the UCC Companies" by failing to "handle" the Sterlite action "to the satisfaction of the UCC Companies."  Counterclaims ¶ 38.  As noted above, the letter allegedly memorializing this agreement refers to the satisfaction not of "the UCC Companies," but of "Union Carbide."  *See*

30

Counterclaims Exhibit B.  Even if such an undertaking were to be deemed a definite contract term that UCCS had standing to enforce, the record establishes that the Sterlite settlement was in fact handled to the satisfaction of UCC.

It was UCC that "personally negotiated and settled" the Sterlite claim at the direction of the Danbury legal department and senior management.  *See* Undisputed Facts, *supra*, Section II.D.  There is no evidence that whether or whatever way Global Singapore handled the claim against it had anything to do with UCC's decision to settle or to pay the $1 million.  Notably, there is no evidence that before the filing of UCCS's counterclaim in January 2006, anyone at UCC, UCAP, or UCCS stated that in their view, Global Singapore or Mittal had breached a contract to handle the Sterlite claim to their satisfaction.  The undisputable fact that UCC itself decided to settle the Sterlite matter—at its own initiative and upon advice of counsel—is yet another basis for dismissal of Count I.

### 3.    Counts III, IV, V, and VI Should Be Dismissed Because UCCS Is Precluded From Establishing the Requisite Reasonable Reliance.

Counts III, IV, V, and VI are all based on allegations of the UCC Companies' reliance on alleged promises and representations by the Counterclaim Defendants.  As set forth above, uncontested testimony and documents in the record establish that neither UCCS nor "the UCC Companies" actually or reasonably relied on such alleged promises and representations in deciding to settle either the Finolex or the Sterlite claims.

For each of the counts in question (promissory estoppel, negligent misrepresentation, fraudulent misrepresentation, and fraud), UCCS must show both actual and reasonable reliance. *See, e.g., Emergent Capital Investment Mgmt, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (to prevail on a fraud claim, a party "has to establish reasonable reliance on the alleged misrepresentations or omissions"); *Golden Buddha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir. 1991) (fraud "requires a false misrepresentation of a material fact, by one who knows it to be false, for the purpose of inducing another to rely upon it, as well as actual

31

reliance to his injury by the defrauded party in ignorance of the falsity") (citing *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987)).

In assessing the reasonableness of a party's alleged reliance, the Court must "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *E.g., Emergent*, 343 F.3d at 195 (affirming dismissal of complaint for lack of reasonable reliance). Reliance is not reasonable as a matter of law, especially for sophisticated parties, where the complaining party made no effort to protect himself or to investigate the propriety of his reliance. *Id.* (affirming dismissal of fraud claim on grounds that "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament"); *see also Davidson v. General Motors Corp.,* 786 N.E.2d 845, 850 (Mass. App. Ct. 2003) (granting summary judgment where alleged reliance was unreasonable as a matter of law) (citing *Carr v. CIGNA Sec.*, 95 F.3d 544, 547-548 (7th Cir.1996)).

Indeed, where material representations are made both orally and in writing, this fact alone may place a party on notice that all such representations should be reduced to a contract. *Emergent*, 343 F.3d at 196. In such circumstances, the failure to do so is unreasonable reliance on the representations. *Id.*; *Wurtsbaugh v. Banc of America Sec. LLC,* 2006 WL 1683416, at *7 (S.D.N.Y. 2006) (granting motion to dismiss fraud claim where reliance on oral representation was unreasonable as a matter of law*).

Here, no reasonable factfinder could conclude that sophisticated businessmen such as Yimoyines and Cheung—both of whom were employed by a multinational chemical corporation and acting in consultation with in-house and outside counsel—were induced by Mittal's alleged oral statements to believe that Global Singapore had promised to "handle" (i.e., pay to settle) all future claims by third parties and had bound itself never to sue for its own contractual damages. Yimoyines himself admits that he neither asked for nor obtained such protection, despite counsel's advice that he do so. *See supra* Section II.D. In light of such admissions and the

irrefutable evidence set forth herein, all claims based on "reasonable reliance" should be dismissed with prejudice.

## IV.     CONCLUSION

UCCS lacks standing and thus this Court lacks subject matter jurisdiction.   On this ground alone, the Court should dismiss the counterclaims in their entirety pursuant to Rule 12(b)(1).   Alternatively, the Court should dismiss the counterclaims under Rule 12(b)(6) for failing to state any claim on which relief may be granted and under Rule 9(b) for failure to plead fraud with particularity.   If necessary, the Court can and should invoke Rule 56 and enter summary judgment in favor of the Counterclaim Defendants on all counts.   By whatever means, UCCS's claims should be deemed meritless and dismissed forthwith.

Respectfully submitted,

BINGHAM McCUTCHEN LLP


By:  /s/ Alicia L. Downey

Richard S. Taffet (ct 10201)
Alicia L. Downey (ct 22066)
399 Park Avenue
New York, NY  10022-4689
(212) 705-7000 (tel)
(212) 752-5378 (fax)

WIGGIN AND DANA LLP
Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One City Place
185 Asylum Street
Hartford, CT  06103
(860) 297-3724 (tel)
(860) 525-9380 (fax)

*Attorneys for Defendants-in-Counterclaim MM Global Services Pte. Ltd. and Ajay Mittal*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2007, a copy of the foregoing Memorandum of Law in Support of MM Global Services Pte. Ltd. And Ajay Mittal's Joint Motion to Dismiss the Counterclaims of Union Carbide Customer Services Pte. Ltd. was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Alicia Downey

34