```
                                                    252

 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
 2

 3                                              COPY

 4    -----------------------------------)
     MM GLOBAL SERVICES, INC., MM GLOBAL  ) 3:02 DV 1107
 5      SERVICES PTE. LTD., and MEGAVISA  )     (AVC)
     SOLUTIONS (S) PTE. LTD.,             )
 6              Plaintiffs                )
     VS                                   )
 7    THE DOW CHEMICAL COMPANY, UNION     )
     CARBIDE CORPORATION, UNION CARBIDE   )
 8      ASIA PACIFIC, INC., UNION CARBIDE )
     CUSTOMER SERVICE PTE. LTD., and DOW  )
 9      CHEMICAL PACIFIC (SINGAPORE) PTE. LTD.)
             Defendant                    )
10    -----------------------------------)

11

12

13
             DEPOSITION OF:  JOHN P. YIMOYINES
14                  DATE:  NOVEMBER 10, 2005
             HELD AT:  BINGHAM McCUTCHEN
15                      ONE STATE STREET
                   HARTFORD, CONNECTICUT
16

17

18

19

20

21

22
        Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
23              BRANDON SMITH REPORTING SERVICE
                       44 Capitol Avenue
24                     Hartford, CT 06106
                       Tel (860) 549-1850
25
```

## Page 417

14:34  1  Serizawa. Do you see that?
       2  A  Yes I do.
       3  Q  Do you know who Serizawa-san is?
       4  A  No, I do not.
14:34  5  Q  I believe yesterday you said you had heard of
       6  Mr. Samtani?
       7  A  Yes.
       8  Q  And just referring to the background section,
       9  described by Mr. Samtani, do you see that?
14:34 10  A  The problem with this is there's a line down
      11  it, so it's a little tough to read, but where do you
      12  want me to look?
      13  Q  The section that has the heading Background.
      14  A  Background, got it.
14:34 15  Q  Why don't you review that for the time being.
      16  A  Okay, I've read the background section.
      17  Q  Do you know where Mr. Ravi retained his
      18  understanding of the old UCC arrangement with MegaVisa
      19  and MM Global Singapore in this instance?
14:35 20     MR. MAROVITZ: Objection, foundation.
      21     MR. EIMER: Same objection.
      22     THE WITNESS: No.
      23  BY MR. TAFFET:
      24  Q  Do you have any basis to understand that that
14:35 25  is not accurate?

## Page 418

       1     MR. MAROVITZ: Objection to the form and
       2  foundation.
       3     MR. EIMER: Objection to the form of the
       4  question.
14:36  5     THE WITNESS: I do not see that MegaVisa
       6  took credit risk, as Mr. Samtani says here.
       7  BY MR. TAFFET:
       8  Q  But you had said before that, I believe it was
       9  yesterday, that the credit relationship was that
14:36 10  MegaVisa would obtain a letter of credit from its
      11  customers and then post a letter of credit to Union
      12  Carbide, is that correct?
      13  A  That's correct. I don't see that it's taken
      14  credit risk when I got a backup LLC from the customer.
14:36 15  Q  And based on your definition, then, Union
      16  Carbide was not taking a credit risk with MegaVisa
      17  because it had the LLC as well from MegaVisa?
      18     MR. MAROVITZ: Objection to form and
      19  foundation.
      20  BY MR. TAFFET:
      21  Q  Is that correct?
      22     MR. MAROVITZ: Same objection.
      23     MR. MAROVITZ: Misstates the record.
      24     THE WITNESS: On an order-to-order basis,
14:37 25  because that's what the LLC's were.

## Page 419

       1  BY MR. TAFFET:
       2  Q  What on an order-to-order basis?
       3  A  The letter of credit was on an order from the
       4  customer, so that on an individual order where the
14:37  5  customer had a letter of credit, I would say yes to
       6  your question.
       7  Q  Okay. Now, under the scenario UCC did not
       8  take the credit risk from the customer in India,
       9  correct?
14:37 10     MR. MAROVITZ: Objection to form.
      11     MR. EIMER: Same objection.
      12     THE WITNESS: Under a situation where
      13  there's a letter of credit from the customer on an
      14  order, and a letter from MegaVisa, letter of credit
14:37 15  from MegaVisa on an order, it's very low, I'm sure a
      16  credit man would say John, you're out of your mind,
      17  but, you know, but to me that's a pretty low credit
      18  risk. As long as the bank is solid, I mean the bank
      19  is solid that backed up the letter of credit, the bank
14:38 20  is solid, the funds were really available from the
      21  customer and really available from MegaVisa, but it's
      22  certainly a lower credit risk than just shipping the
      23  material without anything.
      24  BY MR. TAFFET:
14:38 25  Q  Granted. But my question --

## Page 420

       1  A  But to say no, I think a credit man would tell
       2  me I'm out of my mind to say no.
       3  Q  But the risk to Union Carbide was of
       4  non-payment, however small it was, by MM Global?
14:38  5  A  The risk to Union Carbide was non-payment from
       6  the customer to MM Global and non-payment from MM
       7  Global to Union Carbide.
       8  Q  Right. Well, in your view, even if the
       9  customer didn't pay MM Global, would MM Global still
14:38 10  owe you money? "You" being Union Carbide.
      11     MR. MAROVITZ: Objection to form.
      12     THE WITNESS: If there's a valid order,
      13  and the product is delivered to the customer, and we
      14  do not receive payment, we would first have MM Global
14:39 15  approach the customer. The way the transaction is set
      16  up is that if we couldn't be paid by the customer, we
      17  would look to MM Global. However, that wasn't
      18  practice, as is shown how we backed up MM Global in
      19  Sterlite. They got totally out of the middle of such
14:39 20  a situation, and we stood up behind them, because in
      21  fact they were just a middleman, an agent, and we were
      22  doing business with Sterlite.
      23  BY MR. TAFFET:
      24  Q  And that you're relating to the settlement
14:40 25  with Sterlite, that "you", being Union Carbide, bore

Page 421

    1  the full expense for that?
    2  A  That's correct.
    3  Q  Do you recall the reason that you bore the
    4  full expense for that settlement was because the Union
14:40  5  Carbide legal department insisted upon it because they
    6  didn't want any further problems in India and that in
    7  fact the business side wanted to fight it because you
    8  had no liability, in your view?
    9  A  No.
14:40 10  Q  Before we go back to that, let's stay with
   11  this document. Regarding Mr. Samtani's proposed plan,
   12  which is the last part of his e-mail here, did anybody
   13  bring that to your attention, his proposals, in or
   14  about July 2001?
14:40 15  A  I'm sorry, which proposal? Well, let me read
   16  it, the last page.
   17  Q  Please, take your time.
   18  A  No, and there's no reason that anybody should
   19  bring this to my attention. This is not a wire and
14:41 20  cable issue. Mr. Samtani does not work for wire and
   21  cable. Markus Wildi, PO&E, he has no connection, and
   22  I don't think his plan pertains to the wire and cable
   23  business.
   24  Q  Well, does it say anywhere where it doesn't
14:41 25  pertain to wire and cable?

Page 422

    1  A  Well, it's just a matter of organizational, of
    2  organization. Mr. Samtani cannot put together a plan.
    3  He can put together a plan, but it pertains to his
    4  area of responsibility, and Mr. Samtani has no
14:41  5  responsibility for wire and cable.
    6  Q  So is the answer to my question no?
    7  A  Let me have your question again.
    8  Q  We'll be out of here a lot quicker if you
    9  answer my question.
14:42 10     MR. EIMER: If he wants to hear the
   11  question --
   12  BY MR. TAFFET:
   13  Q  My question simply was, did anyone bring to
   14  your attention Mr. Samtani's proposed plan as
14:42 15  reflected in this e-mail?
   16  A  There's no reason to bring this plan to my
   17  attention.
   18  Q  So whether there is a reason or there is not a
   19  reason, is the answer then no?
14:42 20  A  There's no reason to bring this plan to my
   21  attention.
   22  Q  So it was brought to your attention even
   23  though there was no reason?
   24  A  It was not brought to my attention, but
14:42 25  there's no reason for it to be brought to my

Page 423

    1  attention.
    2  Q  Whether it was or wasn't, that wasn't my
    3  question, sir.
    4     Now, in discussing the alternative that Mr.
14:42  5  Wildi raised of selling direct to customers in India,
    6  what did he say were the advantages, if any?
    7     MR. MAROVITZ: Objection to form.
    8     MR. EIMER: Same objection.
    9     THE WITNESS: We would no longer have to
14:43 10  pay a 3 percent sales commission. It was a matter of
   11  cost effectiveness.
   12  BY MR. TAFFET:
   13  Q  There's also an e-mail here from Edward
   14  Neunuebel. Do you know who that is?
14:43 15  A  In the same exhibit, counsel?
   16  Q  Yes, sir.
   17  A  Let me find it. But to answer your question,
   18  no.
   19  Q  You don't know who he is?
14:43 20  A  I don't know who he is.
   21  Q  Well, did anyone ask you, I'm sorry, not ask
   22  you, confer with you or communicate with you that at
   23  this time selling direct to customers in India was
   24  being opposed by Country Management, i.e., in India,
14:44 25  because of the threat of litigation and protest?

Page 424

    1     MR. EIMER: Object to the form of the
    2  question.
    3     MR. MAROVITZ: Same objection.
    4     THE WITNESS: No.
    5  BY MR. TAFFET:
    6  Q  Was that a consideration that you took into
    7  account at or about this time frame?
    8  A  No.
    9  Q  Staying with the same document on the first
14:44 10  page, I believe it's 5308, there is an e-mail from
   11  Serizawa-san. The first person it's addressed to is
   12  Markus Wildi. At this time do you know whether Mr.
   13  Wildi, using your words, had crossed the line?
   14  A  I believe he had by now. This is July 15th of
14:45 15  2001. And to clarify, crossed the line means that he
   16  now supported the idea of maintaining MegaVisa as our
   17  wire and cable channel in India.
   18  Q  Well, does this refresh your recollection
   19  whether Mr. Wildi was bringing these discussions to
14:45 20  your attention?
   21  A  I think by this --
   22  Q  Regarding MegaVisa?
   23     MR. MAROVITZ: Objection, foundation.
   24     THE WITNESS: I think by this time Mr.
14:46 25  Wildi and I, like I said earlier, were of one mind.

## Page 445

```
                                                           445
 1   lines?
 2         MR. MAROVITZ: Objection to form and
 3   foundation.
 4         MR. EIMER: Same objection.
15:35  5   THE WITNESS: Based on correspondence
 6   that I had from Mr. Mittal, and his continued desire
 7   to work with me and my organization in wire and cable,
 8   yes.
 9   BY MR. TAFFET:
15:35 10   Q   What specifically do you recall in that
11   regard, that Mr. Mittal said he could do this?
12   A   Mr. Mittal continued to encourage me to retain
13   him as my, as wire and cable's agent.
14   Q   This was in letters?
15:35 15   A   Yes.
16   Q   Which letters? Do you recall?
17   A   There's a letter to me probably in the time
18   period, oh, boy, I'm going to say late summer, early
19   fall, 2001.
15:36 20   Q   That was before the decision was made to
21   withdraw the chemicals business, correct?
22   A   That's correct.
23   Q   Do you know if Mr. Mittal had any idea that
24   that was at all being contemplated at that time?
15:36 25   MR. MAROVITZ: Objection to form and
```

## Page 446

```
                                                           446
 1   foundation.
 2         MR. EIMER: Same objection.
 3   BY MR. TAFFET:
 4   Q   Well, do you know?
15:36  5   MR. MAROVITZ: Same objection.
 6         THE WITNESS: Yes.
 7   BY MR. TAFFET:
 8   Q   What do you know?
 9   A   I know that he was encouraging us to stay with
15:37 10   him in wire and cable. I'm sure he was encouraging
11   chemicals at the same time to stay with him in
12   chemicals, because he was concerned that he was about
13   to lose this channel.
14   Q   My question was, do you know whether anyone
15:37 15   from the chemical side of the Dow organization had
16   advised Mr. Mittal that they would no longer do
17   business with him?
18         MR. MAROVITZ: Objection to form. That's
19   a different question.
15:37 20   THE WITNESS: At the time that he wrote
21   me the letter that I referred to?
22         MR. TAFFET: Yes, sir.
23         THE WITNESS: At that point in time he
24   had not been so informed.
25   BY MR. TAFFET:
```

## Page 447

```
                                                           447
 1   Q   We're up to 154, sir. I ask you to take a
 2   look at this, and my question to you is whether you've
 3   ever seen it before?
 4   A   I've seen this before.
15:38  5   Q   And that was forwarded to you by someone in or
 6   about February 2002?
 7   A   This was forwarded to me by many people. This
 8   was forwarded to me by many people.
 9   Q   Do you recall it being forwarded to you by Mr.
15:38 10   Cheung?
11   A   Probably. I remember Mr. Wildi specifically,
12   but Cheung I'm sure sent it to me, also. This was
13   attached to a lot of e-mails in this time period.
14   Q   In the first instance you were unable to open
15:39 15   the attachment, correct?
16   A   If you say so, counsel.
17   Q   I'm just asking if you can remember that?
18   A   I was not as computer literate in those days
19   as I am today. That's a possibility.
15:39 20   Q   Let me hand you a document that's been marked
21   as Exhibit 155.
22   A   I reviewed it.
23   Q   On the first page there is an e-mail to you
24   from Markus Wildi, and right after that this is one
15:41 25   from Mr. Wildi to, amongst others, you're on copy,
```

## Page 448

```
                                                           448
 1   correct?
 2   A   Yes.
 3   Q   And am I correct that you state your view of
 4   the information supplied in the earlier e-mails,
15:41  5   although you couldn't yet open the attachment at this
 6   point in time?
 7         MR. MAROVITZ: Objection to form.
 8         MR. TAFFET: That's a good objection, let
 9   me ask the question better.
15:41 10   MR. MAROVITZ: I finally got one.
11   BY MR. TAFFET:
12   Q   Just to put this in order so that we know what
13   we're talking about here, if we go to the end, the
14   last e-mail, which I think begins on the very bottom
15:42 15   of the second page, 6464, and that's from Ravi to
16   Markus Wildi, with copies to Percossi and Fox,
17   correct?
18   A   Yes.
19   Q   And it indicates that it's forwarding Mr.
15:42 20   Mittal's communication. When you received the e-mail
21   ultimately, did you understand that the communication
22   being forwarded was what is Exhibit 154?
23   A   It's hard to say because I didn't open it.
24   Q   When you ultimately did open it, though,
15:42 25   correct, the attachment?
```

### Page 449

```
15:43    1   A   Yes.
         2   Q   And when you ultimately opened it, do you
         3   recall whether it was Exhibit 154?
         4   A   Yes, it was.
15:43    5   Q   Then after that e-mail Mr. Wildi forwards it
         6   on to Lawrence Cheung to give Mr. Wildi Mr. Cheung's
         7   position on the W&C claims, correct, and you're
         8   copied?
         9   A   Wildi is looking for Mr. Cheung's position.
15:43   10   Q   Correct.
        11   A   Right.
        12   Q   Correct.
        13   A   Yes. Because Wildi has now been hit with this
        14   position of the plaintiffs that we owe them a
15:43   15   significant amount of money.
        16   Q   Right. And then on February 11th, 2002, Mr.
        17   Cheung responds to Mr. Wildi with a copy to you and
        18   others?
        19   A   That is correct.
15:43   20   Q   And sets forth his position, correct?
        21   A   That is correct.
        22   Q   When you received this e-mail, did you read
        23   Mr. Cheung's position?
        24   A   Yes.
15:44   25   Q   Did you agree with it, at the time, sir?
```

### Page 450

```
         1   A   Yes and no. I mean I obviously I felt a
         2   reason to provide, if you will, some more information
         3   on the situation, the reason for my e-mail on top of
         4   this one.
15:44    5   Q   And that e-mail is reflected on the first
         6   page, correct?
         7   A   That's correct.
         8   Q   And that was your position on the situation
         9   before you had read the attachment?
15:44   10   A   That's correct, because if you read this
        11   string here it becomes obvious that, you see it
        12   becomes obvious that we're going back to the former
        13   issues, you know. It doesn't say Sterlite or Finolex
        14   here, but that's what came to my mind when I read
15:45   15   this. This is how I responded.
        16   Q   And indeed you do say Mr. Cheung is correct
        17   concerning what you say here is the second of the
        18   complaints. That would be the Sterlite complaint?
        19   A   Let's see. The first settlement was supposed
15:45   20   ended. MegaVisa negotiated, took a share of the
        21   burden. The second one cropped up late in the third
        22   quarter of 2000. Lawrence is correct, the business
        23   felt there was no basis for complaints, and wanted to
        24   fight the second one out of court.
15:45   25   Q   Out in Indian court?
```

### Page 451

```
         1   A   Second one out in Indian court, where it was
         2   overruled by the UCC legal department and escalated to
         3   the UCC -- yes, that's correct.
         4   Q   And that's how the ultimate settlement was
15:46    5   reached, based upon your description here?
         6   A   Well, this is a long and involved story, and
         7   this is a shorthand e-mail, and, you know, we write in
         8   shorthand sometimes. That certainly was a compelling
         9   reason at the time, and that we wanted, in fact, to
15:46   10   settle this. We do stand behind our commitments, and
        11   we really did not need to be in court in India at this
        12   moment in time.
        13   Q   I've just handed, or had handed to you, Mr.
        14   Yimoyines, Exhibit 156. And to move things along a
15:47   15   little bit, I direct your attention specifically to
        16   the first e-mail, which is from you to Markus Wildi
        17   and Mr. Cheung, amongst others, which I believe
        18   indicates that you had been able to finally open the
        19   e-mail later in the day on February 11th.
15:47   20   A   It's just interesting, this e-mail looks to
        21   come before the one before it.
        22   Q   It does look like that, but --
        23   A   That's kind of curious, isn't it?
        24   Q   I have understanding of why that is, but I'm
15:47   25   not supposed to tell you. According to your counsel.
```

### Page 452

```
         1   After you've read the attachment, these were
         2   your further comments, correct?
         3   A   These are my comments, yes. These are my
         4   comments based upon what I felt at the time of
15:48    5   MegaVisa and of Ajay, I felt we still had a good
         6   working relationship. I had intervened on his part,
         7   tried to help, and I was sincere about wanting to keep
         8   the distributorship. I never cut him off. We had
         9   settled these issues as partners working together, I
15:48   10   backed him, and I felt very personally hurt by this.
        11   I've expressed this personally to Mr. Mittal, that I
        12   was hurt, someone who I felt I could work with and
        13   trust. I consider myself a pretty good judge of
        14   character. In this case I blew it.
15:48   15   Q   What kind of firm conversations did you think
        16   you should have with MegaVisa?
        17   A   I thought we should say, come on, Ajay, we
        18   settled this thing, what are you talking about here, I
        19   could bring up letters where you said it's all behind
15:49   20   us, John, we've settled this, we've worked -- you
        21   know, it's very curious, but in the Sterlite thing, we
        22   had a settlement agreement with Sterlite, and I never
        23   asked for one with MegaVisa. There were attorneys in
        24   Danbury who told me I should have gotten one. I said
15:49   25   I don't need one, MegaVisa is my partner, I trust
```

**Page 453**

```
15:49   1   MegaVisa, and to ask Ajay to sign such an agreement
        2   would be an insult. Boy, was I wrong.
        3   Q   What kind of leverage did you think you had
        4   by, if you hadn't dropped them yet as your W&C
        5   distributor?
        6   A   It says it. This is your obvious leverage,
        7   keeping the wire and cable distributorship. Drop
        8   this, you get to keep it.
15:50   9   Q   Why is that advantageous if they were only
       10   doing a diminimus amount of involvement?
       11   A   Because I still believed they wanted the wire
       12   and cable distributorship.
       13   Q   Even after losing the chemicals?
       14   A   Well, you can see, as I said, as we have — if
15:50  15   we drop them as our wire and cable distributor, and
       16   that shows, you know, as we talked about earlier, this
       17   was the decision of Mr. Tan and Mr. Wildi in the
       18   region, and I was hoping that they hadn't taken such
       19   an action.
15:50  20   Q   And you were hoping because the leverage that
       21   you would lose would mean that you couldn't mitigate
       22   the risk of litigation, correct?
       23   A   I had never —
       24       MR. MAROVITZ: Objection to form.
15:50  25       THE WITNESS: I never felt there were any
```

**Page 454**

```
        1   basis — it says, "no basis for the issues." I just
        2   wanted to settle this with Ajay man to man. That's
        3   how I do business. Never had that chance.
        4   BY MR. TAFFET:
15:51   5   Q   Yes, you made it clear that you don't think
        6   there's any basis. Let me show you a document we've
        7   marked as Exhibit 91. This is, as you can see,
        8   previously been marked, and it's another in the chain
        9   of communications.
15:52  10   A   Okay.
       11   Q   Do you recall this version of the string, not
       12   this version, but this string of related e-mails as
       13   we've collected in Exhibit 91?
       14       MR. TAFFET: Let me draw your attention
15:52  15   specifically to the first page, Mr. Wildi's e-mail to
       16   Lawrence Cheung.
       17   BY MR. TAFFET:
       18   Q   On which you are copied.
       19   A   I think we already looked at this one, right?
15:52  20   Q   I'm not sure we did.
       21   A   I think it's one of these earlier.
       22   Q   If we did, I apologize, but —
       23   A   But, you know, I saw these e-mails, I read
       24   these e-mails. This was getting to be an important
15:53  25   issue at this point in time.
```

**Page 455**

```
        1   Q   This was still in Mr. Wildi's area of
        2   responsibility to direct?
        3   A   Mr. Wildi's books would have been hit with
        4   this, as would my books, so Mr. Wildi didn't like this
15:53   5   at all. And I'll tell you that in such a situation,
        6   now I've been with Dow now a little less than a year,
        7   and I've got one of my customers, one of the people
        8   I've backed, you've put my name on the line that
        9   MegaVisa is someone we should keep, and here pops this
15:53  10   claim. I'm not feeling too good about this right now.
       11   And remember, Mr. Wilde, I told you, had been on the
       12   fence on this, and I dragged him across the fence, got
       13   him to agree, got him to support, and it's kind of
       14   like, you know, okay, John, you know — there's a lot
15:53  15   to this earlier e-mail when he says, what's your take
       16   on this, Lawrence, and how did this happen. It's kind
       17   of like, you Carbide guys, you got me to jump on board
       18   with you, nice going.
       19   Q   Now, at this point in time were you assuming
15:54  20   that whatever the hit on your books, or Mr. Wildi's
       21   books, would be for the entire problems that are being
       22   stated here?
       23       MR. MAROVITZ: Objection to form.
       24       THE WITNESS: No.
       25   BY MR. TAFFET:
```

**Page 456**

```
        1   Q   What was your thinking?
        2   A   I still thought that what was happening here
        3   is that Ajay was using us, wire and cable, to trump up
        4   some claims against Dow so that the letter — remember
15:54   5   now, we're in a time period where the 90 day notice
        6   had been given, could be reversed, and he was applying
        7   pressure on me to go to his behalf by hitting me right
        8   where it hurts, on his behalf to get his chemical
        9   distributorship back. That's what I felt was going
15:54  10   on.
       11   Q   Just connect the dots for me, in connection
       12   with the 90 day notice. What does that have to do
       13   with anything?
       14   A   Well, we're in the period — I think what you
15:55  15   showed me earlier, counsel, was that on January 17th
       16   notice had been given that the 90 day period was
       17   beginning, so in February we're in this period.
       18   Q   That was under the letter agreement that we
       19   had reviewed yesterday?
15:55  20   A   Correct.
       21   Q   Now, there's also an e-mail, second one from
       22   the top here, from Ravi to Markus Wildi and Lawrence
       23   Cheung on which you and Mr. Fox are copied. Do you
       24   recall reading that when it was sent to you?
15:55  25   A   I look at this and I'm not even sure what he
```