LEXSEE 3 SLR 374

© 2003 LexisNexis Asia (a division of Reed Elsevier (S) Pte Ltd)

Singapore Law Reports

THE "PACIFIC VIGOROUS" [2006] SGHC 103

[2006] 3 SLR 374

ADMIRALTY IN REM NO 66 OF 2005 (REGISTRAR'S APPEAL NO 267 OF 2005)

HIGH COURT

**HEARING-DATE-1:** 11 JANUARY 2006; 16 JANUARY 2006; 14 FEBRUARY 2006

**DECIDED-DATE-1:** 9 JUNE 2006

BELINDA ANG SAW EAN J

**CATCHWORDS:**

Contract - Remedies - Election at common law - Plaintiff having right to sue buyer for breach of sale contract and right to sue shipowner for breach of contract of carriage - Whether plaintiff's acceptance of partial payment from buyer under contract for sale of goods amounting to election at common law precluding plaintiff from exercising right to sue shipowner - Whether plaintiff's remedies alternative or cumulative

**HEADNOTES:**

The plaintiff sold a cargo of coal to Bhatia International Ltd ("Bhatia"). Bhatia, as subcharterer of the *Pacific Vigorous*, issued letters of indemnity to the head time-charterer ("Eitzen") to enable delivery of the cargo to be made without the relevant bills of lading issued for the cargo being produced. Eitzen, in turn, issued back-to-back letters of indemnity to the defendant as owner of the *Pacific Vigorous*. A dispute arose between the plaintiff and Bhatia over the contractual quality of the cargo. Despite Bhatia's complaints, it delivered the cargo to its end users and unilaterally deducted a sum for breach of the sale contract from the total sum due to the plaintiff. The plaintiff regarded the sum paid by Bhatia as only part payment for the cargo. The plaintiff, as lawful holders of the relevant bills of lading, commenced *in rem* proceedings against the *Pacific Vigorous* for the loss it had suffered in consequence of the misdelivery of the cargo to Bhatia.

The defendant resisted the plaintiff's application for summary judgment for damages to be assessed and raised the following triable issues: first, whether delivery to Bhatia was with the plaintiff's consent; second, whether the plaintiff's acceptance of part payment for the cargo amounted to an election which precluded it from recovering damages from the defendant.

**Held, allowing the appeal:**
(1) It was trite law that a lawful holder of an order bill was entitled to call for delivery of the goods covered by that transferable document of title, and the shipowner was obliged to give proper delivery and did not fulfil its obligations if the goods were delivered to any person who could not produce the bill of lading. The contract of carriage continued and the bill of lading remained effective until the goods were delivered to the properly entitled person. As such, the lawful [*375] holder was entitled to sue in contract for any breach of the contract of carriage committed even prior to the time at which the claimant became the holder of the bill: at [5].

(2) The triable issue raised by the defendant that the delivery without the bills of lading was with the consent of the plaintiff was untenable. Not only was the alleged consent never pleaded as a defence, the cargo was also in fact delivered and discharged on the basis of letters of indemnity rather than on any prior consent given by the plaintiff: at [7].

(3) An election to accept part payment from Bhatia involved an abandonment of an accrued right to claim damages from the defendant. Such an election was not to be facilely inferred, for in a commercial context, and based on human nature, the probabilities were against the gratuitous or voluntary sacrifice of an accrued right to claim damages from the defendant's breach of contract: at [10].

(4) The plaintiff did not have two inconsistent rights because the claims fell under two contracts which gave rise to separate and independent causes of action against two different persons and, as such, there was no common law election. The plaintiff's remedies as between Bhatia on the one hand and the defendant on the other were cumulative and not alternative remedies, so much so that it was not required to choose between remedies: at [18] and [19].

(5) In any event, the plaintiff had not commenced arbitration proceedings against Bhatia under the sale contract for the balance of the purchase price and the acceptance of part payment was not an unequivocal act which outwardly signified election. Suing the defendant for the shortfall was not conduct which involved an implicit unequivocal representation that the cargo was delivered to the proper person under the sale contract. Also, the affidavit leading the warrant of arrest contained the necessary reservations of right: at [22].

[Observation: The defendant could not raise equitable or promissory estoppel because there was no representation by the plaintiff nor was there reliance by the defendant that the plaintiff would not make a claim for damages that depended on an assertion of misdelivery: at [10].]

*Benjamin Scarf v Alfred George Jardine* (1882) 7 App Cas 345

*BNP Paribas v Bandung Shipping Pte Ltd* [2003] 3 SLR 611

*Cherry, The* [2003] 1 SLR 471

*Cote A Cote Ltd v Mondial Forwarding Ltd* [1999] WL 982440

*Evans v Bartlam* [1937] AC 473

*Future Express, The* [1992] 2 Lloyd's Rep 79

*Ines, The* [1995] 2 Lloyd's Rep 144

*Kuwait Petroleum Corporation v I&D Oil Carriers Ltd (The Houda)* [1994] 2 Lloyd's Rep 541

[*376]

*Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India (The "Kanchenjunga")* [1990] 1 Lloyd's Rep 391

*Lissenden v C A V Bosch Limited* [1940] AC 412

*O'Connor v S P Bray, Limited* (1936) 36 SR (NSW) 248

*Oliver Ashworth (Holdings) Ltd v Ballard (Kent) Ltd* [2000] Ch 12

*Personal Representatives of Tang Man Sit v Capacious Investments Ltd* [1996] AC 514

*Peyman v Lanjani* [1985] 1 Ch 457

*Treasure Valley Group Ltd v Saputra Teddy* [2006] 1 SLR 358

*United Australia, Limited v Barclays Bank, Limited* [1941] AC 1

*Verschures Creameries, Limited v Hull and Netherlands Steamship Company, Limited* [1921] 2 KB 608

Bills of Lading Act (Cap 384, 1994 Rev Ed) s 2(2)

Sale of Goods Act (Cap 393, 1999 Rev Ed) ss 11(2), 53(3)

*Loo Dip Seng* (*Ang & Partners*) for the plaintiff;

*Leong Kah Wah* and *Derek Tan* (*Rajah & Tann*) for the defendant. n1

n1 The defendant has appealed against this decision in Civil Appeal No 27 of 2006, scheduled for hearing in the week beginning 25 September 2006.

**JUDGMENTBY:** BELINDA ANG SAW EAN J

**BELINDA ANG SAW EAN J**
:

1  The *in rem* proceedings here arose out of the shipment of 41,895mt of Indonesian steaming (non-coking) coal in bulk ("the cargo"). The plaintiff, Agritrade International Pte Ltd ("Agritrade"), applied for summary judgment against the defendant, Pacific Vigorous Shipping Inc, for the misdelivery of the cargo at the port of discharge otherwise than against production of the relevant bills of lading covering the subject cargo. I allowed Agritrade's appeal with costs and entered interlocutory judgment for Agritrade with damages to be assessed. The defendant has appealed against my decision.

2  The undisputed facts are as follows. Agritrade sold the cargo to Bhatia International Ltd ("Bhatia") under Contract No BIL 510205 dated 2 February 2005. Payment was to be by letters of credit opened by two Indian banks, namely, the State Bank of Mysore and the Union Bank of India. Five bills of lading (Nos SAT/IND-01/II/2005, SAT/IND-02/II/2005, SAT/IND-03/II/2005, SAT/IND-04/II/2005 and SAT/IND-05/II/2005) all dated 18 February 2005 were issued for the cargo shipped on board the *Pacific Vigorous* at Muara

[*377] Satui, South Kalimantan, Indonesia for carriage to and delivery at Port Pipavav which is located south-west of Bhavnagar in the Saurashtra region of the state of Gujarat. Bhatia as subcharterer of the *Pacific Vigorous* issued three letters of indemnity dated 21 February 2005 to the head time charterer, Eitzen Bulk A/S, for delivery of cargo without production of the relevant bills of lading. Eitzen Bulk A/S in turn issued back-to-back letters of indemnity dated 22 February 2005 to the defendant as owner of the *Pacific Vigorous*. The vessel arrived at the discharge port of Pipavav on or about 4 March 2005. The entire cargo was discharged and delivered to Bhatia by 8 March 2005 against the letters of indemnity.

3  Discrepancies in the shipping documents tendered to the issuing banks were formally notified to Agritrade on 11 March 2005. Suffice it to say, efforts to get Bhatia to waive the discrepancies were not successful. By then, a dispute had arisen and developed between Agritrade and Bhatia regarding the contractual quality of the cargo. The moisture content of the cargo was outside its contractual specification, and communications on this topic ensued between them from 10 March through to 21 March. Despite's Bhatia's complaints, it did not reject the cargo; instead Bhatia delivered the cargo to its end users sometime after 21 March. Bhatia unilaterally deducted a sum of US$ 372,249.51 for breach of the sale contract and on 8 April 2005

credited Agritrade's bank account with the sum of US$ 1,218,281.60 for the cargo. Agritrade regarded the sum of US$ 1,218,281.60 as part payment of the cargo. The amount deducted was not an agreed sum. Agritrade said that it did not know how Bhatia arrived at that figure.

4  On 15 April 2005, Agritrade commenced *in rem* proceedings against the *Pacific Vigorous* for the loss it had suffered in consequence of the misdelivery of the cargo to Bhatia. Initially, Eitzen Bulk A/S entered an appearance to the action as interveners. The defendant later on took over the proceedings, and by order of court dated 13 December 2005 all pleadings and affidavits filed on behalf of the interveners were allowed to stand as though they were the defendant's.

5  It is trite law that a lawful holder of an order bill is entitled to call for delivery of the goods covered by that transferable document of title. Correspondingly, the shipowner is obliged to give proper delivery and does not fulfil its contractual obligations if the goods are delivered to a person (even the cargo owner) who cannot produce the bill of lading. In *The Ines* [1995] 2 Lloyd's Rep 144, Clarke J (as he then was) correctly stressed the fundamental nature of the promise not to deliver other than in return for a bill of lading, as did the English Court of Appeal in *Kuwait Petroleum Corporation v I&D Oil Carriers Ltd (The Houda)* [1994] 2 Lloyd's Rep 541 and [*378] our Court of Appeal in *The Cherry* [2003] 1 SLR 471 at 480-481. Even though the shipowner no longer has the goods, the bill of lading is not spent and as such it does not cease to be a transferable document of title. The contract of carriage generally continues and the bill of lading remains effective until the goods are delivered to the person entitled under the bill of lading (as to which see *The Future Express* [1992] 2 Lloyd's Rep 79). It follows that a lawful holder is entitled to sue in contract in respect of any breach of the contract of carriage committed even prior to the time at which the claimant became holder of the bill. See *BNP Paribas v Bandung Shipping Pte Ltd* [2003] 3 SLR 611 and s 2(2) of the Bills of Lading Act (Cap 384, 1994 Rev Ed).

6  Before the assistant registrar, the defendant in resisting the application for summary judgment raised three triable issues as giving rise to defences to the action. Of the three triable issues, two of them were not pursued at the appeal. They were (a) the plaintiff's title to sue as lawful holders of the bills of lading and (b) the issue of causation, where the contention was that the loss was due to breach of the sale contract and not the defendant's breach of the contract of carriage. Agritrade was able to and did produce the original bills at the hearing before the assistant registrar. As lawful holders of the bills of lading, Agritrade has a right to possession of the cargo against the defendant even after the cargo had been wrongly delivered to Bhatia (see [5] above). Moving on to the causation point, Agritrade had stated in its affidavit that it was suing the defendant in contract. That position was reaffirmed by its counsel, Mr Loo Dip Seng, at the hearing before me. In the event, counsel for the defendant, Mr Leong Kah Wah, rightly accepted that as the ordinary principles of remoteness of damage and causation would apply to Agritrade's damages claim for breach of contract, the issue of causation as presented was a point to be taken and argued at the assessment of damages.

7  The third triable issue raised by the defendant was that the plaintiff consented to the delivery of the cargo to Bhatia without production of the relevant bills of lading. I was persuaded by Mr Loo that there was nothing to this point and this assertion was easily disposed of. The cargo was discharged and delivered to Bhatia by 8 March 2005 against letters of indemnity (see [2] above) and not on the basis of any prior consent by

Agritrade. Significantly, the allegation that Agritrade consented to delivery was never a defence pleaded in the defence filed on 9 June 2005. It was raised as a triable issue in the affidavit of Pin Ying-Kwan dated 22 July 2005 and subsequently addressed in reply by Agritrade. Bhatia as f.o.b buyer arranged the shipment and that would explain the absence of any communication relating to the shipment between Agritrade and the defendant. The defendant resorted to the exchanges of correspondence between Agritrade and Bhatia to cull for itself a defence that was based on *ex post facto* reasoning. Those communications from 10 March 2005 onwards did not bear out the [*379] defendant's assertion that the plaintiff as a fact knew and consented to the discharge of the cargo into the possession of Bhatia against letters of indemnity. Bhatia's letter dated 18 March 2005 was written after the cargo was delivered into the possession of Bhatia and was sent in reply to Agritrade's query on how the vessel could have delivered the cargo without its approval. Bhatia wrote:

> This is the first time that such a frivolous contention is being taken by you particularly when the material had been discharged at the disport with your knowledge and concurrence and the same has not been objected to till date in all your correspondences after the material has been discharged at the disport.

Nothing in that paragraph offered a foundation for the defendant's assertion that Agritrade had prior to the discharge consented to delivery without presentation of the relevant bills of lading. Bhatia's remark - that there was no objection from Agritrade during the earlier exchanges on the off-specification cargo - did not support the defendant's stance.

8 The general picture that emerged from the affidavits and documents is this. Agritrade found itself in a situation where the cargo was in the hands of Bhatia following the defendant's defective performance, as it were, of the contract of carriage. The cargo had been taken and what remained was Agritrade's right to claim damages for breach of contract (see [9] below). As for the sale contact, it was Bhatia who elected to accept the non-contractual cargo by electing not to reject the cargo for breach of condition but to limit its right to claim damages for breach of warranty (s 11(2) of the Sale of Goods Act (Cap 393, 1999 Rev Ed). Having accepted the non-conforming cargo, Bhatia proceeded to unilaterally deduct what it believed was reasonable as damages for the breach of contract and thereafter credited the plaintiff's account for the value of the non-conforming cargo. Since Agritrade was in this situation, it treated the payment by Bhatia as partial payment of the cargo under the sale contract and separately commenced proceedings against the defendant for breach of the contract of carriage.

9 Simply put, was there anything in these circumstances to conclude that Agritrade's conduct after the breach (which could be explained on the basis of estoppel or some other legal principles) implicitly represented unequivocally that it would not make a claim for damages that depended on an assertion of misdelivery? Would acceptance of part of the sale proceeds bar Agritrade from suing the defendant for misdelivery under the respective bills of lading? At the court's direction, the acceptance of partial payment (see [3] above) was discussed in this connection by counsel. The defendant did not raise estoppel but relied on election as a basis for contending that Agritrade's acceptance of part payment precluded it from recovering from the defendant damages under the relevant bills of lading for misdelivery of the cargo. It seemed to me [*380] that whether Agritrade's conduct might amount to an election as alleged must be determined by reference to facts, objectively viewed.

10 I foreshadow the difficulties ahead for the defendant with these observations. An election of the sort alleged must surely involve an

abandonment of an accrued right to claim damages for breach of contract and that is not something to be facilely inferred. In a commercial context, and human nature being what it is, the probabilities are against the gratuitous or voluntary sacrifice of an accrued right to claim damages from the defendant's breach of contract. Dr Aleka Mandaraka-Sheppard expressed the same sentiments in her article, "Demystifying the Right of Election in Contract Law" (2006) 18 SAcLJ 60 at para 78, when discussing total waiver in the sense of an abandonment of rights (which arises by virtue of a party making an election) under a contract after a breach and she rhetorically asked: What person in his right mind, would give up all his rights after a breach? Dr Sheppard observed that once a right after breach has accrued, a release or discharge of that right is either by deed or upon consideration. She also noted that for a finding of an effectual total abandonment of rights one should be looking at whether or not the elements of equitable or promissory estoppel exist. As stated, the defendant did not raise estoppel and there was good reason for that. The defendant would not have been in a position to raise common law estoppel or a promissory estoppel. In both cases, there would have to be some sort of acting on the representation. The representee must have acted on the representation to his detriment. In this present case, the breach had already occurred. Not only was there no representation made by Agrtirade to the defendant, I could not see in what way the defendant had relied on Agritrade's alleged conduct to its detriment.

11  Mr Leong argued that Agritrade's conduct leading up to and including the acceptance of payment from Bhatia amounted to an election by Agritrade to treat the earlier defective performance as good delivery under the contract of carriage to Bhatia as the person entitled to delivery under the sale contract. In so doing, Agritrade was precluded from pursuing its misdelivery claim against the defendant for that right was alternative to and inconsistent with Agritrade's right against Bhatia under the contract of sale. Mr Leong cited the decision of *Verschures Creameries, Limited v Hull and Netherlands Steamship Company, Limited* [1921] 2 KB 608 ("*Verschures Creameries*") in support of the defendant's contentions.

12  Mr Loo submitted that *Verschures Creameries* would not assist the defendant here. In that case, a firm of carriers being authorised by the claimants to carry goods to A delivered them to B. The claimant invoiced the goods to B, sued him for the price, recovered judgment and took bankruptcy proceedings against him. The claimant afterwards sued the carriers for [*381] misdelivery. Clarke J in *The Ines* pointed to *Verschures Creameries* as one of the plainest cases of ratification of an act done by the carriers purporting to deliver on behalf of the claimant and as such there could be no complaint against the carriers for breach of authority. Mr Loo also referred to *Cote A Cote Ltd v Mondial Forwarding Ltd* 26 October 1999, [1999] WL 982440 where the defendant, Mondial, relied on the decision in *Verschures Creameries* to contend that by demanding payment from Karoma International Ltd ("KIL"), the plaintiff, Cote A Cote, had elected to proceed on the basis that the delivery had been valid and had thereby been ratified. The decision in *Verschures Creameries* was again distinguished. The position in that case was clarified by Lord Atkin in *United Australia, Limited v Barclays Bank, Limited* [1941] AC 1 ("*United Australia*"). The delivery in *Verschures Creameries* had been ratified because the carriers were the seller's agents. That was not the position in Mondial. The court had found that Mondial was not acting as the plaintiff's agent and was in clear breach of its obligations. Moreover, at no time had the plaintiff indicated to Mondial that by commencing proceedings against KIL it was waiving its rights to proceed against Mondial. In that case, the plaintiff,

Cote A Cote, was an exporter of fashion goods. KIL was an importer and wholesaler in Greece. By a contract made in August 1996, the plaintiff agreed to sell goods to KIL, payment to be made by way of promissory note 45 days after shipment was confirmed by the plaintiff's bank. The plaintiff released the goods to the defendant, Mondial, which had been nominated by KIL as carrier. On arrival of the goods in Greece, KIL pressed Mondial for delivery. Mondial released the goods to KIL. The plaintiff pressed KIL for payment and at the same time put Mondial on notice that, if unsuccessful, it would look to Mondial for payment. Proceedings were commenced against KIL for the price of goods sold and delivered, and later against Mondial for damages for breach of an express term of the bailment. Both actions were consolidated. The court found that Mondial had not been acting as agent of the plaintiff and made the orders against Mondial and KIL.

13  On the question of election, the defendant referred to the doctrine of election enunciated by Lord Blackburn in *Benjamin Scarf v Alfred George Jardine* (1882) 7 App Cas 345 at 360-361:

> The principle, I take it, running through all the cases as to what is an election is this, that where a party in his own mind has thought that he would choose one of two remedies, even though he has written it down on a memorandum or has indicated it in some other way, that alone will not bind him; but so soon as he has not only determined to follow one of his remedies but has communicated it to the other side in such a way as to lead the opposite party to believe that he has made that choice, he has completed his election and can go no further; and whether he intended it or not, if he has done an unequivocal act - I mean an act which would be [*382] justifiable if he had elected one way and would not be justifiable if he had elected the other way - the fact of his having done that unequivocal act to the knowledge of the persons concerned is an election.

Lord Atkin in *United Australia* ([12] *supra*) at 30 said that reference to "remedies" in this statement meant "rights". English cases have made a distinction between "rights" and "remedies" for the purpose of determining the time at which an election must be made: see *Robert Walker LJ in Oliver Ashworth (Holdings) Ltd v Ballard (Kent) Ltd* [2000] Ch 12 at 28. As for "remedies", the English courts had in mind alternative remedies and cumulative remedies (see [19] below).

14  Mr Loo submitted that neither the common law nor equitable doctrines of election apply in the present case. He again referred to *The Ines* ([5] *supra*) as a case in point for Agritrade. I will come to this decision later on.

15  Election at common law occurs where a person has two inconsistent rights or courses of action and only one of which can be exercised. In such a case, his choice by overt act communicated to the other party that he is relying on one such right precludes him from later claiming the benefit of another. A prerequisite of this election is that the party making the choice must be aware of the facts which have given rise to the existence of his new right (as to which see Lord Goff of Chieveley in *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India (The "Kanchenjunga")* [1990] 1 Lloyd's Rep 391 (" *The Kanchenjunga*") at 398). In a contractual context, the two inconsistent rights can arise either before or after a breach of contract. A common example of the application of the principle of election is the case of a repudiation of a contract. The innocent party has the right to continue with the contract or to accept the conduct of the other party as terminating the contract and sue for damages. If, with knowledge of the facts giving rise to the repudiation, the other party to the contract acts in a manner consistent only with treating that contract as still alive, he is taken in law to have exercised his election to affirm the contract.

16  Election in equity means that a party cannot both accept an instrument or judgment and reject it. It is referable to the principle that a person is not permitted both to approbate and to reprobate an instrument or judgment. Where facts exist which call for the application of the equitable doctrine, the person concerned is required to choose whether he will take under or against the instrument or judgment. He cannot take a benefit under the instrument or judgment without taking the burden. See *O'Connor v S P Bray, Limited* (1936) 36 SR (NSW) 248 at 263 and *Evans v Bartlam* [1937] AC 473. *Treasure Valley Group Ltd v Saputra Teddy* [2006] 1 SLR 358 is a case where the equitable doctrine was applied on the facts.
[*383]
17  With these principles in mind, I went on to consider whether the defendant had made out as a triable issue the defence of an election under either doctrine. In the end, I concluded that in the first place, this was not really a case of common law election at all. Second, there was no unequivocal conduct which outwardly signified an election under common law election or equitable election. Third, the necessary ingredient common to both doctrines, which is knowledge on the part of Agritrade that there is a choice to be made, was not demonstrated. I shall discuss in detail the three points in turn.
18  No election arose in the sense that the defendant was wrong in contending that Agritrade had two inconsistent rights. The case for the defendant did not involve the pursuit of two alternative and inconsistent rights argued for by Mr Leong. The "inconsistent rights" as formulated by Mr Leong were:
(a) the right to treat the delivery of the cargo as wrongful and to pursue the defendant and Bhatia for conversion of the cargo; and
(b) the right to treat the delivery of the cargo as lawful and to pursue Bhatia for the price of the cargo.

The claims here fell under two contracts giving rise to separate and independent causes of action and they were against two different persons. The rule against double recovery imposed a limitation on a plaintiff like Agritrade's ability in such a situation to recover in the aggregate from one or more defendants an amount in excess of its loss. The fact that there were no inconsistent rights was sufficient to dispose of the doctrine of common law election.
19  Agritrade's remedies as between Bhatia on the one hand and the defendant on the other are cumulative, not alternative, remedies so much so that Agritrade was not required to choose between remedies. "Cumulative remedy" is defined in *Black's Law Dictionary* (Bryan A Garner, ed) (West Group, 7th Ed, 1999) as, "A remedy available to a party in addition to another remedy that still remains in force." Lord Nicholls of *Birkenhead in Personal Representatives of Tang Man Sit v Capacious Investments Ltd* [1996] AC 514 ("*Tang Man Sit*") at 521 and 522 discussed alternative remedies and cumulative remedies and at 523 reconciled the apparent inconsistencies between the various speeches in *United Australia* ([12] *supra*) in the light of different considerations applicable to alternative remedies and cumulative remedies. He explained that as against the third party, MFG Trust Ltd, United Australia had a choice of one of two alternative and inconsistent remedies. It could claim redress either in the form of compensation, that is damages as for a tort, or in the form of restitution of money to which it was entitled but which MFG had wrongfully received. His lordship then pointed [*384] out and clarified that United Australia's remedies against MFG on the one hand and Barclays Bank (damages for conversion and negligence) on the other hand were cumulative, not alternative. Hence, the earlier proceedings against MFG were not a bar to United Australia suing Barclays Bank unless, as a result, United Australia had received full satisfaction for its loss.

20   Even if the present case concerned alternative and inconsistent remedies, the common law doctrine of election takes effect only where a stage is reached where some choice has finally to be made at least until judgment and satisfaction. Not unlike the present case, *The Ines* was also a case on delivery of goods without production of bills of lading. The plaintiff, MB Pyramid Sound NV, sold some telephones to a Mr Litwak or a company called Pino Stiftung. Shipment was to be on board the *Ines*, at Rotterdam for carriage to and delivery at St Petersburg. The plaintiff was at all material times the holder of the bills of lading. The named consignee was Pino Stiftung and the notify party was Rusworld. The consignments of telephones were delivered to Rusworld at St Petersburg without presentation of original bills of lading. The plaintiff claimed damages in respect of the alleged misdelivery of the consignments of telephones. Like Agritrade, the plaintiff in that case argued that there was a misdelivery in breach of the contract contained in or evidenced by the bills of lading and that it had suffered loss as a result. One argument raised by the carrier was that as the plaintiff had brought proceedings against Mr Litwak and Pino Stiftung in Belgium for the price of the goods such proceedings were a waiver of the tort of misdelivery, an election to waive any breach of contract or tort in respect of it and a ratification of the delivery and the plaintiff could not sue the carriers. Like Agritrade, the plaintiff was paid part of the purchase price. That fact was not an obstacle to the claim as Clarke J held that in assessing the plaintiff's loss full credit should be given for the part of the price which was paid. Clarke J ([5] *supra*) at 156 further held that:

> The mere assertion of a claim by the plaintiffs against Mr Litwak and Pino Stiftung on a different and even inconsistent basis from that asserted against the carriers does not in my judgment amount to a waiver, election or ratification upon which the carriers could rely. The plaintiffs have not at any stage been put to their election as between themselves and the defendants. Moreover they have not pursued their claim to judgment in Belgium. On the contrary they have expressly decided not to so at present in order to avoid this very risk. I can see no reason based in either principle or authority why the plaintiffs should not be entitled to recover any loss which they have sustained as a result of the carriers' breach of contract.

21   I should add that Judge LJ in *Cote A Cote Ltd v Mondial Forwarding Ltd* ([12] *supra*) referred to *Tang Man Sit* ([19] *supra*) and concluded that on the facts before him, the plaintiff had not elected that KIL only should be sued so as to enable Mondial to avoid liability for their breach.

[*385]

22   In the present case, Agritrade had not commenced arbitration proceedings against Bhatia under the sale contract for the balance of the purchase price. Besides, acceptance of part payment was not an unequivocal act which outwardly signified an election under either doctrine. Neither would suing the defendant for the shortfall change the complexion of things. I did not see that as conduct involving an implicit unequivocal representation that the cargo had been delivered to the proper person under the sale contract and that Agritrade would not claim any right that depended upon on an assertion of misdelivery of the cargo. As Lord Goff highlighted in *The Kanchenjunga* ([15] *supra*), an election requires an unequivocal representation by one party who in making his election is communicating his choice whether or not to exercise a right which has become available to him. Besides, the affidavit leading the warrant of arrest contained the necessary reservations of right. Chaturvedi Nagendra Nath, Agritrade's marketing

director in the coal division stated in his affidavit in support of the arrest dated 15 April 2005 that despite partial payment, it was not waiving and expressly reserved Agritrade's right to claim whatever was permitted by law against the defendant and not just the sum of US$ 372,249.51 deducted by Bhatia. That caveat is understandable for where the quality of the cargo was not as promised, the basic loss is the value of the cargo as represented less its market value in fact (as to which see s 53(3) of the Sale of Goods Act).

23  One element common to both doctrines is that a party will not be held to have made an election if he did not know that he had a right to elect. In *Lissenden v C A V Bosch Limited* [1940] AC 412 at 419, Viscount Maugham said of the equitable doctrine:

> [N]o person is taken to have made an election until he has had an opportunity of ascertaining his rights, and is aware of their nature and extent.

> In *Peyman v Lanjani* [1985] 1 Ch 457 at 500, Slade LJ said of the common law doctrine:
> With Stephenson and May L.JJ., I do not think that a person can be held to have made the irrevocable choice between rescission and affirmation which election involves unless he had knowledge of his legal right to choose and actually chose with that knowledge.

This prerequisite was endorsed by Lord Goff in *The Kanchenjunga* at 398. As stated, an unequivocal act which might outwardly signify an election is not enough. Knowledge of the choice is an essential requirement. In the present case, the requisite knowledge of the existence of choice was not demonstrated by the defendant. In any case, as I have commented earlier in [10] above, it would have been extremely perplexing for someone in the position of Agritrade, after a serious breach by the defendant, not to maintain its right to damages especially in the knowledge of Bhatia's position on the sale contract.

[*386]

24  In the premises and for all these reasons, I allowed Agritrade's appeal with O 14 costs here and below fixed at $ 22,000.

LOAD-DATE: 11/30/2006