2000 SINGJLS 162
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

Singapore Journal of Legal Studies
July, 2000

Review Article

*162 Promises in Equity [FNa1]

J D Davies [FNaa1]

Copyright © 2000 by Contributors and National University of Singapore; J D

Davies

During the nineteenth century, liabilities at common law came to be seen as principally divided into those based on contract, which needed consideration, and those based on tortious wrongdoing. Certain instances of liability that had been developed in equity and which were based on what we would now term "detrimental reliance" did not then meet with acceptance and vanished from the legal scene. Some survived however, and this lecture deals with two of them, which have come to be known as promissory estoppel and proprietary estoppel. The extent of liability under the former, and of remedies under the latter, need reconsideration, and this lecture does this through a discussion of some of the cases in the area, new and old.

EVERYTHING I have read and heard about Mr Koh Choon Joo makes me wish that I could have had the pleasure of meeting him. A scholar, an artist, and a lawyer - the same cannot be said of too many of us - he gave a lifetime of service to Singapore and became a most munificent benefactor to the University. He was educated in the United Kingdom, in Wales, as I was, so providing me with added satisfaction in giving the first in a series of lectures which will commemorate his learning, humanity and generosity. The University of Wales at Aberystwyth would be instantly recognisable to Mr Koh were he to revisit it. Lying on the sea-coast of west Wales, it is not a large town, but was chosen as the place where the University of Wales should first open its doors in 1872, in an extraordinary building on the sea front which a railway entrepreneur had designed as a hotel. There, before proceeding to the Middle Temple, he will have received a first class legal education in a country for which he retained a long-standing affection. The old university building is still part of the University, though in recent years the campus has expanded on to the hill above the town. It adjoins the National Library of Wales, one of the six copyright libraries in the British Isles, which means that it receives a free copy of any book published in the United Kingdom. Aberystwyth is very much a cultural centre for Wales, and I feel sure that Mr Koh would have found himself very much at home there.

*163 During the nineteenth century the law of contract acquired the distinctive character and shape which it has retained to the present day. But its relationship to various developments which were being fostered by Equity over that period was for many years an uneasy one. Some, especially those now included under the heading "Constructive Fraud", have become a crucial and indispensible part of the law, Common Law standing aside to let this happen. [FN1] But others have had a more chequered history, and this is certainly true of various "reliance-based" developments favoured by Equity during that time. Judges in the Chancery Courts regarded certain instances where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 2 of 14

2000 SINGJLS 162                                                                                              Page 2
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

a defendant had taken it upon himself to make certain assertions or promises which proved unfounded or were not honoured as within their domain. Beneath these instances lay a single principle, that where an assertion or promise has been acted on in circumstances in which it was reasonable to have done so, and a loss ensued when it was falsified, Equity should provide a measure of relief: the principle we now term detrimental reliance. Equity was willing to provide relief although the requirements for a remedy under the maturing law of contract or the law of tort were not met. But some of the instances in which Equity was doing so ranged closer to certain rules and principles of the Common Law than was good for them; and it was those rules and principles which were going to be held inviolate. I will mention two such instances.

Equity was reluctant to make decisions depend too much on the precise way in which a party expressed himself. So if a statement forgiving a debt was uttered in a manner from which a lay person would legitimately believe that the debt was never to be enforced, Equity did not think it right to make a distinction between phrases such as "I have cancelled the bond", "I regard the bond as cancelled", "I am cancelling the bond", "I will cancel the bond" and "Let us agree that the bond is cancelled". When any such phrase was used in convincing circumstances, and the debtor had acted on it to his detriment, the creditor would not be allowed to deny the position he had taken up and would have to abide by it, at least to some extent. But this use by Equity of the estoppel notion did not appeal to Lord Cranworth LC or Lord Brougham who together made up the majority of the House of Lords in Jorden v Money [FN2] in 1854. They did not believe it was compatible *164 with the principle of Common Law that promises were enforceable only when supported by consideration; so that, unless the statement constituted a representation of existing fact (in which case estoppel at law would apply) it had to be denied effect altogether. The fact that it had been acted upon could make no difference. The primacy of contract, with its requirement of consideration, was more important and had to be safeguarded.

Another of Equity's developments based on reliance, one which could have become a central feature of liability for words in English law, was to perish, despite the Judicature Act, as a result of Derry v Peek [FN3] in 1889. Throughout the first half of the nineteenth century, Equity had been fostering a remedy of "making representations good". The doctrine could be applied in a wide variety of circumstances, one example being the case early in the century of Burrowes v Lock. [FN4] The defendant trustee had stated to a plaintiff that a third party had an inheritance, and as a result the plaintiff lent money to the third party. The defendant was held liable for the loss which the plaintiff eventually suffered, as he had made the statement irresponsibly; he had known that the third party had assigned the inheritance but had forgotten the fact. The remedy could also apply where the plaintiff's loss was occasioned through entering into a contract with the defendant. But the mental element of this liability was a controversial one, and became the centre of a dispute. For Equity's remedy extended to awarding monetary compensation, and after Derry v Peek it was seen as being in conflict with the principle that, outside of contract, monetary compensation in cases of this variety depended upon satisfying the requirements of deceit at Common Law. Equity's remedy had been given more generously and had to vanish. [FN5] Only Equity's own remedy of rescission, when applicable and feasible on the facts, could be granted when the requirements of deceit could not be met. [FN6] It was to take many years for Equity's wish to hold people liable for what they asserted to return to the centre of the stage, though it did so eventually, first in fiduciary law, [FN7] and then in tort. [FN8]

Another instance of Equity's notion of detrimental reliance survived intact through these various vicissitudes, and has continued to flourish and expand ever since. It is the area now commonly referred to as proprietary estoppel, and the greater part of my lecture will be devoted to it. But first I want to say something about how, in more recent years, Equity's central idea *165 has been revived under the so-called doctrine of promissory estoppel. Both these forms of estoppel are, I believe, accepted in Singapore; but in the case of promissory estoppel, acceptance is only up to a certain point, as is the case in the United Kingdom. What I am going to suggest in this lecture is that you have less to fear in Singapore about a limited expansion of promissory estoppel, and more to worry about in the present state of the law of proprietary estoppel. Though both doctrines derive from the same central idea of detrimental reliance and can in practice overlap, I am going to deal with them separately. For not only has their evolution since Equity's more general principle of detrimental reliance was repudiated been along very different lines, but the problems which they pose for us today are distinct. I will discuss both forms of estoppel through the fact situations of four decided cases, the first of which tells the story of the man who knocked down his own property.

Some of the thinking that preceded Jorden v Money [FN9] survived in the particular context of variations of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 3 of 14

2000 SINGJLS 162                                                                                     Page 3
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

existing obligations. At Common Law a statement or promise that a debt is forgiven was unenforceable in the absence of consideration, the consequence being that the debt remains payable; but Equity felt able to take account of additional detriment caused to a debtor who relied on the impression conveyed. The debtor cannot as a plaintiff sue on the promise made to him, but the creditor suing on his original debt may not be able to recover the whole of it; and will in most cases have to give notice before being able to revert to his earlier position. In this more limited form the doctrine originating in Equity came to win acceptance by the middle of the twentieth century. [FN10] It is important however to note that the doctrine was accepted back into the fold of respectability only on the basis that the debtor is not being protected beyond the point that is necessary in order to reverse the additional detriment caused. During the second half of the last century, this equitable technique of reversing only additional detriment caused by reliance upon a promise unsupported by consideration was taken further. It was suggested, in the United Kingdom to begin with, that the technique need not be confined to the context of variations of existing obligations in which it originated, but could affect obligations arising within a different "pre-existing relationship". [FN11] The idea was not really pursued there, but in Australia it has been. In the leading *166 case of Walton's Stores v Maher, [FN12] a desperate situation called for a drastic solution. Maher had agreed on the terms of a lease of premises that he and his wife owned to a retailer, but the latter wanted Maher to demolish a large part of the premises and rebuild it to suit his own particular requirements. Maher was urged to get on with that job quickly rather than wait for a formal exchange of contracts to take place, and Maher did so. A few weeks later, after a considerable amount of demolition and some reconstruction had already been carried out, the retailer attempted to withdraw. Exchange of contracts had not taken place, and as this was an essential preliminary, it seemed that the contract was not enforceable. Maher must be taken to have knocked his property down at his own risk. But he had been assured that exchange of contracts was going to be a pure formality. It was not clear what form the assurance had taken however. It might have been to the effect that exchange "had" taken effect, a misrepresentation of fact which would lead to Maher being protected under the doctrine of estoppel at Common Law, or it might have been to the effect that exchange of contracts "would" take place, in which case Jorden v Money would deny him protection. The High Court of Australia was not willing to strain the facts too much or to make its decision turn on such a nicety of language, and held that Maher was entitled to have the lease specifically enforced. What really mattered was that he honestly believed that he had a binding agreement. He should be protected even if the assurance had been that the exchange of contracts "would" take place. The retailer knew that demolition was proceeding, and would be "... estopped in all the circumstances from retreating from its implied promise to complete the contract". [FN13]

This result is defensible, and I hope that a similar result will follow if a case of a similar nature occurred in Singapore. A limited remedy can be given without affecting the primacy of contract. It is essential in this type of case however to appreciate what we are doing, to realise that there are limits to it, and to avoid illusions about it. One illusion is that the notion of a "pre-existing relationship" can provide an adequate controlling mechanism. But there was not really one in Walton's Stores v Maher, and I believe that courts in Australia and New Zealand which have attempted to discern relevant legal relationships in other circumstances only deceive themselves. [FN14] Another illusion is that the scope of the remedy can be confined by examining *167 the type of promise or right or interest involved. A more serious illusion is that couching the remedy in the language of estoppel means that a defendant is not being sued for what he has said. One can say that Maher's cause of action in Walton's Stores v Maher was on the contract, and that estoppel was only adjunct to it, but the substance of the liability is, and should be seen to be, the retailer's assurance. We can better control the limits of what we are doing if we state it realistically. The liability is for words and the losses to which they lead; a liability that can usefully supplement the law of tort, which has been much less successful in dealing with economic loss outside the field of contract than in dealing with physical loss. I see no analogy here to the situation in the mid-nineteenth century when the doctrine of "making representations good" was competing with the Common Law. But I do think that Equity should learn from that lesson, and not set itself up as a rival to the principles and remedies of contract law. In reality Maher had got neither an enforceable contract nor an assurance in contractual form, so he should not get contract remedies. All that he had was an assurance which he had reasonably acted on, and his remedy should be confined to recovering the loss occasioned by his reliance on it. That there was need of this limitation was appreciated in Walton's Stores v Maher and in the later case of Verwayen v Commonwealth of Australia, where Mason CJ and Brennan J in particular emphasize its importance, Mason CJ by requiring proportionality between the remedy and the detriment, and Brennan J by talking in terms of the minimum remedy that would be effective to reverse the detriment. [FN15] With this limitation on remedy in place, I believe that Walton's Stores v Maher can be safely accepted in Singapore and in the United Kingdom. Contract law can retain primacy if the remedy in estoppel is not larger in quantum than it needs to be. It is confined to reversing the additional detriment caused by reliance on the promise. The promise

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 4 of 14

2000 SINGJLS 162                                                                                                      Page 4
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

itself should not be enforced, unless there is no other way in which that can be achieved, as will sometimes be the case. And in fact the remedy finally awarded in Walton's Stores v Maher was not specific performance (clearly not the most sensible remedy in those circumstances) but damages in lieu. [FN16]

*168 I now turn to proprietary estoppel, and to the story of the man who built his house on the land of another. Typically, the cases that illustrate the doctrine concern expenditures on land by a non-owner (who is sometimes a lessee) in the expectation, nourished by a promise from the owner, that he will be receiving an interest in it. These cases provide a striking departure from general principle. First, there is no question of Equity's remedy being available only as a defence; the promisee can succeed as plaintiff. Second, the promise can take any form; it can be unilateral, as in a promise to give, or can have a semblance of mutuality but lack consideration as understood in contract law. Third, formalities required by statute for the disposition of an interest inter vivos or through a will may have been ignored, or attempted and not successfully accomplished; the promisee can succeed even though in Equity's eyes he is a volunteer. Fourth, the remedy to be granted is in the court's discretion; moreover it is not confined to reversing any loss suffered by the promisee, whose expectations are often fulfilled. Perhaps because the cases applying the doctrine concern land, the fact that a promisee can sue upon a promise unsupported by consideration is seen as less of a challenge to contract law and so less objectionable; and certainly what a promise leads to matters more than the form of the promise. I am also less troubled than some by the courts exercising a discretion when providing a remedy, for often there is no other way of arriving at the solution that best meets the needs of the case. But I am uneasy that the absence of the required formalities is so freely overlooked, and that the promisee acquires a fee simple in land with relative ease.

Equity's jurisdiction to provide relief in cases of this variety goes back a long way. [FN17] In the mid-nineteenth century, with the doctrine of "making representations good" still in place, proprietary estoppel was beginning to acquire the shape in which we see it today. Fee simples were certainly being granted at that time, but the circumstances in the cases were odder than may be supposed. Sometimes there was a wish to reward an industrious entrepreneur in a dispute with a recalcitrant landowner. For example if, though only informally, a landowner had assured those constructing a canal that he would sell or grant a long lease of a small portion of his land for use as part of the canal, he could not be allowed to refuse to do so after the canal was constructed; [FN18] and clearly the right remedy to grant was the *169 one that enabled the canal to function. But one can only speculate on whether the law would have taken the course that it did, and the practice of readily transferring the fee simple acquire such acceptability, if it were not for the weight that came to be accorded to the decision in 1862 in the case of Dillwyn v Llewelyn. [FN19] It is a case which is still regarded as a leading authority if not the leading authority in the area, [FN20] and I would now like to take you into the interesting story which lies behind the rather basic facts recorded by the law reporters. It also enables me to return to Wales, to Swansea, a city fifty miles south of Aberystwyth, which Mr Koh may well have visited.

There is no need to tell an audience in Singapore that the art of making the finest porcelain came from China. The quality of the ware was appreciated in Europe in the fourteenth century, but not until the France of the eighteenth century was anything produced that could stand comparison with it. I may however need to tell you that some of the finest porcelain ever produced in Europe was manufactured in Wales, though only for a very few years at the beginning of the nineteenth century. It is attributable to the near-genius and enthusiasm of one man, William Billingsley (1758-1828). [FN21] After years of experiment, he had evolved a formula for a "body" from which china of a most attractive lustre could be manufactured. He himself painted the ware - dinner and tea services, vases, etc - and he did so in a natural rather than a stylised way that is immediately recognisable. In 1813 he was producing this high quality china in Nantgarw, a village near the capital city of Wales, Cardiff, but he had insufficient money to carry it on and appealed to the cognoscenti of South Wales for support. His appeal was answered by a man of wealth who owned the Cambrian Pottery in Swansea. His name was Lewis Weston Dillwyn (1778-1855) and his was a remarkable family. They were Quakers and a forebear had emigrated to America in 1700. William Dillwyn, Lewis Weston Dillwyn's father, had been born in *170 Pennsylvania in 1743, but returned to England the possessor of considerable wealth. In 1802 he acquired for the benefit of Lewis Weston Dillwyn a seven-tenth interest in the Cambrian Pottery, which had been established in 1764 and was already producing ware of notable quality; in 1810 the remaining three-tenths was acquired. William Dillwyn seems to have laid out around £20,000 on the investment in the pottery, being ready to indulge a son who was showing himself to be a man of very considerable talents. He was interested in numerous aspects of science, and published extensively on them throughout his life. Pre-eminently however he was a botanist, and between 1802 and 1809 he wrote a significant botanical work, "The Natural History

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 5 of 14

2000 SINGJLS 162                                                                                                               Page 5
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

of British Confervae", becoming a FRS in 1804. During those years he had also become fascinated by the problems of producing very high quality porcelain; and he was attracted by Billingsley's work not only for the unique quality of the "body" he was producing, but also by the way in which he was painting plants on to china in a manner that was botanically accurate. In 1814 Billingsley with his small team moved from Nantgarw to Swansea where kilns were constructed to Billingsley's specifications. But though between then and 1817 extremely fine quality china was produced at Swansea, and experiments with the china clay formula were persevered with, a basic problem remained - the "body" was extremely difficult to work with and wastage in the process made the enterprise uneconomic.

In 1817 Lewis Weston Dillwyn's father-in-law, John Llewelyn, died. He owned a valuable estate at Penllergaer near Swansea but had no male heir. Lewis Weston Dillwyn's eldest son, John Dillwyn (1810-1882) was to succeed him; and on doing so he added Llewelyn to his name. In addition to running the Penllergaer estate, John Dillwyn Llewelyn pursued the family interest in botany, was well-known as an astronomer, and did experimental work on the electric telegraph and on photography. Like his father he became a FRS (in 1836). But on his death-bed, John Llewelyn extracted a promise from Lewis Weston Dillwyn (who was his trustee) that he would take the active role in running the Penllergaer estate until his son was old enough to do so. That was a commitment that had to be honoured, and with reluctance he reduced his commitment to the Cambrian Pottery, bringing others into the venture through various agreements - including an informal memorandum the effect of which was disputed and which led to litigation in 1821. But the involvement of others in the pottery led the temperamental Billingsley to leave Swansea and return in 1818 to Nantgarw, where for one year more the very rare and fine Nantgarw china was produced. Lewis Weston Dillwyn's interest in porcelain never waned however, and the pottery in Swansea remained in operation. It now concentrated on more economic manufacturing processes, though its ware continued to be very highly thought of. In 1831 he decided to introduce his second son Lewis Llewelyn Dillwyn (1814-1892) into the business (instead of sending him to Oxford where his elder *171 brother had gone); and in 1836 the whole of the pottery business was passed on to him. He ran it along with his many other business interests until he closed it in 1870.

Father and son were both important public figures. In addition to holding a number of offices in Wales, Lewis Weston Dillwyn was a Liberal MP for the county of Glamorgan from 1832 to 1841. Lewis Llewelyn Dillwyn was involved in public affairs throughout his life. He held innumerable offices and directorships, and was also Liberal MP for Swansea without interruption from 1855 to 1892. Father and son were both of a radical persuasion, Lewis Llewelyn Dillwyn being a significant contributor to the political debates of the time and a respected and popular member of the House of Commons. They lived in some style. [FN22] In 1833 Lewis Weston Dillwyn bought Sketty Hall, a Georgian mansion in twenty-five acres overlooking the sea on the approaches to the scenically spectacular Gower peninsula and lived there until his death in 1855. Lewis Llewelyn Dillwyn lived close to him in a large house, which belonged to a neighbouring estate. But it was a house that was liable to be needed as a dower house - the need arose in 1855 - and in 1853 Lewis Llewelyn Dillwyn decided it was time to acquire a more permanent residence. His decision led to a family conference. Lewis Weston Dillwyn was now 75 years of age and anxious that his son should establish his residence nearby. He owned the freehold of fifty acres of land a mile and a half away from Sketty Hall, and not much further than that from the Cambrian Pottery. Its name was Hendrefoilan. Lewis Llewelyn Dillwyn and his elder brother John inspected the land together and chose a site for a house on a part of the fifty acres that had only an ancient farm on it. All concerned agreed that an ideal solution had been found, and a family accord on the matter was recorded in an informal memorandum which was signed by the father and witnessed by the elder brother. In non-legal (indeed ungrammatical) language it recorded that

> Hendrefoilan, together with my other freehold estates, are left in my will to my dearly beloved wife; but it is her wish, and I hereby join her in presenting the same to our son Lewis Llewelyn Dillwyn, for the purpose of furnishing himself with a dwelling house.

Evidently Lewis Weston Dillwyn had no more liking for paying lawyers' fees in 1853 than in 1817 when bringing others into the management of the Cambrian Pottery.

*172 Lewis Llewelyn Dillwyn spent virtually £20,000 on the property, including buying the farmer out and considerably improving the land. He spent £14,000 on building a house on it, [FN23] and lived in it for the rest of his life. But in 1855 his father died and the father's will, made in 1847 and not changed, came into operation. Hendrefoilan had never been conveyed away from the father, and under the will it vested (along with other properties) in his two sons as trustees for his widow for life, then in his second son Lewis Llewelyn Dillwyn for life,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 6 of 14

2000 SINGJLS 162                                                                                           Page 6
2000 Sing. J. Legal Stud. 162
**(Cite as: 2000 Sing. J. Legal Stud. 162)**

and in remainder to the son of the latter, with an ultimate remainder to the elder brother. The elder brother having inherited his grandfather's wealth, it is understandable that the younger son is preferred in his father's will. But Lewis Llewelyn Dillwyn was under the impression that he had become the effective owner of Hendrefoilan during the lifetime of his father, and he now asked his brother to convey it to him. Their mother supported this course of action, but Lewis Llewelyn Dillwyn had an (only) son Henry Dillwyn (1844-1891), and John Dillwyn Llewelyn was advised that he could not safely execute the conveyance. It was in these circumstances that a suit was instituted in Chancery.

The case was argued before Sir John Romilly MR on 14 March 1862 by a QC and a junior on each side, and judgment was given the following day. [FN24] The Master of the Rolls appears to have taken the view that everything turned on the intention behind the memorandum, and that this had been to give Lewis Llewelyn Dillwyn his mother's life interest in Hendrefoilan rather than the fee simple. On this footing the result would be that on her death he could continue to live there under the terms of the will. The remainders were unaffected however, so that the declaration the plaintiff was entitled to was that he

> was entitled to the estate called Hendrefoilan during the terms of his mother's and his own life.

Thus what Lewis Llewelyn Dillwyn obtained under Romilly MR's declaration was the life interest originally intended for his mother, and not more than that. No greater violence was being done to the terms of the will than was thought to be necessary, and the family as a whole was being guaranteed their security at Hendrefoilan in the manner which the testator had intended.

*173 Nevertheless a will was being given an effect contrary to one of its provisions without a codicil having been executed or the formalities required for a transfer of an interest in land having been complied with by the testator during his lifetime. The memorandum was thus being given extraordinarily cogent significance. This may surprise one the less however if one investigates Romilly MR's views on statements and promises made informally in other contexts. He was the judge at first instance who had favoured the debtor in Jorden v Money. [FN25] He was also one of the judges who did most to further the doctrine of "making representations good". [FN26] Clearly, he believed that informal promises should be given a much wider effect in Equity than they possessed at Common Law.

Lewis Llewelyn Dillwyn was not satisfied with being a life tenant however. He had spent a great deal of money on Hendrefoilan and was determined to be its owner in fee simple. So he appealed to the Court of Appeal in Chancery, [FN27] and the appeal was heard on 4 June of the same year by Lord Westbury LC, sitting alone. [FN28] This was not unusual, nevertheless the connections between litigants and judges are not without interest. Sir John Romilly must have known Lewis Weston Dillwyn reasonably well, as both had sat for some years on the Liberal benches of the Reform Parliament, each having become an MP for the first time in 1832. So he may have derived some satisfaction in being able as Master of the Rolls to give proper effect to his former colleague's intentions. But neither was Lewis Llewelyn Dillwyn a stranger to Lord Westbury for, as Sir Richard Bethell, Lord Westbury had sat in the House of Commons on the Liberal benches from 1855 until he became Lord Chancellor in 1861, years when Lewis Llewelyn Dillwyn was sitting there too.

The appeal was argued by the same four counsel as appeared below. According to the report in The Law Journal, [FN29] it was said on behalf of the appellant that the Master of the Rolls had laid too much emphasis on the memorandum and not enough on the "transactions" surrounding it; that the *174 circumstances attending the appellant's expenditure meant that he was not a volunteer for the purposes of the rule that a volunteer is not able to enforce an imperfect gift; and that there were satisfactory precedents [FN30] for an equity being available against an owner of land who encouraged another to expend money on that land and then refused to confer upon him an informally promised benefit (or stood by and watched while he did it). Counsel for John Dillwyn Llewelyn seem to have contented themselves with submissions that favoured upholding the judgment below; and if this is so, the option of leaving matters as they stood under the will was not before the court. Maybe the uncle was not pressing his infant nephew's case harder than was necessary. The Lord Chancellor delivered his judgment on 12 July, but it was scarcely a judgment which displayed the considerable intellectual ability which he undoubtedly possessed. The judgment is disjointed and much reliant on analogies, including one to the equitable doctrine of part performance. But his conclusion is clear; the whole transaction had to be looked at, the testator and his wife intended Lewis Llewelyn Dillwyn to receive the fee simple of Hendrefoilan, and the expenditure which he had been encouraged to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC    Document 461-7    Filed 01/05/2007    Page 7 of 14

2000 SINGJLS 162                                                                 Page 7
2000 Sing. J. Legal Stud. 162
**(Cite as: 2000 Sing. J. Legal Stud. 162)**

make constituted a ground on which it should be conveyed to him.

So Lewis Llewelyn Dillwyn had obtained what he wanted. [FN31] The absence of the requisite formalities had proved not to be a barrier, and the remedy he was given was not confined to either a life interest or the return of his expenditure. A pattern was thus set for the future and I can turn to my next story, which concerns the very different story of the district council which built on the land of another.

Mr Greenshields was a farmer in rural Norfolk and also a member of the local council. In 1945 there was a severe housing shortage and the council approached Mr Greenshields to see if he would sell them a small portion of his land on which it would build houses. He was not unwilling and discussed various possible sites with the council's representatives. On 8 September 1945 he went to see the District Valuer and the outcome of their meeting, as recorded by the valuer in writing, was that they were in agreement on a specific site and on the price to be paid for it. The agreement was reported to an extremely dilatory firm of solicitors, who seem to have done nothing about it. Apparently, but inexplicably, everyone concerned thought that an enforceable contract had come into existence on 8 September. *175 At the very beginning of 1947 the council took possession of the site and built twelve houses on it. But in July of that year Mr Greenshields died, and presently the valuer died also. Mrs Greenshields brought an action for trespass against the council and for possession of the site on which the houses were built.

The case - Greenshields v Smallburgh RDC [FN32] - was argued before Roxburgh J in the Chancery Division by a QC and a junior for Mrs Greenshields, and a junior for the council. The council prevailed, though on the strange ground that, according to the judge, there was to be inferred from the conduct of the parties a "licence to enter on the land pending sale which was never to be revoked so long as the council was willing to pay [the purchase price of] £ 135 and costs in exchange for conveyance of the land whatever happened about the outstanding matters". [FN33] A better solution would have been to place the case within the doctrine of Equity that we have been considering. Mr Greenshields knew what the council's intentions were and was alive when it started to build the houses. It would have been monstrous if Mrs Greenshields, as her husband's successor in title, had been able to retain ownership of the land and the houses upon it and charge rent to their occupants. E converso there was no reason why the council should not have to pay the price which it had agreed for the land it was acquiring, thus illustrating the proposition that proprietary estoppel is not restricted to promises to give but can apply to promises to sell.

My fourth story concerns the man who refurbished the property of another: Yaxley v Gotts. [FN34] Mr Yaxley was a builder without much cash that was spare, while Mr Gotts senior and his son Mr Gotts junior were property owners who did. Mr Yaxley came to know of a house with three storeys, previously owned by a bankrupt, which was in a very dilapidated state, and from which a good rental income could be derived if it were completely refurbished. He told his friend Mr Gotts senior about it and, to cut this long story short, Mr Gotts senior promised Mr Yaxley, though not in a precise way, that he could "have" the two flats that were to be created on the ground floor "for ever" if he renovated the whole property at his own expense and then managed it. It was Mr Gotts junior who became the owner of the property however, but since he knew all about his father's promise, the court held that he was bound by it. No writing evidenced the bargain, and no formal document vesting an interest in Mr Yaxley was ever executed. Mr Yaxley carried out his side of the bargain, but three *176 years later the parties quarrelled, Mr Yaxley was ordered out, and it was denied that any bargain had been made. Mr Yaxley brought an action asking that his ownership of the ground floor flats should be recognised; alternatively he sought recompense for his work and expense. The judge, who believed Mr Yaxley's evidence, decided that he should receive a 99-year lease (unless Mr Gotts junior bought him out at the value of such an interest) and that compensation for his work and expense would be inadequate as a remedy. The Court of Appeal affirmed the decision, so illustrating the proposition that proprietary estoppel can apply to promises of a wholly imprecise nature.

We can learn quite a lot from the judgments of the Court of Appeal. First, we can see that, among the analogies drawn by Lord Westbury, the most persuasive for us today seems to be that with expenditures on land by non-owners under some form of misapprehension induced by the owners that they will be entitled to a benefit in it which justified the expenditure. Such a situation can arise in a variety of circumstances however, which need to be seen in conjunction with each other, in order to ensure that Equity is granting its relief consistently. It is a sufficient inducement that an owner, knowing that the other has misunderstood his rights, stands by and watches him improve the land. [FN35] It is thus not odd that an equity lies against an owner who, having promised the improver (albeit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC    Document 461-7    Filed 01/05/2007    Page 8 of 14

2000 SINGJLS 162                                                                Page 8
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

only informally) that the land will be conveyed to him, stands by and watches an improvement being carried out: this point is very clearly taken by Beldam LJ. [FN36] But the same must also be so even when the owner has endeavoured but failed to pass title. It would be strange if an attempt by an owner to pass title which does not succeed disentitled the non-owner to the equity. In each of these situations, the justification for Equity overriding the position as to consideration at Common Law and as to formalities under statute will lie in ascertaining the precise circumstances of the inducement, in the nature of the resulting misapprehension, and then in setting them against the significance of the Common Law and the statutory rules. This point is clearly taken by Clarke LJ. [FN37] As Robert Walker LJ [FN38] points out, the situation in respect of formalities is different from that of real illegality, over which a proprietary estoppel cannot prevail. But on this basis, requirements as wide-ranging as those needed for wills, conveyances, declarations of trust, and contracts respecting land, as well as those dealing with the need to register charges, will have been ignored or not properly complied with; and what needs to be assessed *177 is the importance of the particular one involved. To isolate an attempted transfer of title and make it immune from the assessment because of Equity's practice of not completing a gift implemented in an imperfect form cannot be right. Nevertheless it is strange that the reasons why formalities do not fall within the range of situations over which proprietary estoppel cannot prevail have escaped discussion in its many precedents. [FN39]

But that is far from being the most awkward of the problems which this ebullient remedy poses for us today. Something analogous to what happened to resulting and constructive trusts during the last century in the sphere of matrimonial and quasi-matrimonial property has occurred. In the earlier part of the century, it was more likely that a party contributing to the purchase of a home without being placed on its title would be providing a capital sum. But changes in the organisation of society had altered the situation by the middle of the century; in particular, mortgages became more common, and what was needed was the means of keeping up with instalment payments. Wages and services of various types became significant in the calculation, and eventually they were taken into account when determining the beneficial entitlement of the party off the title. But in this area the law was given a greater coherence, so far as proprietary resulting trusts was concerned, by the decision of the House of Lords in Lloyds Bank v Rosset, [FN40] though the ambit of constructive trusts in the area remains obscure. An expansion of proprietary estoppel has also occurred, but more in the latter part of the century. Remedies have come to be given in a very wide variety of circumstances: where the promises were in wholly imprecise form, where what was being promised was uncertain, where the property they were to affect was uncertain, and where the promises were to be honoured through the means of a will as well as through an arrangement inter vivos. [FN41] But *178 no correction to the law analogous to that in Lloyds Bank v Rosset has occurred. Is it needed?

It is very tempting to say that this down-marketing of the remedy has gone too far, and that its range of application should be narrowed. But in modern times it is precisely in the wider ranges of circumstances associated with the lower end of the social spectrum that the need for a remedy is at its greatest. Many people for whom security in a place which they can call home is crucial have confidence in promises made to them informally. Consulting a lawyer is not only something that they dislike, but is inimical to the atmosphere in which the promises were made and genuinely meant. It is not easy to discern a solution to this social problem, so that cutting back on the ambit of proprietary estoppel is a difficult option to justify, even if it were feasible. It would be a pity to confine the protection of the law to the well-advised.

One turns then to the remedy, and here I believe that the heritage of Dillwyn v Llewelyn is an unfortunate one. Even at the time, it was not necessary to convey the fee simple in order to protect the expenditure on, or the family succession at, Hendrefoilan. There is in fact a lot to be said for Romilly MR's solution. [FN42] An impression from the case has lasted, however, that a promisee can hope to acquire what he was promised. Thus in a recent article, [FN43] Simon Gardner advances the proposition that "... relief in proprietary estoppel ordinarily takes the form of expectation relief in specie, but there is a discretion to give some other form of relief where this seems more appropriate." I am not sure that indulgence to the promisee should be carried to that extent. There is something to be said for an element in the remedy which deters landowners from disregarding the formalities required for the creation, transfer, and protection of interests in land. The policies underlying formal requirements have merit. It is true that it is the promisee who has to pay the penalty for non-compliance, but that is a natural concomitant of having formal requirements. The promisee should not be denied a remedy altogether, but I doubt whether a leaning in favour of fulfilling expectations is justified.

*179 If however one is not to start at the top of the tree in the way that Dillwyn v Llewelyn has encouraged us

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 9 of 14

2000 SINGJLS 162                                                                                                 Page 9
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

to do, where should we start? And here I come to what I see as the worst feature of the present law on proprietary estoppel. Not only is the remedy discretionary, which it has to be, but there are no clear guidelines as to its exercise. The judges commend, seemingly indiscriminately, "expectations", "proportionality", and the "minimum". [FN44] This must be having the effect that more of these difficult cases have to come to court than need be the case.

A further factor has also to be taken into account for, in land cases, a range of technical problems affects resorting to an intermediate solution. At least, if a fee simple is granted, the promisee acquires a clean title. The same is true in reverse if the promisee is bought out, as will frequently be sensible. [FN45] But if a licence, say for life or until children are past the school leaving age, is granted, and on many facts this would be a very reasonable compromise of the conflicting interests of the parties involved at the time, conveyancing complications ensue. Does such a licence constitute an interest in land capable of binding third parties with notice? Can one obtain an entry on a land register so as to protect or give notice of it? On the first question, given that expressly created licences conferring the right of exclusive occupation have now been so firmly declared not to constitute interests in land, [FN46] I do not see how a licence is transmuted into one by having the elements of unconscionable conduct or court order added into the factors that bring it into being. If a third party is to be bound to any extent by a licence derived from a proprietary estoppel, I think it should be through a quite separate assessment of the merits of the situation as between the licensee and the third party, rather than through the traditional mechanism of an acknowledged interest in land being taken forward to bind *180 successors in title. Such an assessment, however difficult, would be realistic, and would allow the underlying principle of unconscionablity to be applied throughout the entirety of the adjudicative process. On the second question, Singaporean legislation merely takes one in a circle. The Land Titles Act requires that an applicant for a caveat must be in a position to claim "a certain estate or interest in land", [FN47] and also provides that entry of a non-proprietary right does not enhance its status but leads the caveator into a potential liability for damages. [FN48] And still we are not at the end of the difficulties, for the position prior to litigation is even more unsatisfactory. Even an occupier of property with a decent chance of acquiring an interest in land under a proprietary estoppel claim may be unable to lodge a caveat. So how can he protect himself against an owner minded to sell to a purchaser willing to accept an element of risk on his purchase? There is also an argument, following observations in Yaxley v Gotts, [FN49] that proprietary estoppel and constructive trust are not materially different doctrines so that a licensee may be entitled to succeed in an in personam action of the type permitted in Loke Yew v Port Swettenham Rubber Co. [FN50] But though such an action creates an exception to indefeasability under the Torrens system, it is more than doubtful whether the possibility of it being successful would entitle the licensee to a caveat.

So it would be kinder not to use licences to solve the problem of finding a remedy in a proprietary estoppel case. A halfway house solution that seems adequate and convenient in the short term could easily cause severe difficulties later. But where does that leave us in the quite usual type of case where a home has been promised? [FN51] I do not think however that we are driven to just choosing between the grant of a fee simple and providing compensation; and I would like to demonstrate the point by contrasting what happened to the two widows in the cases of Pascoe v Turner [FN52] and Williams v Griffiths. [FN53] Mrs Turner, a widow in middle age, went to live with Mr Pascoe in a house which he owned and, a year or two later, in another house which he bought. Some years later he left her to live with another woman. However he assured Mrs Turner "that the house and everything in it was hers". In the belief that Mr Pascoe's assurance was to be trusted, Mrs Turner spent all but a few hundred pounds out of her original small capital of £4500 on various *181 minor but significant improvements to the house. Mr Pascoe was fully aware of what she was doing but later gave her notice to leave. He had not taken any steps to vest any interest in land in her. Nevertheless the Court of Appeal ordered that the fee simple in the house should be conveyed to her. The court gave a number of reasons for feeling that this was the only way to protect her properly. It considered that Mr Pascoe was "ruthless" and might interfere with her possession of the house, on occasions when repairs were needed for instance; so that it would not be right to leave Mrs Turner's security to the vagaries of licences and constructive trusts. It also took the view that her free capital had been most seriously diminished, leaving her in a position in which she would have difficulties in raising a loan should that prove necessary. But giving her the fee simple was not the only way to give her a degree of protection which might be thought adequate in the circumstances, however much it might fall short of her expectations. A lease of the house at a nominal rent might have been ordered, along the lines suggested by another division of the Court of Appeal just a year previously in Griffiths v Williams. That case too involved comparatively small expenditures on a house by a widow whose family then gave her notice to leave. The widow's capital could not have been large, and the family's attitude towards her certainly seems to have been ruthless. Nevertheless the court felt that it should provide her with only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 10 of 14

2000 SINGJLS 162                                                                                    Page 10
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

limited protection. It did not feel able to grant her a marketable property interest, not even a life interest. She should receive the security of a lease granted at law, into which specific terms were to be inserted to take account of the interests of both parties; and such a lease could of course be protected on the Land Titles Act register. Of the two widows, Mrs Turner came out with much the best buy; yet a lease at law might have been sufficient to have protected her possession of the house. It is true that she would have found it difficult to borrow on the security of a house leased in such a manner, and the court was right to be concerned by the extent to which her capital had been diminished. Nevertheless it does seem that, having taken a most unfavourable view of Mr Pascoe's character, the court came to its conclusion rather readily. This may well have been due to the way in which the case was argued, and ordinarily there should be consideration of the various remedies possible. Once the court has come to a conclusion that the requirements for a proprietary estoppel have been met, the parties may themselves be able to work out a suitable solution; [FN54] but if necessary the case could be restored for further hearing.

*182 In recent years there has been a considerable widening in the range of circumstances which lead to a remedy under proprietary estoppel being needed. But this widening does not point in the direction of one particular form of remedy being preferable to another. It merely points to the need to craft a remedy with care. Sometimes it will be obvious that a fee simple should be granted, as in a case like Greenshields v Smallburgh RDC. [FN55] But in others, among which I number Dillwyn v Llewelyn, it will not be so, and a careful appraisal is then needed of background circumstances. There should not be an inclination toward the fee simple being granted, for often a lease can be devised which will better reconcile the conflicting interests of the parties who are before the court - who will not always be the original promisor and promisee. [FN56] The factors that could affect the choice and form of remedy are wide-ranging: the value of the property; where it is sited; whether the promisee could finance the acquisition of a home elsewhere; whether a rent is appropriate; entitlement to a HDB apartment; whether the promisee has a family; the age and health of the promisee and of other parties affected, and so on. But I doubt whether conduct on either side should loom as large as it was allowed to do in Pascoe v Turner. [FN57] It is also a question whether consistency with the limited remedy available for promissory estoppel should count for too much, since the reason why that remedy is limited is the need to safeguard the primacy of contract law, a factor which seems to possess less significance in the land cases that dominate proprietary estoppel. The factors affecting the choice of appropriate remedies under the two estoppels are quite different. Difficult issues also arise if a decision is taken to compensate a party rather than leave him in occupation. Is compensation to be calculated on the basis of loss of a right to occupy, or on the basis of not acquiring an interest in land that could have been granted, or on the basis of a particular promisee's needs?

I hope that I have succeeded in convincing you that the way that proprietary estoppel has developed in recent years has left the courts in a very difficult position. They have to choose between remedies that are embarrassing in their range. But I also now have to say that in one respect I have been leading you up the garden path. I have been keeping proprietary and promissory estoppels apart. I now want to lead you out from the garden and direct you on to the right road by putting them together. The law needs both, *183 though promissory estoppel should be widened. Both have problems however. The main concern in promissory estoppel is that the primacy of contract law should not be prejudiced. The main concern in proprietary estoppel is the uncertainty of the remedies that follow from it and of the protection acquired under some of them. But it does not follow, because the problems of the two areas are dissimilar, that the approach to the remedies under them should differ. They overlap; a proprietary estoppel [FN58] must be based upon some variety of promise. Why should the approach to the remedy to be granted pursuant to detrimental reliance upon a promise be more generous, and extend to the fulfilling of expectations, because it arises in the land situations to which proprietary estoppel applies? One could in fact argue for the very converse of that result, for in those land situations there will not only have been lack of consideration but non-compliance with statutory formalities. Land may have been the protective context within which certain instances of reliance-based remedies were able to survive the nineteenth century, but that does not constitute justification.

I believe that there should be a considerable degree of conflation between the two estoppels. They could be seen as part of one doctrine, thus bringing back something of the unity of the reliance-based liabilities that was lost when the law on reliance fragmented during the second half of the nineteenth century. Proprietary estoppel has the characteristic that a plaintiff is able to sue upon a non-contractual promise. Promissory estoppel suffers from the disadvantages that it is thought to operate only within certain existing relationships and only then as a defence, neither being realistic or necessary limitations upon its availability. Proprietary estoppel suffers from the disadvantages that the remedies and protection under them are unpredictable. Promissory estoppel has the merit that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC    Document 461-7    Filed 01/05/2007    Page 11 of 14

2000 SINGJLS 162                                                                                                              Page 11
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

it has a relatively predictable remedy, the reversal of the detriment occasioned. The answer is that the promises in each of the estoppels should be seen as leading to causes of action; and that the same remedy, that which reverses the detriment, should apply to both. The result should be seen as a "substantive" [FN59] doctrine, one which creates a duty. Such a duty, in Brennan J's words in Walton's Stores v Maher, [FN60] would "... complement the tortious remedy of damages for negligent *184 mis-statement or fraud"; as well as complementing contract law. Under this approach, an useful remedy becomes available; the primacy of contract is preserved; respect for formalities is encouraged; a guideline is provided on remedies; an appropriate balance is struck between principle and justice.*

[FNa1]. A lecture given on 24 March 2000 in the Academy of Law to inaugurate the CJ Koh Professorship of Law in the National University of Singapore.

[FNaa1]. Fellow of St Catherine's College, Oxford.

[FN1]. I would like to pay tribute to the distinguished work in this area of the first Dean of the Faculty, Professor LA Sheridan.

[FN2]. (1852) 51 ER 372; (1852) 21 LJ Ch 893; (1854) 10 ER 868. Lord St Leonards dissented. The case illustrates the unsatisfactory appellate system in being at the time. It was heard at first instance by Romilly MR, who decided it in favour of the debtor. His view prevailed in the Court of Appeal in Chancery as Knight Bruce LJ agreed with it. The other judge sitting, Lord Cranworth LJ, dissented, but by the time the House of Lords heard the appeal he had become Lord Chancellor and presided.

[FN3]. Derry v Peek (1889) 14 AC 337.

[FN4]. (1805) 10 Ves 470. See (1982) 3 U of Melbourne LJ 349 for a discussion of the remedy.

[FN5]. Low v Bouverie [1891] 3 Ch 82.

[FN6]. Redgrave v Hurd (1881) 20 ChD 1 is a well-known example.

[FN7]. Nocton v Lord Ashburton [1914] AC 932.

[FN8]. Hedley Byrne v Heller [1964] AC 465.

[FN9]. Supra, note 2.

[FN10]. Combe v Combe [1951] 2 KB 125. Hughes v Metropolitan Railway (1877) 2 AC 439, a land case, is now seen as within the doctrine. When decided, it might well have been considered part of a wider liability.

[FN11]. Durham Fancy Goods v Michael Jackson (Fancy Goods) [1968] 2 QB 839 at 847 per Donaldson J.

[FN12]. (1988) 164 CLR 387. The High Court found some authority for its decision in Legione v Hateley (1983) 152 CLR 406.

[FN13]. Supra, note 12, at 408.

[FN14]. See for instance in Verwayen v Commonwealth of Australia (1990) 170 CLR 394 and Burbery Mortgage Finance & Savings v Hindsbank Holdings [1989] 1 NZLR 356. I am mentioning these cases only briefly as I have written about them elsewhere at greater length: see M Cope (ed) Equity: Issues and Trends (1995), pp 2 et seq.

[FN15]. See Walton's Stores, supra, note 12, at 425-7 and Verwayen, supra, note 14, at 416-7. That the issue has not been wholly resolved in Australia can be seen from the later High Court case of Giumelli v Giumelli (1999) 161 ALR 471.

[FN16]. As to precedent, the following remark of Lord Templeman in AG of Hong Kong v Humfreys Estate [1987]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC   Document 461-7   Filed 01/05/2007   Page 12 of 14

2000 SINGJLS 162                                                                                             Page 12
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

AC 114 at 127-8 can be taken into account: "It is possible ... that ... a party to negotiations set out in a document expressed to be 'subject to contract' would be able to satisfy the court that the parties had subsequently agreed to convert the document into a contract or that some form of estoppel had arisen to prevent both parties from refusing to proceed with the transactions envisaged by the document." Why should not the same apply to an assurance respecting an exchange of contracts?

[FN17]. The best modern account of the doctrine is that of Charles Harpum, in chapter 13 of his recent edition of Megarry & Wade: The Law of Real Property (6th Ed, 2000).

[FN18]. See Duke of Beaufort v Patrick (1853) 51 ER 954 and Somersetshire Canal Co v Harcourt (1857) 53 ER 478, (1858) 44 ER 1120. Both were decisions of Romilly MR, who was able to base them on observations of Lord Eldon LC in Dann v Spurrier (1802) 32 ER 94 at 95-6, though the context is rather different. The cases were probably being brought to extract money from the contractor rather than to prevent use of the canal, and he might well be made to pay a suitable price for the interest in land obtained.

[FN19]. The case is most often cited from the report in 4 De GF & J 517 reprinted in 45 ER 1285. There are also reports in 6 LT 878 reprinted in (1861-73) All E Reprint 384, in 10 WR 742, 8 Jur (NS) 1068 and 31 LJ Ch 658. The fullest and most accurate report is the one in The Jurist, but The Law Journal reports the argument best. Most reporters get the spelling of the parties' names wrong, which is perhaps understandable. What is less forgiveable is mistaking the name of the plaintiff, as De GF & J do. Lewis Weston Dillwyn is in the Dictionary of National Biography, the later generation in the Dictionary of Welsh Biography. To avoid further confusion, I resort in this lecture to giving the parties their full names throughout.

[FN20]. In Sen v Headley [1991] Ch 425 at 439, Nourse LJ says that the evolution of the doctrine of proprietary estoppel in the form in which we now know it cannot be dated before Dillwyn v Llewelyn. I share Harpum's doubts - see note 17, supra, at 732 - on whether this is strictly true; but the remark is an indication of the case's influence.

[FN21]. For what follows see EM Nance: Pottery and Porcelain of Swansea and Nantgarw (1942).

[FN22]. Lewis Llewelyn Dillwyn also maintained a London residence and was a member of the Athenaeum.

[FN23]. The house remains intact and in a splendid condition, and is now used by the University College of Wales, Swansea. Sketty Hall is in an equally fine condition, and is part of Swansea's Further Education College; among other things it houses a catering college, which one can visit. Penllergaer House has been less fortunate; it was demolished in 1961 to make way for offices of the local District Council. Its lakes and gardens remain.

[FN24]. It is shortly reported in 10 WR 412 and 8 Jur (NS) 425.

[FN25]. See 51 ER at 377.

[FN26]. See for example his judgment in Pulsford v Richards (1853) 51 ER 965.

[FN27]. This court was a fairly recent addition to the appellate scene. It was set up in 1851 by 14 & 15 Vict, c 83, and two Lords Justices were appointed to sit in it. They often constituted the court, but it could also be constituted by the Lord Chancellor sitting with one, or both, of them, or on his own. Section 12 of the Act entrusted regulation of the court to the Lord Chancellor. Jones v Lock (1865) 1 ChA 25 is a familiar example of the Lord Chancellor sitting on his own to hear an appeal.

[FN28]. Of the Lord Chancellors of the period, Lord Campbell (1859-1861) - see Slim v Croucher (1860) 45 ER 462 - and Lord Westbury (1861-1865) were more in favour of "making representations good" than Lord Cranworth (1852-1858 and 1865-1866) from whom Lewis Llewelyn Dillwyn might have received short shrift: supra, note 2.

[FN29]. Supra, note 19.

[FN30]. Though they were mainly decisions of Romilly MR - supra, note 18. He was the son of the noted reformer,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC    Document 461-7    Filed 01/05/2007    Page 13 of 14

2000 SINGJLS 162                                                                Page 13
2000 Sing. J. Legal Stud. 162
**(Cite as: 2000 Sing. J. Legal Stud. 162)**

Sir Samuel Romilly, and was the last member of the House of Commons to retain his seat after appointment as a judge.

[FN31]. Perhaps there was a celebration at the Athenaeum, of which Lord Westbury too was a member - see TA Nash: The Life of Richard Lord Westbury, Vol I (1888), at 306.

[FN32]. It is adequately reported in The Times for 29 November 1955; see also [1955] CLY para 2848.

[FN33]. Fencing and drainage issues required to be settled.

[FN34]. [1999] 3 WLR 1217. It seems that the rents were going to derive from the funds of the Department of Social Security.

[FN35]. This is the doctrine stemming from Lord Kingsdown's speech in Ramsden v Dyson (1866) 1 HL 129. For an accurate modern statement of the doctrine see Taylor Fashions v Liverpool Victoria Trustees [1982] QB 173.

[FN36]. [1999] 3 WLR 1217 at 1242.

[FN37]. Ibid, at 1232.

[FN38]. Ibid, at 1226.

[FN39]. There is discussion of the relevant New South Wales legislation in Walton's Stores v Maher, supra, note 12, at 432-3 and 445-6. There was extended consideration of Equity's role in the related context of part performance in Maddison v Alderson (1883) 8 AC 467. The Court of Appeal in Yaxley v Gotts came near to having to face up to the issue, but managed to avoid it on the facts. They had to contend with the change from the unenforceability of contracts for the disposition of interests in land for want of evidence in writing (under LPA 1925 (UK) s 40, Singapore Civil Law Act s 6 (d)) to such contracts being void for want of a full written record under s 2 of the Law of Property (Miscellaneous Provisions) Act 1989. Maybe the change to voidness necessitated it, but the judges would have been reluctant to accept that, though constructive trusts were exempted from the writing requirement, proprietary estoppel situations were not. Section 2 has created a lot of difficulty; note that Beldam LJ spent several years as Chairman of the Law Commission.

[FN40]. [1991] 1 AC 107.

[FN41]. Eg, Yaxley v Gotts, see note 34, Sledmore v Dalby (1996) 72 C & P Rep 196, Matharu v Matharu (1994) 68 C & P Rep 93, Re Basham [1987] 1 All ER 405, Greasley v Cooke [1980] 1 WLR 1306, Gillett v Holt, The Times 17 March 2000.

[FN42]. See note 24. It went wrong anyway, for Hendrefoilan was sold after Lewis Llewelyn Dillwyn's death, his only son having died the previous year. Daughters were expected to marry (which, like their father and grandfather, they did) out of Quakerdom and into the local aristocracy. But the fiancé of Amy Dillwyn (1845-1935) died and she remained at Hendrefoilan, managing the household after the death of her mother in 1866. Yet she did not inherit it. Instead she was bequeathed the family's zinc smelting works which she ran with vigour and success. She wrote a considerable number of novels and was a well-known figure in London society and on the Riviera.

[FN43]. (1999) 115 LQR 438 at 440. Cf Roger Smith in (ed Rose) Consensus ad Idem (1996) at 235 et seq.

[FN44]. In addition to the cases cited in note 41, supra, a diversity of approach is to be found in eg, Chalmers v Pardoe [1963] 1 WLR 677, Voyce v Voyce (1991) 62 C & P Rep 290, Baker v Baker [1993] 2 FLR 247, Crabb v Arun DC [1976] Ch 103. Very recently, in giving the single judgment of the Court of Appeal in Gillett v Holt, supra, note 41, Robert Walker LJ has suggested an approach to the remedy question which would constitute a great improvement if it were adopted and stuck to. He suggests that "the maximum extent of the remedy" is to be identified first - presumably the expectation - and that the court's aim is then "... to form a view as to what is the minimum required to satisfy it and do justice to the parties." The case concerned a promise to bequeath a farming

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:02-cv-01107-AVC    Document 461-7    Filed 01/05/2007    Page 14 of 14

2000 SINGJLS 162                                                                                                    Page 14
2000 Sing. J. Legal Stud. 162
(Cite as: 2000 Sing. J. Legal Stud. 162)

business rather than just a home. But the same approach to remedy should apply to the various situations that attract proprietary estoppel.

[FN45]. Khew Ah Bah v Hong Ah Mye [1971] 2 MLJ 86.

[FN46]. Ashburn Anstalt v Arnold [1989] Ch 1. Harpum - supra, note 17, at 746-8 - sees greater possibilities of proprietary estoppels binding third parties than I do, and he can certainly cite Duke of Beaufort v Patrick, supra, note 17 in support. More recent cases are not so convincing.

[FN47]. Per LP Thean JA in Asiatic Enterprise Limited v United Overseas Bank [2000] 1 SLR 300 at 312-3.

[FN48]. See ss 95, 115, 128. One at least hopes that "old" notice is excluded.

[FN49]. Supra, note 34, at 1227-8.

[FN50]. [1913] AC 491. Cf Bahr v Nicolay (1988) 164 CLR 604.

[FN51]. There is no time in this lecture to go beyond this situation.

[FN52]. [1979] 1 WLR 431. The report does not reveal what the house was worth.

[FN53]. [1977] 248 EG 947, [1978] 2 EGLR 121.

[FN54]. See the valuable comments on these matters in the Court of Appeal's judgment in Gillett v Holt, supra, note 41.

[FN55]. Supra, note 32. Cf the canal cases and Crabb v Arun DC, supra, note 44, a case which involved a piece of land which had become landlocked and required a permanent right of access.

[FN56]. On this, Sledmore v Dalby, supra, note 41 is illuminating; some cases involve comparatively remote relatives who are simply cashing in.

[FN57]. Supra, note 52.

[FN58]. The rules where an owner merely watches another improve land under a mistake are different - see Taylor Fashions v Liverpool Victoria Trusteess, supra, note 35, at 147.

[FN59]. See Walton's Stores v Maher, supra, note 12, at 449. So far as precedent is concerned, there would seem to be no problem on proprietary estoppel in Singapore. On promissory estoppel there are more but no clear precedents - see Professor Andrew Phang's edition of Cheshire, Fifoot and Furmston's Law of Contract, at 196 et seq.

[FN60]. Supra, note 12, at 427.

*185 Appendix

The Dillwyn Family Tree
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.