**An Overview of the Singapore Legal System**

Chapter 1    The Singapore Legal System [view pdf] [ 新加坡的法律系 ]

Chapter 2    Civil Procedure [view pdf] [ 民事　程序 ]

Chapter 3    Mediation [view pdf]

Chapter 4    International and Domestic Arbitration in Singapore [view pdf]

Chapter 5    Singapore and International Law [view pdf]

Chapter 6    The Conflict of Laws [view pdf]

Chapter 7    Free Trade Agreements: Singapore Legal Developments [view pdf] [ 自由　易　定：新加坡法律体系的　展 ]

**Commercial Laws of Singapore Law**

Chapter 8    The Law of Contract [view pdf]

Chapter 9    Domestic Sale of Goods and Services [view pdf]

Chapter 10    International Sale of Goods [view pdf]

Chapter 11    The Law of Credit and Security [view pdf]

Chapter 12    Intellectual Property Law [view pdf]

Chapter 13    Intellectual Property Licensing [view pdf]

Chapter 14    Forms of Business Organisations [view pdf] [ 企　　形式 ]

Chapter 15    Law of Agency [view pdf]

Chapter 16    Singapore Company Law [view pdf] [ 新加坡公司法 ]

Chapter 17    Corporate Finance and Securities Regulation [view pdf] [ 公司融　与　券　管 ]

Chapter 18    Equity and Trusts [view pdf]

Chapter 19    Restitution [view pdf]

Chapter 20    The Law of Negligence [view pdf]

Chapter 21    Economic Torts [view pdf]

Chapter 22    Banking and Finance [view pdf] [ 　行与金融 ]

Chapter 23    The Law of Guarantees [view pdf]

Chapter 24    Insurance Law [view pdf]

Chapter 25    Shipping Law [view pdf]

Case 3:02-cv-01107-AVC     Document 461-8      Filed 01/05/2007      Page 2 of 27

Chapter 26    Building and Construction Law    [view pdf]

Chapter 27    Competition Law    [view pdf]

**CHAPTER 8     THE LAW OF CONTRACT**

Section 1          Introduction

Section 2          Offer and Acceptance

Section 3          Consideration

Section 4          Intention to Create Legal Relations

Section 5          Terms of the Contract

Section 6          Capacity to Contract

Section 7          Privity of Contract

Section 8          Discharge of Contract

Section 9          Mistake

Section 10         Misrepresentation

Section 11         Duress, Undue Influence and Unconscionability

Section 12         Illegality and Public Policy

Section 13         Judicial Remedies for Breach of Contract

**SECTION 1     INTRODUCTION**

8.1.1     Contract law in Singapore is largely based on the common law of contract in England. Unlike its neighbours Malaysia and Brunei, following Independence in 1965, Singapore's Parliament made no attempt to codify Singapore's law of contract. Accordingly, much of the law of contract in Singapore remains in the form of judge-made rules. In some circumstances, these judge-made rules have been modified by specific statutes.

8.1.2     Many of these statutes are English in origin. To begin with, 13 English commercial statutes have been incorporated as part of the Statutes of the Republic of Singapore by virtue of s 4 of the Application of English Law Act (Cap 7A, 1993 Rev Ed). These are listed in Part II of the First Schedule of this Act. Other statutes, eg the Contracts (Rights of Third Parties) Act (Cap 53B, 2002 Rev Ed), are modelled upon English statutes. There are also other areas where statutory development based on non-English models has taken place, eg the Consumer Protection (Fair Trading) Act (Cap 52A, 2004 Rev Ed) (which was largely drawn from fair trading legislation enacted in Alberta and Sasketchewan).

8.1.3     The rules developed in the Singapore courts do, nevertheless, bear a very close resemblance to those developed under English common law. Indeed, where there is no Singapore authority specifically on point, it will usually be assumed that the position will, in the first instance, be no different from that in England.

### SECTION 2     OFFER AND ACCEPTANCE

*Agreement*

8.2.1     A contract is essentially an agreement between two or more parties, the terms of which affect their respective rights and obligations which are enforceable at law. Whether the parties have reached agreement, or a meeting of the minds, is objectively ascertained from the facts. The concepts of offer and acceptance provide in many, albeit not all, cases the starting point for analysing whether agreement has been reached.

*Offer*

8.2.2     An offer is a promise, or other e8pression of willingness, by the 'offeror' to be bound on certain specified terms upon the unqualified acceptance of these terms by the person to whom the offer is made (the 'offeree'). Provided the other formation elements (ie consideration and intention to create legal relations) are present, the acceptance of an offer results in a valid contract.

8.2.3     Whether any particular statement amounts to an offer depends on the intention with which it is made. An offer must be made with the intention to be bound. On the other hand, if a person is merely soliciting offers or requesting for information, without any intention to be bound, at best, he or she would be making an invitation to treat. Under the objective test, a person may be said to have made an offer if his or her statement (or conduct) induces a reasonable person to believe that the person making the offer intends to be bound by the acceptance of the alleged offer, even if that person in fact had no such intention.

*Termination of Offer*

8.2.4     An offer may be terminated by withdrawal at any time prior to its acceptance, provided there is communication, of the withdrawal to the offeree, whether by the offeror or through some reliable source. Rejection of an offer, which includes the making of a counter-offer or a variation of the original terms, terminates the offer. In the absence of an express stipulation as to time, an offer will lapse after a reasonable time. What this amounts to depends on the particular facts of the case. Death of the offeror, if known to the offeree, would render the offer incapable of being accepted by the offeree. Even in the absence of such knowledge, death of either party terminates any offer which has a personal element.

*Acceptance*

8.2.5     An offer is accepted by the unconditional and unqualified assent to its terms by the offeree. This assent may be expressed through words or conduct, but cannot be inferred from mere silence save in very exceptional circumstances.

8.2.6     As a general rule, acceptance must be communicated to the offeror, although a limited exception exists where the acceptance is sent by post and this method of communication is either expressly or impliedly authorised. This exception, known as the 'postal acceptance rule', stipulates that acceptance takes place at the point when the letter of acceptance is posted, whether or not it was in fact received by the offeror.

*Certainty*

8.2.7    Before the agreement may be enforced as a contract, its terms must be sufficiently certain. At the least, the essential terms of the agreement should be specified. Beyond this, the courts may resolve apparent vagueness or uncertainty by reference to the acts of the parties, a previous course of dealing between the parties, trade practice or to a standard of reasonableness. On occasion, statutory provision of contractual details may fill the gaps. For more on implication of terms, see Paragraphs 8.5.5 to 8.5.8 below.

*Completeness*

8.2.8    An incomplete agreement also cannot amount to an enforceable contract. Agreements made 'subject to contract' may be considered incomplete if the intention of the parties, as determined from the facts, was not to be legally bound until the execution of a formal document or until further agreement is reached.

*Electronic Transactions Act*

8.2.9    The Electronic Transactions Act (Cap 88, 1999 Rev Ed) ('ETA') clarifies that, except with respect to the requirement of writing or signatures in wills, negotiable instruments, indentures, declarations of trust or powers of attorney, contracts involving immovable property and documents of title (s 4(1)), electronic records may be used in expressing an offer or acceptance of an offer in contract formation (s 11). A declaration of intent between contracting parties may also be made in the form of an electronic record (s 12). The ETA also clarifies when an electronic record may be attributed to a particular person (s 13) and how the time and place of despatch and receipt of an electronic record are to be determined (s 15).

## SECTION 3    CONSIDERATION

*Definition*

8.3.1    A promise contained in an agreement is not enforceable unless it is supported by consideration or it is made in a written document made under seal. Consideration is something of value (as defined by the law), requested for by the party making the promise (the 'promisor') and provided by the party who receives it (the 'promisee'), in exchange for the promise that the promisee is seeking to enforce. Thus, it could consist of either some benefit received by the promisor, or some detriment to the promisee. This benefit/detriment may consist of a counter promise or a completed act.

*Reciprocity*

8.3.2    The idea of reciprocity that underlies the requirement for consideration means that there has to be some causal relation between the consideration and the promise itself. Thus, consideration cannot consist of something that was already done before the promise was made. However, the courts do not always adopt a strict chronological approach to the analysis.

*Sufficiency*

8.3.3    Whether the consideration provided is sufficient is a question of law, and the court is not, as a general rule, concerned with whether the value of the

consideration is commensurate with the value of the promise. The performance of, or the promise to perform, an existing public duty imposed on the promisee does not, without more, constitute sufficient consideration in law to support the promisor's promise. The performance of an existing obligation that is owed contractually to the promisor is capable of being sufficient consideration, if such performance confers a real and practical benefit on the promisor. If the promisee performs or promises to perform an existing contractual obligation that is owed to a third party, the promisee will have furnished sufficient consideration at law to support a promise given in exchange.

### Promissory Estoppel

8.3.4    Where the doctrine of promissory estoppel applies, a promise may be binding notwithstanding that it is not supported by consideration. This doctrine applies where a party to a contract makes an unequivocal promise, whether by words or conduct, that he or she will not insist on his or her strict legal rights under the contract, and the other party acts, and thereby alters his or her position, in reliance on the promise. The party making the promise cannot seek to enforce those rights if it would be inequitable to do so, although such rights may be reasserted upon the promisor giving reasonable notice. The doctrine prevents the enforcement of existing rights, but does not create new causes of action.

## SECTION 4    INTENTION TO CREATE LEGAL RELATIONS

### Contractual Intention

8.4.1    In the absence of contractual intention, an agreement, even if supported by consideration, cannot be enforced. Whether the parties to an agreement intended to create legally binding relations between them is a question determined by an objective assessment of the relevant facts.

### Commercial Arrangements

8.4.2    In the case of agreements in a commercial context, the courts will generally presume that the parties intended to be legally bound. However, the presumption can be displaced where the parties expressly declare the contrary intention. This is often done through the use of honour clauses, letters of intent, memoranda of understanding and other similar devices, although the ultimate conclusion would depend, not on the label attached to the document, but on an objective assessment of the language used and on all the attendant facts.

### Social Arrangements

8.4.3    The parties in domestic or social arrangements are generally presumed not to intend legal consequences.

## SECTION 5    TERMS OF THE CONTRACT

### Express Terms

8.5.1    The rights and obligations of contracting parties are determined by first, ascertaining the terms of the contract, and secondly, interpreting those terms. In ascertaining the terms of a contract, it is sometimes necessary, especially where the contract has not been reduced to writing, to decide whether a particular statement is a contractual term or a mere representation. Whether a statement is

contractual or not depends on the intention of the parties, objectively ascertained, and is a question of fact. In ascertaining the parties' intention, the courts take into account a number of factors including the stage of the transaction at which the statement was made, the importance which the representee attached to the statement and the relative knowledge or skill of the parties vis-à-vis the subject matter of the statement.

8.5.2    Once the terms of a contract have been determined, the court applies an objective test in construing or interpreting the meaning of these terms. What is significant in this determination therefore is not the sense attributed by either party to the words used, but how a reasonable person would understand those terms. In this regard, Singapore courts have consistently emphasised the importance of the factual matrix within which the contract was made, as this would assist in determining how a reasonable man would have understood the language of the document.

8.5.3    Where the parties have reduced their agreement into writing, whether a particular statement (oral or written) forms part of the actual contract depends on the application of the parol evidence rule. In Singapore, this common law rule and its main exceptions are codified in s 93 and s 94 of the Evidence Act (Cap 97, 1997 Rev Ed). Section 93 provides that where 'the terms of a contract...have been reduced ...to the form of a document..., no evidence shall be given in proof of the terms of such contract ...except the document itself'. Thus, no evidence of any oral agreement or statement may be admitted in evidence to contradict, vary, add to, or subtract from the terms of the written contract. However, secondary evidence is admissible if it falls within one of the exceptions to this general rule found in the proviso to s 94. Some controversy remains as to whether s 94 is an exhaustive statement of all exceptions to the rule, or whether other common law exceptions not explicitly covered in s 94 continue to be applicable.

8.5.4    It should, however, be noted that the scope of s 93 and s 94 has been circumscribed by Parliament in certain circumstances.

***Implied Terms***

8.5.5    In addition to those expressly agreed terms, the court may sometimes imply terms into the contract.

8.5.6    Generally, any term to be implied must not contradict any express term of the contract.

8.5.7    Where a term is implied to fill a gap in the contract so as to give effect to the presumed intention of the parties, the term is implied in fact and depends on a consideration of the language of the contract as well as the surrounding circumstances. A term will be implied only if it is so necessary that both parties must have intended its inclusion in the contract. The fact that it would be reasonable to include the term is not sufficient for the implication, as the courts will not re-write the contract for the parties.

8.5.8    Terms may also be implied because this is required statutorily, or on public policy considerations. The terms implied by the Sale of Goods Act (Cap 393, 1994 Rev Ed) (eg s 12(1) – that the seller of goods has a right to sell the goods) provide examples of the former type of implied terms. As for the latter, whilst there has been no specific authority on the point, it is not inconceivable that Singapore courts, like their English counterparts, may imply 'default' terms

into specific classes of contracts to give effect to policies that define the contractual relationships that arise out of those contracts.

### Classification of Terms

8.5.9    The terms of a contract may be classified into conditions, warranties or intermediate (or innominate) terms. Proper classification is important as it determines whether the contract may be discharged or terminated for breach [as to which see Paragraphs 8.8.11 to 8.8.12 below].

8.5.10   The parties may expressly stipulate in the contract how a particular term is to be classed. This is not, however, conclusive unless the parties are found to have intended the technical meaning of the classifying words used. In the absence of express stipulation, the courts will look objectively at the language of the contract to determine how, in light of the surrounding circumstances, the parties intended a particular term to be classed. There are also instances where statutes may stipulate whether certain kinds of terms are to be treated as conditions or warranties, in the absence of any specific designation by the contracting parties.

### Exception Clauses

8.5.11   Exception clauses that seek to exclude or limit a contracting party's liability are commonly, but not exclusively, found in standard form agreements. The law in Singapore relating to such clauses is essentially based on English law. The English Unfair Contract Terms Act 1977, which either invalidates an exception clause or limits the efficacy of such terms by imposing a requirement of reasonableness, has been re-enacted in Singapore as the Unfair Contract Terms Act (as Cap 396, 1994 Rev Ed).

### Incorporation

8.5.12   Whether an exception clause will have its intended effect depends on a number of factors. The threshold requirement is that the clause must have been incorporated into the contract. There are generally three ways in which such incorporation may occur. Where a party has signed a contract which contains an exception clause, the signatory is bound by the clause, even if he or she had not read or was unaware of the clause. An exception clause may also be incorporated, in the absence of a signed contract, if the party seeking to rely on the clause took reasonably sufficient steps to draw the other party's attention to the existence of the clause. The determination of this issue is heavily dependent on the facts of the particular case. Finally, exception clauses may be incorporated because there has been a consistent and regular course of dealing between the parties on terms that incorporate the exception clause. Even if no steps were taken to incorporate the clause in a particular contract between such parties, it may have been validly incorporated by the parties' prior course of dealing.

### Construction

8.5.13   The next consideration is one of construction (or interpretation). This is necessary to determine if the liability, which the relevant party is seeking to exclude or restrict, falls within the proper scope of the clause. Here, the courts adopt the contra proferentum rule of construction, and will construe exception clauses strictly against parties seeking to rely on them. Nevertheless, the Singapore courts appear to construe clauses which seek to limit liability more liberally than those which seek to completely exclude liability.

### Unfair Contract Terms Act

8.5.14    Finally, the limits placed by the Unfair Contracts Terms Act (Cap 396, 1994 Rev Ed) (the 'UCTA') on the operation and efficacy of exceptions clauses must be considered. It should be noted that the UCTA generally applies only to terms that affect liability for breach of obligations that arise in the course of a business or from the occupation of business premises. It also gives protection to persons who are dealing as consumers. Under the UCTA, exception clauses are either rendered wholly ineffective, or are ineffective unless shown to satisfy the requirement of reasonableness. Terms that attempt to exclude or restrict a party's liability for death or personal injury resulting from that party's negligence are rendered wholly ineffective by the UCTA, while terms that seek to exclude or restrict liability for negligence resulting in loss or damage other than death or personal injury, and those that attempt to exclude or restrict contractual liability, are subject to the requirement of reasonableness. The reasonableness of the exception clause is evaluated as at the time at which the contract was made. The actual consequences of the breach are therefore, in theory at least, immaterial.

## SECTION 6    CAPACITY TO CONTRACT

### Minors

8.6.1    Under Singapore common law, a minor is a person under the age of 21. The validity of contracts entered into by minors is governed by the common law, as modified by the Minors' Contracts Act (Cap 389, 1994 Rev Ed).

### Contracts with Minors

8.6.2    As a general rule, contracts are not enforceable against minors. However, where a minor has been supplied with necessaries (ie goods or services suitable for the maintenance of the station in life of the minor concerned: see also s 3(3), Sale of Goods Act (Cap 393, 1999 Rev Ed)), the minor must pay for them. Contracts of service which are, on the whole, for the minor's benefit are also valid. The minor is also bound by certain types of contracts (ie contracts concerning land or shares in companies, partnership contracts and marriage settlements), unless the minor repudiates the contract before attaining majority at age 21 or within a reasonable time thereafter.

### Minors' Contracts Act

8.6.3    Under s 2 of the Minors' Contracts Act, a guarantee given in respect of a minor's contract, which may not be enforceable against the minor, is nevertheless enforceable against the guarantor. Section 3(1) of the Minors' Contracts Act empowers the court to order restitution against the minor if it is just and equitable to do so.

### Mental Incapacity and Drunkards

8.6.4    A contract entered into by a person of unsound mind is valid, unless it can be shown that that person was incapable of understanding what he or she was doing and the other party knew or ought reasonably to have known of the disability. In this case, the contract may be avoided at the option of the mentally unsound person (assisted by a court-sanctioned representative where necessary). The same principle applies in the case of inebriated persons. Under s 3(2) of the Sale of Goods Act, persons incapacitated mentally or by drunkenness are required to pay a reasonable price for necessaries supplied.

*Corporations*

8.6.5    Subject to any written law and to any limits contained in its constitution, a company has full capacity to undertake any business, do any act or enter into any transaction (s 23 – Companies Act, Cap 50, 1994 Rev Ed). Where there are restrictions placed on the capacity of a company and the company acts beyond its capacity, s 25 of the Companies Act validates such ultra vires transactions if they would otherwise be valid and binding. Contracts purportedly entered into by a company prior to its incorporation may be ratified and adopted by the company after its formation (s 41 – Companies Act).

8.6.6    A limited liability partnership is also a body corporate under Singapore law – see Limited Liability Partnerships Act 2005 (Act No 5 of 2005). It may, in its own name: sue and be sued in its own name; acquire, own, hold and develop property; hold a common seal; and may do and suffer such other acts and things as any body corporate may lawfully do and suffer – see s 5(1). Section 5(2) also extends s 41 of the Companies Act to apply to a limited liability partnership.

## SECTION 7    PRIVITY OF CONTRACT

### *Third party Enforcement of Contractual Rights Generally not Permitted*

8.7.1    As a general proposition, only persons who are party (ie 'privy') to a contract may enforce rights or obligations arising from that contract. This is sometimes referred to as the 'privity rule.'

8.7.2    A third party who is not privy to a contract is generally not allowed to bring any legal action in his or her own name for breach of contract against a contracting party who fails to perform his or her contractual obligations, even if such failure of performance has caused the third party to suffer a loss.

### *When is Someone Party or Privy to a Contract?*

8.7.3    There is no clear definition as to when a person is/is not privy to a contract. Generally, a party who is an offeror or offeree will be privy to the contract. However, it seems that merely being mentioned in the contract is not enough.

8.7.4    It is, nevertheless, possible to have a multilateral contract where there are multiple offerees (one or more of whom accept the offer on behalf of the others) or where there are multiple offerors (one or more of whom make the offer on behalf of the others). In either case, each offeree or offeror is a joint party to the contract and the privity rule will not apply to them.

### *Non-statutory Exceptions to the Privity Rule*

8.7.5    The privity rule is not absolute. It is subject to many exceptions. Apart from the possibility of a multilateral or multi-party contract (mentioned above), some other exceptions can be found in the law relating to: (a) agency; (b) trusts; or (c) land (in relation to covenants which 'run' with the land or lease). For an in depth discussion of these other legal techniques to circumvent the privity rule, see Chapters 15 and 18.

*Statutory Exceptions to the Privity Rule*

8.7.6    There are also statutory exceptions. Most of these are only applicable to specific and narrowly defined cases. Two examples of such statutes include: (a) the Bills of Exchange Act (Cap 23, 1985 Rev Ed) [see Chapter 22 on Banking Law]; and (b) the Bills of Lading Act (Cap 384, 1994 Rev Ed) [see Chapter 25 on Shipping Law]. Of more general application, the Singapore Parliament enacted the Contracts (Rights of Third Parties) Act (Cap 53B, 2002 Rev Ed) in 2001.

*Contracts (Rights of Third Parties) Act*

8.7.7    Section 1 provides that the Contracts (Rights of Third Parties) Act has no retrospective effect – it cannot apply to any contract formed before 1 January 2002. Section 1 also provides that the Act does not apply to any contracts which were formed on or after 1 January 2002, but before 1 July 2002, unless the contracting parties expressly provided in their contract for it to do so. Contracts formed on or after 1 July 2002 are always subject to the Act.

8.7.8    Where the Act applies, it gives a third party a statutory right to enforce a term of a contract against a party who is in breach of his or her obligations under the contract (the 'promisor'), even though even though the third party is a volunteer who has not provided any contractual consideration – see s 2(5).

8.7.9    This may occur if either: (a) the contract expressly provides that the third party may enforce a term of the contract in his or her own right – s 2(1)(a); or (b) the contract, 'purports to confer a benefit on the third party' – s 2(1)(b). However, s 2(1)(b) is qualified: a third party will not be granted the direct statutory right of suit in the absence of an express provision permitting him or her to do so, 'if, on a proper construction of the contract, it appears that the parties did not intend the term to be enforceable by the third party.' – s 2(2).

8.7.10    This statutory right of enforcement is not just limited to cases where the promisor is under an obligation to act to confer a positive benefit on the third party. 'Negative' benefits, such as the benefit of a term excluding or limiting the third party's legal liabilities to the promisor, may also be enforced –s 2(5).

8.7.11    The third party's statutory right of enforcement against the promisor is qualified in a number of ways. First, the third party's statutory right of recovery may be qualified by a defence or set-off which the promisor would have been able to assert vis-à-vis the other party to the contract (the 'promisee') – s 4. Second, any sum to be recovered by the third party pursuant to the Act may be reduced to take into account sums recovered by the promisee from the promisor in respect of the promisor's breach – s 6.

8.7.12    Once third party rights are created under the Act, certain restrictions are imposed on the ability of the parties to the contract to vary or rescind their contract if this would extinguish or alter the third party's rights under the Act – s 3.

8.7.13    Though wider in its scope than many of the other legal techniques for circumventing privity, the Act is not of universal application. Section 7 of the Act sets out a number of situations where the Act does not apply.  Excluded cases include: (a) contracts on a bill of exchange, promissory note or other negotiable instrument; (b) limited liability partnership agreements as defined under the Limited Liability Partnerships Act 2005 (Act 5 of 2005); (c) the statutory contract binding a company and its members under s39 of the Companies Act (Cap 50, 1994 Rev Ed); (d) third party enforcement of any term of an employment

contract against an employee; and (e) third party enforcement of any term (apart from any exclusion or limitation of liability for the benefit of the third party) in a contract for carriage of goods by sea, or a contract for the carriage of goods or cargo by rail, road or air, if such contract is subject to certain international transport conventions.

## SECTION 8    DISCHARGE OF CONTRACT

### Discharge by Performance

8.8.1    If all the contractual obligations as defined by the terms of the contract are fully performed, the contract is brought to an end or 'discharged' by performance. In theory, such performance must be precise. However, trivial defects in performance may be ignored as being negligible or 'de minimis.' In addition, where full performance is only possible with the cooperation of the other party (as is almost invariably the case with obligations of payment or delivery), tender of performance in circumstances where the other party refuses to accept it is generally deemed to be equivalent to full performance so as to discharge the contract.

### Non- or Defective Performance

8.8.2    In the event that a contractual obligation is not performed or is performed defectively in a non-trivial fashion, Singapore law provides for a variety of legal responses and remedies, depending on the nature of the failure of performance.

### Lawful Excuses for Breach of Contract

8.8.3    If the failure of performance is not subject to any lawful excuse, the contract is said to be 'breached.' In this context, 'lawful excuses' may take the following forms.

### Discharge by Agreement

8.8.4    First, just as parties are free to agree to bind themselves to a contract, they are free to negotiate with each other to release themselves from the obligations of that contract. Such agreement may well have been built into the original contract, for example, where parties agree that their original agreement be terminable by giving notice of termination, or upon lapse of a specified period of time. Alternatively, contracting parties may release themselves from the obligations of the original contract by entering into a subsequent contract of release. Where each contractual party is still subject to contractual obligations which have yet to be performed, the mutual release of their outstanding obligations is generally effective under Singapore law without the need for any further formalities or any other consideration. However, where the party who is owed the obligation in question does not have any outstanding obligations under the original contract, the party seeking to be released from that obligation will have to provide some form of valuable consideration in exchange for the release. In the alternative, the release must be executed under seal to be effective.

8.8.5    Secondly, it may be that the obligation which has not been performed is conditional upon the prior occurrence of certain specified events: these may be external events, or some contractually specified counter-performance by the other party to the contract.

8.8.6    Thirdly, the parties may contractually provide for non-performance following from certain events to be excused so as not to amount to a breach, for example, in the form of a 'force majeure' clause. At the very least, such a clause will hold all parties innocent of liability for non-performance following the specified force majeure event. More detailed force majeure clauses may also make provision for issues such as the return and refund of advance payments, reimbursements for expenses incurred in preparation of the performance of the contract, and so forth. Such provisions will generally be given effect by Singapore law.

### Discharge by Frustration

8.8.7    Fourthly, where the reason for the failure of performance lies in events beyond the control of the contracting parties and which neither party could have reasonably foreseen, the contract is said to be 'frustrated'.   In such cases, there are statutory rules which set out the extent to which advance payments made before the frustrating event intervened may be refunded and work done in preparation of the performance of the contract in advance of the frustrating event may be reimbursed – see Frustrated Contracts Act (Cap 115, 1985 Rev Ed) s 2(2) and s 2(4) respectively. Section 2(3) of the Frustrated Contracts Act also empowers the Singapore courts to make valuations of any non-money benefits which may have been conferred by one contracting party on another, prior to the frustrating event, and to order the recipient of those benefits to pay for such value received.

### Effects of a Breach of Contract

8.8.8    In the absence of a lawful excuse, a breach of contract has two significant effects.

### Contract Damages

8.8.9    First, if the breach of contract by one contracting party (the 'party-in-breach') causes loss to the other (the 'aggrieved party'), the party-in-breach may be ordered by the courts to compensate the aggrieved party in money damages for those losses, in lieu of the primary obligations left unperformed under the contract. However, contractual damages (which are compensatory and not punitive in nature), is not the only judicial remedy available. Other types of remedies may be available in lieu, or sometimes, in addition to damages, depending on the nature of the obligation which has been breached. [See Section 13 below].

### Right to Elect to Discharge for Breach

8.8.10   Second, the breach may give the aggrieved party the right to bring the contract to an end, ie to discharge the contract for breach. In this connection, it is useful to distinguish actual breaches of contract (wherein the breach occurs at the actual time of performance as specified by the contract) from anticipatory breaches of contract (wherein the breach is said to occur in advance of the contractually stipulated time of performance).

### Actual Breach Giving Rise to Right of Discharge

8.8.11   In the case of an actual breach of contract, the aggrieved party may elect to discharge the contract for breach if the contractual term which has been breached is: (a) a 'condition'; or (b) an 'innominate term,' the breach of which

deprives the aggrieved party of substantially the whole of the benefit of the contract. In such a case, the aggrieved party may choose to discharge the contract for breach.

8.8.12    The aggrieved party has no such power of election if the contractual term which has actually been breached is: (a) a 'warranty'; or (b) an 'innominate term,' the breach of which does not deprive the aggrieved party of substantially the whole of the benefit of the contract. In such a case, the contract will persist despite the breach (unless the contract is brought to an end by some other event).

8.8.13    For details as to how a contract term may be categorised as a 'condition,' a 'warranty' or an 'innominate term,' see Paragraphs 8.5.9 to 8.5.10 above.

### Discharge by Actual Breach

8.8.14    If the aggrieved party is entitled to discharge the contract and elects to do so, the contract is brought to an end prospectively. That is, the contract ceases to bind the parties to the contract from the time the election is effectively communicated to the other contracting parties. Such communication may take the form of words, acts, or even (in exceptional cases) silence. Prior to that time, such an election may be withdrawn. Following an effective discharge, the parties are released from all outstanding contractual obligations.

### Affirmation of Contract Following an Actual Breach

8.8.15    The aggrieved party may choose, however, not to discharge the contract. Instead, the aggrieved party may choose to affirm the contract, thereby giving the party-in-breach another opportunity to rectify the non-performance or defective performance. If so, the entire contract is kept alive and the aggrieved party loses the right to have the contract discharged (although the right to sue the party-in-breach and recover money damages for any losses incurred as a result of the delay in procuring full performance may well be retained, unless the aggrieved party also elects to waive his or her right to compensatory money damages).

### Anticipatory Repudiatory Breach

8.8.16    A breach of contract may also occur anticipatorily (in advance of the time of actual performance). If this breach is also repudiatory (where the evidence demonstrates that one party intends not to be bound by the terms of the contract, nor to honour his or her contractual obligations as and when they fall due), the aggrieved party has the right to choose whether to discharge or to affirm the contract. 'Repudiatory' intentions will be more readily proved where there are clear and express communications by the purported party-in-breach to such effect. However, they can also be inferred from actions or steps taken by the purported party-in-breach which render it impossible for his or her obligations to be performed when they become due.

### Effect of Discharge by Anticipatory Repudiatory Breach

8.8.17    Significantly, a party aggrieved by an anticipatory repudiatory breach may exercise his or her right to discharge the contract immediately without waiting until the time of actual performance. If the aggrieved party elects to discharge the contract, the contract is immediately and prospectively brought to an end. The aggrieved party is then entitled to sue the party-in-breach for

damages as compensation for any loss suffered by the aggrieved party as a result of the non-performance of the contract.

### Effect of Affirmation Following an Anticipatory Repudiatory Breach

8.8.18    On the other hand, the aggrieved party may elect to affirm the contract. If so, the contract continues to bind all parties to the contract and the anticipatory breach is ignored. Consequently, once the aggrieved party affirms the contract, there can be no liability for money damages for that anticipatory breach since it is treated as if the breach never occurred.

### Limits on Right of Election to Affirm Contact

8.8.19    Although the aggrieved party's right of election to discharge/affirm a contract following an actual/anticipatory breach is largely unqualified, the English case of White & Carter (Councils) Ltd v McGregor [1962] AC 413 suggests that this right is limited under English law. However, it is arguable that the limitation is less strict in Singapore. In MP-Bilt Pte Ltd v Oey Widarto [1999] 3 SLR 592, the Singapore High Court adopted the limitations set out in White & Carter v McGregor that the aggrieved party may only elect to affirm a contract (despite the other contracting party's breach) if the aggrieved party was reasonably able to perform his or her part of the contract without the need for any cooperation from the party-in-breach and if the aggrieved party had a legitimate interest in doing so. However, the High Court stated that these limitations would not apply when the aggrieved party 'is under a legal obligation or practical compulsion to complete performance of the contract in question and other contracts he has entered into on the basis of the contract in question.' – at p 607. Consequently, it appears that an aggrieved party's freedom to elect to affirm a contract may be less strongly curtailed in Singapore as compared with the case in England.

## SECTION 9    MISTAKE

### Introduction

8.9.1    If one or both parties enter into a contract under a misapprehension of its basis, or of an important aspect of the transaction, the contract may either be completely void, or voidable. In the latter case, the contract is valid until it is rescinded (or set aside) by the mistaken party. This distinction is critical for determining third party rights – see Paragraph 8.9.12 below. Whether a mistake has the effect of rendering a contract void or voidable depends on the manner in which the mistake arises.

### Mutual Mistake

8.9.2    If A contracts with B believing that he is purchasing X but B is in fact intending to sell Y to A, there is no contract between A and B because they have failed to reach any agreement on the subject matter of the contract. Mistakes of this nature are commonly referred to as 'mutual mistakes'. A 'contract' entered into under a mutual mistake (relating to a fundamental aspect of the contract) is void.

### Common Mistake

8.9.3    A 'common mistake' arises when an agreement is reached on the basis of a mistaken assumption or belief shared by both parties. This occurs, for instance, when A contracts to sell a consignment of goods to B but unknown to both

parties, the goods had been destroyed by the time the contract was formed. In this situation, owing to the destruction or non-existence of the subject matter, the contract may justifiably be regarded as invalid and void even though it is otherwise properly formed.

8.9.4    The more problematic situation arises when the common mistake relates to a less fundamental matter, such as the quality of a subject matter of the contract (as opposed to its existence). Here, the law has to strike an appropriate balance between doing justice to the party disadvantaged by the mistake and protecting the counter party's legitimate expectation that the contractual bargain would be upheld. The common law and equity respond to this problem in different ways (on the distinction between common law and equitable rules, see [Chapters 1 and 18 – Singapore Legal System and Trusts]).

### Common Mistake at Common Law

8.9.5    At common law, precedence is given to upholding bargains. Thus, a common mistake as to quality would not, generally, render a contract void unless the mistake has the effect of rendering the subject matter of the contract essentially and radically different from what the parties believed it to be. The ambit of the common law doctrine is therefore extremely narrow, having little application outside cases involving non-existent or destroyed subject matter.

### Common Mistake in Equity

8.9.6    Equity, in comparison, permits a more liberal approach: even if a mistake is not sufficiently fundamental to render a contract void at common law, it may still be set aside provided that the mistake is sufficiently serious.

8.9.7    Distinguishing between the different degrees of 'fundamental' mistakes that are operative at common law and in equity is a difficult task. Nevertheless, the Singapore Court of Appeal's recent observations appear to favour the retention of this two-prong approach (Chwee Kin Keong v Digilandmall.com Pte Ltd [2005] 1 SLR 502).   This may be contrasted with the position in England, where the more flexible equitable rule appears to have been abolished (Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd [2003] QB 679).

### Unilateral Mistake

8.9.8    A contract may also be affected by a 'unilateral mistake', that is when only one party is acting under a mistake. For purposes of discussion, it is convenient to distinguish between the following two cases: (a) where the mistake relates to the identity of a contracting party, and (b) those where the mistake relates to a term of the contract.

### Unilateral Mistake as to Identity

8.9.9   First, unilateral mistakes as to identity typically involve cases where one party's consent to an agreement is procured by deception. If A agrees to sell his car to B (who has deceived A into believing that B is C), the contract is affected by A's unilateral mistake as to B's true identity provided that it is clear that B's identity is material, ie an important factor which induced the contract. As between A and B, it is not essential to determine whether such a mistake renders the contract void or voidable, since A, the mistaken party, would have the right to set aside the contract in either case. However, the distinction becomes critical if B has sold the car to T (an innocent third party who acquires the car without notice of B's deception ) before A discovers the fraud. If the mistake has the effect of

rendering the contract between A and B void, A will be able to recover the car from T because B, not having acquired any property right in the car, has nothing to sell to T. In the converse situation where the contract between A and B is merely voidable, B would have acquired property rights in the car, which he could subsequently transfer to T. A is therefore unable to recover against T in this instance.

8.9.10    Disputes involving mistakes as to identity are invariably 'hard' cases that are not amenable to simple analyses because they often require the court to prefer one of two innocent parties. Nevertheless, it may be observed that the general approach in these cases requires examination of the facts to ascertain whether there is in fact an agreement between the mistaken party and the (fraudulent) counter party. Thus, if A intends to sell his car only to C, then no agreement is reached between A and B when B attempts to purchase the car by pretending to be C. Such intention may, for instance, be inferred from the fact that A's offer is expressly addressed to C, or where there is a written contract purportedly made between A and C (although fraudulently signed by B on C's behalf). However, where A and B transact face-to-face, there is a presumption that they intend to deal with the physical person present, in which case A is presumed to have intended to contract with B, the fraudster. Such a presumption may, however, be rebutted by clear evidence to the contrary.

### Unilateral Mistake as to a Term

8.9.11    Secondly, there is the category of unilateral mistakes as to terms of the contract. If A enters into a contract under a misapprehension as to a particular important term (other than the identity of the other party, B), and the mistake is known to B, such a mistake may render the contract void at common law. The Singapore Court of Appeal has recently clarified (in Chwee Kin Keong v Digilandmall.com Pte Ltd [2005] 1 SLR 502) that this common law doctrine is confined to cases where the non-mistaken party, B, has actual knowledge of A's mistake. In addition, if a case does not fall within the ambit of the common law doctrine (because, for instance, it has not been established that B has actual knowledge of A's mistake), the court may nevertheless exercise its equitable power to set the contract aside if B is guilty of unconscionable conduct. This may arise where B suspects that A is labouring under a mistake but consciously omits to disabuse A of his error.

### Documents Mistakenly Signed

8.9.12    Generally, a person of full age and understanding who has signed a written contract is bound by it even if he or she has not read it. Exceptionally, a signatory to a contract may be able to set it aside if it is fundamentally or radically different from what the signatory believed it to be, as may occur if the signatory's understanding is limited by some innate incapacity, or when he or she has been tricked into signing it. This defence cannot, however, be invoked by a person who has been negligent in signing the document.

### Documents Mistakenly Recorded

8.9.13    If a written contract does not, by reason of a mistake, accurately record the agreement between the parties, the court may rectify the contract so as to give effect to the parties' true intention. Originally, the remedy of rectification was only available in cases where the mistake is shared by both parties, but was subsequently extended to situations where only one party is mistaken, and such mistake is known to the other party.

## SECTION 10     MISREPRESENTATION

### *Representation*

8.10.1     A contract which is induced by a misrepresentation may be set aside, and may give rise to an action for damages. A misrepresentation occurs when one party to a contract makes a false statement of fact to the other contracting party which induces the latter to enter into the contract. To be operative, the false representation must relate to a past or present fact. It follows that a vague or exaggerated statement that is in the nature of a 'puff' does not suffice. Generally, a statement of a party's intention or opinion is also not a sufficient ground for relief. However, if the representor does not honestly hold such intention or opinion, there is a misrepresentation of fact as to the representor's state of mind. A statement of opinion may also be actionable if it is made by a person who professes to have special skill or knowledge in the matter stated. Statements of law appear still to be excluded from the ambit of operative representations, although the correctness of this position must now be doubted in light of the abolition of this distinction in the context of mistakes (see [Chapter 19 on Restitution — Mistaken Payments]).

8.10.2     A representation may be express, or it may be inferred from the representor's conduct. On its own, silence or non-disclosure does not usually constitute a representation.   There are, however, exceptions to this general rule. If a party makes a positive but incomplete disclosure, the omitted disclosure may amount to a misrepresentation if it has the effect of distorting the truth of the information disclosed. Similarly, a failure to correct an earlier (and continuing) representation that was true at the time it was made but which has subsequently become incorrect is actionable. A failure to disclose material facts whilst negotiating contracts uberrimae fidei, such as insurance contracts, would also give rise to an action for misrepresentation.

8.10.3     Generally, a misrepresentation must also be material, in the sense that it relates to a matter which would influence a reasonable person's decision whether to enter into the contract. If a representation is ambiguous and may be interpreted in two (or more) ways, of which one is true and the other false, it is not a misrepresentation unless the representor has intended it to be understood in the sense that is false.

### *Inducement*

8.10.4     Misrepresentation is a ground for relief only where it has induced a contract.   Clearly, if a person is unaware of the representation, or knows that it is untrue, or does not believe it to be true, he or she cannot reasonably have relied on, or be induced by, the representation to enter into the contract. Reliance may also be negated if the representee has independently verified the truth of the representation, although the failure to verify (when the opportunity to do so is available) is not in itself a bar to relief. If the misrepresentation has in fact induced the representee to enter into the contract, it does not matter that it is not the sole inducing factor. The persons who may rely on a representation are not confined to those directly addressed by the representor, but include any person whom the representor intends to reach and influence, even if such a person learns of the representation indirectly from a third party.

### *Rescission*

8.10.5     Once it is established that a contract has been induced by a misrepresentation (whether innocent, negligent or fraudulent), the party induced

may elect to rescind (ie set it aside) or affirm it. The effect of rescission is to release the parties from their contractual obligations, and to restore the parties to their respective positions prior to the making of the contract. The right to rescind will, however, be lost if: (a) the induced party has affirmed the contract; (b) innocent third parties have acquired (for value) rights in the subject matter of the contract; (c) it is no longer possible to restore the parties to their respective prior positions; and (d) (except in the case of fraud) an inordinate period of time has lapsed. It should also be noted that the court may, pursuant to s 2(2) of the Misrepresentation Act (Cap 390, 1994 Rev Ed), award damages in substitution for the right to rescind.

### Damages for Fraudulent Misrepresentation

8.10.6    Whether damages may be awarded for misrepresentation depends on whether the misrepresentation is fraudulent, negligent or innocent. At common law, damages may be awarded for fraudulent misrepresentations. A fraudulent misrepresentation is a false representation that is made: (1) knowingly, (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. In such a case, the representor would have committed the tort of deceit and the representee is permitted to recover for all losses incurred as a consequence of the fraudulent misrepresentation, even for losses which might not have been reasonably foreseeable.

### Common Law Damages for Negligent Misrepresentation

8.10.7    Where an operative misrepresentation results from negligence, the party who has relied on it may obtain damages by commencing an action in the tort of negligence. This requires proof that there is a 'special relationship' between the parties which places the representor under a duty to take reasonable care in furnishing information or advice to the representee, and that the representor has failed to do so. A more extensive survey of the legal principles relating to this branch of the law is contained in [See Chapter 20 on Tort – Negligence]. Recovery in such a case would, however, be restricted to losses which are reasonably foreseeable.

### Statutory Damages for Negligent Misrepresentation

8.10.8    Alternatively, a party who has contracted in reliance on a negligent misrepresentation may claim damages under 2(1) of the Misrepresentation Act (Cap 390, 1994 Rev Ed). In fact, where the issue arises as between contracting parties, this statutory action is generally the preferred route for recovering damages as its requirements are less onerous than those of the common law (tortious) action outlined in Paragraph 8.10.7 above. Under s 2(1), the claimant only has to establish that he or she has contracted in reliance on the other party's misrepresentation, whereupon the latter has the onus of proving that he or she was not negligent in that he or she had reasonable ground for believing in the truth of the statement. In contrast, the claimant in a tortious action bears the burden of proof of all elements of the action, including the existence of a special relationship between the parties, as well as the other party's negligence. The language of the provision suggests that the measure of damages under s 2(1) should be the same as that for fraudulent misrepresentations, which is more liberal than the measure which applies in contract cases [see Paragraph 8.13.10 below] or in cases based on the tort of negligence [see Paragraph 8.10.7 above]. As a matter of principle, however, the contract measure appears to be the more appropriate option.

### Innocent Misrepresentations

8.10.9    Misrepresentations may also be made innocently. In such a case, the claimant is not entitled to damages at common law, but where the claimant still has the right to rescind (and it appears beneficial to do so), the claimant may persuade the court to exercise its discretion under s 2(2) of the Misrepresentation Act to award damages in lieu of rescission. If the court is not so persuaded and the contract is rescinded, the claimant may be compensated for expenses incurred in performing the contract in the form of an 'indemnity'.

### Misrepresentations and Terms

8.10.10    Misrepresentations are usually pre-contractual statements made to induce a person to contract with the representor. A pre-contractual statement which has induced a contract may also have been incorporated as a term of the contract. If so, the person who made the statement would now also be in breach of the contract if the statement turns out to be false. In such an event, damages for breach of contract may be claimed, and s 1 of the Misrepresentation Act makes it clear that the representee may still rescind the contract for misrepresentation. For the test for distinguishing between terms and representations, see Paragraph 8.5.1.

### Excluding Liability For Misrepresentation

8.10.11    Parties to a contract may agree to contractual terms which exclude or limit their liability for misrepresentation, but s 3 of the Misrepresentation Act requires such a term to satisfy the test of reasonableness set out in s 11(1) of the Unfair Contract Terms Act (Cap 396, 1994 Rev Ed). This test has been discussed in Paragraph 8.5.14 above.

### SECTION 11    DURESS, UNDUE INFLUENCE & UNCONSCIONABILITY

### Duress

8.11.1    If A enters into a contract with B as a result of B's coercion (often taking the form of threats of unlawful acts), the contract may be set aside by A on the ground of duress. The types of unlawful or improper pressure that may have this effect include actual or threatened harm to a person, a person's goods or his or her economic interests.

8.11.2    The recognition that economic duress can suffice as a ground for avoiding a contract is a relatively recent development, justified by the concern to prevent a party with strong bargaining power from exploiting the weaker position of the counter party. However, it is not the case that economic duress arises whenever a contract is entered into between parties of unequal bargaining strength. The law recognises that a measure of commercial pressure is inherent in every transaction between such parties, and inequality in bargaining power is a well-accepted (and perhaps necessary) facet of modern commercial life. A plea of economic duress will therefore only succeed in the exceptional case, where a party has used his or her superior bargaining position a way that is illegitimate.

8.11.3    That said, the line between illegitimate pressure and mere commercial (and legitimate) pressure is extremely fine, and where it falls is often dependent on the particular facts of the case. In general, the reasonableness of the parties' respective conduct appears to be an important consideration. For instance, a party who threatens to breach a contract with another if the latter does not agree

to its request for increased payments is not exerting illegitimate pressure if, owing to acute financial conditions, that is the only course available to him. However, where the dominant party makes the same demand for no reason other than an opportunistic desire to exploit the counter party's vulnerability for financial gain, such conduct is less likely to be viewed favourably.

### Undue Influence

8.11.4    The doctrine of undue influence guards against the victimisation of persons by those who exercise dominance or influence over them. The pressure so exerted is generally less direct and acute than that which occurs in cases involving duress. Traditionally, cases involving undue influence fall into two main categories.
Actual undue influence

8.11.5    Under the first category, a contract may be set aside if one utilises one's dominant position over another to procure the latter's consent to the contract. The victim has the burden of proving that the guilty party so dominates the victim's will as to substantially undermine the victim's independence of mind. It is, however, unnecessary to establish that such dominance arises out of a special relationship between the parties, nor that the resulting transaction is manifestly unfair to the victim.

### Presumed Undue Influence

8.11.6    The second category is concerned with situations where, in the absence of proof of actual undue influence, a presumption that one party has acted under the undue influence of another arises. The effect of the presumption is to shift the burden to the defendant to prove that no undue influence has been exercised. The presumption arises in two situations. First, it arises automatically, as a matter of law, from the proof of the existence of certain relationships that are characterized by strong elements of confidence and influence. These include parent-child, guardian-ward, trustee-beneficiary, doctor-patient, lawyer-client, director-company, and religious adviser-disciple relationships. Secondly, although the parties' relationship does not fall into the first-mentioned group, the presumption may nevertheless arise if the claimant is able to establish that he or she has in fact reposed trust and confidence on the other party. It is, however, unsettled as to whether the claimant would also have to establish that the transaction is one which is manifestly disadvantageous.

### Rebutting the Presumption

8.11.7    The presumption may be rebutted by showing that the dominant party did not abuse his or her position and that the subservient party understood what he or she was doing and was in a position to exercise a free judgment based on full information. Generally, it would suffice to demonstrate that the subservient party had the opportunity to receive independent legal advice prior to making the contract.

### Third Parties

8.11.8    If A improperly influences B to contract with C (usually for the benefit of A), B may seek to set aside the contract on the ground of undue influence if it can be shown either (a) that A was acting as the agent of C; or that (b) C had either actual or constructive notice of A's misconduct. If the transaction is one which is, on its face, disadvantageous to B, and C knows of reasons why B could have reposed trust and confidence in A (where, for instance, B is A's wife), then C

would be fixed with constructive notice of the improper influence, unless C has taken reasonable steps to ensure that B's consent was in fact obtained independently. This will entail, at the very least, explaining the transaction to B in a private meeting, and advising her to seek independent legal advice.

### Effects of Duress and Undue Influence

8.11.9     Contracts that are procured by duress, undue influence or unconscionable conduct are voidable. In each case, the improper conduct must be a significant or decisive cause of the victim's consent. This right to rescind may, however, be lost in certain circumstances (see Paragraph 8.10.5 above).

### Unconscionable Bargains

8.11.10     Apart from instances involving duress or undue influence, equity may also relieve parties from 'unconscionable bargains'. Such bargains typically involve the exploitation of one party's weakness, though the mere fact that the parties are of unequal bargaining power does not suffice. The exact ambit of this jurisdiction is unclear, but it has traditionally been applied narrowly to cases involving expectant heirs and improvident transactions.


## SECTION 12     ILLEGALITY AND PUBLIC POLICY

### Statutory Illegality

8.12.1     A contract may be said to be 'illegal' in a number of different contexts. For example, there may be a statutory prohibition as to the formation of contracts which would entail carrying out certain socially undesirable activities.

8.12.2     In such cases, the statute may clearly provide that the 'illegal' contract is void. That is to say, it is to be treated in law as if it had never been formed. If the statutory wording is clear, there is no need to go any further to ascertain the intention of the legislature as to the status of the contract.

8.12.3     Difficulties arise, however, where the statutory wording is unclear, particularly where the statute in question does not clearly specify whether its object is to prohibit the formation of the contract, or the performance of the obligations under that contract. The true parliamentary intention underlying the statutory prohibition will have to be ascertained. In the former case, the contract is void.

### Illegality at Common Law

8.12.4     At common law, certain strands of public policy prohibit the formation of certain types of contract.

8.12.5     Such contracts are completely void and examples include: (a) contracts prejudicial to the administration of justice – these include contracts to stifle prosecution, or contracts savouring of maintenance (where one person supports another in bringing or resisting an action – as by paying the costs of it – which is permissible only if the party providing the support has a legitimate and genuine interest in the result of the action and the circumstances are such as reasonably to warrant such support) or champerty (which is a species of maintenance where the maintainer seeks to make a profit out of another man's action – by taking the proceeds of it, or part of them, for himself or herself); (b) contracts to deceive public authorities; (c) contracts to oust the jurisdiction of courts (although

contracts or agreements to arbitrate, or agreements to confer exclusive jurisdiction over a dispute in favour of a foreign court are not caught by this prohibition); (d) contracts to commit a crime, tort or fraud; (e) contracts prejudicial to public safety; and (f) contracts promoting sexual immorality.

### Effect of Statutory Illegality or Illegality at Common Law

8.12.6     Where a contract is rendered void by statute or common law, the general starting point is to treat the contract as if it had never existed. Any outstanding or unperformed obligations under that contract are extinguished. In other words, in so far as enforcement of such outstanding obligations would have required reliance on the illegal contract, no judicial enforcement is possible. Judicial enforcement may still be available, notwithstanding the illegality, if it is possible to do so without referring to the illegal contract, ie by relying on an independent and separate cause of action.

8.12.7     Conversely, the question arises whether any recovery may be had for benefits which have been conferred under an illegal contract. On one view, such benefits will have been conferred without any basis. It may well be that, in some cases, some form of recovery pursuant to the law of unjust enrichment is possible. This is very likely to be allowed in instances where one party repents of the illegal contract and withdraws from it before the illegal purpose of the contract is fulfilled. If such repentance is genuine, voluntary and timely, before any part of the illegal purpose has been carried out, restitutionary recovery pursuant to the principles of unjust enrichment is likely to be allowed [see Chapter 19 on Unjust Enrichment].

### Contracts in Restraint of Trade

8.12.8     A contract which is wholly in restraint of trade is contrary to public policy and is illegal at common law. Such a contract is void. Leeway, however, is given in light of the fact that, in some contexts, some restraint of trade may well protect legitimate interests.

8.12.9     For example, a 'reasonable' restraint of trade clause which seeks to protect: (a) the interests of the parties concerned; (b) and the interests of the public will not be void. Both these aspects of reasonableness must be established.

8.12.10    This determination will vary from case to case, but significant factors will include the geographic scope as well as the length of time for which the restraint of trade is to apply. The wider and longer the restraint, the more difficult it will be to prove that the restraint is reasonable.

### Severance

8.12.11    Sometimes, illegality might taint only part of a contract, eg, attempts to restrain competition from ex-employees. Such restraints of trade are often incorporated as a covenant or term in an otherwise unobjectionable employment or service contract.

8.12.12    If the restraint of trade covenant is found to be unreasonable, and hence void, the 'illegal' covenant will be severed from the rest of the contract, maintaining the contract's validity if the severed covenant does not form the whole or the main consideration for the contract. If the severed covenant does form the whole or the main consideration for the contract, no severance will take place and the entire contract is void.

8.12.13    Severance may also take effect in a more limited form within the confines of a particular covenant or term. This more limited form of severance is akin to taking a 'blue-pencil' to strike out those words which would render the covenant 'unreasonable.' In doing so, however, the court will not go so far as to re-write the contractual bargain which had been reached by the contracting parties.

## SECTION 13     JUDICIAL REMEDIES FOR BREACH OF CONTRACT

### *Judicial Remedies Contrasted with Self-help Remedies*

8.13.1    Following a breach of a condition of a contract, or where the breach causes one party to be deprived of substantially the whole of the benefit of the contract, the aggrieved party may elect to bring the contract to an end. When this happens, both the aggrieved party and the party-in-breach will be released from any outstanding obligations under the contract. This is said to be a 'self-help' remedy because the release is effected without the need for any court approval or intervention.

8.13.2    Where the aggrieved party has suffered financial losses as a result of the breach, or where release of the party-in-breach from outstanding obligations will cause financial loss, discharge of contract alone may not be an adequate remedy. Recourse to other judicial remedies may be needed.

### *Types of Judicial Remedies*

8.13.3    In relation to contract law, the following types of judicial remedy are commonly sought: (a) the common law remedy of damages; (b) the common law remedy of an action for a fixed sum; (c) the equitable remedy of specific performance; and (d) the equitable remedy of injunction. It is important to draw the distinction between the common law and the equitable remedies because, while the former are available as of right, the latter are discretionary.

### *Availability of Judicial Remedies – Time bars, Limitation Periods and Laches*

8.13.4    Urgency should be the order of the day when seeking judicial remedies as access to judicial remedies may be barred by lapse of time.

8.13.5    Generally speaking, no action may be brought for a breach of contract after 6 years have lapsed from the time when the contract was breached – s 6 of the Limitation Act (Cap 163, 1996 Rev Ed). This bars access to the court insofar as the remedies of damages or an action for a fixed sum are concerned. [See Chapter 2 on Court Procedure for a fuller discussion].

8.13.6    In relation to the equitable remedies of specific performance and injunction, the equitable doctrine of laches applies. Shortly put, applicants who delay applying for equitable relief from the courts may be turned away if the delay is inordinate and inexcusable, such that it would be inequitable to grant such relief. Indeed, an application for an order for specific performance might be denied if the application is not made as soon as the nature of the case might permit.

### Damages – Compensation for Pecuniary Loss

8.13.7    Contractual damages are awarded to an aggrieved party in the form of a sum of money, in compensation for any pecuniary losses which have been incurred as a result of the breach of contract.

### Compensation Only

8.13.8    In general, damages are compensatory in nature. It remains an open question whether, in the appropriate case, damages might be awarded for breach of contract on any other basis.

### Liquidated Compared with Unliquidated Damages

8.13.9    In some cases, compensation for losses resulting from breach may have been pre-agreed by the contracting parties as a term of the contract. If the agreed sum is a genuine pre-estimate of the loss which could be suffered as a result of a breach of the contract, the court will order that sum to be paid in compensation as liquidated damages. However, if the sum is intended to be a penalty aimed at 'punishing' the party-in-breach, the court will strike down the 'penalty' clause and award unliquidated damages instead to compensate the aggrieved party.

### Quantification and Measure of Unliquidated Damages

8.13.10    The court will usually quantify unliquidated damages so as to place the aggrieved party, as far as money can do so, in the position he or she would have been had the contract been performed fully instead of being breached. Therefore, if the aggrieved party would have expected to make a profit by resale of goods which had been purchased from the party-in-breach, but where such profit falls away because of non-delivery and breach, the aggrieved party's expectation loss in the form of the loss of profit may be recovered. Alternatively, where the aggrieved party has to incur additional costs, over and above what was expected under the contract by reason of having to pay for a replacement supply of goods or services following the failure by the party-in-breach to perform his or her contractual obligations, those additional expenses may be recovered by the aggrieved party in compensation as a form of expectation loss. As a further alternative, an aggrieved party may choose to quantify his or her damages on the basis of expenses which were incurred in reliance on the other party performing his or her contractual obligations, instead of on an expectation basis (unless it is demonstrated that the aggrieved party had made a bad bargain and the reliance expenditure would have exceeded any expected gain).

### Time of Quantification

8.13.11    In most instances, unliquidated damages will be assessed as at the time of the breach although, in appropriate cases, the court may take into account events occurring after the breach.

### Restrictions on Recovery of Unliquidated Damages

8.13.12    It is not the case, however, that unliquidated damages are available for all losses. Recovery is subject to certain restrictions.

*Non-pecuniary Loss*

8.13.13    First, non-pecuniary losses (ie for hurt feelings, disappointment, mental distress, and so forth), are generally not compensable except in certain limited circumstances – for example, where the contractual obligation itself related to non-pecuniary matters, as in the case of a contract for a package holiday.

*Remoteness of Loss*

8.13.14    Second, losses which are too remote are not compensable. Losses which arise in the usual course of things as a result of the breach are not too remote, and are compensable. Losses which are out of the ordinary and which would not ordinarily have been in the contemplation of either party to the contract are not – unless the party-in-breach knew or ought to have known about the possibility of such unusual losses.

*Mitigation of Loss*

8.13.15    Third, losses which the aggrieved party could have taken reasonable steps to avoid, but did not, are not compensable. This is to encourage mitigation of losses, that is, steps by the aggrieved party to reduce his or her losses. The duty is to take all reasonable steps to minimise one's loss. If, in taking objectively reasonable steps to mitigate, the aggrieved party incurs greater loss than if no steps been taken at all, such increased losses will still be recoverable from the party-in-breach.

*Action for a Fixed Sum*

8.13.16    Damages, whether liquidated or unliquidated, are not the only remedy at common law. Where the contractual breach relates solely to an obligation to pay a fixed sum of money, damages are not available as a remedy. Instead of damages, the court will order that the fixed sum, due and owing, be paid.

8.13.17    In such cases, generally, there will be no damages for the delay in payment, apart from any court ordered interest on the judgment sum, or any contractual interest (if the contract expressly provides for the payment of interest on any delayed payment of the sum owed).

*Specific Performance*

8.13.18    Sometimes, damages will not be an adequate remedy for a breach of contract. This may be the case where the breach involves delivery of property which is unique (such as a piece of land). In such instances, the aggrieved party may make an application for the court to make an order of specific performance – ie an order to the party-in-breach (or threatening to be in breach) to perform in accordance with the terms of his or her contractual promise.

8.13.19    Specific performance is, however, not available as against the Singapore Government in any civil proceedings to which the state is a party – see s 27(1)(a) of the Government Proceedings Act (Cap 121, 1985 Rev Ed).

*Limits on Availability of Specific Performance*

8.13.20    Specific performance is a discretionary remedy. It may be withheld if, in all the circumstances of the case, it would be inequitable to make such an order. As has been mentioned above, substantial delay in applying for such relief

may be enough to cause the court to withhold such relief. Relief may also be withheld if the applicant does not come to court with 'clean hands'. The order for specific performance may also be made on terms, so as to balance the interests of the parties to the dispute.

8.13.21    Specific performance might also be refused in a number of other instances, most notably where: (a) the proposed order would require constant supervision by the court; (b) the court is not able to specify the terms of the order which is to be complied with; (c) the proposed order would require the performance of something which is impossible to achieve; and (d) the order relates to a contract of personal service because such an order could amount to judicial compulsion of involuntary servitude.

### *Injunction*

8.13.22    Not all contractual obligations are susceptible to orders of specific performance. Sometimes, the contractual obligation in question is a negative one, where the party-in-breach fails to honour his or her promise not to do something. In such circumstances, an application for a prohibitory injunction may be made by the aggrieved party.

8.13.23    In the absence of factors such as those mentioned above in Paragraph 8.13.20, prohibitory injunctions are likely to be granted unless: (a) the remedy would be inequitable or oppressive; or (b) the balance of convenience does not favour making such an order.

8.13.24    If the breach of the negative obligation lies wholly in the past, the aggrieved party may seek a mandatory injunction instead. Such an order requires the party-in-breach to reverse the effects of the breach so as to restore the aggrieved party to the position he or she would have been, had the negative obligation not been breached.

8.13.25    The discretion whether to issue a mandatory injunction is also generally subject to the 'balance of convenience' test.

8.13.26    In general, injunctions will also be refused in relation to contracts of personal service – where the practical effect of the proposed injunction would be to compel the performance of a contract for personal service for which no order of specific performance would have been made in the first place.

Lee Pey Woan
Assistant Professor, Department of Law
Lee Kong Chian School of Business, Singapore Management University

Pearlie Koh
Associate Professor, Department of Law
Lee Kong Chian School of Business, Singapore Management University

Tham Chee Ho
Assistant Professor, Department of Law
Lee Kong Chian School of Business, Singapore Management University