LEXSEE 3 SLR 501

© 2003 LexisNexis Asia (a division of Reed Elsevier (S) Pte Ltd)

Singapore Law Reports

TRANS-WORLD (ALUMINIUM) LTD V CORNELDER CHINA (SINGAPORE)

[2003] SGHC 56

[2003] 3 SLR 501

ORIGINATING SUMMONS NO 1749 OF 2000

HIGH COURT

**HEARING-DATE-1:** 22-26 APRIL 2002, 29-30 APRIL 2002; 2-3 MAY 2002, 6-10
MAY 2002, 13-17 MAY 2002, 22-24 MAY 2002, 28-31 MAY 2002; 1 JUNE 2002; 8
JULY 2002; 8 OCTOBER 2002; 25 NOVEMBER 2002;

**DECIDED-DATE-1:** 17 MARCH 2003

BELINDA ANG J

## CATCHWORDS:

Civil Procedure - Pleadings - Failure to plead alternative claim in quantum meruit - Whether court can nevertheless consider claim

Evidence - Admissibility of evidence - Foreign judgment - Whether plaintiff can rely upon facts stated in judgment as evidence in another trial

Tort - Misrepresentation - Fraud and deceit - What amounts to deceit

Tort - Misrepresentation - Innocent misrepresentation - Misrepresentation Act - Effect of absence of contract

Tort - Misrepresentation - Negligent misrepresentation - Pure economic loss

Tort - Misrepresentation - Whether there can be misrepresentation by silence

## HEADNOTES:

The plaintiffs entered into a contract with M for the purchase of cargo in China. The cargo was in the custody of the defendant warehousemen and collateral managers. The plaintiffs alleged that the defendants' employee, S, had represented to them that the cargo carried no risk as to title and delivery. However, the cargo was already the subject of an injunction and subsequently, in litigation in the Chinese courts, it was held that M did not have good title to the cargo.

The plaintiffs commenced an action against the defendants for misrepresentation, whether fraudulent, innocent or negligent. The defendants counterclaimed for the management fees for the cargo.

**Held, dismissing the plaintiffs' action and the defendants' counterclaim:**
(1) Without the agreement or admission of an appropriate witness for the defendants, the plaintiffs could not refer to matters in the Chinese judgment as evidence of the facts contained in it: at [19].
(2) Where there was ambiguity in a representation, particularly in respect of the total effect of an oral representation and silence, the person represented to ought not just show that in its ordinary meaning the representation was false, but also that it was false in the sense he

3 SLR 501, *; [2003] 3 SLR 501

understood it: at [63].

[*502]

(3) In an action in deceit, the crux was whether the defendants believed in their statement. There was no liability for honestly interpreting the facts known or drawing conclusions from them in a way the court did not think to be legally warranted: at [84].

(4) A claim founded on the Misrepresentation Act (Cap 390) was an action in contract. As the plaintiffs could not establish a contract and the presentation inducing a contact, an action under the Act failed: at [124].

(5) Misrepresentation by silence required more than mere silence. There ought to be a wilful suppression of material and important facts. Thus where silence was alleged to constitute misleading conduct, the proper approach was to assess silence as a circumstance like any other act or statement and in the context in which it occurred: at [66], [68], [126] and [130].

(6) There was no duty of care owed by the defendants as there was no voluntary assumption of responsibility here. There was no obligation to speak in the context of negotiations for an ordinary commercial contract. While S had chosen to answer questions posed to him, he was not asked nor did he undertake to provide information on title or adverse claims: at [132] to [136].

(7) In any event, the loss claimed by the plaintiffs was not a consequence of any inaccuracy in the information supplied to them: at [142].

(8) On the facts, the defendants were unable to prove that there was a concluded and binding agreement for the plaintiffs to pay them management fees. In addition, as the defendants had not pleaded in the alternative a claim in quantum meruit, the court would not consider whether the management fees were nevertheless a reasonable sum for services rendered: at [156].

*Akerhielm v De Mare* [1959] AC 789

*Annie Yeo v Senanayake* [1963] 29 MLJ 43

*Arul Chandran v Chew Chin Aik Victor* [2000] SGHC 111

*Ballantyne v Mackinnon* [1896] 2 QB 455

*Caparo Industries plc v Dickman* [1990] 2 AC 605

*Cremer v General Carriers SA* [1974] 1 All ER 1

*Derry v Peek* (1889) 14 App Cas 337

*Etablissements Soules Et Cie v Intertradex SA* [1991] 1 Lloyd's Rep 378

*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465

*Kea Holdings Pte Ltd v Gan Boon Hock* [2000] 3 SLR 129

*La Banque Financiere de la Cite v Westgate Insurance Co Ltd* [1988] 2 Lloyd's Rep 513

*Maroti Laxman Koshti v Jagannathdas Lachhmandas Gadewal* AIR 1939 Nagpur 72

*P E Bakers Pty Ltd v Yehuda* (1988) 15 NSWLR 437

*Panatron Pte Ltd v Lee Cheow Lee* [2001] 3 SLR 405

[*503]

*Peek v Gurney* [1861-73] All ER Rep 116

*South Australia Asset Management Corporation v York Montague Ltd* [1997] AC 191

*Teo Geok Fong v Lim Eng Hock* [1996] 3 SLR 431

3 SLR 501, *; [2003] 3 SLR 501

*Wall v The King; Ex parte King Won (No 2)* (1927) 39 CLR 266

*White v Jones* [1995] 2 AC 207

*Yogambikai Nagarajah v Indian Overseas Bank* [1997] 1 SLR 258

Misrepresentation Act (Cap 390, 1994 Rev Ed)

*Vivian Ang, Leona Wong, Mark Ortega* and *Yap Yin Soon* (*Allen & Gledhill*) for the plaintiffs;
*Lim Tean* and *Chin Li Yuen* (*Rajah & Tann*) for the defendants. n1

 n1   The appeal against this decision (Civil Appeal No 34 of 2003) was withdrawn on 22 April 2003.

JUDGMENTBY: BELINDA ANG J:

**BELINDA ANG J:**

**Introduction**

1   The plaintiffs, Trans-World (Aluminum) Ltd ("TWA"), entered into a contract of sale with Marco International (HK) Ltd ("Marco") on 12 October 1999 for the purchase of 20,890.50 metric tonnes of sandy metallurgical grade calcined alumina in bags ("the cargo") at a price of USD260 per metric tonne. On 15 October 1999, the plaintiffs paid USD5,431,530 to Marco for the cargo that was lying in storage at Qingdao, China. The plaintiffs learnt on 19 October 1999 from the defendants, Cornelder China (Singapore) Pte Ltd ("Cornelder China"), that a third party, Run Sheng Xiang Trade Co ("RSX"), had caused an injunction to be placed on the cargo in respect of its claims against Grand Empire Holding Ltd ("Grand Empire"), a company incorporated in Hong Kong. The injunction was allegedly granted and served on the Qingdao Port Authority on or about 8 October 1999.

2   From the outset, the complaint of RSX was against Grand Empire. Before the Qingdao Sifang People's Court, RSX claimed ownership of the cargo. RSX had pledged the cargo to Grand Empire as security for a loan, which Grand Empire had not disbursed. Consequently, RSX sought the assistance of the Qingdao Sifang People's Court for a declaration of ownership of the cargo and for the return of four warehouse receipts nos WRC 1999040002 to 5 covering [*504] the cargo. As between Grand Empire and Marco, the latter had purportedly purchased the cargo from Grand Empire.

3   On 9 November 1999, the plaintiffs as owners of the cargo, intervened in the Chinese proceedings in order to set aside the injunction. The Intermediate People's Court of Qingdao City, Shandong Province, upheld the injunction. On 9 May 2000, before the Shandong People's Court, the plaintiffs succeeded in lifting the injunction. On appeal, the Supreme People's Court ruled in favour of RSX and, in so doing, recognised RSX's purchase pursuant to two sale contracts between RSX and Grand Empire and RSX's payment to Grand Empire for the cargo. The decision of the Supreme People's Court was handed down on 12 June 2002 after the conclusion of this trial. The upshot of the decision is that Grand Empire could not and did not pass good title to Marco. Neither did Marco have the capacity to transfer good title to the plaintiffs.

**The proceedings**

4   At the forefront of the plaintiffs' case is the complaint that Adam Slater ("Slater") on behalf of the defendants misrepresented through all his

3 SLR 501, *; [2003] 3 SLR 501

words and conduct that the cargo carried no risk – whether actual or potential with title and with taking delivery – if purchased by the plaintiffs. It is said that not only did the misrepresentations contributed to the making of the contract of sale between Marco and the plaintiffs, the misrepresentations continued to be a cause in the plaintiffs paying the purchase price on 15 October 1999. Therefore, according to the plaintiffs, the damage suffered was causally connected to the misrepresentations. As the ownership dispute in China dragged on, the plaintiffs said they incurred consequential losses.

5   The plaintiffs' primary case is that the misrepresentations were made knowingly. In the event the misrepresentations were innocent, the plaintiffs rely on the provisions of the Misrepresentation Act (Cap 390). Alternatively, it is the plaintiffs' case that the defendants are liable for negligent statements causing loss.

6   Apart from the primary claim in misrepresentation, there is a direct claim for shortage and a claim for fees incurred in connection with bonding of the cargo. The two claims are based on breach of duty as bailees and/or under the storage contract evidenced by warehouse receipts.

7   The defendants have a counterclaim for management fees in respect of the cargo. The plaintiffs say there is no legal basis for this claim and have refused to make payment.

## Background facts

8   It is necessary to deal briefly with the background to the claims made and the context in which the loss is said to have occurred. The cargo was part of [*505] a consignment of 25,886 metric tonnes of alumina shipped from India on board the *Adimon* to Qingdao. The vessel arrived in Qingdao on 30 March 1999 and the shipment was allegedly discharged by RSX. On 7 April 1999, the defendants were appointed by Standard Bank London Limited ("Standard Bank") to receive on its behalf and for the account of its customer, Grand Empire, the cargo that had already landed at Qingdao.

9   It is common ground that Shanghai Cornelder Warehousing Co Ltd ("Shanghai Cornelder") appointed Sinotrans to assist in the storage of the cargo at Qingdao. Slater's evidence is that Sinotrans were appointed agents of Shanghai Cornelder to manage and deal with the *Adimon* shipment including bonding of the cargo. The entire shipment was stored at the premises of Beigang Company, a company owned by the Port Authority of Qingdao ("the Port Authority"). Warehouse receipts nos WRC 1990400001 to 5 dated 12 April 1999 in relation to the *Adimon* shipment were issued by the defendants to the order of Standard Bank for the account of Grand Empire. Grand Empire was to pay the storage and other expenses relating to the cargo. Subsequently, out of the 25,866 metric tonnes of alumina, Grand Empire sold one parcel of about 5000 metric tonnes to China Metallurgical Import and Export Corporation and the balance 20,890.50 metric tonnes went to Marco for which new warehouse receipts were issued.

10   On 22 June 1999, the defendants were instructed by Standard Bank to release the 20,890.50 metric tonnes of alumina to Mees Pierson NV London ("Mees Pierson") and to issue new warehouse receipts naming Mees Pierson as the order party for the account of its customer, Marco. The defendants accordingly issued warehouse receipts nos WRC 1990800001 to 4 dated 3 August 1999 to the order of Mees Pierson for the account of Marco. Following the sale of the cargo to the plaintiffs on 12 October 1999, the defendants, as in the normal course of events, received instructions from Mees Pierson on 15 October 1999 to release the cargo to the order of KBC Bank NV ("KBC Bank") for the account of the plaintiffs. On 18 October 1999, the defendants wrote

to KBC Bank to confirm release of the cargo to them. KBC Bank was also informed that the cargo was stored/handled in accordance with the defendants' standard warehousing conditions. On 5 November 1999, KBC Bank informed the defendants that the warehouse receipts nos WRC 19990800001 to 4 for 20,890.50 metric tonnes of alumina had been given to the plaintiffs as owners of the cargo and the party entitled to take delivery of the cargo. It is common ground that the plaintiffs never presented to the defendants the original warehouse receipts nos WRC 19990800001 to 4 for delivery up of the cargo.

11  It is common ground that the defendants, at all material times, were and are in the business of providing storage, management, forwarding and warehouse services in China. At all material times, the defendants as warehousemen were collateral managers of the cargo, which was at one time [*506] financed by Standard Bank and pledged to the latter as security for the trade finance. The defendants' role in the trade financing of commodities provided by a bank to its customer is that the defendants would confirm through the warehouse receipts the existence of the commodity financed and the quantity of commodity received. The collateral management arrangement would normally be between the bank, its customer and defendants. The warehouse receipts would indicate that the cargo was received under the defendants' standard warehousing terms and conditions. Under the management arrangement, the defendants would control the security, ie the commodity, in the sense that as agreed beforehand with the customer, the commodity would be released only upon the instructions of the bank. The defendants would maintain an inventory of the quantity released and the quantity remaining, if any. In the present case, Shanghai Cornelder was responsible for the management of cargo in China on behalf of the defendants who had issued the warehouse receipts for the cargo financed by foreign financial institutions.

12  As stated, the plaintiffs contracted with Marco for the purchase of the cargo on 12 October 1999. The plaintiffs learnt about Marco's interest in selling it as early as August 1999. Jeremy North ("North") of the plaintiffs was interested in buying the cargo. Supply of alumina was then short due to a drop in production from the United States as a major production plant there had exploded. Prices of alumina had risen as a result and North had expected prices to increase further. On that occasion in August 1999, North's interest in the cargo cooled as it had by then landed in Qingdao. In late September 1999, he renewed his interest in the Marco cargo after he could not secure alumina from other sources.

13  On 4 October 1999, North and Alan Kestenbaum ("Kestenbaum") of Marco discussed a possible purchase of the cargo on an "in warehouse" basis as North's intention was for the plaintiffs to take care of bagging and shipment of the cargo by rail to the Russian border at Manzhouli. Following their discussions, North requested a price indication from Marco. Marco duly sent a fax dated 4 October 1999. Besides indicating a price of USD262 per metric tonne on an "in warehouse Qingdao" basis, Kestenbaum also wrote:

> There are certain logistical/procedural matters that need to be taken care of in order to ship this cargo. As the material is under warehouse receipts of Cornelder would recommend that you contact Adam Slater to discuss these steps with him.

14  North spoke to Kestenbaum after he received the fax to inquire about transporting the cargo by railcars. He was told to discuss the logistics with Slater.

15  Coincidentally, around the same time, Slater had planned a visit to London to participate in activities organised by the London Metal Exchange. It is common ground that Slater's visit to the plaintiffs' London office was [*507] pre-arranged to promote Shanghai Cornelder's services. During

that visit, North took the opportunity to talk to Slater about the cargo. It was at that meeting that the alleged representations were made.

### The evidence

16    The trial lasted 29 days. The documentation before the court was voluminous with transcripts of evidence running into 2,944 pages. Except for a small number of documents agreed to by the parties on authenticity and truth of contents, the rest remained in the pile of inadmissible documentary evidence in the absence of the maker to testify to the truth of the matters contained in those documents. The plaintiffs are patently conscious of the rules of evidence and, to obviate the evidential difficulties, have invited me to rule that the judgment of the Supreme People's Court is an *in rem* judgment and that the entire judgment is conclusive as to all matters there adjudicated upon including the reasons given for the decision and the grounds upon which the judgment is based. The defendants, however, argue that the judgment of the Supreme People's Court is an *in personam* decision and evidentially is conclusive only of its existence, date and legal effect. The defendants in the present proceedings were not a party to the proceedings in China.

17    A ruling of the nature sought by the plaintiffs would not overcome the evidential difficulties standing in their way. It matters not whether the judgment of the Supreme People's Court is an *in rem* or *in personam* decision. It is not in dispute that the outcome of an *in rem* judgment is binding against the whole world. The estoppel that arises in an *in rem* judgment does not extend to every issue decided or findings made in that proceeding. A judgment is to be regarded as an *in rem* decision only in relation to the point concerning the status of the *res*. The estoppel does not extend to the reasons or arguments advanced by the court. See *P E Bakers Pty Ltd v Yehuda* (1988) 15 NSWLR 437 at 442; *Wall v The King; Ex parte King Won (No 2)* (1927) 39 CLR 266 at 271 and *Ballantyne v Mackinnon* [1896] 2 QB 455 at 462.

18    Similarly, with an *in personam* judgment, finding of facts in that proceeding are equally inadmissible evidence in a later proceeding. See *Halsbury's Laws of Singapore, Vol 10* (2001 Ed) para 120.207.

19    Hence, without the agreement of or admission from an appropriate witness for the defendants, the plaintiffs cannot simply refer to matters in the judgment of the Supreme People's Court as evidence of the correctness or truth of any of the facts covered there. See *Arul Chandran v Chew Chin Aik Victor* [2000] SGHC 111. Evidence must be adduced in the usual way.

20    The conversations between Slater and North on 6 October 1999 sit at the heart of this dispute. There are conflicts between the witnesses who were at that meeting about what was actually said and discussed. This situation [*508] requires a comparison of the accounts given, and finding and assessment of the credibility and veracity of the principal witnesses. I would add that the recollections of North and Dobson of the conversations and events are not necessarily more reliable than Slater's and *vice versa*. All three are testifying long after the events and with recollections inevitably coloured by hindsight. On matters on which there are material factual conflicts, I have concluded that I cannot safely place reliance on them unless corroborated by other reliable evidence.

21    It is necessary in assessing the evidence adduced by both parties to evaluate what is clearly hearsay evidence. By way of illustration, I refer to the plaintiffs' reliance on cause documents and exhibits thereto filed by Grand Empire and Marco in Hong Kong and New York proceedings. Witnesses for both parties have at times testified to matters based not on personal

3 SLR 501, *; [2003] 3 SLR 501

knowledge but on either a recollection of what someone who is not before the court has told the witness or from information found in inadmissible third party documents that the witnesses have read about. There have been occasions where the evidence has the hallmark of the witnesses arguing their respective cases, rather than recalling facts or answering questions directly. There is a fair amount of *ex post facto* reasoning designed to support legal propositions advanced as distinct from testifying on matters within the personal knowledge of the witness.

22   Counsel for the plaintiffs, Ms Vivian Ang, submits that Slater is an untruthful witness given his inconsistent testimony and evasive answers to direct questions. Slater's oral testimony at times contradicted the defendants' correspondence or some admissible documentary evidence. She urges the court to reject his evidence. Just because a witness has given inconsistent evidence is not in itself enough to reject his evidence in toto. Yong Pung How CJ in *Teo Geok Fong v Lim Eng Hock* [1996] 3 SLR 431 said at 438 to 439:

> [I]n the context of impeachment of a witness's credibility, the mere fact that the credit of a witness had been impeached did not necessarily mean that all his evidence should be disregarded. The court would still have to scrutinise the whole of the evidence to determine what was true and which aspects should be disregarded. *A fortiori*, where the credit of a witness had not been impeached, ... the same rules would apply.

23   Furthermore, I am not convinced that Slater was an unreliable or unsatisfactory witness. He was on the stand for ten days and I have had ample opportunity to observe the manner in which he gave evidence. Whilst oral testimony should be tested against documents, it does not always follow that discrepancies should be resolved in favour of the documents. The impression I got is that in the preparation of the case, Slater had not been as diligent as he ought to be. So, unless there was some other evidence or something in his demeanour when he gave his evidence which would lead to a disbelief in his [*509] veracity, it seems to me his evidence ought not to be disregarded and its weight evaluated accordingly.

24   The plaintiffs, at the material time, were a major international trader and buyer of alumina and aluminium between manufacturers, end users and merchants. North was then the managing director of the plaintiffs and a very experienced alumina trader. It is apparent that North felt very much aggrieved by the conduct of Slater as he saw it.

25   North said that he acted on the misrepresentations of Slater and would not have bought the cargo had he been told the truth. As it turned out, the plaintiffs had entered into a disastrous transaction. It is only human nature for the trader who found himself in a disastrous transaction to try to show that he has been an innocent victim of something dishonest on the part of the other party. I am mindful of the caution expressed by Rose CJ in *Annie Yeo v Senanayake* [1963] 29 MLJ 43:

> Any plaintiff who is a knowledgeable person who comes into court and says that he did something or bought something on the strength of a representation must, naturally, expect his case to be closely examined, because courts as a rule are somewhat chary of finding that a competent plaintiff, a professional dealer or something of that sort, relied in fact on a representation when he had his own knowledge and experience to guide him.

26   It is also necessary to be cautious about evidence after the event when a plaintiff who has suffered loss says he would not have entered into the contract but for the defendant's misleading conduct. The plaintiffs are

speaking in a setting irreversibly different from that in which the decision to purchase was made, so much so that even though such evidence may be honestly given, there is a likelihood of it being distinctly unreliable since the evidence would probably be coloured by hindsight and more likely to be the product of *ex post facto* reasoning.

27   In making the findings here below, I have taken into consideration all the observations above in assessing the evidence before me.

**Fraudulent misrepresentation**

28   The constituent elements of the tort of deceit are well established. The Court of Appeal in *Kea Holdings Pte Ltd v Gan Boon Hock* [2000] 3 SLR 129 stated at [37]:

> The tort of deceit consists of the wilful making of a false statement with the intent that the plaintiff shall act in reliance upon it and with the result that he does so act and suffers damage in consequence. This damage must be proved by the plaintiff; *Diamond v Bank of London and Montreal* [1979] QB 333.

[*510]

29   The plaintiffs must prove certain matters. They carry the burden of establishing every element of their cause of action. It is necessary to prove that the alleged representation consisted of something said, written or done, which amounts in law to a representation. They must prove that Slater, with the defendants' authority, made the alleged representations. Secondly, the plaintiffs must prove that the representations, if they were made, were made with the object of inducing the plaintiffs to enter into the sale contract. Thirdly, the plaintiffs must show they were induced by the representations to enter into the sale. Then the plaintiffs must prove, fourthly, that the representations were false. Fifthly, the plaintiffs must prove that the representations, if they were made, were made fraudulently, that is to say, that the defendants had authorised Slater to make them knowing them to be untrue, or recklessly not caring whether they were true or false. On that last requirement, L P Thean JA in *Panatron Pte Ltd v Lee Cheow Lee* [2001] 3 SLR 405 said at [14]:

> [T]he representation must be made with knowledge that it is false; it must be wilfully false, or at least made in the absence of any genuine belief that it is true.

30   Of these constituent elements, the first four are common to the other forms of proceedings for misrepresentation. Fraud is proved only when the fifth requirement is established.

31   In a civil case where fraud is alleged, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probabilities. The court does not adopt so high a degree as a criminal court, but still it does require a degree of probability which is commensurate with the gravity of the imputation. See *Yogambikai Nagarajah v Indian Overseas Bank* [1997] 1 SLR 258.

*Meeting of 6 October 1999 and the representations as pleaded*

32   What then are the representations the plaintiffs say the defendants made on 6 October 1999, which the latter knew to be false and were making fraudulently to induce the plaintiffs to enter into the sale contract? In para 13 of the Re-Re-Re-Amended Statement of Claim, the plaintiffs pleaded the following oral representations expressly and/or implicitly made to the plaintiffs by Slater acting for and on behalf of the defendants:

> (i)  The cargo was stored properly and safely and was in good order and condition and in the same quantity as stated in the warehouse

receipts.

  (ii) The cargo was bonded.

  (iii) The cargo was stored in a bonded warehouse.

  (iv) The cargo was free from any adverse claims, encumbrances or liens.

[*511]

   (v) The plaintiffs could take delivery of the cargo without any problems save for some minor problems in physically removing the cargo out of the port which were however easily surmountable.

  (vi) The defendants, as warehousemen, were the custodians and bailees of the cargo which was under their control, with possessory rights in relation thereto and the unfettered ability to deliver it to its rightful owner and/or the person entitled to delivery, subject only to the problems aforementioned.

  (vii) The defendants provided a comprehensive range of services in China equivalent to the services that the Cornelder Group provided elsewhere, being in effect a "one-stop shop".

  (viii) In relation to cargo stored in warehouses in China by virtue of the use of the defendants' services, the customarily understood position that documentary symbols of such cargo, as issued by the defendants, would be documents of title to the cargo and negotiable, applied.

33  The plaintiffs say in para 17 of the Re-Re-Re-Amended Statement of Claim that the representations as pleaded were false and fraudulent or alternatively negligent in that:

   (i) The cargo was in fact not stored in any warehouse but in open spaces of various compounds belonging to third parties whose exact identities are not known.

  (ii) The cargo was in fact not bonded until around 17 December 1999 when the plaintiffs had to make arrangements through the defendants, their servants and/or agents in China to bond the cargo.

  (iii) The cargo was not stored properly and/or safely in that the cargo (which is extremely susceptible to temperature changes and moisture) was exposed to the elements in view of it being stored in open compounds and a portion of it is missing.

  (iv) There was in fact an injunction obtained by RSX on 8 October 1999 restraining the removal and/or disposal of the cargo which the defendants failed to notify the plaintiffs of before the plaintiffs made payment for the cargo.

   (v) There was in fact a title dispute over the cargo by Grand Empire (who sold the cargo to Marco and allegedly also sold to RSX) which the defendants knew of prior to the 6 October meeting but failed to notify the plaintiffs of before the plaintiffs contracted to purchase the cargo and/or effected payment for it.

  (vi) There were claims being made by various Chinese parties for the release and delivery up of a parcel of cargo of Australian alumina which involved threats to take legal measures having injunctive and/or detaining effect and/or threats against those concerned with the storage or control [*512] and in particular the port. As the Australian alumina was no longer in port, the threats, assertion and claims may be executed against the cargo and thereby result in more than mere minor problems in physically removing the cargo out of the port contrary to what had been represented.

  (vii) There were several substantial outstanding charges incurred in

relation to the cargo that the defendants knew of prior to the 6
October 1999 meeting which included, but was not limited to, cost
of supply of the bags, bagging, discharging, storage and various
other unpaid costs, all of which would attract a lien.

(viii) The defendants and/or their agents did not in fact have the
custody and control of or any possessory right over the cargo
themselves at any material time, the same being under the
custody, control and possession of Beigang Company, and/or
Qingdao Gangxing Package Company ("Gangxing Company") and/or
other third parties which the plaintiffs are unable to identify,
all being entities with which the defendants only had possibly at
best indirect contractual relations and over which they were and
are unable to exercise any control.

(ix) The warehouse receipts issued by the defendants are not documents
of title and/or negotiable.

34   At all material times, Slater was the general manager of Shanghai
Cornelder. Shanghai Cornelder is a joint venture company set up by the
defendants and Sinotrans Qingdao Company ("Sinotrans"). Slater did not hold
any position in Cornelder China but reported to the directors of the joint
venture partners.

35   It is not seriously challenged or argued that Slater had acted without
the authority of the defendants. The defendants' liability is in this context
not for what they have done but is a vicarious liability for the wrongs of
their agent, Slater. The defendants, however, deny making the representations
as pleaded. Counsel for the defendants, Mr Lim Tean, submits that it is for
the plaintiffs to prove that Slater made the representations as pleaded and
that they were false. The defendants' case is that at the 6 October 1999
meeting, Slater said that there were no liens on the cargo and that the cargo
was bonded. He submits that the two representations were true and not
half-truths.

*Representations - whether made*

36   I shall now deal with the first constituent element of the tort of
deceit. The plaintiffs have to prove the alleged representations. A starting
point is to determine what was said at the meeting.

*Representations pleaded in paras 13(i), (ii) and (iii)*

37   The plaintiffs' pleaded case is that Slater had represented that the
cargo was bonded and stored in a bonded warehouse in Qingdao. Slater's
version is [*513] that he only said that the cargo was bonded. He did
not say that the cargo was stored in Cornelder's warehouse or in a bonded
warehouse.

38   Slater testified that he had never said or implied during the meeting
that the cargo was stored in a building or a silo as there were no such
facilities for alumina in China. In fact, the cargo was all the time stored
in a customs supervised area in the open on raised platforms covered under
tarpaulin canvas and secured by ropes and hooks. Slater's evidence is that
the way the cargo was stored or how it was stored was not discussed.

39   Both North and Dobson testified that Slater had informed them that the
cargo was stored in a bonded warehouse. They also said that Slater had
confirmed that the cargo was stored in "their warehouse" or "Cornelder's
warehouse".

40   Initially, Dobson was certain that Slater had said that the cargo was
stored in Cornelder's warehouse. However, he later said that he was not sure
whether Slater had said that the cargo was stored in Cornelder's warehouse.

41   North accepted during cross-examination that Slater did not say that the cargo was stored in a warehouse that belonged to Cornelder and accepted that he had assumed that to be the case as the cargo was under a Cornelder warehouse receipt and the cargo would be in a warehouse either owned or controlled by Cornelder.

42   Upon receipt of Marco's fax of 4 October 1999, North spoke to Kestenbaum to find out if the cargo was stored in a bonded warehouse. Kestenbaum confirmed that it was. The sale contract of 12 October 1999 provided for delivery "in bonded warehouse Qingdao". The discussions on "in warehouse" basis was used in the context of a sale term and in correlation with the price and place of delivery. The verbal and fax communications on this matter were between Marco and North and they do not take the matter further between plaintiffs and defendants. It is distinctly probable, given the passage of time, that what was told by Marco was assumed to have come from Slater.

43   North had assumed that the cargo was stored in a warehouse because alumina is hydroscopic and is sensitive to moisture. In a similar frame of mind, so did Dobson. The fact that the cargo was stored under "warehouse receipts" issued by Cornelder did not amount to a representation that the cargo was stored indoors in a warehouse. There is no evidence that North and Dobson had seen the warehouse receipts for the cargo on 6 October 1999. In any case, the words "warehouse receipts" are purely referential or descriptive without any connotation regarding storage of the cargo indoors. As Slater had confirmed that the cargo was bonded, it was probably assumed by those at the meeting that the cargo was stored indoors in a bonded warehouse. [*514]

44   In his written testimony, North said that he discussed with Slater the storage, condition and quantity of the cargo and Slater represented that the cargo was properly stored and protected in their warehouse. He did not deal with Slater's reply on the condition and quantity of the cargo. Dobson in his written testimony said that Slater informed them that the cargo was last assayed in June/July 1999 and he confirmed that the cargo was in a good condition.

45   Overall on the evidence, I am not satisfied that the statement that the cargo was stored in a bonded warehouse was made. I am also not satisfied that the representation pleaded in para 13(i) of the Re-Re-Re-Amended Statement of Claim was made. However, even if the alleged representations were made, they were not shown to be false or misleading. This will be discussed below. Suffice it to say that on the plaintiffs' evidence, the cargo was found by their surveyors in November 1999 to be in a sound condition. The material inspected was found to be dry, free flowing and white coloured fine to powder. There was no trace of discolouration, agglomeration or presence of any visible contamination.

*Representations pleaded in para 13(iv)*

46   The pleaded representation is that Slater had represented at the meeting that the cargo was free from any adverse claims, encumbrances or liens. It is not in dispute that North had asked Slater whether there were any liens on the cargo. Slater answered there was none. North did not in his written and oral testimony say that Slater had represented that the cargo was free from adverse claims or encumbrances. Both Slater and Dobson testified that there were no discussions on claims or encumbrances.

47   This leads to the question whether the effect of Slater's answer that there were no liens on the cargo gave rise to an implied representation that the cargo was free from adverse claims or encumbrances. The plaintiffs submit

that North's question was understood to mean very generally whether there were problems - actual or potential - with title and with taking delivery. I disagree with this interpretation.

48   The query was directed to a warehouseman like the defendants who were the likely persons to assert or exercise a lien on the cargo. Slater was specifically asked about liens and he answered as to liens, which bear on possessory rights or rights to possession and not on title and questions of ownership of the cargo which are proprietary rights.

49   North accepted the *New Shorter Oxford English Dictionary* meaning of the word "lien" which is defined as "a right to keep possession of property belonging to another person until a debt due is discharged by that person". North said to him "lien" meant "a restriction on title". By that definition, he meant: "It would stop the person doing a transfer of title". A lien cannot [*515] defeat a transfer of property and North's interpretation comes across as artificial and contrived.

50   Besides, the plaintiffs must show, and they have not done so, that Slater understood North's question in the sense held by him and that Slater's answer was intended to mislead him. The plaintiffs cannot establish falsity by putting a strained interpretation on the word "lien" even if that was how North had understood the meaning of the word. If it was indeed true that North was looking to Slater for an independent and unbiased view, there is no reason (and none was proffered) why North, who had known Slater for some time, could not have directly asked Slater whether there were any adverse claims or encumbrances.

51   For these reasons, I find that it cannot be implied in Slater's answer that there were no liens on the cargo, the further implied representation that the cargo was free of adverse claims, particularly of ownership, or encumbrances.

*Representation pleaded in para 13(v)*

52   North said he had specifically questioned Slater whether there might be any problems in taking delivery. Slater replied that there could be problems in getting the cargo shipped as the port had been involved in some smuggling of alumina and that this was the last cargo in the port of Qingdao, which meant that the port would not be very keen to see it leave, as there would have to be a reconciliation with Customs that could eventually lead to discovery of smuggling.

53   It is not disputed that Slater at the meeting mentioned that there might be difficulties in physically removing the cargo out of the port area because of the Port Authority's own interest in keeping the cargo there. For convenience, I will refer to this problem as the "port situation". The divergence in evidence is in the context in which the statement was made.

54   Slater's evidence is that North asked about transporting the cargo by rail to the border. North and Slater discussed the possibility of moving the cargo by loading it into rail wagons to rail the cargo to the border should North decide to do so. In the course of the discussion, Slater explained that this mode of transportation would be difficult because of the port situation.

55   Given the port situation, transportation by rail did not appear feasible for such a mode of transportation would require the cooperation of the Port Authority and Customs Department for each train load of between 2,500 -3,000 metric tonnes. The discussion then turned to transporting the cargo by break bulk shipment which would require the cooperation of the Port Authority and Customs only once. They then discussed sea transportation and the costs of shipping the cargo FOB Qingdao and CIF Vanino.
[*516]

56  Dobson testified that Slater mentioned that the port situation could be resolved within a three to four-week period. That time frame was not a point covered by North in his Affidavit of Evidence-in-Chief. It is not denied that Slater gave an indication of three to four weeks or more to resolve such a problem. But he did not say that the port situation was a problem that was " easily" surmountable. To Slater, what he said was he felt that the port situation could be solved because of Sinotrans' connection and influence in Shandong and Qingdao. He believed that Sinotrans, a state owned company, had " enough muscle" to force the port to put the cargo on the vessel. He said that the RSX injunction was a different type of problem.

57  North agreed that Slater did not use the words "easily surmountable". He conceded that it was an impression that he got. I accept Mr Lim's submission that Slater had not and was not giving a blanket assurance that there were no other problems that would obstruct delivery of the cargo.

58  Whilst Slater felt that the port situation could be solved, he nevertheless still considered it something to be concerned about. That was why he said he "strongly suggested to Mr North and Mr Dobson not to buy the cargo on an FOB basis but on a CIF Vanino (delivered) basis". In such a case, Marco would be responsible for clearing the cargo for export and shipping it to Vanino. If the port gave trouble, it would be something that Marco had to resolve.

59  On the evidence, I am not satisfied that Slater made the representations pleaded in para 13(v) of the Re-Re-Re-Amended Statement of Claim. I am, however, satisfied that Slater did represent that stemming from the Port Authority's own interest in keeping the cargo, there might be difficulties in physically removing the cargo out of the port area. However, this problem was surmountable.

60  There cannot be implied in the statements the further implied representation that save for the port situation, the purchase was risk free and the plaintiffs could take delivery of the cargo without any problems. I reach this conclusion based firstly on my earlier finding that there was no express or implied representation that the cargo was free of adverse claims on ownership or encumbrances. Secondly, the statements viewed in their proper context and against the factual matrix do not give rise to an implied representation argued by the plaintiffs. In fact, Slater had suggested that the plaintiffs minimise the risk associated with the purchase and delivery. This point will be dealt with in detail below.

*Representations pleaded in paras 13(vi), (vii) and (viii)*

61  The plaintiffs admit that as far as the representations pleaded in paras 13(vi) and (vii) of the Re-Re-Re-Amended Statement of Claim are concerned, they are not the actual expressions used but those were the [*517] implications underlying the representations made. It is not possible for the court to determine the implied representation without pleading what was said. Moreover, the matters referred to in paras 13(vi) and (vii) are unlikely to amount to representations in law. The matters pleaded in para 13(vii) of the Re-Re-Re-Amended Statement of Claim are puffs or laudatory expressions of the defendants' services. It was Slater's sales pitch or presentation of the company's services in a way that was attractive to a potential customer. Paragraph 13(viii) of the Re-Re-Re-Amended Statement of Claim is a matter of law rather than of fact and is not a representation.

62  In summary, I find that the following are the representations that were made at the meeting by Slater on behalf of the defendants:

(a)  There was no lien on the cargo.

(b)  That stemming from the Port Authority's own interest in keeping

the cargo in the port area, there might be difficulties in physically removing the cargo out of the port area. However this problem was surmountable.

(c)  The cargo was bonded.

63  Save for these three representations, I am not satisfied that the other pleaded representations were made at all for the reasons stated. I also reached this conclusion assisted by other factors. They are:

(a)  In submissions, the plaintiffs accept that they cannot recollect every aspect of what was discussed at the meeting and the pleaded representations are not verbatim repetitions of the statements made by Slater. The plaintiffs are not saying that the pleaded representations are either what Slater had said to North or are words to the effect of what was said and are capable of being understood in the sense in which it was false. Recognising their difficulties, the plaintiffs try to overcome them with the argument that the defendants have accepted some of the pleaded representations as constituting representations and that those very representations were definitely made at the meeting. I can see no basis for the plaintiffs' contention that the defendants have conceded or admitted that the representations "are a true reflection of their mutually understood meaning, and hence of what was represented". The defendants have denied making any representations or had made concessions of the sort alleged. The plaintiffs are required to prove what was said and that it amounts to a representation in law. The court has to determine what representations could be spelt out from the words used. Equally, the court has to know what was said to determine its truth or falsity from an interpretation of the words used and the meaning they bore. Where there is ambiguity, the representee must do more than show that in its ordinary meaning the representation was false. He has to show [*518] in which of the possible senses he understood it, and in that sense it was false. The aforementioned is all the more significant where the plaintiffs are trying to show the total effect of oral representations and silence.

(b)  The observations which I have made earlier under the heading of " The evidence".

*Representations - whether false*

*Misrepresentation by silence*

64  Silence on the part of Slater on various matters is central to the plaintiffs' case. The plaintiffs are alleging that Slater had made a series of representations about the cargo but omitted from them some matters that are vital, so that what was said constituted half-truths. Ms Ang submits that there was misrepresentation through his silence in that Slater did not disclose the Grand Empire claim, prior loss history which revealed that several parties were interested in the cargo, issues concerning the Australian cargo and lack of formal bonding. Ms Ang said it was inexcusable for Slater not to have disclosed these problems since he was an independent party providing an unbiased opinion.

65  It is not in dispute that there is nothing in general law which requires that commercial transactions of this nature be carried on in a completely open way or requiring full disclosure at all times. Mr Lim's contention is there is no question of partial disclosure arising from the

3 SLR 501, *; [2003] 3 SLR 501

matters omitted in respect of the representations admittedly made by Slater. Nothing was left out to qualify them and to make them untrue. To hold the defendants accountable for Slater's silence on the various matters is tantamount to imposing upon them a duty to disclose when there is none.

66   Misrepresentation by silence entails more than mere silence. A mere silence could not, of itself, constitute wilful conduct designed to deceive or mislead. The misrepresentation of statements comes from a wilful suppression of material and important facts thereby rendering the statements untrue.

67   In an action in deceit, the plaintiffs have to prove, to use the language of Lord Cairns in *Peek v Gurney* [1861-73] All ER Rep 116 at 129:

> some active misstatement of fact, or, at all events, such a partial and fragmentary statement of fact that the withholding of that which is not stated makes that which is stated absolutely false.

The statement made must be either in terms, or by such an omission in the sense stated by Lord Cairns, an untrue statement.

68   When silence on the part of Slater or a failure to speak is alleged to constitute misleading conduct or deception, the proper approach to take is to assess silence as a circumstance like any other act or statement and in the [*519] context in which it occurs. Hence, it is necessary to examine the silence with reference to the charge that is made against the defendants.

*Representation that (a) there was no lien on cargo; (b) stemming from the Port Authority's own interest in keeping the cargo in the port area, there might be difficulties in physically removing the cargo out of the port area; however, this problem was surmountable; and (c) the cargo was bonded.*

69   For the reasons explained below, in my judgment, the three statements were true. When taken either individually or cumulatively together with Slater's silence, they do not translate into the misrepresentations argued by the plaintiffs. Ms Ang submits that the total effect of the representations and silence is that Slater misrepresented to the plaintiffs that, to his knowledge:

> if the plaintiffs did proceed to purchase the cargo, there would thereafter be no meaningful hindrance as concerns their subsequent physical dealings with it, and in particular in transporting it out of Qingdao by ship. Indeed he went further and indicated that there might be problems at the port but these were easily surmountable and at the very most he would need only 3 to 4 weeks (a negligible period) to iron out any problems that might possibly arise in that respect.

The charge against the defendants is alleged misrepresentations that affected "physical dealings with the cargo". But issue of title to the sense that the plaintiffs did not have title to and could not acquire good title to the cargo is very different. And it is not possible to put forward on the evidence a case that the loss and damage was that allegedly caused by the plaintiffs being induced by the defendants to pay the purchase price to a person who could not have transferred title in the relevant period leading to the plaintiffs taking up the documents and paying for the cargo.

70   The plaintiffs in para 17(vii) of the Re-Re-Re-Amended Statement of Claim said that Slater's representation that there were no liens was false in that prior to 6 October 1999 there were substantial outstanding charges incurred in relation to the cargo which included, but were not limited to, cost of supply of bags, bagging, discharging, storage and various other unpaid costs, all of which would attract a lien.

71   The plaintiffs have not explained how those various costs attract a lien. The existence of outstanding charges does not equate to a right of lien. The plaintiffs did not adduce evidence of Chinese law to displace the general understood position that a custodian of goods has no common law lien

for his storage charges. There is no common law lien for costs of bagging and discharging. A right to lien arises only by agreement. There is no evidence that any other party besides the defendant had a contractual lien.

72   The defendants' right of lien is conferred by express agreement and is found in cl 34 of the Warehousing Conditions. By cl 6, the defendants were [*520] permitted to entrust the cargo to a third party for storage. Sinotrans stored the cargo with Beigang Company on behalf of the defendants. Although the cargo was stored at Beigang Company, it was Sinotrans' employees who would from time to time check on the cargo. The defendants have the right to possession of the cargo and, in my view, the defendants could in the circumstances of this particular case assert their contractual lien even though the cargo was stored at Beigang Company.

73   Slater did not make a positive false statement when he said that there was no lien asserted against the cargo. At the material time, no lien was in effect asserted or exercised on the cargo by the defendants or any other party. By saying that there was no lien, Slater represented that the defendants had no outstanding charges or that if there were any, the defendants would not assert their contractual lien over the cargo. Marco had by then agreed to pay USD407,408.66 to settle all outstanding charges including the defendants' management fees, which would have made it unnecessary to assert a lien on the cargo. Slater was confident that Marco would not renege from its promise to pay and Marco did in fact remit the money to the defendants on 18 October 1999. Marco's agreement to pay all outstanding amounts is a new arrangement and, if anything, superseded the defendants' letter dated 23 June 1999 whereby the defendants had earlier agreed not to look to Marco for payment of management fees. Marco's promise effectively improved the defendants' position in that Marco or Grand Empire rather than Grand Empire alone would pay management fees and outstanding charges.

74   Wang Xin Wen, the manager of the bonding department of Sinotrans, testified that in October 1999 the port had not asked for payment of storage charges. This was because of an existing arrangement between Sinotrans and the Port Authority that the latter would be paid before taking delivery. On the evidence, the Port Authority or Beigang Company (described by Liu Wei Dong as a branch of the Port Authority) had not asked for payment of storage charges during the relevant period of 6 to 15 October 1999 or raised any invoices. The injunction was not about the Port Authority or Beigang Company detaining the cargo because of unpaid charges.

75   Prior to the injunction, RSX had not presented any claim to the defendants for bagging and discharging expenses. Neither had RSX asserted such a claim against the cargo. At the outset, RSX's claim against Grand Empire was for ownership of the cargo. After the plaintiffs had succeeded in lifting the injunction in May 2000, they sought an order for sale of the cargo pending RSX's appeal. RSX tried to stop the sale order and for the first time in April 2000 raised a claim for outstanding discharging and bagging charges.

76   I have earlier found that Slater had not represented whether expressly or impliedly that there were no problems – actual or potential – with title and with taking delivery. In the light of my finding, neither can it be said that [*521] by Slater's silence, the representations that I found that he had made were qualified and hence half-truths.

77   I now turn to the representation that the cargo was bonded. There is no dispute that Slater said at the meeting that the cargo was bonded. The plaintiffs are alleging that the cargo was not formally bonded until 17 December 1999. Before that, the formalities under the Bonded Rules were not

complied with. As a consequence of the defendants' misrepresentation, the plaintiffs had to bond the cargo and had incurred costs of bonding the cargo. After 16 December 1999, the cargo had not moved from its originally stored location to a bonded warehouse.

78   The defendants take the position that the cargo was declared and bonded in a "customs supervised" manner by way of a handwritten declaration on 12 April 1999 pursuant to the provisions of a directive of Qingdao Customs dated 8 September 1998 ("Qing Guan Ban"). This method of declaration was a "local practice" allowed by the Qingdao Customs.

79   Wang Xin Wen's evidence is that he submitted the handwritten declaration which was accepted by Customs and that meant that the cargo enjoyed bonded status since April 1999 until 16 December 1999. The Qing Guan Ban was later disallowed around November 1999.

80   There is no doubt that at the material time there was such a local practice. The defendants' expert on Chinese Customs law, Jin Yu-Lai explained that the Qing Guan Ban was issued to ease port congestion and shortage of bonded warehouses due to economic growth in China. The plaintiffs' expert on Chinese Customs law, Yu Quan, accepted that the Qing Guan Ban may have been a "temporary practice" to solve the port congestion and shortage of bonded warehouses. He, however, doubted whether such a practice was lawful. Yu Quan testified that the "Qing Guan Ban", which is a practice between the Port Authority and Qingdao Customs, is contrary to the Bonded Rules and Customs law. His view is that the Qingdao Customs would not have the power to vary the laws and practices as set out in the 1987 Chinese Customs laws or Bonded Rules.

81   The plaintiffs further submit that the Qing Guan Ban was inconsistent with the Bonded Rules in that declaration and bonding of cargo pursuant to the Bonded Rules could only be performed where there was an existing consignee, ie there must always be a consignee for the cargo at the time of declaration. The Qing Guan Ban, on the other hand, appeared to permit declaration of cargo where the actual consignee could not be determined within the three-month period stipulated under the law. Therefore, the plaintiffs submit that the handwritten declaration pursuant to the Qing Guan Ban was not a valid declaration because the submission of the consignee's identity to Qingdao Customs.

[*522]

82   Even if the handwritten declaration under the Qing Guan Ban was accepted by Qingdao Customs, Yu Quan's view is that it is still contrary to Chinese law as the three-month period to declare the goods could not be extended. What Sinotrans was doing in the absence of a local consignee was to get round the strict provisions of Customs law by relying on the Qing Guan Ban to make an informal declaration without identifying the local consignee which is contrary to the Bonded Rules.

83   The plaintiffs further submit that the Qing Guan Ban regulated the issue of customs declaration but not bonding, for which the provisions of the Bonded Rules would still have to be complied with.

84   It is not necessary to decide whether the Qing Guan Ban was contrary to law or not. In an action in deceit, the important question is whether the defendants genuinely believed that the cargo was bonded. It does not matter that Slater and Sinotrans got it wrong legally and a court would come to an opposite conclusion on the law. There is no liability for honestly interpreting the facts known to Sinotrans and Slater or drawing conclusions from them in a way the court did not think to be legally warranted. See *Derry v Peek* (1889) 14 App Cas 337; *Akerhielm v De Mare* [1959] AC 789; *Panatron Pte Ltd v Lee Cheow Lee* [2001] 3 SLR 405.

85   The Qing Guan Ban was a directive of the Qingdao Customs. It was not unreasonable and in fact it was natural for Sintrons and Slater to accept the Qing Guan Ban as official and to act accordingly. Its authenticity and conformity to national law would not in the circumstances have been questioned. Acceptance by Qingdao Customs of the handwritten declaration fortified their belief that the cargo was bonded. Rightly or wrongly, the fact remained that all the while no duty was levied on the cargo. No penalties or fines were imposed or confiscation orders made by Qingdao Customs. In my judgment, it was plausible and reasonable for Sinotrans and Slater to have inferred from these facts that the cargo was bonded. There was basis for a belief that was honestly held to be true.

*Inducement and reliance*
86   I now deal with the constituent elements of inducement and reliance should a different view be taken on the conclusions I have reached. In addition, these two elements are closely related to the plaintiffs' alternative claim in negligent misstatement.

*Intention to deceive*
87   On the question of fraudulent intent on the part of the defendants, I am satisfied on the evidence that Slater had no intention to deceive either by active misrepresentation or by dishonest silence. The plaintiffs have not established that Slater had wilfully refrained from correcting any [*523]  misapprehension that he knew existed in the mind of North. There are salient features in this case which in their cumulative effect conclusively negate fraud. There are three factors.

(a) Honest belief in Marco's ownership of the cargo
88   The plaintiffs' contention is that Shanghai Cornelder and Slater were told not to release the cargo because of an ownership dispute between Grand Empire and Marco. They were put on notice by Grand Empire's Hong Kong lawyers, M/s Siao Wen & Leung ("SWL"), that Grand Empire would be re-purchasing or redeeming the mortgage on the cargo from Marco and SWL had cautioned them of Marco's intention to dispose of the cargo. The lawyers had also informed Shanghai Cornelder and Slater of their clients' intention to apply to the Hong Kong court for an injunction restraining Marco from selling or disposing the cargo. The purpose of the letter was to put Shanghai Cornelder on notice not to release the cargo.
89   There was, in my judgment, no wilful suppression of SWL's notice with the intention of deceiving or misleading the plaintiffs. I find that at the time of the meeting Slater honestly believed that the cargo belonged to Marco. There is his evidence that after he received SWL's notice he would have queried and spoken to Kestenbaum who was confident of Marco's legal rights. When queried, Kestenbaum would have equally conveyed to Slater as he did subsequently to North his assurance on Marco's title. I would add that Marco's belief in its legal rights was not misplaced. The New York arbitration award dated 8 May 2001 in favour of Marco bore out Marco's belief. The arbitrator found that Grand Empire had lost its contractual right to repurchase the cargo from Marco by not having exercised those rights in a timely manner prescribed by the relevant contract.
90   In addition, the cargo was held to the order of Mees Pierson on account of Marco following release instructions from Grand Empire's bank, Standard Bank, as far back as June 1999. As stated, the first set of warehouse receipts were issued to the order of Standard Bank on account of Grand Empire in April 1999. From April right until 19 October 1999, the defendants have

had no notice of any adverse claim to ownership by RSX.

91   It is not disputed that the original warehouse receipts were at the relevant times with Marco's bank, Mees Pierson. Mees Pierson sent the original warehouse receipts to KCB Bank on a collection basis. It was not suggested that bills of lading for the cargo were ever in the possession of RSX or Grand Empire.

92   The plaintiffs submit that Slater was alive to possible claims being made against the cargo by RSX even before the Adimon arrived in Qingdao. This they say is evident from the fact that he had some idea that RSX was interested in the cargo right from the start. At the time the cargo arrived, the requisite [*524] letter of credit was not provided by RSX and so the plaintiffs submit Standard Bank sought to retain its security interest. That argument alone does not assist the plaintiffs. To show that the defendants were privy to the commercial arrangements between RSX and Grand Empire, the plaintiffs will have to prove that the defendants were privy to the alleged payment by RSX for the cargo, loan agreement between RSX and Grand Empire and the deposit of four warehouse receipts with Grand Empire as security for the intended loan.

93   Standard Bank and Mees Pierson gave release instructions which resulted in the issue and flow of warehouse receipts from one bank to another. The respective banks were comfortable to provide finance against security of the cargo. It is reasonable to infer therefrom that the banks were satisfied with their respective customer's proprietory interest in the cargo. If the banks were satisfied, there was no reason for the defendants to hold a different view. In addition, the cargo was received subject to the defendants' warehousing conditions and by cl 3, the customers warrant that they are the owners of the goods. All these developments are consistent with what Slater was told by Standard Bank that the defendants' appointment came in the wake of RSX dropping out of the picture as buyer.

94   Even if Slater was legally wrong in attributing ownership to Marco, there was nothing dishonest in the attribution. There was no misrepresentation as to title either fraudulently or negligently.

95   Further, in my view, the Grand Empire claim is separate from the RSX's dispute with Grand Empire. The evidence relied on by Ms Ang that RSX was controlled by Grand Empire is inadmissible evidence as it offends the hearsay rule. SWL's letter dated 10 November 1999, which alleged that Shanghai Cornelder was aware of the mortgage arrangement between Grand Empire and Marco, is for the same reason inadmissible. Interestingly, no notice of the RSX injunction was given by SWL or mentioned in SWL's letter in November 1999.

96   Slater was not under any legal obligation to notify the plaintiffs of SWL's notice or the claims connected with the Australian alumina. I accept the defendants' submission that the dispute with different Chinese entities on account of a parcel of cargo of Australian alumina is irrelevant. The circumstances which I have dealt with justify these conclusions.

(b) Suggestion to buy the cargo CIF Vanino (delivered basis)

97   I accept Slater's testimony that he suggested to North to buy CIF Vanino (delivered basis). This testimony is corroborated by Dobson and also by North's own fax of 6 October 1999 to Marco offering to buy the cargo CIF Free Out Vanino. Nothing turns upon the inclusion of "Free Out" in this offer. The words "Free Out" are concerned with the bearing of costs of discharge and the responsibility for the operation of discharge including any [*525] damage to the goods that may be caused during the process of discharge: see *Etablissements Soules Et Cie v Intertradex SA* [1991] 1 Lloyd's Rep 378. Dobson's evidence is that North and Slater discussed buying

3 SLR 501, *; [2003] 3 SLR 501

on an "in warehouse" basis, on an FOB basis and on a CIF basis. They discussed all three possibilities. Dobson said:

> As I say, I think he did express a preference and his preference was that we purchase it on a CIF basis or FOB basis as opposed to an in warehouse basis.

98   The plaintiffs submit that where capacity to pass good title is in issue it matters not if the sale is on CIF basis or any other basis. That may be so. But, in my view, Slater's suggestion to buy CIF Vanino is significant for the reason that it is proof of absence of intention to deceive or mislead North to purchase.

99   How the suggestion to buy CIF Vanino came about was explained during cross-examination. I would mention that it is accepted by the parties that Slater used the expression "CIF" rather than what appears in the transcripts as "CNF".

> Q:  But if he bought FOB, then the problems in the warehouse up to the shipment port would also not be his problems?
>
> A:  They would only be his problems if he booked a vessel and the cargo would not be able to get loaded on to a vessel because of the problems at the port, and then he would incur demurrage. That is why I suggested that I book the vessel instead of him so that he would not have to incur demurrage. I didn't want that to happen.

> The cost of moving the cargo from in warehouse there was a discussion of what it would cost to move the cargo from in warehouse to FOB, and I did tell him that there would be a premium, I would be charging a premium on the FOB charges because it was difficult ... because of the difficulties at the port, and we were talking about vessels and how to book the vessel, and, initially he was talking about how long it would take to get it out, and I said three or four weeks or maybe more. I was not certain and I said, "You know, maybe it is better that I book the vessels so that you don't have these problems and then at least I can assume these responsibilities", because I was concerned at the time that Trans-World may run into a problem, and they were an important customer for me, and this was a first business for me in China with Trans-World, and I wanted to ensure that everything went well. For that reason, I said, You know what, don't even buy it FOB, don't even bother buying it FOB, just go ahead and buy it CNF [*sic*], because that will clear you of any problem whatsoever in buying the cargo if you just take it delivered, then you don't have to worry about the shipment, how long it is going to take to get it out, it will be Marco's problem and not yours" [*526] and he said, "Yeah, that sounds like a good idea," and, as I said, the last thing I said to him is "Do me a favour, Jeremy, buy the cargo CNF [*sic*]".

He continued:

> I think if you say to somebody "do me a favour" buy the cargo CNF [*sic*], it means you are asking me for my take on it, that is my take. If you do it another way you may confront other problems. I think that is what it means to be honest.
>
> The reason I told him to buy CNF [*sic*] was so he would not encounter any problems, period and if Marco was not able to deliver up on the cargo or there were delays or the price would have crashed because the delays were too long, he would not have been in harm's way at all and he would have full recourse to anything Marco did at that point because they would not have performed on their contract.

100   North had certainly appreciated the risk associated with the purchase

of the cargo. After the meeting, North made Marco an offer in writing. He wrote:

> [W]e have discussed the matter with Adam Slater and it appears that unencumbered title of the material is not available. It seems to me that the best route is for you to arrange shipment out of the port by sea.

He then proceeded to "bid firm" CIFFO Vanino at USD285 per metric tonne. North also stipulated a payment term of 30 days from the bill of lading date. By this offer, the obligation of Marco as a CIF seller is to ship the cargo and to tender the bill of lading and other appropriate shipping documents to the plaintiffs and the plaintiffs' obligation is to take up and pay for the documents 30 days from the bill of lading date. To ensure that the plaintiffs received in Vanino the contracted quantity, he stipulated that the weight of the cargo be determined by draft survey at the discharge port. North's fax of 6 October 1999 irrefutably contradicts the plaintiffs' assertion that they were under the impression that the cargo was "in every respect a safe cargo to buy".

101  It is said that the defendants had a real incentive to misrepresent the truth by their silence. There was no prospect for recovering USD407,408.66 unless the cargo was sold. Furthermore, the plaintiffs say the pre-15 October charges do not add up and according to their calculations the sum of USD407,408.66 is 7.25% of the purchase price. I am not convinced that an inference can be drawn from these facts that the money was for assisting Marco to sell the cargo.

102  If the defendants were indeed in league with Marco, Slater would not have suggested to the plaintiffs to buy CIF Vanino. Besides, a fraudulent person like the defendants would not in my judgment have afforded to his victim such a clear opportunity of detecting his fraud. Marco did not disappear with the purchase price after payment. In fact, Marco and the [*527] defendants assisted the plaintiffs in the Chinese proceedings. Moreover, Marco continued to defend the arbitration commenced in September 2000 in New York by Grand Empire 2000. The arbitration award was published in May 2001.

103  The defendants are not principals in the sale transaction and it is inherently improbable that the defendants would deliberately and dishonestly mislead the plaintiffs with whom they desired to do business in the future. The purpose of Slater's visit was to promote the defendants' services to the plaintiffs who were a major player in the aluminium business. It would not make sense in the circumstances for Slater to lie to the plaintiffs and at the same time jeopardise the reputation of the Cornelder group.

(c) RSX's injunction was not known until 19 October 1999

104  Slater notified North of the injunction on 19 October 1999. The RSX injunction was allegedly obtained on 8 October 1999 which was before the plaintiffs entered into a contract of sale with Marco on 12 October 1999 and before payment of the purchase price to Marco. It is the plaintiffs' case that the defendants or their agents were aware of the injunction as early as 8 October 1999 or by the latest 15 October 1999. North testified that he spoke to Slater on 14 October 1999 for a weight certificate. At that time Slater did not mention the RSX injunction. The plaintiffs paid Marco on 15 October 1999.

105  Liu Wei Dong, the lawyer appointed to assist the plaintiffs in lifting the RSX injunction, said that the court order itself did not bear the date in October 1999 in which it was issued. He observed that as the injunction took immediate effect, the date the injunction was issued or served was therefore material. The plaintiffs' case is that the injunction was obtained and served on 8 October 1999. Contrary to the plaintiffs' contention, Wang Xin Wen did not in para 13 of his Affidavit of Evidence-in-Chief accept as a matter of fact that the injunction was obtained on 8 October 1999.

3 SLR 501, *; [2003] 3 SLR 501

106  The plaintiffs went about proving the date the order was granted and served in three ways: firstly, through Liu Wei Dong's conversation with Yang Qing, the judge who granted the order. Liu Wei Dong was informed by Yang Qing that he granted the order on 8 October 1999 and on the same day served the injunction, RSX's Statement of Complaint and the Enforcement Assistance Notification on the Port Authority and "relevant parties". Yang Qing did not name the "relevant parties". Liu Wei Dong's evidence offends the hearsay rule and is inadmissible. In any case, Liu Wei Dong during cross-examination agreed that Yang Qing did not tell him that he notified or served the injunction on Sinotrans, Shanghai Cornelder or the defendants.

107  Secondly, the plaintiffs sought to rely on a finding of the Shandong Court dated 9 May 2000 that the injunction was obtained and served on [*528] 8 October 1999. That particular finding is not admissible as evidence of the truth of the date of the order and service. In *Maroti Laxman Koshti v Jagannathdas Lachhmandas Gadewal* AIR 1939 Nagpur 72, the Indian court was dealing with s 43 of the Indian Evidence Act (our s 45 Evidence Act (Cap 97)) and held at 74 that:

> [A] judgment is certainly not admissible to prove the truth of the
> fact which it states, much less is any fact, stated as part of the
> reasoning in arriving at the fact in issue, evidence of the truth of
> that fact.

See also the authorities referred to under the heading of "The evidence".

108  Thirdly, Yu Quan gave evidence on judicial practice relating to service of court orders in China and he said that it would be reasonable to inform the warehouse company who issued the warehouse receipts and local agents, Sinotrans and Shanghai Cornelder. Jin Xiao Jian, General Manager of Sinotrans, testified that Sinotrans was never informed of or served with the injunction and Enforcement Assistance Notification. Slater testified that Shanghai Cornelder and the defendants were not notified or served with the injunction and Enforcement Assistance Notification.

109  Yu Quan testified that a standard form is used to acknowledge service or receipt of a court order. No form of receipt was produced by Liu Wei Dong. I am prepared to draw from their absence the necessary adverse inference that the defendants, Shanghai Cornelder and Sinotrans were not notified or served with the injunction and Enforcement Assistance Notification.

110  In the end, there is no evidence before me as to when exactly the injunction was obtained, when it was served and on whom.

111  Wang Xin Wen heard about the injunction over dinner on Friday, 15 October 1999 with Yang Ke, an officer from Beigang Company. Yang Ke was unable to provide him with details. Wang Xin Wen then phoned Zhang Jiachun, the manager of Beigang Company for details of the injunction. The latter was not able to tell him much other than two days ago, a judge from the Sifang Court wanted to locate the goods "to seize". Beigang Company did not accept the court order nor was he (Wang Xin Wen) informed of the exact location of the goods. Wang Xin Wen said that he had not seen any signs such as a court seal on the cargo to indicate that the cargo had been "seized" by the Sifang Court.

112  When Wang Xin Wen returned to work on Monday, he spoke only to his superior, Jin Xiao Jian, about what he had heard on Friday evening. They discussed what they should do and decided to make an application to the Sifang Court. The application, they said, was for the purpose of ascertaining whether there was an injunction and to obtain a copy of the order. It was after the Sifang Court rejected their application that Wang Xin Wen on the evening of 18 October 1999 telephoned Yang Shu Guang of Shanghai Cornelder to [*529] report on what he had heard on 15 October and what he had tried

3 SLR 501, *; [2003] 3 SLR 501

to do on Monday. Yang Shu Guang told him to approach the Sifang Court again the next day. Slater's evidence is that he did not return to China until 14 or 15 October 1999. Wang Xin Wen informed Slater of the injunction on 19 October 1999. Sinotrans successfully obtained a copy of the injunction from the Sifang Court on 19 October 1999 and faxed it to Slater on the same day.

113   In such a case where fraud is alleged, the plaintiffs have to prove that the defendants knew that the plaintiffs would pay Marco for the cargo on 15 October 1999. The fact that defendants' invoices were dated 14 and 15 October 1999 are not in themselves proof that the latter knew beforehand when payment to Marco by the plaintiffs' bank would be effected. In Re-examination, Slater clarified that he never knew when the plaintiffs would pay Marco. The plaintiffs have not proven that notification of the injunction was deliberately held back until the defendants were paid USD407,448.66 by Marco.

114   I find that the defendants were not aware of the RSX injunction prior to the payment of the purchase price. Yang Shu Guang of Shanghai Cornelder heard about a possible injunction on 18 October 1999 which was confirmed the next day after Sinotrans' verification with the Sifang Court.

*Reliance*

115   Even if any of the representations pleaded were in fact made or rendered untrue because of silence on the part of Slater, I am satisfied that there was no reliance by the plaintiffs on any alleged misrepresentation taken either individually or cumulatively in entering the sale contract. The plaintiffs have, on the evidence, disavowed any reliance on the alleged misrepresentations. It follows that no damage flowed from any misrepresentation.

116   North joined the plaintiffs' sister company, Trans-World Metals Ltd, in 1981. In 1985, he was sent to New York to re-organise the USA operations and was made a director. North returned to London in 1990. He was by 1999 already an experienced trader of no less than 18 years' standing and by then was the managing director of the plaintiffs. North left TWA at the end of March 2001 following the company's decision to wind down the business. Prior to the subject contract of sale, North had dealt with Marco on several occasions in the past, mostly with Kestenbaum. He knew Kestenbaum personally from those past deals.

117   North was an astute and experienced trader. It is true that the plaintiffs had little experience in or knowledge of Qingdao. However, in my judgment, it is inherently improbable that North would commit over USD5m to purchase the cargo relying on just the oral statements made by Slater at a courtesy visit to promote Shanghai Cornelder's services and after a 40-minute [*530] discussion. It is significant that at that meeting no attendance note or memorandum was maintained given the importance the plaintiffs had sought to place on the meeting.

118   Besides, North certainly did not get the impression from Slater that the purchase would be risk free in that there was no potential problem with title and delivery. His fax of 6 October 1999 sent after the meeting alluded to Marco's inability to give unencumbered title. The fact that he raised it (and I do not believe his testimony that it was meant to test whether Marco was a strong or weak seller) is a clear indication of how he perceived the situation - it was not at all a risk-free purchase. His fax indicated that he recognised or was aware that title to the cargo was not "clean".

119   North's testimony is that he was subsequently assured by Kestenbaum of Marco's title. North said that on the same day ie 6 October 1999, Kestenbaum called him and was told that Marco was not interested to sell on a CIFFO

basis and would only sell on an "in warehouse" basis. In that same telephone conversation Kestenbaum "assured" North that Marco had clean title to the cargo and was in a position to transfer clean title. That such an assurance was given is highly likely and probable from a commercial viewpoint where a potential seller, like Marco, was confronted with a fax from North doubting clean title. Such an assurance is also consistent with Slater's evidence that Kestenbaum was confident of Marco's legal rights when he spoke to Kestenbaum about SWL's notice.

120    After the RSX injunction was made known to the plaintiffs, North wrote on 22 October 1999 to Kestenbaum to complain that Kestenbaum had only alluded to the logistical problems without pointing out the competing claims for ownership. On the logistical matters, he said, the plaintiffs had spoken to Slater and Slater had "advised us that the Port Authority might not cooperate in shipping the cargo". He went on to state that in fact when the plaintiffs suggested that unencumbered title might not be available, "you [Kestenbaum] assured us that you had clean title to the material and that you were in a position to transfer clean title. It was on this understanding that we bought the material".

121    In my judgment, the plaintiffs' decision to buy on an "in warehouse" basis after Marco's refusal to sell on a CIFFO Vanino basis was not made in reliance on the defendants' representations. Given his past dealings with Kestenbaum, I find that he relied on Kestenbaum's assurance that Marco could transfer clean title. In addition, North knew the benefit of buying CIFFO Vanino. But in buying on an "in warehouse" basis, he decided to take the risk associated with a purchase on that basis.

122    Turning to the issue of bonding, it seems that the plaintiffs were relying on the warehouse receipts rather than on what was said at the meeting that the cargo was bonded. At the meeting no warehouse receipts were produced. In [*531] a fax dated 23 November 1999 to the defendants marked for the attention of Michael Goh, North wrote:

> [W]e purchased the cargo in good faith relying on Cornelder warehouse receipts on the basis of Cornelder's assurances that the cargo was bonded in a warehouse. We know that the cargo was not bonded but in a customs supervised area and furthermore, it has been stored in an open compound since April ie not in a warehouse or indeed under cover. I will stress that we bought the cargo in good faith and in reliance on your warehouse receipts

123    In my judgment, the plaintiffs have not proven that the defendants had acted dishonestly and had acted with the intention of deceiving the plaintiffs in order to get the plaintiffs to buy the cargo. There was no reliance on the part of the plaintiffs on the defendants' representations in entering the contract. The plaintiffs' case on fraudulent misrepresentation therefore fails.

**Innocent and negligent misstatement**

124    A claim founded on the Misrepresentation Act (Cap 390) is an action in contract. The plaintiffs have not established the contract and the representation that induced them into contracting with the defendants. Accordingly, the claim under this Act fails.

125    I now turn to the allegation of negligent misstatements. The plaintiffs claim that the representations on which they relied on had, if not made fraudulently, been made negligently.

126    The loss alleged is purely economic. It was not until *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465 that the House of Lords recognised a category of cases where such a loss was recoverable in tort

apart from any contractual or fiduciary relationship. *Hedley Byrne* was concerned with negligent misstatements causing financial loss, and the principles have been extended to new situations. The categories of persons who could sue for economic loss were nevertheless restricted to a limited category of relationships.

127    The limits of that head of liability for negligent misstatement was set out in the speech of Lord Oliver in *Caparo Industries plc v Dickman* [1990] 2 AC 605 at 638:

> What can be deduced from the *Hedley Byrne* case, therefore, is that the necessary relationship between the maker of a statement or giver of advice ("the adviser") and the recipient who acts in reliance upon it ("the advisee") may typically be held to exist where (1) the advice is required for a purpose, whether particularly specified or generally described, which is made known, either actually or inferentially, to the adviser at the time when the advice is given; (2) the adviser knows, either actually or inferentially, that his advice will be communicated to the advisee, either [*532] specifically or as a member of an ascertainable class, in order that it should be used by the advisee for that purpose; (3) it is known either actually or inferentially, that the advice so communicated is likely to be acted upon by the advisee for that purpose without independent inquiry, and (4) it is so acted upon by the advisee to his detriment. That is not, of course, to suggest that these conditions are either conclusive or exclusive, but merely that the actual decision in the case does not warrant any broader propositions.

128    *Hedley Byrne* is the governing authority in cases such as the present. The particular facts of this case do not call for an extension of the principles to a new situation.

129    It is alleged that the plaintiffs relied on Slater to provide information about the cargo and its status. The issue here is what scope of duty, if any, did Slater assume. Did he assume a responsibility to provide information about the cargo so much so that a failure to speak could give rise to liability in negligence? Or did Slater assume a responsibility limited to answering questions that were posed to him?

130    What is required to establish a special relationship of proximity in a case like the present? Lord Browne-Wilkinson in *White v Jones* [1995] 2 AC 207, explaining the reasoning of the majority in Hedley Byrne, said at 272:

> [T]he crucial element [in Hedley Byrne] was that, by choosing to answer the enquiry, the bank had assumed to act, and thereby created the special relationship on which the necessary duty of care was founded.

He continued at 273 and 274:

> Just as in the case of fiduciary duties, the assumption of responsibility referred to is the [defendant's] assumption of responsibility for the task not the assumption of legal liability. Even in cases of ad hoc relationships, it is the undertaking to answer the questions posed which creates the relationship. If the responsibility for the task is assumed by the defendant he thereby creates a special relationship between himself and the plaintiff in relation to which the law (not the defendant) attaches a duty to carry out carefully the task so assumed.
> The law of England does not impose any general duty of care to avoid negligent misstatements or to avoid causing pure economic loss even if economic damage to the plaintiff was foreseeable. However, such a duty of care will arise if there is a special relationship between the

3 SLR 501, *; [2003] 3 SLR 501

parties. Although the categories of cases in which such special
relationship can be held to exist are not closed, as yet only two
categories have been identified, *viz.* (1) where there is a
fiduciary relationship and (2) where the defendant has voluntarily
answered a question or tenders skilled advice or services in
circumstances where he knows or ought to know that an identified
plaintiff will rely on his answers or advice. In both these categories
this [*533] special relationship is created by the defendant
voluntarily assuming to act in the matter by involving himself in the
plaintiff's affairs or by choosing to speak. If he does so assume to
act or speak he is said to have assumed responsibility for carrying
through the matter he has entered upon.

131   The elements of reasonable foreseeability and reliance are fundamental
as is the element of assumption of responsibility in the sense explained by
Lord Browne-Wilkinson. Reliance by the plaintiff would be relevant in
considering whether there has been such an assumption of responsibility and
causation.

132   In a case like *Hedley Byrne* where the defendant chooses to speak,
he is taken to have assumed responsibility from that fact alone. This is not
so when the defendant keeps silent. Slade LJ in *La Banque Financiere de la
Cite v Westgate Insurance Co Ltd* [1988] 2 Lloyd's Rep 513 said at 559:

> Can a mere failure to speak ever give rise to liability in negligence
> under Hedley Byrne principles? In our view it can, but subject to the
> all important proviso that there has been on the facts a voluntary
> assumption of responsibility in the relevant sense and reliance on that
> assumption. These features may be much more difficult to infer in a
> case of mere silence than in a case of misrepresentation.

133   In contract there is no obligation to speak in the context of
negotiations for an ordinary commercial contract. Likewise in *Westgate*
(above) the court held that there was no legal obligation on the underwriters
to disclose the broker's dishonesty merely because there was an established
relationship with the parties.

134   The distinguishing feature in the present case is that Slater chose to
answer questions about the cargo at an informal meeting when he was not under
any legal obligation to do so. In so doing, Slater had undertaken to answer
questions that were asked of him.

135   In the course of cross-examination by Ms Ang, he said:

> Q:  So your attitude at the meeting, Mr Slater, is just to give
> information based on what you were asked and not give information
> which you thought might be relevant even though you were not
> asked.
>
> A:  It is the nature of anybody in the trade to answer questions that
> you are asked, and answer those questions to somebody as you are
> asked them. You don't start telling them about what is not asked,
> and if the buyer or the customer is interested, they know very
> well what to ask themselves, they don't need me to tell them
> stories about it.
>
> I think that I have mentioned the other day that Trans-World was
> probably the single largest buyer of alumina in the world. They
> knew how to buy alumina and what to ask and what not to ask.

[*534]

136   Slater was not questioned about title or adverse claims on ownership.
Neither did Slater undertake responsibility to provide information about
that. As warehousemen, the defendants would not be involved in issues of
title and Slater would not have agreed to answer questions on that. It

3 SLR 501, *; [2003] 3 SLR 501

follows that the non-disclosure of SWL's notice, for instance, cannot of itself have resulted in the assumption by the defendants of a duty to speak or provide information.

137   His testimony is commercially plausible. Title to the goods may pass from one person to the other whilst the goods remain throughout the entire time in storage. A change of ownership may occur without the prior knowledge of a warehouseman. Whatever the warehouseman might hear about title may be rumours or even true at one time but may be resolved by the time of release of the goods. A warehouseman may well be uncertain whether a purported sale actually affects title to the goods. Furthermore, having received the goods from one person, the warehouseman may consider it inconsistent to acknowledge title in another. As was the case here, the defendants operated on the basis of a warranty from their customer such as Marco of its ownership in the goods. For the defendants, that is a prudent way to conduct business.

138   Besides, the sale contract with Marco was subject to English law. So it was an implied term of the sale contract that the seller has the right to sell. It would have been unnecessary in the circumstances for a potential buyer to inquire about title. However, if a potential buyer had wanted information on title, the proper person to speak to is the seller and not the warehouseman. On the evidence, North had received Marco's assurance on clean title.

139   Slater knew at the meeting that North was thinking of buying the cargo. I accept his evidence that the defendants had no financial interest in influencing the plaintiffs to buy the cargo. It did not matter to Slater whether the defendants managed the cargo for Marco or the plaintiffs. As I said earlier, Slater was hoping to secure the plaintiffs' future business and it would be inherently improbable for him to have done or said anything adverse to jeopardise the defendants' chances.

140   I have already found that there was no misrepresentation of the statements made by him. If they were inaccurate, the statements were not made carelessly. Neither did the plaintiffs, as I have found, rely on the representations. On the particular facts of this case, no duty of care arose and, even if there was such a duty, no breach of duty has been established.

141   I would for completeness add that in *South Australia Asset Management Corporation v York Montague Ltd* [1997] AC 191, Lord Hoffmann with whom the Lords of Appeal agreed, sought to impose further limits or control on the extent of the liability for negligent misstatement by pointing out that the scope of duty has a bearing on damages recoverable in the sense that there can be liability only for a loss which falls within the scope of the duty and not for any [*535] loss which falls outside it. The claimant must show the duty that was owed to him and that it was a duty in respect of the kind of loss that he has suffered. In the case of liability in negligence for providing inaccurate information, this would mean liability for the consequences of information being inaccurate and not responsibility for losses that would have occurred even if the information, which he gave, had been correct. Lord Hoffmann said at 213 to 215:

> Rules which make the wrongdoer liable for all the consequences of his wrongful conduct are exceptional and need to be justified by some special policy. Normally the law limits liability to those consequences which are attributable to that which made the act wrongful. In the case of liability in negligence for providing inaccurate information, this would mean liability for the consequences of the information being inaccurate.
>
> [A] person under a duty to take reasonable care to provide information on which someone else will decide upon a course of action

3 SLR 501, *; [2003] 3 SLR 501

is, if negligent, not generally regarded as responsible for all the
consequences of that course of action. He is responsible only for the
consequences of the information being wrong. A duty of care which
imposes upon the informant responsibility for losses which would have
occurred even if the information which he gave had been correct is not
in my view fair and reasonable as between the parties. It is therefore
inappropriate either as an implied term of a contract or as a tortious
duty arising from the relationship between them.
The principle that a person providing information upon which another
will rely in choosing a course of action is responsible only for the
consequences of the information being wrong is not without exceptions.
This is not the occasion upon which to attempt a list, but fraud is
commonly thought to be one.

142   Here the plaintiffs are claiming damages for negligence equivalent to
the price of the cargo which has nothing to do with the representations made
by the defendants. The loss in other words is not a consequence of the
inaccuracy of the information.

143   I find that on the evidence, apart from choosing to answer the
questions raised, Slater did not agree to further provide or supply
information in respect of the cargo. It would be fallacious to interpret
Slater's decision to answer questions as conduct that gave rise to an implied
undertaking to voluntarily provide information about the cargo. There is
simply no justification for the court in holding that Slater had, in the
circumstances of the present case, even though the potential buyer buys the
cargo with its full history, undertaken or assumed a duty or responsibility
to speak or provide information, in tort, which was not imposed on the
defendants by the law of contract. What I have [*536] said must not be
conflated and confused with the principle that a representation is treated as
continuing up to the time of the contract, or other reliance with a
correlative duty on the maker to correct any misrepresentation.

144   In my judgment, there is no liability in negligence arising from
Slater's silence for he had not voluntarily assumed responsibility to provide
information about the cargo and its status beyond what was asked of him so as
to give rise to a duty to speak and reliance on that assumption. Even if I
had been of the view that the defendants had voluntarily assumed
responsibility to provide information, the plaintiffs' contention under this
head would necessarily fail in the light of my earlier finding that the
plaintiffs did not rely on the defendants' representations to purchase the
cargo.

145   For all those reasons, I have reached the conclusion that the
defendants were under no duty of care to the plaintiffs in the circumstances
of this case to prevent economic loss that they suffered.

**Bailment**

146   The plaintiffs submit that no contract between the plaintiffs and
defendants can be construed out of the warehouse receipts. But, they say
there was an attornment by the defendants to hold the cargo as bailees for
the plaintiffs. The defendants had breached their duty in that there was a
shortage of 1,700 metric tonnes of cargo. The defendants' contention is that
the plaintiffs have not established the shortage as claimed.

147   I am not satisfied on the evidence that there was a shortage of 1,700
metric tonnes of cargo. The plaintiffs' surveyor who conducted a visual tally
did not see every stockpile. It was accepted by their witness, Wang Yi Bing,
a surveyor from A H Knight Asia Ltd, that he had not checked all stockyards
in the Beigang area for the cargo. I would in passing mention that even if

3 SLR 501, *; [2003] 3 SLR 501

there was a shortage, the plaintiffs, whilst they have *locus standi* to
sue, would probably have to account to the owner for the damages recovered.

148    The plaintiffs have alleged a further breach of duty as bailees in
that without authority or consent from the plaintiffs' bailor, the defendants
delegated custody and control of the cargo to Beigang Company, Gangxing
Company and/or other third parties and in further breach of bailment, without
consent of the plaintiffs stored the cargo at the premises under the control
of Beigang Company and/or Gangxing Company and/or other third parties. A
custodian must deal with the goods in the manner authorised by the bailor. He
may not without authority hand over the goods to a third party for storage.
The present case is different. Delegation is permitted under cl 6 of the
defendants' warehousing conditions. Therefore, there is no breach of
authority as alleged by the plaintiffs.

[*537]

## Counterclaim

149    The defendants are claiming management fees from 15 October 1999 and
continuing through March 2002 at the rate of USD5,000 a month until
presumably the date of judgment of the Supreme People's Court. As of March
2002, the total sum of USD145,000 was allegedly outstanding.

150    On 15 October 1999, Mees Pierson instructed the defendants to release
the cargo to the order of KBC Bank for the account of the plaintiffs.
Pursuant to those instructions, on 18 October, the defendants informed KBC
Bank that the cargo was released to KBC Bank for the account of the
plaintiffs. The defendants submit that on those facts, there came into being
a bailment by attornment on same terms as the original contract of bailment.
Under the original bailment, Marco paid the defendants management fees of
USD5,000 a month.

151    The decision of *Cremer v General Carriers SA* [1974] 1 All ER 1,
which the defendants rely on for the proposition that where there is a
bailment by attornment, the new bailor is bound by the terms of the original
contract, is distinguishable on the facts. In this particular case, the
defendants accepted the release instructions of Mees Pierson in London and
agreed to act on the orders of KBC Bank subject only to their standard
warehousing conditions and not, and I so find, on some other additional terms
that might have been agreed previously between Marco and the defendants.

152    So, can the defendants fall back on their standard warehousing
conditions to make this counterclaim? North saw the standard terms and
conditions in November 1999. When asked to explain what management of cargo
involved, Slater replied:

> Management of cargo means managing the cargo, making sure that it is
> there when it is supposed to be there, and I believe that the cargo is
> there, still today.

He elaborated when he was asked the same question again:
> Management includes ensuring that the cargo is properly stored, that
> the cargo is safe, that the cargo is in good condition, that the cargo
> is in this case bonded or maintains a bonded status, that it can be
> delivered to the customer or to the order party when they ask for it,
> and in these special circumstances we are unable to do the last part
> because there is an injunction on the cargo or there was an injunction
> in place on the cargo.

153    The warehousing conditions do not expressly provide for the payment of
a management fee. Neither is a management fee covered by the general wording
of cl 32 of the warehousing conditions. The purpose of cl 32 is to declare

3 SLR 501, *; [2003] 3 SLR 501

fees and charges described there as due and payable immediately. It is apparent that a management fee is a payment obligation typically associated [*538] with the services described in the draft tri-partite collateral management agreement.

154   In so far as the counterclaim is concerned, nothing turns on whether management fees of $ 5,000 per month was or was not discussed at the meeting. It is not the defendants' case that a management fee of $ 5,000 a month for this particular cargo was discussed *and* agreed to by the plaintiffs at the same meeting.

155   The issue before me is whether there was a concluded and binding agreement to pay management fees of $ 5,000 a month from 15 October 1999. In my judgment, the defendants had not, on the evidence, established the existence of such an agreement. The defendants wrote to the plaintiffs on 19 November 1999 setting out the terms of the management fees. Their own witness Slater acknowledged that the plaintiffs never accepted those terms.

156   Mr Lim submits that if the court finds that there was no agreement to pay management fees of $ 5,000 a month, that amount is nonetheless a reasonable figure. He highlighted the assistance rendered to the plaintiffs after the cargo was injuncted by RSX which he says is deserving of remuneration. The defendants, however, have not pleaded in the alternative a claim in *quantum meruit*. I am, therefore, unable to consider their argument that $ 5,000 a month is a reasonable sum for services rendered to the plaintiffs.

**Result**

157   This case was a most unfortunate transaction for the plaintiffs, but it is a misfortune in respect of which they alone must accept responsibility for having decided on this purchase. For all the reasons set out above, the plaintiffs' action is dismissed with costs.

158   As the defendants have not established a legal basis for their claim for management fees, the defendants' counterclaim is dismissed with costs.

   Plaintiff's claim dismissed. Defendants' counterclaim dismissed.