# EXHIBIT 2

413

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| MM GLOBAL SERVICES INC., MM GLOBAL SERVICES PTE. LTD., and MEGAVISA SOLUTIONS (S) PTE. LTD., | : <br> : <br> :    3:02 CV 1107 (AVC) <br> : |
| Plaintiffs, | : |
| -v- | : |
| THE DOW CHEMICAL COMPANY and UNION CARBIDE CORPORATION, | : <br> :    November 12, 2002 |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

THELEN REID & PRIEST LLP
    Michael S. Elkin  (ct 23828)
    Richard S. Taffet  (ct 10201)
    Barbara J. Jacobs  (ct 13566)
    Susan B. McInerney  (ct 23827)
    875 Third Avenue
    New York, New York  10022
    (212) 603-2000 (tel)
    (212) 603-2001 (fax)

WIGGIN & DANA LLP
    Robert M. Langer (ct 06305)
    Suzanne E. Wachsstock (ct 17627)
    One CityPlace
    185 Asylum Street
    Hartford, Connecticut 06103-3402
    (860) 297-3724 (tel)
    (860) 525-9380 (fax)

Attorneys for Plaintiffs
MM Global Services Inc., MM Global Services Pte.
Ltd. and MegaVisa Solutions (S) Pte. Ltd.

NY #490732 v9

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... i

FACTS ....................................................................................................................... 2

ARGUMENT ............................................................................................................. 20

CONNECTICUT IS THE APPROPRIATE FORUM FOR THIS DISPUTE ............................. 20

    A.    Deference Should Be Accorded To Plaintiffs' Choice Of Forum ....................................................................................................... 21

    B.    Singapore Is Not An Adequate Alternative Forum ................................. 24

    C.    The Relevant Private And Public Interest Factors Weigh In Favor Of Plaintiffs ........................................................................... 27

        1.    The relevant private factors favor Plaintiffs' choice of forum ................................................................................... 28

            a.    Relative ease of access to sources of proof ................... 28

            b.    Availability of witnesses ............................................. 30

        2.    The relevant public factors favor Plaintiffs' choice of forum ....................................................................................... 32

            a.    Administrative difficulties associated with court congestion ......................................................... 32

            b.    Burdening citizens of this forum with jury duty ........... 33

            c.    This Court has a local interest in deciding this controversy ................................................................ 33

            d.    Avoiding problems in conflict of laws and the application of foreign law ........................................... 34

    D.    Other Considerations ........................................................................... 39

CONCLUSION .......................................................................................................... 40

NY #490732 v9

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE**

Allstate Life Ins. Co. v. Linter Group Ltd.,
    994 F.2d 996 (2d Cir.), cert. denied, 510 U.S. 945 (1993) ..................................23

Bank of Credit and Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan,
    273 F.3d 241 (2d Cir. 2001)..................................................................................20

Capital Currency Exchange N.V. v. National Westminster Bank, P.L.C.,
    155 F.3d 603 (2d Cir. 1998), cert. denied, 526 U.S. 1067 (1999) ...............................24, 26

Dirienzo v. Philip Serv. Corp.,
    294 F.3d 21 (2d Cir. 2002)...................................................................20, 21, 22, 23, 24,
                                            27, 30, 32, 34, 35

Farris v. Sambo's Restaurants, Inc.,
    498 F. Supp. 143 (N.D. Tex. 1980) ...........................................................................3

Florian v. Danaher Corp.,
    2001 WL 1504493 (D. Conn. 2001) ......................................................................23, 33

G. Richard Goins Constr. Co., Inc. v. S.B. McLauglin Assocs., Inc.,
    930 S.W.2d 124 (Tex. Civ. App. 1996)......................................................................3

Guidi v. Inter-Continental Hotels Corp.,
    224 F.3d 142 (2d Cir. 2000)...................................................................................22

Gulf Oil Corp. v. Gilbert,
    330 U.S. 501 (1947).................................................................................20, 21, 27, 32

In re Initial Public Offering Sec. Litig.,
    174 F. Supp.2d 61 (S.D.N.Y. 2001).........................................................................34

Iraggori v. United Tech. Corp.,
    274 F.3d 65 (2d. Cir. 2001)...................................................................20, 21, 22, 23, 24,
                                            27, 39

Itoba Ltd. v. LEP Group PLC, 930 F. Supp. 36 (D. Conn. 1996)....................................30

Laker Airways v. Pan Am. World Airways,
    568 F. Supp. 811 (D.D.C. 1983) ............................................................................23

NY #490732 v9

**TABLE OF AUTHORITIES (cont'd)**

<u>CASES</u>                                                                                           <u>PAGE</u>

In re Livent, Inc. Sec. Litig.,
    78 F. Supp.2d 194 (S.D.N.Y. 1999)........................................................................32

Madanes v. Madanes,
    981 F. Supp. 241 (S.D.N.Y. 1997)........................................................................32

Maun Int'l, S.A. v. Avon Prods.,
    641 F.2d 62 (2d Cir. 1981)........................................................................34

O'Connor v. O'Connor,
    201 Conn. 632, 519 A.2d 13 (1986) ........................................................................37, 38

Overseas Programming Cos. Ltd. v. Cinematographische Commerz-Anstalt,
    647 F.2d 232 (2d Cir. 1982)........................................................................32

PT United Can Co., Ltd. v. Crown Cork & Seal Co., Inc.,
    138 F.3d 65 (2d Cir. 1998)........................................................................24, 26

Peregine Myanmar Ltd. v. Segal,
    89 F.3d 41 (2d Cir. 1996)........................................................................23, 24, 32

Piper Aircraft Co. v. Reyno,
    454 U.S. 235 (1981)........................................................................24

R. Maganlal & Co. v. M.G. Chemical Co.,
    942 F.2d 164 (2d Cir. 1991)........................................................................24, 30, 34

Reichhold Chem., Inc. v. Hartford Acc. & Indem. Co.,
    243 Conn. 401, 703 A.2d 1132 (1997) ........................................................................35

Transunion Corp. v. PepsiCo, Inc.,
    811 F.2d 127 (2d Cir. 1987)........................................................................26

Van Ommeen Bulk Shipping, B.V. v. Tagship, Inc.,
    821 F. Supp. 848 (D. Conn. 1993)........................................................................32

Vaz v. United States Surgical Corp.,
    1991 WL 47341 (D. Conn. 1991) ........................................................................30, 33, 37

Virgin Atlantic Airways Ltd. v. British Airways PLC,
    872 F. Supp. 52 (S.D.N.Y. 1994)........................................................................22

Wiwa v. Royal Dutch Petroleum Co.,
    226 F.3d 88 (2d Cir. 2000), cert. denied, 532 U.S. 941 (2001) ........................................................................20, 22, 27

NY #490732 v9

## TABLE OF AUTHORITIES (cont'd)

<u>CASES</u>                                                                                   <u>PAGE</u>

<u>World Film Serv., Inc. v. Rai Radiotelevisione Italian S.p.A.,</u>
    1999 WL 47206 (S.D.N.Y. 1999)...................................................................34


<u>RULES</u>

Fed. R. Civ. P. 12(b)(1)...................................................................................22

Fed. R. Civ. P. 12(b)(6)...................................................................................22


<u>OTHER AUTHORITIES</u>

Restatement (Second) of Conflicts of Laws § 188 ........................................35

Restatement (Second) of Torts § 6....................................................................38

Restatement (Second) of Torts § 145(2) ...........................................................38

NY #490732 v9

## PRELIMINARY STATEMENT

Plaintiffs MM Global Services Inc. ("MMGS"), MM Global Services Pte. Ltd. ("MMGS-S") and MegaVisa Solutions (S) Pte. Ltd. ("MVS") (collectively, "Plaintiffs") submit this memorandum of law in opposition to the motion of Defendants Union Carbide Corporation ("UCC") and The Dow Chemical Company ("Dow") (collectively "Defendants") to dismiss Plaintiffs' complaint on *forum non conveniens* grounds.

Contrary to Defendants' assertion, this case does not concern an "Asian business dispute." Rather, as alleged in the Complaint and as established by the proof presented in opposition to this motion, this case directly involves United States corporations and claims that arise from conduct that occurred in the United States and, specifically, in this forum. Thus, while two of the Plaintiffs are non-U.S. companies and certain events occurred outside the U.S., the critical events giving rise to Plaintiffs' antitrust, unfair competition, contract and tort claims center on: the sale of certain chemical products by Defendants and the purchase of such products by Plaintiffs in the United States; the Defendants' implementation and enforcement of a resale price maintenance scheme in connection with such products in the United States; and the adoption and undertaking of acts in the United States in violation of the Plaintiffs' contractual and other rights.

Defendants seek to escape these realities by misstating the parties' relationship and omitting facts directly pertinent to the issues at hand. By way of example, Defendants attempt to exclude consideration of their own conduct because they purportedly are not the real parties-in-interest. But, they are in fact the proper party defendants, and their conduct, most particularly by UCC from its headquarters in Danbury, is at the heart of this lawsuit. Defendants also attempt to make much of the corporate standing of Plaintiff MMGS in the State of Texas. Any defect that

NY #490732 v9

may have existed in connection with such standing, however, has been properly cured, and MMGS is fully competent to assert its claims in this case. Moreover, Defendants entirely ignore the fact that critical witnesses and proof directly material to the issues at hand are present in this forum, or are most conveniently obtained from this forum.

Defendants' arguments also fail because they are premised upon a misapplication of the controlling law in this Circuit concerning the doctrine of *forum non conveniens*. Under these authorities, Defendants cannot, and have not even sought to, meet their burden on this motion. When given proper consideration, these controlling cases establish that Connecticut is the proper forum for this case because: (i) dispositive deference should be afforded to Plaintiffs' choice of forum, particularly in light of the claims asserted by MMGS; (ii) Singapore is not an adequate alternative forum, in no small measure because neither Defendant can be compelled to appear there; (iii) the convenience of the parties in terms of witnesses, documents and other proof will best be served if this case is heard in Connecticut; and (iv) the law of Connecticut is applicable to determine liability for the conduct involved in this case, and this Court has a significant interest in applying such law.

## FACTS

The facts relevant to the *forum non conveniens* analysis are as follows: [1]

---

[1]    As noted by Defendants, the allegations of Plaintiffs' Complaint are accepted as true for the purpose of this motion. See Defendants' Memorandum of Law in support of their *forum non conveniens* motion ("Defs.' *FNC* Mem.") at 2, n.2. It is also noted that, to date, Defendants have failed to meet their discovery obligations and produce any documents in response to Plaintiffs' requests on *forum nor convenience* issues, even though the time to do so have passed.

NY #490732 v9

### The Parties

#### The Plaintiffs

Plaintiff MMGS (f/k/a Mega Global Services Inc.[2] and together with MMGS hereafter referred to as "MMGS") is a corporation organized and existing under the laws of Texas that maintained a principal place of business in Houston, Texas.[3] During the period of 1993 through 1998, pursuant to a contractual relationship with UCC, MMGS purchased certain chemical products (the "Products") from UCC in the United States and resold such Products from the United States to end-user customers in India.[4] Sanghvi Decl., ¶¶ 4, 6, 7. MMGS was established as a Texas corporation at the direction of UCC for the purposes of buying the Products for resale from UCC in the United States. Compl., ¶ 17; Sanghvi Decl., ¶ 3.

Plaintiff MMGS-S, a Singapore corporation, also was established at the direction of UCC for the purpose of buying Products in the United States from UCC for resale from the United States to end-users in India. From 1993 through 2000, MMGS-S engaged in such transactions pursuant to contractual arrangements with UCC. Compl., ¶¶ 5, 20; Sanghvi Decl., ¶¶ 6-8, 10; Declaration of Paresh Zaveri, dated November 1, 2002 ("Zaveri Decl."), ¶¶ 4-6.

---

[2]    In 1995, Mega Global Services Inc.'s name was changed to MMGS. Declaration of Sanjiv Sanghvi, dated November 11, 2002 ("Sanghvi Decl."), ¶ 7.

[3]    Defendants' arguments to the contrary notwithstanding, there is presently no issue concerning MMGS' capacity to assert the claims set forth in the Complaint. MMGS' status as an active and qualified Texas corporation in good standing has been reinstated. See Sanghvi Decl., ¶ 3 and Exh. 1. Accordingly, it is fully competent to maintain this action. See Farris v. Sambo's Restaurants, Inc., 498 F. Supp. 143, 148 (N.D. Tex. 1980) (forfeiture of a Certificate of Authority to operate in Texas is a curable defect); G. Richard Goins Constr. Co., Inc. v. S.B. McLauglin Assocs., Inc., 930 S.W.2d 124, 128 (Tex. Civ. App. 1996) ("Once a corporation pays its delinquent taxes, the corporation's disability is removed.... Once the right to sue or defend is revived, the corporation may sue or defend all causes of action, regardless of whether such causes arose before or during the period of forfeiture").

[4]    The Products specifically included: (1) specialty polymers and products ("SP&P"); (2) wire and cable products ("W&C"); (3) industrial performance chemicals ("IPC"); and (4) solvents, intermediates and monomers ("SIM"). See Compl., ¶ 11.

NY #490732 v9

In 2000, MMGS-S was succeeded by MVS. From 2000 through March 2002, MVS purchased Products from UCC, and thereafter from Dow, in the United States for resale from the United States to customers in India pursuant to contractual arrangements with UCC. Compl., ¶¶ 6, 21; Zaveri Decl., ¶ 6.

Non-party MegaVisa Marketing Solutions Ltd. (f/k/a Visa Petrochemicals Pvt Ltd.) ("MVMS") is an Indian corporation. It was established for the specific purpose of promoting UCC's products in India. In 1987, pursuant to a contract with UCC, MVMS acted as UCC's sales representative in India for such purposes. During all periods relevant to this lawsuit MVMS acted on behalf of MMGS, MMGS-S and MVS as their representative in facilitating the resale of the Products purchased by each of them in the United States from UCC, and then Dow, and resold to end-user customers in India. Compl., ¶ 7.

### The Defendants

UCC is a New York corporation with its principal place of business in Danbury, Connecticut. It is a chemicals and polymer company that sells products worldwide, including in the United States. Id. at ¶ 9. UCC ceased selling Products to India and, instead, sold them to Plaintiffs for resale pursuant to a UCC corporate legal directive resulting from the Bhopal tragedy in 1984. Id. at ¶¶ 13, 16, 17.

Dow is a Delaware corporation maintaining a principal place of business in Midland, Michigan. It is a science and technology company that provides chemical, plastic and agricultural products and services to many consumer markets throughout the world, also including the U.S. Id. at ¶ 8.

Effective February 6, 2001, UCC merged with a subsidiary of Dow, and UCC became a wholly owned subsidiary of Dow (the "Merger"). Dow assumed operational responsibility for all

sales of the Products by UCC and controlled the contractual relationships that existed between

UCC and Plaintiffs. Id. at ¶¶ 10, 22. Dow also reaffirmed to Plaintiffs the existence of the

contractual relationship between them and UCC. See Exhs. 2 and 3.

**The Parties' Contractual Relationship**

      The parties' relationship was memorialized by a series of letter agreements, related

documentation, and a course of dealings, as follows.

      <u>The 1987 Agreement</u>

      The parties first established their relationship in 1987 pursuant to a letter, dated

November 16, 1987 (the "1987 Agreement"), confirming MVMS' appointment as a

"non-exclusive distributor/indentor in India" for the Products "to be supplied by Union Carbide

Corporation (UCC)." The letter was executed on behalf of UCC by its subsidiary, Union Carbide

Eastern, Inc. ("UCE"), in its capacity "[a]s authorized representative of Union Carbide

Corporation (UCC)," and provided that MVMS would "canvas and promote" the Products, and

establish contact with potential customers in India "and represent UCC."[5]

      In performing its duties under the 1987 Agreement, MVMS worked pursuant to the

direction of UCC, as UCC's agent, receiving all directives and orders regarding pricing and other

terms of sale for the Products from UCC personnel at UCC's headquarters in Danbury,

Connecticut. Sanghvi Decl., ¶¶ 16-21. It was further agreed that MVMS would "not be held

liable on account of any Product performance or quality or packaging or demurrage charges in

any way on account of any supplies made or to be made by UCC," and UCC agreed to pay

---

[5]    Compl., ¶¶ 14-15; Exh. 4.

MVMS a commission on all sales arranged by MVMS in India. Such payments were made by UCC in the United States.[6]

The 1987 Agreement provided that it could be terminated by UCC (not UCE), and it was formally terminated, thereby reflecting the binding nature of the Agreement, by letter dated April 5, 1993, from R. Natajaran of Union Carbide Asia Pacific, Inc. ("UCAP"). See Exh. 6.

### The 1993 Agreement

In 1993 UCC requested that MVMS form a separate corporate affiliate and open an office outside India that would buy Products in the United States and resell them from the United States to end-users in India. MVMS complied with UCC's requests, forming MMGS (by its predecessor name Mega Global Services Inc.) in Houston, Texas. This new distributorship arrangement was memorialized by a confirmation letter also dated April 5, 1993 (the "1993 Agreement"). Compl., ¶ 17; Sanghvi Decl., ¶ 6; Exh. 7.

The 1993 Agreement was signed on UCC's behalf again by R. Natarahan of UCAP, and confirmed "Union Carbide's" (not UCAP's) interest in selling its Products to MMGS for resale to end-users in India. UCC confirmed to third parties the fact that MMGS was purchasing the Products from it.[7]

The 1993 Agreement further set forth the rights and obligations of MMGS and UCC (not UCAP). Thus, each sale of Products would be subject to the agreement of MMGS and UCC (not UCAP) on specific terms "including volume, specifications, price, payment and delivery." Exh. 7. The parties' course of dealings established those terms, and they were reflected by, among

---

[6]   Compl., ¶ 15; Exh. 5.

[7]   Exh. 9. See also Exhs. 23-25 and 56.

NY #490732 v9

other things, invoices, order acknowledgments, shipping receipts and other transactional documentation relating to specific orders. Sanghvi Decl., ¶ 10.

In addition, applicable to all transactions: (a) title and risk of loss on damages to the Products would pass from UCC (not UCAP) to MMGS "at the ship rail or inlet flange . . . at the U.S. port of shipment"; (b) unless otherwise requested by MMGS, UCC would arrange ocean transportation for the Products from the U.S.; and (c) MMGS' purchase price would include a mutually acceptable reseller's discount." Exh. 7. As a matter of course, title and risk of loss or damage to the Products did pass to Plaintiffs in the U.S., but MMGS arranged for transport of the Products from the United States. Sanghvi Decl., ¶ 6; see also Exh. 8.

The 1993 Agreement further contemplated that MMGS might purchase Products from UCC affiliates, when it would be more economical or efficient to do so, and then UCC would recommend that the same terms and conditions as applied to its sales to MMGS apply. UCC also reserved for itself (and not UCAP) the right not to sell to MMGS "a given product when Union Carbide is not satisfied as to its appropriateness from a health and safety standpoint due to the sophistication of the market, the product and/or the ultimate customer." UCC reserved no other circumstance in which it could elect not to sell to MMGS. Exh. 7.

### The 1995 Agreement

On September 8, 1995, the parties once again memorialized their relationship in a confirmatory letter agreement (the "1995 Agreement"). Compl., ¶ 19; Exh. 10. This occurred due to the establishment of MMGS as the successor in name to Mega Global Services, Inc. Sanghvi Decl., ¶ 7. The 1995 Agreement was signed by Ron Neri, then president of UCAP.[8]

---

[8]    Plaintiffs understand that Mr. Neri currently resides in the Danbury, Connecticut area. Sanghvi Decl., ¶ 7.

NY #490732 v9

The terms of the 1995 Agreement were virtually identical to those in the 1993 Agreement, again, confirming "Union Carbide's" (and not UCAP's) interest in selling "Union Carbide's products" to MMGS for resale by MMGS to customers located in India. As before, MMGS and UCC (not UCAP) would, and did, agree on specific terms relating to volume, specifications, price, payment and delivery, and the same other terms as reflected in the 1993 Agreement continued under the 1995 Agreement.

The 1995 Agreement included one provision that reflected the binding nature of the agreement not found in the earlier versions. This limited MMGS' right to resell the Products "as supplied by Union Carbide Corporation, only to customers in India and not to customers in any other country in the world." If MMGS did sell outside of India, then the "[d]istributorship arrangement with MMGS will forthwith be terminated without any notice." Exh. 10.

In 1998, at UCC's direction, all purchasing of the Products for resale to end-users in India was assumed by MMGS-S. Compl., ¶ 21; Sanghvi Decl., ¶ 4; Zaveri Decl., ¶ 5. The terms of the 1995 Agreement remained in force. Zaveri Decl., ¶¶ 6-7.

### The 2000 Agreement

In 2000, MVS succeeded MMGS-S as respects all of MMGS-S' business activities and MVS' role was confirmed by a letter agreement, dated June 27, 2000 (the "2000 Agreement"). Compl., ¶ 21; Exh. 12. Mr. Neri of UCAP signed this letter on behalf of UCC, and for all relevant purposes it reflected the same terms as the 1995 Agreement. Compl., ¶ 21; Exh. 12; see also Exh. 3. In addition, the 2000 Agreement, recognizing the binding effect of the parties understanding, provided that "[t]his agreement will commence with immediate effect and shall continue in effect for one year and thereafter unless terminated by Union Carbide [not UCAP] in its sole discretion on ninety days prior written notice." Exh. 12.

-8-

Following the Dow/UCC merger transaction in 2001, Dow assumed operational control of the relationship reflected by the 2000 Agreement and continued the course of conduct thereunder.  Compl., ¶ 22; Sanghvi Decl., ¶ 23; Zaveri Decl., ¶¶ 7-11.  See also Exhs. 3, 13 and 14.

No notice was ever provided that the 2000 Agreement itself had been transferred or otherwise assumed by Dow.  To the contrary, Dow expressly advised Plaintiffs that it "wish[ed] to continue the agreement in accordance with its terms."  Exh. 2.

### The Parties' Course of Dealing

Throughout the parties' relationship, Plaintiffs purchased approximately 95% of the Products from the Defendants in the United States and resold the Products to their customers in India from the United States.  Sanghvi Decl., ¶ 8; Zaveri Decl., ¶ 7.[9]  At all times, Defendants, in their dealings with Plaintiffs operated on a centralized basis such that all decisions and matters concerning the sale of all Products to Plaintiffs emanated from their respective headquarters in the United States.  Sanghvi Decl., ¶ 14.  Thus, all strategic decisions were made by UCC in the United States and were merely implemented through its regional operations.[10]  This practice continued after the Merger as Dow held itself out as "one Dow."  See Sanghvi Decl., ¶ 23.[11]

More particularly, decisions concerning the allocation and availability of Products each year, including to Plaintiffs, were made by Defendants based upon a "top down" process

---

[9]    See also Exh. 11 (various shipping documents demonstrating U.S. as point of origin); Exh. 15 (MMGS invoices to customers showing U.S. as point of origin of products); Exh. 16 (MMGS insurance policies noting U.S. as point of origin); Exh. 17 (certificates of origin showing U.S. as point of origin); Exh. 18 (certificates of analysis conducted and executed by UCC in the United States); Exh. 19 (bills of lading showing U.S. as point of origin); Exh. 22 (email from MMGS to UCAP stating "[h]ope Union Carbide, Danbury would be able to make the product available to catch this Vessel").

[10]   See, e.g., Exh. 57.

[11]   See, e.g., Exh. 26.

-9-

involving the development of what UCC called Annual Business Plans, or ABPs.[12] The ABPs were developed in the first instance by UCC's local representatives, together with Plaintiffs, based upon a review of the prior year's sales for each Product and projections for the following year.[13] This information was provided by UCC's Danbury personnel, and the information compiled for the ABPs was submitted to UCC/Danbury to be considered by UCC in the development of its global strategy. The following documents further illustrate UCC's involvement in the planning process from its Danbury, Connecticut headquarters for sales to Plaintiffs.

- Exh. 58 – email from Jennifer Casazza, marketing manager UCC/Danbury requesting year end sales reports for UCC to update its long range plan, stating "it's important that you communicate any forecast or significant changes to volume on specific product, to insure our production and inventory matches up with customer needs."

- Exh. 59 – email from Ken Bromfield, UCC/Danbury, setting forth key objectives for 2000, including "INCREASE PRICES WORLDWIDE!!!!."

- Exh. 60 – email from UCC/Australia to MMGS requesting market information to incorporate into plan to be submitted to Joe Soviero, Vice President and General Manager UCC/Danbury.

- Exh. 61 – email requesting sales projections from Plaintiffs to be submitted to Kevin Dillan, UCC/Danbury.

- Exhs. 62-63 – requests to Plaintiffs to use specific format provided by UCC for sales reports to allow input into UCC/Danbury systems.

- Exh. 64 – emails to UCC/Danbury requesting 1999 rolling shipping forecasts.

- Exh. 65 – email from Robert Calder of UCC/Danbury forwarded to MMGS requesting information required for piperazine study for India market.

- Exh. 66 – email request from UCC/Malaysia to Plaintiffs, per UCC's request, that MMGS provide competitor information regarding IPC products.

---

[12]   Sample ABPs relating to Plaintiffs are submitted as Exh. 79.

[13]   See Exh. 79.

NY #490732 v9

- Exh. 67 – UCC Chairman and CEO, William Joyce, directing UCC affiliates in 1998 to "minimize" the ABP planning process.[14]

Revisions or changes to the ABPs also required the approval and consent of the managers in UCC's Danbury offices. See, e.g.:

- Exh. 68 – memo rejecting MMGS' request to revise ABP because UCAP representative could "only agree on increased supply provided UCC Danbury can support."

- Exh. 69 – rejection by UCC/Japan of request from MMGS to purchase new product in Japan for resale in India because "I can not discuss with new AA business manager, namely Ralph Davies in Danbury about our AA strategy in India market on long term basis yet," with later advise that "discussed with Ralph in Japan in last week about our AA sales strategy in the India market. I am very sorry to say you but we decided UCC does NOT proceed to promote AA sales in the India market now."

Reports concerning actual sales progress, specifically relating to Plaintiffs were also submitted on a monthly and quarterly basis to UCC headquarters. These reports were sent to and reviewed by numerous individuals located in Connecticut, including individuals identified as E. Boros, T. Austin, K. Chesler, R. Citron, E. Kossakowsi, S. Gromley, P. Lilue, C. Pai, B. Poole, T. Melnick and W. Rosemund.[15]

UCC also gathered competitive information from the Plaintiffs for consideration by the Danbury managers, and gave Plaintiffs direction based upon decisions by those managers. See:

- Exh. 49 – UCAP email to MMGS stating "I had a conference call with Danbury last night. We definitely need the 1000MT business with Indofil. I am willing to be more flexible on price/terms if need be."

- Exh. 50 – UCC/Malaysia advising MMGS that "[t]he Danbury managers would like to be more aware of what is happening at our key customers and

---

[14]  See also Exhs. 83, 84, 87, 89, 97, 98 and 99.

[15]  Samples of quarterly and monthly sales reports are submitted herewith as Exh. 73. See also Exh. 90 (email from Keith Lloyd, a Global Business Manager for W&C at UCC/Danbury, requesting sales information); Exh. 93 (email requesting sales information to be sent to UCC/Danbury).

-11-

would like to have more information on a regular basis rather than the occasional emails."

- Exh. 70 – email from Larry Gross, UCC/Danbury, forwarded to MMGS requesting competitive MV/HV product samples for UCC R&D evaluation in light of stiff competition for such products.

- Exh. 71 – email from David Tornow, UCC/Danbury, to UCAP stating "[p]lease keep pressing hard at distrubtors for more . . . business – that's where the most busines [sic] is uncommitted."

- Exh. 72 – email from Patricia Holahan, UCC/Danbury, forwarded to MMGS providing information on various competitors, attaching letter from Holahan announcing price adjustments for certain products.

UCC/Danbury also provided materials for Plaintiffs to use in connection with the sale and

resale of the Products. For example:

- Plaintiffs were provided and required to use UCC marketing materials and participate in UCC's quality assurance programs, including at UCC headquarters in Danbury, Connecticut. See Exhs. 51-52.

- UCC provided product information to use in conjunction with their marketing efforts. See Exhs. 74, 85, 86, 92, 94 and 100.

- UCC directed training for Plaintiffs, including at UCC headquarters in Danbury, Connecticut. See, e.g., Exh. 44 (agenda for MMGS training session in Danbury that involved as participants and presenters UCC Danbury managers identified as D.C. Causey, R. Dickson, K. Spall, R. Davies, J. White, J. Hartjen and K. Dillan); Exh. 45 (UCC training guide entitled, "Price Implementation Before, During & After"); Exh. 46 (agenda for MMGS training in Danbury that included "meeting with Danbury folks (Duane Dickson, Doug Causey, Ken Spall, (working sessions with Kevin Dillan, Jim White, Jay Hartjens, Ralph Davies, etc)"); Exh. 47 (email reporting on Worldwide Strategy Meeting in Danbury and stating "keep your selling prices high!"); Exh. 48 (script for discussions with distributors concerning the "need for price increases" and global price changes prepared by UCC Chairman and CEO William Joyce, and W&C General Manager and Vice President John Yimoyines, both in Danbury).[16] See also Exh. 82 (answer to Interrogatory No.

---

[16]  See also Exh. 75 – email from UCAP to MMGS reporting on discussion at IPC Business Alignment Meeting in the U.S. attended by "almost all the senior IPC personnel from sales, R&D, manufacturing and business managers/directors" and commenting that changes may be required based upon discussion with U.S. managers; Exh. 76 – draft memo from MMGS to UCAP expressing hope that UCAP representative's "recent visit to USA to attend SVR/PXC commercial managers meeting was a great success and that critical issues such as SVR supply, pricing and aggressive Japanese competition prevailing in this region have been given due consideration."

NY #490732 v9

8 identifies various meetings in Danbury relating to credit, pricing and product availability issues); Exh. 91 (memorandum discussing meeting with W&C managers in Danbury).

UCC's highest executives even became directly involved in issues relating to Plaintiffs' purchases of Products. For example, in connection with a dispute asserted by Sterlite Industries, a MMGS customer, William Joyce, UCC's Chairman and CEO, and John Yimoyines, the Vice President and General Manager for the sales of wire and cable products, attempted personally to arrange a resolution and requested that MMGS keep them apprised of all developments. UCC/Danbury management, in fact became "perturbed" when an expected resolution of the matter seemed to be in jeopardy and requested an explanation for the apparent stumbling block in the negotiations. Exhs. 53, 54. See also Exh. 55 (reflecting UCC's direct involvement in additional disputes concerning Plaintiffs' customers); Exh. 101 (same).

The specifics of the Defendants' sale and Plaintiffs' purchase of Products also was directed from and controlled by the Defendants in the United States. The individual orders by Plaintiffs were also accepted, processed and filled in the United States.

MMGS, for example, would submit orders directly to UCC in the United States. Sanghvi Decl., ¶ 11. MMGS-S and MVS would submit orders to UCC's foreign subsidiary, UCAP in Singapore, but those orders were then entered into the UCC global order entry system, CEBA, and accessed in the United States by UCC.[17] They were then evaluated by UCC in the United States and either accepted or rejected. If accepted, they were then processed in the United States. Sanghvi Decl., ¶ 13. Plaintiffs were advised that a particular order was accepted and the terms

---

[17]  See Exh. 88 (email from UCC/Danbury inquiring where a certain order is and explaining that ll orders must be submitted to CEBA [in Danbury] and not to a UCC affiliate).

NY #490732 v9

approved by UCC by "understood and agreed" ("U/A") emails.[18] Moreover, MMGS would make payment for the Products to UCC in the United States.[19] Sanghvi Decl., ¶ 12. Payments were later made by MMGS-S and MVS in Singapore, but that was at the direction of UCC for purposes of efficiency – it did not change the venue where the actual sales transaction occurred. Sanghvi Decl., ¶ 13; Zaveri Decl., ¶¶ 5-6.

Once Plaintiffs' orders were entered into the CEBA system, decisions regarding whether Products would be allocated to fill Plaintiffs orders were made by UCC's Global Business Managers with responsibility for each of the groups responsible for the sale of the particular type of Product. These groups were called "Strategic Planning Units" or "SPUs," and there was an SPU for each of the Product categories sold to and purchased by Plaintiffs – SP&P Products; W&C Products; IPC Products; and SIM Products. Sanghvi Decl., ¶ 14. The Global Business Managers maintained offices in Danbury, and during the relevant period these individuals included Gene Fischer, Luc Du, Grace Waag, Ken Spall, Mike Marinaccio and Keith Lloyd. The Global Business Managers within each SPU reported to a Vice President and General Manager, also located in Danbury, who were responsible for strategic development, resource allocation and technological development of the products within the SPUs responsibility. During the relevant period the Vice Presidents and General Managers were: Lee McMasters for SP&P Products; John Yimoyines for W&C Products; Duane Dickson for IPC Products; and James Flynn for SIM Products. Sanghvi Decl., ¶ 15.

---

[18] Examples of U/As are submitted herewith as Exh. 96. See also Exh. 31.

[19] See, e.g., Exhs. 20, 21 (MMGS accounting statements reflecting payments to UCC in Houston, Texas).

NY #490732 v9

**Defendants Fixed Plaintiffs'**
**Minimum Resale Prices in Connecticut**

One of the terms set forth in the U/As issued by UCC in connection with orders from

Plaintiffs would be the resale price to be charged by Plaintiffs to their end-user customers as

approved by UCC. Sanghvi Decl., ¶ 16. The setting of the resale price started with the Plaintiffs

requesting approval of a "cost, insurance & freight" or "CIF" price. This was the full price that

they would charge to their end user customers. Sanghvi Decl., ¶ 17.[20] Plaintiffs would propose

the CIF prices based upon their evaluation of market conditions, and on communications with

UCC representatives concerning the range of prices that would be permitted. Local UCC

employees (including UCAP employees in Singapore) would have authority to approve CIF

prices within a certain range established by the managers in Danbury, but any deviation below

the range would require approval from Danbury. Sanghvi Decl., ¶ 18; Zaveri Decl., ¶ 8. Often

the local UCC representatives advised Plaintiffs that they had requested such approvals, but often

they were unsuccessful. In those circumstances, no Products would be allocated by UCC to fill

Plaintiffs' orders. Sanghvi Decl., ¶ 19. Even Plaintiffs themselves would advise UCC of the fact

that sales would be lost because of lower competitive prices, but to no avail. See id.; Exh. 42

(advising UCC that MMGS was "not able to sell W/C [wire and cable] compounds because of

low competitor's prices prevailing in the market"); Exh. 43 (UCC acknowledging that price

increases would cause Plaintiffs' customers to cancel orders).

Once the CIF price was approved, the selling price from UCC to Plaintiffs (the wholesale

price) – which was referred to as the "free alongside steamer" or "FAS" price – was then

established based upon a set mathematical formula that reduced the CIF price by certain

---

[20]    Samples of these requests are submitted herewith in Exhs. 32, 34, and 96.

NY #490732 v9

percentages attributable to freight and insurance costs that would be incurred by Plaintiff in reselling the goods, as well as a profit margin for Plaintiffs. Sanghvi Decl., ¶ 20; Zaveri Decl., ¶ 9.

The fixing of minimum resale prices by UCC, specifically from their headquarter offices in the U.S., is also reflected by numerous documents, some of which are now in the possession of Plaintiffs, that are submitted herewith.[21] Indeed, the transactional documents from UCC (and later Dow) to Plaintiffs in connection with the Products purchased and resold by Plaintiffs in and from the United States, reflect on their face the establishment of the CIF price with the FAS price calculated as described above.[22] Other documents reveal how deeply involved UCC was from its Connecticut headquarters.

- Exh. 77 – email from MMGS to UCAP stating "Tom White [UCC/Danbury Global Business Manager] has suggested us to get some orders for BUTYL CELLOSOLVE at a price of USD 675 CIF Mumbai . . . . Please confirm on this with the quantities available so that we can approach customer accordingly";

- Exh. 34 – email from Arjun Samtani to Kevin Dillan, UCC/Danbury, describing pricing breakup, including final CIF price sold to customer;

- Exh. 35 – email from Kevin Dillan, UCC/Danbury, to UCAP stating "I agree with the suggestion you made in your voice mail message that we NOT meet Akzo's latest prices in India. Let's stay at $2.40/kg for now and let Akzo have some business";

- Exh. 36 – email from UCAP to UCC/Danbury stating "[p]lease verify again the pricing of DEK ex-Taiwan. We need to make sure the pricing quote is at USD 2.10/kg CIF Mumbai level";

- Exh. 37 – email from UCAP to MMGS stating "[a]s promised, we had a conference call with Danbury last week on CZ which included price increase

---

[21]  Through discovery it is anticipated that numerous other documents establishing Defendants per se unlawful price fixing will be discovered. However, as of the date of this submission Defendants have made no production of documents, notwithstanding their time to do so has passed.

[22]  See Exhs. 32, 34, 96.

-16-

NY #490732 v9

in one of the topics we discussed.  We will proceed with our announced price increase and move the minimum floor price up to USD 5.45/kg CIF";

- Exh. 38 – email from UCAP to MMGS requesting information because "[w]e are being requested by Danbury to seriously consider a major price increase on 2,4PDO effective Nov 1 . . . I need this data to strategically determine what to recommend to Danbury on 2,4PDO business/price increase";

- Exh. 39 – email from Gene Fischer, UCC/Danbury Global Business Manager, setting minimum pricing for all telecom jacketing and insulation at USD 800/ton.

A string of related emails (Exh. 33) during February 1998 involving Kevin Dillan of UCC/Danbury, Arjun Samtani of UCAP and Sharad Mirji of MMGS is particularly illustrative of UCC/Danbury's involvement in setting the minimum resale prices that could be charged by Plaintiffs.  These emails provide as follows:

Mirji (MMGS) to Samtani (UCAP):

> [A]s per your advice, we are quoting them [the customer] USD 1900/MT CIF Madras D/A 180 days in Isotanks.

Samtani (UCAP) to Dillan (UCC/Danbury):

> Kevin, if I recall correctly, we did discuss this in our last conference call.  Kevin are you still OK with this or are there any fresh thoughts?

\*   \*   \*

Dillan (UCC/Danbury) to Samtani (UCAP):

> What is our current price on PM-6079?  I assume it is $1900/mt CIF and that we are simply trying to roll-over the price.  We should be increasing the price from today's level by at least $100/mt . . . .

Samtani (UCAP) to Dillan (UCC/Danbury):

> Kevin, thanks.  Our current price is $1900/mt.  We will quote $2000/mt and of course will not get the business.

-17-

Samtani (UCAP) to Mirji (MMGS):

> Please see attached email from Kevin and my reply.  Let us quote $2000/mt.

### UCC Set Plaintiffs' Credit in Connecticut

The credit terms pursuant to which Plaintiffs were able to buy the Products from UCC were also set by UCC in Danbury.  Thus, during the parties' relationship UCC extended Plaintiffs a line of credit that was a multiple of the value of a standby letter of credit that Plaintiffs opened in favor of UCC.  The people at UCC primarily responsible for establishing Plaintiffs' line of credit were UCC/Danbury credit managers Ed Roberts and Ted Gilsenan.  Sanghvi Decl., ¶ 22.  Documents reveal the involvement of Roberts and Gilsenan.

For example, in 1996, Kamal Jain and Arjun Samtani of UCAP submitted a report to Roberts reflecting their credit review of MMGS.  Roberts, indicating that the authority for credit decisions was his and others at Danbury, responded:

> I just finished reading Kamal's captioned report and was happy to see the sales opportunities he identified.  We certainly want to exploit them where possible.
>
> Kamal's bottom line was a request for a $500M open credit line for MM Global, Houston.  Since there is little credit basis for such a line, our best approach is to make it a "business decision" approval by Gordon Mounts/Don Ryan [both UCC/Danbury] with a U/A letter outlining the pros and cons, similar to other situations we have had in the past.

Exh. 78.  Thereafter, Roberts met with representatives of MMGS to discuss the credit situation, and encouraged MMGS to "keep up the close dialogue" with his office on credit and payment matters.  See Exhs. 27-30.[23]

---

[23]  See also Exh. 80 (memo from Roberts stating that he, Gilsenan and "everyone at the Danbury meeting" expressed support in working out letter of credit arrangements and ongoing payments against shipments with MMGS).

NY #490732 v9

**Dow's Involvement Following the Merger**

After the UCC/Dow Merger, the relationship with the Plaintiffs remained the same with all decisions being made in the United States. Sanghvi Decl., ¶ 23; Zaveri Decl., ¶¶ 7-11. Communications from Dow confirmed this.

Thus, John Yimoyines, who was UCC's Vice President and General Manager for the W&C SPU, and who became employed by Dow as its Business Vice President for wire and cable products, and, who continued to maintain his office in Danbury, wrote to Plaintiffs on March 2, 2001, that "we will attempt to avoid changes in the way we conduct our business with you, and we would ask that you continue to deal with us as you have in the past." Mr. Yimoyines also introduced Dow's "global leadership team," which included him as having the "responsibility for overseeing our wire & cable activities on a worldwide basis," with support from local commercial directors, including in Singapore. See Exh. 13.

Other documents also confirm Dow's activities in the United States in furtherance of the relationship with Plaintiffs. See, e.g., Exh. 41 (letter from Dow/Midland announcing price increase for Carbowax). Dow India also explained the process for Plaintiffs to place orders after the merger. An email, dated May 25, 2001, from Dow India to Plaintiffs confirmed that (i) Plaintiffs' Singapore office would issue a request for information to Dow in Singapore with a copy to Dow India salespeople; and (ii) the Dow India sales person, in turn, would get clearance from Dow's marketing managers in the U.S. and advise whether Dow Singapore should proceed in connection with entering Plaintiffs' order into the global ordering system. See Exhs. 40 and 95.

NY #490732 v9

### ARGUMENT

### CONNECTICUT IS THE
### APPROPRIATE FORUM FOR THIS DISPUTE

For purposes of a *forum non conveniens* analysis the "first level of inquiry" is to

determine the degree of deference owed to a plaintiff's choice of forum.  Dirienzo v. Philip Serv.

Corp., 294 F.3d 21, 28 (2d Cir. 2002) (quoting Iragorri v. United Tech. Corp., 274 F.3d 65, 73

(2d Cir. 2001) (en banc)).  A court next must determine whether an adequate alternative forum

exists.  Dirienzo, 294 F.3d at 29 ("[a] *forum non conveniens* motion cannot be granted absent an

adequate alternative forum"); Iraggori, 274 F.3d at 73.  If an adequate alternative forum does

exist, then "a series of factors involving the private interests of the parties in maintaining the

litigation in the competing fora and any public interests at stake" must be balanced.  Wiwa v.

Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000), cert. denied, 532 U.S. 941 (2001);

see also Dirienzo, 294 F.3d at 29; Iraggori, 274 F.3d at 73.  The relevant private and public

interests are as set forth by the Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09

(1947) ("Gilbert"), which held that "unless the balance is strongly in favor of the defendant, the

plaintiff's choice of forum should rarely be disturbed."  330 U.S. at 508.

In connection with each of the foregoing factors, a defendant moving for dismissal on

*forum non conveniens* grounds bears the burden of proof.  Dirienzo, 294 F.3d at 29; Bank of

Credit and Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d Cir.

2001); Wiwa, 226 F.3d at 100.  Thus, an action will be dismissed on *forum non conveniens*

grounds "only if the chosen forum is shown to be genuinely inconvenient and the selected forum

significantly preferable."  Iragorri, 274 F.3d at 74-75.  See also Dirienzo, 294 F.3d at 30

(plaintiffs should not be deprived of their chosen forum "except upon defendant's clear showing

that a trial in the United States would be so oppressive and vexatious to them to be out of all

proportion to plaintiffs' convenience"). Indeed, "the plaintiff's choice of forum should rarely be disturbed." Gilbert, 330 U.S. at 508.

Here, Defendants fail to acknowledge the foregoing authorities,[24] and they do not attempt to make the requisite showings required by them.[25] Moreover, even in connection with those factors that are raised by Defendants, Defendants rely upon misdirected arguments that fail properly to balance the types of considerations pertinent to a *forum non conveniens* analysis. Accordingly, Defendants have not met, and in many respects have not even attempted to meet, their burden of proof on this motion.

**A.     Deference Should Be Accorded**
**To Plaintiffs' Choice Of Forum**

In Dirienzo, the Second Circuit comments that "[i]n Iragorri we ruled that a court should begin with the assumption that a plaintiff's choice of forum will stand unless the defendant can demonstrate that reasons exist to afford it less deference." 294 F.3d at 28. Dirienzo further states that "[t]o determine what amount of deference should have been given, Iraggori instructs that '[t]he more it appears that a domestic or *foreign* plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice.'" Id. (emphasis added) (internal citations omitted).

Here, Defendants make no effort to present proof that Plaintiffs' selection of Connecticut as the forum for this action was for anything other than valid reasons. Their only reference to this factor at all is that the "general presumption in favor of a plaintiff's choice of forum is

---

[24]  Notably, Defendants do not cite, much less discuss, any of the Second Circuit decisions set forth herein.

[25]  See, e.g., Defs.' *FNC* Mem. at 9.

NY #490732 v9

weakened when, as here all of the claimants are from outside the forum." Defs.' *FNC* Mem. at

24. This position, however, is without support.

First, plaintiff MMGS is a U.S. resident plaintiff. Although MMGS is a Texas

corporation, it would be judicial error to accord its choice of this forum less than the presumptive

deference that would be accorded the choice of this forum by a resident or citizen of Connecticut.

See Wiwa, 226 F.3d at 103 ("the benefits for a U.S. resident plaintiff of suing in a U.S. forum is

not limited to suits in the very district where plaintiff resides," therefore error for the district

court to weigh against plaintiffs' choice fact that not all plaintiffs were U.S. residents); Guidi v.

Inter-Continental Hotels Corp., 224 F.3d 142, 146-47 (2d Cir. 2000) (the "home forum" of an

American citizen for *forum non conveniens* purposes is any "United States court").

Second, even if all of the Plaintiffs in this case were non-U.S. residents, under Dirienzo

and Iraggori, this alone would no longer support giving lesser deference to their selection.

Iraggori, 274 F.3d at 73 ("[w]e . . . understand the Supreme Court's teachings on the deference

due to plaintiff's forum choice as instructing that we give greater deference to a plaintiff's forum

choice to the extent that it was motivated by legitimate reasons"). As remarked, Defendants

present no proof that Plaintiffs' motives were anything other than legitimate, nor can they, given

the specifics of this case.

Indeed, a valid reason for selecting this forum over Singapore is this Court's interest in

enforcing federal and state antitrust laws, as well as the Connecticut Unfair Trade Practices

Act.[26] See Virgin Atlantic Airways Ltd. v. British Airways PLC, 872 F. Supp. 52, 61 (S.D.N.Y.

1994) (plaintiff's choice of forum not overcome by weighing private and public interest factors,

---

[26]    As shown in Plaintiffs' memoranda in opposition to Defendants' motions pursuant to Fed. R. Civ. P. 12(b)(1)
and (6), this Court has subject jurisdiction over Plaintiffs' federal and state antitrust claims, and Plaintiffs' complaint
states causes of action in connection with those claims, the CUTPA claims, and all other causes of action alleged.

-22-

even though certain conduct occurred in United Kingdom, where complaint alleged violation of federal antitrust laws, since United States has a strong interest in having such claims decided in the United States); Laker Airways v. Pan Am. World Airways, 568 F. Supp. 811, 817 (D.D.C. 1983) (U.S. interest in enforcing Sherman Act made *forum non conveniens* dismissal inappropriate). See also Dirienzo, 294 F.3d at 28 (valid reason for selecting U.S. forum was interest in enforcing U.S. securities laws); Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1003 (2d Cir.), cert. denied, 510 U.S. 945 (1993) (same). Further, the fact that both Defendants are amenable to process in Connecticut supports the validity of Plaintiffs' selection, as do the self-evident facts that Defendants will likely not be subject to prejudicial determinations here based upon their unpopularity or Plaintiffs' popularity. See Iraggori, 274 F.3d at 72. See also Florian v. Danaher Corp., 2001 WL 1504493 at *2 (D. Conn. 2001) ("[t]he presumption in favor of the plaintiff's choice of forum is especially important when the defendant resides in the chosen forum").[27]

The bona fide connections of this lawsuit to Connecticut also support according strong deference to Plaintiffs' choice of forum, and weigh strongly in favor of denying Defendants' motion. See id. As the proof offered by Plaintiffs shows, this case is blanketed with such connections, including without limitation: (i) the contractual relationship between the Plaintiffs and UCC; (ii) the involvement of UCC's management in Danbury with establishing Plaintiffs' presence in the U.S. for purposes of buying and reselling the Products; (iii) UCC's and, later, Dow's implementation and enforcement of the resale price maintenance arrangement that is at the heart of this case, including their setting the specific resale prices that were part of this *per se*

---

[27] The Court in Florian relied for this proposition on the Second Circuit's decision in Peregine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996), a case otherwise sought to be relied upon by Defendants on this motion.

unlawful price fixing conduct; (iv) UCC's, and later Dow's, management of the relationship with

Plaintiffs, including without limitation activities directed from Danbury concerning credit issues,

the development of sales policies and strategies applicable to Plaintiffs, and the overall decision

making in connection with the sale of the Products to Plaintiffs; and (v) training of both

Plaintiffs' and Defendants' personnel in Danbury in connection with the purchase and resale of

the Products.

Based upon the foregoing, Plaintiffs' choice of this forum to litigate the issues of this case

should be accorded presumptive deference, and Defendants should be held to a high standard of

proof to overcome this presumption. As demonstrated below, Defendants have not, and cannot,

meet such a standard.[28]

**B.**     **Singapore Is Not An Adequate Alternative Forum**

As discussed above, a *forum non conveniens* motion cannot be granted absent an

adequate alternative forum. Dirienzo, 294 F.3d at 29; Iraggori, 274 F.3d at 73.[29]  An alternative

forum is deemed adequate if: (1) the defendants are subject to service of process there and (2) the

forum allows "litigation of the subject matter of the dispute." Piper Aircraft Co. v. Reyno, 454

U.S. 235, 255 n.22 (1981).

Here, Defendants assert that Singapore is an adequate alternative forum. They are

mistaken.

---

[28] Cases according a plaintiff's choice of forum less deference because the plaintiff was a non-U.S. citizen or resident are inapposite. In those cases, in contrast to here, no plaintiff was resident in or a citizen of the United States. See Capital Currency Exchange N.V. v. National Westminster Bank, P.L.C., 155 F.3d 603, 611-12 (2d Cir. 1998), cert. denied, 526 U.S. 1067 (1999); PT United Can Co., Ltd. v. Crown Cork & Seal Co., Inc., 138 F.3d 65 (2d Cir. 1998). But, even in circumstances where a foreign plaintiff's choice of forum is properly accorded reduced deference, this "is not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for *forum non conveniens* is the exception rather than the rule." R. Maganlal & Co. v. M.G. Chemical Co., 942 F.2d 164, 168 (2d Cir. 1991).

[29] Accord Peregine Myanmar, 89 F.3d at 46.

NY #490732 v9

First, Defendants are not subject to suit in Singapore.[30]  They attempt to finesse this fatal

defect by ignoring the fact they are named as parties in this case and by simply pointing the finger

at certain of their subsidiaries in Singapore.[31]  This, however, is insufficient to overcome

Defendants' burden on this motion.  While Defendants' subsidiaries may indeed have had

dealings with Plaintiffs, as the facts presented by Plaintiffs show, the subsidiaries were acting

solely on behalf of UCC and Dow.  Thus, while UCAP may have executed the letter agreements

at issue, they did so on behalf of UCC and the letter agreements on their face make clear that it

was UCC that assumed the obligations and duties under the Agreements, and it actually

performed under the Agreements.[32]  Dow continued in the same way after the Merger.  Thus, in

fact, UCC and Dow are the properly named defendants in this case, and since they are not subject

to suit in Singapore, Singapore cannot as a matter of law be considered an adequate alternative

forum.

Second, Defendants' own arguments defeat their position that Singapore will allow

litigation of the subject matter of the claims alleged in this case.  Defendants' memorandum of

law in support of their motion acknowledges:  "Singapore law does not, of course, have the

Sherman Act or the Connecticut Antitrust Act, and does not otherwise recognize a cause of

action for resale price maintenance. . . . It also has no analog to Connecticut's tort of unfair

competition."[33]  Nor does Singapore law afford relief analogous to that available under

---

[30]  See Affidavit of Johnny Cheo Chai Beng, dated November 8, 2002 ("Cheo Aff."), ¶¶ 16-25.

[31]  See Defs.' *FNC* Mem. at 12.

[32]  See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) at 4-9.  To the extent Defendants believe that UCC's subsidiary UCAP should be named as a party defendant in this case, it would, as a Delaware corporation, be subject to suit in this forum and could be added as a party.

[33]  Defs.' *FNC* Mem. at 13.  See also Cheo Aff., ¶¶ 29-30, 41-42, 45-46.

-25-

NY #490732 v9

CUTPA.[34]  Thus, even if Plaintiffs could recover on their claims for breach of contract and certain of their tort claims, a litigation in Singapore would deprive Plaintiffs of having the subject matter of most of their claims addressed, including the central unlawful conduct in this case – i.e., Defendants' *per se* anticompetitive resale price fixing and their acts of unfair competition.

The cases relied upon by Defendants are not to the contrary.  For example, in Capital Currency Exchange, supra, the Court found the United Kingdom to be an available alternative forum to hear the plaintiff's antitrust claims because EU competition law provided analogous relief to that available under the Sherman Act.  See Defs.' *FNC* Mem. at 10.  Similarly, in Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127 (2d Cir. 1987), the Second Circuit held that the Plaintiffs' inability to assert their RICO claim under Philippine law did not preclude the Philippines from being an adequate alternative forum.  That, however, was because the plaintiffs could still assert claims for the three frauds underlying the RICO claim.  See Defs.' *FNC* Mem. at 26.  Defendants' conclusory statement to the contrary notwithstanding, the same cannot be said of Plaintiffs' claims here for antitrust violations, unfair competition and other tort claims.  See Cheo Aff., ¶¶ 29-30, 41-46.[35]

Because Defendants are not subject to suit in Singapore and because Singapore does not allow litigation of the very subject matter of this dispute, Singapore is not an adequate alternative forum to hear this case, and Defendants' *forum non conveniens* motion must be denied as a matter of law.

---

[34]    Cheo Aff., ¶¶ 43-44.

[35]    See also PT United Can, supra (inability to pursue a RICO claim in a foreign jurisdiction, Indonesia, did not cause the foreign jurisdiction to be held unavailable as an alternative forum because plaintiff could still pursue claims for the underlying alleged frauds in Indonesia).

NY #490732 v9

C.    **The Relevant Private And Public**
      **Interest Factors Weigh In Favor Of Plaintiffs**

Even if Defendants could show that Singapore was an adequate alternative forum (which

they cannot), they still would not "carry the day." Iragorri, 274 F.3d at 74. Defendants must still

meet their heavy burden of demonstrating that the balance of relevant private and public interest

factors "tilt[s] strongly in favor of trial in the foreign forum," Wiwa, 226 F.3d at 100, and that "a

trial in the United States would be so *oppressive and vexatious* to them as to be out of all

proportion to the plaintiffs' convenience." Dirienzo, 294 F.3d at 30 (emphasis added). This is

especially the case given the strong deference that should be given to Plaintiffs' choice of this

forum. Iraggori, 274 F.3d at 74 ("the greater degree of deference to which the plaintiff's choice

of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail

in securing *forum non conveniens* dismissal").

The relevant private and public factors to be considered were first set forth by the

Supreme Court in Gilbert. The private factors include: (1) the relative ease of access to sources

of proof; (2) the availability of compulsory process for attendance of unwilling, and the cost of

obtaining attendance of willing, witnesses; (3) if relevant, the possibility of viewing the premises

at issue in the suit; and (4) all other practical problems that make trial of a case easy, expeditious

and inexpensive. 330 U.S. at 508. The public factors established by Gilbert are: (1) the

administrative difficulties associated with court congestion; (2) the unfairness of imposing jury

duty on a community with no relation to the litigation; (3) the interest in having localized

controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the

application of foreign law. 330 U.S. at 508-09. Each case will turn on its own facts, and rarely

will a single factor be dispositive. Dirienzo, 294 F.3d at 29.

NY #490732 v9

When consideration is given to all of the facts relevant to this motion, the Gilbert factors show that Defendants cannot meet their burden, and Plaintiffs' election to litigate this case in this forum is proper and should not be disturbed.

**1.    The relevant private factors**
**favor Plaintiffs' choice of forum**

Defendants argue, albeit briefly, that the private interest factors favor dismissal because employees of Dow's Singapore subsidiary and certain employees of UCC's UCAP subsidiary are located in Singapore and it would take them a long time to travel to Connecticut. They also point out that a single representative of Plaintiffs, Sanjiv Sanghvi, resides in Singapore.[36] While the location of these particular individuals and potential witnesses may be accurately presented, Defendants convey only a fraction of the story. What they omit is telling.

**a.    Relative ease of access to sources of proof**

Omitted from Defendants' discussion is the significant volume of relevant documentary evidence that should be found at UCC headquarters in Connecticut, and at other UCC and Dow locations in the United States, or that is accessible in the United States, including through Defendants' global order entry system. As set forth in the accompanying affidavits and summarized above, approximately 95% of the transactions at issue involved the sale of the Products by UCC (and thereafter by Dow) to Plaintiffs in the United States. These sales were directed and made pursuant to strategies fashioned in the United States and specifically in Danbury, Connecticut. Moreover, Plaintiffs' orders were accepted and processed in the United States. Title to the Products also passed from Defendants to Plaintiffs in the United States, delivery of the Products to Plaintiffs occurred in the United States, and shipments of the Products

---

[36]  See Defs.' *FNC* Mem. at 14-15.

NY #490732 v9

by Plaintiffs to end-users originated in the United States. In connection with each of these
matters, records exist, or should exist, that are not located in Singapore, but rather, in the United
States. Plaintiffs have produced those documents in their possession that should also be in the
possession of Defendants in the United States, but these should only be a fraction of the relevant
documents. Once Defendants comply with their discovery obligations, which they have not yet
done, there should be many more.

Similarly, contrary to the incomplete picture that Defendants paint, decisions relating to
the foregoing transactions, while perhaps implemented to a certain extent by people located in
Singapore (or India), were directed by Defendants from UCC headquarters in Danbury, and later
by Dow still from Danbury. Thus, as evidenced even by the small volume of documents
Plaintiffs possess, communications to and from Defendants' offices in the United States
concerned, among other things:

- Establishment of UCC and Dow's worldwide pricing and other
  competitive strategies for the Products;

- Establishment and enforcement of Defendants' resale price
  maintenance scheme, including the setting of end-user prices at which
  Plaintiffs would be permitted to sell the Products consistent with
  Defendants' worldwide pricing strategies;

- Credit terms and the relationship that would exist in connection with
  Plaintiffs' purchase of the Products as established by Defendants'
  senior credit managers;

- Training and strategic policy decisions concerning Defendants' sale of
  Products to Plaintiffs and others; and

- Changes in Defendants' distribution of the Products as the result of the
  UCC/Dow merger transaction.

In these circumstances, while it is not disputed that certain proof will be found in
Singpore, that fact should not provide any determinative weight for *forum non conveniens*

-29-                                               NY #490732 v9

purposes. See R. Maganlal, 942 F.2d at 169 (fact that important evidence located in India insufficient to support *forum non conveniens* dismissal). Not only must such facts be viewed in the full context of this case, which shows that significant proof is located in the United States and this forum specifically, but it also must be considered in light of Defendants' absolute failure to explain how transporting any relative documents from Singapore to this jurisdiction would in any way be oppressive or vexatious. See Dirienzo, 294 F.3d at 30 (citing Itoba Ltd. v. LEP Group PLC, 930 F. Supp. 36, 44 (D. Conn. 1996) ("[t]o extent documents exist in England, advances in transportation and communication accord this issue less weight")).

Accordingly, it would be legal error to consider this factor other than weighing in favor of Plaintiffs' choice of forum. Dirienzo, 294 F.3d at 30. See also Vaz v. United States Surgical Corp., 1991 WL 47341 at *3 (D. Conn. 1991) (accessibility of proof factor pointed to maintaining case in Connecticut where plaintiff's claim based on alleged decisions made by the defendants at their world headquarters in Norwalk, Connecticut).

### b. Availability of witnesses

This factor also weighs heavily in favor of maintaining Plaintiffs' chosen forum. As Defendants acknowledge,[37] if this case was dismissed and Plaintiffs were required to refile it in Singapore, not only would Plaintiffs be unable to subject Defendants to suit in that jurisdiction, but Plaintiffs could not compel the attendance of many significant witnesses who were most involved in the transactions at issue. These would include the business and credit managers and executives located in Danbury, as well as UCC's employees involved in the delivery and shipment of Products elsewhere in the United States. See supra at 9-14. It would also include

---

[37]   Defs.' *FNC* Mem. at 15.

NY #490732 v9

Ron Neri, UCAP's president who signed the 1995 and 2000 Agreements on behalf of UCC, and who now lives in Connecticut.

Moreover, third parties involved in the delivery of the Products to Plaintiffs in the U.S., and the shipment of the Products by Plaintiffs from the U.S. to its end-user customers will also likely be necessary witnesses.

Nor should the Singapore residence of certain employees of Defendants' subsidiaries weigh in Defendants' favor. Notwithstanding the distance of Singapore from Connecticut and whatever cost may be involved in transporting people to Connecticut, throughout the relationship between Plaintiffs and Defendants people traveled to Connecticut repeatedly and continuously for, among other reasons, training and strategy meetings relating directly to the sale of the Products by Defendants to Plaintiffs.[38] Moreover, Defendants' employees themselves, even when located in Singapore, maintained voice mail and other presences in Connecticut.[39] Accordingly, whatever inconvenience may be experienced in having Defendants' own witnesses appear in the United States for trial in this forum, it would be no greater than the inconvenience they voluntarily undertook in connection with their relationship with Plaintiffs.[40]

Even if certain witnesses were not available to appear personally in the United States, however, their absence would not afford any support for Defendants' position. As the Second Circuit recently observed, "[d]espite the preference for live testimony, we have recognized the

---

[38]    See Exhs. 44-48, 82 (answer to Interrogatory No. 8 identifies a series of specific meetings that occurred in Danbury during the relevant period relating to issues such as credit, pricing, availability of product and fulfillment of accepted orders).

[39]    See Exh. 81.

[40]    Plaintiffs' primary witnesses also will be available to testify in the United States, and travel here regularly. See Exh. 82 (answers to Interrogatory Nos. 16 and 18 explaining that Plaintiffs' witnesses shall be available for testimony in the United States and travel to the United States for general business purposes).

NY #490732 v9

availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is

inconvenient." Dirienzo, 294 F.3d at 30 (citing Overseas Programming Cos. Ltd. v.

Cinematographische Commerz-Anstalt, 684 F.2d 232, 235 (2d Cir. 1982) ("any difficulties . . .

regarding witnesses whose attendance the Court is unable to compel can most likely be resolved

by the use of deposition testimony or letters rogatory") and In re Livent, Inc. Sec. Litig., 78 F.

Supp.2d 194, 211 (S.D.N.Y. 1999)).

    Accordingly, all that would be achieved by depriving Plaintiffs of their chosen forum in

favor of Singapore would be to transform what is, at worst, a minor inconvenience for

Defendants into a major burden for Plaintiffs. This is not an adequate showing to prevail on a

*forum non conveniens* motion. See Van Ommeen Bulk Shipping, B.V. v. Tagship, Inc., 821 F.

Supp. 848, 850 (D. Conn. 1993) (court should "not order a transfer which would merely switch

the burden of inconvenience from one party to the other").

**2.    The relevant public factors
favor Plaintiffs' choice of forum**

    Not only do Gilbert's private factors tip in Plaintiffs' favor, consideration of the relevant

public interest factors requires the same conclusion that this action must be maintained in this

forum.

**a.    Administrative difficulties associated with court congestion**

    A case may not be dismissed on *forum non conveniens* grounds unless the forum chosen

by a plaintiff is ***prohibitively*** congested. Madanes v. Madanes, 981 F. Supp. 241, 266-67

(S.D.N.Y. 1997) (emphasis in original). This factor will weigh in favor of *forum non conveniens*

dismissal only if the forum chosen by the plaintiff cannot accommodate the case on its docket.

See Peregrine Maynmar, 89 F.3d at 47.

-32-

Here, Defendants entirely ignore this factor, making no showing that this Court is prohibitively congested or that it cannot accommodate this matter on its docket. As Defendants have utterly failed to satisfy their burden of proof on this point, this factor must weigh in favor of maintaining the case here.

### b.    Burdening citizens of this forum with jury duty

Defendants ignore the fact that the citizens of Connecticut have a vested interest in ensuring that its residents do not engage in unlawful conduct. Both Defendants have a presence in this forum and regularly conduct business in this State. Importantly, UCC, headquartered in Danbury, is one of the largest corporate residents of Connecticut. Moreover, as previously discussed, the very conduct giving rise to Plaintiffs' claims occurred and was directed from this forum. Given Defendants' significant ties to this forum, a Connecticut jury certainly would have a direct interest in ensuring that corporations residing or transacting business in this forum not abuse that privilege and engage in unlawful conduct. Florian, 2001 WL 1504493 at *4; see also Vaz, 1991 WL 47341 at *3.

Given Defendants' failure to even address this factor, it too weighs heavily in favor of Plaintiffs' choice of forum.

### c.    This Court has a local interest in deciding this controversy

This Court's interest in deciding this case arises from the fact that the conduct underlying Plaintiffs' claims occurred in or was directed from Connecticut. Such conduct includes: (i) establishing Plaintiffs as distributors of UCC's Products; (ii) implementing the *per se* unlawful resale price maintenance arrangement; (iii) determining the prices that Plaintiffs were permitted to charge in reselling the Products sold to them by UCC; (iv) establishing the credit terms pursuant to which Plaintiffs could purchase the Products; (v) overseeing the strategies and

NY #490732 v9

training involved in UCC's and Plaintiffs' sales and resales of the Products; and (vi) terminating

Defendants' relationship with Plaintiffs when the Dow/UCC merger transaction was pending and

once it was completed. Defendants simply fail to acknowledge these facts, and the far more

extensive conduct that occurred in this forum and in the United States that will no doubt be

established once discovery in this case proceeds.

Thus, even when taking into account the fact that relevant conduct also took place in both

India and Singapore, consistent with the Second Circuit's decision in Dirienzo, it would be

"clearly erroneous" to find Singapore more convenient. 294 F.3d at 31.

### d.     Avoiding problems in conflict of laws and the application of foreign law

In discussing the Gilbert factors, Defendants primarily rely on the argument that the law

of Singapore will control a determination of Plaintiffs' breach of contract and tort claims. Even

if Defendants are correct (which, as discussed below, they are not), this is not sufficient for them

to prevail on this motion.

The Second Circuit has consistently admonished that the "need to apply foreign law is not

in itself a reason to apply the doctrine of *forum non conveniens* and [courts] must guard against

an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must

often perform." Maun Int'l, S.A. v. Avon Prods., 641 F.2d 62, 67 (2d Cir. 1981). See also R.

Maganlal, 942 F.2d at 169 ("it is well-established that the need to apply foreign law is not

sufficient to dismiss a complaint under the doctrine of *forum non conveniens*"); In re Initial

Public Offering Sec. Litig., 174 F. Supp.2d 61, 65 (S.D.N.Y. 2001) (trial courts may find and

apply foreign law and may even use experts to assist them); World Film Serv., Inc. v. Rai

Radiotelevisione Italian S.p.A., 1999 WL 47206 at *8 (S.D.N.Y. 1999).

NY #490732 v9

In addition, Defendants include no consideration in their analysis of the fact that if this case were heard in Singapore, Plaintiffs' antitrust and CUTPA claims, to the extent they were heard at all, would require the Singapore court to apply U.S. law.  Singapore law, however, provides no analog that would provide a Singapore court with any experience to adjudicate such claims, and dismissal on *forum non conveniens* grounds that would cause a foreign court to adjudicate claims with which it is unfamiliar would be contrary to the interest of having such claims decided here.  See Dirienzo, 294 F.3d at 28.

Further, Connecticut's conflict of laws principles[41] do not indicate application of foreign law to Plaintiffs' breach of contract and tort claims.

### 1)   Connecticut law should apply to Plaintiffs' contract claims

In connection with Plaintiffs' breach of contract claims, Defendants correctly state that the conflicts analysis will be determined according to the most significant relationship test, and that under this test, the law of the jurisdiction where the bulk of the contracting transactions took place should apply absent an overriding policy of another state to the contrary.[42]  Thus, the factors to be considered are: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."[43]  Reichhold, 243 Conn. at 414.

---

[41]   Plaintiffs do not dispute that application of Connecticut's conflict of laws principles would be proper.

[42]   See Defs.' *FNC* Mem. at 18.  See also Reichhold Chem., Inc. v. Hartford Acc. & Indem. Co., 243 Conn. 401, 414, 703 A.2d 1132, 1138 (1997); Restatement (Second) Conflict of Laws § 188.

[43]   Restatement (Second) Conflict of Laws § 188(2).

NY #490732 v9

When applied to the relevant facts in this case, even at this early stage, it becomes apparent that United States, and specifically Connecticut, law should apply to Plaintiffs' contract claims.  As set forth above, UCC was, in fact, the true contracting party with the Plaintiffs, and at least one of those companies is incorporated in Texas.  Even more compelling, though, are the facts that performance of the contract and the location of the subject matter of the contract was here.  Thus, 95% of the products in question were purchased by Plaintiffs from UCC in the United States; title to such goods passed to Plaintiffs in the United States; the goods were shipped by Plaintiffs from the U.S. to end-user customers in the India; and price, credit and other terms and conditions were established in the United States and specifically in Connecticut, as were the overall strategies for marketing the products through the Plaintiffs.  Moreover, payments were made by Plaintiffs in the United States in U.S. dollars, and such payments were made in Singapore only to accommodate UCC and Dow's structure, and then still in U.S. dollars.

Furthermore, the involvement of Defendants' foreign business units in the relevant transactions was simply to carry out the bidding of the U.S. parent companies.  And, as revealed by the exhibits submitted herewith, following the Dow/UCC Merger, the foreign business unit involved was Dow India – not Dow Singapore.

Thus, under traditional conflicts principles, Plaintiffs' contract claims should be governed by Connecticut law.

       **2)**       **Connecticut law should apply to Plaintiffs' tort claims**

Connecticut law should also apply to Plaintiffs' tort claims.  Or, if any foreign law applies (which it should not), it would be, as Defendants themselves argue, that of India.[44]  In either case,

---

[44]   See Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' 12(b)(6) Mem."), Section III.B.2.  It is not surprising, however, that Defendants, and particularly

NY #490732 v9

dismissal of this case on *forum non conveniens* grounds in favor of Singapore cannot be supported; this Court is certainly better equipped to decide issues under U.S. law, and is at least as equipped to decide issues under Indian law as would a court in Singapore.

As instructed by the Connecticut Supreme Court in O'Connor v. O'Connor, 201 Conn. 632, 519 A.2d 13 (1986), the first question to be addressed in a conflicts inquiry for claims sounding in tort is whether the doctrine of *lex loci delicti* should apply – i.e., whether the place of injury shall determine liability in connection with a plaintiff's tort claims. If application of *lex loci* would yield an arbitrary or irrational result that would frustrate the legitimate expectations of the parties or an important state interest, then a "most significant contacts" analysis should be undertaken. Id.

The application of Indian law to this matter, as proposed by Defendants, would indeed be an arbitrary and irrational result. To do so would leave Plaintiffs without a remedy as to most of their claims, as Defendants acknowledge that Indian law does not recognize causes of action for tortious interference with contractual relationships, tortious intereference with business expectancies, and unfair competition claims.[45] Accordingly, the application of Indian law would frustrate the reasonable expectations of the Plaintiffs and would undermine Connecticut's interest in enforcing its laws against its residents for their tortious acts. Vaz, 1991 WL 47341 at *3 ("Connecticut has an interest in insuring that corporations residing here do not act fraudulently"). Conversely, UCC, as one of Connecticut's largest corporate residents, and Dow, which also is

---

UCC, would be loathe to consent to jurisdiction in India. The liabilities Defendants would face there relating to the Bhopal tragedy would far outstrip the damages Plaintiffs will recover here.

[45]  See Defs.' 12(b)(6) Mem., Sections III.F, III.G, and III.I, respectively.

-37-

present in the state, certainly cannot argue that they have no expectation to answer for their tortious conduct in the courts of Connecticut.

In these circumstances, a "most significant contacts" analysis should apply, and it points to application of Connecticut law for purposes of Plaintiffs' tort claims. Under such an analysis, the Court must weigh the factors set forth in Restatement (Second) of Torts § 6.

- The needs of the interstate and international systems;

- The relevant policies of the forum;

- The relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue;

- The protection of unjustified expectations;

- The basic policies underlying the particular field of law;

- Certainty, predictability and uniformity of result; and

- Ease in the determination and application of the law to be applied.

O'Connor, 519 A.2d at 22. O'Connor further instructs that the factors set forth in § 145(2) of the Restatement should be taken into account in applying the principles of § 6 set forth above. These factors are:

- The place where the injury occurred;

- The place where the conduct causing the injury occurred;

- The domicile, residence, nationality, place of incorporation and place of business of the parties; and

- The place where the relationship is centered.

Id. at 23. In analyzing these factors, it is the significance of the factors, not the number of factors, that determines the outcome of this inquiry under the Restatement approach. Id.

-38-

NY #490732 v9

As discussed, the parties' expectations and the interests of Connecticut weigh in favor of applying the law of Connecticut to Plaintiffs' tort claims. Also weighing in favor of applying Connecticut law under a "most significant contacts" analysis is that Defendants' conduct giving rise to Plaintiffs' tort claims occurred in and emanated from their headquarter offices in Connecticut. That is where decisions were made by Defendants in connection with their entire relationship with Plaintiffs. Furthermore, this Court's application of Connecticut law would afford the parties with the consistent application of the law of a single jurisdiction to claims arising from the same core set of facts.

**D.**     **Other Considerations**

Finally, consistent with the cautionary observation of the Second Circuit in <u>Iraggori</u>, this Court must consider whether Defendants' arguments reflect genuine concerns with convenience, or are asserted for forum-shopping reasons. 273 F.3d at 75. Plaintiffs respectfully submit that the latter is the underlying motivation for Defendants' motion.

Defendants argue that this case should be heard in Singapore. Defendants would not be subject to suit there. Moreover, as Defendants acknowledge, Plaintiffs' antitrust and unfair competition claims could not be adjudicated under Singapore law. Singapore law also would not even apply to Plaintiffs' tort claims. What these arguments make plain is Defendants' intent to steer this case to the jurisdiction that would most effectively bar Plaintiffs from obtaining the relief to which they are entitled. That this is Defendants' true motive is made even more patent by their complete ignoring of controlling authority in this Circuit on *forum non conveniens* issues and the facts relevant to this motion.

-39-

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss on *forum non conveniens* grounds should be denied.

Dated: November 12, 2002

THELEN REID & PRIEST LLP

By: _____

Michael S. Elkin  (ct 15828)
Richard S. Taffet  (ct 10201)
Barbara J. Jacobs  (ct 13566)
Susan B. McInerney  (ct 23827)
875 Third Avenue
New York, New York  10022
(212) 603-2000 (tel)
(212) 603-2001 (fax)

WIGGIN & DANA LLP

Robert M. Langer (ct 06305)
Suzanne E. Wachsstock (ct 17627)
One CityPlace
185 Asylum Street
Hartford, Connecticut 06103-3402
(860) 297-3724 (tel)
(860) 525-9380 (fax)

Attorneys for Plaintiffs
MM Global Services Inc., MM Global Services Pte.
Ltd. and MegaVisa Solutions (s) Pte. Ltd.

-40-

NY #490732 v9