# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., and MEGA VISA SOLUTIONS (S) PTE. LTD., | : : : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil No. 3:02 CV 1107 (AVC) |
| v. | : | |
| | | |
| THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, and UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD. and DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD. | : : : : : : | |
| | : | |
| Defendants. | : | January 30, 2006 |

## FIRST AMENDED COUNTERCLAIMS OF DEFENDANT
## UNION CARBIDE CUSTOMER SERVICES PTE. LTD.

### Parties

1.      Defendant and counterclaim-plaintiff Union Carbide Customer Services Pte. Ltd. ("UCCS") is a Singaporean corporation that maintains a principal place of business in Singapore.

2.      Defendant and counterclaim-plaintiff UCCS, together with defendants Union Carbide Asia Pacific, Inc. ("UCAP") and Union Carbide Corporation ("UCC"), will hereinafter collectively be referred to as the "UCC Companies."

3.      Plaintiff and counterclaim-defendant MM Global Services PTE Limited ("Global Singapore") is a Singaporean corporation that maintains a principal place of business in Singapore.

4.      Plaintiff and counterclaim-defendant Mega Visa Solutions (S) Pte. Ltd. ("Visa Singapore") is a Singaporean corporation that maintains a principal place of business in

Singapore. Upon information and belief, Visa Singapore is the mere continuation of Global Singapore, and is therefore the successor to some or all of Global Singapore's liabilities associated with UCCS's counterclaims. Upon information and belief, in mid-2000, Global Singapore essentially discontinued business operations and began operating as Visa Singapore, with the same employees, directors, officers, and shareholders.

5.      Upon information and belief, third-party defendant Ajay Mittal is citizen of India residing there and responsible for controlling and running Global Singapore and/or Visa Singapore.

### Jurisdiction

6.      This Court has subject matter jurisdiction over UCCS's counterclaims pursuant to 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000 and there is complete diversity among the parties. Further, this Court has jurisdiction over UCCS's counterclaims under the principle of supplemental jurisdiction, 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over third-party defendant Ajay Mittal because he has traveled to this jurisdiction numerous times to conduct business with the UCC Companies and has transacted business related to these claims in this jurisdiction.

### Venue

8.      Venue over third-party defendant Ajay Mittal is proper in this jurisdiction under 28 U.S.C. §§ 1391 (b) and (d) because Ajay Mittal has transacted business related to these claims in this jurisdiction, because a substantial part of the events and omissions giving rise to the claims alleged occurred in this jurisdiction, and because Ajay Mittal is an alien.

### Underlying Facts and General Allegations

9. During 1999, the UCC Companies faced a feedstock shortage because of a significant increase in the price of oil.

10. As a result of the feedstock shortage, the UCC Companies were unable to fill all of the wire and cable orders that had been placed by Global Singapore on behalf of purchasers in India ("1999 Unfilled Orders").

11. As a result of the 1999 Unfilled Orders, one purchaser, Finolex Cables Ltd. ("Finolex"), brought suit against, among others, Global Singapore, for failing to fill its orders.

12. Shortly after Finolex filed suit, on or about March 29, 2000, Ajay Mittal, speaking on behalf of himself and Global Singapore, told Lawrence Chung, a director of UCCS and area director of UCAP, that he and Global Singapore would not initiate a legal action against the UCC Companies seeking indemnification for the Finolex claim resulting from the 1999 Unfilled Orders.

13. Ajay Mittal told Mr. Cheung that he and Global Singapore desired to work together with the UCC Companies to resolve the Finolex lawsuit and any future disputes, rather than suing each other, and recommended to the UCC Companies that the case with Finolex should be settled.

14. To induce the UCC Companies' assistance in resolving the litigation against Global Singapore, Ajay Mittal, speaking on behalf of himself and Global Singapore, repeatedly made it clear to the UCC Companies in numerous telephone conversations with John Yimoyines of UCC and others that neither he nor Global Singapore would bring suit against the UCC Companies based on the 1999 Unfilled Orders.

3

15.    In addition to the numerous telephone conversations described above, Ajay Mittal emailed John Yimoyines on May 4, 2000, and again assured him that neither he nor Global Singapore would bring suit against the UCC Companies based on the 1999 Unfilled Orders: "I am glad to inform you that with settlement between MM Global & Finolex in place, I can confirm that there will be no more issues of any liability on part of Union Carbide." A true and correct copy of that email is hereto annexed as **Exhibit A** ("Ajay Mittal Email").

16.    Ajay Mittal has testified under oath that he told the UCC Companies that Global Singapore would not bring suit against them because he, together with Global Singapore, wanted the UCC Companies' help in settling the lawsuit with Finolex and wanted the UCC Companies to pay a portion of the settlement amount.

17.    Upon information and belief, Ajay Mittal and Global Singapore intended the UCC Companies to falsely understand that, if the UCC Companies cooperated and helped settle the Finolex lawsuit, Ajay Mittal and Global Singapore would not file suit against them based on the 1999 Unfilled Orders.

18.    Upon information and belief, at the time Ajay Mittal made the representations, promises and assurances to the UCC Companies, Ajay Mittal had no intention of keeping those representations, assurances and promises.

19.    Upon information and belief, Ajay Mittal's representations, promises and assurances to the UCC companies were false at the time they were made and Ajay Mittal knew of their falsity.

20.    In reliance on those repeated representations, promises, and assurances, the UCC Companies agreed to help Ajay Mittal and Global Singapore resolve the dispute with Finolex and pay a significant portion of the settlement based on the agreement with Ajay Mittal and

4

Global Singapore that Ajay Mittal and Global Singapore would be responsible for resolving any future disputes regarding the 1999 Unfilled Orders and would not sue the UCC Companies.

21.     On June 5, 2000, Paresh Zaveri, Vice President of Global Singapore, sent a letter to Lawrence Cheung summarizing the terms of the Finolex settlement. A true and correct copy of that letter is hereto annexed as **Exhibit B** ("Zaveri Letter").

22.     The Zaveri Letter memorialized the parties' agreement that Global Singapore would handle any other disputes regarding the 1999 Unfilled Orders on their own, without involving the UCC Companies: "MM Global Services Pte. Ltd. further assures Union Carbide of its commitment to handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide."

23.     On or about June 14, 2000, in reliance on the agreements made with Ajay Mittal and Global Singapore, their representations that they would bring no litigation against the UCC Companies, and further that they would resolve any future purchaser actions relating to the 1999 Unfilled Orders, UCCS paid US$280,000 in settlement of the Finolex action.

24.     Contrary to the parties' agreement memorialized in the Zaveri Letter, Global Singapore breached their repeated representations, promises, assurances and agreement to handle "any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide."

25.     Shortly after the Finolex settlement was complete (with UCCS paying US$280,000 and Global Singapore thus being dismissed from that suit), Ajay Mittal and Global Singapore informed the UCC Companies that another purchaser, Sterlite Industries (India) Limited ("Sterlite"), was upset about the 1999 Unfilled Orders.

26.    Ajay Mittal assured the UCC Companies that there would be no legal action brought by Sterlite because the father of the owner of Sterlite was a Mittal Family friend.

27.    In spite of Ajay Mittal's assurances, Sterlite brought an action against Global Singapore, UCC, and UCAP, seeking US$1.8 million.

28.    On or about September 15, 2000, Ajay Mittal met with employees of the UCC Companies and, asserting that Sterlite had a meritorious claim, recommended that a payment of roughly half of the US$1.8 million be made to Sterlite to settle the matter.

29.    Sterlite eventually agreed to settle the dispute for US$1,000,000, roughly the amount proposed by Ajay Mittal, and the agreement was signed on October 12, 2000.

30.    In spite of the parties' agreement memorialized in the Zaveri Letter and Ajay Mittal's belief that Sterlite had a meritorious claim, Ajay Mittal and Global Singapore refused to contribute any money to the settlement with Sterlite.

31.    UCCS was thus forced to pay the US$1,000,000 to extinguish the Sterlite claim (which also resulted in Global Singapore being dismissed from the lawsuit).

32.    At the time of the Sterlite Settlement, Mr. Sanjiv Sanghvi, an executive officer of Global Singapore and later a director of Visa Singapore, sent Mr. Cheung a letter representing, promising and assuring that, in the event that Sterlite did not abide by the settlement, "any further action and consequences there of independently without any further recourse to or claim against Union Carbide." A copy of that letter is hereto annexed as **Exhibit C** ("Sanghvi Letter").

33.    In 2002, in spite of their repeated representations, promises and assurances to the contrary, Ajay Mittal and Global Singapore initiated this suit against the UCC Companies alleging breach of contract based on the 1999 Unfilled Orders.

6

### First Counterclaim—Breach of Contract

34.     UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 - 33 of the Counterclaims as if fully set-forth at length herein.

35.     The UCC Companies and Global Singapore had a valid and enforceable contract regarding the disputes resulting from the 1999 Unfilled Orders.

36.     The UCC Companies agreed to pay US$280,000 to settle the Finolex dispute and Global Singapore agreed to "handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide."

37.     This valid and enforceable agreement was memorialized in the Zaveri Letter.

38.     Shortly after UCCS made its payment to settle the Finolex dispute, another Indian W & C purchaser, Sterlite, brought suit.

39.     Contrary to the parties' agreement memorialized in the Zaveri letter, Global Singapore did not handle the action to the satisfaction of the UCC Companies and thus breached the valid and enforceable contract.

40.     Ajay Mittal and Global Singapore refused to contribute any money towards the settlement in spite of the fact that Ajay Mittal believed Sterlite had a meritorious claim and the fact that the settlement was for roughly the amount Ajay Mittal proposed.

41.     As such, UCCS was forced to pay US$1,000,000 to settle the Sterlite dispute. WHEREFORE, for this First Counterclaim, UCCS prays for judgment against Global Singapore and Visa Singapore as follows:

        a)  damages for all sums to which it is entitled as a result of Global Singapore's breach of contract including, but not limited to, the US$1,000,000 UCCS was

forced to pay to settle the Sterlite dispute and the US$280,000 UCCS was forced

to pay to settle the Finolex dispute;

b)  pre and post-judgment interest;

c)  attorneys' fees, costs and expenses; and

d)  such other and further relief as the Court may deem proper.

### Second Counterclaim—Breach of Oral Agreement

42.     UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 -

41 of the Counterclaims as if fully set-forth at length herein.

43.     Global Singapore and Ajay Mittal told the UCC Companies that no suits would be

filed against them, including the following statement made by Ajay Mittal: "I am glad to inform

you that with settlement between MM Global & Finolex in place, I can confirm that there will be

no more issues of any liability on part of Union Carbide."

44.     The UCC Companies had a valid and enforceable oral agreement with Ajay Mittal

and Global Singapore that if the UCC Companies helped Ajay Mittal and Global Singapore

resolve the dispute with Finolex, Global Singapore would not bring suit against the UCC

Companies based on the 1999 Unfilled Orders.

45.     The UCC Companies helped Ajay Mittal and Global Singapore resolve the

disputes with Finolex, with UCCS paying US$280,000, which resulted in Global Singapore

being dismissed from the suit brought by Finolex.

46.     In spite of UCCS's payment to settle the Finolex dispute, UCCS was forced to

pay an additional US$1,000,000 to settle the dispute with Sterlite.

47.     After being dismissed from the Finolex and Sterlite lawsuits, Ajay Mittal and

Global Singapore, in breach of their oral agreement, initiated this suit against the UCC

8

Companies to collect alleged damages resulting from the 1999 Unfilled Orders, and thus the UCC Companies have been forced to pay the costs and fees associated with defending this action.

WHEREFORE, for this Second Counterclaim, UCCS prays for judgment against Global Singapore, Visa Singapore, and Ajay Mittal as follows:

      a) damages for all sums to which it is entitled as a result of Ajay Mittal's breach of oral agreement including, but not limited to, the US$1,000,000 UCCS was forced to pay to settle the Sterlite dispute, the US$280,000 UCCS was forced to pay to settle the Finolex dispute, and the total cost and fees associated with defending this action;

      b) pre and post-judgment interest;

      c) attorneys' fees, costs and expenses; and

      d) such other and further relief as the Court may deem proper.

### Third Counterclaim—Promissory Estoppel

48.    UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 – 47 of the Counterclaims as if fully set-forth at length herein.

49.    Ajay Mittal and Global Singapore represented and promised to the UCC Companies that they would "handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide."

50.    Ajay Mittal and Global Singapore repeatedly represented, promised, and assured the UCC Companies that they would not bring suit against the UCC Companies if the UCC Companies helped settle the Finolex dispute, including the statement by Ajay Mittal that "I can confirm that there will be no more issues of any liability on part of Union Carbide."

51.     The UCC Companies could reasonably be expected to believe and rely upon, and did, in fact, believe and rely upon Ajay Mittal's and Global Singapore's representations, promises, and assurances to their detriment by UCCS paying US$280,000 to resolve the Finolex dispute with the understanding that Ajay Mittal and Global Singapore would handle any subsequent disputes and that Ajay Mittal and Global Singapore would not bring suit against the UCC Companies relating to the 1999 Unfilled Orders.

52.     In spite of UCCS's payment to settle the Finolex dispute and contrary to the parties' agreement memorialized in the Zaveri letter, UCCS was forced to pay an additional US$1,000,000 to settle the dispute with Sterlite.

53.     After being dismissed from the Finolex and Sterlite lawsuits, Ajay Mittal and Global Singapore, contrary to their repeated representations, promises, and assurances, initiated this suit against the UCC Companies to collect alleged damages resulting from the 1999 Unfilled Orders, and thus the UCC Companies have been forced to pay the costs and fees associated with defending this action.

WHEREFORE, for this Third Counterclaim, UCCS prays for judgment against Ajay Mittal, Global Singapore, and Visa Singapore as follows:

a)    an order barring Global Singapore from maintaining the breach of contract claim against the UCC Companies for the 1999 Unfilled Orders;

b)    damages for all sums to which it is entitled as a result of the UCC Companies' reliance on Ajay Mittal's and Global Singapore's promises;

c)    pre and post-judgment interest;

d)    attorneys' fees, costs and expenses; and

e)    such other and further relief as the Court may deem proper.

10

### Fourth Counterclaim—Negligent Misrepresentation

54.    UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 - 53 of the Counterclaims as if fully set-forth at length herein.

55.    Ajay Mittal and Global Singapore supplied false material facts to the UCC Companies regarding the settlement of the lawsuit with Finolex, including that Global Singapore would "handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide."

56.    Ajay Mittal and Global Singapore supplied false material facts to the UCC Companies regarding their intention to not bring suit against the UCC Companies if the UCC Companies helped Ajay Mittal and Global Singapore resolve the Finolex dispute, including the statement by Ajay Mittal that "I can confirm that there will be no more issues of any liability on part of Union Carbide."

57.    Ajay Mittal and Global Singapore did not exercise reasonable care or competence in communicating their intentions to the UCC Companies.

58.    The UCC Companies justifiably and reasonably relied on these false material facts to their detriment by UCCS paying US$280,000 to resolve the Finolex dispute with the understanding that Ajay Mittal and Global Singapore would handle any subsequent disputes and that Ajay Mittal and Global Singapore would not bring suit against the UCC Companies relating to the 1999 Unfilled Orders.

59.    In spite of UCCS's payment to settle the Finolex dispute and contrary to the parties' agreement memorialized in the Zaveri letter, UCCS was forced to pay an additional US$1,000,000 to settle the dispute with Sterlite.

11

60.    After being dismissed from the Finolex and Sterlite lawsuits, Ajay Mittal and Global Singapore, contrary to their repeated representations, promises, and assurances, initiated this suit against the UCC Companies to collect alleged damages resulting from the 1999 Unfilled Orders, and thus the UCC Companies have been forced to pay the costs and fees associated with defending this action.

WHEREFORE, for this Fourth Counterclaim, UCCS prays for judgment against Ajay Mittal, Global Singapore, and Visa Singapore as follows:

      a)  damages for all sums to which it is entitled as a result of Ajay Mittal's and Global Singapore's negligent misrepresentation;

      b)  pre and post-judgment interest;

      c)  attorneys' fees, costs and expenses; and

      d)  such other and further relief as the Court may deem proper.

### Fifth Counterclaim—Fraudulent Misrepresentation

61.    UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 - 60 of the Counterclaims as if fully set-forth at length herein.

62.    Ajay Mittal and Global Singapore made false representations of material facts to the UCC Companies regarding the settlement of the lawsuit with Finolex, including that Global Singapore would "handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide."

63.    Ajay Mittal and Global Singapore made false representations of material facts to the UCC Companies regarding their intention to not bring suit against the UCC Companies if the UCC Companies helped Ajay Mittal and Global Singapore resolve the Finolex dispute, including

the statement by Ajay Mittal that "I can confirm that there will be no more issues of any liability on part of Union Carbide."

64.    Ajay Mittal's and Global Singapore's representations of material facts were false and, upon information and belief, were known to be false when made.

65.    Upon information and belief, Ajay Mittal's and Global Singapore's false representations of material facts were made with the intent of inducing the UCC Companies' reliance on them.

66.    The UCC Companies justifiably relied on the false representations of material facts to their detriment by UCCS paying US$280,000 to resolve the Finolex dispute with the understanding that Ajay Mittal and Global Singapore would handle any subsequent disputes and that Ajay Mittal and Global Singapore would not bring suit against the UCC Companies relating to the 1999 Unfilled Orders.

67.    In spite of UCCS's payment to settle the Finolex dispute and contrary to the parties' agreement memorialized in the Zaveri letter, UCCS was forced to pay an additional US$1,000,000 to settle the dispute with Sterlite.

68.    After being dismissed from the Finolex and Sterlite lawsuits, Ajay Mittal and Global Singapore, contrary to their repeated representations, promises, and assurances, initiated this suit against the UCC Companies to collect alleged damages resulting from the 1999 Unfilled Orders, and thus the UCC Companies have been forced to pay the costs and fees associated with defending this action.

WHEREFORE, for this Fifth Counterclaim, UCCS prays for judgment against Ajay Mittal, Global Singapore, and Visa Singapore as follows:

a)  damages for all sums to which it is entitled, including punitive damages, as a

result of Ajay Mittal's and Global Singapore's fraudulent misrepresentation;

b)  pre and post-judgment interest;

c)  attorneys' fees, costs and expenses; and

d)  such other and further relief as the Court may deem proper.

### Sixth Counterclaim—Fraud

69.  UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 -

68 of the Counterclaims as if fully set-forth at length herein.

70.  Ajay Mittal and Global Singapore made false representations of material facts to

the UCC Companies regarding the settlement of the lawsuit with Finolex, including that Global

Singapore would "handle any other action/s instituted by any other Indian W & C customers to

the satisfaction of Union Carbide."

71.  Ajay Mittal and Global Singapore made false representations of material facts to

the UCC Companies regarding their intention to not bring suit against the UCC Companies if the

UCC Companies helped Ajay Mittal and Global Singapore resolve the Finolex dispute, including

the statement by Ajay Mittal that "I can confirm that there will be no more issues of any liability

on part of Union Carbide."

72.  Ajay Mittal's and Global Singapore's representations of material facts were false

and, upon information and belief, were known to be false when made.

73.  Upon information and belief, Ajay Mittal's and Global Singapore's false

representations of material facts were made with the intent of inducing the UCC Companies'

reliance on them.

74.     The UCC Companies justifiably relied on the false representations of material facts to their detriment by UCCS paying US$280,000 to resolve the Finolex dispute with the understanding that Ajay Mittal and Global Singapore would handle any subsequent disputes and that Ajay Mittal and Global Singapore would not bring suit against the UCC Companies relating to the 1999 Unfilled Orders.

75.     In spite of UCCS's payment to settle the Finolex dispute and contrary to the parties' agreement memorialized in the Zaveri letter, UCCS was forced to pay an additional US$1,000,000 to settle the dispute with Sterlite.

76.     After being dismissed from the Finolex and Sterlite lawsuits, Ajay Mittal and Global Singapore, contrary to their repeated representations, promises, and assurances, initiated this suit against the UCC Companies to collect alleged damages resulting from the 1999 Unfilled Orders, and thus the UCC Companies have been forced to pay the costs and fees associated with defending this action.

WHEREFORE, for this Sixth Counterclaim, UCCS prays for judgment against Ajay Mittal, Global Singapore, and Visa Singapore as follows:

    a)  damages for all sums to which it is entitled, including punitive damages, as a result of Ajay Mittal's and Global Singapore's fraud;

    b)  pre and post-judgment interest;

    c)  attorneys' fees, costs and expenses; and

    d)  such other and further relief as the Court may deem proper.

### Seventh Counterclaim—Recoupment

77.     UCCS hereby incorporates each and every allegation set-forth in paragraphs 1 - 76 of the Counterclaims as if fully set-forth at length herein by way of recoupment only.

78.     Global Singapore alleges that UCCS breached its contract relating to the 1999 Unfilled Orders (the "Transaction") and is thus seeking monetary damages.

79.     As part of the Transaction and arising from it, Ajay Mittal and Global Singapore represented and agreed to "handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide" and Ajay Mittal and Global Singapore represented and agreed not bring suit against the UCC Companies if the UCC Companies helped Ajay Mittal and Global Singapore resolve the Finolex dispute, including the statement by Ajay Mittal that "I can confirm that there will be no more issues of any liability on part of Union Carbide."

80.     In evaluating the Transaction that forms the basis of Global Singapore's breach of contract cause of action, justice requires the entire Transaction be examined in all its aspects, including Ajay Mittal's and Global Singapore's representation and agreement to "handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide" and Ajay Mittal's and Global Singapore's representation and agreement not to bring suit against the UCC Companies if the UCC Companies helped Ajay Mittal and Global Singapore resolve the Finolex dispute.

WHEREFORE, for this Seventh Counterclaim, UCCS prays for judgment against Ajay Mittal, Global Singapore, and Visa Singapore by way of recoupment as follows:

a)   in the event that Global Singapore is entitled to damages as a result of Transaction, the damages UCCS suffered arising out of the same Transaction, including, but not limited to, the payment of US$1,000,000 to settle the Sterlite dispute, the payment of US$2280,000 to settle the Finolex dispute, and the

attorneys' fees, costs, and expenses associated with defending this action, ought to

be deducted from Global Singapore's recovery; and

b)  such other and further relief as the Court may deem proper.

Respectfully Submitted,

Dated:  January 30, 2007

_____

Nathan P. Eimer (ct 23693)
Scott C. Solberg (phv 0234)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL  60604
(312) 660-7600

*Attorneys for Defendants Union Carbide*
*Corporation, Union Carbide Asia Pacific,*
*Inc. and Union Carbide Customer*
*Services Pte. Ltd.*

Craig A. Raabe (ct 04116)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  06103-3597
(860) 275-8304

*Attorneys for All Defendants*

# EXHIBIT A
## TO FIRST AMENDED COUNTERCLAIMS

From: Ajay Mittal [mittal@megavisa.com]
Sent: Thursday, May 04, 2000 10:16 PM
To: John Yimo
Cc: lawrence cheung; Ron Neri
Subject: Overview of W/C business in India

Dear John,

I hope this is about the last correspondence we are having on entire issue of non supply of about 14000 MT of Wire& Cable compounds to Indian customers against confirmed orders due to oil price rise and other factors. Over last six months we have worked tirelessly to placate the Indian customers& to reestablish one of the fastest growing market for cable compounds for Union Carbide. Along the way we had to take many insults & abuses from our customers and some unfortunate incidents like letter by CMI& notice from Finolex Cables, but we have persisted in our endeavors& hopefully we will be able to fully regain the lost market share over next few months.

I am also glad to inform you that with settlement between MM Global& Finolex in place, I can confirm that there will be no more issue of any liability on part of Union Carbide, any future claim in this issue of Finolex will be handled by MM Global independently.

I would also like to briefly touch upon the financial consequences of the fall out. Union Carbide would obviously would have gained by huge margin on subsequent sales and thanks to all the hard work in India by Megavisa team the compensation for UCC would only be $ 280,000. As against MM Global/Megavisa having gone as per the business plan agreed upon will be loser by $ 360,000 (cost of lost commission income + settlement cost). However, we never raised this issue in any of the forum is because we know you understand& appreciate this. We see this issue beyond financials, lot of what has happened has to do with relationship built over the years between Megavisa/MMG and Union Carbide. We immensely value this relationship& I am confident your& your team feels likewise and we will continue to work closely in future to make your products most sought after in Indian market.

I would also like to take this opportunity to look ahead in working out joint strategy for making UCC Wire& Cable compounds again market leader, even in this time of extreme turmoil& hostile environment for our team we have continued to work with DoT to upgrade the specification to drive out smaller players and we are hoping to give you some good news there. We have also won over many of the customers& sold 850 MT at an average price of $ 1005/MT(for both ie,power& telecom) from Jan. 2000 to April 2000. As we go ahead we are confident of achieving better volumes and better net backs for UCC.

May I complete this by putting on record my appreciation for close co-operation extended to us by your team? We appreciate this& look forward to better& brighter future.

Thanks& Regards,
Ajay Mittal
mittal@megavisa.com



DEFENDANT'S
EXHIBIT
106

Confidential

DECE0006454

EXHIBIT B
TO FIRST AMENDED COUNTERCLAIMS

## MM Global Services Pte Ltd

3421

5 June, 2000

Mr. Lawrence Cheung
Area Director
Wire & Cable Polymer Business
Union Carbide Asia Pacific

Sub: Settlement of Claim with Finolex Cables Ltd.

Dear Mr. Lawrence Cheung,

I refer to claim and legal notice by Finolex Cables Ltd. for about USD 1.5 million for non-shipment of 5304 MT of Wire & Cable compounds against their confirmed order to MM Global Services Pte. Ltd., against which order we had placed our order with Union Carbide. We have agreed to settle the case for USD 400000 with Finolex Cables Ltd.

As per terms of agreement Union Carbide will pay MM Global total of USD 280000 and in spirit of partnership balance USD 120000 will be borne by MM Global Services. MM global will further agree that this will be full & final settlement against this claim by Finolex Cable Ltd. and that Finolex Cable will drop all its legal action and undertake not to take any further action.

In an unlikely event of Finolex Cable not abiding by its commitment, we confirm that MM Global will handle any further action and consequences there of independently without any further recourse to or claim against Union Carbide. MM Global Services Pte. Ltd. further assures Union Carbide of its commitment to handle any other action/s instituted by any other Indian W & C customers to the satisfaction of Union Carbide.

We sincerely hope settlement will put an end to the whole saga with Finolex Cables Ltd. and we can look forward to working closely to re-establish market leadership in India for Union Carbide W&C compounds.

Regards

For MM Global Services Pte. Ltd.

Paresh Zaveri
Vice President

DEFENDANT'S
EXHIBIT

107

3 Shenton Way • #07-04 Shenton House • Singapore 068805
Tel: (65) 221 1329 / 221 0527 • Fax: (65) 227 8101
E-mail: petro@singnet.com.sg

D00640

EXHIBIT C
TO FIRST AMENDED COUNTERCLAIMS

10/10/00   08:12   ☎203 ⁻⁻6 4423         UC CT:LAW DEPT.                    @003/01⁰

⁸ FRI 19:09 FAX

*MM* Global Services Pte Ltd

1/2

4ᵗʰ October, 2000

Mr. Lawrence Cheung
Area Director
Wire & Cable Polymer Business
Union Carbide Asia Pacific

Sub: Settlement of Claim with Sterlite Industries (India) Limited

Dear Mr. Lawrence Cheung,

I refer to claim and legal notice by Sterlite Industries (India) Limited for about USD 1.7 million for non-shipment of Wire & Cable compounds against their order to MM Global Services Pte. Ltd., against which order we had placed our order with Union Carbide. We have agreed to settle the case for USD 1.0 Million with Sterlite Industries (India) Limited.

MM global will agree that this will be full & final settlement against this claim by Sterlite Industries (India) Limited and that Sterlite Industries will drop all its legal action and undertake not to take any further action.

In an unlikely event of Sterlite Industries not abiding by its commitment, we confirm that MM Global will handle any further action and consequences there of independently without any further recourse to or claim against Union Carbide.

We can look forward to working closely to re-establish market leadership in India for Union Carbide W&C compounds.

Regards

For MM Global Services Pte. Ltd.

(SANJIV SANGHVI)
Director

OCT 6' 2000

**DEFENDANT'S EXHIBIT**
109

2 of 4

3 Shenton Way • #07-04 Shenton House • Singapore 068805
Tel: (65) 221 1329 / 221 0821 • Fax: (65) 227 8101
E-mail: petrol@singnet.com.sg

D00538