# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MM GLOBAL SERVICES, INC., MM GLOBAL SERVICES PTE. LTD., MEGA VISA SOLUTIONS (S) PTE. LTD., and ADVENT MANAGEMENT LTD. <br>    Plaintiffs,<br>    v.<br><br>THE DOW CHEMICAL COMPANY, UNION CARBIDE CORPORATION, UNION CARBIDE ASIA PACIFIC, INC., UNION CARBIDE CUSTOMER SERVICES PTE. LTD, AND DOW CHEMICAL PACIFIC (SINGAPORE) PTE. LTD.<br>    Defendants.<br>UNION CARBIDE CUSTOMER SERVICES PTE. LTD.,<br>    Counterclaim-Plaintiff,<br>    v.<br><br>MM GLOBAL SERVICES PTE. LTD. AND AJAY MITTAL<br>    Counterclaim-Defendants, | Civil No. 3:02 CV 1107 (AVC)<br><br><br>February 2, 2007 |

**RESPONSE OF UNION CARBIDE CUSTOMER SERVICES PTE. LTD. TO MM GLOBAL SERVICES PTE. LTD. AND AJAY MITTAL'S JOINT MOTION TO DISMISS THE COUNTERCLAIMS OF UNION CARBIDE CUSTOMER SERVICES PTE. LTD. <u>PURSUANT TO FED. R. CIV. P. 12(b)(1), 12(b)(6) AND 9(b)</u>**

Nathan P. Eimer (ct 23693)  
Scott C. Solberg (phv 0234)  
EIMER STAHL KLEVORN & SOLBERG LLP  
224 South Michigan Avenue Suite 1100  
Chicago, IL 60604  
(312) 660-7600  

Craig A. Raabe (ct 04116)  
ROBINSON & COLE LLP  
280 Trumbull Street  
Hartford, CT 05103-3497  
(860) 275-8304  

*Counsel for Defendant/Counter-Plaintiff Union Carbide Customer Services Pte. Ltd.*

# INTRODUCTION

Union Carbide Customer Services Pte. Ltd. ("UCCS") agreed to partially indemnify MM Global Services Pte. Limited ("Global Singapore") and Ajay Mittal (hereinafter, the "Defendants") regarding a dispute over unfilled wire and cable orders in 1999 by paying US$280,000, because Defendants represented that (1) they would handle any other disputes over the unfilled orders; and (2) they would not take any legal action against UCCS.  But Defendants did the opposite.  They refused to handle a dispute just a few months after UCCS made this payment, even though Defendants believed the suit was meritorious.  UCCS was thus forced to pay US$1,000,000 to settle this subsequent dispute.  Now, Defendants have brought UCCS into this action, in clear breach of their prior agreements.

Apparently recognizing the problems these claims present, Defendants spend more than thirty pages introducing largely irrelevant facts and making numerous complex and unsupportable legal arguments.  Yet Defendants' arguments can be reduced to two simple premises:  (1) UCCS did not suffer injury; and (2) UCCS was not a party to the agreements.  These premises, however, are unsupportable as a matter of law.  Indeed, allegations of the counterclaim—which must be taken as true—establish the contrary.  Moreover, the volumes of facts (improperly) introduced by Defendants do nothing to support their position.  Finally, with respect to the negligent misrepresentation claim, if Defendants' argument is correct, it necessarily dooms their own claim against all defendants in the underlying case.  In the end, Defendants paint with a broad brush, making general arguments and introducing extraneous facts, desperately hoping this Court will ignore the allegations in the counterclaim complaint,

clear law and controlling authorities. It should not. Accordingly, this Court should deny Defendants' motion to dismiss.

## FACTUAL ALLEGATIONS

UCCS, together with Union Carbide Asia Pacific, Inc. ("UCAP") and Union Carbide Corporation ("UCC") (hereinafter the "UCC Companies") used Global Singapore and its affiliates as indenters to help sell wire and cable in India. Global Singapore and its affiliates had a limited and well-defined role. They were not typical distributors, purchasing and warehousing products for resale. Instead, Global Singapore and its affiliates were commission-compensated middlemen of the UCC Companies' products in India, doing business on a transaction by transaction basis. With only the rarest and most minimal exceptions, they never purchased any product from the UCC Companies, except to fill a specific order of a specific customer in India. Notably, UCCS was the party with which Global Singapore contracted to purchase UCC-produced products.

In 1999, the UCC Companies faced a feedstock shortage due to a significant increase in the price of oil. Because of the shortage, the UCC Companies were unable to fill all of the wire and cable orders that had been placed by Global Singapore on behalf of its purchasers (the "1999 Unfilled Orders"). One customer—Finolex Cables Ltd. ("Finolex")—brought suit against Global Singapore. Shortly after the suit was filed, Defendants represented to the UCC Companies that if they helped resolve this matter, Defendants would handle any other disputes over the 1999 Unfilled Orders and would not bring any legal action against the UCC Companies

regarding them. UCCS, in its counterclaims, made the following specific allegations regarding these agreements:

- On or about March 29, 2000, Ajay Mittal, speaking on behalf of himself and Global Singapore, told Lawrence Cheung, a director of UCCS, that he and Global Singapore would not initiate legal action against the UCC Companies over the 1999 Unfilled Orders and would instead work with them to resolve any future disputes ("March 29 Discussion") (Countercl. Compl. ¶¶ 11-12);

- Ajay Mittal, speaking on behalf of himself and Global Singapore said in numerous telephone conversations with John Yimoyines of UCC that Defendants would not bring suit against the UCC Companies over the 1999 Unfilled Orders (*Id*., ¶ 13);

- Ajay Mittal emailed Mr. Yimoyines (copying Mr. Cheung) on May 4, 2000 assuring him that neither he nor Global Singapore would bring suit against the UCC Companies over the 1999 Unfilled Orders ("May 4 Email") (*Id*., ¶ 14);

- Ajay Mittal testified at his deposition, under oath, that he had told the UCC Companies that he and Global Singapore would not bring suit against the UCC Companies over the 1999 Unfilled Orders ("Mittal Testimony") (*Id*., ¶ 15); and

- On June 5, 2000, just after the Finolex Settlement, Paresh Zaveri, Vice President of Global Singapore, sent a letter to Mr. Cheung stating that Global Singapore would handle any other actions brought regarding the 1999 Unfilled Orders ("Zaveri Letter").

Based on all of these representations and promises, UCCS contributed US$280,000 toward settlement of the Finolex action. Put differently, UCCS made this payment based on Defendants' representations that (1) they would not bring legal action against the UCC Companies over the 1999 Unfilled Orders, and (2) they would handle any other disputes regarding the 1999 Unfilled Orders.

But Defendants did just the opposite. Indeed, a few months after the Finolex settlement was complete, another company—Sterlite Industries (India) Limited ("Sterlite")—filed suit regarding the 1999 Unfilled Orders. Rather than handling this dispute, Defendants refused to

contribute any money toward the settlement—in spite of Ajay Mittal's belief that the claim was meritorious. UCCS thus had no option other than paying US$1,000,000 to resolve the Sterlite dispute. Notably, that payment was made directly from UCCS to Global Singapore. Once resolved—at no cost to Ajay Mittal or Global Singapore—Defendants again promised and assured the UCC Companies that Defendants would take no legal action against them over the 1999 Unfilled Orders. This was memorialized in an October 4, 2000 letter from Mr. Sanjiv Sanghvi, an executive of Global Singapore, to Mr. Cheung ("Sanghvi Letter"). In spite of this further representation and agreement, Defendants brought suit against all of the UCC Companies, with UCCS just recently becoming a party to that dispute in December 12, 2005.[1]

In sum, UCCS paid US$280,000 to Finolex to settle a dispute for Defendants based on the understanding that Defendants would both handle future disputes and would not bring suit against it. But Defendants did not live up to their bargain, breaching their agreements and thus forcing UCCS to pay US$1,000,000 to Global Singapore to resolve the Sterlite dispute and defend this lawsuit based on the 1999 Unfilled Orders.

## LEGAL STANDARD

In considering a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the

---

[1] The Court entered an order staying discovery in the case and the proceeding was stayed for much of 2006. Defendants filed the present motion to dismiss on January 5, 2007.

allegations." *Id*; s*ee also Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (reversing district court's dismissal and holding that dismissal of the complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). Importantly, the test applied "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim. Indeed it may appear on the face of the pleadings that a recovery is very remote, but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984).

## ARGUMENT

Defendants' thirty pages of factual summaries, legal analysis and arguments can be boiled down to two contentions: (1) UCCS did not suffer injury; and (2) UCCS was not a party to the agreements. As demonstrated below, neither is supportable. Defendants' remaining arguments are similarly untenable.

### I. UCCS Has Standing to Bring this Suit.

Defendants repeat, in mantra-like fashion, that UCCS lacks standing because it has suffered no injury-in-fact. (Defs. Bf. at 1, 2, 7-11, 15-16.) Yet Defendants candidly admit that the constitutional requirement of standing is relatively minimal. (Defs. Br. at 15.) As Justice (then Judge) Alito, explained, "[i]njury-in-fact is not Mount Everest." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005). Indeed, the standard is "very generous." *Id*. (citation omitted). Accordingly, "to survive a motion to dismiss, [UCCS] must simply *plead*

that [it] suffered some concrete form of harm." *Id*. at 292 (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (emphasis added).

Notwithstanding Defendants' protestations to the contrary, UCCS has done just that. It pled two concrete and cognizable harms: (1) the money it paid on the 1999 Unfilled Orders to settle the Finolex and Sterlite disputes; and (2) the harm of defending this suit brought by Defendants. These two, well-pled allegations by themselves establish that UCCS has standing.[2] Moreover, a material breach of contract is itself a concrete harm, which confers upon UCCS the right "to seek redress in accordance with law." *Stone Forest Indus., Inc. v. U.S.*, 973 F.2d 1548, 1550 (Fed. Cir. 1992). Accordingly, UCCS has pled concrete injuries that more than meet the "very generous" requirements of Article III standing.[3]

## II. UCCS Was a Party to the Agreements at Issue.

Apparently recognizing the futility of their Constitutional challenge to standing, Defendants next argue that UCCS does not have "prudential standing" because UCCS was not a party to the contracts at issue. (*e.g.*, Defs. Bf. at 16, 18-20).[4] Not so. UCCS's pleading—which

---

[2] Defendants' focus on who "funded" the settlement (Defs. Br. at 7-10) or who is paying for the defense of the lawsuit (Defs. Br. at 10-12) misses the point. Notably, Defendants do not cite a single case demonstrating that either issue is relevant to standing. They are not. Indeed, such payments—to the extent they occurred—are wholly irrelevant. *Cf. Savona v. General Motors Corp.*, 640 F. Supp. 6, 11 (D. Conn. 1985) ("payments from a collateral source to an injured plaintiff may not be considered in mitigation of damages") (citation omitted).

[3] In light of the fact that Defendants originally brought a breach of contract claim against UCCS in connection with the 1999 Unfilled Orders, their standing argument is especially strange. According to Defendants, UCCS is a proper defendant in their suit but suddenly lacks standing to bring its own suit on the basis of the same facts.

[4] Defendants make the same argument in both their 12(b)(1) motion to support the alleged lack of standing and their 12(b)(6) motion to support their argument that Counts I and II fail for to state a claim. Rather than repeat the same arguments—as Defendants did—UCCS will address the issue here.

must be taken as true—makes abundantly clear that UCCS was a party to the agreements.[5]  For this reason alone, Defendants' argument fails.  Moreover, the specific agreements to which UCCS refers, including the March 29 Discussion, the May 4 Email, the Zaveri Letter, and Sanghvi Letter all involved Mr. Cheung who, as the pleadings make plain and Defendants concede,[6] was "a director of UCCS."[7]  Quite simply, the pleadings establish and Defendants' additional facts confirm that these agreements were all made with a director of UCCS.

Faced with these uncontroverted facts, Defendants resort to the argument that such agreements were with Mr. Cheung *qua* UCAP, not Mr. Cheung *qua* UCCS.  (Defs. Br. at 5-7, 19-20).  In other words, Defendants contend that Mr. Cheung was only wearing his UCAP hat during these exchanges and not his UCCS hat.  Such a factual argument—to the extent it can be made at all—is clearly not appropriate for a motion to dismiss.  Indeed, when the jury considers this argument, it will certainly be relevant that Ajay Mittal testified under oath that he considers all of the UCC Companies as one singular entity.[8]  Ajay Mittal's own sworn deposition testimony thus confirms that he did not distinguish between UCC, UCAP and UCCS in his business dealings with the UCC Companies.  Moreover, Defendants' current claim that they were not contracting with UCCS rings hollow, because UCCS was the party with which Global Singapore contracted to purchase UCC-produced products *and* UCCS directly paid Global

---

[5] *See, e.g.*, Countercl. Compl., ¶¶ 11, 12, 14, 15, 20, 21, 22, 31.

[6] *See* Defs. Br. at 5 n.2.

[7] Contercl. Compl. ¶ 11.

[8] *See* December 15, 2005 Deposition of Ajay Mittal, at 340.  Attached hereto as Exhibit 1 are true and correct copies of the relevant excerpts of Ajay Mittal's deposition.

Singapore to resolve the Finolex and Sterlite disputes.[9]  Under these undisputable facts, there can be no question that UCCS was a party to the agreements.

Finally, even if this Court were to determine that UCCS was not formally a party to these agreements (which it should not do), there can be no doubt that UCCS was a third-party beneficiary.  *See generally* 2 Restatement (Second) of Contracts § 304 p. 448 (1979) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty.").  Simply put, even if Defendants were only contracting with UCC or UCAP, their representations and agreements not to bring suit against the *UCC Companies*,[10] which include UCCS, makes UCCS a third party beneficiary to those agreements.  Because, as Defendants concede, the other UCC Companies have standing to sue,[11] UCCS similarly has standing as a third-party beneficiary to the contract.[12]  Defendants cannot seriously contest the interest UCCS had in these matters, particularly when Defendants brought suit against UCCS relating to the 1999 Unfilled Orders and MM Global received US$1,000,000 directly from UCCS to resolve the Sterlite dispute.

---

[9] For both the Finolex and Sterlite settlements, Global Singapore *invoiced* UCCS and received the payment directly from UCCS.  Attached hereto as Exhibit 2 are true and correct copies of documents showing this process.

[10] *See, e.g.*, Countercl. Compl. ¶ 11 ("[Ajay Mittal] and Global Singapore would not initiate a legal action against the *UCC Companies*") (emphasis added); ¶ 13 ("neither [Ajay Mittal] nor Global Singapore would bring suit against the *UCC Companies* based on the 1999 Unfilled Orders") (emphasis added); ¶ 14 ("neither [Ajay Mittal] nor Global Singapore would bring suit against the *UCC Companies* based on the 1999 Unfilled Orders") (emphasis added).

[11] *See* Defs. Br., at 16.

[12] Defendants candidly concede that UCCS would have standing if it were "a contemplated beneficiary."  Defs. Br. at 19.

### III. Defendants' Theory Mandates Dismissal of Their Own Negligent Misrepresentation Claim.

Defendants contend that UCCS's negligent misrepresentation claim should be dismissed because UCCS failed to allege that the parties shared a "special relationship." (Defs. Br. at 25-26). This is precisely the argument made by the UCC Companies and The Dow Chemical Company in their motion to dismiss the underlying complaint. Yet this Court rejected it, concluding that United States common law governed, and United States common law—as explained by a single Connecticut decision—did not require a special relationship to sustain a claim for negligent misrepresentation. (Sept. 12, 2003 Ruling on Defendants' Motions to Dismiss, at 33-34). This Court's original decision, however, cannot be reconciled with the governing law advanced by Defendants themselves.

Indeed, that conclusion is contradicted by the declaration of the Indian attorney submitted by Defendants.[13] He explained that "Indian courts have not recognised a duty on the part of a party in an arms-length business relationship" sufficient to sustain a cause of action for negligent misrepresentation.[14] In other words, something more—*i.e.*, a "special relationship"—is necessary. To the extent Defendants are right with respect to Singapore law—as they clearly are with respect to Indian law—the claim for negligent misrepresentation against the Underlying Defendants is doomed and must be dismissed.

---

[13] Moreover, this Court's conclusion that United States common law governed the India tort claim of negligent misrepresentation was explicitly based on a declaration of a *Singaporean* attorney discussing *Singaporean contract law*. *See* Sept. 12, 2003 Ruling on Defendants' Motions to Dismiss, at 32, n.10. Not surprisingly, the Singaporean attorney never discussed Indian law or negligent misrepresentation.

[14] Affidavit of Som Mandal, ¶ 10.5.

### IV.     Defendants' Remaining Arguments are Futile.

Although the bulk of Defendants' motion is devoted to the two standing issues, Defendants make a blunderbuss of other arguments.[15]  Each merits only brief discussion.

#### A.     UCCS has properly pled a contract claim.

Defendants contend in conclusory fashion that all of the agreements at issue "are too indefinite to form an enforceable contract."  (Defs. Br. at 20).  Defendants' position is unsupportable.  Indeed, Defendants clearly agreed (1) to resolve any other disputes over the 1999 Unfilled Orders after the Finolex settlement; and (2) to not file suit against UCCS over the 1999 Unfilled Orders.

On March 29, 2000, Ajay Mittal orally agreed to resolve any additional disputes over the 1999 Unfilled Orders.[16]  In addition, the Zaveri Letter could not be more clear:

> [Global Singapore] further assures Union Carbide of its commitment to handle any other actions instituted by any other Indian W & C customers to the satisfaction of Union Carbide.[17]

Quite simply, Defendants promised orally and in writing to independently resolve any other disputes over the 1999 Unfilled Orders—a promise they ultimately refused to honor.  In fact,

---

[15] Defendants' contend that Count III should be dismissed because promissory estoppel is not an affirmative cause of action under Singapore law.  (Defs. Bf., at 24-25).  To the extent Defendants are correct, UCCS has raised the affirmative defenses of estoppel and set-off, making this issue relevant in the case.  (Pl. Answer, p. 14). Defendants also argue that Count VII should be dismissed because UCCS has failed to state any claim for relief.  (Defs. Br. at 28-29).  Because UCCS has, in fact, stated claims for relief under which it is entitled to recover, Count VII should not be dismissed.

[16] *See* Countercl. Compl., ¶12.

[17] Countercl. Compl., Exhibit B.

they refused to provide any money to settle the Sterlite dispute and thus breached their agreements.

Similarly, Defendants agreed on several occasions not to bring suit against UCCS over the 1999 Unfilled Orders. (*See* Countercl. Compl. ¶¶ 11, 14, 15). Although these agreements are clear on their face, Defendants quixotically contend that they are not "clear and unequivocal." Defendants' conclusion is belied by the sworn deposition testimony of Ajay Mittal, where he admitted that he intended the UCC Companies to understand that if they resolved the Finolex and Sterlite disputes, Defendants would not bring suit over the 1999 Unfilled Orders.[18] Again, contrary to these agreements, Defendants brought suit against UCCS, UCC, and UCAP.

In sum, UCCS has sufficiently alleged the existence of several agreements and breaches, and this Court must, for the purposes of Defendants' motion to dismiss, take these well-pled allegations as true.

### B. The oral agreements are enforceable.

Defendants next contend the oral agreements (at the heart of Count II) are barred by the statute of frauds. Defendants argue that, because the "oral agreement necessarily required continuing performance in excess of one year, it is unenforceable under the Statute of Frauds, and hence, Count II fails to state a claim upon which relief can be granted." (Defs. Br. at 24). Defendants' argument myopically focuses on the agreements not to bring suit against the UCC Companies and ignores the oral agreement to resolve any disputes after the Finolex settlement.

---

[18] *See* Countercl. Compl., ¶ 15. *See also* Dec. 16, 2005 Deposition Testimony of Ajay Mittal, at 699-700.

Notably, UCCS alleged that Ajay Mittal represented on or about March 29, 2000 that Defendants would work with the UCC Companies to resolve any future disputes. (Countercl. Compl. ¶ 12). They did not. Indeed, Defendants refused to contribute any money to the Sterlite settlement—in spite of Ajay Mittal believing it was a meritorious claim—leaving UCCS responsible for paying US$1,000,000 in October of 2000. Defendants thus breached the oral agreement less than seven months after it was made, well within the one year period for the statute of frauds.

        C.      <u>UCCS has pled its fraud claims with particularity.</u>

Defendants attempt to make much of the heightened pleading requirements of Fed. R. Civ. P. 9(b), alleging that UCCS has failed to meet this standard. (Defs. Br. at 27-28). Rule 9(b) does require that allegations of fraud "shall be stated with particularity," yet the rule merely "adds to the pleading standard of Rule 8 [and] does not drastically alter it." *In re Vivendi Universal, S.A. Securities Litigation*, 381 F. Supp. 2d 158, 165 (S.D.N.Y. 2003) (denying motion to dismiss for failure to plead fraud with particularity) (citation omitted). Although particularity has been well-defined as "the who, what, when, where, and how: the first paragraph of any newspaper story," *id*. (citations omitted), it does not require lengthy pleadings. In fact, as Form 13 to the Federal Rules of Civil Procedure makes clear, a sufficient allegation of fraud can be done in a single sentence.[19]

UCCS has more than met this standard. UCCS alleged four specific incidents of fraud: the March 29, 2000 telephone call, the May 4, 2000 email, the Zaveri Letter, and the Sanghvi

---

[19] "Defendant C.D. on or about [date given] conveyed all his property, real and personal [or specify and describe] to defendant E.F. for the purpose of defrauding plaintiff and hindering and delaying the collection of the indebtedness evidenced by the note above referred to."

Letter. Each contains the "who, what, when, where, and how" and thus is clearly sufficient to sustain causes of action.

### D. UCCS's tort claims were timely brought.

Defendants' argument that UCCS's tort claims are untimely is similarly without merit. UCCS's tort claims are based on Defendants' representations not to bring suit against UCCS regarding the 1999 Unfilled Orders. UCCS became a party to this suit on December 12, 2005, when this Court vacated its Order Dismissing UCCS from the lawsuit. Accordingly, the present counterclaims, filed on January 11, 2006, clearly fall within three years of Defendants' torts committed on December 12, 2005.

## V. Summary Judgment Is Not Proper.

In apparent recognition of the sufficiency of the pleadings, Defendants introduce a host of extraneous facts and ask this Court to convert their motion to one for summary judgment. Each of Defendants' three summary judgment arguments is unsupportable in light of their own evidence. In fact, Defendants' own evidence establishes that UCCS is entitled to summary judgment.

### A. UCCS has been damaged.

Defendants again argue that UCCS has not been injured. As discussed in Section I, *supra*, UCCS has clearly alleged damages including (1) the money paid to settle the Finolex and Sterlite disputes; (2) defending this action; and (3) the material breach of the contract itself. Moreover, documentary evidence confirms that UCCS directly paid MM Global to settle the

disputes.[20]

Defendants focus obsessively on the fact that UCCS was allegedly reimbursed for a portion of these payments or helped fund the defense of this litigation. Whether or not UCCS sought or obtained reimbursement from its own supplier is inapposite. Indeed, in a related context, courts frequently find that "payments from a collateral source to an injured plaintiff may not be considered in mitigation of damages." *See Savona v. General Motors Corp.*, 640 F. Supp. 6, 11 (D. Conn. 1985) (citations omitted). The same logic applies here. Regardless, the uncontroverted facts show that Defendants breached their agreement with UCCS which resulted in UCCS paying US$1,280,000 *and* defending this suit. Accordingly, UCCS has established that it was damaged by Defendants' breaches. At most, Defendants' argument on this point creates a fact issue for the jury to consider when deciding the amount of damages to award.

        B.   <u>Defendants did not adequately resolve the dispute with Sterlite.</u>

Defendants next argue that summary judgment is proper because "the Sterlite settlement was handled to the satisfaction of UCC." (Pls. Br. at 31). The present counterclaims strongly suggest that Defendants' assessment of the situation is wrong. Even if the UCC Companies were satisfied with the terms of the Sterlite settlement under the circumstances at that time, intervening events—including Defendants filing the present suit—make Defendants' arguments irrelevant.

Moreover, the only evidence Defendants can marshal to support their conclusion that the UCC Companies were satisfied with the Sterlite settlement is that "UCC itself decided to settle

---

[20] *See* note 9, *supra*.

the Sterlite matter—at its own initiative and upon advice of counsel." (Pls. Br. at 31). But this is simply not true. Ajay Mittal admitted under oath that he had met with the UCC Companies and told them he believed a settlement might be possible with Sterlite for roughly half of the $1.8 million in damages Sterlite was claiming.[21] Moreover, an internal UCC email confirms that Ajay Mittal was, in fact, negotiating with Sterlite to resolve the claim.[22] Contrary to Defendants' contentions, then, Ajay Mittal did advise the UCC Companies regarding settlement of the Sterlite dispute. Regardless, Defendants conclusory assertions that UCCS was satisfied with the Sterlite settlement are clearly an insufficient basis for summary judgment.

        C. <u>UCCS reasonably relied on Defendants' representations and promises.</u>

Defendants finally argue that the UCC Companies could not have reasonably relied on Defendants' misrepresentations that they would handle any other disputes or that Defendants would not bring suit. Defendants' uncontroverted "evidence" to support this position is merely that "[Mr.] Yimoyines himself admits that he neither asked for nor obtained such protections, despite counsel's advice that he do so." (Pls. Br. at 32). But the undisputed testimony of Mr. Yimoyines *quoted by Defendants* proves the contrary, namely that he did rely on Ajay Mittal: "I said I don't need [a settlement with Global Singapore]. I trust [Global Singapore], and to ask Ajay to sign such an agreement would be an insult." (Pls. Br. at 14). Mr. Yimoyines' testimony thus confirms that he did, in fact, rely on Mr. Mittal. This is further confirmed by the sworn testimony of Ajay Mittal that he intended Mr. Yimoyines and the UCC Companies to understand

---

[21] *See* December 16, 2005 Deposition of Ajay Mittal, at 727-28.

[22] *See* Exhibit O to the January 5, 2007 Declaration of Alicia Downey.

that if they resolved the Finolex and Sterlite disputes, Defendants would not bring suit over the 1999 Unfilled Orders.[23] In the end, the undisputed facts confirm that UCCS did reasonably rely on Defendants' promises.

## CONCLUSION

For the foregoing reasons, UCCS respectfully submits that the Court should deny Defendants' motion to dismiss.

Respectfully submitted,

\s\
Craig A. Raabe (ct 04116)
Jason M. Kuselias (ct20293)
Elizabeth R. Leong (ct24453)
Andrea Donovan Napp (ct26637)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  05103-3497
*Attorney for all Defendants*

Andrew S. Marovitz (ct 25409)
Dana S. Douglas (ct 25412)
MAYER, BROWN, ROWE & MAW LLP
71 S. Wacker Drive
Chicago, Illinois  60606

Christopher J. Kelly (ct 25410)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006-1157

*Counsel for Defendants The Dow Chemical Company and Dow Chemical Pacific (Singapore) Pte. Ltd.*

Nathan P. Eimer (ct 23693)
Scott C. Solberg (phv 0234)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604

*Counsel for Defendants Union Carbide Corporation, Union Carbide Asia Pacific, Inc., and Union Carbide Customer Service Pte. Ltd.*

---

[23] *See* Countercl. Compl., ¶ 15. *See also* Dec. 16, 2005 Deposition Testimony of Ajay Mittal, at 699-700.

**CERTIFICATE OF SERVICE**

This is to certify that a copy of RESPONSE was filed electronically and served by mail on anyone unable to accept electronic filing.. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

A copy of the RESPONSE was sent via Federal Express to the following:

Peter Chay Fook Yuen
Bob Yap Cheng Ghee
Yeap Lam Keung
c/o KPMG
16 Raffles Quay #22-00
Hong Leong Building
Singapore 048581

*Liquidators for Mega Visa Solutions (S) Pte. Ltd.*

Vinodh Coomaraswamy, SC
SHOOK LIN & BOK
1 Robinson Road
#18-00-AIA Tower
Singapore 048542

Pamela Chepiga
ALLEN & OVERY
1221 Avenue of the Americas
New York, NY 10020

*Counsel for Mega Visa Solutions (S) Pte. Ltd*.

\s\
Jason M. Kuselias

-18-